# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BRENT KIDECKEL,

               Plaintiff,

      v.

THE FOREIGN NATION OF CANADA, *et al.*,

               Defendants.

Case No.:  24-cv-02907-CJN

## **EXHIBIT 1 CASE INDEX**

1. *Benson v. McCarthy Tetrault LLP*, 2023 ONSC 7527 (Can. Ont. Sup. C.J.)

2. *Boutis v. The Corporation of Norfolk County et al.*, 2025 ONSC 542 (Can. Ont. C.A.)

3. *Caplan v. Atas*, 2021 ONSC 670 (Can. Ont. Sup. C.J.)

4. *Colistro v. Tbaytel*, 2019 ONCA 197 (Can. Ont. C.A.)

5. *Ferri v. Root*, 2006 CanLII 5304 (Can. Ont. C.A.)

6. *Filler Depot v. Copart Canada Inc.*, 2024 ONSC 466 (Can. Ont. Sup. J.)

7. *Globe POS Systems v. Visual Information Products Inc.*, 2022 ONSC 5932 (Can. Ont. Sup. C.J.)

8. *Hamilton v. Osborne*, 2009 ONCA 684 (Can. Ont. C.A.)

9. *Harris v. GlaxoSmithKline Inc.*, 2010 ONCA 872 (Can. Ont. C.A.)

10. *Hneihen v. Centre for Addiction and Mental Health*, 2014 ONSC 55 (Can. Ont. Sup. C.J)

11. *Hosseini v. Gharagozloo*, 2024 ONSC 1106 (Can. Ont. Sup. C.J.)

12. *Jones v. Tsige*, 2012 ONCA 32 (Can. Ont. C.A.)

13. *Merrifield v. Canada (AG)*, 2019 ONCA 205 (Can. Ont. C.A.)

14. *Nelles v. Ontario*, 1989 2 S.C.R. 170 (Can.)

15. *Ontario Consumers Home Services v. Enercare Inc.*, 2014 ONSC 4154 (Can. Ont. C.A.)

16. *Owsianik v. Equifax Canada Co.*, 2022 ONCA 813 (Can. Ont. C.A.)

17. *Paulus v. Fleury,* 2018 ONCA 1072 (Can. Ont. C.A.)

18. *WIC Premium Ltd. v. General Instrument Corp.*, 1999 ABQB 804 (Can. Alta. Q.B.)

**1**

**CITATION:** Bensen v. McCarthy Tétrault LLP, 2023 ONSC 7527
**COURT FILE NO.:** CV-22-00677523-0000
**DATE:** 20230630

2023 ONSC 7527 (CanLII)

## SUPERIOR COURT OF JUSTICE - ONTARIO

**RE:**  LYNDSAY BENSEN, LYNDSAY BENSEN, as Trustee of the WJ and Family Trust and LYNDSAY BENSEN FAMILY HOLDINGS INC.  Plaintiffs

    **AND:**

    MCCARTHY TÉTRAULT LLP and MICHAEL ROSENBERG  Defendants

**BEFORE:** Justice Chalmers

**COUNSEL:** *N. Tourgis* for the Plaintiffs/Responding Party

    *P. Le Vay* for the Defendants/Moving Party

**HEARD:**  April 3, 2023 by videoconference

## <u>ENDORSEMENT</u>

## <u>OVERVIEW</u>

[1] The Defendants, McCarthy Tétrault LLP (McCarthy) and Michael Rosenberg bring this motion under R. 21.01(1)(b), to strike the Plaintiffs' Statement of Claim on the basis that it discloses no reasonable cause of action. Alternatively, the Defendants move under R. 21.01(3)(b), to stay or dismiss the action on the basis that it constitutes an abuse of process.

[2] The Claim arises in the context of a dispute between Lyndsay Bensen (Lyndsay) and Robert Bensen (Robert). Robert is the president and sole director of the Charlton Centre for Specialized Treatment Inc. (Charlton Centre). The Charlton Centre together with Charlton Health Inc. (Charlton Health) operates as the Charlton Group. The WJ and Family Trust (WJ Trust) and Lyndsay Bensen Family Holdings Inc. (LBFHI), among others, are shareholders of Charlton Centre.

[3] The Plaintiffs bring this action for declaratory relief and damages in relation to the Defendants' representation of the Charlton Centre. The Defendants were retained with respect to an employment-related agreement involving Ajisa Kawalecki. The Plaintiffs did not directly retain the Defendants, and the Defendants did not take instructions from them. However, the Plaintiffs argue that the Defendants were fiduciaries to the Plaintiffs and that in representing the Charlton Centre with respect to the agreement with Ms. Kawalecki, the Defendants breached their fiduciary duty to the Plaintiffs. The Plaintiffs also argue that the Defendants "aided and abetted" Robert's breach of an undertaking between Robert and Lyndsay, and "aided and abetted" a breach of s. 132 of the *Ontario Business Corporations Act*. (*OBCA*).

[4]    The Defendants argue that the Claim does not disclose a reasonable cause of action. Alternatively, the Defendants argue that the Claim is an abuse of process because it has been brought for the collateral purpose of preventing or impeding the Defendants' ability to act as counsel for Charlton Centre and Robert in a separate oppression application that has been brought by the Plaintiffs.

[5]    For the reasons that follow, I find that the Claim does not disclose a reasonable cause of action as against the Defendants. The Claim is struck without leave to amend.

## THE ISSUES

[6]    The following issues will be addressed in this endorsement:

    a.  Is it plain and obvious that the Claim discloses no reasonable cause of action?

        i)  Is it plain and obvious that the Defendants cannot be liable to the Plaintiffs for breach of a fiduciary duty?

        ii)  Is it plain and obvious that the Defendants cannot be liable to the Plaintiffs for "aiding or abetting" Robert's purported breach of the Undertaking? and

        iii)  Is it plain and obvious that the Defendants cannot be liable to the Plaintiffs for "aiding and abetting" Robert's alleged contravention of s. 132 of the *OBCA*?

    b.  Does the Claim constitute an abuse of process?

## ANALYSIS AND DISCUSSION

### *Legal Principles – Rule 21 Motion*

[7]    Rule 21.01(1)(b) provides that a judge may strike a pleading for disclosing no reasonable cause of action. The only question to be considered is whether the Statement of Claim pleads a legally sufficient claim: *Dawson v. Rexcraft Storage and Warehouse Inc*., 1998 CanLII 4831 (ON CA), at para. 9.

[8]    The following principles apply to a Rule 21.01 motion to strike a pleading:

    (a)  the material facts pleaded must be deemed to be proven or true, except to the extent that the alleged facts are patently ridiculous or incapable of proof;

    (b)  the claim incorporates by reference any document pleaded and the court is entitled to read and rely on the terms of such documents as if they were fully quoted in the pleadings;

    (c)  novelty of the cause of action is of no concern at this stage of the proceeding;

    (d)  the Statement of Claim must be read generously to allow for drafting deficiencies; and,

2023 ONSC 7527 (CanLII)

2023 ONSC 7527 (CanLII)

(e)    if the claim has some chance of success, it must be permitted to proceed: *Trillium Power Wind Corporation v. Ontario (Natural Resources)*, 2013 ONCA 683, at para. 31.

[9]    To strike a claim, the court must be satisfied that there is no reasonable cause of action. It must be plain and obvious that the claim will not succeed: *Hunt v. Carey Canada Inc.,* [1990] 2 S.C.R. 959, at p. 980.

***Does the Claim Disclose a Reasonable Cause of Action – R. 21.01(1)(b)***

   **a.  Is it plain and obvious that the Defendants cannot be liable to the Plaintiffs for breach of a fiduciary duty?**

**Test for an Ad Hoc *Fiduciary Duty***

[10]    There is no allegation in the Claim that there was a solicitor-client relationship between the Plaintiffs and Defendants. However, the Plaintiffs plead that there was an *ad hoc* fiduciary duty. An *ad hoc* fiduciary duty can arise where there is:

   a.    An undertaking by the alleged fiduciary to act in the best interests of the alleged beneficiaries;

   b.    A defined class of beneficiaries vulnerable to the fiduciary's control, and

   c.    A legal or substantial practical interest of the beneficiaries that may be adversely affected by the alleged fiduciary's exercise of discretion or control: *Williams Lake Indian Band v. Canada (Aboriginal Affairs and Northern Development),* 2018 SCC 4, at para. 612.

[11]    The Plaintiffs argue that the issue of whether there is a fiduciary relationship involves a factual enquiry, and the determination cannot be made on a R. 21 motion. The question is whether, given all the surrounding circumstances, one party could reasonably have expected the other party would act in the former's best interest with respect to the subject matter at issue. As stated by the Supreme Court of Canada in *Hodgkinson v. Simms*, 1994 CanLII 70 (SCC), [1994] 3 S.C.R. 377 (SCC);

   […] the question to ask is whether, given all the surrounding circumstances, one party could reasonably have expected that the other party would act in the former's best interests with respect to the subject matter at issue. Discretion, influence, vulnerability and trust are non-exhaustive examples of evidentiary factors to be considered in making this determination.

   Thus, outside the established categories, what is required is evidence of a mutual understanding that one party has relinquished its own self-interest and agreed to act solely on behalf of the other party. […]: at page 227.

*Allegations in the Statement of Claim*

[12]    On a R. 21.01(1)(b) motion, no evidence is admissible. The facts as alleged in the Claim are assumed to be true, unless the facts are patently ridiculous or incapable of proof. The Plaintiffs argue that the Claim contains allegations of fact that supports the claim for breach of fiduciary duty.

[13]    The Claim was issued on February 25, 2022. The following facts are pleaded:

    (a)    Robert and Lyndsay are husband and wife and are involved in Family Law Proceedings. The Defendants knew of the Family Law Proceedings;

    (b)    Lyndsay is an owner, both directly and indirectly in Charlton Health and Charlton Centre. She gave notice to Robert of specific claims related to the Charlton Group. The Defendants knew that Lyndsay was asserting claims against Robert and the Charlton Group; and that Robert had acknowledged that Lyndsay held an interest, directly or indirectly, in the Charlton Group;

    (c)    The Defendants had provided legal services to the Charlton Group since at least 2015. As a result of which, Mr. Rosenberg became acquainted with Robert and Lyndsay. Lyndsay knew Mr. Rosenberg was acting for the Charlton Group;

    (d)    Lyndsay reposed trust in Mr. Rosenberg. In 2018 she provided Mr. Rosenberg with "sensitive and emotionally upsetting information" that Ms. Kawalecki had trespassed at Robert and Lyndsay's cottage. Lyndsay sent an e-mail to Mr. Rosenberg believing he would take steps to assist her. He never responded to the e-mail;

    (e)    In late 2020, early 2021, Lyndsay learned of an intimate relationship between Robert and Ms. Kawalecki and that Robert had diverted money from the Charlton Group to purchase a property in which Ms. Kawalecki could live. Lyndsay separated from Robert. On January 20, 2021, Robert and Lyndsay entered into an Undertaking that provided, among other things, that they would not sell or dispose of any assets without notice to the other. The Undertaking expired on April 19, 2021. The Defendants had full knowledge of the Undertaking and its terms;

    (f)    On February 1, 2021, Lyndsay commenced Family Law Proceedings against Robert, in which she sought, among other things, an accounting of personal and business property diverted to Ms. Kawalecki;

    (g)    The Defendants were retained by Robert to act on behalf of Charlton Centre and Charlton Health with respect to an employment law matter involving Ms. Kawalecki. On February 3, 2021, Robert's family lawyer, Heather Hansen wrote to Lyndsay's family lawyer, Julie Hannaford advising that Robert was working with the Defendants to resolve the employment law issues with Ms. Kawalecki;

2023 ONSC 7527 (CanLII)

2023 ONSC 7527 (CanLII)

(h)  On February 3, 2021, Mr. Rosenberg sent an e-mail to Ms. Hannaford advising that he was acting for the Charlton Group in negotiating the termination of Ms. Kawalecki's employment. In the letter, Mr. Rosenberg stated that he "was wondering whether Lyndsay would like to see what was being negotiated and provide her views, without prejudice to the family law matter". In a telephone call later that day, Ms. Hannaford took the position that any resolution of the Ms. Kawalecki claim would fall under the Undertaking and that Lyndsay's consent was required. It is pleaded that Mr. Rosenberg stated that he did not want to do anything but obtain the best outcome for the Charlton Group. Ms. Hannaford did not participate in the negotiations with Ms. Kawalecki;

(i)  The Plaintiffs plead that based on Lyndsay's previous relationship with Mr. Rosenberg, her existing relationship with him and his assurances that his goal was to act in the best interests of the Charlton Group, that she understood that Mr. Rosenberg would work towards hers and the Charlton Group's best interests. The Plaintiffs plead that Lyndsay continued to repose the trust and confidence in Rosenberg to act in the negotiations in a manner that would not be prejudicial to her, LBFHI and the WJ Trust;

(j)  Lyndsay retained counsel, Robert Centa to advise her with respect to protecting her interests in the Charlton Group. On February 9, 2021, Mr. Centa wrote to Mr. Rosenberg to advise that it was unreasonable for Lyndsay to be put in a position to negotiate with Ms. Kawalecki given the relationship between Robert and Ms. Kawalecki. By letter dated February 11, 2021, Mr. Centa wrote that it was the Plaintiffs' expectation that the Defendants would act in the best interests of the Charlton Group and Charlton Centre;

(k)  On April 30, 2021, Robert, on behalf of the Charlton Group entered into a Settlement Agreement with Ms. Kawalecki terminating her employment and entering into an Independent Contractor Agreement to maintain her existing physician relationships and a Retainer Agreement to cover new business. It is alleged that the Defendants acted on behalf of Robert, Charlton Health and Charlton Centre with respect to the agreements. Lyndsay was not consulted or advised of the terms of the agreements before they were executed. She did not provide her consent to the agreements. Mr. Rosenberg provided a copy of the agreements to Mr. Centa on December 2, 2021;

(l)  The Plaintiffs allege that the agreements with Ms. Kawalecki favoured Robert's interests to the detriment of the interests of Lyndsay, LBFHI, WJ Trust and the Charlton Group. It is alleged that this was known to, or ought to have been known to the Defendants. It is also alleged that the Defendants knew Lyndsay's consent was required for the agreements. It is alleged that the agreements were in breach of the Undertaking both actually and in spirit and intent;

(m)  It is alleged that the Defendants aided and abetted Robert's breach of the Undertaking;

(n)  It is alleged that the Defendants breached their fiduciary duty to the Plaintiffs;

(o)  It is alleged that the Defendants were in a conflict of interest and their duties to the Plaintiffs conflicted with those of Robert; and

(p)  The agreements were not disclosed to the shareholders of the Charlton Centre and therefore there was a breach of s. 132 of the *OBCA*. It is alleged that the Defendants aided and abetted in the breach of s. 132 of the *OBCA*.

[14]    The Plaintiffs argue that the allegations set out in the Claim satisfy the pleading of fiduciary duty. It is alleged that Mr. Rosenberg knew Lyndsay reposed trust and confidence in him and McCarthys. It is also alleged that the Defendants knew the Plaintiffs were relying upon them to act in the Plaintiffs' best interests in the Charlton Group. The Plaintiffs allege that based on Lyndsay's previous experience with Mr. Rosenberg, her existing relationship with him and his assurances that his goal was to act in the best interests of the Charlton Group and to protect an asset both Lyndsay and Robert had a significant interest in, that Mr. Rosenberg would work towards hers and the Charlton Group's best interests.

[15]    The Defendants argue that there are no allegations in the Claim that could support a finding of a fiduciary duty between the Plaintiffs and Defendants. They state that the three requirements for a finding of an *ad hoc* fiduciary duty are not pleaded in the Statement of Claim. It is not alleged that the Defendants undertook to act in the best interests of the Plaintiffs, that the Plaintiffs were vulnerable to the Defendants' control, or that an interest of the Plaintiffs would be affected by the Defendants' exercise of discretion or control.

[16]    The Defendants state that other than the bald assertions of a fiduciary duty, the only particular provided is in paragraph 30 of the Claim in which it is alleged that Lyndsay sent an email to Mr. Rosenberg about a cottage trespass incident in 2018. In that paragraph it is pleaded that Mr. Rosenberg did not respond to the e-mail or provide any assistance to her. The Defendants argue that this single interaction is insufficient to establish a fiduciary relationship.

[17]    The Defendants also argue that there are no allegations consistent with dependence and vulnerability on the part of the Plaintiffs. Lyndsay knew that the Defendants had acted for the Charlton Centre since at least 2015 and were acting for the Charlton Centre with respect to the Kawalecki matter. It is alleged in the Claim that Lyndsay retained a family lawyer, Ms. Hannaford and a separate lawyer, Mr. Centa to act on her behalf.

### *Do The Allegations Support a Claim in Breach of Fiduciary Duty?*

[18]    To strike a claim under R. 21.01, I must be satisfied that there is no reasonable cause of action pleaded and that it is plain and obvious that the claim will not succeed. I am to apply a generous reading of the Claim. The threshold is a high one.

[19]    Here there are no allegations that the Defendants were retained by the Plaintiffs. Although there is no allegation of a solicitor and client relationship, the issue is whether the allegations give rise to an *ad hoc* fiduciary duty whereby the Plaintiffs could reasonably have expected the Defendants would act in their best interests with respect to the Kawalecki agreement: *Hodgkinson v. Simms*.

2023 ONSC 7527 (CanLII)

[20]    The Plaintiffs argue that based on Lyndsay's previous experience with Mr. Rosenberg, there was an expectation that the Defendants would act in the Plaintiffs' best interests. The only specific interaction between Lyndsay and Mr. Rosenberg alleged in the Claim is the e-mail she sent to him in 2018 in which she advised Mr. Rosenberg about the trespass of Ms. Kawalecki at their cottage. Mr. Rosenberg did not respond to the e-mail or provide any advice to Lyndsay with respect to the issue. The Defendants argue that the single e-mail in 2018 is "too thin" to ground an expectation on the part of the Plaintiffs that the Defendants would protect their interest. I agree.

[21]    It is also alleged that the Defendants had acted for the Charlton Group since at least 2015. There was a solicitor and client relationship between the Defendants and the Charlton Centre and the Charlton Group. The Defendants' duty is to act in the best interests of their clients; the corporations. It is pleaded in the Claim that Mr. Rosenberg recognized this interest and that he stated that he did not want to do anything but obtain the best outcome for the Charlton Group. Although the Claim alleges a fiduciary relationship between the Defendants and the Charlton Centre and the Charlton Group, there are no facts alleged to support the existence of a fiduciary relationship between the Defendants and the Plaintiffs. There is no allegation that Mr. Rosenberg undertook to act in the best interests of the Plaintiffs.

[22]    The Defendants also argue that the Claim does not include allegations that there was the requisite dependence or vulnerability necessary for the fiduciary relationship. It is alleged that Lyndsay had retained two sets of lawyers to represent her interests. Ms. Hannaford was retained with respect to the Family Law matter, and Mr. Centa with respect to her interests in the corporations. Mr. Centa in his letter dated February 11, 2021, stated that it was the Plaintiffs' expectation that the Defendants would act in the best interests of the Charlton Group and Charlton Centre. That statement is consistent with the Defendants' solicitor and client relationship with the corporations. The fact that Lyndsay retained her own lawyer to represent her interests is inconsistent with her relying on the Defendants. There are no facts alleged that could support a finding that she relied on the Defendants.

[23]    I conclude that on a generous reading of the Claim, the allegations do not support a valid claim for breach of fiduciary duty.

### b.    Is it plain and obvious that the Defendants cannot be liable to the Plaintiffs for "aiding or abetting" Robert's purported breach of the Undertaking?

[24]    The Plaintiffs allege that the Defendants "aided and abetted" Robert in his purported breach of the Undertaking. The Undertaking provides that the parties are not to enter into any agreements during the period of the Undertaking. The Undertaking expired on April 19, 2021. It was not extended by the parties. The Agreements with Kawalecki were not entered into until April 30, 2021. By this date the Undertaking had expired.

[25]    The Plaintiffs argue that the Undertaking also provided at (d) that a party is not to take any steps in the operation of the business outside the normal course. The Plaintiffs argue that the fact the Undertaking expired does not necessarily preclude an action for breach of the Undertaking. The Plaintiffs argue that the Undertaking was breached in "spirit". Again, the Plaintiffs argue that the determination of this issue is a factual enquiry into the merits which is not permitted on a R. 21.01 motion.

2023 ONSC 7527 (CanLII)

[26]    The Defendants argue that "aiding and abetting" is a criminal concept and is not a recognized claim at law: *WIC Premium Ltd. v. General Instrument Corp.*, 1999 ABQB 804. The Plaintiffs did not refer me to caselaw to support their position that "aiding and abetting"' is a valid cause of action.

[27]    The Defendants also argue that as a matter of public policy a claim cannot be made against a lawyer by a third-party adversary of their client for giving advice on a contract or for taking instructions. There are no allegations in the Claim that the Defendants were in a solicitor and client relationship with the Plaintiffs. Also, for the reasons set out above, I find that the Claim does not allege facts that there was a fiduciary relationship between the Defendants and the Plaintiffs.

[28]    In the absence of a solicitor and client relationship, or a fiduciary relationship, the Defendants owe no duty of care to the Plaintiffs. Also, as a matter of public policy, a claim cannot be made against a lawyer by an adversary of their client for giving advice on a contract or taking instructions. Arguably in every case of breach of contract where the party alleged to have breached the contract is represented by counsel, a claim for "aiding and abetting" the breach could be brought. This is clearly not the law.

[29]    As noted by Perell J. in *Crown Crest Financial Corp. v. Sabbah*, 2019 ONSC 7114, at paras. 26 and 27:

> An action in negligence against a litigant's adversary's legal counsel for negligence or for breaches of ethical duties, will be struck out on the grounds that a lawyer has no duty of care to his client's adversary in litigation. However, the action will also be struck out on public policy grounds.

> The public policy prohibiting such claims is that they would interfere with the loyalty relationship between a litigant and his or her legal representative and would encourage re-litigation of the dispute between the litigants and collateral attacks on the judgments reached in the dispute between the litigants.

> [….]

> In *Stanfield v. Schneider*, [15] another case involving striking a claim against lawyers and also a claim against them for inducing breach of contract, Master Robertson of the Alberta Court of Queen's Bench stated at paragraph 53:

>> *53. The allegation of inducing breach of contract is made on the premise that the Low defendants advised Ms. Schneider to breach the contract. This inevitably would require reviewing privileged communications. It is untenable that an opposing party could force the waiver of privilege simply by asserting the tort of inducement of breach of contract. That runs completely counter to the jealously guarded right of a client and lawyer to communicate in private, and for the lawyer to provide advice to the client, all with confidence that the communications will remain private.*

> I agree with Master Robertson's comments. I also agree with Master Robertson's comments at paragraph 56 of the decision:

2023 ONSC 7527 (CanLII)

2023 ONSC 7527 (CanLII)

> *56. Lawyers regularly advise their clients about breaching contracts. This is what happens regularly when an employer seeks advice about the termination of an employee's employment. The advice is, in essence, "Terminating the employment without notice and without cause is a breach of contract and in my opinion the damages for the breach will be $X." If the client chooses to breach the contract and suffer the consequences, the lawyer is not liable to the dismissed employee for providing candid legal advice. The lawyer may draft the letter terminating the employment. However, the claim for damages is against the employer. That does not change simply because the former employee is offended by the termination.*

In the immediate case, it is plain and obvious that on public policy grounds and because it would be an abuse of process, the cause of action for inducing breach of contract should be struck without leave to amend: at paras. 26, 27 and 38 to 40.

[30]    I am of the view that the claim that the Defendants "aided and abetted" the breach of the Undertaking is contrary to public policy. It would interfere with the lawyer-client relationship and could result in an inquiry into the legal advice Robert and Charlton Centre received from the Defendants. The Defendants argue that McCarthys owed an absolute duty of loyalty to their clients and none to the Plaintiffs. I agree.

[31]    I conclude that on a generous reading of the Claim, the allegations do not support a valid claim for "aiding and abetting" breach of the Undertaking. I find that this claim has no reasonable prospect of success.

### c. Is it plain and obvious that the Defendants cannot be liable to the Plaintiffs for "aiding and abetting" Robert's alleged contravention of s. 132 of the OBCA?

[32]    It is alleged that the Defendants knew that the Kawalecki agreements were not presented to the shareholders for approval. This is required by s. 132 of the *OBCA* and therefore it is alleged that Robert was in breach of that provision. The Plaintiffs argue that the Defendants "aided and abetted" Robert in the breach of s. 132 of the *OBCA*.

[33]    For the reasons set out above, I find that a claim that the Defendants "aided and abetted" a breach of the Undertaking is contrary to public policy. The reasoning with respect to aiding and abetting a breach of the undertaking also applies to the allegations of aiding and abetting a breach of s. 132 of the *OBCA*.

[34]    The Defendants also argue that s. 132(9) of the *OBCA* provides that where a director fails to make full disclosure or otherwise contravenes s. 132, a shareholder may seek an order setting aside the transaction and require the director to account to the corporation for any profit or gain realized. Therefore, the Plaintiffs' remedy is against the director, Robert. The remedy is being pursued by the Plaintiffs in the Oppression Application.

[35]    In addition, the Defendants argue that the Defendants' client was Charlton Centre and therefore any harm caused by the Defendants' breach was suffered by the corporation, and not a shareholder. Pursuant to the rule in *Foss v. Harbottle*, a shareholder such as Lyndsay does not have a right to bring an action for a wrong done to the corporation. A shareholder cannot be held accountable for the liabilities of the corporation and conversely a shareholder cannot sue for the

losses suffered by the corporation. Only the corporation has a cause of action flowing from the wrongs committed against it: *Tran v. Bloorston Farms Ltd.*, 2020 ONCA 440, at para. 1.

[36]    I am satisfied that the claim for "aiding and abetting" breach of s. 132 of the *OBCA* has no reasonable prospect of success.

### Does the Claim Constitute an Abuse of Process?

[37]    I find that the Claim is struck in its entirety for failing to disclose any reasonable cause of action. Having struck the Claim pursuant to R. 21.01(1)(b), it is not necessary for me to address the Defendants' alternative argument that the Claim is to be stayed or dismissed because it constitutes an abuse of process.

### Leave to Amend

[38]    In striking the Claim under R. 21.01, I must also consider whether to grant leave to amend.

[39]    For the reasons set out above, I conclude that the Claim does not allege a reasonable cause of action. With respect to the claim for breach of fiduciary duty, I find that there are no allegations of fact to support a fiduciary relationship between the Plaintiffs and Defendants. When the Claim was issued, the Plaintiffs were required to plead the material facts to support the causes of action. The Plaintiffs are required to plead details and specifics in the Claim and cannot hope that material facts will emerge later in the discovery process. The material facts with respect to the nature of the relationship with the Defendants were known to the Plaintiffs at the time the Claim was drafted. Nothing new has occurred or has been discovered since that date.

[40]    With respect to the claims for "aiding and abetting" breach of the Undertaking and breach of s. 132 of the *OBCA*, I find that the Defendants had no duty to the Plaintiffs and that the claims are contrary to public policy. I am of the view that no amendment is available that could result in a valid cause of action being pleaded.

[41]    The Plaintiffs did not provide to the court a draft amended claim that the Plaintiffs would seek to file if leave was granted. It is my view that if the defects in the Claim could have been remedied, it was incumbent upon the Plaintiffs to provide a draft to the court for review on this motion.

[42]    Leave to amend will not be granted if a claim discloses no reasonable cause of action or lacks a legal foundation. As noted in *Turner v. York University*, 2011 ONSC 6151, at para. 56:

> Where as in this case it is plain and obvious that the pleading is fatally flawed, the amendment should be refused. It makes no sense to allow an amendment that does not disclose a cause of action and lacks a legal foundation. Further, the defendant should not be faced with having to bring a motion to strike such a pleading.

[43]    I am satisfied that the material facts related to the relationship between the Plaintiffs and Defendants were known to the Plaintiffs at the time the Claim was issued. If there were material facts which could have supported the Plaintiffs' position that there was a fiduciary relationship with the Defendants, it was incumbent upon them to plead those facts in the Claim. With respect

2023 ONSC 7527 (CanLII)

to the claims for "aiding and abetting" the breach of the Undertaking and breach of s. 132 of the *OBCA*, I am of the view that this claim is contrary to public policy and no amendment will change that fact. I do not grant leave to amend the Claim.

## **DISPOSITION**

[44]    For the reasons set out above, I find that the claims pleaded against the Defendants have no reasonable prospect of success. I grant the Defendants' motion and strike the Plaintiffs' Claim, without leave to amend.

[45]    The Defendants are successful on this motion and are entitled to their costs. The Defendants uploaded a cost outline in which they seek their costs in the amount of $57,405.97 inclusive of counsel fee, disbursements and H.S.T. The Plaintiffs also filed a cost outline in which they state that if successful on the motion, they would have sought costs in the amount of $8,577.55, inclusive of counsel fee, disbursements, and H.S.T.

[46]    I have considered the factors set out in R. 57.01. I am of the view that the motion was not particularly complex. There is no allegation made that the conduct of either party tended to shorten or lengthen unnecessarily the duration of the proceedings. I have not been advised of any offers to settle that may be relevant.

[47]    I have also taken into account the overall objective that costs should be fixed in an amount that is fair and within the reasonable expectations of the unsuccessful party to pay in the particular proceedings: *Boucher v. Public Accountants Council (Ontario)* (2004) 71 O.R. (3d) 291 (C.A.). Costs must also be proportional.

[48]    I fix the Defendants' costs in the amount of $15,000, inclusive of counsel fee, disbursements and H.S.T. I am satisfied that a cost award in this amount is fair and within the reasonable expectation of the Plaintiffs to pay if unsuccessful on the motion.

DATE: June 30, 2023

CHALMERS, J.

**2**

CITATION: BOUTIS v. THE CORPORATION OF NORFOLK COUNTY et al,
2025 ONSC 542
**COURT FILE NO.: CV-22-23**
**DATE:** 2025-01-27

2025 ONSC 542 (CanLII)

## ONTARIO

## SUPERIOR COURT OF JUSTICE

**B E T W E E N:**

| | |
|---|---|
| Paula Boutis | ) Saba Amad, Counsel for the Plaintiff |
| Plaintiff/Moving Party | ) |
| **- and -** | ) |
| The Corporation of the County of Norfolk, The Board of Health for Haldimand-Norfolk Health Unit, Kristal Chopp and Jason Burgess | ) Casey Dockendorff, Laura Freitag, Counsel for the Defendants The Corporation of the County of Norfolk, The Board of Health for Haldimand-Norfolk Health Unit |
| | ) Clarence L. Bennett, K.C., Counsel for the Defendants Kristal Chopp and Jason Burgess |
| Defendants/Responding Parties | ) |
| | ) **HEARD:** December 19 and 20, 2024 |

**Endorsement on Motion to Amend Plaintiff's Statement of Claim**

**The Honourable Justice M. Valente**

- 2 -

2025 ONSC 542 (CanLII)

## Overview

[1]     The Plaintiff brings this motion pursuant to Rule 26.01 of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194 (the '*Rules*') to seek leave to amend her statement of claim. The proposed amendments are significant. They include five alleged new causes of action: (i) breaches of the *Human Rights Code*, R.S.O. 1990, C.H. 19, as amended (the '*Code*'); (ii) intrusion upon seclusion; (iii) intentional interference with contractual relations; (iv) negligent infliction of mental suffering; and (v) defamation. In addition, the amendments both delete allegations from the most current version of the issued pleading and advance new allegations.

[2]     Briefly, the Plaintiff's submission is that leave ought to be granted to amend the statement of claim because each of the new proposed legal theories of liability is based on the same facts that support the currently advanced causes of action, and therefore, are not barred by the *Limitations Act*, 2002, S.O. 2002, c.24, schedule B (the '*Limitations Act'*). Otherwise, the Plaintiff's position is the proposed amendments allege material facts, provide particulars, and comply with the *Rules*.

[3]     On the other hand, the Defendants jointly submit that the new causes of action are barred by limitation periods and the new allegations violate the rules of pleading. These violations include the pleading of immaterial facts, similar fact evidence, opinion evidence and previously abandoned or withdrawn allegations.

- 3 -

For these reasons the Defendants oppose the Plaintiff's motion for leave to amend her statement of claim.

**Factual Background and Procedural History**

[4]      The Plaintiff was formally employed as the county solicitor for the Defendant, the Corporation of the County of Norfolk (the 'County'). The Plaintiff commenced her employment on September 3, 2019 and was terminated on a without cause basis on November 17, 2021. The County is a single-tier municipal corporation located in southern Ontario with a population of approximately 63,000 residents.

[5]      The Defendant, the Board of Health for Haldimand-Norfolk Health Unit (the 'BOH') acts as the board of health for both Haldimand and Norfolk Counties.

[6]      The Defendant, Kristal Chopp ('Chopp'), is the former mayor of the County. The Defendant, Jason Burgess ('Burgess') is the former chief administrative officer of the County.

[7]      On February 4, 2022, the Plaintiff's former counsel filed a statement of claim for, among other relief, damages for wrongful dismissal. The Plaintiff retained her current counsel in mid November 2023.

[8]      On May 17, 2022, the Defendants filed their joint statement of defence. The Defendants were collectively represented by the same legal counsel until mid February 2023 at which time Chopp and Burgess retained separate counsel.

2025 ONSC 542 (CanLII)

- 4 -

[9]    The statement of claim has undergone five revisions since its issuance in February, 2022. These revisions are described below:

> (i)    On April 14, 2022, the first amendment to the pleading was made prior to the Defendants delivering their statement of defence.

> (ii)    On September 5, 2023, the Plaintiff sought and obtained the Defendants' consent to a second amendment to her statement of claim.

> (iii)    On October 6, 2023, the Plaintiff sought and once again obtained the Defendants' consent to amend her claim. The <u>Amended Fresh as Amended</u> Statement of Claim was issued on November 16, 2023 and is sometimes referred to by the parties and in this Endorsement as the 'Fallback Claim'.

> (iv)    On December 7, 2023, the Plaintiff's current counsel served a fourth amended version of the statement of claim to which the Defendants refused their consent. It is this Fresh as Amended Statement of Claim, dated and served on December 7, 2023, that is the subject of the Plaintiff's motion for leave (the 'Proposed Amended Claim').

2025 ONSC 542 (CanLII)

- 5 -

2025 ONSC 542 (CanLII)

(v)    On February 16, 2024, the Plaintiff circulated a fifth amended version of the proposed pleading to which the Defendants again objected.

[10]    The Plaintiff's fifth proposed amended pleading, circulated to defence counsel on February 16, 2024, is not in the court record. It is neither in the original motion record, dated March 19, 2024, nor in the amended motion record, dated December 9, 2024. The only proposed amended version of the statement of claim before the court is that which is dated December 7, 2023 and attached to the Plaintiff's notice of motion, dated December 19, 2023 otherwise referred to in this Endorsement as the 'Proposed Amended Claim'. For this reason, my ruling addresses the proposed amendments in this draft pleading.

**Guiding Principles**

[11]    Rule 26.01 provides that on motion at any stage of the proceeding the court shall grant leave to amend a pleading on such terms as are just save and except where prejudice would result that could not be compensated for by costs or an adjournment.

[12]    "Although the general rule is that amendments are presumptively approved", as the Court of Appeal makes clear in *Marks v. Ottawa (City)*, 2011 ONCA 248, "there is no absolute right to amend pleadings. The court has a residual right to

- 6 -

deny amendments where appropriate: *Daniele v. Johnson*, 1999 CanLII 1992/ (ON

SCDC) ..." (at para 19).

[13]   The principles applicable to granting leave to amend pleadings are

summarized by the Court of Appeal in its 2017 decision of *1588444 Ontario Ltd. v.*

*State Farm Fire and Casualty*, 2017 ONCA 42, ('*1588444 Ontario*') where

Hourigan J.A., states the following:

- The rule requires the court to grant leave to amend unless the responding party would suffer non-compensable prejudice; the amended pleadings are scandalous, frivolous, vexatious or an abuse of the court's process; or the pleading discloses no reasonable cause of action.

- The amendment may be permitted at any stage of the action.

- There must be a causal connection between the non-compensable prejudice and the amendment. In other words, the prejudice must flow from the amendments and not from some other source.

- The non-compensable prejudice may be actual prejudice, i.e., evidence that the responding party has lost an opportunity in the litigation that cannot be compensated as a consequence of the amendment. Where such prejudice is alleged, specific details must be provided.

- Non-compensable prejudice does not include prejudice resulting from the potential success of the plea or the fact that the amended plea may increase the length or complexity of the trial.

- 7 -

- At some point the delay in seeking an amendment will be so lengthy and the justification so inadequate, that prejudice to the responding party will be presumed.

- The onus to prove actual prejudice lies with the responding party.

- The onus to rebut presumed prejudice lies with the moving party. (at para 25, citations omitted)

[14]   The expiry of a limitation period is one form of non-compensable presumed prejudice. "A party cannot circumvent the operation of a limitation period by amending their pleadings to add additional claims after the expiry of the relevant limitation period" (see: *Klassen v. Beausoleil*, 2019 ONCA 407, ('*Klassen*'), at para 26). "An amendment will be statue-barred if it seeks to assert a "new cause of action" after the expiry of the applicable limitation period…"  (see: *Klassen*, at para 27). However, unless the limitation issue to prevent an amendment is clear, "the Court of Appeal has expressed a reluctance to make findings about limitation periods in the absence of a full record" (see: *Vale Canada Limited v. Solway Investment Group Limited et al*, 2021 ONSC 7562, ('*Vale Canada*'), at para 89, referring to *Clark v. Ontario (Attorney General)*, 2019 ONCA 311, at paras 47-50).

[15]   "[T]he case law discloses a "factually oriented" approach to the concept of a "cause of action" – namely, "a factual situation the existence of which entitles one

2025 ONSC 542 (CanLII)

- 8 -

person to obtain from the court a remedy against another person.." (see: *Klassen*, at para 27)

[16]   "An amendment does not assert a new cause of action – and therefore is not impermissibly statue-barred if the "original pleading … contains all the facts necessary to support the amendments .. [such that] the amendments simply claim additional forms of relief, or clarify the relief sought, based on the same facts as originally pleaded" (see: *Klassen*, at para 28).

[17]   For example, "if the original claim pleaded a series of facts and alleged that those facts constituted a tort, an amendment to plead breach of contract arising out of those same facts would not trigger a limitation period. By contrast, what may trigger a limitation period are fundamentally different facts and a fundamentally different claim" (see: *Vale Canada*, at para 117, relying upon *Klassen*, at paras 27-30).

[18]   Finally, as the Court of Appeal makes clear in *Klassen* that on a Rule 26.01 motion, "it is necessary to read the original Statement of Claim generously and with some allowance for drafting deficiencies…" (at para 30).

[19]   The proposed amendments must otherwise comply with the rules of pleading. For example, the proposed amendments must not be "scandalous, frivolous or vexatious" (Rule 25.11(b); but must contain a "concise statement of the material facts" relied on "but not the evidence by which those facts are to be

2025 ONSC 542 (CanLII)

- 9 -

2025 ONSC 542 (CanLII)

proved" (Rule 25.06(1); and the proposed amendments are not to be "an abuse of the process of the court" (Rule 25.11(c)).

[20]    In *George v. Harris*, [2000] OJ No 1762. ('*George*'), Epstein J. describes a proposed amended pleading that is scandalous, frivolous, or vexatious in this way:

> It is clear that a document that demonstrates a complete absence of material facts will be declared to be frivolous and vexatious. Similarly, portions of a pleading that are irrelevant, argumentative, or inserted for color, or that constitute bare allegations should be struck out as scandalous. The same applies to a document that contains only argument and includes unfounded and inflammatory attacks on the integrity of the party, and speculative, unsupported allegations of defamation. In such a case the offending statements will be struck out as being scandalous and vexatious. In addition, documents that are replete with conclusions, expressions of opinion, provide no indication whether information is based on personal knowledge or information and belief, and contained many irrelevant matters, will be rejected in their entirety (at para 20).

[21]    In *Cerqueira v. Ontario*, 2010 ONSC 3954, at para 11, Strathy J., as he then was, states:

> … (b) the causes of action must be clearly identifiable from the facts pleaded and must be supported by facts that are material: *CIT Financial Ltd. v. Sharpless*, 2006 CarswellOnt 3325;
>
> (c) every pleading must contain a concise statement of the material facts on which the party relies but not the evidence by which those facts are to be proved: rule 25.06; this includes pleading the material facts necessary to support the causes of action alleged.

- 10 -

[22]     Simply put, pleadings should be brief, clear, focused and plead the material facts – not evidence – to support the claim (see: *Del Giudice v. Thompson*, 2021 ONSC 5379, at para 52.) Material facts are those essential facts required to establish the constituent elements of the claim or defence. This permits the opposing party "to clearly and, in a focused way, respond to the allegations" (see: *Gayle v. Cambridge Mercantile Corp.*, 2023 ONSC 3554, at paras 68-69).

[23]     It is noted, however that Rule 25.06(8) requires that allegations of fraud, misrepresentation, breach of trust, malice or intent are to be plead with particularity. The same principle applies to allegations of negligence and conspiracy (see: *Lana International Ltd. v. Menasco Aerospace Ltd*, [1996] OJ No. 1448). I am also guided by the observation of Master MacLeod, as he then was, in *Toronto (City) v. MFP Financial Services Ltd.* (2005), 17 C.P.C. (6th) 338 (Ont. Master) (*'MFP Financial'*) that the distinction between material facts, particulars, and evidence is not a "bright line" and "there will be situations where the minimum level of fact disclosure may require a pleading of material facts that might also be regarded as evidence" (at para 31).

[24]     The concept of failing to disclose a reasonable cause of action as referenced by Hourigan J.A. in *1588444 Ontario* has been interpreted to mean that amendments are to be granted unless the claim is clearly impossible of success. The court is to assume that the facts pleaded in the proposed amendments are

2025 ONSC 542 (CanLII)

- 11 -

true (unless patently ridiculous or incapable of proof) in order to determine whether they disclose a cause of action. For this purpose, and as I have previously stated, amendments are to be read generously with allowances for drafting deficiencies (see: *Plante v. Industrial Alliance Life Insurance Co.*, 2003 CanLII 64295 (ON SC) ('*Plante*') at para 21(b). Once an amendment passes this threshold, the court cannot go beyond the text of the pleading to assess its strength or weakness (see: *Vale Canada*, at para 83).

[25]    Finally, I am reminded that Rule 51.05 addresses the withdrawal of an admission in a pleading. This Rule provides that such an admission may be withdrawn on consent or with leave of the court. Without the consent of the opposing party or the court's leave, a party is prohibited from pleading new or different facts or from withdrawing statements of fact if "the statements qualify as admissions that were deliberately made as a concession to the opposing party" (see: *Stronach v. Stronach*, 2021 ONSC 3801, at para 84).

## The Agreed Amendments

[26]    The Defendants consent to the following paragraphs in the Proposed Amended Claim for which the leave to amend is granted:

> Paragraphs 1(a), 1(b), 1(d), 1(g) – 1(j), 2(b) – 2(d), 3(b) – 3(d), 4-27, 30, 32034, 51, 56, 59-64, 94-108, 111-113, 119-120, 126, 133, 136(a) – 136(d), 136(f), 140, 144, 162, and 163.

2025 ONSC 542 (CanLII)

- 12 -

[27]    I now address the amendments opposed by the Defendants.

**I.  The New Causes of Action**

(a) **Human Rights Code Violations**

[28]    The Proposed Amended Claim alleges that the Plaintiff suffered damages as a result of the Defendants' breach of their obligations pursuant to s. 46.1 of the *Code*, and more specifically, the Defendants' failed to provide the Plaintiff with a workplace environment free from discrimination and harassment because of her disability otherwise defined by the *Code* to include a condition of mental impairment (see ss. 5(1), 5(2) and 10(1) of the *Code*).

[29]    The Defendants submit that the Plaintiff's cause of action for alleged *Code* violations are proscribed by the one-year limitation period stipulated in s. 34(1) of the *Code*, and in the alternative, they argue that the Plaintiff's Fallback Claim pleads insufficient facts to support alleged *Code* breaches subsequent to November 17, 2020.

[30]    For her part, the Plaintiff submits that a two-year limitation period is applicable to a claim before this court for a civil remedy as a result of the Defendants' *Code* violations, but in any event, she has pleaded the material facts in the Fallback Claim to ground a remedy pursuant to s. 46.1 of the *Code*.

[31]    Whether a one year or two-year limitation period applies to proceedings before this court for alleged *Code* violations is immaterial to the Plaintiff's leave

2025 ONSC 542 (CanLII)

- 13 -

motion. The reality is that the Plaintiff's claim for damages pursuant to the provisions of the *Code* was made subsequent to the expiry of the two-year limitation period. Having said that, I would comment in *obiter* that in my view, the one-year limitation period set out in s. 34(1) of the *Code* applies to applications before the Human Rights Tribunal and otherwise the two-year basic prescription period stipulated in s. 4 of the *Limitation Act* governs proceedings before this court for alleged *Code* infringements (see: *Nero v. Allstate Insurance Company*, 2023 ONSC 4472).

[32]    The real questions is, does the Fallback Claim plead the material facts to ground a claim for the Defendants' alleged breaches of ss. 5(1) and 5(2) of the *Code*? While the Fallback Claim does not plead the *Code*, set out specific *Code* breaches or claim relief for any such alleged breaches, I find that the Plaintiff's claim for damages as a result of alleged *Code* violations is an "alternative claim for relief arising out of the same general factual matrix previously pleaded and [is] not a new cause of action" (see: *Galluzzi v. Pearlann Consulting Inc.,* 2017 ONSC 3296, at para 9). I have reached this conclusions based in part on the following material facts alleged in the Fallback Claim:

- Paragraphs 49-50 – plead that the Plaintiff was subjected to a toxic and poisoned work environment characterized by bullying and harassment that prevented her from doing her job;

- 14 -

- Paragraph 52 – pleads that the Plaintiff reported serious mental health and stress issues to the County in July 2021 which the County failed to address but instead contributed to;

- Paragraph 64(e) – alleges Chopp made it extremely stressful for the Plaintiff to do her job;

- Paragraph 65(h) – pleads that Burgess failed to assist the Plaintiff after expressing to him that she was significantly stressed and overwhelmed; and

- Paragraph 68 – alleges the County generally failed to accommodate the Plaintiff when it knew that she could no longer function in the current environment.

[33]    In sum, the Fallback Claim contains all the facts necessary to support the alleged *Code* breach. Each of the Defendants were put on notice in the Fallback Claim of the Plaintiff's alleged mental impairment and of her claims of discrimination and harassment because of their alleged failure to accommodate her mental health issues.

[34]    Accordingly, leave is granted to amend the Proposed Amended Claim with the inclusion of paragraphs 1(f), 85 (with the exception of any reference to the Chopp July 12, 2021 post being defamatory as discussed below), 130, 131, 132, 136(g), 153 and 154, all of which address the alleged *Code* violations.

2025 ONSC 542 (CanLII)

2025 ONSC 542 (CanLII)

### (b) Intrusion Upon Seclusion

[35]    In its recent 2022 decisions in *Owsianik v. Equifax Canada Co.*, 2022 ONCA 813 ('*Owsianik*'), at paragraph 54, the Court of Appeal restates the elements of the tort of intrusion upon seclusion as established in *Jones v. Tsige*, 2012 ONCA 32 ('*Jones*'), in this way:

- the defendant must have invaded or intruded upon the plaintiff's private affairs or concerns, without lawful excuse [the conduct requirement];

- the conduct which constitutes the intrusion or invasion must have been done intentionally or recklessly [the state of mind requirement]; and

- a reasonable person would regard this invasion of privacy as highly offensive, causing distress, humiliation, or anguish [the consequence requirement].

[36]    It is conceded by the Plaintiff that the tort of inclusion upon seclusion is not pleaded in the Fallback Claim, and therefore, was not advanced prior to the expiration of the two-year general limitation period prescribed by the *Limitations Act*. Plaintiff's counsel submits, however, that the Defendants have not suffered non-compensable presumed prejudice because the tort was pleaded in the Proposed Amended Claim well within two years of the County's cease-and-desist letter of December 8, 2021 to the Plaintiff and Chopp's comments reported in local newspapers on December 9, 2021 in which it was stated, among other matters,

that the Plaintiff's employment was "terminated". Apart from whether these pleaded facts satisfy the conduct requirement of the tort of intrusion upon seclusion, I find that the Plaintiff has failed to discharge her onus of rebutting non-compensable presumed prejudice because she has failed to put before the court any evidence to suggest that she only discovered or ought to have discovered this cause of action upon the publication of the December, 2021 newspaper article and/or the delivery of the County's cease-and-desist letter of the same month. None of the affidavit evidence filed by the Plaintiff in support of her motion speaks to this central issue.

[37]    It also does not escape me that on the occasion of the Plaintiff's cross-examination on her affidavit, sworn December 18, 2023, Plaintiff's counsel conceded that the tort could have been pleaded in the initial claim: "… I would say intrusion upon seclusion is one [claim] that probably could have been made initially and wasn't" (see: Transcript of the cross-examination of the Plaintiff of March 27, 2024 at p. 139, ll. 16-25). Indeed, it seems to me that the tort could have been pleaded in the Fallback Claim because the facts relied upon by Plaintiff's counsel in her submissions to extend the limitation period beyond November 21, 2023 are alleged in that earlier claim.

[38]    Having reached this conclusion, an inquiry is to be made whether the Fallback Claim pleads the material facts necessary for the foundation of a theory

2025 ONSC 542 (CanLII)

of liability based on the tort of intrusion upon seclusion. I find that it does not with the most generous interpretation and making allowances for drafting deficiencies.

[39]   The tort as defined in *Jones* "targeted those who, like the defendant in *Jones¸* had actually invaded or intruded upon the privacy of a plaintiff, by accessing that plaintiff's private information" (see: *Owsianik*, at para 3). Even were I to accept that the conduct requirement of the tort of intrusion upon seclusion is sufficiently pleaded in the Fallback Claim, in recognition of the well established principle that the novelty of a claim should not militate against a plaintiff on this type of motion (see: *Trustees of the Millwright Regional Council of Ontario Pension Trust Fund v. Celestica Inc.*, 2012 ONSC 6083), and also accept, as I do, that the state of mind requirement of the tort is satisfied by the allegations in paragraph 97 of the Fallback Claim, no where in the pleading does the Plaintiff allege the consequence requirement as restated in *Owsianik*. Although the Fallback Claim alleges the community was shocked by the Plaintiff's termination and lamented her departure (see: paras 93 and 94), these allegations fall short of the required allegation that a reasonable person would regard the alleged invasion of privacy as highly offensive, causing distress, humiliation, or anguish.

[40]   For these reasons, leave is refused to include in the Proposed Amended Claim paragraph 2(a) as it relates to the subject tort and paragraphs 150-152 inclusive, all of which address the tort of intrusion upon seclusion.

2025 ONSC 542 (CanLII)

- 18 -

### (c) <u>Intentional Interference with Contractual Relations</u>

[41]    The Court of Appeal in *Unisys Canada Inc. v. York Three Associates Inc.*, 2001 CanLII 7276 (ON CA), states that the four essential elements of the tort of intentional interference with contractual relations are:

- an enforceable contract;

- knowledge of the plaintiff's contract by the defendant;

- an intentional act on the part of the defendant to cause a breach of contract; and

- resulting damages to one of the parties to the contract (at para 13).

[42]    It is not disputed that the Fallback Claim does not plead the tort of intentional interference with contractual relations, and as a result, the burden falls to the Plaintiff to rebut the non-compensable presumed prejudice suffered by the Defendants due to the triggering of the November 17, 2023 prescription date.

[43]    In her submissions, Plaintiff's counsel urges me to accept that the Plaintiff has satisfied her burden because within months of July 2023, when the Defendants belatedly produced a memorandum authored by Burgess to the County's incoming chief executive officer (the 'Burgess Memo'), this new theory of liability was advanced in the Proposed Amended Claim. Plaintiff's counsel submits that it was not until the discovery of the Burgess Memo in which the outgoing chief executive

2025 ONSC 542 (CanLII)

officer states that "[i]f [he] was here longer [he] would have likely terminated [the Plaintiff] and moved forward" did the Plaintiff knew or ought to have known that Burgess had targeted her employment for termination.

[44]   I am not, however, persuaded that the Plaintiff has displaced the non-compensable prejudice presumed to have been suffered by the Defendants. Just as with the tort of intrusion upon seclusion, the Plaintiff has failed to proffer any evidence in support of her counsel's submission. Neither the Plaintiff's affidavit nor the supporting affidavits of Plaintiff's counsel's law clerks speak to the issue; the same can be said of the Plaintiff's evidence on cross-examination.

[45]   Similarly, I am unable to accept Plaintiff's counsel's alternative submission that the material facts to make out this new theory of tort liability are pleaded in the Fallback Claim. Were one to adopt the most generous reading of that version of the statement of claim, with a liberal allowance for drafting deficiencies, no where is it pleaded that Burgess and Chopp intentionally acted to cause a breach of the Plaintiff's employment contract.

[46]   Therefore, the purposed amendments to advance the tort of intentional interference with contractual relations must fail. Leave is refused to include paragraph 3(a) as it relates to this tort and paragraphs 147-149 inclusive in the Proposed Amended Claim.

### (d) The Negligence and Vicarious Liability Claims

2025 ONSC 542 (CanLII)

- 20 -

[47]    The Fallback Claim alleges negligence against the County and the BOH and also advances a claim of vicarious liability on the part of the corporate Defendants for the alleged conduct of Burgess and Chopp. Many of the material facts alleged in the Fallback Claim to found a claim in negligence against the County and the BOH are duplicated in the Proposed Amended Claim (see for example, paragraph 114 in the Fallback Claim and paragraph 136 in the Proposed Amended Claim). The same can be said for the Fallback Claim's allegation of vicarious liability that is repeated in the Proposed Amended Claim. Indeed, the Defendants have consented to several of the allegations of negligence that were carried over from paragraph 114 of the Fallback Claim to paragraph 136 of the Proposed Amended Claim. Where the positions of the parties diverge is with respect to the Plaintiff's new allegation in the Proposed Amended Claim that the corporate Defendants breached their duty to protect her from the infliction of mental suffering caused by their alleged breaches of contract and the tortious conduct of Burgess and Chopp, among others.

[48]    The Defendants' objection to the Plaintiff's newly advanced duty of care does not require the same limitation period analysis that was undertaken with respect to the Plaintiff's claims pursuant to the *Code*, the tort of intrusion upon seclusion and that of intentional interference with contractual relations. The Court of Appeal's decision in *Piresferreira v. Ayotte,* 2010 ONCA 384, ('*Piresferreira*')

2025 ONSC 542 (CanLII)

- 21 -

settles the issue. At paragraph 63 of *Piresferreira*, Juriansz J.A. unequivocally states that whereas employees are at liberty to pursue a claim for the intentional infliction of mental suffering, the tort of negligent infliction of mental suffering "is not available in the employment context".

[49]    Accordingly, leave is refused to include paragraph 134 in the Proposed Amended Claim, but I do grant leave to include the first sentence of paragraph 135 along with paragraphs 137 to 139 inclusive.

**(e) Allegations of Defamation**

[50]    The Plaintiff's Proposed Amended Claim includes factual allegations that support a claim of defamation. The Plaintiff does not, however, seek any relief for the Defendants' defamation. Both the Plaintiff's former counsel and current counsel confirmed during the course of the Plaintiff's examination on September 27, 2023 and March 27, 2024 that no damages are sought in defamation (see: discovery transcript of the Plaintiff of September 27, 2023 at p. 14, ll. 17-25 and cross-examination transcript of the Plaintiff of March 27, 2024 at p. 136, ll. 3-10).

[51]    Nonetheless, and for example, at paragraphs 123-124 of the Proposed Amended Claim, the Plaintiff alleges that Chopp's media statements were made "willfully and maliciously, with the intent of damaging the Plaintiff's reputation" and that the "defamation in these articles continues to taint

2025 ONSC 542 (CanLII)

- 22 -

Ms. Boutis' professional reputation as an exceptionally hard-working and efficient lawyer".

[52]   Because the Plaintiff does not seek damages for defamation, the alleged facts that advance this cause of action are irrelevant and only serve the twofold purpose of embellishing the record and improperly broadening the scope of discovery. In sum, these allegations are frivolous and vexatious and should not be permitted.

[53]   I would therefore deny leave to amend the Proposed Amended Claim with the inclusion of paragraphs 123 and 124 and order the deletion of any reference to the Defendants' alleged defamatory conduct in the balance of the Proposed Amended Claim as found, by way of example only, in paragraphs 83, 85, 115, 117 and 121.

## II. Previously Abandoned Allegations

[54]   It is the position of the Defendants that paragraphs 75-80, 83-88, and 89-93 of the Proposed Amended Claim, (collectively, the 'Impugned Paragraphs') reintroduce allegations from the original statement of claim, filed on February 4, 2022, but abandoned by the Plaintiff with the delivery of her first amended pleading on April 14, 2022. The Plaintiff submits that the allegations in the Impugned Paragraphs were never abandoned. Specifically, the Plaintiff submits that paragraphs 83-88 of the Proposed Amended Claim particularize the allegations in

- 23 -

paragraphs 52 and 64(j) of the Fallback Claim, paragraphs 89 and 93 of the Proposed Amended Claim mirror paragraphs 59 and 61 of the Fallback Claim and paragraphs 90(a) and 90(c) of the Proposed Amended Claim summarize the allegations raised in paragraphs 44, 57 and 58 of the Fallback Claim.

[55]    I am not satisfied that by failing to advance the impugned allegations in the first amendment to the statement of claim and by not raising them again until some eighteen months later in subsequent amendments, the Plaintiff had abandoned the original allegations. On the other hand, I accept the Plaintiff's description of the Impugned Paragraphs in relation to the Fallback Claim.

[56]    Therefore, I would grant the Plaintiff leave to amend the Proposed Amended Claim with the inclusion of the Impugned Paragraphs same and except for the following paragraphs for the following reasons:

- Paragraph 79 – alleges a conspiracy between Chopp and BOH which is not particularized, for which damages are not sought and is otherwise statue barred.

- Paragraphs 83, 53 – as previously ordered, any reference to the Defendants' alleged defamatory conduct is to be deleted from the statement of claim.

## III.  Proposed Amendments Conflict with Other Evidence

2025 ONSC 542 (CanLII)

- 24 -

[57]    The Defendants object to a number of amendments in the Proposed Amended Claim because they submit that the allegations conflict with the cross-examination testimony of the Plaintiff. The Defendants' objection focuses on the following paragraphs, for the following reasons:

- Paragraphs 115-116 allege that Chopp broke the news to the media that the Plaintiff's employment was "terminated" in contrast to the Plaintiff's admission on cross-examination that she was the first person to refer to herself as the "former" County solicitor (see: examination transcript of March 3, 2023, current B-1-689 – B-1-690).

- Paragraphs 145-146 particularize a number of ways in which Burgess intentionally inflicted mental suffering upon the Plaintiff in contrast to the Plaintiff's examination admission that her claims against Burgess for the subject tort were limited to his decision to hire outside counsel and his failure to "have her back" (see: examination transcript of March 3, 2023, pp 169-207).

- Paragraphs 155-160 allege several facts in support of the claim for moral damages resulting from the manner in which the Plaintiff was terminated in contrast to the Plaintiff's evidence that the basis of her moral damages claim is limited to two media reports of

2025 ONSC 542 (CanLII)

2025 ONSC 542 (CanLII)

December 1 and 9, 2021 and the cease and desist letter of December 8, 2021 (see: examination transcript of March 2, 2023, pp 154-157).

[58]    The Defendants submit that unless on consent, Rule 51.05 prevents the withdrawal of admissions with the exception of limited circumstances. These circumstances require proof that the opposing party would not suffer prejudice as a result of the amendment and the admission resulted from inadvertence or wrong instruction (see: *Shwaluk v. HSBC Bank of Canada*, 2023 ONCA 538, at paras 37-38). The Defendants submit that not only has the Plaintiff failed to seek leave to withdraw her admissions but no exceptional circumstances exist in this case.

[59]    I do not accept the Defendants' submissions. Firstly, Rule 51.05 does not apply in this instance: there is no admission by the Plaintiff in response to a request to admit, nor is there a deemed admission under Rule 51.03, and nor is there an admission by the Plaintiff in a pleading. Secondly, evidence inconsistent with a pleading is not a reason to refuse an amendment. The facts pleaded are taken as true unless they are patently ridiculous or incapable of truth. Whether the evidence substantiates the pleaded facts is irrelevant to a pleadings motion but rather a matter for the trial judge to decide on a full record (see: *R v. Imperial Tobacco Canada Ltd.*, 2011 SCC 42, at para 23). Thirdly, I disagree with the Defendants'

- 26 -

characterization that the Plaintiff's examination evidence necessarily conflicts with the subject paragraphs in the Proposed Amended Claim. Specifically,

- There is a nuanced difference between being the first person to have referred to oneself as being the "former" County solicitor and a third party announcing to the press that the County solicitor's employment had been "terminated".

- During the course of her examination, the Plaintiff did not limit her claims against Burgess for his intentional infliction of mental suffering as the Defendants suggest. Her testimony is replete with a number of examples, including making proposals that the Plaintiff found out about only after the fact, commencing a major piece of litigation without consulting her, and failing to recognize her skill and expertise.

- During the course of the Plaintiff's examination, her counsel states on the record that in the event that there are additional facts to support the claim for moral damages, the Plaintiff will advise and amend her pleadings. She has done so with the delivery of the Proposed Amended Claim.

2025 ONSC 542 (CanLII)

[60]    I would therefore grant leave to amend the Proposed Amended Claim with the inclusion of paragraphs 115 (same and except for the reference to the defamatory conduct of Chopp), 116, 145-146, and 155-160.

## IV. <u>Proposed Amendments that do not Comply with the Rules of Pleading</u>

[61]    The Defendants submit that leave should not be granted to include a number of amendments in the Proposed Amended Statement of Claim because they are scandalous, frivolous, or vexatious as described by Epstein J. in *George*. Specifically, the Defendants submit certain of the proposed amendments plead irrelevant facts, similar facts or express the Plaintiff's subjective opinions, beliefs, or feelings. I will address each of the Defendants' objections separately.

### (a) Irrelevant Facts

[62]    It is the Defendants' position that paragraphs 35-50, 109-110, 114 and 136(e) of the Proposed Amended Claim allege facts that both precede the Plaintiff's employment and follow her termination, and on that basis, are not material to the Plaintiff's wrongful dismissal claim and the corollary causes of action. The Defendants submit that these allegations are pleaded to establish the toxic work environment in which the Plaintiff found herself but are immaterial to whether she herself experienced a toxic workplace. The proposed amended pleading includes, for example, the allegation that the Plaintiff joined the County

2025 ONSC 542 (CanLII)

- 28 -

unaware of Chopp's reputation as a "recalcitrant bully" and details of Chopp yelling at a senior County employee five months prior to the Plaintiff's employment.

[63]    I find that for the most part, the subject paragraphs plead facts that do not impact the Plaintiff's employment and her causes of action. This proceeding is not a general inquiry into the County as a workplace. In addition, the proposed amendments include large amounts of evidence that advance a personal attack on Chopp, and for that reason alone, have no proper purpose.

[64]    Therefore, apart from the first sentence of paragraph 47 and paragraphs 49 and 50, leave is refused to include in the Amended Proposed Claim the balance of paragraph 47 together with paragraphs 35-48, 109-110, 114 and 136(e). I am, however, prepared to grant leave to amend with respect to the first sentence of paragraph 47 as well as paragraphs 49 and 50 as they describe the workplace environment in which the Plaintiff found herself.

[65]    The Defendants also submit that paragraphs 66-74, 81-82 and 127-132 include facts that do not support any sustainable cause of action and are therefore irrelevant. Apart from paragraph 82, I do not accept the Defendants' position. Although the paragraphs at issue include a certain degree of particularity, I do not find that the pleaded particulars tip the balance from alleging sufficient material facts to support a theory of liability to the pleading of evidence.

2025 ONSC 542 (CanLII)

[66]    Furthermore, I find that the subject paragraphs (save for paragraph 82) support the Plaintiff's claims for breach of contract, breach of the *Code* (as I have previously found in these Reasons) and intentional infliction of mental suffering. For example, the Defendants object to the inclusion of paragraphs 127-132 in the Proposed Amened Claim. In these paragraphs the Plaintiff pleads reliance on the County's polices that are alleged to have created duties owed to her that were breached by the County. It is not my role sitting as the judge on this pleadings motion to determine if there is a contractual right under the polices and nor is it my role to determine if the alleged duties have been breached. That is the role of the trial judge, and the Plaintiff is entitled to have all tenable theories of liability before the trier of fact and law.

[67]    I would therefore grant the Plaintiff leave to amend the Proposed Amended Claim with the addition of paragraphs 66-74, 81 and 129-132.

### (b) Similar Facts

[68]    The Defendants further submit that the Plaintiff pleads similar facts in paragraphs 52-54 and 57-58 of the Proposed Amended Claim which are irrelevant to the issues to be determined, and therefore, are any one or all of scandalous, frivolous, and vexatious. These paragraphs detail such incidents as staff resignations because of poor senior leadership, stress leaves and a high rate of staff turnover due to a toxic workplace culture as well as one incident of Chopp

- 30 -

yelling and accusing staff of lying. None of the factual allegations involve the Plaintiff but are, in my view, designed to influence the trier of fact based on a pattern of unrelated events.

[69]    Master MacLeod (as he then was) in *MFP*, cited with approval in *Cyr v. Calypso Parc Inc.*, 2016 ONSC 7636 ('*Cyr*'), at paras 47-49, summarizes the principles of pleading as they relate to similar fact allegations in this way:

- • If similar facts are material to a portion of the claim, including punitive damages, they may be pleaded so as to give fair notice that will form part of the discovery and will be part of the case at trial.

- • Similar facts that are mere evidence and are not in themselves material facts should not be pleaded because doing so offends Rule 25.06(1).

- • Similar facts that are not material but are irrelevant should be struck pursuant to Rule 25.11(b) as scandalous, frivolous, and vexatious but even relevant similar facts may be struck out under Rule 25.11(a) if they will prejudice or delay the fair trail of the action.

- • Even in those cases where the similar facts are relevant and material, they should not be permitted if the added complexity arising from their pleading does not outweigh their potential probative value (at paras 29-30).

[70]    As Corthorn J. points out in *Cyr*, the decision in *MFP* emphasizes that for similar fact allegations in a pleading to stand, they must be material and relevant

2025 ONSC 542 (CanLII)

- 31 -

to the issues to be determined, and in addition, their probative value must outweigh any complexity arising from their pleading.

[71]    I find the similar fact allegations set out in the stipulated paragraphs of the Proposed Amended Claim to be neither material or relevant to the Plaintiff's tenable causes of action. They are added only for colour and will needlessly expand the scope of discovery and otherwise delay a fair trial.

[72]    Accordingly, I decline to grant leave to include paragraphs 52-54 and 57-58 in the Proposed Amended Claim.

### (c) The Plaintiff's Opinions, Beliefs and Feelings

[73]    The Defendants submit that paragraphs 55, 65, and 141 of the Proposed Amended Claim plead the Plaintiff's subjective opinions, beliefs, and feelings and thereby violate the rules of pleading. Specifically, the Defendants submit:

- In paragraph 55, the Plaintiff pleads that she "perceived that she had raised the mayor's ire and from this point on, felt unsafe";

- In paragraph 65, the Plaintiff characterizes her employment as "arduous, stressful, and chaotic" and includes her internal thought process about evaluating her position to make accommodations for a properly functioning legal department; and

2025 ONSC 542 (CanLII)

- 32 -

2025 ONSC 542 (CanLII)

- In paragraph 141, the Plaintiff pleads that Chopp's alleged disparagement was intended to reach a broad audience "to score political points and to advance her own popularity";

all of which offend the rules of pleading.

[74]    Certainly, this court in *George* makes clear that "documents that are replete with conclusions, expressions of opinion, provide no indication whether information is based on personal knowledge or information and belief, and [contain] many irrelevant matters, will be rejected in their entirety" (at para 20).

[75]    I find, however, that it is entirely proper for the Plaintiff to describe her reaction to the situation in which she found herself as detailed in paragraph 55, to characterize her initial workplace conditions as set out in paragraph 65 and to describe the alleged conduct of Chopp in paragraph 141. These allegations are relevant to her claims for damages.

[76]    I would therefore grant leave to include paragraph 55, the Plaintiff's description of her initial employment conditions in paragraph 65 but not the remainder of the paragraph that includes the Plaintiff's speculations, and paragraph 141 save and except for the second and third sentences that are conclusionary and an expression of opinion respectively.

## V. Paragraphs Yet to be Addressed

2025 ONSC 542 (CanLII)

[77]    Finally, the following paragraphs in the Proposed Amended Claim have yet to be addressed in this Endorsement. They are paragraphs 1(c) to which the Defendants specifically object as well as paragraphs 1(e), 28, 29,122,125,142,143 and 161 to which the Defendants have neither specifically consented nor opposed.

[78]    I would grant leave to include paragraphs 1(c) and 1(e) in the Proposed Amended Claim. These paragraphs address the Plaintiff's breach of contract and *Code* violations claim as well as the vicarious liability of the corporate Defendants. I would similarly allow the amendments in proposed paragraphs 28, 29,122, and 125. They speak to the Plaintiff's claim for damages, including damages for the Defendants' alleged breach of their contractual duty of good faith, moral damages, and damages for the alleged *Code* violations. For the same reasons, I would grant leave to include paragraphs 142, 143 and 161 in the Amended Proposed Claim.

**Disposition**

[79]    For the above reasons, leave is granted to include the following paragraphs in the Proposed Amended Claim:

> 1(a) – 1(j), 2(a) in part*, 2(b)-2(d), 3(a) in part*, 3(b)-3(d), 4-34, 47 in part*, 49-51, 55-56, 59-64, 65 in part*, 66-77, 79-81, 83-108, 111-113, 115 in part*, 116, 117 in part*, 118-122, 125-133, 135 in part*, 136-140, 141 in part*, 142-146, 153-163

- 34 -

but denied with respect to all remaining proposed paragraph amendments. *Reference is to be made to the previous relevant paragraphs of this Endorsement for the specific text of the permitted amendment.

[80]    As a condition to granting leave to amend the Plaintiff's statement of claim as I have, the Defendants shall have their costs of delivering their respective amended statements of defence, their costs of further document production, if any, and their costs of discovering the Plaintiff on any new issues raised in the approved amended statement of claim and not already canvassed in the Plaintiff's four days of discovery.

[81]    I am of the view that Rule 26.01 rebuts the presumption that costs generally follow the event, and in such circumstances, the responding is entitled to an award of compensatory costs (see: *Plante*, at para 53). I address the scale of costs to be awarded to the Defendants later in this Endorsement.

**Follow Up Issues**

[82]    My expectation is that the Proposed Amended Claim, as approved by me, will necessitate redrafting in some respects for syntax and to accommodate logical transitions between paragraphs. Should any issues arise in this respect for which counsel requires the court's assistance, counsel are invited to contact the Simcoe trial co-ordinator to schedule a case conference.

2025 ONSC 542 (CanLII)

- 35 -

[83]    Counsel are also invited to contact the Simcoe trial co-ordinator to schedule the Plaintiff's motion for documentary production in the event that such motion remains necessary as a result of this Endorsement.

**Costs**

[84]    In the event that counsel are unable to agree on the scale of costs to which the Defendants are entitled as a result of the approved pleading amendments, I invite them to deliver written submissions.

[85]    Likewise, if counsel are not able to agree on the costs of this motion, I will entertain written submissions.

[86]    The written submissions of each party shall not exceed four pages double spaced in total excluding cost outlines, case law and offers to settle.

[87]    The party seeking costs shall deliver their submissions within fourteen days of receipt of this Endorsement and responding submissions will be delivered within ten days of receipt of the submissions of the party seeking costs. There will be no right of reply.

[88]    If no submissions are received withing this time frame, I will consider all issues respecting costs to be resolved. All submissions are to be delivered to my judicial assistant, Zachary Gernhaelder, at HamiltonSopinka.SCJJA@ontario.ca .

_____

2025 ONSC 542 (CanLII)

- 36 -

Justice M. Valente

**Released:**  January 27, 2025

2025 ONSC 542 (CanLII)

**CITATION:** BOUTIS v. THE CORPORATION OF NORFOLK COUNTY et al,
2025 ONSC 542
**COURT FILE NO.: CV-22-23**
**DATE:** 2025-01-27
**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**B E T W E E N:**

Paula Boutis

Plaintiff

**- and –**

The Corporation of the County of Norfolk,
The Board of Health for Haldimand-Norfolk
Health Unit, Kristal Chopp and Jason
Burgess

Defendants

---

**Endorsement on Motion to Amend
Plaintiff's Statement of Claim**

---

Justice M. Valente

**Released:** January 27, 2025

2025 ONSC 542 (CanLII)

3

**CITATION:** Caplan v. Atas, 2021 ONSC 670
**COURT FILE NOS.:** CV-10-400035, CV-16-544153, CV-18-594948, CV-18-608448
**DATE:** 20210128

# ONTARIO

## SUPERIOR COURT OF JUSTICE

### COURT FILE NO.: CV-10-400035

| | | |
|---|---|---|
| **B E T W E E N:** | ) | |
| | ) | |
| STANCER GOSSIN ROSE LLP | ) | *Gary Michael Caplan and Rebecca Longpré* |
| | ) | for the Plaintiffs |
| Plaintiffs | ) | |
| | ) | |
| **- and -** | ) | |
| | ) | |
| NADIRE ATAS and JANE DOE | ) | *Nadire Atas s*elf-represented |
| | ) | |
| Defendant | ) | |

### COURT FILE NO.: CV-16-544153

| | | |
|---|---|---|
| **B E T W E E N:** | ) | |
| | ) | |
| DALE & LESSMAN LLP, ROBERT E. | ) | *Gary Michael Caplan and Rebecca Longpré* |
| DALE, DAVID E. MENDE, CHRISTINA | ) | for the Plaintiffs |
| J. WALLIS, KAGAN SHASTRI LLP, | ) | |
| RAHUL SHASTRI, DAVID WINER, | ) | |
| STANCER GOSSIN ROSE LLP, | ) | |
| RAYMOND STANCER, ERIC GOSSIN, | ) | |
| MITCHELL ROSE, GARTH DINGWALL, | ) | |
| and RALPH STEINBERG, J. DAVID | ) | |
| SLOAN, PEOPLES TRUST COMPANY, | ) | |
| DEREK PEDDLESDEN, FRANK RENOU, | ) | |
| MARTIN MALLACH and SHARON | ) | |
| SMALL | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| **- and -** | ) | |
| | ) | |
| NADIRE ATAS | ) | *Nadire Atas s*elf-represented |
| | ) | |
| Defendant | ) | |

2021 ONSC 670 (CanLII)

2021 ONSC 670 (CanLII)

**COURT FILE NO.: CV-18-594948**

**B E T W E E N:**                                )
                                                  )
DR JOSEPH CAPLAN, DEREK LUTH,                     )    *Gary Michael Caplan and Rebecca Longpré*
YAHEL NOV, JONATHAN MICHAEL                       )    *for the Plaintiffs*
STANCER, CHARLES ADAM STANCER,                    )
RAYMOND STANCER, TOM PIRES and                    )
NELLA PIRES                                       )
                                                  )
                                       Plaintiffs )
                                                  )
**- and -**                                       )
                                                  )
NADIRE ATAS                                       )    *Nadire Atas s*elf-represented
                                                  )
                                       Defendant  )

**COURT FILE NO.: CV-18-608448**

**B E T W E E N:**                                )
                                                  )
GUY BABCOCK, LUC GROLEAU, JULIA                   )    *Gary Michael Caplan and Rebecca Longpré*
GROLEAU, MARC GROLEAU, SHU                        )    *for the Plaintiffs*
GUANG SHEN, REBECCA HAUFE,                        )
ANDREW HAUFE, KATHERINE BRNJAC,                   )
TOM BABCOCK, RAMONA HELM, JOHN                    )
BABCOCK, MILA BAIER, SHAWN                        )
MURRAY AND AGNIESZKA MURRAY,                      )
PRESTON SCHMIDT, BRANDON                          )
SCHMIDT, RALPH SCHMIDT, SARA                      )
BASARA, JOHN BAIER, TONY LOCANE,                  )
ALEXANDRA BORONDY, ALFONSO                        )
COSENTINO and STEVE PROC[1]                       )
                                                  )
                                       Plaintiffs )
                                                  )
**- and -**                                       )
                                                  )
NADIRE ATAS                                       )    *Nadire Atas s*elf-represented
                                                  )
                                       Defendant  )    **ALL HEARD:** at Toronto November 15 and
                                                  )    December 6 and 19, 2019

---

[1] Mr Proc discontinued his claim by Notice of Discontinuance dated December 6, 2019.

2021 ONSC 670 (CanLII)

## JUDGMENT

**D.L. Corbett J.:**

### Part 1: Overview, Disposition and Facts

#### I – Introduction

##### (a) Nature of the problem in these Cases

[1]    These cases concern extraordinary campaigns of malicious harassment and defamation carried out unchecked, for many years, as unlawful acts of reprisal.  Nadire Atas, has used the internet to disseminate vicious falsehoods against those towards to whom she bears grudges, and towards family members and associates of those against whom she bears grudges.  Atas is destitute and apparently content to revel in ancient grievances, delighting in legal process and unending conflict because of the misery and expense it causes for her opponents.

[2]    Cyber-stalking is the perfect pastime for Atas.  She can shield her identity.  She can disseminate vile messages globally, across multiple unpoliced platforms, forcing her victims to litigate in multiple jurisdictions to amass evidence to implicate her, driving their costs up and delaying the process of justice.  Unrestrained by basic tenets of decency, when she is enjoined from attacking named plaintiffs, she moves her focus to their siblings, their children, their other family members and associates, in a widening web of vexatious and harassing behaviour.

[3]    Serious mental illness must underlie this conduct: what person of sound mental health would throw away more than a decade of her life, her material prosperity, and risk her liberty, for such paltry visceral satisfaction: the obsession seems clear.  When this conduct is placed alongside the apparent grievances that have spurred Atas on, the disproportionality – even as apparently apprehended by Atas herself – is so unbalanced as to impugn her grasp on reality: what mentally sound person would devote so much time and energy to such negative unproductive activities?  And then one must consider some of the persons Atas has been willing to attack to cause harm to her primary victims: persons unknown to her, used by her as ammunition to hurt others.  Her lack of empathy is sociopathic.

[4]    Freedom of speech and the law of defamation have developed over centuries to balance the importance of preserving open public discourse, advancing the search for truth (which must allow for unpopular and even incorrect speech), protecting personal reputations, promoting free democratic debate, and enforcing personal responsibility for statements made about others.  The value of freedom of speech, and the need for some limits on that freedom, have long been recognised as central to a vibrant and healthy democracy and, frankly, any decent society.

[5]    The internet has cast that balance into disarray.

[6]    This case illustrates some of the inadequacies in current legal responses to internet defamation and harassment.  This court's response is a solution tailored for these cases and

Page: 4

addresses only the immediate problem of a lone publisher, driven by hatred and profound mental illness, immune from financial constraints and (dis)incentives, apparently ungovernable except through the sledgehammer response of incarceration. It remains to be seen whether there is any way to control Atas' unacceptable conduct other than by locking her up and/or compelling her to obtain treatment. Whatever the solution may be that brings an end to her malicious unlawful attacks on other people, it is clear that the law needs better tools, greater inter-jurisdictional cooperation, and greater regulation of the electronic "marketplace" of "ideas" in a world with near universal access to the means of mass communication. Regulation of speech carries with it the risk of over-regulation, even tyranny. Absence of regulation carries with it the risk of anarchy and the disintegration of order. As should be clear from the discussion that follows, a situation that allows someone like Atas to carry on as she has, effectively unchecked for years, shows a lack of effective regulation that imperils order and the marketplace of ideas because of the anarchy that can arise from ineffective regulation.

### (b) Grievances Underlying Atas' Campaigns of Harassment and Defamation

[7]     Atas has carried on systematic campaigns of malicious falsehood to cause emotional and psychological harm to persons against whom she has grievances. These include adverse parties in litigation, Atas' own lawyers, and the lawyers and agents, relatives (including siblings, spouses and children) of these people, a former employer, its successor, owners, managers and employees of this former employer, and generally an ever-widening circle of victims, generally chosen to cause misery to Atas' prime victims, those against whom she harbours festering grievances. As of the time that these motions were argued, there have been as many as 150 victims of Atas' attacks.

[8]     And what are the grievances that have moved Atas to do this? There appear to be four sets of them. The first includes a broad range of persons connected with mortgage enforcement proceedings taken against Atas in the early years of the twenty-first century. The sums actually in dispute, at the time of those disputes, were relatively modest, but ballooned as legal costs, interest and penalties accrued over the years. The underlying dispute was resolved on a final basis by a judge of this court in 2004, a decision upheld a year later by the Ontario Court of Appeal. Atas' attacks against persons connected with these cases have been premised on her view that the mortgage enforcement proceedings were wrongly decided: she has been unable to accept that the case ended fifteen years ago, and to move on from that decision.

[9]     The second set of grievances concern mortgage enforcement proceedings arising after she refinanced her two properties in the shadow of the first dispute. The properties were sold long ago – one by Atas herself and the other by her lender under power of sale proceedings – and all that has really remained, for years, were disputes over the propriety of certain mortgage enforcement charges claimed by the mortgagee against Atas. At the outset, the real value of these disputes was some tens of thousands of dollars – not inconsequential sums, in the context of the loans, but hardly claims that would be a reasonable basis to distort the fabric of the rest of one's life.

[10]     The third set of grievances concerns an application brought by some parties adverse to Atas to have her declared a vexatious litigant pursuant to s.140 of the *Courts of Justice Act* – an

application that proceeded in a linear fashion, over four years, from start to finish, a model of alacrity in comparison to the other litigation involving Atas.

[11]     The first three sets of grievances are connected in that they all concern underlying litigation over mortgage enforcement proceedings brought against Atas respecting her two highly leveraged residential real estate income properties, properties she lost a decade ago.  They have all festered since the events that gave rise to Atas' grievances.

[12]     The fourth set of grievances are unrelated to the first three.  They originate in the termination of Atas' employment in the 1990's, a termination that was for cause for alleged dishonesty and unethical conduct as a real estate agent.  This set of grievances led Atas to engage in harassment and defamation of the principal of her former employer at the time of her termination, in the 1990's, and then again two years later, when that employer refused to provide her with a reference for new employment.  Then the conduct stopped.  It was roughly twenty years later, in 2018, that the former employer discovered that a wave of defamation and harassment had been mounted against him – and against his family members and other associated persons – starting in 2016.  It was only when this former employer found out about Atas' conduct towards the victims of her first three campaigns of harassment and defamation that this fourth group realized that it was Atas who was behind the recent campaign against them.

**(c)  The Cases at Bar**

[13]     This decision concerns four cases brought against Atas.  The plaintiffs in these four actions sue Atas for defamation, harassment and related claims (collectively, the "**Defamation Proceedings**").  In chronological order, the four cases are:

        (d)      CV-10-400035 (the "Stancer Action");

        (e)      CV-16-544153 (the "Dale & Lessman Action");

        (f)      CV-18-594948 (the "Caplan Action"); and

        (g)      CV-18-0060848-0000 (the "Babcock Action").

[14]     The Stancer Action involves a campaign of internet harassment and defamation arising from Atas' first set of grievances.  The plaintiff is a law firm that acted on behalf of the mortgagees against Atas in the mortgage enforcement proceedings authoritatively decided in 2004.

[15]     The Dale & Lessman Action arises from Atas' second set of grievances.  The first-named plaintiff is a law firm that acted on behalf of the mortgagee, Peoples Trust Company, enforcing mortgages it held against Atas' two properties.

[16]     The Caplan Action arises from the third set of grievances.  The first-named plaintiff is the brother of Gary Caplan, counsel for the plaintiffs in the four cases at bar and a lead counsel for applicants in the s.140 application against Ms Atas.  This action is not confined to persons associated with the third set of grievances, however: when Ms Atas embarked on this campaign, she cast her net to include a range of persons against whom she bore grievances.

Page: 6

[17]    The Babcock Action arises from the fourth set of grievances. The first-named plaintiff was the principal of Atas' employer and terminated her from her employment back in the 1990's. Babcock subsequently refused to provide Atas with a reference after he sold his real estate brokerage firm in the mid-1990's, and, in the result, the new owners of that firm declined to employ Atas. Plaintiffs in this action include Babcock's sons, the new owners of the brokerage firm, and various real estate agents and others associated with residential real estate services in and around the City of Hamilton from the time Atas had worked there.

[18]    The impugned statements in the Stancer Action and the Dale & Lessman Action are summarized in the Judgment and that summary is incorporated into this decision be reference (Judgment, paras. 174-183). It is on this basis that I focus more in this judgment on describing the impugned statements in the Caplan Action and the Babcock Action than those in the Stancer Action and the Dale & Lessman Action.

[19]    In Section IV of this section of this decision, I set out the factual basis for these decisions. I incorporate by reference portions of prior decisions involving Ms Atas, as summarized below. Defined terms in this decision bear the same meaning as is given to those terms in the Judgment in the s.140 application made January 3, 2018 (as explained below).[2]

### (d) Procedural History of these Motions

[20]    In this section, I explain how these motions come before this court as three motions for summary judgment and one motion for default judgment and why there is no evidence before the court from Atas on any of these motions.

[21]    The starting point for this summary is the Judgment. All litigation involving Atas was stayed pending final determination of the s.140 application. That stay was replaced by the directions set out in the Judgment for the processes to be followed for all litigation by Atas. Atas repeatedly sought stays of the Judgment pending appeal, which were refused by me and by the Court of Appeal.[3] Thus, the directions set out in the Judgment applied to Atas' litigation (including the Defamation Actions) from January 3, 2018. Central to the processes prescribed in the Judgment was case management of all proceedings by this court.

[22]    Since January 3, 2018, this court has issued 45 endorsements published on CanLII and additional handwritten endorsements. Of these, the following explain the history of the Defamation Actions and these motions since the Judgment:

(a)    April 6, 2018: direction for a case conference to address the new allegations that are the subject matter of the Caplan Action: 2018 ONSC 2249

(b)    June 27, 2018: case management endorsement (2018 ONSC 4059), salient portions of which are found at paras. 6-11:

---

[2] *Peoples Trust Company* v. *Atas*, 2018 ONSC 58 (the **Judgment**").
[3] See for example *Peoples Trust Company* v. *Atas*, 2018 ONSC 2173.

[6]    In respect to the three defamation actions, the plaintiffs are now all represented by Mr Caplan. They seek consolidation or an order that they be tried together before the same judge. They seek a trial date and appointment of a trial judge. They believe the trial can be conducted in two weeks. Ms Atas does not consent to consolidation, but does agree to trial together before the same trial judge. In my view the cases ought to be ordered tried together or serially in front of the same trial judge – the issue of application of facts in one proceeding to the other proceedings can be addressed by the trial judge as matters of similar fact evidence.

[7]    In my view the trial date ought to be obtained from Justice Firestone, in his capacity as head of the Toronto Civil Team. I agree with the preliminary assessment that two weeks ought to be sufficient time for the trial. The key relief sought is a permanent injunction (damages are sought but it seems unlikely there is a prospect of recovery of material damages). There is an interlocutory injunction in place and the plaintiffs are obliged to move forward to trial expeditiously now that the s.140 application has been decided and case management is moving forward.

[8]    Ms Atas was canvassed over deadlines for delivery of pleadings in the defamation proceedings. She is under the burden of three injunctions, now in place until trial in the actions, and she has been clear in her materials that she considers these injunctions burdensome. The plaintiffs say they are ready for trial now in these actions, and the only impediment to moving forward is scheduling steps required by Ms Atas to ready her for trial. I have made this clear to her – that the delay extends the period during which these injunctions will be in force before trial, and that if she does not like having the injunctions in place, she can move more quickly to ready herself for trial. To be clear – I indicated that the court will take reasonable steps to expedite these trials in view of Ms Atas' position that she is prejudiced by continuation of the pre-trial injunctions.

[9]    Ms Atas has not completed pleadings in the defamation actions. She has agreed to complete these documents and serve them by July 13, 2018, and to file them by July 20, 2018. I would have been prepared to give her more time than this, however, I understand her desire to see these actions move forward promptly, and deadlines imposed on the plaintiffs depend on these early dates for Ms Atas' pleadings in the defamation proceedings.

[10]    In particular, Ms Atas will serve and file a defence in the 2010 Defamation Proceedings and in the 2018 Defamation Proceedings. There is already a defence filed in the 2016 Defamation Proceedings.

[11]    Ms Atas wishes to pursue counterclaims in at least some of the defamation actions. She requires leave under s.140 of the Courts of Justice Act to do this, and before she can apply for that leave, she

needs *Chavali* permission from this court. The most practical way in which to proceed, in view of Ms Atas' concern about the continuing injunctions, is to permit Ms Atas to file counterclaims as part of her defences to the defamation proceedings, to direct that the plaintiffs need not defend the counterclaims pending further court order, and directing Ms Atas to provide a *Chavali* request for the counterclaims. In this way, the proposed claim is clearly delineated and the process of closing pleadings in the defamation proceedings will not be delayed unduly by the Chavali process. I set the date for the *Chavali* request at Ms Atas' suggestion – she can, of course, make the request earlier, in which case the schedule could be accelerated at the next case management conference. On this basis, order to go:

(a) That Ms Atas serve statements of defence, which may include counterclaims, in the 2010 and 2018 Defamation Proceedings by July 13, 2018, and file those documents with the court by July 20, 2018;

(b) That court fees be waived for Ms Atas for filing of the documents described in a., above;

(c) That the plaintiffs need not deliver statements of defence to any counterclaims brought by Ms Atas in any of the three defamation proceedings pending further order from the case management judge;

(d) Ms Atas shall provide a *Chavali* request in respect to any counterclaims she has asserted or does assert in any of the defamation proceedings by September 30, 2018;

(e) Ms Atas indicates that she has motions she wishes to bring in the defamation proceedings, including motions before me to set aside or vary injunction orders currently in place. Ms Atas may make *Chavali* requests to take any of these steps; she will not be permitted to bring any of these motions before she has made such *Chavali* requests. I will give further directions about any such proposed motions at the next case conference, if any *Chavali* requests have been made by that time.

(f) The plaintiffs shall serve their affidavits of documents in the defamation proceedings by August 31, 2018, on the following terms:

(i) They need not list and re-produce documents that have been filed in materials served on the injunction motions, but instead shall reference these previously filed documents in the affidavit of documents;

(ii) They shall list all other documents as required by the Rules, and shall provide one copy of each such producible document to Ms Atas, at their expense.

2021 ONSC 670 (CanLII)

(iii)   They need not list or produce documents relevant only to the counterclaim(s) pending further order of this court.

(g)   Ms Atas has indicated that she wishes to pursue appeals of one, some or all of the interlocutory or interim injunctions.  To do this would require a *Chavali* request (which has not been made), a motion pursuant to s.140(3) of the *Courts of Justice Act*, a motion for leave to appeal to the Divisional Court, and then, if leave be granted, the appeal itself.  Given the length of time these orders have been in place, the alacrity with which these matters could proceed to trial, the relative costs involved, and the broadly discretionary nature of the injunction remedy, it seems to make no sense to spend time and money on interlocutory proceedings. However, if Ms Atas wishes to pursue any of these matters by way of appeal, she may make *Chavali* requests that she be permitted to do so.  If and when such requests are made, I will address these issues further.

(h)   Plaintiffs shall schedule a trial scheduling conference with Firestone J. on a date after the next case management conference.

(i)   There is no point in these three defamation cases being mediated – it would be a waste of time.  Order to go dispensing with the requirement for mediation.  This direction is without prejudice to Firestone J., at the trial scheduling conference, directing mediation or a pretrial if he is of the view that these steps should take place.

(c)   September 28, 2018 endorsement from a case management conference held on September 14, 2018, at paras. 44-46 (2018 ONSC 5804):

[45]   … There are three defamation proceedings against Ms Atas – the 2010 Defamation Proceedings, the 2016 Defamation Proceeding and the 2018 Defamation Proceedings.  As of the time of the case management conferences, Ms Atas had not delivered statements of defence in two of these proceedings.  She indicated that she also wishes to assert a counterclaim in one or both of these proceedings.  I provided her with a deadline to serve and file the pleadings and she then asked for a fee waiver to file these pleadings.  The conference ran long – it lasted an entire court day and we did not have time to address all outstanding matters.  The Defamation Proceedings should proceed to disclosure, discovery and trial promptly, since the plaintiffs have interlocutory injunctions in two of the actions and an interim injunction in the third. There was no time for a further case management conference before the summer.  Rather than delay filing of the Statements of Defence and Counterclaim by Ms Atas in order to consider a request for a fee waiver on proper materials, I exercised my discretion to grant the fee waiver summarily.

[45]    In paragraph 11(a) of my endorsement of June 27, 2018, I directed Ms Atas to serve her outstanding statements of defence in the Defamation Proceedings by July 13, 2018, and to file those documents by July 20, 2018. These documents have been served but not filed. Ms Atas explained that, although I had waived the filing fee to file these documents, that waiver did not include the cost of commissioning an affidavit of service at the court office in order to file the pleadings. I asked Ms Atas what the charge was for commissioning an affidavit of service. She did not know because she did not ask. On the court web site the fee posted is $20.

[46]    Ms Atas shall forthwith file her statements of defence; if she needs to pay a fee to commission affidavits of service then she shall pay that fee, without prejudice to her applying to this court, on proper materials, after a case management conference, for an order that she be repaid these fees on the basis that they should be waived. I address the proper process for seeking fee waivers below.

(d)    October 9, 2018 direction for a further case management conference (2018 ONSC 5965, para. 3):

**October 19, 2018**        Parties to the Defamation Actions are to attend a one hour case management conference before me, at 9 am, to settle the form of the order that the three actions be tried before the same trial judge, together, one after the other, or as the trial judge directs (September 28, 2018, paras. 31-32), and to set the schedule for affidavits of documents and examinations for discovery (September 28, 2018, para. 32). Ms Atas was ordered to file her statement of defence (and counterclaims, if she asserted any) by July 20, 2018 (June 27, 2018, paras. 9, 11(a)). She served them but did not file them because she felt she should not have to pay a $20 fee to commission her affidavit of service. Ms Atas was then to make a *Chavali* request for any counterclaim she seeks to assert by September 30, 2018 (June 27, 2018, para. 11(d)). Ms Atas has not done this. Ms Atas was directed on September 14, 2018, to pay any fees necessary to swear her affidavit of service and file her pleadings "forthwith" (September 28, 2018, para. 46). I have no information that Ms Atas has done this. The fate of Ms Atas' defence and her intended counterclaims will depend in part on whether and when she brings herself into compliance with previous orders respecting these issues, all of which will have to be addressed at the case management conference of October 19, 2018. If Ms Atas has not filed her statements of defence by the time of the case management conference, the plaintiffs may request that their claims continue by way of default proceedings. If Ms Atas has filed her statements of defence, and if they include a counterclaim, and if Ms Atas has not made a *Chavali* request in respect to the counterclaim, then the plaintiffs may ask the court to strike the counterclaims so that the main claims may move forward. The court's scheduling directions in June 2018 were intended to facilitate putting a schedule in place in September 2018. That date was

2021 ONSC 670 (CanLII)

moved to October 2018 because of Ms Atas' failure to comply with the June case management order; she should not expect a further scheduling delay by virtue of continuing non-compliance with this court's directions.

(e)    October 15, 2018: further direction re case management conference to be held on October 18, 2018 (2018 ONSC 6134, paras. 30-31):

The court previously indicated that on October 19, 2018, it would deal only with scheduling of steps in the Defamation Proceedings (not in respect to the interlocutory injunction, for which steps have been scheduled already and which will next be addressed at the case management conference on December 7, 2018, but in respect to the status of the pleadings, the status of any counterclaims brought by Ms Atas, signing the consent order that the trials be heard together or one after the other by the same trial judge, deadlines for affidavits of documents, dates for examinations for discovery, and any other issues bearing on scheduling these steps).  The court, on October 19, 2018, will now also deal with the costs issues identified in this endorsement, and any issues that may have arisen as a consequence of any order that may be made by the Court of Appeal as a result of the review motion scheduled before that court on October 18, 2018.

Ms Atas must attend this conference on October 19, 2018.  Counsel for the plaintiffs in the Defamation Proceedings are also expected to attend this conference.

(f)    Ms Atas advised the court that she was not going to attend the case management conference on October 18, 2018, and that she would participate no further in case management before this court.  The court ordered her to attend the conference and advised her that if she breached the order, a bench warrant could be issued for her arrest to bring her before the court.  Atas did not attend the case management conference on October 18, 2018.  A bench warrant was issued for her arrest, and the conference proceeded in her absence.  The court ordered Atas noted in default in the three Defamation Proceedings (the Babcock Action had not yet been started), and gave directions (a) for Atas to move to seek to set aside the notings in default, and (b) for motions for default judgment if the notings in default were not set aside. (2018 ONSC 6255)

(g)    On October 31, 2018, I refused to extend the time for Atas to move to set aside the noting in default, but also noted that she would not be precluded from bring her motion at any time: the deadline was a triggering event for the plaintiffs to be able to move for default judgment (2018 ONSC 6531).

(h)    On November 23, 2018 I scheduled return of Atas' motion to set aside the notings in default in the three Defamation Actions and gave directions about the fourth action (the Babcock Action), including directions for scheduling motions for summary

judgment in all four actions once Notices of Motion had been delivered for those motions (2018 ONSC 7044).

(i)     On December 7, 2018, I set aside the notings in default for the following reasons (2019 ONSC 71, paras. 48-51):

> [48]    I ordered Ms Atas noted in default in the three Defamation Proceedings on October 19, 2018, because of her failure to comply with this court's orders to file the statements of defence.  I also gave directions for her to bring any motion to set aside the notings in default promptly.  These motions did not come on for hearing until December 7, 2018.

> [49]    There is but one difficulty here.  The plaintiffs seek broad relief against Ms Atas in respect to very serious allegations of malicious defamation online, and multiple breaches of court orders restraining Ms Atas from this conduct.  The consequences for Ms Atas of losing these actions could be very serious.  The court wants Ms Atas to have every reasonable opportunity to defend herself in these proceedings.

> [50]    And yet Ms Atas has proved herself ungovernable since the judgment in the s.140 application.  In respect to the instant issue, her failure to file the defences – which apparently have been ready since the summer of 2018 – seems motivated by a desire to dispute with the court its jurisdiction and the merits of its various directions.  Something had to be done to brought Ms Atas back to the table – and what has been done is the three notings in default and the citations for contempt accompanied by a short, sharp jail sentence for the most flagrant of Ms Atas' contempts of court.  Studied and longstanding as Ms Atas ' defiance has been of this court's case management orders, I still do not think that matters have reached such a pass that she should be precluded from defending the Defamation Proceedings, on the merits, if she wishes to do so.

> [51]    The three notings in default are set aside, and Ms Atas is to ensure that her statements of defence in the three Defamation Proceedings are filed forthwith, with copies of them thereafter provided to this court.

At the same case management conference, I made the following directions respecting the motions for summary judgment (2019 ONSC 71, paras. 52-54 and 63-65:

> [52]    Mr Caplan advises that his clients all wish to move for summary judgment in the Defamation Proceedings.  Ms Atas states that she wishes to move to strike affidavits filed on the motions.

> [53]    Ms Atas shall serve and file her motion to strike affidavits by January 31, 2019.  She shall pay the regular motions fee for this motion, or she shall apply for a fee waiver in accordance with this court's prior directions no later than January 25, 2019.  The motion to strike shall be returnable before me on

2021 ONSC 670 (CanLII)

February 15, 2019, at 10 am, for no more than half a day. Ms Atas is cautioned that she must include every basis on which she objects to the plaintiffs' motion materials in her motion returnable February 15th.

[54]     Mr Caplan advises that he expects to receive further evidence around the end of January 2019 (respecting the source of various internet postings, obtained through legal process in California). If possible, the court asks that Mr Caplan serve any additional evidence upon which his clients rely on the motion for summary judgment before the return of Ms Atas' motion on February 15th. Ms Atas will not be expected to include objections to evidence filed by the plaintiffs hereafter in her motion on February 15th. However, the court expects that all parties will be to advise of all further steps that will be required after February 15th in order to ready the motions for summary judgment for a hearing on the merits.

…

[63]     Ms Atas shall serve and file her statement of defence in the Babcock Defamation Action by January 31, 2019. Although it should not be necessary to do so, I note that there is no fee waiver of the filing fee for filing this statement of defence. If Ms Atas seeks a fee waiver for that filing fee, she shall have to apply for the waiver, in the manner provided in this court's prior endorsements, and she must do this no later than January 25, 2019 so that this court will be able to decide the issue in time for Ms Atas to proceed on the basis of this court's decision within the filing deadline of January 31st. If Ms Atas does not obtain a fee waiver in this way, then she will have to pay the applicable filing fee.

[64]     Ms Atas has not filed any responding materials on the motion for an interlocutory injunction in the Babcock Defamation Action.[4] That motion shall proceed before me on Tuesday January 29, 2019, at 10:00 am. Ms Atas will not be permitted to file any evidence, having now missed the deadlines for doing so. The motion will proceed on the basis of the record filed by the moving parties. Ms Atas will be permitted to deliver a factum and to make oral argument, but she should understand that she will be restricted to making argument on the basis of the evidence before the court. All factums for this motion shall be provided to me, electronically, through my assistant, no later than January 25, 2018.

[65]     In this decision I set aside the notings in default in the Defamation Proceedings previously ordered by this court. I require confirmation from Ms Atas that she has, in fact, filed her statements of defence in the Defamation

---

[4] This was a typographical error in the endorsement. The interlocutory injunction motion in the Caplan Action was the motion scheduled for January 29, 2019. No injunction motion was brought in the Babcock Action.

Page: 14

> Proceedings, now that the defaults have been lifted.  She shall provide this confirmation, by email, attaching a copy of each of the statements of defence, by January 25, 2019.

At the same case management conference, I addressed Atas' failure to obtain permission to commence or continue claims.  As described in the Judgment and addressed repeatedly in case management endorsements, Atas was required to seek permission to move for leave pursuant to s.140 of the *Courts of Justice Act*, what is referred to in the case law and the Judgment and endorsements as a "*Chavali* request".  Despite being directed to make such requests multiple times in respect to her counterclaims in the Defamation Proceedings, she refused to do so.  Finally, at the case management conference of December 7, 2018, I dismissed the counterclaims for failure to obtain leave pursuant to s.140 of the *Courts of Justice Act* and for failure to follow the court's directions to make a *Chavali* request in respect to those claims (2019 ONSC 71, paras. 32, 34):

> [32]     Enough is enough, to repeat the citation quoted at the start of the judgment of January 3, 2018.  The defendants to Ms Atas' claims have been waiting many years to have these cases disposed of.  The delay has been intolerable.  And while there might be some basis to excuse long periods of delay prior to the judgment of January 3, 2018, there is no excuse for Ms Atas' failure to take any steps to move forward with her claims since the judgment was handed down.  The court has been very patient with Ms Atas, because she is self-represented, because there is a great deal of litigation and Ms Atas has limited resources with which to pursue claims.  But enough is enough.

> …

> [34]     The counterclaims in the Defamation Proceedings are dismissed without costs.  Ms Atas was required to make her *Chavali* requests in July, so that the pleadings could be finalized and the cases readied for trial.  The plaintiffs should not be delayed further in prosecuting their claims because Ms Atas has chosen not to pursue her counterclaims in accordance with this court's directions.  Mr Caplan shall prepare the dismissal orders for my signature.

(j)    In an endorsement in preparation of a case management conference to be held on May 31, 2019, I summarized the state of the litigation in the Defamation Proceedings as follows (2019 ONSC 3284):

> [17]     The following motions for summary judgment are pending before me:

>> (a)      Action CV-10-400035 (Stancer Gossin v. Atas)

>> (b)      Action CV-16-544153 (Dale & Lessman LLP v. Atas)

>> (c)      Action CV-18-594948 (Caplan v. Atas)

Page: 15

2021 ONSC 670 (CanLII)

(d)    Action CV-18-608448 (Babcock v. Atas)

The evidence tendered on these motions – substantially identical for each of the four motions – consists of affidavits filed previously in these proceedings. The notices of motions, with memory sticks containing copies of previously filed materials relied upon for the motions, were delivered in January 2019. I have no record of Ms Atas delivering responding materials for these motions for summary judgment. If Ms Atas has delivered responding materials, she is requested to bring a paper copy of those materials with her to the CMC.

(k)    At a case management conference held on May 31, 2019, the court addressed the filing of pleadings by Ms Atas as follows (2019 ONSC 3620, paras. 30-32):

[30]    I understand that statements of defence have been served and filed in all the Defamation Proceedings other than the Babcock Action. In respect to the three defamation actions in which statements of defence have been filed, Ms Atas shall provide me with copies of her pleadings by July 5, 2019, by email sent to my assistant. I understand that some or all of these pleadings may contain counterclaims. That is of no moment now: the counterclaims have been dismissed by prior order of this court. Copies of the pleadings, as they have been filed with the court, are to be provided to me by July 5th. [footnote omitted]

[31]    Ms Atas was ordered to file her defence in the Babcock Action by January 31, 2019. I understand that she has served her defence but she has not filed it. Ms Atas explained that her pleading includes a counterclaim, but she did not want to file the counterclaim and incur a filing fee for a counterclaim, if this court was just going to strike the counterclaim. Ms Atas has been told, repeatedly, that she must make a *Chavali* request if she wishes to commence or pursue a counterclaim. I confirmed this again at the case management conference on May 31st. Ms Atas then told me that she does not believe the Judgment precludes her from commencing and pursuing a counterclaim without first making a *Chavali* request and, if permitted, seeking and obtaining leave pursuant to s.140(3) of the *Courts of Justice Act*. There is no merit to this position: the Judgment covers every proceeding and every step in a proceeding, whether Ms Atas is a plaintiff or a defendant. Ms Atas understands this: indeed, it was one the bases on which she pursued her unsuccessful appeal of the Judgment.

[32]    Ms Atas is to file her statement of defence in the Babcock Action by July 5, 2019. She is to provide this court with a copy of this pleading, as filed, by July 5, 2019. If Ms Atas does not complete this step on time, then she should expect that the Babcock Action will thereafter proceed by default without her further participation.

Also at the case management conference on May 31, 2019, I established a schedule for the motions for summary judgment in the Defamation Proceedings, as follows (2019 ONSC 3620, paras. 45-54):

[45]   Mr Caplan advises that his materials on the motions for summary judgment in the four Defamation Proceedings are complete, subject only to the following:

    (a)    An affidavit from US counsel relating to electronic evidence obtained in the USA; and

    (b)    An expert report and related affidavit from an expert witness.

Mr Caplan advised that he could serve these materials by July 19, 2019; it is ordered that this be done by July 19th.

[46]   When I asked Ms Atas about a deadline for responding materials on the motions for summary judgment, she raised concerns about the use that could be made of these materials in the contempt proceedings against her that are before Pollak J.  Given the quasi-criminal nature of those proceedings, and the prospect that they may be pursued as matters of criminal, rather than civil, contempt, Ms Atas advised that she considered it a violation of her right to remain silent to be required to deliver responding materials to a motion for summary judgment or face the consequence of judgment being granted against her essentially by default.

[47]   Mr Caplan advised that he was prepared to undertake – and to consent to an order – that the prosecution in the contempt proceedings not be permitted to use any evidence filed by Ms Atas in the civil proceedings in its case-in-chief in the contempt proceedings.  Ms Atas was not satisfied that this concession protects her rights sufficiently.

[48]   This is potentially a significant procedural issue, and not one the court will decide except on a proper motion, on the basis of the evidence filed on that motion, and full argument on the applicable law.

[49]   The motion arises as an objection by Ms Atas in the civil proceedings to filing responding materials on a motion for summary judgment, or for that motion proceeding on the merits, in the face of her prosecution for contempt of court.  In sum, it is a request by Ms Atas for a stay – at least of the summary judgment motions – and perhaps of the defamation proceedings themselves – until the disposition at trial of the contempt proceedings.  In the absence of such a stay, or relief to the same effect, the court would ordinarily impose deadlines and proceed with the defamation proceedings, either by way of motions for summary judgment, or by way of a trial.  Thus in my view it is for Ms Atas to move for this stay, or other relief she thinks appropriate.

[50]   Ms Atas shall deliver her notice of motion and evidence in support of her motion for a stay, or other relief she thinks appropriate, respecting this

2021 ONSC 670 (CanLII)

issue, by July 19, 2019. The court will provide further directions about this motion once it has Ms Atas' motion materials in hand.

[51] If Ms Atas does not deliver her motion materials by July 19th, as ordered, then the motions for summary judgment shall proceed. The moving parties' materials will be complete once Mr Caplan delivers the additional materials due on July 19, 2019. Ms Atas shall have until September 30, 2019 to deliver responding materials.

[52] I appreciate that this sounds complicated, and perhaps even inconsistent. Ms Atas says she will bring a motion to put a halt to these motions. I have said that the court will entertain this motion. And yet I have also stipulated a date by which Ms Atas must deliver her responding materials, assuming these matters are not stayed.

[53] Ms Atas has a long history of introducing procedural motions for the purpose of causing delay. The court has made no assessment of the potential merit of Ms Atas' stay motion, aside from concluding that, in the thumbnail description of it given at the case management conference, it raises serious issues, has some prospect of some success, and may involve important interests for Ms Atas. Ms Atas should be given a reasonable chance to bring this motion forward. However, if she fails to do so, then matters will proceed as if she had not raised this point: delay is not purchased by stating an intention to bring a motion. Once I have a chance to review the motion materials, I will give further directions that may include lifting or extending the due date for Ms Atas' responding motion materials.

[54] Mr Caplan asked me again to indicate that I will seize myself of the motions for summary judgment on the merits. I will not do so at this time: the request is premature. I do not know when these motions will be ready to proceed or how long they will take. It is not clear to me what efficiency, if any, will be gained by my hearing these motions. Indeed, I do not yet know if they will be opposed (Ms Atas' failure to file responding materials in the interlocutory injunction motion in *Caplan* v. *Atas* was, at least for the court, unexpected, and left the task of deciding the motion considerably simpler than if the motion had been defended robustly).

(l)    As noted above, I directed Atas to serve and file her statement of defence in the Babcock Action by July 5, 2019, and to provide a copy of her defence to this court by July 5, 2019. She did not send a copy of the defence to the court. On July 15, 2019, I directed as follows (2019 ONSC 4285, paras. 14-15):

[14]    At the case management conference of May 31, 2019, I ordered Ms Atas to file her defence in the Babcock action by July 5, 2019, and to provide this court with a copy of her defence also by July 5, 2019: 2019 ONSC

Page: 18

3620.  Ms Atas has not provided the court with a copy of this pleading, in violation of the court's direction.

[15]      If Ms Atas has not filed her defence then the plaintiffs may requisition that she be noted in default in the Babcock action.  If Ms Atas has filed her defence, she shall <u>immediately</u> provide a copy of it to my assistant, and should expect to be required to explain why she did not comply with the court's direction to provide this document by July 5th.

(m)     At a case management conference on October 4, 2019, Ms Atas did not attend, and sent an email to the court saying that she would not take part in any further case management conferences.    The entire endorsement concerns the Defamation Proceedings and (a) why Atas was noted in default in the Babcock Action, and (b) why I directed that the motions for summary judgment proceed before me, without evidence from Atas (2020 ONSC 6152, paras. 1-14):

[1]      A case management conference was held on October 4, 2019.  Ms Atas did not attend.  The case management conference proceeded in Ms Atas' absence and orders and directions were made.  This endorsement sets out the directions given respecting the four defamation actions brought against Ms Atas.  Separate endorsements will be released respecting other issues addressed at the case management conference, including Ms Atas' decision not to attend on October 4th, and not to take part in any further case management conferences.

[2]      At the May 30, 2019 case management conference, Ms Atas stated that she wished to move for a stay of the defamation proceedings pending disposition of the contempt proceedings ongoing against her.  I considered that there might be a tenable argument for the relief Ms Atas described and directed Ms Atas that, if she wished to seek that relief in the defamation proceedings, she deliver her motion materials in that regard by July 19, 2019.  She did not do so.  As of October 4, 2019 she still had not done so.

[3]      I was mindful on May 30, 2019 that Ms Atas has a long history of saying that she is going to take certain steps in order to precipitate delay.  I put it thusly in my endorsement from the case management conference of May 31, 2019:

If Ms Atas does not deliver her motion materials by July 19th, as ordered, then the motions for summary judgment shall proceed.  The moving parties' materials will be complete once Mr Caplan delivers the additional materials due on July 19, 2019.  Ms Atas shall have until September 30, 2019 to deliver responding materials.

I appreciate that this sounds complicated, and perhaps even inconsistent.  Ms Atas says she will bring a motion to put a halt to these

2021 ONSC 670 (CanLII)

2021 ONSC 670 (CanLII)

motions. I have said that the court will entertain this motion. And yet I have also stipulated a date by which Ms Atas must deliver her responding materials, assuming these matters are not stayed.

Ms Atas has a long history of introducing procedural motions for the purpose of causing delay. The court has made no assessment of the potential merit of Ms Atas' stay motion, aside from concluding that, in the thumbnail description of it given at the case management conference, it raises serious issues, has some prospect of some success, and may involve important interests for Ms Atas. Ms Atas should be given a reasonable chance to bring this motion forward. However, if she fails to do so, then matters will proceed as if she had not raised this point: delay is not purchased by stating an intention to bring a motion. Once I have a chance to review the motion materials, I will give further directions that may include lifting or extending the due date for Ms Atas' responding motion materials. (2019 ONSC 3620, paras. 51-53)

[4]    Ms Atas did not deliver responding motion materials for the motions for summary judgment in the three defamation actions in which such motions have been brought. Her deadline was September 30, 2019. These motions may now proceed without any responding evidence from Ms Atas.

[5]    In respect to the fourth defamation action (the *Babcock* action), I ordered Ms Atas to file her defence in the *Babcock* action by July 5, 2019. Mr Caplan advises that he was served with a statement of defence and counterclaim, but that he has no knowledge of its having been filed. The Superior Court FRANK system and filing office advise that no statement of defence has been filed in the action (CV-18-608448).

[6]    This requirement was reiterated in this court's endorsement of July 15, 2019, in the following terms:

At the case management conference of May 31, 2019, I ordered Ms Atas to file her defence in the Babcock action by July 5, 2019, and to provide this court with a copy of her defence also by July 5, 2019: 2019 ONSC 3620. Ms Atas has not provided the court with a copy of this pleading, in violation of the court's direction.

 If Ms Atas has not filed her defence then the plaintiffs may requisition that she be noted in default in the Babcock action. If Ms Atas has filed her defence, she shall <u>immediately</u> provide a copy of it to my assistant, and should expect to be required to explain why she did not comply with the court's direction to provide this document by July 5th. (2019 ONSC 4285, paras. 14-15).

[7]     Ms Atas has repeatedly failed to follow this court's directions to file pleadings and provide a copy to the court. I see no reason why the plaintiffs should be put to further expense and delay because of Ms Atas' failure to follow clear, simple directions. Ms Atas is hereby noted in default in the Babcock action.

[8]     Mr Caplan has delivered motions for summary judgment in three of the defamation proceedings. No responding evidence has been filed. These motions shall proceed before me on November 15, 2019, 10 am.

[9]     Ms Atas has now been noted in default in the *Babcock* action by this court. The plaintiffs in that action may move for default judgment before me on November 15, 2019, 10 am.

[10]     Mr Caplan shall deliver a motion record for the motion for default judgment by October 15, 2019, if his clients wish to move for default judgment. Mr Caplan shall deliver one factum, covering the motions for summary judgment and the motion for default judgment; this factum shall be delivered by October 15, 2019. Mr Caplan shall deliver by November 8, 2019 a draft order in each of the defamation proceedings, setting out precisely the relief sought in each proceeding, whether by default or by way of summary judgment.

[11]     Ms Atas may not file evidence on the motions for summary judgment: she was given her chance to do this and failed to do so. She may, however, provide a factum on the basis of the evidence before the court on the motions for summary judgment and she may make oral argument on the motions for summary judgment on November 15, 2019. Any factum Ms Atas wishes to rely upon should be delivered by November 8, 2019. I say "should be" because Ms Atas routinely fails to meet filing deadlines. If she is late with her factum, I may still permit her to deliver it, even on the day of the motion, but this will depend on the extent to which late delivery of the factum may work unfairness to the moving parties.

[12]     Ms Atas may move to set aside the noting in default in the *Babcock* action, if she is so inclined. If she decides to do so, her motion materials should be delivered by November 8, 2019, and that motion should be returnable on November 15, 2019.

[13]     Subsequent to the case management conference, but prior to release of this endorsement, Ms Atas received materials from Mr Caplan and communicated with the court about them. Most of that communication does not merit comment, however one point should be addressed. Ms Atas has indicated that she wishes to move before me for an order that I should recuse myself on the basis of bias or reasonable apprehension of bias. Ms Atas has been told repeatedly that there is a process she must follow if she wishes to

2021 ONSC 670 (CanLII)

2021 ONSC 670 (CanLII)

bring a motion.  She must raise that issue at a case management conference, in order to obtain directions, or she must make a *Chavali* request to be permitted to bring the motion.  Ms Atas decided not to participate in the case management conference.  She has said repeatedly that she will not make a *Chavali* request to bring a recusal motion.

[14]     On November 15, 2019, the court has scheduled up to a full day for argument of the motions for summary judgment and the motion for default judgment (and any motion to set aside the noting in default, if such a motion is brought).  Ms Atas may raise any relevant arguments she wishes on these motions, but she may not deliver evidence except in accordance with the terms of this endorsement: she had her chance to deliver motion materials, did not do so, and the moving parties should not be delayed further.

[23]     The motions did proceed on November 15, 2019, on the basis set out in the court's last endorsement (2020 ONSC 6152) and continued over two additional days fo argument in December 2019.

[24]     Ms Atas was noted in default in the Babcock Action after multiple deadlines to serve, file and provide the court with a copy of her pleading.  After the court noted her in default on October 4, 2019, she was given a schedule to bring a motion to set aside the noting in default.  She did not bring that motion.

[25]     Ms Atas objected to filing evidence on the motions for summary judgment on the basis that to do so would compromise her right to remain silent in the motions against her for contempt of court.  The court gave directions for her to bring a motion to seek a stay of the motions and the Defamation Proceedings on this basis.  She failed to follow this process and never did serve motion materials seeking this relief.

[26]     Ms Atas had most of the motion materials for the motions for summary judgment as early as January 2019.  She was given a deadline of September 30, 2019 to file responding materials and she did not do so by that deadline or at all.

### (e) Atas' Assignment in Bankruptcy

[27]     In the fall of 2019, on the eve of the motions for summary judgment and default judgment, Atas made an assignment in bankruptcy.  There is no doubt that Atas met the test for bankruptcy: her debts far exceeded her assets as a result of multiple unpaid costs orders against her totalling more than $250,000 and she was without assets or income.  There is also no doubt that the assignment in bankruptcy was tactical: Atas did it on the eve of the motions for judgment in these cases and then at the return of the motions she took the position that these proceedings were stayed as a result of her bankruptcy.

[28]     The plaintiffs responded to this last-minute tactic by withdrawing their financial claims in the Defamation Proceedings against Atas, both as to damages and costs.  They took the position that, as a result of the withdrawal of all financial claims, these actions could continue without an order to continue the proceedings in the bankruptcy proceedings.  Atas' trustee in bankruptcy did

not oppose these proceedings continuing on that basis. Atas opposed, though she was unable to articulate a principled basis for her position: she seemed to think that the assignment in bankruptcy and the stay of proceedings was to benefit her, rather than to benefit her creditors and to facilitate the trustee's discharge of its duties.

[29]    I accepted the plaintiffs' arguments that they did not need an order to continue these proceedings, in all the circumstances, and directed that these actions proceed on the basis of the withdrawal of financial claims. I gave reasons for this decision in writing on the day this issue was addressed (November 15, 2019). There is no need for me to supplement those reasons here.

[30]    I then began to hear argument on the motions for judgment brought by the plaintiffs.

## II – Interlocutory Injunctions

[31]    Interlocutory injunctions have been made against Atas in the Stancer Action, the Dale & Lessman Action and the Caplan Action. This section summarizes the history of those interlocutory injunctions.

### (a) Stancer Action Injunction

[32]    Between March 17 and 29, 2010, Ms Atas allegedly posted defamatory statements on the internet about Messrs Stancer and Hatcher (among others), lawyers who acted against Atas in the Gomes/Kelly Mortgage Action. Atas stated in these postings (among other things) that Messrs Stancer and Hatcher should be disbarred and were guilty of mortgage fraud. On March 29, 2010, Stancer Gossin Rose LLP sued Ms Atas for damages and for an injunction in the Stancer Action.

[33]    On April 9, 2010, Matlow J. granted an interim injunction restraining Ms Atas from making, publishing or causing to be published "any statements of any kind relating to Stancer Gossin Rose LLP or any of its partners, associates or employees". On April 29, 2010, this order was continued on an interim basis by Newbould J. On May 12, 2010, this order was extended on an interlocutory basis by Strathy J. (as he then was) until "disposition of the Trial". This interlocutory order is still in force (the "Stancer Action Injunction").[5]

### (b) Dale & Lessman Action Injunction

[34]    In 2016, after several years during which the primary focus of litigation activity was between Atas and Peoples Trust Company, a second round of internet attacks began. This time the attack was broader, both in terms of the victims of the attacks and in terms of the defamatory statements made against them. Professionals were still accused of incompetence, negligence, professional misconduct and fraud. This time, however, attacks were made against relatives of

---

[5] Atas did not file evidence on the motion before Strathy J. and argued before him that she needed more time in which to do that. Strathy J. granted the injunction until trial subject to the provision that Atas could bring the injunction issue back before the court on proper materials. Aside from saying at various times that she wished to avail herself of this option, Atas never did take steps to bring the injunction motion back before the court, and so the interlocutory injunction granted by Strathy J. remained in place from 2010 up to the time this decision is released.

Atas' targets, including spouses, siblings and children. This round of attacks was focused on Peoples Trust Company, its officers, employees and agents, and its counsel, Ms Wallis, her law firm, and members of families of individuals targeted in these attacks. The nature of the attacks also shifted, from professional misconduct to allegations of sexual criminality, most frequently pedophilia or sexual predation.

[35]    I granted an interlocutory injunction in October 2016 in much the same terms as the order granted in the Stancer Action, for the benefit of the plaintiffs in the Dale & Lessman Action.

### (c) Caplan Action Injunction

[36]    Counsel for the plaintiffs in this proceeding, Gary Caplan, was counsel for applicants in the s.140 application and came to take a leading role in that litigation (together with Ms Wallis for Peoples Trust). Atas commenced a third wave of defamatory publications against a broad range of people connected to her historic grievances, including Gary Caplan's brother, a reputable cardiologist living and practicing in the State of New Mexico in the United States of America. The impugned publications described Dr Caplan as a pedophile and child pornographer and included altered newspaper articles that made it look like established newspapers had so described Dr Caplan. The perpetrator used pictures of Dr Caplan that had been displayed on Dr Caplan's Facebook page including one referencing Dr Caplan's son, a young man with cystic fibrosis. Dr Caplan was alerted to the attacks by colleagues and patients, but he did not connect them to events in which his brother was involved in Ontario: it was a mystery to him as to why someone had targeted him for this malicious campaign of internet defamation.[6] Dr Caplan tried to engage by email and internet posts with the publisher of these posts, to appeal to his/her sense of decency, to no avail. One of the posts he found included an avatar picture of Ms Atas, but he did not know who she was or whether the name and image was real. Finally, after much effort, Dr Caplan did have an exchange of messages with a person at an account that was posting impugned messages. Since appeals to decency had proved ineffective, Dr Caplan posted a rude message to the account, which did prompt responses:

-   "your name is Caplan?"

-   "brother of Gary Caplan – attorney in Toronto?

-   [picture of Dr Caplan used with a "pedophile" caption]

-   "will be shared"

The reference to Dr Caplan's brother prompted him to inquire of his brother, and at that point the pieces began to fall together.

[37]    Upon investigation, it was discovered that Atas had mounted a campaign against several other members of Mr Caplan's family, including two sons-in-law (Messrs. Luth and Yov).

---

[6] Restated Motion Record, vol. 2, tab 2, para 6 *et seq.*

Page: 24

[38]    A similar attack was made on family members of Ms Wallis, the solicitor for Peoples Trust in the underlying litigation and in the s.140 application.  Ms Wallis had long been a target of Ms Atas (including posts that are the subject matter of the Dale & Lessman Action).  After a death in Ms Wallis' family, in relation to which Ms Wallis and her family members were named in an obituary, attacks began against every family member named in that obituary.  For example, Ms Atas found that Ms Wallis' daughter, Natalie, worked as an underwriter at a bank, and sent emails to other bank employees defaming her.

[39]    I granted an interim interim injunction against Atas in the Caplan Action on April 9, 2018, which I continued on an interim basis on May 1, 2018.  On February 14, 2019, I granted the injunction on an interlocutory basis pending final determination of the action or other court order.[7]

[40]    The terms of the injunction on the Caplan Action Injunction were broader than the prior injunction orders.  I prohibited her from posting anything[8] online at all, on the basis that history had shown that orders restricted to publications about specific people would leave it open to Atas to broaden her campaign further without violating the order.

### (d) No Babcock Action Injunction

[41]    The Babcock Action was commenced in the fall of 2019, after I had granted the interim injunction in the Caplan Action.  The plaintiffs in the Babcock Action did not seek an injunction on the basis that (a) the scope of the order made in the Caplan Action would protect them (if Atas abided by it) and (b) history to that point suggested that obtaining an injunction against Atas would provide no appreciable benefit to the plaintiffs and would lead to increased costs and delay.

**Summary**

[42]    The plaintiffs in the Stancer Action have had the benefit of an interlocutory injunction since 2010.  The plaintiffs in the Dale & Lessman Action have had the benefit of an interlocutory injunction since 2016.  As of April 2019, Atas has been prohibited from publishing anything at all on the internet (other than trying to sell items on sites like Kijiji).  All of these injunctions are framed to continue until final disposition of the Stancer Action, the Dale & Lessman Action and the Caplan Action respectively.

### **III – Contempt Proceedings for Alleged Injunction Breaches**

[43]    I have cited Atas for contempt of court for defying various procedural orders.  The details of those citations are set out in prior endorsements and are not repeated here.  Atas has spent 74 days in jail, plus a day in custody at the courthouse, in connection with these findings of contempt.  A sentence of six days for one of the findings of contempt was stayed pending appeal to the Court

---

[7] The delay between the initial interim orders and the interlocutory order was to set repeated schedules for Atas to deliver responding materials which, as it turned out, she never did.
[8] I provided minor exceptions to the order to permit Atas to try to sell things online using sites like Kijiji.

Page: 25

of Appeal and I understand that appeal has yet to be heard: the balance of the sentence to be served for that citation for contempt is five days in jail.

[44]     Plaintiffs in these proceedings have brought motions for findings of contempt of court against Atas: they claim that Atas has continued to publish statements about them on the internet in violation of the injunction orders.  The first such motion was brought in 2016 in the Dale & Lessman Action and the second, in 2018, in the Caplan Action.  These motions were referred to and have been case-managed by Pollak J.  Over more than three years, Pollak J. has held numerous case conferences and motions, has appointed *amicus curiae* and invited the Attorney General to take carriage and control of the process. The Attorney General advised that the Crown reserves the right to intervene in the proceedings after the liability phase of the contempt trial is decided.  I am advised that it is expected that the trial will take 20 to 30 days of court time, and that it is hoped that this trial may be heard in 2021, subject to the impact that the ongoing COVID-19 pandemic has on scheduling trials in Toronto.

## IV – Facts and Evidence On Which these Decisions Are Based

### (a) Vexatious Litigant Judgment (January 2018)

[45]     As stated above, this court found Atas to be a vexatious litigant in the Judgment released in January 2018.[9]  The Judgment compendiously reviews the history of litigation brought by, on behalf of, and against Atas.  No purpose would be served recounting that history again here. However, a note of caution is in order.

[46]     In the s.140 Application, Atas sought to litigate the merits of underlying litigation – some dozens of lawsuits.  For obvious reasons she was not permitted to do that: it can hardly be reasonable to litigate the merits of dozens of vexatious proceedings in order to decide whether they are vexatious.  However, the findings of fact made in the Judgment were based on the limited record before the court in that case.  Atas was told that she would have an opportunity to adduce a full record in any underlying litigation that was permitted to proceed after disposition of the s.140 Application.  Then, in the Judgment, the court set out a process by which Atas could seek permission to proceed with her other cases, if she wished to do so (Judgment, paras. 335-344, 357). She did not avail herself of that process, despite having deadlines extended several times, and despite being given clear warnings that she would have to take steps to advance those cases, or they would be disposed of and Atas would be precluded from trying to pursue them again in future.

[47]     Given this context, this court circumscribed the effect of factual findings in the Judgment – they were findings made on the record before the court in that proceeding, for the purpose of deciding that proceeding (Judgment, paras. 331-334).  As of the time the motions at bar were argued, the situation had changed.  All of the underlying litigation had been disposed of, other than the Defamation Proceedings (the cases at bar).  Atas, not having availed herself of opportunities to pursue the underlying litigation, is bound by the decisions in those cases, which may not be relitigated in defence of the Defamation Proceedings.  This point, as it turns out, has little effect

---

[9] *Peoples Trust* v. *Atas*, 2018 ONSC 58 (the "Judgment").

on the decisions in the motions before this court, because Atas chose to file no evidence.  Thus, there is, in any event, no evidence before the court that could be said to challenge the final disposition of the underlying litigation.

[48]    Findings set out in the Judgment are, therefore, available for use in this proceeding.  In particular, the history of the underlying litigation, as set out in the Judgment, may be incorporated by reference into this decision without repeating it here.  On this basis, the facts that underlie the allegations against Atas in these proceedings are incorporated by reference from the Judgment as follows:

   (a)  Atas' financing of the St George Street Property in 2003 (paras. 51-54);

   (b)    Litigation arising from the 2003 financing of the St. George Street Property (paras. 55-80).  As noted in the Judgment, Atas took the position that she would seek to re-open this old litigation and the Judgment provided her with a process by which she could seek to do this.  Ms Atas did not avail herself of that process and is now foreclosed from doing so.  Thus, it can now be said without qualification and I find that "the judgment of Pitt J. [in the Gomes/Kelly Mortgage Action is] final and authoritative, and not capable of challenge now." (Judgment, para. 75)

   (c)    The refinancing of the Wycliffe Property with Peoples Trust in July 2005, and litigation arising from mortgage enforcement steps taken by Peoples Trust in connection with that mortgage (Judgment, paras. 81-96).

   (d)    Litigation arising from the mortgage obtained from Peoples Trust in 2006 to refinance the St George Street Property (Judgment, paras. 97-111).

   (e)    Progress in litigation involving Atas was delayed when Atas successfully requested that the PGT be appointed to represent her in six proceedings, and then months later brought a motion to discharge the PGT on the basis that she was able to represent herself.  Events during this period (2010-2014) are set out in the Judgment, paras. 116-145.

   (f)    Other legal proceedings commenced by Atas are set described in paras. 146-152 and paras. 217-218 of the Judgment.

[49]    In the Judgment a process was established by which Atas could seek to continue with her litigation arising from mortgage enforcement steps in connection to the Wycliffe Property and the St George Street Property (Judgment, paras. 335-344, 357).  Ms Atas did afford herself recourse to the process established to fix contested mortgage enforcement expenses claimed by Peoples Trust, and this court decided those issues summarily in the fall of 2019.  Ms Atas did not avail herself of the process established in respect to the rest of the litigation arising out of the refinancing of the Wycliffe Property and the St George Property and all of that litigation has now been disposed of by this court.

   **(b) Deemed Facts in the Babcock Action**

[50]    In the Babcock Action, Atas has been noted in default. The allegations contained in the statement of claim in that action are deemed to be true. My findings of fact in that proceeding are anchored in the allegations in the statement of claim, and are also established by the affidavit evidence adduced by the plaintiffs on the motion for default judgment.

[51]    The Babcock action is brought by 23 plaintiffs who are all connected, directly or indirectly – or are related to – persons connected with real estate firms in Hamilton, Ontario.

[52]    The "Babcock Family" owned and operated a real estate brokerage in Hamilton between 1985 and 1997.[10]

[53]    Atas was employed by the Babcock real estate brokerage firm as a sales representative for slightly more than two years, between December 1990 and January 1993.[11]

[54]    Atas' employment was placed on probation for two three-month periods (starting August 27, 1991 and on June 25, 1992) for not adhering to professional standards after the firm received complaints from clients and other salespersons.[12]  In January 1993 the brokerage firm came to believe that Atas had committed further acts of serious professional misconduct, perhaps including fraud, and her employment was terminated.[13]

[55]    On January 23, 1993, Atas telephoned the owner of the brokerage firm, John Babcock, and threatened him with reprisal if he reported her to local and professional regulators and professional bodies. Babcock contacted police, the matter was investigated, Atas was interviewed, and she was cautioned.[14]

[56]    In 1997, the Babcocks sold their brokerage firm to Ralph Schmidt and Tom Rendall. The Babcocks refused to provide a favourable reference for her to the new owners, and the new owners declined Atas' requests for employment in the firm.[15]

[57]    John Babcock's wife, Barbara, died in 1999. Shortly afterwards, John Babcock received the following anonymous letter in the mail at his home address:

> Barbara Bab COCKSUCKER beloved shit/face of John Bab COCKSUCKER finally DIED after a short and evil life. The image of her bloated ugly corpse engulfed in flames tickles the soul. However, an incinerator would have been more appropriate, for that bloated piece of Garbage. The pain Bab COCKSUCKER endured in the final year of her short and evil life was lovely to witness. GOD BLESS[16]

---

[10] Babcock Statement of Claim, para. 13.
[11] Babcock Statement of Claim, para. 14.
[12] Babcock Statement of Claim, para. 15.
[13] Babcock Statement of Claim, para. 16.
[14] Babcock Statement of Claim, para. 17.
[15] Babcock Statement of Claim, para. 18.
[16] Babcock Statement of Claim, para. 19.

2021 ONSC 670 (CanLII)

2021 ONSC 670 (CanLII)

[58]    Roughly two weeks after John Babcock received this vile communication, several of his neighbours received anonymous letters in the mail which read as follows:

> John Babcock of 53 Braemar Pl. has been seen roaming the neighborhood late at night and masturbating behind the bushes. Please beware and keep your doors and windows locked.[17]

Ms Babcock reported these incidents to police and investigation was opened into criminal stalking and harassment.[18]

[59]    About three weeks later, in early May 1999, John Babcock received two more abusive communications, one in reference to his wife and the other calling him a "pervert".[19]  Then these communications seemed to end.

[60]    Babcock was convinced that Atas had been behind the conduct described above, but after it ceased in 1999, he took no further steps in respect to it.  From his perspective, the problem had gone away.

[61]    Unbeknownst to the plaintiffs, starting in 2016, Atas started posting defamatory statements on the internet about the Babcocks and others related to the Babcocks.  The publications started out calling plaintiffs "scammers", "thieves" and as engaging in "fraud".  Over time the calumny grew to include calling plaintiffs "pedophiles" and "dangerous pedophiles".  The publications were made from several source accounts, and often included pictures of plaintiffs.[20]

[62]    These publications were aimed at the Babcocks, the purchasers of the Babcock real estate brokerage firm, real estate agents who worked in Hamilton for RE/MAX brokerage firms, and family members (including spouses, siblings and children) of these people.[21]

[63]    Plaintiffs became aware of the internet attacks in 2018, when an email was sent to members of a club to which John Babcock was associated, accusing him and his sons of being pedophiles and attaching links to prior internet publications making these accusations.  The email was falsified to appear as if it came from an American who, it turns out, is or was a District Court Judge in West Virginia.[22]  When John Babcock was alerted to this communication, and he in turn alerted his sons, they conducted internet searches and discovered the campaign that had been underway against them for two years.

[64]    Initially the plaintiffs had no idea who was behind these attacks.  As noted above, John Babcock had been harassed and defamed previously, and he had believed that Atas had been responsible for those attacks.  But those events were more than fifteen years in the past.  There had

---

[17] Babcock Statement of Claim, para. 20.
[18] Babcock Statement of Claim, para. 21.
[19] Babcock Statement of Claim, para, 22.
[20] Babcock Statement of Claim, para, 49.
[21] Babcock Statement of Claim, para, 49-52.
[22] Babcock Statement of Claim, para. 48.

been no further dealings of any kind between Atas and Babcock and no reason for Babcock to believe that Atas had resumed and escalated her long-abandoned campaign.

[65]    As the Babcocks investigated the campaign that had been undertaken against them, they discovered that others had also been targeted, leading them to look for further victims, to try to discover a pattern that could lead them to the identity of the person behind these attacks.  And while searching for clues on the internet, they discovered information about Atas' attacks on plaintiffs in the three other Defamation Proceedings.  The *modus operandi* appeared to be the same.  The pieces fell together.  It had to be her.  No matter that no rational and reasonable person would do as Atas was apparently doing: to resurrect an old grievance and pursue it with a vengeance, against an ever-broadening group of victims: the ineluctable conclusion was that Atas had found a means for revenge against those with whom she was upset, and it had obviously given her a sense of satisfaction when wielded against the plaintiffs in the other Defamation Proceedings.

[66]    The plaintiffs plead that the words used, the form of the messages, the platforms used for publication, the links to Atas providing some direct evidence that she published these statements, the timing of these publications relative to the defamatory publications published by Atas in the other Defamation Proceedings, and the steps taken to hide Atas' identity when she learned of evidence discovered by plaintiffs in the Defamation Proceedings identifying her as the author and publisher, all provide circumstantial evidence that Atas is the author and publisher of the impugned statements in this case.

[67]    There is nothing in the record to explain why, after so many years, Atas became interested in Babcock again in 2016 and started her campaign against the Babcock Plaintiffs.  An obvious inference is that Atas was pleased with the results of the other internet campaigns she had mounted – they gave her pleasure and she knew that they caused her victims hardship.  At around the same time that she began her campaign that is the subject of the Dale & Lessman Action, she also started a fresh campaign against the Babcock Plaintiffs – using similar allegations, phraseology, avatars, pseudonyms and posting to the same sites.

[68]    The facts alleged in the statement of claim in the Babcock Action include an allegation that Atas is the author of the impugned publication.

[69]    I have cautioned myself that the facts deemed to be true in the Babcock Action by reason of Atas' default in that proceeding may not be treated as facts in the other Defamation Proceedings. However, plaintiffs in the Babcock Action have adduced evidence on this motion and, subject to considering the principles behind the permitted use of similar fact evidence, I may take the evidence into account in all of the Defamation Proceedings.

[70]    The deemed facts in the statement of claim establish that Atas has engaged in a systematic campaign of internet defamation and harassment of the plaintiffs in the Babcock Action. Accordingly, there shall be default judgment granted in the Babcock Action in accordance with my analysis of the legal principles set out below.

### (c) Evidence Adduced on these Motions

[71]    In the other three Defamation Proceedings, the plaintiffs have moved for summary judgment.  I review the law of summary judgment briefly, below.  One principle reduces this court's fact-finding task on these motions: in a motion for summary judgment, a defendant may not rest on the allegations in her pleadings: she must adduce affirmative evidence to establish her allegations.  In the lexicon of the cases, both parties "must lead trumps or risk losing".  I am entitled to weigh the record before me on the basis that it includes, in some form, all of the evidence that would be available at a trial.

[72]    The plaintiffs have placed a voluminous record before this court.[23]  Atas has filed no evidence on these motions.[24]  There is no issue about clashing evidence or credibility contests.  The question before this court is whether the plaintiffs have proved their allegations on a balance of probabilities based on the record they have put before the court.

[73]    I do not find it necessary to review in detail the tens of thousands of pages of evidence before me to explain my decision.  I have read it all.  There can be no doubt, on the record:

    (a) that the impugned publications were published on the internet;

    (b) that the publications are defamatory;

    (c) that the publications are intended to harass the people against whom they are targeted; and

    (d) that the publications are part of long-term campaigns to harass and defame the people against whom they are targeted.

[74]    As I explain below, there is only one factual issue that requires analysis in these reasons: is it proved on a balance of probabilities that it was Atas who published or caused to be published the impugned publications.

[75]    On the record before me, I have no doubt that it was.

[76]    I explain why I have come to this conclusion after reviewing the legal test for the claims in defamation, later in these reasons.  In summary, I have so concluded because the evidence is overwhelming that the impugned publications have all been made or directed by the same person.

2021 ONSC 670 (CanLII)

---

[23] Counsel advises that the aggregate record on these motions is comprised of more than 30,000 pages of evidence. 15 volume motion record filed in contempt proceedings in the Dale & Lessman Action (volumes are numbered 1-10, but volume 9 has 6 volumes); a "restated" five volume motion record for an interlocutory injunction sought in the Caplan Action; "restated" notices of motion in the Stancer Action, the Dale & Lessman Action and the Caplan Action; Notice of Motion for Default Judgment in the Babcock Action; Supplementary Affidavit of Guy Babcock, sworn January 25, 2019; Supplementary Affidavit of Luc Groleau, sworn February 1, 2019; Supplementary Affidavit of Luc Groleau, sworn March 7, 2019;  The Affidavit of Michael Jason Lee, sworn June 6, 2019; Affidavit of Tom Warren, sworn June, 20 2019; Affidavit of Nadire Atas,  sworn May, 17 2018; Transcript of the cross-examination of Nadire Atas, dated May 22, 2018.

[24] As noted in the previous footnote, an affidavit from Atas and a cross examination of her on that affidavit were filed on these motions, not by Atas, but by the moving parties.  The affidavit and cross examination were originally filed in connection with the motion for an interlocutory injunction brought in 2018 by the Caplan Plaintiffs.

The evidence is similarly overwhelming that some of the publications were made or directed by Atas. These two findings, put together, lead to the ineluctable conclusion that Atas made or directed all the impugned publications.

### (d) Factual Findings and Disposition

[77]    On the totality of the evidence I find that Nadire Atas has long used anonymous and pseudonymous communications to respond to grievances she has – or believes she has – against other people. This started at least as early as the 1990's, when her employment was terminated by John Babcock from the REMAX real estate brokerage firm he owned in Hamilton, Ontario. I find that Atas' employment was terminated for alleged unprofessional conduct, including allegedly dishonest conduct incompatible with working as a real estate agent: according to Babcock, Atas forged extensions to a listing agreement.[25]

[78]    I find that Atas contacted Babcock after the termination and threatened him if he reported her conduct to professional associations or regulators. Subsequently, Babcock sold his firm to another real estate brokerage firm owned by the Schmidt family. Atas sought employment with the firm after it was under new management, but her application was declined after Babcock refused to provide her with a positive reference. This precipitated another round of abuse aimed at Babcock.

[79]    These early rounds of abuse, taking place in the 1990's, with technology being as it then was, took place in writing, by way of "poison-pen" communications, taunting Babcock over the death of his wife and spreading malicious lies in Babcock's neighbourhood that he was a sexual predator. I find that Atas was suspected of these communications at the time, that there was a reasonable basis for this suspicion, that the matters were reported to police, who made contact with Atas to interview her. Following these police interviews, the malicious communications ceased until 2016, a gap in the conduct of about twenty years.

[80]    Starting in about 2010, Atas began a campaign of internet defamation focused on people involved in her litigation over the first financing of her property at St George Street. Atas had long been of the view that the original mortgage proceedings were wrongly decided – that there was an injustice in the court's adjudication of the issues. She took the position that this injustice resulted from misconduct by her lenders, by their counsel, incompetence by her own (multiple) solicitors, and that all of this would be established on evidence. She complained and sued these people. The impugned publications were based on Atas' allegations against these people. There is no evidence that there is anyone else involved in those matters would or could have made the impugned postings, which would have required knowledge of grievances that were peculiar to Atas.

[81]    Atas soon found herself in a fresh round of conflicts with Peoples Trust Company, the lender that refinanced her debt on the St George St and Wycliffe properties. Two sets of mortgage enforcement proceedings ensued in defense of which Atas claimed misconduct by the lender, its

---

[25] Babcock Affidavit, Restated Motion Record, vol. 5, tab 10.

lawyers, its property manager (in the case of the St George St. property), and her own (multiple) lawyers in defending her interests in that litigation.

[82]    I find that Atas commenced a fresh round of defamatory internet publications in 2016, and at around the same time began a new campaign of similar publications against persons associated with her old conflict with Babcock. In respect to the Dale & Lessman Action, Atas admits to posting the impugned publications in her statement of defence and takes the position that the allegations are true. This defence is not available to Atas for two reasons: (i) she has adduced no evidence to prove the truth of these statements, and (ii) her defence of justification is now foreclosed by the final dismissal of all of the underlying litigation. Atas' defence of justification is a collateral attack on authoritative judicial decisions and has been finally decided against her.

[83]    The facts alleged in the Babcock Action are true but are also established on the evidence put forward by plaintiffs in the Babcock Action. The Babcock campaign had been underway for two years before it came to Babcock's attention, and that only happened because Atas contacted a club of which Babcock was a member and brought the publications to the club's attention. This emphasizes the obvious underlying motive for Atas: to cause distress to her victims. She wanted to know that Babcock knew about the publications.

[84]    Finally, I find that Atas commenced yet another campaign in 2018 against the Caplan plaintiffs, seeking redress against a lawyer who had taken a prominent role against her in the s.140 Application.

[85]    There is evidence that defamatory publications have continued after the interim injunction was issued in the Caplan Action. On a civil standard of proof it is clear that these publications were made or directed by Atas. This is a relevant fact in considering the scope of relief to be granted in this case: together with Atas' defiance of court orders in the case management process, the court concludes that granting a permanent injunction, by itself, will not be sufficient to bring Atas' wrongful conduct to an end.

[86]    Throughout, Atas has shown a pattern of seeking to create, prolong and escalate conflict with her adversaries, launching numerous repetitive lawsuits, seeking ever larger damages awards. She has maintained that she wishes to have her grievances adjudicated in a fair process, in fact she has used the litigation process to prolong conflict through endless procedural techniques. She herself sought to interrupt the process of litigation by having herself found in need of a litigation guardian by reason of mental illness, only to seek to have the appointment of the Public Guardian and Trustee terminated months after it had been appointed, ostensibly because she had recovered her mental health, but in reality because she had failed to understand that her litigation guardian would control her litigation and would be able to settle it without her consent. When the Public Guardia and Trustee sought court approval to do precisely that, Atas launched her motion to remove the PGT, a process replete with procedural manoeuvring that took nearly three years to complete, during which time almost no progress was made on the dozens of legal proceedings in which she was involved. On the eve of these motions, to delay or prevent the hearings, she made an assignment in bankruptcy.

2021 ONSC 670 (CanLII)

[87]    The plaintiffs raise one other factual issue that relates to their ability to use this judgment to remove defamatory postings that are under the control of courts outside Ontario.  Counsel advises that in some American jurisdictions, the plaintiffs require an affirmative finding of the falsity of the impugned publications in order to get those publications removed.  If this court does not make the requisite factual findings then, counsel advises, plaintiffs may be put to the expense of re-litigating issues that have been finally determined by this court.

[88]    This request could pose a serious problem in many defamation cases.  It is not for the plaintiffs to prove that the impugned statements are false.  It is the defendant's burden to prove that they are true.  In many cases where justification is contended, the court may make no more of a finding than that the defendant has failed to meet her burden to show that the statements are true.  That is not the same thing as the court finding that the statements are false.

[89]    However, in this case this issue is not so difficult.   The allegations of professional misconduct against plaintiffs are precluded by authoritative decisions in the underlying litigation.  There are already judicial decisions establishing the true version of the facts and the impugned statements are inconsistent with those facts.  In respect to the other allegations, not grounded in the underlying litigation, they are patently false and without any evidentiary foundation.  They were statements made for the purposes of harassment – made knowing the statements to be false.  These two principles cover the range of publications excepting only those statements that are, on their face, not factual claims (naked abuse, such as calling a person a "twit").  Although the factual findings are not necessary in order to decide this case under Ontario law, I am satisfied that making such findings is an appropriate ancillary remedy available in this case.

[90]    I find as a fact that all of the impugned publications are false, other than those that do not allege facts and are properly understood as empty statements of disapprobation,

[91]    On the facts, Atas has done what the plaintiffs allege in the four Defamation Actions.  Based on the legal analysis that follows, there shall be judgment for the plaintiffs on the motions for summary judgment.

## **Part 2: Law, Remedies and Final Orders**

### **Introduction**

[92]    Atas has engaged in a vile campaign of cyber-stalking against the plaintiffs in the four actions, the goal of which has been retribution for longstanding grievances.  As argued by the plaintiffs, the conduct falls in the area where the civil and criminal law intersect.  The law should respond to this conduct to compensate victims, to express the law's disgust and firm rejection of the conduct, to punish for wrongful conduct, to deter Atas and others from this sort of conduct in future, and to bring Atas' wrongful conduct to an end.

[93]    The law's response, thus far, has failed to respond adequately to Atas' conduct.  It is evident that Atas enjoys the ongoing conflict.  The history set out in the Judgment demonstrates that this is so.  In the denouement to the Judgment (paras. 352-356), I noted that Atas' personal history did not emerge during the s.140 application, except narrowly glimpsed aspects of her life.  More has emerged on these motions, but it is still not clear what Atas conceives as the benefit she obtains

2021 ONSC 670 (CanLII)

from her conduct. At one point she was a qualified real estate professional and owned two income properties. Now she is destitute, lives in shelters, owns no property other than the clothes on her back and a cellphone, and is an undischarged bankrupt. She has already spent 74 days in jail for contempt of court unrelated to her alleged violations of the injunctions, and plaintiffs are seeking substantial jail sentences for Atas alleged breaches of the injunctions.

[94]    In sum, there have been severe consequences for Atas for her conduct. These consequences address the court's concerns about general deterrence. Although Atas herself has not been deterred, the consequences she has suffered and may yet suffer would deter most people from doing what she has done. Those with assets and income would be deterred by the threat of financial ruin. Those with any eye to the future would be concerned about the damage to their reputation: Atas' prospects for obtaining financing, leasing a residence, securing employment, would all be impacted negatively by the public record of court decisions respecting her conduct. And, of course, most people value freedom and recognize the risk of incarceration associated with defying court orders.

[95]    Compensation, though usually a primary goal of the civil justice system, is not available from a person such as Atas. On the record, Atas has been insolvent for years. She made an assignment in bankruptcy on the eve of these motions for judgment and monetary remedies have been abandoned by the plaintiffs as the price for proceeding with these motions without the delay of obtaining an order to continue from the bankruptcy courts.

[96]    Expressions of the law's disapprobation in a civil proceeding are usually limited to awards of punitive and exemplary damages – claims that have been abandoned in this proceeding because of their futility and to avoid delay as a result of Atas' assignment in bankruptcy. Again, Atas' poverty leaves her judgment-proof.

[97]    This leaves two closely related goals: specific deterrence and preventing Atas from continuing or repeating this conduct. The first aspect addresses Atas' motive force. The second addresses creating practical impediments to Atas repeating or continuing this conduct, whatever she may wish to do. This latter aspect is focused on efficacy and dispatch: remedies for the plaintiffs that could embroil them in further lengthy legal proceedings with Atas would be counter-productive: it is clear that provoking and continuing legal proceedings of any kind is something Atas seeks.

[98]    The Statements of Claim in each of the four actions plead defamatory libel as a cause of action. In addition, the Statements of Claim in each of the Caplan and Babcock Actions plead common law 'harassment' and 'private nuisance'. All of the Statements of Claim seek "such further and other relief" as the court considers just.

[99]    Online harassment, bullying, hate speech, and cyber stalking straddle criminal and civil law. Harmful internet communication has prompted many jurisdictions to amend or pass legislation to deal with the issue. The courts too have been challenged to recognize new torts or

expand old ones to face the challenges of the internet age of communication.[26] The academic commentators are almost universal in their noting that, while online harassment and hateful speech is a significant problem, there are few practical remedies available for the victims.

[100]   In England, after it appeared that there was some movement toward the recognition of a common law tort of harassment, Parliament passed the *Protection from Harassment Act 1997*, which created statutory protections and civil remedies for harassment.   In 2014, the Australian Law Reform Commission recommended the passage of legislation for a statutory civil remedy for harassment.   In 2015, New Zealand passed the *Harmful Digital Communications Act*, which created an agency to administer a complaints process and applicable remedies.

[101]   In November 2017, the Law Reform Commission of Ontario published a consultation paper entitled 'Defamation Law in the Internet Age'.   One of its working papers, entitled 'The Relationship between Defamation, Breach of Privacy, and Other Legal Claims Involving Offensive Internet Content' was published by David Mangan in July 2017. Both the consultation paper and the working paper include extensive reviews of the law.  Since final argument of these motions, the Law reform Commission of Ontario has published a Final Report.[27]   To date, legislation has not been enacted in Ontario to address these issues.

[102]   In 2018, Nova Scotia re-introduced the *Intimate Images and Cyber-Protection Act*.[28] 'Cyber-bullying' is defined, at section 3(c) of the *Act*, as follows:

> "cyber-bullying" means an electronic communication, direct or indirect, that causes or is likely to cause harm to another individual's health or well-being where the person responsible for the communication maliciously intended to cause harm to another individual's health or well-being or was reckless with regard to the risk of harm to another individual's health or well-being, and may include (i) creating a web page, blog or profile in which the creator assumes the identity of another person, (ii) impersonating another person as the author of content or a message, (iii) disclosure of sensitive personal facts or breach of confidence, (iv) threats, intimidation or menacing conduct, (v) communications that are grossly offensive, indecent, or obscene, (vi) communications that are harassment, (vii) making a false allegation, (viii) communications that incite or encourage another person to commit suicide, (ix) communications that denigrate another person because of any prohibited ground of discrimination listed in Section 5 of the Human Rights Act,

---

[26] The Book of Authorities contains a number of on line articles which are instructive on this point: see Mary Mullen, *Information Brief for the Minnesota House of Representatives*, "The Internet and Public Policy: Cybertorts and On Line Property Rights ( May 2018); DLA Piper, "Online Harassment: A Comparative Policy Analysis for Hollaback" (November 2016);  Alice Marwick and Ross Miller, "Online Harassment, Defamation, and Hateful Speech: A Primer of the Legal Landscape", (June 10 2014, *Fordham Center on Law and Information Policy Report*. See also David A. Potts, "Cyberlibel: Information Warfare in the 21st Century" Irwin Law Inc. (2011).

[27] Law Commission of Ontario, *Defamation Law in the Internet Age* (Final Report: March 2020)  https://www.lco-cdo.org/wp-content/uploads/2020/03/Defamation-Final-Report-Eng-FINAL-1.pdf.

[28] The *Intimate Images and Cyber-Protection Act*, SNS 2017, c 7, (http://canlii.ca/t/53dcv). An earlier version of the Act was struck down in *Crouch v. Snell*, 2015 NSSC 340 (http://canlii.ca/t/gmhjl). See too the *Intimate Image Protection Act*, CCSM c I87, (http://canlii.ca/t/52ksr) which creates a statutory actionable tort.

2021 ONSC 670 (CanLII)

or (x) communications that incite or encourage another person to do any of the foregoing.

[103]  Section 6(1) of the *Act* gives the Court the following powers:

Where the Court is satisfied that a person has engaged in cyber-bullying or has distributed an intimate image without consent, the Court may make one or more of the following orders:

(a)  an order prohibiting the person from distributing the intimate image;

(b)  an order prohibiting the person from making communications that would be cyber-bullying;

(c)  an order prohibiting the person from future contact with the applicant or another person;

(d)  an order requiring the person to take down or disable access to an intimate image or communication;

(e)  an order declaring that an image is an intimate image;

(f)  an order declaring that a communication is cyber-bullying;

(g)  an order referring the matter to dispute-resolution services provided by the agency or otherwise;

(h)  an order provided for by the regulations;

(i)  any other order which is just and reasonable.

[104]  As should be clear from this brief review, this is a developing area of the law.  The law of defamation provides some recourse for the targets of this kind of conduct, but that recourse is not sufficient to bring the conduct to an end or to control the behaviour of the wrongdoer.  The reasons that follow explain this conclusion, which provides a foundation for this court's conclusion that the common law tort of harassment should be recognized in Ontario.  "Harassment" describes what Atas has been doing, and ordering Atas to stop harassment provides remedial breadth not available in the law of defamation.

[105]  The balance of these reasons is structured as follows:

(a)  First, I review applicable principles of the law of summary judgment.

(b)  Second, I review applicable principles of the law of default judgment.

(c)  Third, I review the law of defamation and conclude that Atas has committed the tort of defamation against each of the plaintiffs.

(d)     Fourth, I review the law related to the common law tort of harassment and explain why this case is distinguishable from recent appellate authority finding that there is no need to recognize this tort in Ontario.

(e)     Fifth, I briefly review the test for the tort of invasion of privacy and conclude that the facts of this case does not meet the test for this tort, and conclude that (a) binding authority precludes this court from altering the legal test for this tort and (b) recognition of the tort of harassment will enable the court to provide an effective remedy for the plaintiffs without broadening the established test for the tort of wrongful invasion of privacy.

(f)     Sixth, I address numerous discreet arguments made by Atas in her factum and during oral argument.

(g)     Seventh and finally, I address remedies and draft orders provided by the plaintiffs.

**(a) Summary Judgment Principles**

[106]  The principles applicable on motions for summary judgment are set out in *Hryniak* v. *Mauldin*[29] and *Sweda Farms* v. *Egg Farmers of Ontario.*[30]

Prior to *Hryniak*, the test for summary judgment was: can a full appreciation of the evidence and issues required to make dispositive findings be achieved by way of summary judgment, or can this full appreciation only be achieved by way of a trial?[31]  Under this test, generally, in cases where there must be multiple findings of fact on the basis of testimony from a number of witnesses, and/or where there is a voluminous record, a motions judge will not be able to come to a "full appreciation" of the case without a trial.  However, that does not mean that a substantial record, or numerous witnesses, will always preclude summary judgment.  The focus is on the relationship of the record to the contested issues that have to be decided.[32]

The length and complexity of the statement of claim is of little significance on a motion for summary judgment.  The plaintiffs must show that there is evidence to support their allegations.[33]  A party may not rest on allegations in its pleadings on

---

[29] *Hryniak* v. *Mauldin*, 2014 SCC 7.

[30] *Sweda Farms Ltd.* v. *Egg Farmers of Ontario*, 2014 ONSC 1200, aff'd 2014 ONCA 878, leave to appeal to SCC refused [2015] SCCA No. 97.

[31] *Combined Air Mechanical Services* v. *Flesch*, 2011 ONCA 764, 2011 CarswellOnt 13515 (C.A.) at paras. 50-51; Rule 20.04(2).

[32] *Combined Air Mechanical Services* v. *Flesch*, 2011 ONCA 764, para. 51, 2011 CarswellOnt 13515 (C.A.) at paras. 50-51; Rule 20.04(2); *Precious Metal Capital Corp.* v. *Smith*, 2012 CarswellOnt 5603 (C.A.) at paras. 10 and 12; leave to appeal refused 2012 CarswellOnt 14533 (S.C.C.).

[33] *New Solutions Extrusion Corp.* v. *Gauthier*, 2010 CarswellOnt 913 (S.C.J.); aff'd 2010 CarswellOnt 2966 (C.A.).

a motion for summary judgment. The party must "put its best foot forward" or "lead trumps or risk losing".[34] [35]

[107] *Hryniak* dispenses with the trial as the measuring standard against which a motion for summary judgment is measured:

> Summary judgment motions come in all shapes and sizes, and this is recognized in the Supreme Court of Canada's emphasis on "proportionality" as a controlling principle for summary judgment motions. This principle does not mean that large, complicated cases must go to trial, while small, single-issue cases should not. Nor does it mean that the "best foot forward" principle has been displaced; quite the reverse. If anything, this principle is even more important after *Hryniak*, because on an unsuccessful motion for summary judgment, the court will now rely on the record before it to decide what further steps will be necessary to bring the matter to a conclusion. To do this properly, the court will need to have the parties' cases before it.

> As I read *Hryniak*, the court on a motion for summary judgment should undertake the following analysis:

> (1)    The court will assume that the parties have placed before it, in some form, all of the evidence that will be available for trial;

> (2)    On the basis of this record, the court decides whether it can make the necessary findings of fact, apply the law to the facts, and thereby achieve a fair and just adjudication of the case on the merits;[36]

> (3)    If the court cannot grant judgment on the motion, the court should:

> (a)    Decide those issues that can be decided in accordance with the principles described in 2), above;

> (b)    Identify the additional steps that will be required to complete the record to enable the court to decide any remaining issues;[37]

> (c)    In the absence of compelling reasons to the contrary, the court should seize itself of the further steps required to bring the matter to a conclusion.

---

[34] *Combined Air Mechanical Services* v. *Flesch*, 2011 ONCA 764, para. 51, 2011 CarswellOnt 13515 (C.A.), at para 56; *Bhakhri*, v. *Valentin*, 2012 CarswellOnt 6667 (S.C.J.), para. 7; *Pizza Pizza* v. *Gillespie* (1990), 1990 CanLII 4023 (ON SC), O.J. No. 2011.
[35] *Sweda Farms* v. *Egg Farmers of Ontario*, 2014 ONSC 1200, paras. 24-25.
[36] *Hryniak* v. *Mauldin*, 2014 SCC 7, para. 4.
[37] *Hryniak* v. *Mauldin*, 2014 SCC 7, paras. 66-68, 76-78.

2021 ONSC 670 (CanLII)

The Supreme Court is clear in rejecting the traditional trial as the measure of when a judge may obtain a "full appreciation" of a case necessary to grant judgment. Obviously greater procedural rigour should bring with it a greater immersion in a case, and consequently a more profound understanding of it. But the test is now whether the court's appreciation of the case is sufficient to rule on the merits fairly and justly without a trial, rather than the formal trial being the yardstick by which the requirements of fairness and justice are measured.[38]

[108]   Two points from this summary bear emphasis for these motions for summary judgment. First, the parties must put their "best foot forward" on these motions. They must adduce evidence and may not rest on the allegations set out in their pleadings. The plaintiffs have adduced a voluminous record to support their motion. Atas has adduced no evidence in her defence of these motions. This does not mean the plaintiffs should win the motion, solely because of Atas' failure to place any evidence before the court. It is still for the plaintiffs to prove on a balance of probabilities that there are no issues for trial.

[109]   Second, a point seldom discussed in the vast jurisprudence respecting summary judgment, the court is entitled to presume have placed before it "in some form" all of the evidence that will be available for trial. The court does not presume that the evidence on the motion is the "best evidence" or in the form of the evidence that would be tendered at a trial. Quite the contrary, hearsay evidence may be tendered in affidavits on information and belief on a motion for summary judgment, evidence that would not generally be admissible in this form at a trial unless a successful *Khan* application was brought.[39]

[110]   It is expected that there will be fewer witnesses on a motion for summary judgment, and that some evidence may be presented in the form of will-says and other hearsay evidence that places a party's case before the court in "summary" form: one of the tasks of the motions court will be to consider whether it is necessary to hear directly from witnesses whose evidence has been tendered in hearsay form, either through the use of the extended powers on a summary judgment motion, or by directing that the action, or some aspect of it, be tried.

[111]   In these cases, where Atas has adduced no evidence at all, there is no conflict in the evidence before the court, and the risks associated with proceeding on a written record are greatly reduced. I have not found it necessary to use the ancillary powers available to a judge hearing a summary judgment motion: I am satisfied that I my "appreciation of the case is sufficient to rule on the merits fairly and justly without a trial" and without exercising any of the ancillary powers available to me pursuant to Rule 20.

### (b) Default Judgment Principles

[112]   A defendant who has been noted in default is deemed to admit the truth of all allegations of fact made in the statement of claim: Rule 19.02(1). A defendant who has been noted in default

---

[38] *Sweda Farms* v. *Egg Farmers of Ontario*, 2014 ONSC 1200, paras. 32-34.
[39] *R.* v. *Khan*, [1990] 2 SCR 531.

is not entitled to notice of any step in the action and need not be served with any document in the action, except where the court orders otherwise: Rule 19.02(3).

[113]   Where a defendant has been noted in default, the plaintiff may move before a judge for judgment against the defendant on the statement of claim in respect to any claim for which default judgment has not been signed: Rule 19.05(1).  Such a motion for judgment shall be supported by evidence given by affidavit if the claim is for unliquidated damages: Rule 19.05(2).

[114]   A plaintiff is not entitled to judgment on a motion for judgment merely because the facts alleged in the statement of claim are deemed to be admitted, unless the facts entitle the plaintiff to judgment: Rule 19.06.

[115]   In the motion for default judgment in the Babcock Action, the plaintiffs have not relied solely on the allegations in their statement of claim and their deemed truth because of the noting in default.  They have placed affidavits before the court to establish the facts upon which their claims are based.  This they are entitled to do, and the court may receive and consider that evidence when deciding whether to grant default judgment.

### (c)  Defamation Law

[116]   There can be no doubt that the content of many of the thousands of postings allegedly posted on the internet by Atas are defamatory of the plaintiffs, their families and associates. The affidavits sworn by the plaintiffs contain many thousands of examples.

[117]   On their face, the impugned postings are "of and about" the plaintiffs (identifying the plaintiffs by name, often also by reference to a photograph and other identifying information such as addresses or business associations).

[118]   On their face, most of the impugned posting are defamatory of the plaintiffs, alleging that plaintiffs are (variously) dishonest, incompetent, have acted in violation of professional standards, have committed fraud, and, in some cases, are prostitutes, "sluts", sexual predators, pedophiles (including, in some cases, pedophiles who take a public role in educating the public about the challenges and possibilities of persons suffering from pedophilia of rising above their desires and living constructive and law-abiding lives), members of organizations advocating sexual exploitation of children, such as NAMBLA ("North American Man-Boy Love Association").

[119]   A minority of the postings are not defamatory of the plaintiffs because the substance of these postings are abusive comments rather than factual allegations.  Calling someone a "twit" or "stupid", in the context in which the postings are presented, communicates no more than disapprobation and does not communicate a statement of fact that is either true or false: the plain meaning of this minority of postings is that the poster dislikes and/or disapproves of the target of the posting.  These publications may be considered as part of a pattern of harassment but cannot ground liability in defamation.   The vast majority of postings include serious defamatory statements, and the "merely abusive" comments are a form of rhetorical seasoning.  There is no need to undertake a close analysis to separate defamatory words from the "merely abusive" words in the context of the overall mass of defamatory publications.

2021 ONSC 670 (CanLII)

[120]   The postings have been disseminated on the internet anonymously, pseudonymously, or by using false names.  This has been done by placing the postings on internet sites that do not monitor or control the content of postings, including:

- Wordpress

- Ripoff Reports

- Reddit

- Pinterest

- Facebook

- Lawyerratingz

- Blogspot

- dozens of other less well known sites such as "cheaters.com" and "reportcheatingonline"

On the record before me, these sites may be viewed almost anywhere in the world by anyone with access to the internet.  On these facts, by posting the impugned words, the person who posted them "published" the words within the meaning of the law of defamation.

[121]   This leaves two sets of issues for this court to decide: (1) whether the plaintiffs have proved on a balance of probabilities that Atas is the author of, published, and/or caused to be published the defamatory words; and (2) whether a defence has been established for publishing these words.

### (1) Atas wrote, published and/or caused to be published the impugned words

[122]   Atas wrote and published the statements that are the subject-matter of the Dale & Lessman Action.  She has so admitted in her statement of defence in that action, and so argued during oral argument.

[123]   While Atas has attempted to publish her statements anonymously or pseudonymously in the other Defamation Proceedings, she is not sophisticated enough in respect to internet technology to entirely cover her tracks successfully.  Further, she has, from time to time come forward and self-identified in efforts to prevent hosting sites from releasing information about the person who posted the impugned content.

[124]   The affidavit of Luc Groleau[40] explains how Mr Groleau was able to link postings to Ms Atas.  Mr Groleau, a plaintiff in the Babcock Action (a son-in-law of Mr Babcock), is an IT specialist, and was able to find out a great deal of relevant information by virtue of his expertise.[41]

---

[40] Restated Motion Record, volume 5, tab 11 and Supplementary Motion Record, vol. 1, tab 4.
[41] Mr Groleau was not put forward as an expert witness.  He has given evidence of his expertise (he would qualify as an expert if he was independent), and then explained in detail what he did to link posts to Atas.  I am satisfied that I

As explained in detail in Mr Groleau's affidavits, many of the impugned postings are connected to Atas' pinterest account, including her picture and other identifying information. Much of this information was hidden in the coding rather than displayed on impugned postings, and so would not have been apparent to an unschooled poster. The reasonable inference is that Atas used her pinterest account as the basis of her internet presence, but used masking techniques (such as "gravatars") to make it appear that the postings were coming from some place other than from a person using her pinterest account.

[125]   Also as explained in detail by Mr Groleau, the tactics used to post online changed after evidence was served in these proceedings describing the techniques Atas had used to that point. The change in masking tactics corresponds so closely with the dates this information was served on Atas to ground an inference that, after Atas learned how she had left clues tying her to impugned posts, she changed her tactics to try to avoid detection.

[126]   One of the sites used to publish impugned reports is called "Ripoff Reports". The company that hosts "Ripoff Reports" is located in Arizona. Plaintiffs in the Stancer Action, Dale & Lessman Action and Caplan Action, contacted Ripoff Reports to request that defamatory content be removed and that metadata showing the source of the posts be provided to the plaintiffs. The Arizona company would not provide the metadata without a court order (as was its general practice) but advised that it would consider complying voluntarily with a court order from an Ontario court. On this basis, plaintiffs sought an order in the nature of a "Norwich Order" from this court, a request opposed by Atas before this court.

[127]   Atas contacted Ripoff Reports in Arizona, by telephone, to oppose removal of the posted content or divulgation of metadata associated with those postings. Those postings included a full range of offensive content, covering allegations in the Stancer Action, the Dale & Lessman Action and the Caplan Action. The Ripoff Reports postings were posted using many of the aliases attributed to Atas.

[128]   It was Atas who phoned in respect to these posts. She spoke to one of the directing minds at Ripoff Reports and clearly took the position that she had an interest in the impugned postings. She asked "why are these posts being taken down when they're true". There were eight such telephone conversations between Atas and Ripoff Reports. They were recorded. The recordings are part of the record before the court on these motions. It is Atas' voice on those calls. And the calls are attested to by the other party to those calls, Ed Magedson, in his affidavit evidence on these motions.[42]

[129]   The metadata associated with the postings to Ripoff Reports provides addresses and computer ID's for the computers that sent the postings. One is located at a branch of the

---

am able to understand and evaluate the information provided by Mr Groleau without receiving opinion evidence from an expert. By way of example, if a witness testified that information reflected in a bank account showed that certain amounts of money were directed to certain payees, so long as sufficient evidence was adduced as to how this information was gathered, it could be received by the court through a fact witness rather than an expert witness.
[42] Restated Motion Record, tab 8.

2021 ONSC 670 (CanLII)

Scarborough Public Library, and another at a public terminal located at University of Toronto.[43] By her own evidence (obtained during cross examination on an injunction motion), Atas testified that she does not own a computer and accesses the internet by public computer terminals in libraries, at University of Toronto, and in "internet cafes".  Under surveillance, Atas was seen at a computer terminal at a library at University of Toronto, though she was not observed in the act of making any of the impugned postings.

[130]   Analysis done by Mr Groleau and Mr Lee ties many of the impugned postings to Atas' facebook page, her email address, her pinterest account, and an avatar she uses that is a picture of Atas.  These correlations tie together posts made to multiple platforms about multiple victims and establishes a pattern of work done by Atas to disseminate her publications widely, under multiple fictitious names, to multiple platforms.  There is a clear *modus operandi* here, and it is convincingly tied back to Atas.

[131]   As stated above, most of the publications appear to have been made from public computers in the Toronto area.  However, when plaintiffs sought publication information from the "Pinterest" web site, in legal proceedings in California, they received information that one of the accounts publishing this information belonged to a person calling herself (online) "Fayeth Cees".[44]

[132]   Plaintiffs retained a private investigator, Tom Warren, and he investigated the postings made under the name "Fayeth Cees".  In reviewing online information about this person, Mr Warren came to the view that her account appeared to be "genuine" – that is, that it was a real account, for a real person with an online presence beyond the publication of defamatory and harassing content at issue in these proceedings.

[133]   On further investigation, Mr Warren was able to locate "Fayeth Cees".  He learned that this person works as a sex worker in northern Ontario. This person told Mr Warren that Atas had asked her to post impugned publications harassing and defaming plaintiffs and promised to pay her for doing that.

[134]   Mr Warren gave evidence, by affidavit, describing his investigation, the statements made to him by "Fayeth Cees", and explained that this person stopped communicating with him and would not provide an affidavit for these proceedings.

[135]   In argument, Atas noted that Mr Warren provided information that "Fayeth Cees" has substance abuse issues.  She argued that "she would say it is fabricated by Warren" – by which she argued that Mr Warren fabricated the evidence he attributes to "Fayeth Cees".

[136]   Atas then argued, presumably in the alternative, that "Fayeth Cees" was probably living "in a haze" induced by drugs.  She argued that a "drug-addicted witness" would not be able "to do these things" (by which she meant navigate to the various internet sites and post the content posted

---

[43] Affidavit of Michael Lee, Supplementary Record, vol., tab 5; Supplementary Record, vol. 2, tab 6.
[44] "Fayeth Cees" is a moniker for Robin Faith Corbiere.

by "Fayeth Cees". Atas argued further that a drug-addicted witness would have to have "some sort of organization and ability to keep track."

[137] On a motion, a party may adduce hearsay evidence on information and belief. This evidence is admissible, in the discretion of the court, and the weight to be placed upon it is a matter of discretion in all the circumstances of the case. For the following reasons I admit this evidence and accept it as true:

(a) Mr Warren is a professional private investigator. He was retained and paid by plaintiffs, as would be the case with any private investigator retained in a case such as this, but he does not otherwise have any connection to the parties or issues in this case.

(b) Mr Warren gives evidence in the affidavit of the steps he took to locate "Fayeth Cees", and then to meet with her and talk to her. Mr Warren was not cross-examined on this evidence, and no evidence to the contrary was placed before the court. On the record before me, Mr Warren is a trustworthy witness, and I have no reason to doubt that he did what he says he did and had the conversations with "Fayeth Cees" that he describes.

(c) I accept that Fayeth Cees is, herself, an inherently unreliable witness, and her evidence must be approached with caution. I say this not because she is a sex worker, or that she has substance abuse issues, but because, on her own statements, she agreed to accept money to post hateful and malicious statements on the internet about complete strangers.

(d) The statements made by "Fayeth Cees" about what she did herself are not "double-hearsay" coming from Mr Warren: she has direct knowledge of these things and would be entitled to testify to them in person. Set out in Mr Warren's affidavit, they are "single hearsay" – the kind of evidence that is permitted on information and belief in an affidavit, as described above.

(e) The statements made by Fayeth Cees about her knowledge of and dealings with Atas are likewise first-hand evidence from Fayeth Cees, and Mr Warren's evidence is hearsay on information and belief, admissible on this motion.

(f) The statements attributed to Atas by Fayeth Cees, as reported by Mr Warren, are not double-hearsay for two reasons. First, they are material, not for the truth of the underlying contents of the statements, but for the fact that they were said by Atas to Fayeth Cees. Fayeth Cees has direct knowledge that the statements were said. Second, the statements attributed to Atas by Fayeth Cees are statements against interest made by a party to these proceedings and are admissible as "admissions".

(g) The words published by Fayeth are consistent in tone, content, and phraseology, to the other statements published by Atas. The similarities are so striking as to make it highly unlikely that two different unrelated persons would have independently published these materials. It is possible, of course, that the publications by Fayeth

Cees were republications by Fayeth Cees of prior publications by Atas. However, there is no evidence that would provide a foundation to make this a plausible explanation. The scope of the republished comments, against multiple unconnected victims, is far too great to persuade me that Fayeth Cees came across Atas' posts online and decided to republish them herself, for no apparent reason.

(h)    The targets of the posts by Fayeth Cees are all connected to Atas – they are Atas' opponents or persons chosen because of their proximity to her opponents or the underlying conflicts with her opponents. There is not a shred of evidence that "Fayeth Cees" herself has any connections of any kind to any of the victims.

(i)    The posts under the name of Fayeth Cees" were made after litigation had begun between plaintiffs and Atas, and arranging for publication of defamatory and harassing materials from some place distant from Toronto would serve to distract plaintiffs and make their task of proving Atas' authorship more expensive and time-consuming (which it was). Such conduct is in keeping with Atas' longstanding obsessive campaigns of harassment of plaintiffs, inside and outside the litigation process.

(j)    Atas did not give evidence denying the statements made by Fayeth Cees to Mr Warren.

(k)    Atas did not cross-examine Mr Warren, either in respect to Fayeth Cees herself (to cast doubt on the credibility of the statements made by Fayeth Cees to Mr Warren) or to impugn Mr Warren's credibility in support of the argument that Mr Warren himself fabricated the evidence attributed to Fayeth Cees.

(l)    It is understandable that Fayeth Cees would have little interest in being involved voluntarily in these proceedings. She told Mr Warren that she was unhappy with Atas because Atas never paid her as she had said she would, but beyond that, in the absence of being compelled as a witness in these proceedings, it is understandable and believable that Fayeth Cees would decide to stop communicating with Mr Warren and not willingly provide evidence herself in these proceedings.

[138]   If Atas had given evidence to challenge the statements attributed by Fayeth Cees, it could have been open to either side to seek to examine Fayeth Cees as a witness in these proceedings. The plaintiffs were entitled to proceed on the basis of the information obtained from Fayeth Cees, and to present it through Mr Warren on information and belief, and Atas has not established a basis on which this court should reject this evidence.

[139]   As set out in the second supplementary affidavit of Luc Groleau, it is clear that Atas' online attacks have continued in the face of injunction orders against her, attacks brought against an ever-widening group of people.[45]

---

[45] Second Supplementary Affidavit of Luc Groleau, Supplementary Record, vol. 8.

[140]  Mr Groleau is a son-in-law of Mr Babcock and, as it happens, has been an information technology specialist employed at IBM for nearly three decades.  Mr Groleau has continued to keep track of Atas' internet harassment as the actions have moved forward.  In his most recent internet searches, Mr Groleau has identified more than 80,000 unique search results attributable to Atas, related to some 3,747 online posts, on 77 different web sites, directed against 150 different victims.  Since April 9, 2018, the date on which this court ordered Atas not to make further posts to the internet of any kind, Mr Groleau found 1,072 posts for which dates of posting can be verified.

[141]  This information points to two conclusions.  First, despite a broad order from this court to stop Atas from posting online, she has ignored the order and continued to do so.  This conduct continued, and appeared to escalate, right up to the time that these motions were heard.

[142]

(a) Atas has admitted to some of the publications;

(b) Atas has motive to engage in the impugned conduct;

(c) Atas has engaged in extensive other harassing behaviour against plaintiffs, behaviour that itself exhibits obsessive fixation on old grievances, out of all proportion to the underlying grievances;

(d) many of the publications are linked to online accounts for which there is evidence that they belong to Atas, and no evidence to the contrary;

(e) there is evidence, which I accept, that Atas paid another person to post some of the impugned publications from internet sites in northern Ontario, to create the impression that not all publications originate from the Toronto area;

(f) most of the publications originate from the Toronto area, including publications about relatives who live outside Ontario (Quebec, Arizona and the United Kingdom);

(g) where identifying information has been obtained by plaintiffs, computers used to publish the impugned publications were located in public libraries, a university, and internet cafes in Toronto, consistent with evidence that Atas has no fixed address and no access to a computer at a residence;

(h) the style, format, use of language, structure and content of the impugned publications, including the defamatory words used (including unusual word choices ["twit", "skank"] consistent errors of punctuation, spelling and diction, all tend to establish common authorship;

(i) the escalation of campaigns are consistent among the Dale & Lessman, Caplan and Babcock Actions, and can be correlated to significant milestones in Atas' other litigation (for example, a wave of publications followed the completion of final argument in the s.140 application);

(j) the accounts from which the publications originated are pseudonymous, and use dozens of different names or nicknames, but bear a striking resemblance in other respects;

(k) the victims, as a group, have only one thing in common: they or someone close to them is in conflict with Atas. These are a disparate group, from a cardiologist in Arizona, an IT specialist in Quebec, a retired realtor in the UK, a bank employee in Toronto, realtors in Hamilton, trust company personnel in Toronto, and, of course, the many victims in the Toronto area with direct connections to Atas' underlying litigation;

(l) where the publications are focused on Atas' grievances (as was the case in the Stancer Action and the Dale & Lessman Action and subsequent posts building on those allegations), the subject matter of the posts, themselves are matters that only Atas would care about, and things that very few people other than Atas would even know about (for example, allegations that the Stancer firm purported to act for clients without being retained by those clients; allegations that Wallis and Peoples Trust inflated mortgage enforcement costs and failed to account for attorned rents)

[143]  The evidence is overwhelming when viewed in isolation in respect to the four proceedings. Taken altogether, there is a clear pattern and *modus operandi* here: this is a coordinated effort from a single source. I have no hesitation in finding that Atas posted or caused to be posted all of the impugned publications.

## (2) There is No Defence Established for the Impugned Publications

[144]  In argument, Atas asserted the following defences:

(a)    The defamation claims are barred by the notice requirements of s.5(1) of the *Libel and Slander Act*.[46]

(b)    The impugned statements made of professional plaintiffs that they are dishonest, incompetent, have breached their professional duties, and that they have engaged in fraud, are true and therefore the defence of justification applies.[47]

## (a) *Libel and Slander Act*, ss.5(1) and 6

[145]  In her defence to the Caplan Action, Atas pleads that the notice provisions under s.5(1), and the time provisions of s.6 of the *LSA* apply in these circumstances. I do not accept that argument.

---

[46] *Libel and Slander Act*, R.S.O. 1990, c L. 12, ss. 5(1).
[47] Atas has pleaded other defences such as fair comment and qualified privilege. I do not address these defences separately since there is no evidence before the court in support of these defences.

Page: 48

[146]   Section 5(1) of the *LSA* requires notice of any action for libel in a "newspaper" or in a "broadcast" to be delivered within 6 weeks:

> No action for libel in a newspaper or in a broadcast lies unless the plaintiff has, within six weeks after the alleged libel has come to the plaintiff's knowledge, given to the defendant notice in writing, specifying the matter complained of, which shall be served in the same manner as a statement of claim or by delivering it to a grown-up person at the chief office of the defendant.[48]

[147]   Section 1(1) of the *LSA* defines "broadcasting" and "newspaper":

> "broadcasting" means the dissemination of writing, signs, signals, pictures and sounds of all kinds, intended to be received by the public either directly or through the medium of relay stations, by means of,
>
> > (a) any form of wireless radio electric communication utilizing Hertzian waves, including radiotelegraph and radiotelephone, or
> >
> > (b) cables, wires, fibre-optic linkages or laser beams,
>
> "newspaper" means a paper containing public news, intelligence, or occurrences, or remarks or observations thereon, or containing only, or principally, advertisements, printed for distribution to the public and published periodically, or in parts or numbers, at least twelve times a year.[49]

[148]   In addition, s.7 of the *LSA* geographically limits its application to Ontario:

> Subsection 5(1) and section 6 apply only to newspapers printed and published in Ontario and to broadcasts from a station in Ontario.

[149]   For the notice requirement of section 5(1) to apply to this case, the online postings would need to meet the definition of "broadcast" under the *LSA*.  Social media websites are not "newspapers."

[150]   The *LSA* contains a technical and exhaustive definition of "broadcast," which, when passed in 1958, was intended to cover publications on radio and television. The Supreme Court of Canada in *Reference re Broadcasting Act*,[50]  found that an internet communication was not necessarily a "broadcast," and refused to include internet service providers within the statutory definition of "broadcasting" in the federal *Broadcasting Act*.

---

[48] *Libel and Slander Act*, R.S.O. 1990, c L. 12, ss. 5(1).
[49] *Libel and Slander Act*, R.S.O. 1990, c L. 12, ss. 1(1).
[50] *Reference re Broadcasting Act*, 2012 SCC 4, paras 3-7.

Page: 49

[151]   The Courts have repeatedly held that, due to the technical language of "broadcast," expert evidence is required for the Court to determine whether any technology, including the internet, meets the definition of "broadcast."[51]

[152]   This approach was confirmed recently by the Divisional Court, in *Nanda v McEwan*, where the issue involved the application of the *LSA* to defamatory postings on the social media application 'Whatsapp'. Having reviewed the case law on this issue, Justice Ricchetti stated:

> These authorities make it clear that there must be clear, ample evidence for the court to make the determination whether the distributed statement(s) at issue in the particular case constituted a "broadcast" under the Act.[52]

[153]   In *St. Lewis v. Rancourt*, the trial court held that the limitation period under section 5 of the *LSA* only applied only to newspapers printed and published in Ontario and to broadcasts from a station in Ontario and did not apply to defamatory blogs posted on the internet. On appeal the Court of Appeal held:

> The appellant submits that, pursuant to s. 5(1) of the *Libel and Slander Act…*, the respondent was required to serve a notice of libel within six weeks of acquiring knowledge of the impugned blog posts. The first notice of libel was served more than three months after the first impugned blog post was published. The limitation period, however, applies "only to newspapers printed and published in Ontario and to broadcasts from a station in Ontario": *Act*, s. 7.  The burden of proof was with the appellant to establish that the blog posts fell within this definition under the *Act*. He called no evidence to establish that they did. The respondent was prepared to call expert evidence to address this issue, but, as the appellant did not lead any evidence, the respondent did not do so.[53]

[154]   There is no evidence from Atas, let alone expert evidence, that the impugned publications constitute "broadcasts" under the *LSA* or that the online publications were broadcasts from a "station in Ontario."  Atas has failed to satisfy this onus.[54]

[155]   There are other common-sense reasons why the Atas case demonstrates that the notice and limitation period provisions of the *LSA* do not and should not apply here. First, it is impractical and unfair to require a victim to deliver a fresh written notice for each and every one of thousands of malicious postings that this cyber stalker has posted with the click of a mouse.

---

[51] *Nanda v. McEwan*, 2019 ONSC 125, at paras. 71 to 88 (Div. Ct.); *Romano v. D'Onofrio*, 2005 CarswellOnt 6725 (C.A.), at paras. 7 – 9; *Bahlieda v. Santa*, 2003 CarswellOnt 4012 (C.A.), at para. 6; *Shtaif v. Toronto Life Publishing Co.*, 2013 ONCA 405, at paras. 25 – 26; *St. Lewis v. Rancourt*, 2015 ONCA 513, at para. 8; *Kim v. Dongpo*, 2013 ONSC 442 (S.C.J.), at para. 25; *Warman v. Fromm*, 2007 CarswellOnt 9648 (S.C.J.), at paras. 76 – 92; and *Warman v. Grosvenor*, 2008 CarswellOnt 6629 (S.C.J.), at paras. 44 & 45.

[52] *Nanda v. McEwan*, *supra*, at para. 77

[53] *St. Lewis v. Rancourt*, 2015 ONCA 513, at para. 8

[54] See also *Levant v. Day*, 2019 ONCA 244 (http://canlii.ca/t/hzd3v, retrieved on 2019-10-10), which involved an appeal from a decision where the court below had concluded that the *LSA* did not apply to Twitter posts.

[156]   Second, the public policy of the notice and the time period requirements of the *LSA* have no application to a cyber stalker such as Atas.  Atas had no intention of correcting, retracting or apologizing for her defamatory postings.  Her intention is to maliciously harm and vex her victims online, not to report or comment fairly and faithfully on them.

[157]   Third, other than for some of the 2016 posts, Atas denies that she is the author of the online content.  It would seem counterintuitive to provide statutory notice to a cyber stalker who denies that she is the perpetrator.

[158]   Fourth, the short timeline to provide notice is inconsistent with the anonymity and pseudonymity available on the internet.  Some "newspapers" publish on the internet, but not all internet publishers are "newspapers".

[159]   I am satisfied that this defence is not available to Atas.

**(b) Defence of Justification**

[160]   The Statement of Defence in the Dale & Lessman Action, Atas pleads justification: Atas admits to publishing the impugned words but pleads that they are true.

[161]   In *Magno v. Balita Media Inc,*[55] the court stated that justification is a complete defence which requires the defendant to prove the truth of all the defamatory statements. However, there can be no defence of justification if the pleading is completely devoid of particulars. Failure to plead particulars results in no evidence of truth being admitted and the defence fails.  Here, Atas pleaded no particulars, filed no responding evidence on the motions for summary judgment, and hence her defence of justification/truth must fail.

[162]   During oral argument, Atas argued that the issue on the motion for summary judgment in the Dale & Lessman Action is whether the statements are true, since she has pleaded that the statements are true.  Atas has been told by this court, many times, during the case management process that she bears the burden of proving, on evidence, that the statements are true, and that it is not for the plaintiffs to prove the statements are false.  In this context, Atas' argument to the contrary at the motion is vexatious: arguing on the basis of a flawed legal analysis that has been explained to her many times.

**(d) Harassment**

[163]   The prevalence of online harassment is shocking.  In Canada, as of October 2016, about 31% of social media users were harassed.[56]  Studies[57] on the effects of cyber harassment show the potentially devastating impact of these attacks:

---

[55] 2018 ONSC 3230, at paras. 41-44
[56] Dylan E. Penza, "The Unstoppable Intrusion: The Unique Effect of Online Harassment and What the United States Can Ascertain from Other Countries' Attempts to Prevent It" *Vol 51 Cornell International Law Journal:* found at https://www.lawschool.cornell.edu/research/ILJ/upload/Penza-note-final.pdf.
[57] *Ibid.*

> Online harassment has a unique effect on those who have been subjected to it, both in regard to their mental health and in regard to violations of their legal rights. Research suggests that online harassment effects are like the effect of harassment that occurs physically or verbally. For example, harassment, regardless of whether performed in person or online, can make victims "develop a variety of psychological, as well as somatic, symptoms".
>
> However, online harassment differs from other forms of harassment because it is an unstoppable intrusion. Perpetrators of online harassment do not allow their victims to escape their harmful action by entering their home or private domain. The victim cannot escape the harassment in the haven that is his or her own home. Moreover, the perpetrator can perform the harassment from anywhere remotely.
>
> A 2014 study found that forty percent of victims of online abuse suffered damage to their self-esteem. Additionally, thirty percent of these victims reported a fear for their lives. This abuse can have such intense ramifications that twenty percent of these victims reported that they were even afraid to leave their home. Furthermore, victims of online harassment like cyberbullying face a high risk of depression, anxiety, and may increase the risk of the victim harming himself or herself. Most distressingly, cyberbullying victims were about twice as likely to have attempted suicide than those who have not been harassed in this manner. However, the victims of online harassment are not the only ones to suffer negative mental health effects from the behavior. The harassers themselves suffer from a variety of negative mental health effects. Cyberbullying offenders are more likely to have attempted suicide than non-performers. In conclusion, online harassment is an epidemic.

[164]   The Statements of Claim in the Caplan Action and Babcock Action (issued March 29, 2018, and November 17, 2018, respectively) plead harassment as a cause of action. At the time of the issue of each, the Ontario Superior Court of Justice, in *Merrifield*, appeared to have recognized a common law tort of harassment in the employment law context.[58]  On appeal, the Court of Appeal overturned the trial decision.[59]  The Court of Appeal's decision not to recognize the new tort was based on two critical conclusions. First, the Court concluded that the tort of intentional infliction of mental suffering was a sufficient remedy in the circumstances of *Merrifield*.  Second, the court held that: "(w)e were not provided with any foreign judicial authority that would support the recognition of a new tort.  Nor were we provided with any academic authority or compelling policy rationale for recognizing a new tort and its requisite elements."[60]

[165]   In the end, the Court of Appeal "[did] not foreclose the development of a properly conceived tort of harassment that might apply in appropriate contexts, we conclude

---

[58] *Merrifield v. Canada (Attorney General)*, 2017 ONSC 1333.
[59] *Merrifield v. Canada (Attorney General)*, 2019 ONCA 205.
[60] *Ibid*, at para. 40

that Merrifield has presented no compelling reason to recognize a new tort of harassment in this case."

[166]  Except for the US, no other common law court has recognized the common law tort of harassment.   Ontario does not have a comprehensive statute akin to the English, Manitoba and Nova Scotia legislation. There have been some developments, including recognition of the tort of intrusion upon seclusion.[61]

[167]  In *Doe*, Justice Stinson stated as follows:

> In recent years, technology has enabled predators and bullies to victimize others by releasing their nude photos or intimate videos without consent. We now understand the devastating harm that can result from these acts, ranging from suicides by teenage victims to career-ending consequences when established persons are victimized. Society has been scrambling to catch up to this problem and the law is beginning to respond to protect victims.
>
> Each year, criminal courts in Canada deal with an increasing number of these cases. Unlike past decades, many child pornography cases now involve same-aged peers who share nude photos or sex videos with each other. Adults also suffer great harm from these acts. In 2014, Parliament responded by amending the Criminal Code to include a new offence of "publication of an intimate image without consent": Criminal Code, R.S.C., 1985, c. C-46, as amended, s. 161.1. Under this new provision, anyone who publishes an intimate image of a person without that person's consent is guilty of an offence and can be sentenced to up to five years in prison.
>
> In November 2015, the Province of Manitoba enacted legislation to create the tort of "non-consensual distribution of intimate images": see The Intimate Image Protection Act, C.C.S.M. c. I87, s. 11, which came into force on January 15, 2016. No other legislature has so far passed similar legislation. This case, therefore, raises legal questions about the availability of a common law remedy for victims of this conduct, and the legal basis upon which such claims might be founded. Counsel for the plaintiff informed the court that she had been unable to locate any reported decision in Canada concerning a victim seeking civil damages on these or similar facts and my research has not revealed one. This case is possibly the first.
>
> For the reasons that follow, I have concluded that there are both established and developing legal grounds that support the proposition that the courts can and should provide civil recourse for individuals who suffer harm arising from this misconduct and should intervene to prevent its repetition.[62]

---

[61] See, for example, Stinson J.'s decision in *Doe 464533 v N.D.,* 2016 ONSC 541.
[62] *Doe 464533 v N.D.,* 2016 ONSC 541, paras. 16-19.

Page: 53

[168]   In my view, the tort of internet harassment should be recognized in these cases because Atas' online conduct and publications seek not so much to defame the victims but to harass them. Put another way, the intent is to go beyond character assassination: it is intended to harass, harry and molest by repeated and serial publications of defamatory material, not only of primary victims, but to cause those victims further distress by targeting persons they care about, so as to cause fear, anxiety and misery.  The social science literature referenced above makes it clear that real harm is caused by serial stalkers such as Atas.

[169]   The tort of intentional infliction of mental suffering is simply inadequate in these circumstances: it is designed to address different situations.  The test is set out in *Prinzo v. Baycrest Centre for Geriatric Care*.[63]  The plaintiff must prove conduct by the defendant that is (1) flagrant and outrageous, (2) calculated to produce harm, and which (3) results in visible and provable illness.  The third branch of the test must be understood in the context of the broad range of behaviour that may be caught by the first two branches of the test.  It is not part of the test that the conduct be persistent and repetitive.

[170]   I do not have evidence that the plaintiffs have suffered visible and provable illnesses as a result of Atas' conduct.  One would hope that a defendant's harassment could be brought to an end before it brought about such consequences.  To coin a phrase from Sharpe J.A., quoted by the Court of Appeal in *Merrifield*, "[T]he law of this province would be sadly deficient if we were required to send [the plaintiff] away without a legal remedy."  The law would be similarly deficient if it did not provide an efficient remedy until the consequences of this wrongful conduct caused visible and provable illness.

[171]   The plaintiffs propose, drawn from American case law[64] the following test for the tort of harassment in internet communications: where the defendant maliciously or recklessly engages in communications conduct so outrageous in character, duration, and extreme in degree, so as to go beyond all possible bounds of decency and tolerance, with the intent to cause fear, anxiety, emotional upset or to impugn the dignity of the plaintiff, and the plaintiff suffers such harm.

[172]   The facts of these cases clearly meet this stringent test.

[173]   I am mindful that *Merrifield* is a recent case and strongly cautions against quick and dramatic development of the common law (para. 20).  Often courts are not in the best position to address complex new legal problems (para. 21).  As my brief review of legal developments in this area shows, this is a developing area of the law, legislatures have tried to fashion responses, and the issue has been under active recent consideration by the Law Commission of Ontario.  It would be better if changes in this area of the law came from the legislature rather than a trial judge.

[174]   However, the facts of the case before me are very different from the facts in *Merrifield*. They are much closer to the situation in which the Court of Appeal recognized the tort of intrusion on seclusion, *Jones* v. *Tsige*, in which Sharpe J.A. stated: ""we are presented in this case with facts

---

[63] *Prinzo v. Baycrest Centre for Geriatric Care* (2002), 60 OR (3d) 474 (Ont. CA).
[64] See Marnie Shiels, 'Civil Causes of Action for Stalking Victims', Victim Advocate, Fall 2000, found at www.victimsofcrime.org.

Page: 54

that cry out for a remedy".[65]  As I said at the outset, the law's response to Atas' conduct has not been sufficient, and traditional remedies available in defamation law are not sufficient to address all aspects of Atas' conduct.  Harassment, as a concept, is recognized in the criminal law.[66]  It is well understood in the context of family law.  In the Judgment I considered making a non-harassment order and rejected it because it had not been requested by the applicants.[67]  The concept of "harassment" as wrongful conduct is known to the law and is a social ill.  The concern, of course, on the other side of the question, is that people are not always on their best behaviour, and not all, or perhaps even most, conduct intended to annoy another person should be of concern to the law.  It is only the most serious and persistent of harassing conduct that rises to a level where the law should respond to it.

[175]   The facts of these cases fit within that description.

### (e)  Invasion of Privacy

[176]   In my view these cases do not fit within the tort of invasion of privacy or "intrusion upon seclusion".  Atas has not invaded the plaintiffs' private affairs or concerns (the second branch of the test).[68]  She has persistently published false statements about a broad range of people to cause harm to her primary victims.

[177]   Counsel for the plaintiffs pointed out the Atas did use images of some plaintiffs that she copied from the internet.  I do not see this as a violation of the privacy of the plaintiffs: these pictures were placed on the internet: Atas did not invade their private affairs by copying or even using those photos.  It was the repeated use of the photos, together with the false statements she made about plaintiffs that was the essence of her wrongful conduct.  Use of the photos made the conduct worse, but the essence of the conduct was the harassment and defamation.

[178]   I conclude that plaintiffs have not made out claims for invasion of privacy.

### (f)  Limitations Issues

[179]   Atas argued that many of the claims in the Defamation Proceedings are barred by the *Limitations Act*.  This defence cannot succeed.

[180]   Atas has adduced no evidence respecting the limitation defences.  In argument, she relied on dates on which publications are said to have been uploaded to the internet.  Under the law of limitations, this information, which can be seen in the plaintiffs' evidence, may establish a date of original posting, but does not assist in establishing the "date of discoverability" for the purposes of a limitations period.

---

[65] *Jones* v. *Tsige*, 2012 ONCA 32.
[66] *Criminal Code of Canada*, RSC 1985, c. C-46, as am., s.264,
[67] *Peoples Trust* v. *Atas*, 2018 ONSC 58, paras. 326-330.
[68] *Jones* v. *Tsige*, 2012 ONCA 32, para. 71.

[181]   Third, the publications are continuing.  Atas has refused to facilitate removal of these postings and has taken steps to delay or prevent removal of these publications from the sites that still display them.  There is no evidence that any of the impugned publications were removed from the internet before the Defamation Proceedings were commenced.  On the record before me, the publication is ongoing, and the statements continue to be actionable.

### (g) Other Issues

[182]   Ms Atas raises numerous other issues.  These may all be dealt with briefly because either (a) these issues have been decided already or (b) Atas failed to pursue these issues properly in the manner directed by the court.

### (i)      The Right to Remain Silent

[183]   Atas took the position that the Defamation Proceedings should be stayed until the contempt proceedings are tried.  She argued that either her defence of the Defamation Proceedings would be prejudiced by her exercise of her right to silence in the contempt proceedings, or her right to silence would be infringed by the requirement in the Defamation Proceedings that she "put her best foot forward" on the motions for summary judgment.

[184]   This issue was raised by Atas on May 31, 2019 during a case management conference. This court recognized that the issue raised by Atas had sufficient merit to warrant a motion, and the court set terms by which Atas could move for a stay or other relief in the alternative.  Atas failed to bring the motion in accordance with the court's case management directions, or at all.  By the return date of the motions for summary judgment in November 2019, Atas had still not brought this motion.  When argument was not completed as scheduled, and argument was adjourned to be completed eventually on December 11, 2019, Atas had still not brought a motion for a stay on this basis.

[185]   While this court is aware of the ongoing contempt proceedings, it has no evidence before it of the state of those proceedings, the prejudice that could be caused to Atas' defence of those proceedings if she is required to defend the Defamation Proceedings, the practical effect of Atas' defence of the Defamation Proceedings on her right to remain silent in the Contempt Proceedings, or the extent to which any prejudice to her right to remain silent could be ameliorated by a protective order in the Defamation Proceedings.  This court has no record on which it could review the extraordinary delays in the Contempt Proceedings and the extent to which Atas has used the delay in those legal proceedings to continue to publish defamatory and harassing publications on the internet.  In short, this court has no record upon which it can adjudicate a motion for a stay – a motion that was never brought in any event, despite the court giving directions so that the motion could be brought.

[186]   In all the circumstances, whatever merit there may have been to Atas' request for a stay or other relief to protect her right to silence, she is foreclosed from raising that issue on these motions because of her failure to bring the required motion.

### (ii) Allegations of Reasonable Apprehension of Bias

[187]   Atas has repeatedly raised an allegation that this court has shown a reasonable apprehension of bias against her during case management, in the s.140 Proceedings, in connection with the underlying proceedings, and in respect to the Defamation Proceedings.  This issue was litigated in connection with the s.140 Application and was rejected in the Judgment (Judgment, paras. 229-284).  The Judgment was affirmed on appeal and as a result the bias issue has been disposed of up to the time of judgment in the s.140 Application (January 2018).

[188]   Atas requested to bring a stand-alone motion that this court recuse itself from further involvement in matters respecting Ms Atas.  This court rejected that request but advised Atas that she could make a request for such relief in connection with any substantive step taken in these proceedings, and specifically, she was directed to raise the issue by way of a *Chavali* request or at a case conference.  She did not do that.  Ms Atas did not file responding materials on the motion, in which she could have filed evidence in respect to the allegation of reasonable apprehension of bias.

[189]   There is no factual basis placed before the court upon which a reasonable apprehension of bias is shown.  Having failed to adduce any evidence to support her allegations, this objection must fail.

[190]   I note also that Atas has raised this allegation in respect to numerous judges before whom she has appeared, and numerous times in respect to me.  She is well aware that she is required to adduce a record in support of such an allegation.

### (iii)   Case Management and Summary Judgment Motions

[191]   Ms Atas made the same argument in the s.140 Application: that this court could not case manage her litigation and preside on the s.140 application on the merits.  This court decided that issue against Ms Atas in the Judgment (at paras. 234-249).  That reasoning applies with equal force to this objection to my hearing these motions.

[192]   Further, a motion for summary judgment can be "akin to a trial"[69] but it is not always so. How closely it resembles a trial depends on the circumstances of the case.  Here, Atas has filed no evidence and she has conducted no cross examinations.  No findings of credibility are required because of competing versions of the facts from the plaintiffs and the defendant.  It is not the case that just because a case management judge has developed a familiarity with the case and the parties that s/he should not hear questions that go to the merits of the case.[70]  It all depends on the circumstances, bearing in mind that the court must be and be seen to be an independent and impartial tribunal.

[193]   The plaintiffs asked me to seize myself of these proceedings to trial, and in respect to the motions for summary judgment, several times during the case management process.  I declined to do that, making it clear that I would decide whether I would hear the Defamation Proceedings on the merits based on all the circumstances at the time.  It was not until Atas failed to file any

---

[69] *Royal Bank of Canada* v. *Hussain*, 2016 ONCA 637, per Simmons J.A.
[70] *Trade Capital Corp* v. *Cook*, 2017 ONSC 3606, per Emery J.

2021 ONSC 670 (CanLII)

evidence on the motions that I directed that I would hear the motions, an exercise of discretion based on principles of judicial economy and the absence of any impediment to my hearing the motions.

### (iv)    Non-Compliance With Pleadings Rules

[194]   Ms Atas argued that the Statement of Claim in Babcock does not comply with the rules of pleadings, specifically R.25.06(1). This objection reflects Atas' approach to litigation generally: she rejects a linear process in order to narrow issues and then decide issues on the merits. The time to object to the form of the statement of claim was during the case management process. The issue would then have been dealt with in case management, either by a case management order or by scheduling a pleadings motion.

[195]   In fact, Atas did prepare a statement of defence and counterclaim in the Babcock Action and apparently served it. She did not file it. She was directed to file it repeatedly and given several deadlines to do so. Still she would not file her pleading. She was told, finally, that if she did not file her pleading as directed, she would be noted in default. Not only did she not file a pleading, but she failed to attend a case management conference at which she had been ordered to appear and advised the court in writing that she would not participate further in case management of her proceedings.

[196]   Atas objected that the defects in the statement of claim are obvious on their face: the plaintiffs plead and attach a great deal of evidence to their claim in violation of the principles that parties are to plead the facts concisely, and not the evidence. Atas argued that, as she is self-represented, the court had an obligation to identify this issue for her and to do something about it.

[197]   Atas never raised a concern with the court that she was unable to plead a defence in the Babcock Action, and as noted above, apparently she did so. It was for her to raise issues with the pleading and she did not do so. Once she had been noted in default in the Babcock Action, she was not entitled to move to strike the statement of claim before obtaining an order setting aside the noting in default.

### (v)    Setting Aside the Noting in Default

[198]   The court provided Atas with a process by which she could have sought to move to set aside the noting in default. She did not follow this process. She did not provide any evidence to satisfy the test to set aside an order noting her in default.

[199]   At the motion she asked the court to set aside the noting in default. She did not bring a motion or put any evidence before the court in support of this request.

[200]   For all of these reasons her request to set aside the noting in default was denied.

### (vi)    Plaintiffs Adduced Further Evidence After Order Precluding Atas From Adducing Evidence

[201]   Atas argued that the plaintiffs were permitted from filing "additional and unfettered evidence" after the court ordered on October 23, 2019 that Atas could not file evidence, having failed to do so within court-imposed deadlines.

[202]   Atas argued that she was "prejudiced" because of evidence filed by the plaintiffs after October 23, 2019.

[203]   The additional evidence filed was to update the court on further alleged publications by Atas since the respondents' evidence had been filed.  There was nothing "unfettered" about the court permitting this evidence to be adduced.

[204]   Atas delayed the interlocutory injunction motion in the Caplan Action for months on the basis that she wanted to file evidence.  She never did.  She said she would file evidence on the summary judgment motions, and then never did.  By the time of the motions she was taking the position that she would not and could not file evidence because it would breach her right to silence.  She did not ask to file responding evidence to the latest evidence filed by the plaintiffs, and could not have made such a request while also refusing to file any materials at all in order to maintain her right to silence.  In all of these circumstances, there is no evidence that the late filed evidence caused Atas any prejudice.

### (vii)   Plaintiff in Stancer Action is Dissolved

[205]   In oral argument, Atas advised that the plaintiff in the Stancer action, Stancer Gossin Rose LLP, has been dissolved.  Therefore, she argued, there is no longer a plaintiff before the court with the capacity to maintain legal proceedings.

[206]   I do not accept this argument.  There is no evidence before the court that Stancer Gossin Rose LLP has been idssolved.  Atas was given an opportunity to file evidence on the motion for summary judgment in the Stancer Action, and she chose not to do so.  She cannot put evidence before the court during oral argument.  Further, even during oral argument she did not tender any evidence to establish that her allegation, that the plaintiff had been dissolved, was, in fact, true.

### (viii)   Request to Adduce Fresh Evidence

[207]   On Friday January 3, 2020, I committed Atas to jail for 74 days for contempt of court.  Atas sought bail pending appeal from the Court of Appeal pending her appeal of this contempt decision.  This motion was denied by Macpherson J.A.  In the result, Atas was in jail for 74 days starting on January 3, 2020.

[208]   Shortly after the suspension of ordinary court operations as a result of COVID-19, in mid-March 2020, the court received an email from Atas requesting a case management conference.  My endorsement of March 27, 2020 addresses this request as follows:

> [4]      By email sent March 25, 2020, Ms Atas requested as follows:
>
> … since the Courts are sort of ongoing, I would like to bring a short and simple motion (prefer it to be in writing) to open the motions heard by Justice

2021 ONSC 670 (CanLII)

Corbett that began November 15, 2019. An ex-parte affidavit would be difficult due to the lock down which seems to be getting more stringent everyday. The following are just some of the issues I would like to include in my motion in writing:

(a)    A plethora of internet postings about the plaintiffs appeared on the internet dated January 3, 2020 - March 15, 2020 and certainly not by me.

(b)    Also, I spoke personally with Peter Racco. I was connected by his office to his cell phone while he was on his honeymoon. Peter Racco is named in Schedule " B " in the motions. Although Schedules " A " and  "B " in the motions contain names of people who are dead and/or not plaintiffs to the claims,  which I have already included in my submissions in Court,  Peter Racco confirmed to me  that he was unaware that court orders were sought in his name and that he has never heard of  Gary Caplan or  the law firm Mason Caplan Roti LLP and has never been contacted nor has he authorized Gary Caplan or anyone from the law firm Mason Caplan Roti LLP to seek orders on his behalf.

(c)    John David Coon is also named in Schedule " B " in the motions.  He is a lawyer who was out of the country after being wanted for more than 5 years and arrested August 3, 2019 via an international flight to Vancouver. I believe he is still in custody. The Court can infer that neither Gary Caplan nor the law firm Mason Caplan Roti LLP have ever had any contact with John David Coon for the purposes of the motions began November 15, 2019.

[5]    First, the courts are not "sort of ongoing".  The courts have suspended operations as a result of COVID-19, and only urgent matters are being heard, by direction of the Chief Justice.

[6]    Second, the points raised by Ms Atas are not a "short and simple motion".  They appear to be a request to re-open evidence on four motions for judgment in which Ms Atas failed to file any responding evidence whatsoever.  The motions did not "begin" on November 15, 2019: they began when the moving parties delivered motions materials, roughly two years ago.  Final argument "began" on November 15, 2019, and was completed in December 2019.  There is a stringent legal test for re-opening evidence after argument of a motion, while decision is under reserve.  That motion would be neither "short" nor "simple".

[7]    Third, my direction was that, if Ms Atas has concerns or issues, she may schedule a case management conference through my assistant.  I will not authorize her to bring a motion without first conducting a case management conference.  If Ms Atas wishes the court to schedule a case management conference, I directed that she "describe, in detail, her proposed agenda for the case management conference".  In her email, Ms Atas states, "[t]he following are just some of the

2021 ONSC 670 (CanLII)

issues I would like to include in my motion….” That will not suffice: if Ms Atas wishes the court to hold a case management conference, she must describe “all” the matters she wishes to raise, not just “some” of them.

[8]     The request for permission to bring a motion is denied, without prejudice to such a request being made through the case management process, as previously directed.

[9]     The court will consider any request made for a case management conference during the current suspension of court operations, but will not schedule the hearing of a case management conference during the suspension unless the court is satisfied that there is urgency for the conference, within the meaning of the directions given by the Chief Justice.

[209]  Atas wrote again to the court on this topic purporting to bring a motion to reopen the motions for summary judgment, without notice to the other parties.  The court's endorsement dated April 9, 2020, states as follows (2020 ONSC 2201):

[1]     Atas has written yet again.  Now she sends the court a “notice of *ex parte* motion” and affidavit, asking to re-open the four motions under reserve.

[2]     I previously declined to schedule Atas' proposed motion without a case management conference.  She then asked for a case management conference, but failed to provide a draft agenda specifying all the matters she wishes to address at the conference.  Now she seems to ask the court to address her concerns on the merits without notice to or involvement of the other parties.

[3]     Atas is a very experienced self-represented litigant.  She is capable of understanding the court's clear directions.  If she wishes to make a *Chavali* request to be given permission to seek leave, in a motion, to bring the proposed motion, directions as to how to do that are set out in the Judgment of January 2018 and in innumerable endorsements since.  I decline to repeat those instructions.  If Atas wishes to have a case management conference convened, then she will comply with the directions given to her previously on this topic.

[4]     The ex parte motion is dismissed – it is not a motion that should be brought without notice to the other side.  This dismissal is without prejudice to any proper *Chavali* request Atas may make, or any proper request for a case management conference Atas may make, and is without prejudice to the underlying merits of the motion she seeks to bring.

[5]     As of April 6, 2020, the court is able to schedule non-urgent matters.  However, the court's capacity to do business is limited during the COVID-19 suspension of ordinary court operations.  If Atas ever does make

Page: 61

> a proper request in respect to the issues she now raises, she should not expect that a case management conference will be scheduled prior to the resumption of normal court operations.

[210]   Atas did eventually make a request for a case management conference in accordance with the directions provided by this court.  That request was denied, and she was advised that the reasons for that denial would be set out in this decision: 2020 ONSC 3471, para. 13.

[211]   I denied Atas' request for a case conference on the issue of adducing fresh evidence for the following reasons.  Only one of her requests had any theoretical prospect of meeting the test to reopen evidence after the conclusion of argument.  Atas' argument that dead people and persons who are not parties or have not authorized that remedies be sought in their names is not material to the proceeding.  The plaintiffs made it clear in argument that they have included, as "protected parties" in their draft orders, everyone they have been able to identify as having been targeted by Atas.  Ms Atas made her arguments about the propriety of such a remedy, and further information about who is encompassed in this category of persons will not affect the disposition of this case.  Further, it was clear that all of this information was available at the time of the hearing.  Ms Atas did not learn about it until later because she did not inquire about it until after the hearing.  Parties must exercise due diligence to place their entire case before the court by the end of the hearing.

[212]   The one issue raised by Atas that could have qualified as a basis to reopen the evidence concerned internet posts made while she was in jail.  She said that she wished to place before the court evidence that defamatory postings continued during the 74-day period that she was incarcerated.  This evidence, presumably, would also have established that Atas did not have access to the internet to post to the internet while she was in jail.  Obviously, this information did not arise until after the hearing, and so was not available at the time of the hearing.

[213]   I did not schedule a case conference on this issue because, nonetheless, this proposed fresh evidence could not have met the test for fresh evidence.  First, I have found that Atas arranged to have another person upload posts to the internet at her direction.  Second, it would be very easy for Atas to ask someone to use her account to upload posts while she was in jail, and such conduct would be entirely in keeping with her past behaviour.  Third, Atas did not purport to have any other evidence related to these posts: just evidence that there were such posts and she was in jail at the time: she would place the burden on the plaintiffs to once again gather evidence on meta-data to prove her authorship.  Fourth, Atas failed to put her best foot, or even a toe, forward on the motions for summary judgment, not even basic evidence denying her authorship of the impugned posts.  For her to put in the fresh evidence, for it to have any force, she would have had to respond to all of the allegations, something she had failed to do when given the chance to do so.

### (h) Remedies

[214]   In their factum, the moving parties acknowledged that Atas is indigent and sought the following relief:

> (a)    an order in the nature of mandamus compelling Atas to remove any and all of the offending hyperlinks, postings, tweets, photographs, depictions and materials

Page: 62

published in her own name, or any nickname, pseudonym, or alias, that she now uses, has used, with respect to the persons set out in Schedule 'A' to this Factum from any website. In support of the relief sought, the moving parties submit that the courts have ordered removed existing defamatory statements from the Internet.

(b)     An order in the nature of mandamus requiring that Atas issue a public retraction and apology to plaintiffs and other victims of her defamation and harassment, to be published online under the supervision of the Court at her own expense, within 30 days of the Order of the Court.

(c)     A permanent injunction barring Atas in her own name, or any nickname, pseudonym, or alias from disseminating, publishing, distributing, communicating or posting on the internet by any means, including hyperlinks or otherwise, any comment, chat, blog, statement, photograph, depiction, description, review on any webpage, or any other online platform or medium, with respect to all plaintiffs and other victims of her defamation and harassment, together with their families and related persons, and business associates.

(d)     An order that upon the want of compliance by the defendant with the relief sought in the Judgment and Orders sought, that the right, title, interest and ownership of the defendant in the Offending Statements, postings, internet and email accounts as listed in Schedule 'B' to this Factum be and the same be transferred, without recourse, to such *amicus curiae*, independent supervising solicitor or expert so appointed by the Court in order to perform the removal of the Offending Statements and postings listed in Schedule 'A' to this Factum.

### (i) Atas' Objections to the Requested Remedies

[215]   Atas raised the following arguments respecting the requested remedies:

[1]     Atas should not be compelled to apologize for her conduct: such a remedy is unduly coercive and would infringe her freedom of speech and freedom of conscience.

[2]     Plaintiffs' draft orders include remedies for the benefit of persons who are not parties to the Defamation Proceedings. Remedies must be limited to those persons who have sued Atas.

[3]     Draft judgments contain terms that were not sought in the statements of claim and so are not available to the plaintiffs.

[4]     The court ought to refer conduct of counsel for the plaintiffs to the Law Society of Ontario "for failing to treat the court with candour".

[5]     Various other arguments, none of which requires extensive reasons to address.

2021 ONSC 670 (CanLII)

Page: 63

### (a) Permanent Injunctions

[216]   In *Astley v. Verdun,* 2011 ONSC 3651, Chapnik J. stated as follows:

> Permanent injunctions have consistently been ordered after findings of defamation where either: (1) there is a likelihood that the defendant will continue to publish defamatory statements despite the finding that he is liable to the plaintiff for defamation; or (2) there is a real possibility that the plaintiff will not receive any compensation, given that enforcement against the defendant of any damage award may not be possible….[71]

[217]   Atas did not address this issue in her written or oral arguments.

[218]   The record establishes that Atas has continued to publish, and to cause to be published, defamatory and harassing publications on the internet after having been ordered not to do so.  She has not adduced evidence to defend the Defamation Proceedings and has a long history of procedural misconduct in litigation: given the chance she will seek to re-open these proceedings and to continue with them indefinitely while continuing her wrongful conduct.  As a result of Atas' bankruptcy and the resulting withdrawal of the plaintiffs' monetary claims in these proceedings, even as to costs, it is certain that plaintiffs will not receive any monetary compensation.  This is a case where a permanent injunction should be ordered.

[219]   The interlocutory injunction granted in the Caplan Action cast a wider net than the injunction sought by the plaintiffs.  It simply banned Atas from posting anything at all on the internet, with a few minor exceptions to enable her to post items for sale.  I would have given serious consideration to a permanent order of this nature, but with some misgivings: it would be akin to ordering someone to never use the telephone again.

[220]   For someone who has done what Atas has done, I would not foreclose a complete prohibition.  However, that is not what the plaintiffs have sought.  An order shall issue in the terms requested by the plaintiffs for a permanent injunction.  The "other victims" of Atas' conduct, as that phrase is used in the plaintiffs' requested remedy, must be listed in the formal order so that there is no ambiguity.  The "families and related persons, and business associates" also protected by the order need not be listed: it is intended to foreclose Atas from carrying out a campaign against someone for the purpose of causing harm to the persons protected by the order and is a precise as it can be to achieve its purpose.

### (b) Apologies

---

[71] *Astley v. Verdun,* 2011 ONSC 3651, para. 21, citing *Hunter Dickinson Inc. v. Butler*, 2010 BCSC 939 (CanLII) at paras.75-79; *Griffin v. Sullivan*,  2008 BCSC 827 (CanLII) at paras. 119-127; *Newman v. Halstead*, 2006 BCSC 65 (CanLII) at paras. 297-301; *Cragg v. Stephens*, 2010 BCSC 1177 (CanLII) at paras. 34-35, 40. *Astley* was cited with approval in *Labine v. Webster, 2019 ONSC 4023 (CanLII),* (per Firestone J).

Page: 64

[221]   The law in this area is developing and I acknowledge that some courts have ordered retractions and apologies as remedies for defamation.[72]  I see a place for such orders, in some cases, but I see no utility in an apology here.

[222]   First, Atas is not a public person whose word carries with it credibility or weight.

[223]   Second, Atas did not publish the impugned words under her own name.  She published them anonymously or pseudonymously, on internet sites understood not to exercise editorial control over published contents.

[224]   Third, flooding the internet with apologies from the various identities used by Atas, to apologize for the thousands of posts made against dozens of people, would have the effect of drawing further attention to the impugned words and cause further damage.

[225]   Fourth, it is generally understood that the plaintiffs' vindication comes from this court's judgment.  This is not a case where an unqualified retraction from an established media source would further add to the credibility of the court's findings.

[226]   Fifth, unlike some "apology" cases, the plaintiffs do not ask that the apology be published in reputable media sources.  For example, in the *Ottawa-Carlton School Board* case, the defendants were ordered as follows:

> An order in the nature of mandamus requiring the defendants to issue a public apology to the plaintiffs such apology to be published at the defendants' expense in the Ottawa Sun and the Ottawa Citizen within 60 days of the date of this judgment.[73]

This order responded to the very specific statements made by the defendants alleging serious misconduct by the plaintiffs, including violations of a fictitious court order.

[227]   Atas also argued that a forced apology could, in effect, compel her to abandon her right to silence in the contempt proceedings, and could be used against her in those proceedings.  The plaintiffs counter on the basis that the apology would be governed by and protected by the *Apology Act*.[74]  In view of my conclusion that it would not be appropriate to order an apology in this case, I need not answer these questions.

### (c)  Order to Remove Impugned Content

---

[72] See Peter A. Downard, *The Law of Libel in Canada*, 4th ed. (Toronto: LexisNexis, 2018), paras. 15.1 – 15.27; David A. Potts, *Cyberlibel: Information Warfare in the 21st Century* (Toronto: Irwin Law, 2011), pp. 213-215; Brent T. White, "Say you're sorry: Court-Ordered Apologies as a Civil Right Remedy" (2006) Cornell L.R. 1261; *Ottawa-Carlton District School Board* v. *Scharf*, [2007] O.J. No. 3030.

[73] *Ottawa-Carlton District School Board* v. *Scharf*, [2007] O.J. No. 3030, para. 30(d).

[74] *Apology Act*, S.O. 2009, c.3.

[228]   I accept that the court can order a defendant to remove offensive content on the internet.[75]
Such an order will certainly not be effective in this case.  First, Atas has shown already that she
will not follow court orders.  Second, as reflected in the record, Atas has posted to sites that have
policies of not removing content simply on request.  Third, it is not reasonable to suppose that Atas
will even remember all the places and ways in which she has posted content wrongfully on the
internet.  Fourth, the proposed order requires Atas to undertake removal of content "at her own
expense".  Atas is currently destitute and will use that circumstance to excuse her compliance with
any steps that would cost a materials amount to pursue.  Fifth, any remedy that by its nature will
require ongoing involvement between plaintiffs and Atas will almost inevitably lead to conflict
and further litigation.  As explained in the Judgment, Atas seeks out conflict with her opponents,
and seeks to extend and complicate that conflict.  The court itself has an interest in seeing the
overall conflict brought to an end.  The alternative order proposed by the plaintiffs: vesting title to
the postings in them, with ancillary orders enabling them to take steps to have the content removed,
will be more effective for them.

### (d) Scope of Orders

[229]   Atas' objection to the breadth of the proposed orders underlines one of the reasons this
court concludes that a common law tort of harassment should be recognized.  Atas' goal has been
to inflict harm and misery on her primary targets: persons such as Wallis and Caplan, who have
been prime adversaries against her in the Underlying Litigation and the s.140 Application.  When
Atas was enjoined from publishing further defamatory comments about Wallis, she started to
publish defamatory comments about members of Wallis' family, including Wallis' children.  The
purpose of this conduct may be inferred from all the circumstances: Atas had no grudge with the
Wallis children: she had never met them or had anything to do with them.  She attacked them in
order to do harm to Wallis.

[230]   An order that is limited in its scope to persons who have been harmed already would not
prevent Atas from shifting her focus to a new set of victims associated with her primary victims.
The cycle could be endless.

[231]   Second, defamation litigation has been called the "sport of kings" for a reason.  It is
notoriously complex and expensive relative to the financial interests usually at stake.  The instant
story of vexatious litigation is eloquent testimony to what can befall a hapless victim of a person
such as Atas: overall litigation has been underway for more than 15 years, and the litigation
involving Peoples Trust and its professionals (including Wallis) is now more than ten years old.
It is not over yet.  Many victims of a person such as Atas – after seeking advice from counsel of
what may be entailed in going to law over these issues – may well decide to let it go and hope that
the harassment stops or that the perpetrator will shift her focus to others.

---

[75] See, *Ottawa Carleton*, *supra*, at para. 30, and *Warman v. Fournier, 2014 ONSC 412 (*CanLII), But see also,
*Rodrigues v Rodrigues*, 2013 ABQB 718 (CanLII), where the court, relying on *Brown on Defamation*, 2nd ed. Vol. 6,
loose-leaf 2001 Release (Toronto Carswell, 1994) at p 26-55 and 26-56, refused to compel an apology and retraction
from a party which was not a newspaper or broadcaster. *Quaere*: whether Atas is a 'broadcaster'.

[232]   Third, a person in the position of the primary victims – while feeling outraged and angry by Atas' conduct, would also feel terrible that their entanglement with a person like Atas has brought harm to their friends and families.  I see no reason why primary victims should not be able to take the lead in bringing this conduct to an end and then to ask the court to extend protective orders to all who have been besmirched by the perpetrator's campaign of harassment, and a wider circle of potential victims against whom Atas might turn her sights in future.

[233]   This third point also provides a basis for a remedial distinction among those who have sued and those who have not.  I am not sanguine that other remedies (such as damages) would be available for the benefit of non-parties.  Injunctive relief that protects the parties from harassment by conduct aimed at their friends, families and associates, seems a fair and measured response.

[234]   The overall history makes it clear that Atas must be ordered to leave the plaintiffs alone, and that the order must be framed broadly to ensure that she does not do indirectly that which she has been restrained from doing directly.

### (e)  Remedies Sought Not Claimed in the Statements of Claim

[235]   Atas argues that various remedies sought by the plaintiffs (such as an apology, production by her of her passwords and account information to enable plaintiffs to take steps to remove Atas' publications from the internet) are not claimed in the statements of claim.

[236]   I see no merit to this argument.  In each statement of claim, the plaintiffs have claimed "such further and other relief" as the court considers just.  The orders sought by the plaintiffs are properly ancillary to their main claims for damages (claims which were only abandoned after Atas made her assignment in bankruptcy).  Atas argues in her factums that "[h]er pleadings and steps in the action would certainly have been different with different Prayer[s] for Relief."  There is no evidence to support this assertion and Atas was unable to provide the court with any reason why she would have defended the actions differently if (for example) an apology had been claimed in the statement of claim.

### (f)  Orders Should Not Be Enforceable By or in Respect to Non-parties

#### (i)  Enforcement by a Non-Party

[237]   Not all persons defamed and harassed by Atas are plaintiffs in one of the Defamation Action.  The plaintiffs ask this court to order that classes of persons who are not plaintiffs receive the benefits of the orders granted in these cases and be entitled to enforce them.

[238]   Atas argues that the law does not permit non-parties to enforce orders.

[239]   In my view, for the reasons expressed above, the court is entitled to order Atas to desist from defaming and harassing non-parties where that conduct is part of a campaign of harassment directed against parties to these cases.

2021 ONSC 670 (CanLII)

[240]  On first principles, Ms Wallis will be entitled to enforce this order, even if subsequent harassing conduct is directed, not against her, but against another person for the purpose of harassing Ms Wallis.

[241]  Another example illustrates why this approach to enforcement is both necessary and effective.  Initially, back in the 1990's, Atas harassed Mr Babcock but sending him vile communications about his deceased wife.  Mr Babcock's deceased wife cannot maintain an action in defamation, and she cannot be harassed, because she is dead.  However, Mr Babcock himself can be harassed by vile words published about his deceased wife and should be able to enforce an order against Atas prohibiting her from such conduct.

[242]  I do not find it necessary to decide, now, whether a non-party victim of Atas' conduct should be able to enforce this court's orders.  I decline to order prospectively that they can.  That question can be addressed if and when that issue ever arises.

### (ii) Precluding Conduct Against A Non-party

[243]  It follows from the discussion above that I see no impediment to prohibiting Atas from engaging in harassment and defamation of non-parties where that conduct is also harassment of a party to one of these actions.  In my view that is one of the reasons it is necessary for the court to recognize the tort of harassment: to protect the plaintiffs from a broad range of wrongful conduct that includes harming others to cause damage to a plaintiff.

[244]  Atas argued that this principle cannot apply to a person who is dead.  I do not agree.  As noted above, harassing a living person by waging a malicious campaign against a dead relative can be a form of harassment which the law can restrain in an appropriate case, such as the cases at bar.

### (g) Conduct of Plaintiffs' Counsel

[245]  Atas complains that counsel was aware of the decision in *Oesterlund* and should have brought it to the court's attention on the issue of whether these motions ought to have been heard before the contempt proceedings.  Atas argues that this failure should lead the court to report counsel to the Law Society.

[246]  There is no merit to this argument.  The question of whether these motions ought to have awaited the contempt proceedings was raised by Atas but never litigated by her.  If those issues had been litigated, then and only then would the plaintiffs have been called upon to argue the issue on the merits.  The plaintiffs were never called upon to argue this issue.  Counsel was not required to advance the issue on Ms Atas' behalf.

### (h) Orders and Costs

[247]  Counsel shall revise the draft orders to reflect this decision.  The court shall schedule a ZOOM call to settle the form of the orders after receiving revised drafts from counsel.  Because of the lengthy schedules, the draft orders were very long (each in a bound volume).  Counsel need not transmit copies of the schedules again.

Page: 68

[248]   Judgment for the plaintiffs in accordance with these reasons.  As stated at the outset, the plaintiffs do not seek costs and none are ordered.

### (i) *Chavali* Permission to Appeal this Judgment

[249]   Pursuant to the Judgment and s.140 of the *Courts of Justice act*, Atas needs permission obtained from a Superior Court Justice to bring an appeal from this Judgment.  She must obtain this permission before she commences an appeal.

[250]   I remain the case management judge for any litigation in Ontario involving Atas.  In that capacity, I direct Ms Atas that any request for permission to bring an appeal shall be decided by a judge designated by Regional Senior Justice Firestone.  If Ms Atas seeks such permission, she shall do so by directing her request to Firestone R.S.J. with a request that he assign a Justice to decide the question.

[251]   As a result of COVID-19, this decision is effective from the time an unsigned copy is sent to the parties by email; a signed version shall be provided to the parties in due course.

_____
                                                              D.L. Corbett J.

**Released:** January 28, 2021

2021 ONSC 670 (CanLII)

**CITATION:** Caplan v. Atas, 2021 ONSC
**COURT FILE NOS.:** CV-10-400035, CV-16-544153, CV-18-594948, CV-18-608448
**DATE:** 20210128

2021 ONSC 670 (CanLII)

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**D.L. Corbett J.**

**BETWEEN:**

Dr Joseph Caplan et al.

Plaintiffs

**- and –**

Nadire Atas

Defendant

---

**JUDGMENT**

---

**D.L. Corbett J.**

**Released:** January 28, 2021

**4**

## Colistro v. Tbaytel et al.
## [Indexed as: Colistro v. Tbaytel]

Ontario Reports

Court of Appeal for Ontario

Hoy A.C.J.O., Simmons and Pardu JJ.A.

March 13, 2019

**145 O.R. (3d) 538**  |  2019 ONCA 197

## Case Summary

---

**Employment — Wrongful dismissal — Constructive dismissal — Employer constructively dismissing long-time employee when it rehired executive who was dismissed 11 years earlier partly because he had sexually harassed that employee.**

**Employment — Wrongful dismissal — Damages — Employer constructively dismissing long-time employee when it rehired executive who was dismissed 11 years earlier partly because he had sexually harassed that employee — Trial judge not erring in awarding Honda damages on basis that defendant's conduct in course of dismissal was unduly insensitive.**

**Torts — Initial infliction of mental suffering — Defendant rehiring executive who was dismissed 11 years earlier partly because he had sexually harassed plaintiff — Plaintiff rejecting defendant's offer to accommodate her by transferring her to equivalent position in another building — Plaintiff subsequently diagnosed with post-traumatic stress disorder and depression — Trial judge correctly dismissing plaintiff's claim for intentional infliction of mental suffering — Defendant not intending to cause plaintiff harm and plaintiff failing to establish that defendant knew that kind of harm [page539] suffered by plaintiff was substantially certain to follow from its rehiring of executive and offer of accommodation.**

The plaintiff was a long-time, valued employee of the defendant. Her immediate supervisor, B, was dismissed in 1996 for sexually harassing the plaintiff and others. In 2007, the defendant rehired B, subject to a 12-month probationary term. The plaintiff strongly objected and informed the defendant that she was "not eating or sleeping, was vomiting and on the verge of a nervous breakdown". The defendant's chief executive officer decided to go forward with the hiring after the end of the probationary period and offered to accommodate the plaintiff by transferring her to an equivalent position in an adjacent building. The plaintiff rejected that offer and did not return to work. She was subsequently diagnosed with post-traumatic stress disorder and depression. She brought an action for damages for constructive dismissal and intentional infliction of mental suffering. The trial judge found that the plaintiff was constructively dismissed and awarded her damages equal to pay in lieu of 12 months' notice, less certain benefits that she had received

Colistro v. Tbaytel et al.[Indexed as: Colistro v. Tbaytel]

over that period, and *Honda* damages in the amount of $100,000. He dismissed the claim of intentional infliction of mental suffering. The plaintiff appealed the dismissal of that claim, and the defendant cross-appealed the finding of constructive dismissal.

**Held**, the appeal and cross-appeal should be dismissed.

The three elements of the tort of intentional infliction of mental suffering are (1) flagrant or outrageous conduct; (2) calculated to produce harm; and (3) resulting in a visible and provable illness. The trial judge found that the first and third elements were satisfied, but found that the second element was not made out as the plaintiff had failed to establish that the defendant knew that the kind of harm that she suffered was substantially certain to follow from its rehiring of B. While the trial judge erred in law to the extent that he required the defendant to have known of the exact kind of harm that resulted, down to the particular psychiatric illness that was subsequently diagnosed, he did not err in dismissing the claim. It was not alleged that the defendant actually intended to cause the plaintiff harm. While its offer of accommodation was not acceptable to the plaintiff, it could have been acceptable to others. In light of that offer of accommodation, a finding that the defendant had subjective knowledge that serious psychological injury was *substantially certain* to follow from its rehiring decision and offer to accommodate was not reasonably available on the evidence.

The trial judge did not err in finding that the plaintiff was constructively dismissed. A single act by an employer can evince an intention not to be bound by the employment contract and can render an employee's continued employment intolerable. The trial judge's finding that the defendant's position on B's rehiring was demeaning and dismissive, revictimized the plaintiff and minimized the past conduct of B in the eyes of the plaintiff and other employees was well-founded.

The trial judge did not err in awarding *Honda* damages on the basis that the defendant's conduct in the course of the dismissal was unduly insensitive. The quantum of $100,000 was not dissimilar to amounts recently awarded to other employees mistreated in their manner of termination.

*General Motors of Canada Ltd. v. Johnson* (2013), 116 O.R. (3d) 457, [2013] O.J. No. 3467, 2013 ONCA 502, 307 O.A.C. 359, 9 C.C.E.L. (4th) 1, [2013] CLLC para. 210-051, 230 A.C.W.S. (3d) 732; *Piresferreira v. Ayotte*, [2010] O.J. No. 2224, 2010 ONCA 384, 319 D.L.R. (4th) 665, 263 O.A.C. 347, 82 C.C.E.L. (3d) 14, 74 C.C.L.T. (3d) 163, [2010] CLLC para. 210-037, [2010] I.L.R. para. G-2332, 189 A.C.W.S. (3d) 881 [Leave to appeal to S.C.C. refused [2010] S.C.C.A. No. 283]; *Potter v. New Brunswick Legal Aid Services Commission*, [2015] 1 S.C.R. 500, [2015] S.C.J. No. 10, 2015 SCC 10, 381 D.L.R. (4th) 1, 468 N.R. 227, J.E. 2015-438, 432 N.B.R. (2d) 1, 33 B.L.R. (5th) 1, 21 C.C.E.L. (4th) 1, 18 C.C.P.B. (2d) 1, [2015] CLLC para. 210-017, EYB 2015-248943, D.T.E. 2015T-173, 2015 CBPG para. 8120, 2015EXP-830, 2015EXPT-425, 249 A.C.W.S. (3d) 802, **consd**

**Other cases referred to**

Colistro v. Tbaytel et al.[Indexed as: Colistro v. Tbaytel]

*Boucher v. Wal-Mart Canada Corp.* (2014), 120 O.R. (3d) 481, [2014] O.J. No. 2452, 2014 ONCA 419, 318 O.A.C. 256, 374 D.L.R. (4th) 293, 16 C.C.E.L. (4th) 239, [2014] CLLC para. 210-037, 240 A.C.W.S. (3d) 389; *Carroll (Litigation guardian of) v. McEwen* (2018), 143 O.R. (3d) 641, [2018] O.J. No. 6344, 2018 ONCA 902, 429 D.L.R. (4th) 443, 65 C.B.R. (6th) 167, 34 M.V.R. (7th) 1, 2019 OABC para. A-1359 [Application for leave to appeal to S.C.C. pending, 38514 (February 4, 2019)]; *Colistro v. Tbaytel*, [2017] O.J. No. 3114, 2017 ONSC 2731, 40 C.C.E.L. (4th) 51, 2017 CLLC para. 210-053, 280 A.C.W.S. (3d) 533 (S.C.J.); *Doyle v. Zochem Inc.*, [2017] O.J. No. 748, 2017 ONCA 130, 31 C.C.P.B. (2d) 200, [2017] CLLC para. 210-030, 276 A.C.W.S. (3d) 114; *Galea v. Wal-Mart Canada Corp.*, [2017] O.J. No. 6444, 2017 ONSC 245, 2018 CLLC para. 210-017, 44 C.C.E.L. (4th) 251 (S.C.J.); *Honda Canada Inc. v. Keays* (2008), 92 O.R. (3d) 479, [2008] 2 S.C.R. 362, [2008] S.C.J. No. 40, 2008 SCC 39, 294 D.L.R. (4th) 577, 376 N.R. 196, J.E. 2008-1354, 239 O.A.C. 299, 66 C.C.E.L. (3d) 159, [2008] CLLC para. 230-025, 166 A.C.W.S. (3d) 685, EYB 2008-135085, 63 CHRR D/247, D.T.E. 2008T-551; *Johnston v. Arran-Elderslie (Municipality)*, [2018] O.J. No. 6702, 2018 ONSC 7616, 52 C.C.E.L. (4th) 109, 83 M.P.L.R. (5th) 271 (S.C.J.); *Mustapha v. Culligan of Canada Ltd.*, [2008] 2 S.C.R. 114, [2008] S.C.J. No. 27, 2008 SCC 27, 293 D.L.R. (4th) 29, 375 N.R. 81, J.E. 2008-1083, 238 O.A.C. 130, 55 C.C.L.T. (3d) 36, [2008] I.L.R. para. G-2223, EYB 2008-133554, 2008 CCLG para. 24-937, 165 A.C.W.S. (3d) 954; *Prinzo v. Baycrest Centre [page540] for Geriatric Care* (2002), 60 O.R. (3d) 474, [2002] O.J. No. 2712, 215 D.L.R. (4th) 31, 161 O.A.C. 302, 17 C.C.E.L. (3d) 207, [2002] CLLC para. 210-027, 115 A.C.W.S. (3d) 801 (C.A.); *Rougemount Capital Inc. v. Computer Associates International Inc.*, [2016] O.J. No. 5786, 2016 ONCA 847, 410 D.L.R. (4th) 509, 272 A.C.W.S. (3d) 522; *Saadati v. Moorhead*, [2017] 1 S.C.R. 543, [2017] S.C.J. No. 28, 2017 SCC 28, 409 D.L.R. (4th) 395, [2017] 6 W.W.R. 431, 96 B.C.L.R. (5th) 1, 37 C.C.L.T. (4th) 1, [2017] I.L.R. para. M-3000, EYB 2017-280397, 2017EXP-1678, 279 A.C.W.S. (3d) 84; *Shah v. Xerox Canada Ltd.*, [2000] O.J. No. 849, 131 O.A.C. 44, 49 C.C.E.L. (2d) 166, [2000] CLLC para. 210-022, 95 A.C.W.S. (3d) 502 (C.A.); *Stamos v. Annuity Research & Marketing Service Ltd.*, [2002] O.J. No. 1865, [2002] O.T.C. 356, 18 C.C.E.L. (3d) 117, [2002] CLLC para. 210-036, 114 A.C.W.S. (3d) 67 (S.C.J.); *Strudwick v. Applied Consumer & Clinical Evaluations Inc.*, [2016] O.J. No. 3556, 2016 ONCA 520, 349 O.A.C. 360, 34 C.C.E.L. (4th) 235, 84 C.H.R.R. D/257, 269 A.C.W.S. (3d) 287; *Sweeting v. Mok*, [2017] O.J. No. 1185, 2017 ONCA 203, 37 C.C.E.L. (4th) 1, 276 A.C.W.S. (3d) 356, affg [2015] O.J. No. 5646, 2015 ONSC 4154, 27 C.C.E.L. (4th) 161, 261 A.C.W.S. (3d) 349 (S.C.J.).

**Statutes referred to**

*Municipal Act, 2001*, S.O. 2001, c. 25, s. 197(1) [as am.]

**Rules and regulations referred to**

Rules of Civil Procedure, R.R.O. 1990, Reg. 194, rule 49.10(2)

APPEAL AND CROSS-APPEAL from the judgment of Fregeau J., [2017] O.J. No. 3114, 2017 ONSC 2731, 40 C.C.E.L. (4th) 51 (S.C.J.).

*Michael Cupello* and *Luke Ruberto*, for appellant.

*Bradley A. Smith* and *Jonathon Clark*, for respondents.

---

The judgment of the court was delivered by

[1] **HOY A.C.J.O.**: — This appeal considers the consequences that flow from a company's decision to place its business interests above the expectations and concerns of a valued, long-time employee by rehiring an executive dismissed in part due to allegations of harassment of that same employee and others a decade earlier. It raises two main questions: (1) whether this decision constituted intentional infliction of mental suffering on the appellant, Linda Colistro; and (2) whether it resulted in her constructive dismissal.

I. *Overview*

[2] The appellant worked for the respondent, Tbaytel and its predecessor, the Corporation of the City of Thunder Bay (the "City"), for nearly 20 years. On January 29, 2007, Tbaytel announced the hiring of Steve Benoit as vice-president of business consumer markets.

[3] The appellant was shocked and upset by the announcement. Some 11 years earlier, before Tbaytel had assumed management [page541] and provision of the City's telecommunications services, Mr. Benoit had been her immediate supervisor in the City's telephone department. At the time of the announcement, the appellant was the executive assistant of Ken Esau, executive vice-president of operations. After the announcement, she advised Mr. Esau that she was not feeling well and went home.

[4] That evening, the appellant and her husband met with Mr. Esau and Tbaytel's vice-president of human resources, Christine Seeley, and told them that the City had terminated Mr. Benoit's employment in early 1996 for sexually harassing the appellant and others.

[5] In a February 1, 2007 e-mail to Mr. Esau, the appellant advised that she was "not eating or sleeping, was vomiting and on the verge of a nervous breakdown". She saw her doctor, who provided a note advising that she would be off work due to stress until March 1, 2007.

[6] Tbaytel made inquiries. Mr. Benoit had not been interviewed by the City when it conducted its investigation into the allegations of sexual harassment and had not been terminated by the City for cause. Nonetheless, the complaints of sexual harassment were part of the reason for his termination.

[7] Tbaytel had hired Mr. Benoit effective February 19, 2007, subject to a 12-month probationary term. Tbaytel could have chosen not to proceed with hiring Mr. Benoit without consequences. Instead, by letter dated February 6, 2007, Peter Diedrich, Tbaytel's president and chief executive officer, advised the appellant that he had decided to go forward with hiring Mr. Benoit. He indicated that he took her "accusations of 11 odd years ago seriously and will discuss appropriate behaviour with Mr. Benoit". Tbaytel offered to accommodate the appellant by transferring her to an equivalent position in an adjacent building. But the appellant would accept nothing less than Tbaytel not proceeding with the hiring of Mr. Benoit.

Colistro v. Tbaytel et al.[Indexed as: Colistro v. Tbaytel]

[8] The appellant did not return to work. Ultimately, she was diagnosed with post-traumatic stress disorder ("PTSD") and depression. In June 2008, the appellant commenced this action against Tbaytel and the City, claiming damages for intentional infliction of mental suffering and wrongful dismissal. The City accepted that it was vicariously liable for any compensatory damages awarded against the respondent, Tbaytel, a Municipal Services Board created under s. 197(1) of the *Municipal Act, 2001*, S.O. 2001, c. 25.

[9] On June 16, 2017, the trial judge dismissed the appellant's claim for intentional infliction of mental suffering and assessed her damages in the event that he erred in doing so. However, the [page542] trial judge found that the appellant had been constructively dismissed on February 6, 2007. He ordered Tbaytel and the City to jointly and severally pay the appellant damages equal to pay in lieu of 12 months' notice, less the short-term salary continuance and long-term disability benefits she had received over that period,[1] leaving a net award of $14,082, plus *Honda* damages in the amount of $100,000, and prejudgment interest.

[10] The trial judge held that Tbaytel and the City were the substantially successful parties to the litigation. By order dated January 26, 2018, he ordered the appellant to pay costs to Tbaytel in the amount of $150,000 and to the City in the amount of $50,000.

[11] The appellant appeals the trial judge's dismissal of her claim for intentional infliction of mental suffering and argues that he erred in his assessment of her damages flowing from the tort. She also seeks leave to appeal the trial judge's costs order.

[12] Tbaytel and the City cross-appeal, arguing that the trial judge erred in finding that Tbaytel had constructively dismissed the appellant and, in any event, erred in awarding *Honda* damages. In the cross-appeal, they also argue that the trial judge erred in finding that the first element of the tort of intentional infliction of mental suffering was made out.

[13] For the following reasons, I would dismiss the appellant's appeal of the dismissal of her claim for intentional infliction of mental suffering and Tbaytel and the City's cross-appeal from the trial judge's declaration that the appellant was constructively dismissed by Tbaytel on February 6, 2007. I would deny the appellant leave to appeal the costs award.

II. *Intentional Infliction of Mental Suffering*

*The trial judge's reasons*

[14] The trial judge correctly summarized the three elements of the tort of intentional infliction of mental suffering:

   (1)  flagrant or outrageous conduct;

   (2)  calculated to produce harm; and

   (3)  resulting in a visible and provable illness. [page543]

[15] He noted, again correctly, that the first and third branches of the test are objective, and the second is subjective. Citing this court in *Prinzo v. Baycrest Centre for Geriatric Care* (2002), 60 O.R. (3d) 474, [2002] O.J. No. 2712 (C.A.), at para. 45, he wrote that the "calculated to produce harm" element is established "where the actor desires to produce the consequences

Colistro v. Tbaytel et al.[Indexed as: Colistro v. Tbaytel]

that follow from the act, or if the consequences are known to be substantially certain to follow". He referred to *Piresferreira v. Ayotte,* [2010] O.J. No. 2224, 2010 ONCA 384, 319 D.L.R. (4th) 665, at paras. 78-79, leave to appeal to S.C.C. refused [2010] S.C.C.A. No. 283, 2011 CarswellOnt 202, and instructed himself that the second element is not satisfied by evidence of foreseeability or reckless disregard: "Foreseeability, which indicates only that a result may follow, is much less than knowledge that a result is substantially certain to follow." He also cited *Piresferreira* for the principle that while the extent of the harm suffered need not be anticipated, the *kind* of harm must have been intended or known to be substantially certain to follow.

[16] The trial judge found that the first element of the test was satisfied. In his view, Tbaytel's conduct in deciding to proceed with hiring Mr. Benoit was "objectively viewed and in all the circumstances, flagrant and outrageous conduct": para. 280. He found that, as a result of Tbaytel's investigations, it knew that Mr. Benoit had sexually harassed the appellant in 1995 and had been terminated in 1996 because of this behaviour.

[17] He wrote, at paras. 283 and 284:

Possessed with this knowledge, Tbaytel chose to finalize the hiring of Mr. Benoit, the person that [Peter] Diedrich, [Tbaytel's President and Chief Executive Officer,] wanted for the vacant position of VP Business Consumer Markets, while at the same time hoping to put [the appellant's] concerns to rest by shuffling her to another building. This decision minimized and invalidated the sexual harassment complaints of [the appellant], a 20-year valued and respected current employee of the company.
Tbaytel's conduct in this regard exceeds insensitivity or poor management[.]

[18] The trial judge also found that the third element of the test was met. He was satisfied that the hiring of Mr. Benoit resulted in the appellant suffering visible and provable illnesses: PTSD and depression. Tbaytel and the City do not challenge this finding.

[19] However, the trial judge concluded that the second element of the test had not been met. The appellant did not allege that Tbaytel intended to cause her harm. Therefore, the trial judge held [at para. 285] the appellant was required to prove that Tbaytel "knew that the kind of harm suffered by the [appellant] (PTSD [page544] and a major depressive disorder) was substantially certain to follow from their hiring of Mr. Benoit".

[20] The trial judge was not convinced that Tbaytel had the necessary subjective knowledge. He wrote, at para. 286:

Tbaytel knew the [appellant] was very upset. They were aware that the [appellant] was unable to work. They were aware of the [appellant's] statement that she was vomiting and on the verge of a nervous breakdown. I find that Tbaytel also had Dr. Rao's note as of February 6, 2007, which merely stated that the [appellant] would be off work due to stress. In my opinion, however, this evidence cannot bear the weight the [appellant] suggests that Tbaytel knew it was substantially certain that their conduct would precipitate the [appellant's] PTSD and depression.

*Analysis*

[21] The appellant argues that in concluding that the second element of the test was not met, the trial judge erred in law by imposing a requirement that Tbaytel had to know that the *exact* kind of harm that she suffered was substantially certain to follow, down to her specific diagnoses. Tbaytel and the City argue that the trial judge correctly interpreted and applied *Piresferreira*, which directs that the defendant must have subjective knowledge that the kind of harm that resulted was substantially certain to follow.

[22] In *Boucher v. Wal-Mart Canada Corp.* (2014), 120 O.R. (3d) 481, [2014] O.J. No. 2452, 2014 ONCA 419, at para. 44, Laskin J.A., citing *Piresferreira*, summarized the relevant principle:

> The plaintiff cannot establish intentional infliction of mental suffering by showing only that the defendant ought to have known that harm would occur. The defendant must have intended to produce the kind of harm that occurred or have known that it was almost certain to occur.

[Citation omitted]

[23] In my view, *Piresferreira* does not require that the defendant must have intended to produce a particular, recognized psychiatric illness or have known that it was substantially certain to follow. The confusion arises from para. 79 of *Piresferreira*, where Juriansz J.A. commented that the evidence did not support the inference that the defendant intended or knew that it was substantially certain to follow that the plaintiff would suffer post-traumatic stress disorder or a major depressive disorder. However, subsequent passages in para. 79 indicate that Juriansz J.A. accepted that the requisite "kind of harm" in that case was the more general category of *serious psychological injury*. He wrote that, at most, the trial judge found that serious psychological injury was foreseeable and, "[f]oreseeability, which indicates only that a result may follow, is much less than knowledge that a result is substantially certain to follow". The second element of [page545] the test was not satisfied in *Piresferreira* because the trial judge had wrongly applied a test of reckless disregard or reasonable foreseeability, not because the harm that was foreseeable was not of the right kind.

[24] I agree with the appellant that the trial judge erred in law to the extent he required Tbaytel to have known of the *exact* kind of harm that resulted, down to the particular psychiatric illness that was subsequently diagnosed. In this case, medical evidence confirmed that the appellant was suffering from visible and provable illnesses that satisfied the third element of the tort. And in this case, as in *Piresferreira*, the kind of harm that occurred was serious psychological injury. A finding that Tbaytel knew its February 6, 2007 letter was substantially certain to cause the appellant serious psychological injury would have sufficed to satisfy the second element.

[25] However, I agree with the trial judge that the second element of the test was not made out.

[26] As the trial judge noted, the second element of the test is subjective. Further, as Juriansz J.A. stressed in *Piresferreira*, where, as in this case, a plaintiff relies on the "substantially certain to follow" branch of the second element of the test, more than evidence of foreseeability or reckless disregard is required: *Piresferreira*, at paras. 77-79; *Boucher*, at paras. 43-44. The bar is necessarily high where a defendant is to be liable for all of the consequences of an intentional wrongful act.

Colistro v. Tbaytel et al.[Indexed as: Colistro v. Tbaytel]

[27] The requirement that the defendant have intended to produce the harm that occurred, or known that the harm was substantially certain to follow as a result of his or her conduct, is an important limiting element of the tort and distinguishes it from actions in negligence. It is now well established that a plaintiff can recover in negligence for psychological injury. A plaintiff seeking recovery in negligence for mental injury must show that (1) the defendant owed a duty of care to the claimant to avoid the kind of loss alleged; (2) the defendant breached that duty by failing to observe the applicable standard of care; (3) the claimant sustained damage; and (4) such damage was caused, in fact and in law, by the defendant's breach: *Saadati v. Moorhead*, [2017] 1 S.C.R. 543, [2017] S.C.J. No. 28, 2017 SCC 28, at para. 13; *Mustapha v. Culligan of Canada Ltd.*, [2008] 2 S.C.R. 114, [2008] S.C.J. No. 27, 2008 SCC 27, at paras. 8-9. Frequently, the issue will be whether it is reasonably foreseeable that a person of ordinary fortitude would suffer the mental injury incurred as a consequence of the defendant's allegedly negligent behaviour. However, in *Piresferreira*, this court held, at paras. 50-63, that an [page546] employee cannot pursue a claim for negligent infliction of mental suffering in the employment context.

[28] It was not alleged that Tbaytel actually intended to cause the appellant harm. Tbaytel sought to accommodate the appellant in its February 6, 2007 letter. It was open to accommodating the appellant ostensibly for the purpose of *avoiding* the imposition of mental suffering upon her. Individuals subjected to harassment of any kind respond in different ways. While Tbaytel's offer of accommodation was not acceptable to the appellant, it could have been acceptable to others. In light of that offer of accommodation, a finding that Tbaytel had *subjective* knowledge that serious psychological injury was *substantially certain* to follow from its February 6, 2007 decision and offer to accommodate was not reasonably available on the evidence. The evidence might support an inference that serious psychological injury was reasonably foreseeable, but that is not sufficient to ground an intentional tort. The evidence does not support the inference that Tbaytel subjectively knew that the serious psychological injury which ensued was substantially certain to occur.

[29] Because I agree with the trial judge that the second element of the test was not made out, it is unnecessary to address Tbaytel's arguments that the trial judge erred in finding that its conduct was "flagrant and outrageous". Nor is it necessary to address the appellant's argument that the trial judge erred in his calculation of damages for intentional infliction of mental suffering. Accordingly, I turn to Tbaytel's cross-appeal from the trial judge's declaration that the appellant was constructively dismissed by Tbaytel on February 6, 2007.

III.  *Constructive Dismissal*

*The trial judge's reasons*

[30] The trial judge found, at para. 310, that "Tbaytel's actions between January 29, 2007 and February 6, 2007 and their treatment of [the appellant] made her continued employment with Tbaytel intolerable such that she was constructively dismissed on February 6, 2007".

[31] He explained, at paras. 315 and 316:

Colistro v. Tbaytel et al.[Indexed as: Colistro v. Tbaytel]

It was impossible for Tbaytel to employ the [appellant] and Mr. Benoit without the two of them potentially coming into contact with one another. [The appellant] found this unacceptable. It was not just that she was unable to tolerate even incidental contact with Mr. Benoit. Tbaytel had been her employer for approximately 20 years. Their position on this issue re-victimized the [appellant] and minimized the past conduct of Mr. Benoit in the eyes of the [appellant] and other Tbaytel employees. [page547]

In my opinion, Tbaytel's position, as enunciated in Mr. Diedrich's February 6, 2007 letter to the [appellant], was demeaning and dismissive: "I have come to the decision that there is no legal or other reason not to go forward with hiring Mr. Benoit . . . You may find that you are unable to accept my decision and, in that case, you will have to proceed as you see fit." The issues raised by [the appellant] were not "accusations," as suggested by Mr. Diedrich. Tbaytel chose to proceed with the hiring of an individual whom they knew had previously sexually assaulted one of their apparently valuable employees, who had an unblemished 20 year history with the company and who was objecting "vehemently" to her abuser being hired. I find this to have been a blatant disregard for the interests of [the appellant].

[32] He also noted, at para. 313, that Tbaytel was aware "that the hiring of Mr. Benoit prompted a very significant negative reaction from the [appellant]". The trial judge concluded, at para. 317, that "an objective reasonable bystander, aware of all the facts, would find that [the appellant's] continued employment with Tbaytel in these circumstances was intolerable".

[33] As noted above, he ordered Tbaytel and the City to jointly and severally pay the appellant damages for wrongful dismissal equal to pay in lieu of 12 months' notice, less the short-term salary continuance and long-term disability benefits she had received over that period, leaving a net award of $14,082.

[34] Further, the trial judge concluded that the appellant was entitled to *Honda* damages in the amount of $100,000 due to the manner of her dismissal. At para. 325, he explained why:

In the tort claim, I found that Tbaytel's conduct toward [the appellant] was flagrant and outrageous. I also find that Tbaytel's treatment of [the appellant] was grossly unfair, unduly insensitive and in blatant disregard of her interests. The Court has the benefit of extensive expert medical evidence which establishes that [the appellant] has suffered actual damages as a direct result of the way in which she was treated by Tbaytel at the time of her dismissal.

*Tbaytel's position on the issue of constructive dismissal*

[35] Tbaytel advances three main arguments:

(1) Although Tbaytel acknowledges that a court may find that an employee has been constructively dismissed if the employer's treatment of the employee made continued employment intolerable, it argues that constructive dismissal on this basis cannot be founded on a single act by the employer. While the trial judge referred [at para. 310] to "Tbaytel's actions between January 29, 2007 and February 6, 2007", Tbaytel submits that the trial judge's finding effectively rests on a single act: Tbaytel's communication to the appellant on February 6, 2007 of its decision to proceed with the hiring of Mr. Benoit. In Tbaytel's view, the persistent or repeated conduct required to found constructive dismissal was not present. [page548]

Colistro v. Tbaytel et al.[Indexed as: Colistro v. Tbaytel]

(2) It argues that the trial judge erred by concluding that the appellant's employment was intolerable based on the subjective feelings of the appellant, rather than on an objective standard, as the law requires.

(3) It argues that the trial judge erred in awarding *Honda* damages.

*Analysis*

[36] I am not persuaded that there is a basis for this court to interfere with the trial judge's finding that the appellant was constructively dismissed or his award of *Honda* damages. Below, I address the appellant's arguments, in turn.

(1) *A single incident can ground a finding that continued employment was intolerable*

[37] In addressing Tbaytel's first argument, it is helpful to begin by briefly reviewing the Supreme Court's summary of the guiding principles in *Potter v. New Brunswick Legal Aid Services Commission*, [2015] 1 S.C.R. 500, [2015] S.C.J. No. 10, 2015 SCC 10.

[38] Constructive dismissal arises when an employer's conduct evinces an intention to no longer be bound by the employment contract. The courts have taken a flexible approach in determining whether an employer's conduct evinced an intention to no longer be bound by the contract: *Potter*, at para. 32.

[39] Two approaches have emerged. In the first, the court identifies an express or implied term that has been breached and then determines whether the breach was sufficiently serious to constitute constructive dismissal: *Potter*, at para. 32. In the second, the court considers whether the employer's conduct more generally shows that the employer intended not to be bound by the contract. The second approach permits the court to find that an employee has been constructively dismissed without identifying a specific fundamental term of the employment contract that has been breached where the employer's treatment of the employee makes continued employment intolerable: *Potter*, at para. 33.

[40] In this case, the trial judge employed the second approach described in *Potter*. The second approach "requires consideration of the cumulative effect of past acts by the employer and the determination of whether those acts evinced an intention no longer to be bound by the contract": *Potter*, at para. 33.

[41] Tbaytel grounds its argument that a single act by Tbaytel cannot constitute constructive dismissal under the second approach on this reference in *Potter* to the "cumulative effect of past acts". [page549] It argues that "cumulative" and "acts" make clear that more than a single act is required.

[42] I reject Tbaytel's argument that a single act by an employer cannot evince an intention not to be bound by the contract. As Wagner J. (as he then was) noted, at para. 32 of *Potter*, courts have properly taken a flexible approach in determining whether the employer's conduct evinced an intention to no longer be bound by the contract. The rigid approach argued for by Tbaytel is contrary to *Potter*. In my view, a stand-alone incident can render an employee's continued employment intolerable. Whether it does so will depend on all the circumstances.

Colistro v. Tbaytel et al.[Indexed as: Colistro v. Tbaytel]

[43] This court recognized, albeit in *obiter* and before *Potter*, that a single egregious act could make continued employment intolerable in *General Motors of Canada Ltd. v. Johnson* (2013), 116 O.R. (3d) 457, [2013] O.J. No. 3467, 2013 ONCA 502, at para. 67.

[44] In *General Motors*, an employee's constructive dismissal claim, based on racism in the workplace, was founded on a single incident. On appeal, Cronk J.A., writing for the court, held that the trial judge's conclusion that there was racism in the workplace was unreasonable and not supported by the evidence and, accordingly, the trial judge's holding of constructive dismissal could not stand. The racism complaint arose from a single employee's refusal to attend a single training session conducted by the plaintiff. On the evidentiary record, it was unreasonable for the trial judge to have held that the employee's absence was solely racially motivated.

[45] Cronk J.A. went on to comment, in *obiter*, that even if the employee's absence were racially motivated, it would not have supported a finding that the workplace was poisoned by racism, warranting a finding of constructive dismissal. The incident in question was but one incident over an eight-year working relationship. In this context, Cronk J.A. cautioned, at para. 67, that "except for particularly egregious, stand-alone incidents, a poisoned workplace is not created, as a matter of law, unless serious wrongful behaviour sufficient to create a hostile or intolerable work environment is persistent or repeated".

[46] The facts in this case are very different from those in *General Motors*. Here, the trial judge's holding of constructive dismissal is rooted in a series of key factual findings that were made following a 13-day trial:

> -- Mr. Benoit had sexually harassed the appellant in 1995, when both were employed by the City telephone department, and Mr. Benoit was the appellant's immediate supervisor; [page550]
>
> -- by February 6, 2007, Tbaytel knew that Mr. Benoit had been the subject of sexual harassment complaints in 1995, that the appellant was one of several complainants, and that her complaint was one of the reasons for Mr. Benoit's 1996 termination, but proceeded to hire him;
>
> -- the appellant was a valued employee with an unblemished 20-year history with the company; and
> -- Tbaytel knew that the appellant was shocked and very upset by its hiring of Mr. Benoit and "vehemently" opposed to his continued employment.

[47] These findings were amply supported by the evidence and are not challenged on appeal.

[48] The trial judge evaluated Tbaytel's February 6, 2007 letter communicating to the appellant its decision to proceed with the hiring of Mr. Benoit in light of Tbaytel's knowledge of the sexual harassment the appellant and others had experienced in 1995. As the trial judge highlighted, Tbaytel referred to the sexual harassment that led to Mr. Benoit's dismissal as the appellant's "accusations of 11 odd years ago". Mr. Diedrich concluded that "there is no legal *or other reason* to not go forward with hiring Mr. Benoit" (emphasis added). However, it is clear that Tbaytel knew the appellant's harassment complaint was more than an allegation. The trial judge's finding [at para. 315] that Tbaytel's position, as reflected in this letter, was demeaning,

dismissive and "re-victimized the plaintiff and minimized the past conduct of Mr. Benoit in the eyes of the plaintiff and other Tbaytel employees" was well-founded.

[49] Although Tbaytel frames its February 6, 2007 letter as a single act, as found by the trial judge, the letter took its significance from the sexual harassment and ensuing investigation that led to Mr. Benoit's termination in 1996. Whether the letter communicating Tbaytel's decision to re-instate Mr. Benoit despite his past conduct is viewed as a particularly egregious, stand-alone incident or the last in a series of past acts with cumulative effect is of no consequence. I am not convinced that the trial judge committed a palpable and overriding error in concluding that a reasonable person would see the appellant's continued employment as intolerable under such circumstances and I defer to his finding.

[50] Further, I would add this. While the trial judge employed the second approach to constructive dismissal described in *Potter*, there is overlap between the two approaches *Potter* describes. Some courts have found constructive dismissal based on the breach of an implied term or duty that the employer will treat the [page551] employee with civility, decency, respect and dignity (*Piresferreira*; *Sweeting v. Mok*, [2015] O.J. No. 5646, 2015 ONSC 4154, 27 C.C.E.L. (4th) 161 (S.C.J.), affd [2017] O.J. No. 1185, 2017 ONCA 203, 37 C.C.E.L. (4th) 1) or that the work atmosphere be conducive to the well-being of its employees (*Stamos v. Annuity Research & Marketing Service Ltd.*, [2002] O.J. No. 1865, 18 C.C.E.L. (3d) 117 (S.C.J.)). The trial judge could have approached his task by considering whether there was a similar implied term in the appellant's contract and a sufficiently serious breach to constitute constructive dismissal. Tbaytel does not suggest that under the first approach described in *Potter* a single, serious breach of an implied term cannot give rise to constructive dismissal.

[51] I turn now to the appellant's argument that the trial judge's conclusion was improperly based on the subjective feelings of the appellant.

(2) *The trial judge's conclusion was not based on the subjective feelings of the appellant*

[52] As Tbaytel submits, whether an employer's treatment of an employee made continued employment intolerable is assessed objectively: *General Motors*, at para. 66; *Potter*, at para. 42. Where a constructive dismissal claim is based on the employer's work environment or treatment of the employee, the trial judge must ask whether a reasonable person, putting herself in the position of the claimant, would consider the employer to have evinced an intention to no longer be bound by the contract by making the employee's continued employment intolerable: *Potter*, at paras. 42 and 47; *General Motors*, at paras. 69 and 91; *Shah v. Xerox Canada Ltd.*, [2000] O.J. No. 849, 49 C.C.E.L. (2d) 166 (C.A.), at paras. 6-9.

[53] Tbaytel argues that the trial judge's references to the *appellant's* reaction to the hiring (at paras. 313 and 316) and to Tbaytel's position having re-victimized the appellant and minimized the conduct of Mr. Benoit in the *eyes of the appellant* (at para. 315) demonstrate that he improperly based his conclusion on the subjective feelings of the appellant.

[54] I reject this argument.

[55] It is clear that the trial judge directed his mind to the correct legal standard. He adverted to the governing legal principles and the objective nature of the test before conducting his

Colistro v. Tbaytel et al.[Indexed as: Colistro v. Tbaytel]

analysis: see paras. 241-246. He then applied those principles to the facts. As indicated above, at para. 317, the trial judge specifically concluded that "an *objective reasonable bystander*, aware of all the facts, would find that [the appellant's] continued employment with Tbaytel in these circumstances was intolerable" (emphasis added). [page552] The trial judge's references to the reactions of the appellant and other Tbaytel employees formed an important part of the narrative and the context in which Tbaytel's actions were objectively assessed.

### (3)  *The trial judge did not err in awarding Honda damages*

[56] The respondents did not pursue this ground in their oral submissions. Nonetheless, I will briefly address it.

[57] Tbaytel acknowledges that the trial judge properly directed his mind to *Honda Canada Inc. v. Keays (2008)*, 92 O.R. (3d) 479, [2008] 2 S.C.R. 362, [2008] S.C.J. No. 40, 2008 SCC 39. In that case, the Supreme Court reaffirmed that damages in addition to compensatory damages for wrongful dismissal can be awarded only if the employer engages in conduct during the course of dismissal that is "unfair or is in bad faith by being, for example, untruthful, misleading or unduly insensitive": at paras. 57 and 59.

[58] Tbaytel essentially makes two arguments in its factum. First, it argues that the trial judge's findings about Tbaytel's conduct that underpinned his award of *Honda* damages amounted to palpable and overriding error. It takes particular exception to the finding that its conduct was "flagrant and outrageous", and satisfied the first element of the tort of intentional infliction of mental suffering. Second, it argues that the trial judge did not provide any reasons for awarding the sum of $100,000, as opposed to some other amount.

[59] It was not necessary to address Tbaytel's argument that the trial judge erred in finding that its conduct satisfied the first element of the tort of intentional infliction of mental suffering in order to dispose of the appellant's appeal of the trial judge's dismissal of its tort claim. Nor is it necessary to address it here. Whether or not Tbaytel's conduct was "flagrant and outrageous" for the purposes of the tort analysis, the factual findings underpinning the trial judge's conclusion that the appellant was constructively dismissed adequately support his finding that Tbaytel's conduct in the course of dismissal was unduly insensitive.

[60] Assessing *Honda* damages is an imprecise and fact-specific exercise: *Rougemount Capital Inc. v. Computer Associates International Inc.*, [2016] O.J. No. 5786, 2016 ONCA 847, 410 D.L.R. (4th) 509, at para. 42; *Doyle v. Zochem Inc.*, [2017] O.J. No. 748, 2017 ONCA 130, 2017 CLLC para. 210-030, at para. 14. From the trial judge's reasons as a whole, it is apparent that in his view the appellant's conduct warranted an award of damages in the amount of $100,000. [page553]

[61] While the quantum of damages awarded is necessarily fact-specific, this quantum is not dissimilar to amounts recently awarded to other employees mistreated in their manner of termination: *Galea v. Wal-Mart Canada Corp.*, [2017] O.J. No. 6444, 2017 ONSC 245, 44 C.C.E.L. (4th) 251 (S.C.J.); *Johnston v. Arran-Elderslie (Municipality)*, [2018] O.J. No. 6702, 2018 ONSC 7616 (S.C.J.); *Strudwick v. Applied Consumer & Clinical Evaluations Inc.*, [2016] O.J. No. 3556, 2016 ONCA 520, 34 C.C.E.L. (4th) 235; some of which have been affirmed by this court: *Boucher*; *Doyle*.

Colistro v. Tbaytel et al.[Indexed as: Colistro v. Tbaytel]

## IV. *The Trial Judge's Costs Order*

[62] The trial judge held that, given the damages sought at trial by the appellant and the result achieved after trial, it was obvious that Tbaytel and the City were the substantially successful parties to the litigation, and were therefore entitled to an award of costs. While the appellant's judgment was less favourable on its face than the financial terms of Tbaytel and the City's 2015 and 2016 offers to settle, the trial judge chose not to invoke the cost consequences of rule 49.10(2) of the Rules of Civil Procedure, R.R.O. 1990, Reg. 194. Instead, he chose "to fix costs in an amount which partially indemnified the defendants and which [he found] to be fair and reasonable taking into account all parties' Bills of Costs, the terms of the 2015 and 2016 offers" and other relevant factors: costs endorsement, para. 36.

[63] By order dated January 26, 2018, the trial judge ordered the appellant to pay costs to Tbaytel in the amount of $150,000 and to the City in the amount of $50,000.

[64] The appellant argues that the trial judge erred in the exercise of his discretion by not

-- considering that vindication was important to her, and that a settlement without admission of liability would not have vindicated her;

-- comparing the tax consequences of Tbaytel and the City's settlement offers to the tax consequences of the judgment she received after trial; and
-- considering her partial indemnity costs to the date of Tbaytel and the City's settlement offers.

[65] The test for leave to appeal an order as to costs is stringent. Leave to appeal will not be granted save in obvious cases where the party seeking leave convinces the court there are strong grounds upon which the court could find that the judge erred in exercising his discretion: *Carroll (Litigation guardian of) v. McEwen* (2018), 143 O.R. (3d) 641, [2018] O.J. No. 6344, [page554] 2018 ONCA 902, 34 M.V.R. (7th) 1, at paras. 58-59, application for leave to appeal to S.C.C. pending, 38514 (February 4, 2019).

[66] I am not persuaded that the appellant has met this stringent test and would deny leave to appeal the costs order.

[67] The appellant's submissions suggest that the trial judge determined that she was entitled to her costs, subject to the application of rule 49.10(2). But he did not. He proceeded on the basis that Tbaytel and the City were the substantially successful parties and entitled to costs. Further, the record on appeal does not contain the settlement offers. The trial judge's endorsement on costs suggests that Tbaytel's second settlement offer did not include a "no admission of liability" clause. Finally, the trial judge acknowledged that the appellant argued that some of the amount of the settlement would have been taxable, but it is not clear that she quantified or substantiated that assertion and she does not do so before us.

## V. *Disposition*

[68] For these reasons, I would dismiss the appellant's appeal of the dismissal of her claim for intentional infliction of mental suffering, and Tbaytel and the City's cross-appeal from the trial judge's declaration that the appellant was constructively dismissed by Tbaytel on February 6, 2007. I would deny the appellant leave to appeal the costs award. In light of the parties' mixed

Colistro v. Tbaytel et al.[Indexed as: Colistro v. Tbaytel]

success, I would award no costs of the appeal or the cross-appeal.

*Appeal and cross-appeal dismissed.*

Notes

**1**   The appellant conceded at trial that the long-term disability benefits were deductible from her damages, Colistro v. Tbaytel, [2017] O.J. No. 3114, 2017 ONSC 2731, 40 C.C.E.L. (4th) 51 (S.C.J.), at para. 299.

**End of Document**

**5**

**DATE:** 2006/02/24

2006 CanLII 5304 (ON SC)

**ONTARIO**

**SUPERIOR COURT OF JUSTICE
AT WELLAND**

**COURT FILE NO.:** 11,471/00

| | | |
|---|---|---|
| **B E T W E E N:** | ) | |
| | ) | |
| ANDREW ADAM FERRI | ) | Angelo Fazari, |
| | ) | for the Plaintiff/Respondent |
| | ) | |
| | ) | |
| Plaintiff/Respondent | ) | |
| | ) | |
| **- and -** | ) | |
| | ) | |
| | ) | |
| ALLAN H. ROOT, PATRICIA | ) | Sara Blake, |
| VADDACCHINO, NIAGARA REGIONAL | ) | for the Ministry of the Attorney General, |
| POLICE SERVICES BOARD, LOUANN | ) | for the Defendants, Allan H. Root and |
| SCHENCK, GREG MACDONALD and | ) | Patricia Vaddachino |
| THE TORONTO-DOMINION BANK | ) | |
| | ) | Terry Marshall, |
| | ) | for the Defendants, Niagara Regional |
| | ) | Police Services Board, Louanne |
| | ) | Schenck and Greg MacDonald |
| | ) | |
| | ) | |
| | ) | |
| Defendants/Moving Parties | ) | |
| | ) | |
| | ) | |
| | ) | |

2006 CanLII 5304 (ON SC)

**ONTARIO**

**SUPERIOR COURT OF JUSTICE
AT WELLAND**

**COURT FILE NO.:** 14,882/03

| | | |
|---|---|---|
| **B E T W E E N:** | ) | |
| | ) | |
| PASQUALE MAMMOLITI | ) | Luigi De Lisio, |
| | ) | for the Plaintiff/Respondent |
| | ) | |
| | ) | |
| Plaintiff/Respondent | ) | |
| | ) | |
| **- and -** | ) | |
| | ) | |
| | ) | |
| CHIEF OF THE NIAGARA REGIONAL | ) | Terry Marshall, |
| POLICE SERVICE GARY NICHOLLS, | ) | for the Defendants/Moving Parties |
| THE NIAGARA REGIONAL POLICE | ) | |
| SERVICES BOARD, THE NIAGARA | ) | |
| REGIONAL POLICE SERVICE, ERNEST | ) | |
| CLAYTON, LOUANNE SCHENCK, | ) | |
| STEVE MACLEOD, and GREG | ) | |
| MACDONALD | ) | |
| | ) | |
| Defendants/Moving Parties | ) | |
| | ) | |
| | ) | |
| | ) | **HEARD:** Oct. 31, Nov. 1/05, Feb. 20 /06 |

**Sheppard J.**

[1]     The first motion is by counsel for the Ministry of the Attorney General on behalf of the defendants, Allan H. Root and Patricia Vaddachino, both Crown Attorneys, for an order for summary judgment dismissing the plaintiff, Ferri's, claim for damages against them.  Before referring to the second motion for summary judgment, I shall describe Ferri's claim.

- 3 -

[2]     By statement of claim dated August 2, 2000 (a Notice of Action was issued on July 5, 2000), the plaintiff, Ferri, claimed

> a.     general damages for malicious prosecution in the amount of 1,000,000.00;
>
> b.     punitive, aggravated and/or exemplary damages for false arrest and imprisonment in the amount of $1,000,000.00;
>
> c.     special damages in the amount of $3,000,000.00,
>
>         plus interest and costs.

[3]     The claim for damages for false arrest and imprisonment is not particularized in the statement of claim.  In the descriptive part of the statement is a further claim that "his (Ferri's) rights under the *Canadian Charter of Rights and Freedoms*, especially section 6 and 7 have been violated."  Again, there are no particulars.  Also, there is reference to a conspiracy but again no particulars.

[4]     The second motion is by counsel for the other defendants in the Ferri action (other than Root and Vaddachino) and all the defendants in the Mammoliti action for an order in respect of each action for summary judgment dismissing the plaintiff's claims for damages in each action against those named defendants.

[5]     By statement of claim dated May 10, 2001, the plaintiff, Mammoliti, claimed:

> a)     General damages in the amount of $250,000.00 for negligence, gross negligence, and malicious prosecution;
>
> b)     Aggravated damages in the amount of $500,000.00 for negligence, gross negligence, and malicious prosecution;
>
> c)     Punitive damages in the amount of $500,000.00 for negligence, gross negligence, and malicious prosecution;
>
> d)     Special Damages in an amount the Plaintiff is not yet able to ascertain;
>
> e)     Damages in the amount of $500,000.00 for breach of fiduciary duty;

2006 CanLII 5304 (ON SC)

- 4 -

Plus interest and costs.

[6]    Paragraph 39 of Mammoliti's claim makes the following allegations:

39.    The Plaintiff states that all of the Defendants in the execution of their duties, failed to act in good faith and were jointly and severally negligent and grossly negligent, the particulars of which include:

A.    As against the Defendants CLAYTON, SCHENCK, MACDONALD, and MACLEOD:

a)    Failure to consider the Plaintiff's interest in the files;

b)    Failure to examine the Agreement of Purchase and Sale;

c)    Failure to contact and question relevant parties including but not limited to Martin Tidus and Paul Leon;

d)    Failure to make adequate inquiries;

e)    Developing premature conclusions about the events in question;

f)    Failure to have the requisite reasonable and probable grounds for making an arrest;

g)    Ignoring available evidence of the unreliability of the complainant's information;

h)    Failure to detect the deception of the complainant;

i)    Ignoring relevant and material facts which were known or ought to have been known by the said defendants;

j)    Failure to make adequate investigation;

k)    Failure to respect the Plaintiff's rights;

l)    Failure to maintain a professional approach in dealing with the public;

m)    Failure to follow operational policies;

- 5 -

2006 CanLII 5304 (ON SC)

n)    Subjecting the Plaintiff, or causing, or permitting the Plaintiff to be subjected to unnecessary harm, emotional stress, nervous shock, trauma, and detention;

o)    Such other particulars as counsel may advise.

B.    As Against the Remaining Defendants:

a)    Failure to train or educate employees or agents or employees under their supervision as to how to apply polices (sic) and procedures;

b)    Failure to supervise employees and agents in the execution of their duties and responsibilities.

c)    Failure to implement policies for the proper investigation of complaints:

d)    Failure to have in place a program or procedure whereby officers can be trained and educated as to the proper investigation techniques and practices;

e)    Failure to train or educate employees or agents under their supervision as to how to form the requisite reasonable and probable grounds;

f)    Employing officer lacking skill, competence, and ability;

g)    Assigning officers duties beyond their capacity, training and intelligence;

h)    Such other grounds as counsel may advise.

[7]    Ferri's and Mammoliti's claims arise out of the following informations (the details of which I am paraphrasing);

1.    By information #34721 dated June 27, 1997 the Crown charged Mammoliti:

(a)    with extortion by attempting to obtain $500,000 from the T.D. Bank for the return of a large number of boxes containing bank records; and

- 6 -

2006 CanLII 5304 (ON SC)

b)  with possession of stolen property having a value over $5,000 again relating to the same bank records.

2.  By information #34909 dated July 9, 1997, the Crown charged Ferri:

    (a)  with extortion as described above; and

    (b)  with theft of the bank records as described above.

3.  By information #35579 dated February 11, 1998, the Crown jointly charged Ferri and Mammoliti:

    (a)  with extortion as described above; and

    (b)  with theft of the bank records as described above.

[8]    According to the transcript of the cross-examination of Vaddachino, it was the Crown's intention to proceed on only the jointly charged information.

[9]    A preliminary hearing was held with respect to the above charges and on December 16, 1998, the Ontario Court of Justice (Provincial Division):

    1.  discharged Ferri on the charge of extortion;

    2.  committed for trial Ferri on the charge of theft; and

    3.  committed for trial Mammoliti on both charges.

[10]    On January 5, 2000, the Superior Court of Justice, on motions brought by both Ferri and Mammoliti for orders to quash with certiorari in aid the above-described committals, quashed Ferri's committal on the charge of theft but upheld Mammoliti's committals on both charges.

[11]    The charges against Mammoliti were withdrawn on November 14, 2000, upon certain conditions one of which was that he return the bank's records which the bank had stored in the premise purchased by Ferri.

[12]    I shall now review the facts which resulted in the charges being laid.  It would be an understatement to say they amount to a litany of mutual errors in judgment and misunderstanding of fact, even law.

- 7 -

[13]    By an agreement dated March 12, 1997, Universal Management Consultants, a business name used by Ferri, agreed to purchase from Toronto-Dominion Realty Co. Limited, a subsidiary of the T.D. Bank, property located on East Main Street, Welland, for $65,000.  The offer, as originally presented by the agent for the purchaser, Ferri, contained the following clause:

> The vendor agrees to remove all bank records and files stored in the building prior to closing.

Curiously, an officer of the vendor, Mr. Deutschman, crossed out this clause and inserted the following:

> The Purchaser accepts the building in an "as is" condition.

Needless to say an issue arose over what the parties intended by this change and how it related to the fact that the T.D. Bank had some 2000 boxes containing customers' confidential information stored in these premises.

[14]    The purchase was to close on May 30, 1997.  The date was extended to June 2, 1997.  Ferri was permitted early access to the premises to do minor cleanup.

[15]    There was some contact with bank representatives about removing the boxes prior to closing but the boxes remained on the premises as of the date of closing. Ferri hired and instructed Mammoliti to remove all 2000 boxes, which he did, and Mammoliti put them in storage.  Following closing, the bank wanted these boxes returned.  Ferri took the position that he did not have control over them; that they were now under the control of Mammoliti.  Discussions followed to resolve the dispute but they were not successful.  Then Mammoliti informed the bank that he would not release the boxes unless the bank paid him $500,000, a statement which Mammoliti said was only a "joke". Not surprisingly, this resulted in the bank contacting the police.  As I stated earlier, Mammoliti was the first charged by an information dated June 27, 1997. Subsequently, Ferri was charged by an information dated July 9, 1997.  The information

2006 CanLII 5304 (ON SC)

- 8 -

2006 CanLII 5304 (ON SC)

dated February 11, 1998, charged Ferri and Mammoliti jointly apparently on the ground that they were both parties to the offences charged.

[16]    The claims for damages, except for malicious prosecution, are circumscribed by the provisions of the *Public Authorities Protection Act*, R.S.O. 1990, c. P. 38 (the "Act"), which provides:

> 7.--(1) No action, prosecution or other proceeding lies or shall be instituted against any person for an act done in pursuance or execution or intended execution of any statutory or other public duty or authority, or in respect of any alleged neglect or default in the execution of any such duty or authority, unless it is commenced within six months next after the cause of action arose, or in case of continuance of injury or damage, within six months after the ceasing thereof.

[17]    The claims for damages for malicious prosecution are not circumscribed by the provisions of the *Public Authorities Protection Act*, so the plaintiffs' claims on that basis continue.  (see ***Al's Steak House and Tavern Inc. v. Deloitte & Touche***, [1997] O.J. No. 3046 (C.A.))

### THE CLAIMS FOR DAMAGES FOR NEGLIGENCE, FALSE ARREST ET CETERA

[18]    Mammoliti was charged with extortion and possession on June 27, 1997.  It would appear from a review of the information and the transcript of a cross-examination of Mammoliti that he was arrested and detained for a weekend and then released apparently on June 30, 1997.

[19]    Ferri was charged with extortion and theft on July 9, 1997 and it would appear from a review of the information and the transcript of a cross-examination of Ferri that he was arrested and released on the same day – July 9, 1997.

[20]    Ferri and Mammoliti were jointly charged on February 11, 1998 and it would appear from a review of the information that both were arrested and released on the same day – February 11, 1998.

2006 CanLII 5304 (ON SC)

[21]    Ferri's notice of action for claims for damages was dated July 5, 2000.  His statement of claim was dated August 2, 2000.

[22]    Mammoliti's statement of claim is dated May 10, 2001.

[23]    In ***Nicely v. Waterloo Regional Police (Chief of Police),*** [1991] 2 O.R. (3d) 612, the Divisional Court discussed s. 7(1) of the *Act* and in particular the concluding words.  The court held that the words "unless it is commenced within six months next after the cause of action arose" means within six months of the date of arrest and imprisonment.  The court went on to discuss one element of the charge of malicious prosecution: that is, that the prosecution terminates in favour of the plaintiff as a condition precedent to the bringing of an action.  At page 619, the court said:

> However, there is no authority that counsel have been able to find, or of which this court is aware, for the proposition that the long-standing rule (i.e. that the prosecution terminate in favour of the plaintiff) applies to false arrest and imprisonment.  In our view it should not.

[24]    Applying this direction to the matters before the court, the claims for damages by Ferri and Mammoliti against the defendants named in the respective statements of claim – except the claim for damages for malicious prosecution – are statute barred by s. 7(1) of the *Act*.  I have some doubt as to the correctness of this decision preferring the reasoning of the court below.  But that is a matter for a higher appeal court.

[25]    Counsel for Ferri submitted in argument that the damage caused to Ferri's reputation by reason of the charges brought against him, both of which were found to be without merit, extends the limitation period in as much as there is continuation of the damage even as of the present time.  Counsel claimed and Ferri stated in the transcript of his cross-examination that his business as a financier suffered due to these charges being brought against him.  Both Ferri's and Mammoliti's statements of claim make general allegations of continuing loss.  But neither Ferri nor Mammoliti produced any evidence to the court to substantiate such claims.  And, with respect, such evidence would not be relevant because the court in ***Nicely*** said at page 620 that "the

- 10 -

continuance of the injury or damage means the continuance of the act which caused the damage" i.e. the negligence or the false arrest and imprisonment.  The words relate to the continuation of the impugned act not to the consequences on the victim.

- 11 -

2006 CanLII 5304 (ON SC)

### THE CLAIMS FOR MALICIOUS PROSECUTION

[26]    With respect to the claims for damages for malicious prosecution, it is important to review separately the role played by the police officers and their employers in laying the charges against Ferri and Mammoliti and the role played by the Crown Attorneys for this reason:  ordinarily it is the police who investigate allegations of criminal conduct and make the decision as to whether or not charges are justified.  Ordinarily, a Crown Attorney is not involved in the process at this stage, although a Crown Attorney may be consulted by police for legal advice.  Whether or not a Crown Attorney plays a larger role and can be said to be a principal player in the laying of the charges will depend on the facts.

[27]    The Supreme Court of Canada in **Nelles v. Ontario**, [1989] 2 S.C.R. 170 at 192-193 stated that a plaintiff alleging malicious prosecution must successfully prove each of the following four elements:

   a.    The prosecution was initiated by the defendant;

   b.    The prosecution was terminated in favour of the plaintiff;

   c.    There was no reasonable and probable cause for the prosecution; and

   d.    The defendant was motivated by malice, or a primary purpose other than that of carrying the law into effect.

[28]    Counsel for the Attorney General on behalf of Root and Vaddachino by reference to various transcripts of cross-examination on affidavits established that both Root and Vaddachino played no role in laying of the charges, notwithstanding that Root was consulted for legal advice.  I accept this evidence. This finding of fact is sufficient in and of itself to issue a summary judgment dismissing the claim by Ferri for damages for malicious prosecution against the two Crown Attorneys; the plaintiff, Ferri, having failed on ground (a) in **Nelles**.

- 12 -

[29]    Dealing next with the claim for damages for malicious prosecution by Mammoliti against the police officers and their employer: in my view, Mammoliti has failed on points (b), (c) and (d) in **Nelles**.  I shall have more to say with respect to (c) and (d) when I discuss the claim made by Ferri other than to say the demand made by Mammoliti to the bank for a payment of $500,000 for the return of the bank's records certainly and without a doubt amounted to reasonable and probable cause for the police to lay the charges which they did against him, Mammoliti.  Further, Mammoliti has failed on point (b).  The prosecution was not terminated in favour of the plaintiff.  The charges were settled and it was agreed that the charges would be withdrawn on conditions, one of which was that he return the bank's business records.  In my view, point (b) contemplates that the charges are withdrawn without conditions or the accused is discharged upon a verdict of not guilty.  A settlement does not fulfill this requirement.  Therefore, a summary judgment shall issue dismissing the claim by Mammoliti for damages for malicious prosecution against the police officers and their employers.

[30]    This leaves the claim by Ferri for damages for malicious prosecution against the police officers and their employer.  I repeat:  Ferri was discharged at the preliminary hearing on the charge of extortion.  He was committed for trial on the charge of theft but that committal was subsequently quashed.

[31]    The analysis of Ferri's claim against the police officers and their employer turns on points (c) and (d) in **Nelles**: absence of reasonable and probable cause and malice.  Counsel for Ferri argued strenuously that the absence of reasonable and probable cause is necessarily an inference to be drawn from the facts.  Further, and I shall comment on this point later, malice can be inferred from the absence of reasonable and probable cause.  Counsel made this argument:

1.    by reference to the "as is" clause in the agreement of purchase and sale;

2.    by reference to the authority given to Ferri to enter the premises before closing to do minor cleanup;

- 13 -

3.     to the fact the bank did not move quickly to remove its records;

4.     to the fact that Ferri together with his solicitor met with the police and the Crown Attorney's office and offered to layout their entire real estate file as evidence that Ferri acted honestly in instructing Mammoliti to remove the boxes; and

5.     that the police and Crown Attorneys were pressured by the bank to lay and prosecute the charges and the police and Crown Attorneys acceded to the bank's wishes.

[32]    Counsel submits that the cumulative affect of these facts must lead to the irresistible inference of absence of reasonable and probable grounds and hence, as well, malice.

[33]    With respect to the "as is" argument, counsel argued that the bank, by deleting the original clause and substituting the "as is" clause, impliedly consented to Ferri removing the bank's records; that the bank was impliedly waiving its ownership interests in the records; that, in effect, the bank was abandoning their records.  Counsel for Ferri met with the police and Crown Attorney to persuade them that in law "as is" meant just that; that the purchaser took title to the building in an "as is" condition and that included the purchaser having to remove any leftover contents.  That might be a reasonable interpretation when the property left behind was, for example, old desks, chairs, filing cabinets, et cetera, but 2000 boxes of confidential information on the bank's customers, I think not.  The bank can be faulted for not reacting more quickly, much more quickly, in my view, when they realized prior to closing that the building housed 2000 boxes of their documents.  The bank ought to have moved immediately.  However, in my view, the bank's failure to remove the boxes prior to closing cannot be said to be a waiver of interest or an abandonment; such a conclusion offends common sense.  With respect, what Ferri and his counsel ought to have done was to inform the bank in writing that its boxes were there, that they should be removed prior to closing and if they are not removed, then following closing the boxes would be removed and safely stored for the account of the bank.  Such an approach would have avoided Mammoliti making the money demand which he did, which under the circumstances, significantly and seriously

- 14 -

changed a possible non-culpable interpretation of the fact of removing the boxes to an obviously culpable interpretation. In my view, the money demand by Mammoliti constituted reasonable and probable cause for the police to charge Mammoliti and then charge Ferri because Ferri was the purchaser of the property and hired Mammoliti to do the clean up and remove the boxes. In determining reasonable and probable cause, the police must look subjectively and objectively at the evidence as they know it to be at the time the charges are laid and, in my view, they had reasonable and probable cause to charge Mammoliti and Ferri at the time they did.

[34]    With respect to counsel's other arguments as listed above, that the police did not have reasonable and probably cause, I would say with respect to point 2 and 3, the argument is based on facts which are at best equivocal, possibly leading to the inference that Ferri was entitled to remove the boxes but only, in my view, if one were to suspend common sense.

[35]    I fail to see how point 4 could be material and as far as point 5 is concerned, that is more fact to be wished for as opposed to being founded on the evidence. Ms. Vaddachino, the Crown who had carriage of the prosecutions, repeatedly denied under cross-examination on her affidavit that she acted under pressure by the bank. Crown Attorney Root said the same thing. On that point, I should also point out that although Ferri tried to resolve his differences with the bank he did want his costs recovered, which was not unreasonable, but he also insisted on a release and indemnification from the bank should a customer sue him for whatever reason which was not made clear to me. Ferri has not proved on the balance of probabilities absence of reasonable and probable cause nor has he proved malice in the laying of the charges against him. Hence summary judgment will issue dismissing Ferri's claim for damages against the police officers and their employer for damages for malicious prosecution.

***TO SUMMARIZE:***

[36]    To summarize: there being no genuine issue for trial for the reasons given:

- 15 -

1.   Summary judgment will issue dismissing Ferri's claims for damages against all the defendants named in his action; and

2.   Summary judgment will issue dismissing Mammoliti's claims for damages against all the defendants named in his action.

[37]   I expect that costs will be as contentious an issue as these motions were.  The defendants in each case have been successful and shall have their costs.  If necessary, Ms. Blake and Mr. Marshall should arrange through the trial coordinator in Welland a date for hearing before me.  Not less than 10 days before the hearing date, each counsel will deliver to counsel for each plaintiff her and his respective bill of costs prepared separately on both scales: partial indemnity and substantial indemnity.

[38]   I expect a claim will be made by each counsel for the defendants for substantial indemnity because of the nature of the claims made: namely for malicious prosecution.  However, I should not be taken to have concluded that costs on a substantial indemnity basis will be awarded.  I wish to hear submissions on this.  Preparing bills of costs on both scales might save time.

_____

Sheppard J.

**Released:**   February 24, 2006

6

**CITATION:** Filler Depot v. Copart Canada Inc., 2024 ONSC 466
**COURT FILE NO.:** CV-22-00690636-0000
**DATE:** 20240122

**SUPERIOR COURT OF JUSTICE - ONTARIO**

**RE:**       FILLER DEPOT, Plaintiff

           **AND:**

           COPART CANADA INC., Defendant

**BEFORE:**    VERMETTE J.

**COUNSEL:**   *Shahryar Mazaheri*, for the Plaintiff

           *Adam Raikes*, for the Defendant

**HEARD:**     November 6, 2023

**ENDORSEMENT**

[1]    The Defendant moves for an order striking out the Statement of Claim in its entirety or, in the alternative, an order striking specific paragraphs of the Statement of Claim. While the Defendant acknowledges that a couple of causes of action have been sufficiently pleaded, it alleges that the Plaintiff has failed to plead material facts and essential elements for its claims based on the following causes of action: (1) unlawful means tort, (2) oppression, (3) conspiracy, (4) deceit, fraudulent misrepresentation and civil fraud, and (5) breach of fiduciary duty. The Defendant does not object to leave to amend being granted.

[2]    I agree with the Defendant's position. The causes of action in issue have not been properly pleaded. The Plaintiff's claims based on these causes of action are struck with leave to amend. Because of the manner in which the Statement of Claim is drafted and structured, it is not possible to strike specific paragraphs or even sentences of the Statement of Claim. As a result, the Plaintiff is ordered to deliver a Fresh as Amended Statement of Claim that complies with this decision within 30 days of the date of this decision.

## A.   **RECUSAL MOTION**

[3]    At the beginning of the hearing, counsel for the Plaintiff asked that I recuse myself. The only ground that he advanced in support of his request was that I had presided over another matter where he had represented clients who were unsuccessful in the litigation and had appealed my decision. When I asked counsel whether there were any other grounds supporting his request, he confirmed that there were no other grounds.

2024 ONSC 466 (CanLII)

[4]     I note that the other matter relied upon by counsel involved different parties/clients and a different area of law.  I also note that since the hearing of this motion, the Court of Appeal has dismissed the appeal from my decision from the bench: see *York Condominium Corporation No. 221 v. Mazur*, 2024 ONCA 5 at para. 3.

[5]     Impartiality reflects a state of mind in which the judge is disinterested in the outcome and is open to persuasion by the evidence and submissions.  In contrast, bias reflects a state of mind that is closed or predisposed to a particular result on material issues.  See *Marchand (Litigation guardian of) v. Public General Hospital of Chatham* (2000), 2000 CanLII 16946 at para. 131 (Ont. C.A.) ("***Marchand***").  The test for apprehension of bias is an objective test and has been formulated as follows: What would an informed person, viewing the matter realistically and practically – and having thought the matter through – conclude?  Would the person think that it is more likely than not that the decision-maker, whether consciously or unconsciously, would not decide fairly?  See *Peart v. Peel Regional Police Services*, 2006 CanLII 37566 at paras. 36-37 (Ont. C.A.) ("***Peart***").

[6]     As stated, the test is an objective one.  While it is not unusual that a losing litigant (or counsel) honestly and, from their perspective, reasonably perceives the proceedings as unfair and the judge as partial, to equate that personal perception of bias with a reasonable apprehension of bias is to incorrectly use a subjective and inherently partial perspective to decide whether a proceeding was conducted impartially: see *Peart* at para. 54.

[7]     An allegation of a reasonable apprehension of bias must overcome the strong presumption of judicial impartiality: *Peart* at para. 39.  The party that makes the allegation must establish a reasonable apprehension of bias on the balance of probabilities: *Peart* at para. 40.  Cogent evidence is required to make out an allegation of judicial bias.  Suspicion is not enough.  See *Marchand* at para. 131.

[8]     In light of the foregoing principles, I dismissed the Plaintiff's recusal motion at the beginning of the hearing.  In my view, an informed person, viewing the matter realistically and practically, and having thought the matter through, would not conclude that it is more likely than not that I would not decide this matter fairly, whether consciously or unconsciously.  There is no connection or similarity between this matter and the other matter.  Further, the fact that a lawyer was unsuccessful before a judge in one matter and appealed the judge's decision does not give rise to a reasonable apprehension of bias for every other matter in which the lawyer may be appearing before the judge.  The ground raised by the Plaintiff does not even come close to overcome the strong presumption of judicial impartiality.

## B.    <u>THE ACTION</u>

[9]     The Statement of Claim was issued on November 22, 2022.  The body of the Statement of Claim is six pages long and contains 41 paragraphs.

[10]    The Plaintiff seeks the following relief in the Statement of Claim (reproduced verbatim):

2024 ONSC 466 (CanLII)

i)     Payment in the sum of $500,000.00 for breach of contract, unjust enrichment, loss and damages;

ii)    Damages, in the amount to be particularized, for conspiring alone or with others unknown to the Plaintiff but known to the Defendant, to make changes to the Plaintiff's online Copart account;

iii)   An Order for disgorgement and restitution for unjust enrichment and any profit by the Defendants be transferred to the Plaintiff,

iv)    A declaration that the Defendant or an individual working for with Defendant acted negligently and or in collaboration with the Defendant conspired to defraud the Plaintiff;

v)     A declaration that the Defendant alone or in collaboration with others changed Plaintiff's online Copart account with a scheme to defraud the Plaintiff;

vi)    An Order for damages in the amount to be determined prior to trial for breach of fiduciary duty, breach of trust, tort of deceit, fraudulent misrepresentation and Civil fraud;

vii)   a declaration that the defendants are liable for breach of trust committed during the time the Defendant was trusted with Plaintiff's Lots/vehicles in their possession;

viii)  punitive damages against the Defendants in the amount of $100,000.00;

ix)    In addition, and in the alternative, damages in the amount of $100,000.00 for economic interference, breach of contract, breach of fiduciary duty, unjust enrichment, breach of trust, and inducing the Plaintiff to sign Power of Attorney for tort of deceit, fraudulent misrepresentation and Civil fraud;

x)     Interim and permanent injunctive relief against the Defendants from dealing with, exercising distrain over, profiting from, and undertaking of the Defendants from selling or assigning the vehicles in possession of the Defendant as particularized in this Statement of Claim;

xi)    Payment of pre-judgment and post-judgment interest on the total amount due and found to be owing by the Defendant pursuant to the *Courts of Justice Act*, R.S.O. 1990, c. C.43 as amended;

xii)   costs of this action on the basis of complete, or alternatively, substantial indemnity basis plus HST; and

xiii)  such further and other relief as this Honourable Court may deem just.

2024 ONSC 466 (CanLII)

[11]    The allegations in the Statement of Claim primarily pertain to two vehicles owned by the Plaintiff that were sold by the Defendant at an auction.  The following is a summary of the factual allegations in the Statement of Claim:

2024 ONSC 466 (CanLII)

    a.  The two vehicles were erroneously placed by the Defendant as "pure sales" instead of "approved sales".

    b.  On November 16, 2021, the Plaintiff's owner notified the Defendant of its error and instructed the Defendant to remove the "pure sale" status.

    c.  The Defendant was aware of these instructions prior to the sale of the vehicles, but it negligently or intentionally proceeded with the transactions as "pure sales".

    d.  Other vehicles of the Plaintiff were on "approval sale", but the Defendant claimed that it never received an approval notification.

    e.  There were five other vehicles belonging to the Plaintiff in the Defendant's possession.  The whereabouts of two of these vehicles are currently unknown.  The other three vehicles are on identified lots.

    f.  On January 5, 2022, the Plaintiff received an unknown charge of $1,504.00, even though the Plaintiff had already paid $346.50 for owner retain delivery for three lots.  The Plaintiff's owner notified the Defendant on January 7, 2022 about the unknown charge.

    g.  The Plaintiff has made several attempts to communicate with the Defendant and has advised the Defendant that it had fraudulently, unilaterally and intentionally changed the terms of the sale to "pure sale", hence causing substantial financial loss to the Plaintiff.

    h.  The Defendant caused damages to the vehicles, including missing parts, when the vehicles were moved to the Defendant's yard.

    i.  The Defendant charged for lots that were not sold, which is contrary to the parties' agreement.

    j.  The Defendant overcharged for delivery of the vehicles in Edmonton and failed to comply with its contractual obligations.

    k.  The Defendant, unlawfully and without authorization of the Plaintiff, accessed the Plaintiff's account and changed the status of the lots for sale thereby causing financial damage.

    l.  As a result of the "pure sale" of the two vehicles, they were sold well below retail value.  The retail value of each vehicle was $90,000.00.

2024 ONSC 466 (CanLII)

    m. The Defendant was unjustly enriched when it charged the Plaintiff $1,504.00 without any valid reason.

[12]    The following causes of action are mentioned in the Statement of Claim: breach of contract, unjust enrichment, conspiracy, negligence, deceit, fraudulent misrepresentation, civil fraud, breach of fiduciary duty, breach of trust, intentional infliction of economic loss by unlawful means/intentional interference with economic relations, and oppression.

## C.    GENERAL PRINCIPLES APPLICABLE ON A MOTION TO STRIKE

[13]    On a Rule 21.01(1)(b) motion, a pleading will only be struck out if, assuming the facts pleaded to be true, it is plain and obvious that it discloses no reasonable cause of action – that is, where the pleading has no reasonable prospect of success: *Potis Holdings Ltd. v. The Law Society of Upper Canada*, 2019 ONCA 618 at para. 18.

[14]    The Court of Appeal set out the principles applicable to a motion to strike in *McCreight v. Canada (Attorney General)*, 2013 ONCA 483 at para. 39 ("***McCreight***"):[1]

-  In the interests of efficiency and correct results, there is a need to weed out hopeless claims – this housekeeping dimension underlies Rule 21.

-  If the cause of action pleaded has been recognized, all of its essential elements must be pleaded.

-  If the cause of action has not been recognized, this is not necessarily fatal. One must ask whether there is a reasonable prospect that the claim will succeed.

-  The claim should not be struck merely because it is novel.

-  Unless manifestly incapable of being proven, the facts pleaded are accepted as being true for the purposes of the motion.

-  The pleading forms the basis of the motion; possible future facts that have not been pleaded may not supplement the pleading.

-  No evidence is admissible on such a motion.

-  The pleading must be read generously in favour of the plaintiff, with allowances for drafting deficiencies.

---

[1] In its Factum, the Plaintiff relies on cases dealing with motions to strike decided under the *Family Law Rules*. The principles set out in these cases are different from the principles applicable in motions to strike under Rules 21 and 25 of the *Rules of Civil Procedure*.

- A motion to strike should not be confused with a summary judgment motion which has a different test, a different purpose, and different rules relating to evidence.

[15]    Rule 25.06(1) of the *Rules of Civil Procedure* requires a statement of claim to contain a concise statement of the material facts on which the party relies for its claim.  As a result, a defendant named in a statement of claim should be able to determine, upon review of the pleading, what it is alleged to have done that caused harm to the plaintiff, and when it was done: *Burns v. RBC Life Insurance Company*, 2020 ONCA 347 at para. 16.  Vague allegations that make it impossible for an opposing party to reply should be struck: see *Aristocrat Restaurants Ltd. (c.o.b. Tony's East) v. Ontario*, [2003] O.J. No. 5331 at para. 19 (S.C.J.).

[16]    Although the court must accept as true the material facts as pleaded, this obligation does not extend to bald conclusory statements of fact, unsupported by material facts: *Trillium Power Wind Corporation v. Ontario (Natural Resources)*, 2013 ONCA 683 at para. 31.  Similarly, while a party may raise a point of law in a pleading, conclusions of law may be pleaded only if the material facts supporting them are pleaded: see Rule 25.06(2) of the *Rules of Civil Procedure*.

[17]    Where fraud, misrepresentation, breach of trust, malice or intent is alleged, the pleading shall contain full particulars.  However, knowledge may be alleged as a fact without pleading the circumstances from which it is to be inferred.  See Rule 25.06(8).

[18]    While no evidence is permitted on a motion to strike under Rule 21.01(1)(b), the court may consider documents referred to in the claim.  For a document to be properly considered as being incorporated by reference into the pleading, it is not enough that it has been referenced in the statement of claim.  It must "form an integral part of the plaintiff's claim" or of the "factual matrix of the statement of claim": see *McCreight* at para. 32 and *Allan Etherington v. National Hockey League*, 2020 ONSC 5789 at para. 127.

[19]    While a pleading may be struck, leave to amend should be denied only in the clearest of cases.  The fact that the allegations are bald is not, in itself, a basis for refusing leave.  Leave to amend should only be refused where it is clear that the deficiencies in the pleading cannot be cured by an appropriate amendment and the plaintiff cannot allege further material facts that the plaintiff knows to be true to support the allegations.  The fact that amendments may have previously been made is a relevant consideration.  See *Miguna v. Ontario (Attorney General)*, 2005 CanLII 46385 at para. 22 (Ont. C.A.), *Tran v. University of Western Ontario*, 2015 ONCA 295 at para. 27, *South Holly Holdings Limited v. The Toronto-Dominion Bank*, 2007 ONCA 456 at para. 6 and *Horfil Holding Corp. v. Queens Walk Inc.*, 2019 ONSC 1381 at paras. 33-34.

## D.    **EVIDENCE FILED BY THE PLAINTIFF**

[20]    Most of the Defendant's motion is based on Rule 21.01(1)(b), i.e., on the ground that the pleading does not disclose a reasonable cause of action with respect to some of the causes of action that are pleaded.  As stated above, no evidence is admissible on such a motion.  Contrary to this rule, the Plaintiff has filed evidence on this motion.

- Page 7 -

[21]    The Plaintiff's Motion Record includes an affidavit of the legal assistant of the Plaintiff's lawyer.  The affidavit contains hearsay evidence from the Plaintiff's owner and attaches eight exhibits.  The last exhibit is a letter setting out a settlement offer, which is improperly before the Court.  Further, with the exception of one or two exhibits,[2] the documents that are attached to the affidavit are not documents that are referred to in the Statement of Claim.  Therefore, they are inadmissible for the purpose of the motion under Rule 21.01(1)(b).  As for the one or two exceptions, I am of the view that they do not meet the test for a document to be properly considered as being incorporated by reference into a pleading because they do not form an integral part of the Plaintiff's claim or of the factual matrix of the Statement of Claim.  Therefore, these documents are also inadmissible.

[22]    In addition to relying on Rule 21.01(1)(b), the Defendant argues that five specific paragraphs of the Statement of Claim should be struck as scandalous, frivolous or vexatious under Rule 25.11 because they are incomplete, incoherent, incomprehensible or illegible.  The Defendant also argues in the alternative that certain paragraphs that refer to deceit, fraudulent misrepresentation and civil fraud should be struck as scandalous, frivolous or vexatious under Rule 25.11 if they are not struck under Rule 21.01(1)(b).  While evidence is admissible in a motion under Rule 25.11, the evidence must be relevant to the motion that is before the court: see *Baradaran v. Alexanian*, 2016 ONCA 533 at para. 16.  I find that the evidence in the Plaintiff's Motion Record is not relevant to the issue of whether the specific paragraphs in issue ought to be struck based on the grounds advanced by the Defendant.

[23]    Although I conclude that the evidence filed by the Plaintiff is inadmissible, I note that my decision on this motion would have been exactly the same had I considered the evidence.

## E.    DISCUSSION

[24]    While the Defendant acknowledges that the causes of action of breach of contract and unjust enrichment have been sufficiently pleaded in the Statement of Claim, the Defendant alleges that the Plaintiff has failed to plead material facts and essential elements for its claims based on the following causes of action: (1) unlawful means tort, (2) oppression, (3) conspiracy, (4) deceit,

---

[2] The two potential exceptions are: (1) listings of vehicles on the Defendant's website, which are referred to in paragraph 10 of the Statement of Claim; and (2) what are described as "Copart Dealer Services Agreements".  The second exception may not be a valid one because it is unclear whether the documents attached as "Copart Dealer Services Agreements" are, in fact, documents referred to in the Statement of Claim.  While an "agreement" is referred to in paragraph 14 of the Statement of Claim and a "contract" is referred to in paragraph 17, the "Copart Dealer Services Agreements" do not appear to be the documents that are referred to in these paragraphs because their contents do not correspond to what is pleaded.  I also note that the documents are entitled "High Priority Dealer Pick Up" rather than "Copart Dealer Services Agreement".

2024 ONSC 466 (CanLII)

- Page 8 -

fraudulent misrepresentation and civil fraud, and (5) breach of fiduciary duty. The Defendant does not object to leave to amend being granted.

[25]    The Defendant also seeks to strike five paragraphs on the basis that they are incomplete, incoherent, incomprehensible or illegible.

[26]    I discuss below each of the causes of action in issue. I then address the issue of the incomplete/incomprehensible paragraphs and the appropriate remedy.

## 1.    Unlawful means tort

[27]    In *A.I. Enterprises Ltd. v. Bram Enterprises Ltd.*, 2014 SCC 12 ("***A.I. Enterprises***"), the Supreme Court of Canada discussed the unlawful means tort. Cromwell J. noted that this tort had been variously referred to as "unlawful interference with economic relations", "interference with a trade or business by unlawful means", "intentional interference with economic relations", or simply "causing loss by unlawful means". See *A.I. Enterprises* at para. 2.

[28]    The essential elements of the unlawful means tort are the intentional infliction of economic injury on the plaintiff by the defendant's use of unlawful means against a third party. The Supreme Court stated that this tort should be kept within narrow bounds, and is only available in three-party situations in which the defendant commits an unlawful act against a third party and that act intentionally causes economic harm to the plaintiff. For the purpose of this tort, conduct is unlawful if it would be actionable by the third party or would have been actionable if the third party had suffered loss as a result of it. See *A.I. Enterprises* at paras. 5(A) and 23.

[29]    The elements of the unlawful means tort are not properly pleaded in this case. Among other things, the Plaintiff has not pleaded any unlawful act against a third party. Further, the Plaintiff has not pleaded full particulars with respect to the Defendant's alleged intent to cause economic harm to the Plaintiff, as required by Rule 25.06(8). The Plaintiff must plead circumstances, particulars or facts which are sufficient to enable a trier of fact to infer intentional conduct.

[30]    Thus, the Plaintiff's claim for the tort of unlawful means is struck with leave to amend.

## 2.    Oppression

[31]    Subsection 248(2) of the *Business Corporations Act*, R.S.O. 1990, c. B.16 states as follows:[3]

---

[3] The Statement of Claim does not plead which provincial or federal statute the Plaintiff relies on with respect to its oppression claim. For the purpose of my analysis, I use the Ontario statute, but I note that the corresponding provisions in the federal statute are substantially the same.

- Page 9 -

Where, upon an application under subsection (1), the court is satisfied that in respect of a corporation or any of its affiliates,

    (a) any act or omission of the corporation or any of its affiliates effects or threatens to effect a result;

    (b) the business or affairs of the corporation or any of its affiliates are, have been or are threatened to be carried on or conducted in a manner; or

    (c) the powers of the directors of the corporation or any of its affiliates are, have been or are threatened to be exercised in a manner,

that is oppressive or unfairly prejudicial to or that unfairly disregards the interests of any security holder, creditor, director or officer of the corporation, the court may make an order to rectify the matters complained of.

[32]   A complainant who alleges oppression must identify their reasonable expectations, establish that they were reasonably held, and show that they were violated by corporate conduct that was oppressive, unfairly prejudicial to, or that unfairly disregarded the reasonable expectations of the complainant.  In assessing a claim of oppression, a court must answer two questions: (1) Does the evidence support the reasonable expectation asserted by the claimant? and (2) Does the evidence establish that the reasonable expectation was violated by conduct falling within the terms "oppression", "unfair prejudice" or "unfair disregard" of a relevant interest?  See *BCE Inc. v. 1976 Debentureholders*, 2008 SCC 69 at paras. 68, 70, and *The Investment Administration Solutions Inc. v. Pro-Financial Asset Management Inc.*, 2018 ONSC 1220 at para. 86.

[33]   While the word "oppression" appears in a heading in the Statement of Claim, the Plaintiff has not properly pleaded the essential elements of this cause of action.  Among other things, the Plaintiff has not pleaded:

    a.  the capacity in which the Plaintiff is seeking relief and is a "complainant" under the relevant statute (e.g., creditor);

    b.  the Plaintiff's expectations;

    c.  facts supporting the reasonableness of the Plaintiff's expectations;

    d.  violation of the Plaintiff's reasonable expectations by conduct of the Defendant; and

    e.  facts supporting that the conduct of the Defendant was oppressive or unfairly prejudicial to or unfairly disregarded the interests of a security holder, creditor, director or officer of the corporation.

[34]   As a result, the Plaintiff's claim for oppression is struck with leave to amend.

2024 ONSC 466 (CanLII)

### 3. <u>Conspiracy</u>

[35]    There are two types of actionable conspiracy: predominant purpose conspiracy and unlawful means conspiracy.  Predominant purpose conspiracy is made out where the predominant purpose of the defendant's conduct is to cause injury to the plaintiff using either lawful or unlawful means, and the plaintiff does in fact suffer loss caused by the defendant's conduct.  Unlawful means conspiracy requires no predominant purpose but requires that the unlawful conduct in question be directed toward the plaintiff, that the defendant should know that injury to the plaintiff is likely to result, and that the injury to the plaintiff does in fact occur.  See *Pro-Sys Consultants Ltd. v. Microsoft Corporation*, 2013 SCC 57 at paras. 73-74, 80.

[36]    In an action founded in civil conspiracy, it is not sufficient for the plaintiff to allege that the defendants conspired together intentionally to harm the plaintiff.  The statement of claim must include, with clarity and precision, particulars of (i) the parties and their relationships, (ii) the agreement to conspire, (iii) the precise purpose or objects of the alleged conspiracy, (iv) the overt acts that are alleged to have been done by each of the conspirators, and (v) the injury and particulars of the special damage suffered by the plaintiff by reason of the conspiracy.  See *Normart Management Ltd. v. West Hill Redevelopment Co.* (1998), 37 O.R. (3d) 97 at 104, 1998 CanLII 2447 (C.A.), and *Kates v. Trapeze Asset Management Inc.*, 2019 ONSC 3483 at para. 39.

[37]    I note that the Statement of Claim refers on at least one occasion to the Defendant "conspiring alone".  There is no cause of action for "conspiring alone".

[38]    The references to conspiracy in the Statement of Claim are cursory and almost in passing. The elements of the tort of conspiracy are not properly pleaded.  Among other things, the Plaintiff has not pleaded particulars of the agreement to conspire, the parties, and the overt acts in furtherance of the conspiracy.

[39]    Therefore, the Plaintiff's claim for conspiracy is struck with leave to amend.

### 4. <u>Deceit, fraudulent misrepresentation and civil fraud</u>

[40]    Courts use the same test for civil fraud, deceit and fraudulent misrepresentation.  The five elements of the test are as follows: (a) a false representation of fact by the defendant to the plaintiff; (b) knowledge that the representation is false, absence of belief in its truth, or recklessness as to its truth; (c) an intention that the plaintiff act in reliance on the representation; (d) the plaintiff acting on the representation; and (e) the plaintiff suffering a loss in doing so.  See *Paulus v. Fleury*, 2018 ONCA 1072 at paras. 8-9.

[41]    A pleading of deceit, fraudulent misrepresentation and civil fraud must contain full particulars: see Rule 25.06(8).  This means that the pleading must set out the following with careful particularity:

　　　　a.　the alleged misrepresentation itself;

　　　　b.　when, where, how, by whom and to whom it was made;

    c.   its falsity;

    d.   the inducement;

    e.   the intention that the plaintiff should rely on it;

    f.   the alteration by the plaintiff of their position relying on the misrepresentation; and

    g.   the resulting loss or damage to the plaintiff.

See *Hamilton v. Osborne*, 2009 ONCA 684 at paras. 34-35

[42]    The elements of deceit, fraudulent misrepresentation and civil fraud are not properly pleaded in this case. The Statement of Claim arguably refers to some of the elements of this tort (e.g., a reference to "untrue or inaccurate statement made by the Defendant"), but only bald statements are pleaded without any particularity. Importantly, the pleading does not identify any specific false representation and the circumstances in which such representation was made.

[43]    Consequently, the Plaintiff's claim for deceit, fraudulent misrepresentation and civil fraud is struck with leave to amend.

### 5.   **Breach of fiduciary duty**

[44]    In cases not covered by an existing category in which fiduciary duties have been recognized (e.g., solicitor-client relationship), a plaintiff must show the following for an *ad hoc* fiduciary duty to arise (see *Alberta v. Elder Advocates of Alberta Society*, 2011 SCC 24 at para. 36):

    a.   an undertaking by the alleged fiduciary to act in the best interests of the alleged beneficiary or beneficiaries;

    b.   a defined person or class of persons vulnerable to the fiduciary's control (the beneficiary or beneficiaries); and

    c.   a legal or substantial practical interest of the beneficiary or beneficiaries that stands to be adversely affected by the alleged fiduciary's exercise of discretion or control.

[45]    A claim for breach of fiduciary duty may only be founded on breaches of the specific obligations imposed because the relationship is one characterized as fiduciary: *Galambos v. Perez*, 2009 SCC 48 at para. 37.

[46]    The elements of the cause of action of breach of fiduciary duty are not properly pleaded in the Statement of Claim. Among other things, the Plaintiff has not pleaded any facts supporting the recognition of a fiduciary duty between the Plaintiff and the Defendant.

[47]    As a result, the Plaintiff's claim for breach of fiduciary duty is struck with leave to amend.

### 6.    **Incomplete and incomprehensible paragraphs**

[48]    Paragraph 2 of the Statement of Claim is an incomplete sentence.  It stops in the middle of the sentence.

[49]    Paragraph 3 is also an incomplete sentence.  It stops in the middle of an incomplete word.

[50]    Paragraph 6 is a sentence that is incoherent.  It is grammatically incorrect and appears to miss a number of words and/or incorrectly include certain words.

[51]    Paragraph 20 appears to start with the last word of a missing sentence.  It reads as follows:

> law.  Accordingly, the Plaintiff says it is entitled to exemplary, punitive and/or aggravated damages.

[52]    While I agree with the Defendant that paragraphs 2, 3, 6 and 20 are deficient for the reasons stated above, I do not agree that paragraph 19 is also deficient.  The sentence in paragraph 19 is coherent and understandable.  The only issue is that it misses a period at the end.

[53]    For the reasons set out below, I am ordering the Plaintiff to deliver a Fresh as Amended Statement of Claim.  This being the case, it is unnecessary to make a specific order with respect to paragraphs 2, 3, 6 and 20.[4]  The Plaintiff shall ensure that these and other paragraphs in the Fresh as Amended Statement of Claim are complete, coherent and understandable.

### 7.    **Adequate remedy**

[54]    Given the manner in which the Statement of Claim is drafted and structured, I am of the view that it is neither possible nor productive to try to identify with precision the paragraphs and/or sentences that need to be struck out and those that do not need to be in order to implement this decision.  This is because many sections/paragraphs/sentences refer to more than one causes of action, some of which have not been struck.  Further, if only part of a section/paragraph/sentence were to be struck, what would remain would not necessarily make sense.

[55]    Therefore, the Plaintiff is ordered to deliver a Fresh as Amended Statement of Claim that complies with this decision.

[56]    As set out in the previous section, the Plaintiff needs to ensure that the sentences in the Fresh as Amended Statement of Claim are complete, coherent and understandable.  I would also urge the Plaintiff to consider the following:

---

[4] Counsel for the Defendant clarified at the hearing that the Defendant was not "firmly requesting" that these paragraphs be struck and was simply seeking clarity so that it could properly respond to the allegations in the Statement of Claim instead of simply denying incoherent allegations.

2024 ONSC 466 (CanLII)

2024 ONSC 466 (CanLII)

a. While leave to amend has been granted, it is unlikely that all of the causes of action discussed above are appropriate in this case. The Plaintiff should consider the essential elements of all of these causes of action and whether it is appropriate to plead them in light of the facts of this case.

b. The readability and legibility of the Statement of Claim could be improved, keeping in mind that the judge reading the Statement of Claim is not familiar with the facts and likely has no knowledge of the particular industry in which the parties operate. For example, there is no explanation anywhere in the Statement of Claim of what a "pure sale" is.

**F.    CONCLUSION**

[57]    The motion is granted.

[58]    The Plaintiff's claims for (1) unlawful means tort, (2) oppression, (3) conspiracy, (4) deceit, fraudulent misrepresentation and civil fraud, and (5) breach of fiduciary duty are struck with leave to amend. The Plaintiff is ordered to deliver a Fresh as Amended Statement of Claim that complies with this decision within 30 days of the date of this decision.

[59]    If costs cannot be agreed upon, the Defendant shall deliver submissions of not more than three pages (double-spaced), excluding the costs outline, by February 5, 2024. The Plaintiff shall deliver its responding submissions (with the same page limit) by February 19, 2024. The submissions of all parties shall also be sent to my assistant by e-mail and uploaded onto CaseLines

_____

**Vermette J.**

**Date:** January 22, 2024

7

**CITATION:** Globe POS Systems v. Visual Information Products Inc., 2022 ONSC 5932
**DIVISIONAL COURT FILE NO.:** 820/21
**DATE:** 20221019

2022 ONSC 5932 (CanLII)

**ONTARIO
SUPERIOR COURT OF JUSTICE
DIVISIONAL COURT**

**D.L. Corbett J.**

| | | |
|---|---|---|
| **BETWEEN:** | ) | |
| | ) | |
| GLOBE POS SYSTEMS INC. and TONY ROSSI | ) | *Julien Bonniere*, for the Appellant |
| | ) | |
| | ) | |
| | ) | *Mr Rossi*, not appearing |
| Defendants/Appellant | ) | |
| | ) | |
| – **and** – | ) | |
| | ) | |
| VISUAL SYSTEMS INFORMATION INC. | ) | *Daria Chyc*, for the Respondent |
| | ) | |
| Plaintiff/Respondent | ) | |
| | ) | **HEARD at Toronto (by videoconference):** |
| | ) | April 5, 2022 |

**REASONS FOR DECISION**

**D.L. Corbett J.**

[1]     This is an appeal from the final order of La Horey A.J., dismissing a motion by the defendant Globe to amend its statement of defence to add a counterclaim.  For the reasons that follow, the appeal is dismissed.

[2]     The Associate Justice correctly set out the permissive test for amendment of pleadings and identified the sole issue on the motion before her: the plaintiff/respondent Visual defended the motion on the basis that the proposed amendments, being the crossclaim, are not tenable in law (Decision, para. 9).  Globe devotes a considerable portion of its written argument to the correct principles on a motion to amend pleadings, but, in my view, they are not engaged in this appeal. The Associate Justice was correct in finding that she should not grant the motion for leave to amend if the proposed pleadings are, on their face, not tenable in law.  The Associate Justice also correctly stated the breadth of this principle, quoting from a recent decision of the Court of Appeal as follows: "leave to amend should be denied only in the clearest of cases, especially where deficiencies in the pleading can be cured by an appropriate amendment and the other party would

Page: 2

not suffer prejudice if leave to amend was granted." (*Burns* v. *RBC Insurance Co.*, 2020 ONCA 347 at para. 22, quoted at Decision, para. 8).

[3]     The Associate Justice quoted the proposed crossclaim and characterized it as follows:

> In essence, Globe seeks to bring a counterclaim against Visual for commencing this action.

[4]     This characterization is accurate.  The claim in the main action is summarized accurately at para. 2 of the Decision.

> Visual commenced this action on August 21, 2019 against its former employee, Tony Rossi… and Rossi's subsequent employer, Globe.  Visual alleges that Rossi has breached non-competition and confidentiality clauses in his employment contract, appropriated corporate opportunities, violated the plaintiff's intellectual property rights and breached his fiduciary duty to the plaintiff.  As against Globe, Visual alleges that Globe is liable for inducing Rossi to breach his contract with it.

[5]     The proposed counterclaim is for "intentional and wrongful interference with the contractual and economic relations and business opportunities" (Decision, para. 4) arising from Visual "commencing [this action]… to intimidate… Rossi… and to further their own economic pursuits by extinguishing the potential success of parties that they perceive as competitors…." (para. 3 of the proposed counterclaim, quoted at para. 10 of the Decision).  In other words, Globe alleges that Visual committed a legal wrong by suing Rossi.

[6]     In paragraph 4 of the proposed counterclaim, Globe alleges that, faced with the claims against him in the main action, Rossi resigned his subsequent employment with Globe, as a result of the "unwanted stress and mental anguish caused" by Visual's lawsuit against him.  In paragraph 5 of the proposed counterclaim, Globe alleges that Visual "knew or ought to have known" that the lawsuit would cause Rossi "emotional distress and suffering" and that the "outcome" was "deliberately orchestrated" as a way to "maliciously interfere" with Globe's "contractual and economic relations" and "future business opportunities."  In other words, Globe alleges that, as a result of Visual suing Rossi, Rossi resigned his employment with Globe, causing Globe damage for which Visual is liable in law.

**What are the Alleged Causes of Action?**

[7]     The Associate Justice notes as follows at para. 12 of the Decision:

> At the hearing of the motion counsel for Globe confirmed that the counterclaim asserts two causes of action: 1) intentional interference with economic relations (now known as the unlawful means tort); and 2) inducing breach of contract.

[8]     The Associate Justice quoted leading authority from the Supreme Court of Canada on the elements of the "unlawful means tort" (paras. 13 and 14 of the Decision).  As held by Cromwell J., "for conduct to constitute "unlawful means" for this tort, the conduct must give rise to a civil cause of action by the third party or would do so if the third party had suffered loss as a result of

Page: 3

that conduct" (*A.I. Enterprises Ltd.* v. *Bram Enterprises Ltd.*, 2014 SCC 12, para. 76, quoted in the Decision, para. 14).

[9]    The "third party" in the context of this appeal is Rossi.  The alleged "unlawful means" is Visual's bringing a lawsuit against Rossi.  As held by the Associate Justice, "[i]t is beyond clear that this proposed pleading is not legally tenable….  Issuing a civil claim is not an unlawful act, and it cannot give rise to civil liability."  I agree.

[10]    The Associate Justice quoted leading authority from the Court of Appeal for the test for the tort of inducing breach of contract and then correctly stated as follows (Decision, paras. 17 and 18, following *Drouillard* v. *Cogeco Cable Inc.*, 2007 ONCA 322, para. 26):

> If Globe is able to make out these four elements [the test for inducing breach of contract], the action may nonetheless fail if the defence of justification is available.

[11]    The Associate Justice then found that "[i]t is a tenet of our legal system that any person may issue a civil action to seek redress of their rights."  On this basis, the Associate Justice concluded, "Visual is certain to be able to make out the defence of justification" (Decision, para. 19).  Again, I agree.

[12]    On the basis on which the motion was argued before the Associate Justice, she was correct in dismissing the motion.  The claims of intentional interference with economic relations (the "unlawful means" tort) and inducing breach of contract are not tenable in law.

**Argument on Appeal**

[13]    On appeal, Globe now asserts a third cause of action, one upon which it did not rely before the Associate Justice: the tort of abuse of civil process.  Globe acknowledges that "the tort of 'abuse of process' is not plead *verbatim* within Globe's proposed counterclaim" but argues that "all of the components of the test for abuse of process are noted in its claim for damages under the tort of intentional and wrongful interference…."  First, Globe fails to address the confirmation it provided to the Associate Justice of the nature of its proposed claims, quoted above.  The Associate Justice was entitled to decide the motion before her on the basis on which it was argued.  She made no error in failing to consider and decide whether Globe might have a tenable claim for the tort of abuse of civil process.

[14]    In its factum, Globe argues that the Associate Justice erred in law in making the following statement:

> Commencing a lawsuit does not give rise to a civil cause of action.  Issuing a civil claim is not an unlawful act, and it cannot give rise to civil liability. (Decision, para. 16)

This statement, plucked from the context in which it was made, is not consistent with the test for the tort of abuse of civil process, which carves out a narrow exception to the general principle stated by the Associate Justice.  The context in which this statement arises, however, was an

Page: 4

analysis of the tort of unlawful interference with economic relations. Bringing a lawsuit, in that context, is not an "unlawful means". It is a lawful means for seeking redress.

**(a)    No New Arguments on Appeal**

[15]    The appeal rests on an argument not made at first instance. The parties are represented by counsel, and the context in which the case arises is a "departing employee case' that arises in our courts regularly. Extended interlocutory proceedings delay the timely and cost-efficient adjudication of disputes and permitting parties to raise entirely new arguments on appeal can only have the effect of encouraging extended interlocutory proceedings. Only in exceptional circumstances should this court entertain issues on appeal that were not raised below: *Perez* v. *Governing Council of the Salvation Army of Canada* (1998), 42 OR (3d) 229 at 233 (CA).

**(b)    No Tenable Claim for Abuse of Civil Process in this Case**

[16]    In any event, the proposed counterclaim cannot meet the test for the tort of abuse of civil process. That test, as held by the Ontario Court of Appeal in *Smith* v. *GlaxoSmithKline Inc.*, 2010 ONCA 872, para. 27, is as follows:

> i.      the plaintiff is a party to a legal process initiated by the defendant;
>
> ii.     the legal process was initiated for the predominant purpose of furthering some indirect, collateral and improper objective;
>
> iii.    the defendant took or made a definite act or threat in furtherance of the improper purpose; and
>
> iv.    some measure of special damage has resulted.

[17]    The proposed counterclaim cannot meet branches (ii) and (iii) of the test. No "indirect, collateral or improper objective" is pleaded. Inducing Rossi to leave his subsequent employment is not an "indirect, collateral or improper objective." That was one of the direct goals of the lawsuit – to preclude Rossi from working for Globe in alleged breach of his employment contract and fiduciary duty. The propriety of Rossi's employment with Globe was the very essence of the claims asserted by Visual, and cannot be characterized as an "indirect, collateral and improper objective." If Visual's allegations are devoid of merit – as seems to be the premise of the counterclaim – then the course available to Globe and Rossi is to defend those claims and seek costs.

[18]    The proposed counterclaim does not plead "a definite act or threat in furtherance of the improper purpose." Instead, Globe argues that "the essence of [Visual's] legal proceeding was to threaten the business and economic prospects of Globe. In other words, the alleged "definite act" is the bringing of the lawsuit – there is no "conduct" alleged other than the lawsuit. To quote from *Teledata Communications Inc.* v. *Westburne Industrial Enterprises Ltd.*, 1990 CarswellOnt 812, para. 9:

2022 ONSC 5932 (CanLII)

Page: 5

> … the bringing of an action, even if factually groundless, together with wrongful motives for bringing the action, are not sufficient to constitute the tort of abuse of process. What lies at the heart of the cause of action is <u>an act</u>, <u>or threat of an act</u>, <u>outside the ambit of the action</u>. The essence of the action therefore is the use of legal process to gain an end which the legal process does not entitle the plaintiff to obtain.

No "act or threat of an act outside the ambit of the action" is pleaded. What is relied upon instead are alleged consequences of the lawsuit itself – Rossi's resignation and Globe's alleged losses as a result. Malicious use of the litigation process itself is not actionable; that kind of conduct is addressed in the exercise of the court's discretion as to costs: P.H. Osborne, *The Law of Torts* (5th ed., 2015), pp. 278-279.

**(c)    The Practical Assessment**

[19]    Departing employee Rossi resigned his subsequent employment when he was sued in connection with it. That was one of the results the plaintiff, Visual, sought in the lawsuit. Visual was entitled to pursue its claims, and it was for Globe and Rossi to defend against those claims if they wished to do so. There is no tenable claim by Globe against Visual in these circumstances. The facts, as pleaded, do not meet the test for civil abuse of process. No additional facts were suggested in argument or put in evidence which could render the claim tenable by further amendment.

**Disposition and Costs**

[20]    For these reasons the appeal is dismissed, with costs payable by Globe to Visual in the amount of $10,000, inclusive, payable within thirty days.

_____

D.L. Corbett J.

**Released:** October 19, 2022

2022 ONSC 5932 (CanLII)

**CITATION:** Globe POS Systems v. Visual Information Products Inc., 2022 ONSC 5932
**DIVISIONAL COURT FILE NO.:** 820/21
**DATE:** 20221019

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**DIVISIONAL COURT**

**D.L. Corbett J.**

**BETWEEN:**

Globe POS Systems Inc. and Tony
Rossi

Defendants/Appellant

**- and -**

Visual Systems Information Inc.

Plaintiff/Responding Party

---

**REASONS FOR DECISION**

---

**D.L. Corbett J.**

**Released:** October 19, 2022

2022 ONSC 5932 (CanLII)

**8**

CITATION: Hamilton v. Osborne, 2009 ONCA 684
DATE: 20090928
DOCKET: C49051

COURT OF APPEAL FOR ONTARIO

Winkler C.J.O., Feldman and Epstein JJ.A.

BETWEEN

Mary Faye Hamilton

Plaintiff (Appellant/
Respondent by way of cross-appeal)

and

1214125 Ontario Limited, Lou Lacivita,
<u>Jon Osborne</u>, and Cornerstone Connections Inc.,
formerly Century 21 Cornerstone Graceville Realty Inc.

Defendants (<u>Respondent</u>/
<u>Appellant by way of cross-appeal</u>)

Louis A. Frapporti, for the appellant/respondent by way of cross-appeal

Jeffrey S. Klein, for the respondent/appellant by way of cross-appeal

Heard: June 9, 2009

On appeal from the judgment of Justice Cory A. Gilmore of the Superior Court of
Justice dated June 10, 2008, with reasons reported at (2008), 71 R.P.R. (4th) 97.

Epstein J.A.:

2009 ONCA 684 (CanLII)

Page:  2

## I.    INTRODUCTION

[1]    The issue in this appeal is the relief, if any, to which Mary Faye Hamilton, the appellant/respondent by cross-appeal, is entitled as a result of problems she encountered when she purchased land and hired a builder to build a home for her. Jon Osborne, the respondent/appellant by cross-appeal, a co-worker in the real estate firm where Hamilton worked as an associate broker,[1] had listed the property and recommended the builder.

[2]    As the project progressed, problems developed.  First, the builder, who was to purchase the property and then sell Hamilton a finished home on it, did not have enough money to close on the sale of the property. Second, the builder's work was deficient.  Third, for a number of reasons, it was not possible for the home to have a feature that was particularly important to Hamilton - a walk-out basement apartment.  After a small amount of work had been completed in the construction of her new home, Hamilton was forced to replace the original builder and build a modified dwelling.

---

[1] The defendants, 1214125 Ontario Limited and Lou Lacivita were noted in default.  The other defendants no longer exist as legal entities.

Page:  3

2009 ONCA 684 (CanLII)

[3]    Central to this appeal and cross-appeal is the way in which the trial judge dealt with the issues of damages and alleged misrepresentations and breach of fiduciary duty on the part of Osborne.

[4]    For the reasons that follow, I would dismiss the appeal and allow the cross-appeal, in part.

## II.    FACTS

[5]    Following separation from her husband, Hamilton wanted a home with a walk-out basement apartment that she could rent out to help defray expenses.

[6]    In the spring of 1998, Hamilton's colleague, Osborne, presented an exclusive listing of a vacant lot for which he had a builder; namely, Lou Lacivita, operating through his numbered company, 1214125 Ontario Limited (collectively "Lacivita"). The information in the listing included the opportunity to build a home with a walk-out basement.

[7]    Hamilton investigated the proposal by viewing the lot and asking Osborne questions including about the possibility of a walk-out basement apartment and Lacivita's qualifications.

[8]    After deciding to proceed, Hamilton personally prepared an offer in the form of the agreement of purchase and sale.  In the agreement, entered into on May 11,

Page:  4

1998, Hamilton agreed to pay Lacivita $320,000.00 for the home and lot, with a $15,000.00 initial deposit payable to Lacivita and a further $15,000.00 to be paid when the sale of her home closed.  At the time the agreement was signed, Hamilton knew that Lacivita did not own the lot, but that he intended to buy it in advance of her purchase of the property and newly-built home, scheduled to close on August 28, 1998.

[9]    In late June 1998, Lacivita's lawyer told Hamilton that Lacivita did not have the $7,500 required to complete the acquisition of the land.  Hamilton, in order to salvage the project, agreed to advance the money herself.  On June 30, 1998, she purchased the lot and assumed a vendor take-back mortgage.

[10]   Shortly after the land transaction closed, additional problems surfaced. Lacivita had not obtained building permits, trades people were not being paid, and the municipality had delivered a stop work order.  Later, Hamilton found out from the Ontario New Home Warranty Program ("ONHWP") that Lacivita's membership had expired and that he owed them money. In addition, unbeknownst to Hamilton, Osborne had been in communication with Lacivita's lawyer about Lacivita's need for $150,000 to assist with construction financing.

2009 ONCA 684 (CanLII)

Page:  5

2009 ONCA 684 (CanLII)

[11]   After completing only a small percentage of the construction, Lacivita stopped working on the home.  Hamilton subsequently hired a new builder.  Once familiar with the project, the new builder advised Hamilton that he would have to repair Lacivita's mistakes and that a walk-out basement would be very expensive due to restrictions imposed by the Lake Simcoe Conservation Authority and the topography of the lot. Hamilton also learned that the property was not serviced by either hydro or gas.

[12]   Hamilton's agreement with the new builder was for a modified home to be built for $308,000, without a walk-out basement apartment.  She spent additional money for legal fees and for her new builder to correct the deficiencies in Lacivita's work.

[13]   As a result of these various problems, Hamilton sued Osborne and others. Her claim against Osborne is for damages arising from, among other things, negligent misrepresentation and breach of fiduciary duty.  Specifically, Hamilton claims that Osborne misled her in relation to Lacivita - his standing with ONHWP and his financial strength - and the feasibility of building a home on the property that included a walk-out basement apartment.

## III.    THE TRIAL JUDGE'S REASONS

[14]   The trial judge's reasons contain a detailed analysis of Hamilton's claims against Osborne on the basis of negligent misrepresentation and breach of fiduciary duty.

## 1.    <u>Negligent Misrepresentation</u>

[15]   Relying on the principles established in *Hedley Byrne & Co. v. Heller & Partners Ltd.*, [1964] A.C. 465, adopted by the Supreme Court of Canada in *Queen v. Cognos*, [1993] 1 S.C.R. 87, the trial judge noted, at para. 39, that for a finding of misrepresentation to be made, Hamilton had to establish that:

     i.    there was a duty of care based on a special relationship;

     ii.    the representation was untrue or inaccurate;

     iii.    Osborne acted negligently in making the misrepresentation;

     iv.    she relied on the misrepresentation; and

     v.    the reliance on that misrepresentation was detrimental in that damages resulted.

[16]   The trial judge found that a "special relationship" existed between Hamilton and Osborne based on "dual agency" – both parties worked for the same brokerage

2009 ONCA 684 (CanLII)

2009 ONCA 684 (CanLII)

firm.  Osborne was the vendor's agent and Hamilton was both the purchaser and the purchaser's agent.

### (i)    Lacivita's reputation as a builder

[17]   The trial judge found, at para. 44, that Osborne had described Lacivita to Hamilton as a "solid gold" builder. This finding notwithstanding, the trial judge rejected Hamilton's claim that Osborne's misguided endorsement of Lacivita as a builder was negligent.  First, Hamilton had the opportunity to investigate the quality of Lacivita's work on her own terms but made only minimal inquiries. Second, relying on *Fraser v. Powell River Real Estate Ltd.* (1998), 112 B.C.A.C. 276 (C.A.), the trial judge found, at para. 47, that the statements upon which Hamilton relied amounted to "broad exhortations" for which Osborne should not be held liable.

### (ii)    The walk-out basement

[18]   The trial judge then proceeded to consider Hamilton's claim that Osborne misled her about being able to build a walk-out basement.  The trial judge rejected this aspect of the claim, at paras. 53-55, primarily because she found nothing in the evidence to support a conclusion that a walk-out basement was not possible.  It would simply have cost more than originally anticipated.

Page:  8

### (iii)   *The basement apartment*

[19]   With respect to Hamilton's complaint that she was misled into believing that there was no legal impediment to her building a basement apartment, the trial judge found that Osborne told her that a basement apartment could be built.  Based on this finding, the trial judge went on to conclude that Osborne was guilty of negligent misrepresentation as, to his knowledge, the relevant by-law prohibited basement apartments in that area. However, the trial judge, at para. 65, found Hamilton to have been contributorily negligent.   Given her background and knowledge, Hamilton could have taken steps to satisfy herself as to the legality of a basement apartment and failed to do so.  The trial judge therefore held Hamilton 50% responsible for any damages she incurred as a result of her not being able to build a basement apartment.

### (iv)   *Lacivita's financial strength*

[20]   Turning to the issue surrounding Osborne's representation that Lacivita was financially strong, the trial judge found, at para. 89, that while Osborne was negligent in making representations to this effect, after June 1998 when evidence came to light indicating that Lacivita was in financial difficulty, Hamilton did not act reasonably in relying on those representations.

Page: 9

[21]  The trial judge's analysis of Hamilton's response to becoming aware of Lacivita's financial difficulties is contained in paras. 75-77 and 88 of the reasons, as follows.  I set these paragraphs out in full as this analysis was pivotal to the trial judge's assessment of the damages to which Hamilton was entitled.

> [75]  When Ms. Hamilton discovered that Mr. Lacivita could not come up with $7500.00 to buy the building lot, she did not terminate her contract with Mr. Lacivita. Instead, she told Mr. Osborne to prepare a new agreement related solely to the house construction which would be signed when Mr. Osborne brought her proof of Mr. Lacivita's financial stability.  With respect, it is difficult to understand why Ms. Hamilton adopted this course of action when she knew that her Builder was unable to come up with the sum of $7500.00.

> [76]  At this critical point in the timing of matters, Ms. Hamilton had good reason to believe that Mr. Lacivita had financial problems.  However, rather than taking matters into her own hands, she sat back and waited for Mr. Osborne to prepare a new agreement.  One must ask why Ms. Hamilton did not prepare a new agreement herself (since she was clearly capable of doing so) and make it conditional on Mr. Lacivita's ability to provide adequate financial backing.

> [77]  If Ms. Hamilton had reasonably relied on Mr. Osborne's representations up to this point, surely this was the moment when she would have had some realization that it was time for her to make her own enquiries.  When she knew that her builder could not come up with $7500.00 clearly her level of reliance on any of Mr. Osborne's past representations would have been shaken. I agree with the Defendant Osborne's submissions that at

2009 ONCA 684 (CanLII)

2009 ONCA 684 (CanLII)

> this point had Ms. Hamilton stepped back and not closed the land transaction, or if she had closed the lot transaction and applied to the ONWHP to get back her deposit, her loss would have been minimal.
>
> ...
>
> [88]  I find that she would not have done anything differently.  She already knew that Mr. Lacivita did not have the $7500.00 to close the lot transaction and so she proceeded to buy the lot.  It would not have therefore surprised her to find out he needed financing to build her home if he did not have $7500.00.  Once again, it must be kept in mind that Ms. Hamilton was very concerned about timing.  The sale of her own home would close within a month of the date she bought the lot and she needed a place to live.  Ms. Hamilton was intent on proceeding no matter what warning signs came her way.

## 2.  **Breach of fiduciary duty**

[22]  The trial judge next dealt with Hamilton's claim for damages arising out of Osborne's alleged breach of fiduciary duty to her.

[23]  The trial judge started this part of her analysis, at para. 90, by quoting from Mark Vincent Ellis's *Fiduciary duties in Canada*.  She concluded that due to the dual agency relationship that existed between Hamilton and Osborne, each had an obligation to the other to "make full and fair disclosure of all material circumstances and of everything known to him or her respecting the subject matter of the contract which would be likely to influence the conduct of the principal":

2009 ONCA 684 (CanLII)

Mark Vincent Ellis, *Fiduciary duties in Canada*, looseleaf (Toronto: Thompson Carswell, 2008), at p. 5-2.3.

[24]   Relying on *Laycock v. Lee & Fraser* (1912), 17 B.C.R. 73 (C.A.), the trial judge held, at para. 91, that this duty includes an obligation to disclose all facts about the property's value and suitability for the principal's purpose.

[25]   Against the background of this mutual obligation, the trial judge dealt with all aspects of Hamilton's arguments essentially on the same basis as that involving Hamilton's claims for damages arising from the various alleged negligent misrepresentations, reviewed above.  The only aspect of the claim under breach of fiduciary duty for which the trial judge was prepared to hold Osborne responsible was with respect to his advising her as to the feasibility of being able to build a home with a basement apartment.

## 3.   **Damages**

[26]   The trial judge found that Hamilton's damages claim against Osborne was limited by her failure to mitigate in relation to the $15,000 deposit she paid Lacivita and by her failure to establish causation in relation to damages incurred after June 1998 when Hamilton learned of Lacivita's financial difficulties.

Page:  12

[27]   Against this background, the trial judge awarded damages in favour of Hamilton in the amount of $15,005, calculated as follows.

[28]   Osborne was ordered to pay Hamilton one-half of her costs associated with his negligent misrepresentation concerning the viability of a basement apartment. In arriving at the amount of $5,005, the trial judge relied on the work schedules in determining the cost of restoring the property to vacant lot status when the new builder was brought in to build a home without a basement apartment and took into account Hamilton's costs of renting alternative accommodation over the additional time to completion resulting from the extra work involved restoring the property.

[29]   To the $5,005, the trial judge added $10,000 in punitive damages based on her finding that Osborne breached his fiduciary duty owed to Hamilton and that he deliberately lied to her about the basement apartment.

## IV.  ISSUES

[30]   In the appeal, Hamilton raises the following issues:

      1.    Did the trial judge err in not explicitly finding fraud or fraudulent misrepresentation on the part of Osborne?

      2.    Did the trial judge err in her analysis of Osborne's misrepresentations?

2009 ONCA 684 (CanLII)

Page: 13

> 3.    Did the trial judge err in respect of her damages award?

[31]  By way of cross-appeal, Osborne raises the following issue:

> 1.    Did the trial judge err in any other respect with regard to her ruling on damages, especially punitive damages?

## V.    ANALYSIS

## 1.    <u>Did the trial judge err in not explicitly finding fraud or fraudulent misrepresentation on Osborne's part?</u>

[32]  Hamilton argues that the trial judge erred in failing to find that Osborne's conduct toward her amounted to fraud or fraudulent misrepresentation and in assessing the consequences of his conduct "without regard to the relevant legal principles."

[33]  Hamilton did not adequately plead fraud against Osborne and her failure to do so is fatal to this argument advanced for the first time on appeal.

[34]  Rule 25.06(1) of the *Rules of Civil Procedure* requires that every pleading contain a concise statement of the material facts on which the party relies for the claim or defence, but not the evidence by which those facts are to be proved. Rule 25.06(8) further provides:

> Where fraud, misrepresentation, breach of trust, malice or intent is alleged, the pleading shall contain full

Page:  14

2009 ONCA 684 (CanLII)

> particulars, but knowledge may be alleged as a fact without pleading the circumstances from which it is to be inferred.

[35]   In *Lana International Ltd. v. Menasco Aerospace Ltd.* (1996), 28 O.R. (3d) 343, at 350, Greer J. interpreted Rule 25.06(8) and adopted the following requirements from *Rahn v. McNeill* (1987), 19 B.C.L.R. (2d) 384 at 392 (S.C.), for pleading either innocent misrepresentation or deceit:

> The pleading, even of innocent misrepresentation, must set out with careful particularity the elements of the misrepresentation relied upon, that is:
>
> 1. the alleged misrepresentation itself,
> 2. when, where, how, by whom and to whom it was made,
> 3. its falsity,
> 4. the inducement,
> 5. the intention that the plaintiff should rely upon it,
> 6. the alteration by the plaintiff of his or her position relying on the misrepresentation,
> 7. the resulting loss or damage to the plaintiff.
>
> Of course, if deceit is alleged, then there must also be an allegation that the defendant knew of the falsity of his statement…. Each of the defendants must know the case that it has to meet.

Page:  15

[36]   Since fraud was not raised in the pleadings and Hamilton did not seek to amend her claim, I would not give effect to this ground of appeal.  This takes me to the claims that Hamilton did properly advance – negligent misrepresentation and breach of fiduciary duty.

**2.     Did the trial judge err in her analysis of Osborne's statements based on negligent misrepresentation?**

[37]   I see no error in the trial judge's reasoning that led to her rejection of most of Hamilton's claim for damages based on negligent misrepresentation.   With respect to the quality of Lacivita's work, both Osborne and Hamilton acted as agents on the transaction and Hamilton was fully capable of performing her own due diligence. With respect to the feasibility of a walk-out basement, the trial judge found that a walk-out basement was feasible and therefore the information provided was not inaccurate or untrue.   Whether such a basement could be provided at the price stipulated was an issue between Hamilton and Lacivita. With respect to Lacivita's financial strength, I agree with the trial judge's conclusion that Hamilton should be held responsible for the decisions she made once Lacivita's financial difficulties became apparent.  Hamilton knew in June 1998 that Lacivita could not come up with the relatively small amount - $7,500 - to close the land transaction; this fact is indicative of serious money problems for a builder

Page:  16

2009 ONCA 684 (CanLII)

who was by then building an expensive home for Hamilton.  Notwithstanding this clear evidence that Lacivita was in financial trouble, Hamilton chose to proceed with the project with Lacivita as builder.

**3.    Did the trial judge err in respect of her ruling on damages?**

[38]   The most significant factor that restricts the damages to which Hamilton is entitled is the trial judge's clear finding to the effect that Hamilton was determined to go ahead with the project, "no matter what".  This finding creates a barrier to the recovery of damages incurred after June 1998 when Hamilton first became aware of Lacivita's financial difficulties.  Any losses Hamilton incurred after June 1998 must be attributed not to Osborne's misrepresentations but to Hamilton's decisions.

[39]   Aside from the costs associated with Osborne's negligent misrepresentation concerning the viability of a basement apartment, Hamilton's only loss incurred before June 1998 is the $15,000 she paid Lacivita for the initial deposit.  Hamilton submits that the trial judge erred in relying on the duty to mitigate her damages in holding that because it was possible for her to seek repayment of the deposit from ONHWP, she could not recover the loss.  According to Hamilton, her ONHWP claim is akin to a claim against an insurance policy.  She relies on law to the effect that the existence of an available insurance policy does not obligate the wronged

Page: 17

2009 ONCA 684 (CanLII)

party to claim under it or disentitle the party who fails to make a claim under an available policy to compensation from the tortfeasor.

[40]   I do not agree with this argument.

[41]   The principle Hamilton cites, that insurance proceeds are not susceptible to the doctrine of mitigation, stems from the fact that they cannot be deducted from tortfeasor's liability: Tetterborn, A. *The Law of Damages* (London, England: Butterworths LexisNexis-UK, 2004) at para. 5.50. This is a well-established principle in Canadian and English law.  The history of this principle can be traced at least to *Bradburn v. Great Western Railway Co* (1874) LR 1 Ex 10, where the English House of Lords ruled that insurance is not deductible from tort liability. As Baron Bramwell put it,

> One who pays premiums for the purpose of insuring himself, pays on the footing that his right to be compensated when the event insured against happens is an equivalent for the premiums he has paid; it is a quid pro quo, larger if he gets it, on the chance that he will never get it at all. (p.2)

[42]   This principle was reiterated by the Supreme Court in *Ratych v. Bloomer,* [1990] 1 SCR 940.  Cory J., writing in dissent (but not on this point), traced the issue of deductibility through Canadian law since *Bradburn* and concluded that

Page:  18

2009 ONCA 684 (CanLII)

"despite any confusion that may have beset this issue, no court in Canada or England has questioned the principle enunciated in *Bradburn*, that benefits awarded under a private insurance contract should not be deducted from damages awarded against a tortfeasor." *Ratych*, para. 11.

[43]   The rationale for this exception is that people should not lightly be deprived of the proceeds of their own thrift and foresight; therefore premiums paid for insurance should not be used to reduce a tortfeasor's liability: Tetterborn, at para. 5.26. See also *Ratych* at para. 7.   But this rationale is only applicable where insurance premiums are paid.  Hamilton paid no premiums to ONHWP, nor did she demonstrate any foresight in gaining access to it.   The guarantee fund was available to her by statute.  While her contract with Lacivita included an indemnity clause for his registration under ONWHP upon completion of construction, it is clear that construction did not proceed to that stage and that this payment was never made.  The ONWHP fund was therefore not "insurance" in the sense that warranted its exclusion from the doctrine of mitigation.

[44]   I would dismiss Hamilton's appeal as to damages.

Page: 19

**4.    Cross-appeal:  Did the trial judge err in any other respect with regards to her ruling on damages, particularly punitive damages?**

[45]    In the cross-appeal, Osborne appeals two aspects of the damages award – the award for punitive damages, and the amount of $5,005, being one-half of the costs associated with restoring the property to vacant lot status.

[46]    I start with the award of punitive damages.

[47]    As previously mentioned, the trial judge ordered Osborne to pay $10,000 in punitive damages based on her finding that he breached his fiduciary duty to Hamilton by lying to her with respect to the legality of a basement apartment.

[48]    With respect, I do not agree with the trial judge's conclusion that Osborne had a fiduciary obligation to Hamilton.  Although Osborne and Hamilton worked at the same agency – and in that sense there was "dual agency" – the listing agent and selling agent were not the same person.  Osborne was the vendor's agent and Hamilton served on her own behalf as agent for herself.  Even though real estate agents fall within the traditional categories of fiduciaries, the real estate context alone does not give rise to a fiduciary relationship in this case since Osborne did not serve as Hamilton's agent.

2009 ONCA 684 (CanLII)

Page:  20

[49]   Relationships in which a fiduciary obligation has been imposed are marked by the following three characteristics: (1) scope for the exercise of some discretion or power; (2) that power or discretion can be exercised unilaterally so as to effect the beneficiary's legal or practical interests; and, (3) a peculiar vulnerability to the exercise of that discretion or power: *Hodgkinson v. Simms*, [1994] 3 S.C.R. 377, at p. 408; *Lac Minerals Ltd. v. International Corona Resources Ltd.*, [1989] 2 S.C.R. 574 at 599 per Sopinka J., and at 646 per La Forest J.  In the context of real estate transactions, a fiduciary duty arises where a real estate agent has access to confidential information and can exercise discretion in a fashion that places the principal in a position of dependency or vulnerability:  *Valiquette v. Re/Max Realty Specialists*, [1997] O.J. No. 2677 at para. 35(O.C.G.D.).  None of those factors exist here. As stated above, the by-law prohibiting basement apartments was freely available to the public. Osborne possessed no discretion or power in relation to the transaction that left Hamilton vulnerable. Quite the contrary, Hamilton was an experienced agent and broker who had access to the same information as did Osborne.  Finally, Osborne was not in a position of conflict with Hamilton; as the listing agent, he would have earned a commission whether the property was sold to Hamilton or to another purchaser.

2009 ONCA 684 (CanLII)

Page:  21

[50]   My conclusion that no fiduciary relationship existed between Osborne and Hamilton significantly erodes the basis upon which the trial judge awarded Hamilton punitive damages.

[51]   The only other basis expressed by the trial judge is the nature of Osborne's conduct. The worst that can be said of Osborne's conduct, as found by the trial judge, is that he concealed from Hamilton the legality of building a basement apartment – in other words, he told her something that a search of the public records would have proven incorrect.   This is not the type of "highly reprehensible" conduct sufficient to attract an award of punitive damages.

[52]   For these reasons I would set aside the award for punitive damages.

[53]   I now turn to the award of $5,005.

[54]   The award of $5,005 based on negligent misrepresentation in relation to the legality of the basement apartment is arguably problematic due to the lack of evidence about the amount of work, if any, Lacivita had done in relation to the basement apartment as of June 1998.   However, it has long been recognized that in the absence of an error of law, an award to damages is reviewable by a deferential standard.   While the evidence is scant, it was for the trial judge to review and determine the award.   I see no error of law or any palpable and overriding error on

2009 ONCA 684 (CanLII)

Page:  22

the facts on which the award was based.  Therefore, I would not interfere with this award.

[55]   Accordingly, I would allow the cross-appeal, in part, and set aside the order that Osborne pay $10,000 in punitive damage award.

## VI.    DISPOSITION

[56]   For these reasons, I would dismiss the appeal and allow the cross-appeal, in part.  The effect of this disposition is that I would reduce the award of damages payable by Osborne from $15,005 to $5,005.

[57]   Based on the parties' submissions at the conclusion of the hearing, I would award Osborne his costs of this appeal and cross-appeal, fixed in the amount of $20,000, including disbursements and Goods and Services Tax.

RELEASED:

"SEP 28 2009"                    "G.J. Epstein J.A."
"GE"                                     "I agree W. Winkler C.J.O."
                                              "I agree K. Feldman J.A."

2009 ONCA 684 (CanLII)

9

Harris v. Glaxosmithkline Inc. et al.

[Indexed as: Harris v. GlaxoSmithKline Inc.]

106 O.R. (3d) 661

2010 ONCA 872

Court of Appeal for Ontario,
Rosenberg, Moldaver and Karakatsanis JJ.A.
December 20, 2010*

* This judgment was recently brought to the attention of the
editors.

Torts -- Abuse of process -- Plaintiff bringing action
against defendants for damages for abuse of process based on
fact that she was unable to buy cheaper generic version of drug
manufactured by defendants while proceedings by defendants
against generic manufacturer were outstanding in Federal Court
-- Motion judge properly striking statement of claim and
dismissing action -- Plaintiff not party to any legal process
initiated by defendants -- Statement of claim also alleging no
overt act outside of alleged abusive process -- Abuse of
process claim bound to fail. [page662]

Torts -- Conspiracy -- Plaintiff bringing action against
defendants for damages for conspiracy based on fact that she
was unable to buy cheaper generic version of drug manufactured
by defendants while proceedings by defendants against generic
manufacturer were outstanding in Federal Court -- Motion judge
properly striking statement of claim and dismissing action --
Defendants' predominant purpose in bringing Federal Court
proceedings not to injure plaintiff -- Plaintiff unable to show
unlawful act on part of defendants -- Plaintiff not having
viable claim for conspiracy.

2010 ONCA 872 (CanLII)

Waiver of tort -- Wrongdoing -- Plaintiff bringing action
against defendants for damages for abuse of process based on
fact that she was unable to buy cheaper generic version of drug
manufactured by defendants while proceedings by defendants
against generic manufacturer were outstanding in Federal Court
-- Motion judge properly striking claim and dismissing action
-- Plaintiff unable to point to any predicate wrongdoing on
part of defendants -- Predicate wrongdoing essential element of
waiver of tort.

The plaintiff was a user of the drug Paxil, which was
manufactured and sold by the defendants. Between 1999 and 2003,
the defendants filed six Notice of Compliance ("NOC")
Proceedings in the Federal Court against several generic drug
makers who sought to introduce a generic equivalent of Paxil
into the Canadian market. Upon the commencement of an NOC
Proceeding, the Minister of Health is automatically enjoined
from issuing an NOC to the generic drug manufacturer for a
period of up to 24 months from the date of the filing. The
defendants were unsuccessful in four of the six proceedings and
discontinued the other two. However, by virtue of the automatic
stays, the defendants retained the exclusive right to market
Paxil during the four years in question. The plaintiff brought
a proposed class action against the defendants alleging causes
of action in abuse of process, conspiracy and waiver of tort.
She claimed that she had suffered damages as a result of the
postponement of the sale of the generic drug as she was
required to purchase Paxil at a "supra-competitive price"
during that period. The defendants moved successfully for an
order striking out the claim and dismissing the action. The
plaintiff appealed.

Held, the appeal should be dismissed.

The motion judge properly found the following to be the
constituent elements of the tort of abuse of process: (1) the
plaintiff is a party to a legal process initiated by the
defendant; (2) the legal process was initiated for the
predominant purpose of furthering some indirect, collateral and
improper objective; (3) the defendant took or made a definite

act or threat in furtherance of the improper purpose; and (4) some measure of special damage has resulted. The first element was not satisfied as the plaintiff was not a party to a legal process initiated by the defendants. The third element was also not satisfied as there was no overt act outside of the alleged abusive process. It was plain and obvious that the claim for abuse of process could not succeed.

 To make out a conspiracy to injury, the defendant's predominant purpose must be to inflict harm on the plaintiff. It is not enough if harm is the collateral result of acts pursued predominantly out of self-interest. It was plain and obvious that the plaintiff could not establish that the defendants' predominant purpose in bringing the Federal Court proceedings was to injure her. The defendants' predominant purpose was to lawfully advance its self-interest. Even if the defendants acted with bad intentions in bringing the NOC Proceedings, there can be [page663] no liability when the defendant merely employs regular legal process to its proper conclusion. Moreover, the plaintiff could not show a wrongful act on the part of the defendants. The NOC Proceedings were not contrary to law or to statute. They were proceedings that the defendants were at liberty to bring. The motion judge correctly concluded that it was plain and obvious that the plaintiff did not have a viable claim for conspiracy.

 Waiver of tort requires some predicate wrongdoing. There was none to be found in this case. The motion judge correctly dismissed the waiver of tort claim.

 Cases referred to

Metrick v. Deeb, [2003] O.J. No. 2221, 172 O.A.C. 229, 16
 C.C.L.T. (3d) 298, 123 A.C.W.S. (3d) 831 (C.A.) [Leave to
 appeal to S.C.C. refused [2003] S.C.C.A. No. 378], consd

Other cases referred to

Apotex Inc. v. Merck & Co. Inc., [2009] F.C.J. No. 712, 2009
 FCA 187, [2010] 2 F.C.R. 389, 76 C.P.R. (4th) 1, 178 A.C.W.S.
 (3d) 212, 2010EXP-3842; Aronowicz v. Emtwo Properties Inc.
 (2010), 98 O.R. (3d) 641, [2010] O.J. No. 475, 2010 ONCA
 96, 258 O.A.C. 222, 64 B.L.R. (4th) 163, 316 D.L.R. (4th)
 621; AstraZeneca Canada Inc. v. Canada (Minister of Health),
 [2006] 2 S.C.R. 560, [2006] S.C.J. No. 49, 2006 SCC 49,

272 D.L.R. (4th) 577, 354 N.R. 88, J.E. 2006-2157, 52 C.P.R. (4th) 145, 151 A.C.W.S. (3d) 682, EYB 2006-110778; Belsat Video Marketing Inc. v. Astral Communication Inc., [1998] O.J. No. 654, 54 O.T.C. 84, 81 C.P.R. (3d) 1, 77 A.C.W.S. (3d) 732 (Gen. Div.); Canada (Competition Act, Director of Investigation and Research) v. Warner Music Canada Ltd., [1997] C.C.T.D. No. 53, 78 C.P.R. (3d) 321 (Comp. Trib.); Crofter Hand Woven Harris Tweed Co. v. Veitch, [1942] A.C. 435, [1942] 1 All E.R. 142 (H.L.); Positive Seal Dampers Inc. v. M. & I. Heat Transfer Products Ltd. (1991), 2 O.R. (3d) 225, [1991] O.J. No. 3383, 33 C.P.R. (3d) 417, 26 A.C.W.S. (3d) 208 (Gen. Div.); Reach M.D. Inc. v. Pharmaceutical Manufacturers Assn. of Canada (2003), 65 O.R. (3d) 30, [2003] O.J. No. 2062, 227 D.L.R. (4th) 458, 172 O.A.C. 202, 17 C.C.L.T. (3d) 149, 25 C.P.R. (4th) 417, 123 A.C.W.S. (3d) 411 (C.A.); Roman Corp. v. Hudson's Bay Oil and Gas Co., [1973] S.C.R. 820, [1973] S.C.J. No. 70, 36 D.L.R. (3d) 413

Statutes referred to

Competition Act, R.S.C. 1985, c. C-34, ss. 32 [as am.], 79(5)

Food and Drugs Act, R.S.C. 1985, c. F-27 [as am.]

Patent Act, R.S.C. 1985, c. P-4 [as am.]

Rules and regulations referred to

Food and Drug Regulations, C.R.C., c. 870, Part C, Division 8, C.08.004

Patented Medicines (Notice of Compliance) Regulations, SOR/93-133, ss. 5(1) [as am.], 6(1) [as am.], (5)(b) [as am.], 7(1)(e), 8 [as am.]

Rules of Civil Procedure, R.R.O. 1990, Reg. 194, rules 21, 21.01(1)(a), (b)

Authorities referred to

Fleming, John, The Law of Torts, 9th ed. (North Ryde, N.S.W.: LBC Information Services, 1998)

APPEAL from the order of Perell J. (2010), 101 O.R. (3d) 665, [2010] O.J. No. 1710 (S.C.J.) striking a statement of claim and dismissing an action. [page664]

William V. Sasso, Jacqueline A. Horvat and Professor Ed

Morgan, for appellant.

 David W. Kent, W. Brad Hanna and Geoff Moysa, for respondents.


 The judgment of the court was delivered by

 MOLDAVER J.A.: --
Introduction

 [1] The respondents (collectively "GSK") are a group of related companies engaged in the business of pharmaceutical research and development, as well as the manufacture and sale of pharmaceuticals. One of GSK's products is Paxil, a prescription drug used to treat anxiety, depression and other disorders.

 [2] The appellant, Ms. Harris, is a Paxil user. She is the representative plaintiff in a class action in which she, and other Paxil users, contend that from 1999 to 2003, GSK misused a process under the Patent Act, R.S.C. 1985, c. P-4 to delay the entry into the Canadian market of a less expensive generic equivalent of Paxil. During that four-year period, Paxil users were required to buy Paxil at a "supra-competitive" price for which they now seek to hold GSK accountable.

 [3] In her claim on behalf of the class, the appellant alleges three causes of action against GSK: (1) abuse of process; (2) conspiracy; and (3) waiver of tort.

 [4] In April 2010, GSK moved under rules 21.01(1)(a) and (b) of the Rules of Civil Procedure, R.R.O. 1990, Reg. 194 for an order striking out the appellant's claim and dismissing the action. On April 22, 2010, Perell J., of the Superior Court of Justice, granted GSK's motion. He did so on the basis that the pleadings did not disclose a viable cause of action against GSK. In his view, it was plain and obvious that the action could not succeed.

 [5] The appellant challenges that ruling on appeal. In

2010 ONCA 872 (CanLII)

essence, she submits that the motion judge made the following
five errors:

(1) he misdirected himself on the constituent elements of the
    tort of abuse of process;

(2) he erred in holding that the facts as pleaded did not and
    could not establish the tort of conspiracy;

(3) he misdirected himself in holding that a waiver of tort
    claim could not succeed absent a predicate wrongdoing;
    [page665]

(4) he overstepped his mandate on a Rule 21 motion by making
    findings of fact that he was precluded from making; and

(5) he erred in summarily disposing of important and novel
    issues of law in the absence of a full and complete factual
    record.

[6] For reasons that follow, I am satisfied that the motion
    judge was correct in dismissing the action against GSK. In
    short, I agree with him that the pleadings do not disclose
    a viable cause of action against GSK. Accordingly, I would
    dismiss the appeal.

Background

[7] The reasons of the motion judge are detailed and
comprehensive. It is unnecessary to duplicate them. Most of the
heavy lifting has been done. By way of background, I consider
it sufficient to outline, in summary form, the regulatory
regime by which GSK is governed and the salient facts that the
appellant and other Paxil users rely on in support of their
claim against GSK.

The Regulatory Regime

[8] The marketing of drugs in Canada is governed by the Food
and Drugs Act, R.S.C. 1985, c. F-27 ("FDA") and the Patent Act.
The FDA deals with the safety and efficacy of drugs.
Regulations made under that Act (the Food and Drug Regulations,
C.R.C., c. 870, Part C, Division 8, C.08.004) provide that a
drug cannot be marketed in Canada unless and until the Minister
of Health has issued a Notice of Compliance ("NOC") in respect
of it.

[9] The Patent Act deals with intellectual property issues
relating to patented drugs and their subsequent generic copies.

The Patented Medicines (Notice of Compliance) Regulations, SOR/93-133 ("PM(NOC) Regulations") provide that all patents pertaining to a drug for which a NOC has been issued may be listed in the Patent Register. These regulations further provide for a process whereby the interests of innovator patentees are balanced against the competing interests of generic manufacturers.

[10] A subsequent manufacturer that wishes to market a generic version of a patented drug can simply wait for the relevant patents to expire. Alternatively, s. 5(1) of the PM(NOC) Regulations allows a manufacturer to serve a Notice of Allegation ("NOA") on the patentee asserting that the listed patents [page666] are invalid and/or will not be infringed by the proposed generic equivalent.

[11] Section 6(1) of the PM(NOC) Regulations provides that a patentee who receives a NOA may challenge the allegations made by the generic manufacturer by applying for judicial review in the Federal Court (a "NOC Proceeding"). In the NOC Proceeding, the patentee disputes the NOA and asserts the validity and/or infringement of the patent in issue. The patentee is given an opportunity to demonstrate that the allegations set forth in the NOA are "not justified".

[12] Upon the commencement of a NOC Proceeding, s. 7(1)(e) of the PM(NOC) Regulations takes effect and automatically enjoins the Minister from issuing a NOC to the generic drug manufacturer for a period of up to 24 months from the date of the filing.

[13] If the patentee prevails in a NOC Proceeding, the Minister is enjoined from issuing a NOC to the generic manufacturer prior to the expiry of the patent in issue. Alternatively, the court may dismiss a NOC Proceeding if it finds that the patent is invalid or would not be infringed, or that the patent holder has failed to show that the allegations in the NOA are not justified. In that event, the Minister may immediately issue a NOC for the generic product.

[14] A possible check on the automatic 24-month stay

2010 ONCA 872 (CanLII)

contemplated by the filing of a NOC Proceeding is found in s. 6(5)(b) of the PM(NOC) Regulations. Under that provision, the court may dismiss a s. 6(1) application on the ground that "the application is redundant, scandalous, frivolous or vexatious or is otherwise an abuse of process".

[15] Another check on patentees who choose to institute NOC Proceedings is found in s. 8 of the PM(NOC) Regulations. Under that provision, where a NOC Proceeding is withdrawn or discontinued or is ultimately dismissed, the unsuccessful patentee is liable to the generic drug manufacturer for any losses the generic manufacturer may have suffered due to its inability to market its product during the stay period. The PM(NOC) Regulations do not, however, provide any form of relief to other persons or entities, including consumers who may have been adversely affected by a patentee's choice to instigate a NOC Proceeding.

[16] In Apotex Inc. v. Merck & Co. Inc., [2009] F.C.J. No. 712, 2009 FCA 187, the Federal Court of Appeal commented on the balance the PM(NOC) Regulations seek to achieve between the need for effective patent protection and the timely entry of generic drugs into the marketplace. The automatic stay that [page667] arises from the commencement of a NOC Proceeding is part of that balance. Its counterpart is the s. 8 obligation on the patentee to pay damages to a delayed generic entrant if the NOC Proceeding fails. At paras. 54 and 55 of his reasons, Noel J.A., for the court, recognized that "the automatic 24-month stay was capable of being used in a manner which does not advance patent protection" and "given the scheme, it is the patentee who has both the carriage of the proceeding and the interest in its dilatory prosecution". At para. 56, Noel J.A. quoted from AstraZeneca Canada Inc. v. Canada (Minister of Health), [2006] 2 S.C.R. 560, [2006] S.C.J. No. 49, in which Binnie J., for the court, made the following observations, at para. 39:

By imposing the 24-month delay called for by the NOC Regulations, the decision of the Federal Court of Appeal undermines achievement of the balance struck by Parliament between the objectives of the FDA . . . and regulations

thereunder (making safe and effective drugs available to the
public) and the Patent Act and its regulations (preventing
abuse of the "early working" exception to patent
infringement). Given the evident (and entirely
understandable) commercial strategy of the innovative drug
companies to evergreen their products by adding bells and
whistles to a pioneering product even after the original
patent for that pioneering product has expired, the decision
of the Federal Court of Appeal would reward evergreening even
if the generic manufacturer (and thus the public) does not
thereby derive any benefit from the subsequently listed
patents.
(Emphasis added)

[17] Binnie J.'s concerns about the commercial strategy of
the innovative drug companies seeking to evergreen their
products did not escape Noel J.A.'s attention. According to
Noel J.A., s. 8 of the PM(NOC) Regulations was enacted to
address the concerns mentioned by Binnie J. and others as to
the various ways patentees might attempt to misuse the NOC
regulatory regime. At paras. 58 to 60 of his reasons, Noel J.A.
made the following observations:

  Section 8, by imposing on first persons a liability for the
losses suffered by a second person, as a result of the
operation of the automatic stay, when a prohibition
application is withdrawn, discontinued or is ultimately
unsuccessful, alleviates these concerns[.]

  By the same logic, [that a first person no longer has an
exclusive interest in delaying the progress of a NOC
Proceeding], a first person no longer has an exclusive
interest in triggering the operation of the automatic stay by
reference to patents which are not properly listed . . . or
to "evergreen" a patented drug in order to perpetuate the
benefit which the PM(NOC) Regulations provide . . . As a
result of section 8, a first person must focus on the issue
of infringement and consider the strength of its position
before initiating a prohibition proceeding.

  This promotes the use of the PM(NOC) Regulations for the

purpose for which they are intended: the prevention of
infringement. Significantly, it [page668] does so in a manner
which is consistent with maintaining the balance [of making
safe and effective drugs available to the public and
protecting the rights of patentees].

Monopoly Rights of Patentees

[18] In considering the rights of patentees, it is essential
to differentiate between a monopoly, in the anti-competitive,
unlawful sense of the word, and an intellectual property right,
such as a patent. For present purposes, the distinction is
important because the appellant, in her claim, makes numerous
references to GSK's "monopoly" in respect of Paxil and the
resulting "supra-competitive" prices GSK was able to charge.

[19] The distinction between intellectual property rights and
unlawful anti-competitive acts is well-established in
competition law. For example, s. 79(5) of the Competition Act,
R.S.C. 1985, c. C-34 provides that "an act engaged in pursuant
only to the exercise of any right or enjoyment of any interest
derived under the . . . Patent Act . . . is not an anti-
competitive act". See, also, Canada (Competition Act,
Director of Investigation and Research) v. Warner Music Canada
Ltd., [1997] C.C.T.D. No. 53, 78 C.P.R. (3d) 321 (Comp. Trib.),
at p. 9 C.P.R., where, in discussing intellectual property
rights, the tribunal stated that "[t]he right granted by
Parliament to exclude others is fundamental to intellectual
property rights and cannot be considered to be anti-
competitive."

[20] While the normal exercise of an intellectual property
right is not an "abuse of dominance" under the Competition Act,
Parliament was alive to the fact that those rights can be used
inappropriately. Section 32 of the Act gives the Federal Court
broad remedial powers to address the use of intellectual
property rights in ways that "unduly lessen" competition. This
reflects recognition that intellectual property rights can be
used in unlawfully anti-competitive ways. What then is the
nature of a drug patent? It is a time-limited, statutorily-
authorized monopoly on the production and sale of certain
medicines. The patent-holder's right to exclude others is

2010 ONCA 872 (CanLII)

fundamental to the nature of the patent, but those anti-competitive characteristics are dealt with in the statutory scheme of the Competition Act.

[21] It is against this statutory and legal framework that the appellant's claim against GSK must be assessed.
The Failed NOC Proceedings

[22] Between 1999 and 2003, GSK filed six NOC Proceedings in the Federal Court against several generic drug makers who sought to introduce a generic equivalent of Paxil into the [page669] Canadian market. None of the NOC Proceedings were successful. However, by virtue of the automatic stays that took effect upon their filing, GSK retained the exclusive right to market Paxil during the four years in question.

[23] Referring to the NOC Proceedings as "objectively baseless", the appellant claims that GSK initiated them so that GSK could continue to charge consumers a "supra-competitive" price for Paxil. In doing so, GSK used the court process for an improper collateral purpose and caused damage to the class members -- hence the abuse of process claim.

[24] As for the conspiracy claim, the appellant alleges that GSK engaged in a course of conduct, the predominant purpose of which was to cause injury to the class members by forcing them to pay a "supra-competitive" price for Paxil during the years 1999 to 2003. Alternatively, the appellant claims that GSK's use of the regulatory NOC process was unlawful, it was directed at the class members and GSK should have known in the circumstances that the class members would be injured, as indeed they were.

[25] Finally, with respect to waiver of tort, the appellant claims the right to waive damages for the torts of conspiracy and abuse of process and, instead, to seek disgorgement of any profits made by GSK over the four-year period from 1999 to 2003. In this regard, the appellant claims that GSK's conduct constitutes an "affront to good conscience and require[s] a restitutionary disposition that will satisfy equity in the circumstances of this case as pleaded".

2010 ONCA 872 (CanLII)

[26] As indicated, the motion judge rejected each of the claims put forward by the appellant. In his view, the statement of claim did not disclose a viable cause of action against GSK. I agree and now consider the claims asserted.

Abuse of Process

[27] At para. 48 of his reasons, the motion judge defined the constituent elements of the tort of abuse of process as follows:

  The case law authorities establish that there are four constituent elements to the tort of abuse of process: (1) the plaintiff is a party to a legal process initiated by the defendant; (2) the legal process was initiated for the predominant purpose of furthering some indirect, collateral and improper objective; (3) the defendant took or made a definite act or threat in furtherance of the improper purpose; and (4) some measure of special damage has resulted: Hawley v. Bapoo (2005), 76 O.R. (3d) 649 (Ont. S.C.J.) at para. 86, var'd (2007), 156 C.R.R. (2d) 351 (Ont. C.A.); Metrick v. Deeb (2002), 14 C.C.L.T. (3d) 297 (Ont. S.C.J.) at para. 9, aff'd (2003), 172 O.A.C. 229 (C.A.), leave to appeal ref'd, [2003] S.C.C.A. No. 378, 195 O.A.C. 398n (S.C.C.); Scintilore Explorations Ltd. v. Larache, [1999] O.J. No. 2847 (S.C.J.); P.M. Perell, "Tort Claims for Abuse of Process" (2007) 33 Adv. Q. 193 at p. 193; J. Irvine, "The Resurrection of Tortious Abuse of Process" 47 C.C.L.T. 217. [page670]

[28] In my view, the motion judge correctly defined the elements of the tort of abuse of process. His conclusion finds support in academic writings and an established line of authorities.

[29] The appellant referred to this court's decision in Metrick v. Deeb, [2003] O.J. No. 2221, 172 O.A.C. 229 (C.A.), leave to appeal refused [2003] S.C.C.A. No. 378, as authority for the proposition that the tort of abuse of process consists of only two elements: (1) using the legal process for an improper or collateral purpose; and (2) the need for a definite

act or threat in furtherance of the illegitimate purpose.

[30] Those two elements were taken from a passage in Fleming,
The Law of Torts, 9th ed. (North Ryde, N.S.W.: LBC Information
Services, 1998), at p. 668, which the court referred to as
"instructive". In its brief endorsement, the court directed
its attention to the second of the two elements and found that
it had not been made out on the evidence.

[31] Metrick should not be taken as authority for the
proposition that the tort of abuse of process consists of only
two elements. The court in that case was not called upon to
consider the constituent elements of the tort. It was simply
responding to the particular issues raised in that case, one of
which related to the need for a definite act or threat in
furtherance of the illegitimate purpose. In that regard, the
court found [at para. 3] the following quote from Fleming
instructive: "Some such overt conduct is essential, because
there is clearly no liability when the defendant merely employs
regular legal process to its proper conclusion, albeit with bad
intentions" (emphasis added).

[32] As we shall see, that principle is applicable to the
case at hand, both as regards to the tort of abuse of process
and also the tort of conspiracy.

[33] Having concluded that the motion judge correctly
identified the constituent elements of the tort of abuse of
process, the appellant's claim necessarily founders on the
first element. In short, she was not a party to the NOC
Proceedings.

[34] In addressing the first element of the tort, the motion
judge explored what he referred to as the "many policy reasons"
against eliminating it and extending the tort of abuse of
process to non-parties. For present purposes, it is unnecessary
to outline the policy reasons he explored. I only mention the
fact that he considered policy matters because that is one of
the complaints the appellant raises in support of her argument
that the motion judge misidentified "mutuality" as one of the
constituent elements of the tort of abuse of process. In short,

2010 ONCA 872 (CanLII)

the appellant submits that the motion judge was not entitled on
a Rule 21 [page671] motion, absent an evidentiary record, to
consider policy matters. In doing so, he engaged in unwarranted
speculation.

[35] I disagree. In the factum she filed on the motion, the
appellant took the position that there were "no policy reasons
for denying those persons [non-parties] the right to say that
they were abused and to recover damages they have suffered as a
result". That being so, she cannot fault the motion judge for
taking up the issue.

[36] Be that as it may, even if the appellant is correct that
the motion judge should not have entered into the realm of
policy, his doing so occasioned no harm. The constituent
elements of the tort of abuse of process remain the same and
the motion judge would have come to the same conclusion had he
said nothing about policy considerations.

[37] The motion judge also found that the third element of
the tort of abuse of process was not made out on the pleadings.
At para. 72 of his reasons, he made the following observations,
with which I agree:

In the case at bar, based on the allegations pleaded in the
statement of claim, there is no overt act outside of the
alleged abusive process. From a reading of the statement of
claim, all that can be said is that GSK made an application
under s. 6 of the NOC Regulations, which automatically
triggered the injunctive provisions of s. 7 of the
regulation, which, in turn, delayed the entry of generic
drugs into the market but exposed GSK to a claim under s. 8
of the regulation. Ms. Harris submits that the overt act
outside the NOC Proceeding was GSK's act of continuing to
sell Paxil at supra-competitive prices, which is to say the
act of selling at prices untouched by competition. That overt
act, however, is not outside the NOC Proceedings. The act of
bringing a NOC Proceeding is precisely the act of prohibiting
competition so that sales may continue untouched by
competition or at what Ms. Harris likes to call supra-
competitive pricing.

[38] For these reasons, I am satisfied that the motion judge correctly determined that the tort of abuse of process was not made out on the pleadings.

Conspiracy

(i) Conspiracy to injure [See Note 1 below]

[39] To make out a conspiracy to injure, the defendant's predominant purpose must be to inflict harm on the plaintiff. It is not enough if harm is the collateral result of acts pursued predominantly out of self-interest. The focus is on the actual intent [page672] of the defendants and not on the consequences that the defendants either realized or should have realized would follow.

[40] In Roman Corp. v. Hudson's Bay Oil and Gas Co., [1973] S.C.R. 820, [1973] S.C.J. No. 70, at p. 830 S.C.R., Martland J. quoted with approval Lord Simon L.C.'s statement of the law in Crofter Hand Woven Harris Tweed Co. v. Veitch, [1942] A.C. 435, [1942] 1 All E.R. 142 (H.L.), at pp. 444-45 A.C.:

The question to be answered, in determining whether a combination to do an act which damages others is actionable, even though it would not be actionable if done by a single person, is not "did the combiners appreciate, or should they be treated as appreciating, that others would suffer from their action," but "what is the real reason why the combiners did it?" Or, as Lord Cave puts it, "what is the real purpose of the combination?" The test is not what is the natural result to the plaintiffs of such combined action, or what is the resulting damage which the defendants realize or should realize will follow, but what is in truth the object in the minds of the combiners when they acted as they did.

[41] In Belsat Video Marketing Inc. v. Astral Communication Inc., [1998] O.J. No. 654, 81 C.P.R. (3d) 1 (Gen. Div.), at para. 53, Rosenberg J. observed that steps taken for the purpose of protecting a party's trade or business interests amount to legitimate promotion of a self-interest and, hence, do not give rise to the tort of conspiracy to injure:

2010 ONCA 872 (CanLII)

If the real purpose of a combination is not to injure the plaintiffs but to forward or defend the trade of those who enter into it, then no wrong is committed and no action will lie although damage to another ensues, provided that no resort is made to unlawful means in carrying out such purpose. An ordinary commercial transaction, the predominant purpose of which is to advance economic interests, does not constitute a conspiracy even though the complaining party may suffer an economic loss as a result.

(Emphasis added)

See, also, Positive Seal Dampers Inc. v. M. & I. Heat Transfer Products Ltd. (1991), 2 O.R. (3d) 225, [1991] O.J. No. 3383 (Gen. Div.), at pp. 237-38 O.R., per Anderson J.

[42] In the case at hand, it is difficult to discern from the appellant's pleading what the appellant alleges was GSK's predominant purpose in bringing the NOC Proceedings. Para. 57 of the amended statement of claim, reproduced in full below, reads as follows:

Some, but not all, of the defendants' predominant purposes, concerns, motivations and intentions were to:
  (a) cause each of the Class Members to pay the Overcharge so that they would receive more income from the sale of Paxil than they would have if there was a generic equivalent for sale in Canada during the Class Period; [page673]
  (b) suppress, delay and eliminate competition in the supply and sale of a generic equivalent in Canada in order to cause each of the Class Members to pay the Overcharge;
  (c) maintain their monopoly in the sale of Paxil in order to maintain its supra-competitive price during the Class Period;
  (d) harm Class Members by requiring them to pay the Overcharge;
  (e) receive directly or indirectly increased revenue from the sale of Paxil; and
  (f) avoid detection and conceal the conspiracy from Tracey and the other Class Members and the regulatory authorities in Canada.

(Emphasis added)

[43] Assuming that there can be more than one "predominant" purpose, a cursory examination of para. 57 of the amended statement of claim shows that there is considerable overlap in five of the six alleged "predominant" purposes. (Para. 57(f) is a non-sequitur. It relates to how the conspiracy was meant to operate.)

[44] Stripping the five "predominant purpose" clauses to their essentials, the discernable predominant purpose would appear to be that GSK engaged in a course of conduct designed to obtain the highest possible price from consumers with a view to maximizing its revenue from the sale of Paxil -- in other words, a classic commercial purpose that cannot amount to a conspiracy to injure even though, as a result, there is an economic impact on consumers.

[45] GSK submits that this is where the distinction between an anti-trust monopoly and the rights accruing to a patentee must be borne in mind. To the extent GSK's predominant purpose in bringing the NOC Proceedings was to extend the patent rights it had enjoyed in relation to the sale of Paxil, GSK submits that that conduct could not amount to a conspiracy to injure. The PM(NOC) Regulations permitted GSK to do just that. GSK was entitled to defend the validity and scope of its patents. The fact that a patent confers on its owner the power to exclude others certainly has economic implications. But, as GSK points out, those implications are necessarily consequential and, in any event, intended by Parliament and thus not unlawfully anti-competitive.

[46] Viewed through that lens, GSK submits, correctly in my view, that the appellant "cannot convert the legitimate interest of a patentee in protecting (and monetizing) its intellectual property rights into anti-competitive monopoly practices in order to conjure up the improper predominant purpose required for the tort of conspiracy". [page674]

[47] The motion judge agreed with GSK's submissions on this issue. At para. 86 of his reasons, he stated:

2010 ONCA 872 (CanLII)

The resort to a NOC Proceeding is a part of the ordinary
competition between innovators and generic manufacturers. The
case law establishes that provided that there are no unlawful
acts, an ordinary commercial transaction with the predominant
purpose of advancing one's own economic interests does not
constitute a conspiracy even though a party or a third party
may suffer an economic loss.

(Authorities omitted)

And, at para. 89:

GSK is not a public authority, a non-government
organization, a charity, or a not-for-profit organization. It
is a business enterprise with the purposeful activity of
making money, which activity is not wrongdoing. As alleged in
Ms. Harris' statement of claim, all of GSK predominate
purposes are connected to GSK advancing its own self-interest
by making money, which is normal and a norm for for-profit
enterprises. In my opinion, it is plain and obvious that Ms.
Harris cannot establish an intent to injure simply from the
fact that GSK continued to make money from her and from
others by acting in its own self interest and availing itself
of the statutory rights under s. 6 of the NOC Regulations to
protect existing patents while exposing itself to the
attendant statutory liability under s. 8 of the NOC
Regulations.

[48] I agree with those statements by the motion judge and
would simply add that even if GSK acted with bad intentions in
bringing the NOC Proceedings, as Fleming points out, at para.
31 above, "there can be no liability when the defendant merely
employs regular legal process to its proper conclusion".

(ii) Conspiracy to do an unlawful act

[49] The motion judge gave the appellant the widest possible
berth in respect of this allegation. He tested her complaint
against this court's decision in Reach M.D. Inc. v.
Pharmaceutical Manufacturers' Assn. of Canada (2003), 65 O.R.
(3d) 30, [2003] O.J. No. 2062 (C.A.), where Laskin J.A., for
the court, held, at paras. 52 and 53, that the concept of
"illegal or unlawful means" is broad enough to include the
doing of an act that the person or entity is "not authorized to

2010 ONCA 872 (CanLII)

do" or "at liberty to commit".

[50] Applying that test to the case at hand, the motion judge
stated the following, at para. 94 of his reasons:

In the case at bar, GSK's NOC Proceedings were not contrary
to law or to statute. GSK's NOC Proceedings were the opposite
of unauthorized; they were proceedings that GSK was entitled
to bring. In other words, they were acts that GSK was at
liberty to commit. The NOC Proceedings are actually a
response to NOC's initiated by Apotex and two other generic
manufacturers. GSK has a statutory right to show that the
generic manufacturer's allegations are "not justified."
[page675]

[51] I agree with the motion judge's characterization of
GSK's conduct. It follows that the pleadings do not
substantiate a conspiracy based on unlawful means.
  (iii) The sham litigation argument

[52] Having determined that the appellant's abuse of process
and conspiracy allegations could not stand, the motion judge
went on to consider the six cases in which GSK had commenced NOC
Proceedings. Of those six cases, four were determined on their
merits [See Note 2 below] and, in each instance, the courts
found in favour of the generic manufacturers. GSK had failed to
establish that all of the allegations set out by the generic
manufacturers in their NOAs were unjustified.

[53] The motion judge analyzed the four decisions, although
he was not asked to do so by the parties. He did so because the
appellant, in her submissions, had characterized the NOC
Proceedings instituted by GSK as "frivolous", "meritless",
"sham litigation", "spurious" and "objectively baseless". In
the opinion of the motion judge, it was those allegations that
form [at para. 105] "the lynchpin allegations of all of the
claims against GSK". With that in mind, the motion judge
analyzed the four decisions in which GSK was unsuccessful and,
at para. 105 of his reasons, he stated, "[I]n my opinion, it is
plain and obvious that these allegations are patently
ridiculous and incapable of proof."

2010 ONCA 872 (CanLII)

[54] The appellant argues that it was wrong for the motion judge to analyze the four decisions on his own motion. Of greater importance, she submits that it was not open to the motion judge on a Rule 21 motion to find, based on his review of the four decisions, that the appellant's "sham litigation" allegations were [at para. 105] "patently ridiculous and incapable of proof". According to the appellant, that finding, which exceeded the scope of the motion judge's mandate, coloured his perception of the appellant's claims and tainted his analysis of them.

[55] I agree with the appellant in part. In my view, it was open to the motion judge to look at the four decisions since they formed part of the record before him. I further think he was entitled, based on his review of those decisions, to conclude that the NOC Proceedings were not, on their face, sham proceedings. What he could not do, in my respectful view, was to use them to conclude that the plaintiff's allegations to the opposite effect [page676] "were patently ridiculous and incapable of proof". That finding could only be made on a full record.

[56] That said, I am satisfied that the motion judge's error was harmless. His findings in relation to the four decisions are obiter. They form no part of the analysis that led him to conclude, correctly in my view, that the pleadings as framed disclose no viable cause of action against GSK in tort.

[57] Accordingly, I would not give effect to this aspect of the appellant's argument.

 (iv) Waiver of tort

[58] At para. 102 of his reasons, the motion judge dismissed the waiver of tort claim because, in his view, "it is plain and obvious that there is no predicate wrongdoing upon which to base a plea of waiver of tort".

[59] In concluding that there must be a predicate wrongdoing to substantiate "waiver of tort", the motion judge relied on this court's decision in Aronowicz v. Emtwo Properties Inc.

(2010), 98 O.R. (3d) 641, [2010] O.J. No. 475, 2010 ONCA 96,
where Blair J.A. stated, at para. 82, "Whether the claim
[waiver of tort] exists as an independent cause of action or
whether it requires proof of all the elements of an underlying
tort aside, at the very least, waiver of tort requires some
form of wrongdoing" (emphasis added).

 [60] I agree with the motion judge's analysis and conclusion.
Conclusion

 [61] The motion judge determined that the amended statement
of claim disclosed no viable cause of action against GSK.
Hence, he concluded that it was the plain and obvious that the
action against GSK could not succeed. I agree. Accordingly, I
would dismiss the appeal.
Costs

 [62] The parties are not seeking costs. Accordingly, there
will be no order as to costs.

                                        Appeal dismissed.

                        Notes

----------------

 Note 1: GSK concedes, for purposes of this appeal, that wholly
owned affiliated companies can enter into the type of agreement
required to found a conspiracy.

 Note 2: GSK discontinued the fifth and sixth proceedings.

----------------

**10**

2014 ONSC 55 (CanLII)

**CITATION:** Hneihen v. Centre for Addiction and Mental Health, 2014 ONSC 55
**COURT FILE NO:** CV-12-456311
**DATE:** 20140122

### ONTARIO
### SUPERIOR COURT OF JUSTICE

| | | |
|---|---|---|
| **B E T W E E N:** | ) | |
| | ) | |
| BAHAEDDINE HNEIHEN, BY HIS LITIGATION | ) | *Walter Kim,* |
| GUARDIAN, THE PUBLIC TRUSTEE | ) | for the Plaintiff, The Public Guardian and |
| | ) | Trustee |
| Plaintiff | ) | |
| | ) | |
| | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| | ) | |
| CENTRE FOR ADDICTION AND MENTAL | ) | *William Manuel, Judie Im & Hart Schwartz,* |
| HEALTH (QUEEN STREET DIVISION), AND HER | ) | for the Defendant/Moving Party, Her |
| MAJESTY THE QUEEN IN RIGHT OF ONTARIO AS | ) | Majesty the Queen in Right of Ontario |
| REPRESENTED BY THE MINISTER OF HEALTH | ) | |
| AND LONG TERM CARE, HER MAJESTY THE | ) | |
| QUEEN IN RIGHT OF ONTARIO AS | ) | |
| REPRESENTED BY THE MINISTER OF | ) | |
| COMMUNITY SAFETY AND CORRECTIONAL | ) | |
| SERVICES, AND HER MAJESTY THE QUEEN IN | ) | |
| RIGHT OF ONTARIO AS REPRESENTED BY THE | ) | |
| ATTORNEY GENERAL OF ONTARIO | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | **HEARD**: October 7, 2013 |

### REASONS FOR DECISION

<u>**FIRESTONE J.**</u>

[1]     The moving party, Her Majesty the Queen in Right of Ontario ("Crown") brings this motion pursuant to Rules 1.04, 21.01(1)(a), 21.01(1)(b), 31.01(3)(d), 25.11 and 37 of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194 ("the Rules") to determine various issues of law raised in the plaintiff's pleading and to strike out portions of the Statement of Claim.

Page: 2

[2]    The defendant, Centre for Addiction and Mental Health ("CAMH"), had brought a similar motion pursuant to Rules 1.04, 21.01(1)(a), 21.01(1)(b), 21.01(3)(d), 25.11 and 37 of the Rules. That motion has been withdrawn by CAMH. Consequently, these reasons deal with the action insofar as it is brought against the moving party.

## ISSUES FOR DETERMINATION

[3]    The issues for determination are as follows:

(a) Whether the plaintiff's claim for false imprisonment discloses a reasonable cause of action against the Crown;

(b) whether the Crown is immune from liability for claims of false imprisonment;

(c) whether the facts pled in the Statement of Claim establish a violation of the plaintiff's rights under ss. 7, 9 or 12 of the *Charter* or any viable basis for an award of damages under section 24(1) of the *Charter*; and

(d) whether the allegations at paragraphs 9, 20, 26, 28, 46 and 53 of the amended Statement of Claim are scandalous, frivolous and vexatious or an abuse of process.

[4]    The plaintiff in his factum has confirmed that he is not advancing a claim for contempt of court order.

[5]    The plaintiff also agreed that there is no claim against Her Majesty the Queen in Right of Ontario as represented by the Minister of Health and Long Term Care.

## FACTUAL BACKGROUND

[6]    In January 2010, the plaintiff, Bahaeddine Hneihen ("Hneihen"), was arrested for forcible confinement, sexual assault, theft under $5,000, mischief under $5,000 and failure to comply with recognizance. These offences were committed in late 2009 and early 2010.

[7]    On June 10, 2010, following trial, Justice Schneider of the Ontario Court of Justice, found Hneihen not criminally responsible ("NCR") by reason of mental disorder under s. 16(1) of the *Criminal Code*, R.S.O. 1985, c. C-46 ("the Code") .

[8]    On the same day, Justice Schneider issued a warrant of committal under s. 672.46(2) of the Code. The warrant stated as follows:

> TO THE PEACE OFFICER IN THE SAID REGION, and to the keeper (administrator, warden) of the CAMH OR DESIGNATE
>
> . . .

2014 ONSC 55 (CanLII)

Page: 3

> This warrant is issued for the committal of BAHAEDDINE HNEIHEN hereinafter called the accused.
>
> WHEREAS the accused has been charged that FORCIBLE CONFINEMENT/ SEXUAL ASSAULT/FTC RECOG./THEFT UNDER/MISCHIEF UNDER X 2
>
> AND WHEREAS, the accused, upon trial of the issue, has been found not criminally responsible
>
> AND WHEREAS cause has been shown to vacate any order or release or detention previously in force
>
> IT IS THEREFORE ORDERED, pursuant to the provisions of 672.46(2) of the *Criminal Code of Canada* that you, in Her Majesty's name, take the accused in custody and convey the accused safely to the FORTHWITH TO CAMH OR DESIGNATE.
>
> I DO THEREFORE COMMAND YOU, the said Administrator, to receive the accused in your custody in the said facility and to keep the accused safely there until a hearing has been held by the Ontario Review Board and a Disposition made.

[9]     Hneihen was taken into custody as the order provided for, but not taken to CAMH or any other hospital. He was taken by the Toronto Police to the Toronto (Don) Jail because CAMH advised that there was no bed available.

**Ontario Review Board Disposition**

[10]     On July 15, 2010 the ORB disposition hearing was held. On July 20, 2010 the ORB released its disposition and ordered that "the accused be detained at the Secured Forensic Unit of the Centre for Addiction and Mental Health" and that the person in charge of CAMH create a program for his rehabilitation.

[11]     Such disposition was to remain in force until a new disposition by the ORB was issued. The disposition commanded CAMH in Her Majesty's name to execute the terms of the disposition.

[12]     By way of written reasons, the ORB understood the warrant of committal to mean that Hneihen was to be conveyed forthwith to CAMH or its designate. Although the ORB noted that it was unfortunate that they did not have an up-to-date hospital report addressing risk, the appropriate level of security and conditions for a disposition, they unanimously concluded that Hneihen represented a significant threat to the safety of the public.

[13]     Despite the ORB's disposition that he be conveyed to CAMH, Hneihen continued to remain in jail from the date of that disposition because CAMH still had no beds available.

2014 ONSC 55 (CanLII)

Page: 4

2014 ONSC 55 (CanLII)

***Habeas Corpus* Application**

[14]    On July 30, 2010, counsel for Hneihen brought an application before Justice Forestell of this court for the prerogative writs *of habeas corpus* and *mandamus*.    An order was sought declaring Hneihen's detention in jail to be unlawful and for an order for his immediate transfer to CAMH.

[15]    On July 30, 2010 Justice Forestell ordered that he be moved immediately from the Don Jail to CAMH.    At that time, Hneihen was on a waiting list for transfer to CAMH. No date for transfer had been set.

[16]    In Justice Forestell's reasons, dated September 28, 2010, at *R. v. Hneihen*, 2010 ONSC 5353, it was held that the two elements for a successful *habeas corpus* application were met.

[17]    Hneihen was deprived of his liberty and that deprivation was unlawful.    The warrant of committal did not authorize Hneihen's detention in jail, but rather only provided that he be taken into custody to be detained at CAMH.

[18]    The warrant of committal was not ambiguous according to Justice Forestell. There was no lawful authority to detain Hneihen in jail for any period of time.

[19]    Justice Forestell held that the scheme under Part XX.I of the *Code* which provides for the nature and quality of the detention of an NCR accused following a verdict "cannot be overridden by an opaque and bureaucratic process with no discernible criteria, no temporal limitations and no appeal."

[20]    Justice Forestell described the provisions and objectives of Part XX.I relevant to this case:

- Following ss. 672.46 and 672.47 of the *Code,* the only time an NCR accused can be detained in jail after the NCR verdict is when the NCR accused has been detained in jail pending trial and the court does not order a change in the detention order.    In such circumstances, the legislation permits detention in jail for up to 45 days or in exceptional circumstances, 90 days.    Then a disposition must be made. In this case, Mr. Hneihen was detained in jail pending trial, but the court changed the detention order to detain Mr. Hneihen in a hospital.

- Following s. 672.54 of the *Code,* there are three dispositions available to the court or the ORB for accused who are mentally ill: absolute discharge, conditional discharge, or detention in a designated hospital. The provisions are consistent with the objectives of Part XX.1, which are to treat rather than punish the NCR accused and detain the NCR accused in a hospital rather than jail.

Page: 5

2014 ONSC 55 (CanLII)

[21]     Hneihen, it is alleged, was detained in the Toronto (Don) Jail for 50 days before being transferred to CAMH. During this time period he allegedly suffered from periodic acts of violence, mental anguish and distress, and had limited opportunities to receive treatment and counselling.

**The Action**

[22]     Hneihen has brought this action for damages as against Her Majesty Queen in Right of Ontario as represented by the Ministry of Correctional Services and the Ministry of the Attorney General of Ontario ("the Crown") and CMAH.   The action against CAMH is continuing and it takes no position on this motion.

[23]     The amended Statement of Claim alleges the Crown unlawfully detained Hneihen and breached Hneihen's ss. 7, 9, and 12 *Charter* rights. The amended Statement of Claim also alleges CAMH was negligent by failing to admit him since CAMH knew or ought to have known that Hneihen was incarcerated at the time.

[24]     The Public Guardian and Trustee ("PGT") became Hneihen's litigation Guardian in late November 2012.

[25]     The Ministry of Correctional Services is responsible for public safety, law enforcement, and correctional facilities for the benefit of Ontarians.

[26]     The Attorney General for Ontario is responsible for conducting prosecutions under the *Code* in Ontario.

[27]     CAMH is a publicly funded psychiatric hospital that provides care for individuals who suffer from addiction and mental health disorders.   CAMH is designated under Part XX.I of the *Code* to provide custody, treatment and assessment of criminally accused persons.

**POSITION OF THE PARTIES**

[28]     The parties agree that the test on a motion to strike is whether, assuming the facts pleaded are true, it is "plain and obvious" that the claim discloses no reasonable cause of action. If the test is met, the claim should be struck.

[29]     The plain and obvious test applies equally to rule 21.01(1)(a) and (b): see *Hunt v. Carey,* [1990] 2 S.C.R. 959, at paras. 30-33*; MacDonald v. Ontario Hydro* (1994), 19 O.R. (3d) 529 (Gen. Div.), aff'd (1995) 26 O.R. (3d) 401 (Div.Ct.).

   **Whether the plaintiff's claim of false imprisonment discloses a reasonable cause of action**

Page: 6

2014 ONSC 55 (CanLII)

[30]     The Crown argues that once a *prima facie* case of false imprisonment is made out by the plaintiff, the onus shifts to the defendant to justify the confinement. Justification exempts from liability persons who act reasonably in committing an intentional tort like false imprisonment. The defense of public necessity is available in situations of "imminent peril".

[31]     Hneihen's detention in jail was justified, they submit, because the warrant authorized the Crown to take him into "custody" until he could be safely conveyed to CAMH.

[32]     The Ontario Court of Appeal in *Centre for Addiction and Mental Health v. Ontario*, 2012 ONCA 342, 111 O.R. (3d) 19, leave to appeal to S.C.C. granted [2012] S.C.C.A. No. 339 (*"Conception"*) and *Centre for Addiction and Mental Health v. Al-Sherewadi*, 2011 ONSC 2272, [2011] O.J. No. 1755 interpreted the term "forthwith" in a warrant of committal regarding an accused with mental health issues as meaning some reasonable period of time for the system to accommodate the needs of these individuals.

[33]     The Crown argues that Hneihen was never entitled to be released from custody.  Neither the warrant, the disposition, nor, Justice Forestell's order, authorized the Crown to release him. He could only be released when the ORB found he was not a significant threat to the safety of the public.  This never occurred. The detention, they argue, was necessary, reasonable and in the public interest until such time as he was accepted into CAMH. The defense of necessity, they argue, is available in the circumstances.

[34]     It is submitted that the ORB's disposition of July 20, 2010 was directed at CAMH and, therefore, cannot be the basis to ground a viable cause of action for false imprisonment against the Crown.

[35]     The plaintiff argues that Hneihen's unlawful detention gives rise to a claim for false imprisonment.

[36]     He argues that the Crown improperly relies on the *Conception* and *Al-Sherewadi* cases for the proposition that "forthwith" should be interpreted to allow for a period of detention in jail awaiting admittance to CAMH and, therefore, the Crown was not authorized to take Hneihen to jail.

[37]     *Conception* does not, he argues, apply to this case because it addresses treatment orders for an accused unfit to stand trial, which is governed under different provisions of the *Code,* and the warrant in that case specifically stated that the accused was not to be taken to jail or a correctional facility under any circumstances

[38]     *Al-Sherewadi,* he submits, is inapplicable because it also addresses a treatment order regarding an accused unfit to stand trial. In *Al-Sherewadi,* the court acknowledged that there are subtle but important differences between an accused found NCR and an accused found unfit to stand trial, which include the sections of the *Code* that deal with these matters.  They argue that Hneihen's detention was not legally justified. They submit that he should have been detained only at CAMH and nowhere else.

Page: 7

[39]    The plaintiff submits that s. 672.54 is to be interpreted to mean that when a disposition regarding an NCR accused is made, if detention is ordered, it is to occur in a hospital.  Whether or not Hneihen was detained in jail because of scarce public resources for hospital beds is of no consequence.  It does not render his detention lawful.

[40]    In the alternative, if this interpretation is not accepted, he argues that *Al-Sherewadi* states that, notwithstanding the funding issues, the length of detention in jail must be reasonable. In *Conception* and *Al-Sherewadi*, the accused had been detained for six days and two days, respectively.   Whether 50 days is a reasonable period of time to remain in jail is a triable issue.

[41]    They argue that the disposition of the ORB is irrelevant in determining whether there was lawful authority to detain Hneihen in jail. The claim for false imprisonment is based on the Crown's actions and not on the ORB's order.

[42]    They submit that just because the Crown was not authorized to release Hneihen from custody does not justify detaining him in jail without authority.   The issue of whether detention was necessary or in the public interest requires a trial.   Further, the Crown's argument that the detention was lawful is *res judicata* given that this was the same argument before Justice Forestell on the *habeus corpus* application  and her decision  was not appealed.

### Whether the Crown is immune from liability for the claim of false imprisonment

[43]    The Crown argues that in this instance it is immune from liability for a claim framed in false imprisonment  by way  section 25(2) of the *Code,* sections 2(2)(d) and 5 in the *Proceedings Against the Crown Act*, R.S.O. 1990, c. P. 27 ("PACA"), section 12 of the *Ministry of Correctional Services Act,* R.S.O. 1990, c. M. 22 ("MCSA"), s. 8 of the *Public Authorities Protection Act,* R.S.O. 1990, c. P. 38 ("PAPA") and s. 142 of the *Courts of Justice Act*, R.S.O. 1990, c. C. 43 ("CJA") each of which applies to these circumstances.  They rely on *Ontario v. Phaneuf*, [2009] O.J. No. 5618 (Div Ct.), at paras. 44-46, aff'd 2010 ONCA 901, which found the sections apply to protect correctional officers discharging their responsibilities in connection with executing  a warrant of committal.

[44]    Section 5 of PACA subjects the Crown to liability for torts committed by any of its servants or agents only if a proceeding in tort may be brought against that servant or agent of the Crown.

[45]    Section 25(2) of the *Code* provides that a person authorized or required by law is justified in executing  a process if that person acts in good faith notwithstanding the process is defective:

> Where a person is required or authorized by law to execute process or to carry out a sentence, that person or any person who assists him is, if that person acts in good faith,  justified  in  executing  the  process  or  in  carrying  out  the  sentence notwithstanding that the process or sentence is defective or that it was issued or imposed without  jurisdiction  or in excess of jurisdiction.

Page: 8

[46]　　The Crown argues that this provision has been found to protect peace officers from the intentional tort of false imprisonment. The corrections officers at the Toronto (Don) Jail were required to, and acted in good faith in executing the warrant of committal regarding Hneihen. The plaintiff's pleadings do not suggest that the officers either acted in bad faith or refused to carry out the warrant in bad faith. As a result, section 25(2) protects the corrections officers at the Toronto (Don) Jail from tort liability.

[47]　　Section 5(6) of PACA states that the Crown is immune to any court proceeding regarding judicial acts:

> No proceeding lies against the Crown under this section in respect of anything done or omitted to be done by a person while discharging or purporting to discharge responsibilities of a judicial nature vested in the person or responsibilities that the person has in connection with the execution of judicial process.

[48]　　Section 2(2)(d) of PACA gives the Crown immunity from acts in the "due enforcement of criminal law":

> Nothing in this Act, subjects the Crown to a proceeding under this Act in respect of anything done in the due enforcement of the criminal law or of the penal provisions of any Act of the Legislature.

[49]　　Correctional officers are also statutorily immune from personal liability for claims arising from conveyance of an accused into custody pursuant to section 12 of MCSA, which states as follows:

> (1) No action or other proceeding for damages shall be instituted against the Deputy Minister or any other officer or employee of the Ministry or anyone acting under his or her authority for any act done in good faith in the execution or intended execution of his or her duty or for any alleged neglect or default in the execution of his or her duty or for any act of an inmate, parolee or probationer while under his or her custody and supervision.
>
> (2) Subsection (1) does not, by reason of subsections 5(2) and (4) of the *Proceedings Against the Crown Act*, relieve the Crown of liability in respect of a tort committed by a person mentioned in subsection (1) to which it would otherwise be subject, and the Crown is liable under that Act for any such tort in a like manner as if subsection (1) had not been enacted.

[50]　　Persons who obey a court or mandatory order in Ontario are also protected from personal liability under s. 8 of PAPA and s. 142 of CJA:

> Persons obeying *mandamus* protected

8.  No action or other proceeding shall be commenced or prosecuted against any person for or by reason of anything done in obedience to a *mandamus* or mandatory order. (PAPA)

…

Protection for acting under court order

142.  A person is not liable for any act done in good faith in accordance with an order or process of a court in Ontario. (CJA)

[51]     The Crown submits that there are no allegations in the plaintiff's claim that would deprive any individual correctional officers from personal immunity provided in these applicable statutory provisions.

[52]     The plaintiff, on the other hand, argues that none of the immunity provisions referred to by the Crown apply.  The Crown, it submits, was not required or authorized by law to detain Hneihen in jail. As a result, s. 25(2) of the *Code* does not exclude liability.

[53]     The order of Justice Schneider is not defective nor did Justice Schneider exceed jurisdiction in making such order. Even if the unauthorized acts were done in good faith, that does not mean the Crown can avail itself of s. 25(2).

[54]     Regarding section 5(6) of PACA, the Crown's detainment of Hneihen was not discharging responsibilities of a judicial nature, nor was it discharging responsibilities in connection with the execution of a judicial process.

[55]     In the alternative, the plaintiff states that if s. 5(6) does apply, only the Crown is immune. The individual officers are still personally liable and the plaintiff requests leave to amend the Statement of Claim to list the individuals responsible for Hneihen's detention.

[56]     Regarding section s. 2(2)(d) of PACA, the Crown, it is argued, was not enforcing the warrant when the police took him to jail.

### Whether the plaintiff's *Charter* violation and damages claim discloses a reasonable cause of action

[57]     It is the Crown's position that the facts as pleaded in the Statement of Claim do not establish a *prima facie* ss. 7, 9 or 12 *Charter* violation and as such, no basis for awarding damages pursuant to s. 24 of the *Charter* is made out.

Page: 10

2014 ONSC 55 (CanLII)

[58]     The plaintiff, the Crown submits, has failed to plead sufficient particulars that his loss of liberty was inconsistent with the principles of fundamental justice regarding his section 7 *Charter* claim.

[59]     Such particulars could have consisted of allegations that the corrections officers' conduct was arbitrary, overbroad or grossly disproportionate, or the corrections officers were not acting out of necessity, or were acting outside the scope of their statutory immunity.

[60]     Based on the pleading, however, it cannot be said that the conduct violated the basic tenants of our legal system.

[61]     The detention of Hneihen was not, the Crown argues, arbitrary such that the Crown violated s. 9 of the *Charter*. The peace officers decision to keep Hneihen at the Toronto (Don) Jail based on their understanding of the warrant was rationally related the overarching purpose of the warrant i.e. that Hneihen "be detained, not released" and safely conveyed to CAMH.

[62]     They argue that regarding the s. 12 *Charter* claim, the harm alleged to have been suffered does not meet the test of being "so excessive or grossly disproportionate as to outrage decency in the particular circumstances of this offender": see *R. MacDonald* (1998), 127 C.C.C. (3d) 57 (Ont.C.A.) at para. 16.

[63]     Even if there is a *prima facie Charter* breach on the pleading, the Crown submits that the plaintiff has failed to plead that the Crown's conduct met the threshold to make out a viable claim for an award of monetary damages under s. 24(1) of the *Charter. Vancouver  (City) v. Ward,* 2010 SCC 27, [2010] 2 S.C.R. 28 and Ontario cases require plaintiff to establish a high threshold of misconduct, in addition to a *Charter* breach, to obtain damages as a remedy pursuant to s. 24(1) of the *Charter*. Tort liability principles are relevant for analyzing whether *Charter* damages are appropriate. As well, the statutory provisions granting Crown immunity from liability apply to the *Charter* damages claim.

[64]     The Crown argues that the plaintiff's plea of "recklessness" is a mere bald allegation that violates rule 25.06(8), which requires full particulars where malice or intent is alleged.

[65]     As well, the plaintiff has not sought leave to give particulars, nor does he suggest he could give such particulars were leave to do so to be granted. The Statement of Claim does not plead that a Crown agent or employee engaged in conduct meeting the established and required threshold. The *Conception* decision, released subsequent to Justice Forestell's reasons, found, the Crown submits, that a reasonable wait time in jail is acceptable.

[66]     The plaintiff argues that the Statement Claim, if taken to be true, does establish *Charter* breaches, as well as the grounds for awarding such *Charter* damages.

[67]     The unlawfulness of the detention addresses the issue of fundamental justice in the s. 7 *Charter* breach claim. He argues that the *Code* has no provision to detain the accused in jail

Page: 11

following a verdict of NCR. Therefore, the detention in jail without the benefit of due process breaches the principles of fundamental justice.

[68]    As well, the detention in jail was indeterminate. The plaintiff's failure to plead facts to overcome all the defenses the Crown would raise is not the test on a motion to strike.

[69]    With respect to the s. 9 *Charter* breach claim, the plaintiff argues that the pleadings do show a *prima facie* case for arbitrary detention. The detention was not rationally related to the purpose of the *Code*, the purpose of which is to treat rather than punish NCR accused and to detain them in hospital.

[70]    The plaintiff submits that the facts supporting the s. 12 *Charter* breach claim are properly pleaded. The Statement of Claim adequately describes the harm suffered. Hneihen's detention would have been arbitrarily indeterminate but for the *habeas corpus* application. There was no mechanism to challenge CAMH's internal decision process.

[71]    The plaintiff further argues that the test for s. 24(1) *Charter* damages is properly pleaded in accordance with the *Ward* decision. The Statement of Claim, he submits, pleads the facts supporting the *Charter* rights breach claims and material facts which show that *Charter* damages are a just and proper remedy.

[72]    Hneihen seeks compensation and vindication because the defendants knowingly acted contrary to a court order and ORB order. As well, the defendants were reckless causing harm to Hneihen.

### Whether the allegations at paragraphs 9, 20, 26, 28, 46 and 53 are scandalous, frivolous and vexatious or an abuse of process

[73]    The Crown argues that the allegations at paragraphs 9, 20, 26, 28, 46 and 53 should be struck without leave to amend because there is no private cause of action for "contempt of court order" and no such claim is being advanced by plaintiff.

[74]    They further argue that such paragraphs must be struck without leave to amend because absolute privilege attaches to anything said or done during the judicial process. As a result, any reference to the *habeas corpus* proceedings is an improper pleading.

[75]    The plaintiff confirms there is no claim being advanced for "contempt of court order" *per se*, but rather argues that these paragraphs are included to provide the necessary factual backdrop for the false imprisonment claim being advanced.

## ANALYSIS

### Whether the plaintiff's claim for false imprisonment discloses a reasonable cause of action

2014 ONSC 55 (CanLII)

Page: 12

[76]    Pursuant to Rule 21(1)(b), I am to determine whether, assuming the facts as pleaded to be true, it is "plain and obvious" that the claim for false imprisonment against the moving party cannot succeed.

[77]    I begin my analysis with a review of the essential elements of the intentional tort of false imprisonment.  These are summarized in the moving party's factum as follows:

> (a)    the plaintiff has been totally deprived of their liberty;
>
> (b)    the deprivation was against the plaintiff's will; and
>
> (c)    the deprivation was directly caused by the defendant.

See:  *Linda Rainaldi et al*, Remedies in Tort, loose-leaf (consulted on June 2013), Toronto: Thompson Carswell, 1987) ch. 7 at pp. 9-21 [Remedies]

[78]    I agree with the moving party's submissions at para. 24 and 25 of their factum that:

1.  Once a *prima facie* case of false imprisonment is made out which must consist of "direct and intentional confinement", the onus shifts to the defendant to justify the confinement. See: John Murphy, Christian Witting & James Goudkam Street on Torts, 13th ed. (Oxford: Oxford University Press, 2012) at p 275 [Street]; and

2.  Justification at common-law exempts persons from liability who act reasonably in committing an intentional tort like false imprisonment. The defense of public necessity is available for certain narrowly defined situations of "imminent peril".  See Street, *supra* para. 24 at p. 340; Allen Linden & Bruce Feldthusen, Canadian Tort Law, 9th ed. (Markham, ON:  LexisNexis, 2011) at p.99 and *R. v. Bournewood Mental Health Trust* ex parte, [1998] 3 ALL ER 289 at 300-301.

[79]    At this stage of the analysis it is not in my view "plain and obvious" that the plaintiff's claim, assuming the facts as pleaded to be true, for false imprisonment (subject to being statutorily excluded) could not succeed against the moving parties based on his confinement at the Toronto (Don) Jail.

[80]    A motion to strike is to proceed on the basis that the facts pleaded are true, unless they are manifestly incapable of being proven: *Operation Dismantle Inc. v. The Queen*, [1985] 1 S.C.R. 441, at p.455.

[81]    The plaintiff has pleaded the necessary facts, which if true, could reasonably support a false imprisonment claim.  The plaintiff pleads that:

•    He was found NCR regarding the charges against him (para. 14).

Page: 13

- An order was made pursuant to s. 672.46(2) requiring him to be detained at CAMH pending disposition by the ORB (para.16).

- Despite the order he was taken to the Don Jail where he was unlawfully detained against his will (para. 19).

- The ORB made an order specifying that he be removed from the Don Jail and taken to CAMH (para. 22).

- The Crown continued to unlawfully imprison him in jail (para. 24).

- The procedures set out in the *Criminal Code* were followed by the Court and the ORB. Valid orders were made but were not followed by the defendants (para. 26).

- The sub-standard conditions of the Don Jail caused him serious harm (para. 31).

- The MCSC was responsible for his incarceration and continued unlawful detention (para. 45).

- Either or both defendants caused, contributed to, or were responsible for his unlawful imprisonment at the Don Jail and are liable in damages (para.48).

[82]    Whether both the initial and continued detention at the Toronto (Don) Jail for the 50-day period as opposed to detention at CAMH or its designate was justified in the circumstances of this case can only be made on a full evidentiary record where a determination can be made regarding:

- Whether the warrant of committal allowed the plaintiff to be taken to jail at all and if so, for how long?

- At any point during the 50-day period (continuum) was such detention unlawful or against his will?

- Was continued detention at jail necessary and reasonable or should another option have been pursued and if so, by whom?

- Was his detention in jail intentional?

[83]    The answers to these and other questions would ultimately determine if a claim for false imprisonment (if not otherwise statutorily precluded) would ultimately succeed.    The proper place for such an evidentiary inquiry is on a summary judgment motion or at trial but not on a motion to strike.

Page: 14

[84]    While there is no question that on any reading of the warrant, Hneihen was to be taken into custody and that at no time was he to be released into the public, there is an issue regarding what the term "custody" means in the context of the warrant as well as where he was to be taken (lawfully or otherwise), for how long he was to remain there and who was to follow up, if at all, with CAMH or its designate to secure a place.

[85]    Such a cause of action is not solely dependent on whether such transfer and detainment at the Toronto (Don) Jail was lawful.

[86]    This, however, does not end the false imprisonment analysis against the Crown.

**Whether the Crown is immune from liability for the claim of false imprisonment**

[87]    For the reasons that follow, I find that the Crown in this action, based on the amended Statement of Claim as currently constituted, is immune from liability for the claim of false imprisonment based on s. 25(2) of the *Code,* ss. 2 (2)(d) and 5 of PACA, s. 12 of MCSA, s. 8 of PAPA, and s. 142 of CJA.

[88]    In *Pispidikis v. Ontario (Justice of the Peace)* (2002), 62 O.R. (3d) 596 (S.C.), aff'd (2003), 68 O.R. (3d) 665 (Ont.C.A.) the court held that correctional officers, a Justice of the Peace and the Crown were immune from liability for wrongful arrest and imprisonment of a plaintiff based on ss. 2(2)(d) and 5(6) of PACA, s. 8 of PAPA, and s. 142 of CJA.

[89]    In *Pispidikis* the court held, at paras. 46-50, that the correctional officers at the Don Jail were simply complying with the warrant of committal as they were obligated to. Their actions constituted discharging responsibilities in connection with the judicial process or acting in the due enforcement of penal provisions of an Act of the Legislature. The officers were also protected by s. 8 of PAPA.  The court held that on a public policy basis, persons following a warrant of committal "in good faith" should be protected from liability, at para. 51:

> [P]ersons acting in good faith in response to a judicial order such as a warrant of committal should not attract liability. That is not to say that if there were evidence of malice or an absence of good faith they would not then become disentitled to the protection of s. 142 of the *Courts of Justice Act* and the claim allowed to proceed.

[90]    In *Pispidikis*, the Crown did not bring a motion to strike the claim of alleged negligent acts against an individual correctional officer. That officer was alleged to have opened the plaintiff's cell door upon request from a number of inmates, who proceeded to severely beat the plaintiff in his cell.

[91]    In this case, the Crown was required to implement the warrant of committal. The plaintiff's amended claim does not allege that the Crown did so on anything other than a good-faith understanding that Hneihen was to be taken into custody and thereafter detained in jail until a CAMH bed was made available.

Page: 15

[92]    The plaintiff's amended Statement of Claim at para. 20 states "The Toronto Police took Baha to the Don Jail because CAMH had advised the Toronto Police and/or the Crown that it had no bed available for Baha at its Queen Street location."

[93]    At para. 41 the plaintiff further pleads, "CAMH continued to cause Baha's detention by failing to admit him as bed space became available during the 50 days that he remained in jail. CAMH knew or ought to have known that Baha was incarcerated during this time and that their continued failure to admit him to the hospital would cause his continued detention."

[94]    As in *Pispidikis*, the conduct of the Crown and its servants or agents constituted discharging responsibilities in connection with a judicial process, enforcing the criminal law, and obeying a mandatory court order in Ontario. They are, therefore, protected against liability from a tort proceeding pursuant to s. 25(2) of the *Code*, ss. 2(2)2(d) and 5 of PACA, s. 12 of MSCA, s. 8 of PAPA, and s. 142 of CJA.

[95]    As well, the amended Statement of Claim does not identify or refer to any individual correctional officers to which a claim for false imprisonment is brought or to any material facts that would oust the immunity provisions. The Crown cannot be directly liable on the pleading as pled; Crown liability is plausible only if liability can be established through its servants or agents. No such correctional officers are identified in the body of the amended claim.

[96]    For the above reasons I find that the Crown on the amended Statement of Claim before me is immune from liability for the claim of false imprisonment. This is because it fails to contain the elements necessary to exclude the application of the limited liability provisions.

[97]    The false imprisonment claim in the amended Statement of Claim is struck, with leave to amend.

**Whether the facts pled establish a violation of the plaintiff's rights under ss. 7, 9 or 12 of the *Charter* or any basis for an award of damages under section 24(1) of the *Charter***

[98]    I will address sections 7, 9 and 12 of the *Charter* first.

[99]    In my view, the amended Statement of Claim properly pleads and discloses a *prima facie Charter* breach against the Crown for violation of sections 7, 9 and 12 of the *Charter*. I say this for the following reasons:

**(a) Section 7 *Charter* breach**

[100]    Paragraph 50, in conjunction with the other paragraphs in the amended Statement of Claim including paragraph 31, 32, 45 and 57, if true, could give rise to a s. 7 *Charter* breach.

[101]    By being detained in jail and being subject to a facility that was possibly ill-equipped to handle persons with mental illness, Hneihen was arguably deprived of his liberty.

Such deprivation, it is pled, was not consistent with the principles of fundamental justice in that his detention was indeterminate, contrary to the objectives of Part XX.I of the *Code* that NCR accused should be treated in a hospital, not exposed to harsh conditions in a prison, and his detention in jail was excessive and became unlawful following the ORB's disposition.

### (b) Section 9 *Charter* breach

[102]    Sufficient facts are pled regarding an arguable denial of the right not to be arbitrarily detained or imprisoned.  It may very well be that when Hneihen was first detained in jail, such detention was not arbitrary.  It is clear the warrant of committal did not authorize his release in the event that no beds were available.  Therefore, there is an issue regarding whether it was reasonable for Hneihen, as the Crown argues, to remain in jail pending disposition from the ORB or until such time could be conveyed to CAMH.

[103]    After a certain period of time, however, during the 50-day period that he remained in jail, such detention may have become arbitrary and unfair.  As well, the plaintiff pleads his transfer to jail for any period of time based on the warrant in this case was unlawful.

### (c) Section 12 *Charter* breach

[104]    Sufficient facts are pled that could give rise, if true, to a s. 12 *Charter* breach claim. This section of the *Charter* prohibits grossly disproportionate punishment and barbaric punishment. Section 12 governs the quality of the punishment.  It does not require the treatment or punishment to be both cruel *and* unusual, however it must be so excessive as to outrage standards of decency.  Put another way, the treatment or sentence must be grossly disproportionate to the extent that Canadians would find a treatment or punishment abhorrent or intolerable: see *R. v. Smith* (Edward Dewey), [1987] 1 S.C.R. 1045, at pp. 1072, 1089-1090, 1109; *R. v. Ferguson*, 2008 SCC 6, [2008] 1 S.C.R.96.

[105]    In *Phanuef,* the Ontario Court of Appeal acknowledged that mentally ill accused persons are exposed to a high risk of harm when they are detained in jail despite being subject to judicial orders that they be treated in hospital:  "[t]here can be no doubt that the incarceration of mentally ill persons in a jail setting risks further deterioration of their mental state and potentially places them in real risk of physical harm." [at para. 28]

[106]    In the amended Statement of Claim, the plaintiff alleges that during the 50-day detention, he was subject to periodic violence, abuse and mistreatment by inmates, his symptoms of mental illness became more severe over the period of his detention, and he was provided with little opportunity for psychiatric treatment and counseling.   It is further alleged that his long-term prognosis for recovery has been adversely affected and that he suffered mental anguish, distress and humiliation.

Page: 17

[107]    Sufficient facts supporting a s. 12 *Charter* claim have been pleaded.  Assuming the facts to be true, it is not "plain and obvious" such a *Charter* breach claim could not succeed. It is arguable the facts pleaded - that suffering these harms over the course of 50 days having been found NCR for the offenses committed - could amount to grossly disproportionate treatment that the public would find excessive enough to outrage the standards of decency in the unique circumstances of this case.

### Damage claim under section 24(1) of the *Charter*

[108]    In order to be a viable claim for damages under s. 24(1) of the *Charter* a *prima facie Charter* breach made out on the pleading alone is insufficient. *Mala fides* in the breach is a required element according to the jurisprudence. The Supreme Court of Canada in *Vancouver (City) v. Ward*, [2010] 2 S.C.R. 28 confirmed at para. 4, that damages may be awarded for a *Charter* breach under s. 24(1) where appropriate and just.

[109]    In order to determine whether s. 24 (1) *Charter* damages may be awarded for a *Charter* breach, the court is to engage in a four-part inquiry as follows:

(1)    Has a *Charter* right been breached?

(2)    Are damages a just and appropriate remedy which would fulfill one or more of the related functions of compensation, vindication of the right, and/or deterrence of future breaches?

(3)    Has the state demonstrated countervailing factors to defeat the functional considerations for awarding damages rendering an award of damages inappropriate or unjust?

(4)    What is the appropriate and just *quantum* of damages?

[110]    The Ontario Divisional Court confirmed in *Forrest v. Ontario (Provincial Police)*, 2012 ONSC 429, [2012] O.J. No. 518 that wilfulness or *mala fides* must be proven in order to establish liability for damages under s. 24(1) of the *Charter*.  At para. 62, the Divisional Court stated as follows:

"In our opinion, the liability for breach under s. 7 of the *Charter* requires wilfulness or *mala fides* in the creation of a risk or course of conduct that leads to damages. Proof of simple negligence is not sufficient for an award of damages in an action under the *Charter*.  Bad faith is essential to establish the *Charter* breach." *McGillivray v. New Brunswick* (1994), 116 D.L.R. (4th) 104 [C.A.] and *Ferri v. Ontario (Attorney General)*, [2007] O.J. No: 397 [C.A.]

2014 ONSC 55 (CanLII)

Page: 18

2014 ONSC 55 (CanLII)

[111]    In this case, *mala fides* or bad faith on the part of the Crown is not alleged. Even where it is alleged pursuant to Rule 25.06(8), full particulars must be pleaded.  Wilfulness has been alleged at paragraph 47, but particulars and material facts are not.

[112]    In the amended Statement of Claim at paragraph 47, it states, "Both defendants were parties to the breach of Justice Schneider's Order and the Order of the ORB, which breaches were committed knowingly and willfully, and without lawful excuse."

[113]    At paragraph 52 it states, "The defendants behaved recklessly in failing to abide by a lawful Order, the common law, the *Criminal Code* and the *Charter*."

[114]    Without material facts these are no more than bald allegations which do not meet the requirements of Rule 25.06(8).  As a result, I strike paragraph 51 relating to the plaintiff's s. 24(1) *Charter* damage claim with leave to amend.

> **Whether paragraphs 9, 20, 26, 28, 46 and 53 are scandalous, frivolous and vexatious and an abuse of process**

[115]    I agree with the moving party that there is no private cause of action for "contempt of a Court Order".  The plaintiff has confirmed that there is no claim being advanced for contempt of Court Order.  As a result, all allegations against the named defendant, Her Majesty the Queen in Right of Ontario as represented by the Attorney General of Ontario at paragraphs 9, 46 and 53, to the extent that they assert such a claim are struck as disclosing no cause of action without leave to amend.

[116]    Absolute privilege would attach to anything said or done during judicial proceedings. See: *Samuel Manu-Tech Inc. v. Redipac Recycling Corp.* (1999), 124 O.A.C 125 at para. 19(C.A.); *Web Offset Publications Ltd. v. Vickery* (1998), 40 O.R. (3d) 562 (Gen.Div.) at 8, aff'd (1999) 43 O.R. (3d) 802 (Ont.CA).

[117]    I, therefore, order that paragraph 28 be struck in its entirety without leave to amend pursuant to Rule 25.11.  That paragraph refers to argument made at a specific judicial proceeding for which absolute privilege would apply.  The inclusion of the privileged representation in that paragraph of the pleading is, therefore, scandalous, frivolous or vexatious.

[118]    I deny the request to strike paragraphs 20 and 26 of the amended Statement of Claim.  I find these paragraphs are not scandalous, frivolous or vexatious based on the above legal principles.

**Leave to Amend**

[119]    As drafted, the amended Statement of Claim fails to set out a reasonable cause of action for false imprisonment against the Crown given there are insufficient material facts pled which

would take the claim outside the limited liability provisions referred to above as required by Rule 25.06(8).

[120]     As well, the amended Statement of Claim fails to plead the material facts of willfulness and *mala fides* necessary to support an s. 24(1) *Charter* damage claim.

[121]     In *R. v. Imperial Tobacco*, 2011 SCC 42, [2011] 3 S.C.R. 45 at para. 19, the Supreme Court of Canada discussed motions to strike: "The power to strike out claims that have no reasonable prospect of success is a valuable housekeeping measure essential to effective and fair litigation. It unclutters the proceedings, weeding out the hopeless claims and ensuring that those that have some chance of success go to trial."   At para. 22 the Court emphasizes, given the importance of the pleadings to effective and fair litigation, what the plaintiff's obligation in pleading is as follows: "It is incumbent on the plaintiff to clearly plead the facts upon which it relies in making its claim. A claimant is not entitled to rely on the possibility that new facts may turn up as the case progresses. The claimant may not be in position to prove the facts pleaded at the time of the motion. It may only hope to plead them. But plead them it must."

[122]     If the plaintiff has material facts which it has as of yet failed to plead that would make out such a claim, they are granted leave to amend accordingly.

[123]     The plaintiff is also granted leave to amend to identify and provide material facts surrounding the involvement of any individual correctional officers, in the event such material facts exist, so as to bring the claim within the requirements of PACA.

[124]     Because of the unique circumstances of this case including the findings of Justice Forestell in granting the *habeus corpus* application, and the fact that the Statement of Claim has been amended only once, an order permitting leave to amend is warranted and in the interests of justice.

**Disposition**

[125]     For the reasons set forth above, I order as follows:

1. The plaintiff's claim for false imprisonment against the Crown is struck.  Leave to amend is granted to plead the material facts, if any, necessary to establish why the limited liability provisions in the *Code*, PACA, PAPA, MCSA and s. 142 of the *CJA* do not apply.

2. The plaintiff's claim for s. 24(1) *Charter* damages is struck with leave to amend to plead the necessary material facts, if any, to make out more than a bald plea regarding willfulness and *mala fides*.

3. The plaintiff is granted leave to amend to identify and provide material facts, if any, regarding the involvement and motivation or conduct of the correctional officers in the events pleaded in the amended Statement of Claim.

Page: 20

4. Paragraph 28 of the amended Statement of Claim is struck without leave to amend.

5. Paragraph 9, 46 and 53 of the amended Statement of Claim are struck without leave to amend.

[126]   I wish to thank counsel for both their written and oral submissions which were exceptional.

[127]   I encourage the parties to agree on the costs. If they cannot, I may be contacted in order to set a timetable for cost submissions.

_____
FIRESTONE, J.

**DATE:**  January 22, 2014

**CITATION:** Hneihen v. Centre for Addiction and Mental Health, 2014 ONSC 55
**COURT FILE NO:** CV-12-456311
**DATE:** 20140122

2014 ONSC 55 (CanLII)

### ONTARIO
### SUPERIOR COURT OF JUSTICE

**B E T W E E N:**

BAHAEDDINE HNEIHEN, BY HIS LITIGATION
GUARDIAN, THE PUBLIC TRUSTEE

Plaintiff

- and -

CENTRE FOR ADDICTION AND MENTAL HEALTH
(QUEEN STREET DIVISION), AND HER MAJESTY THE
QUEEN IN RIGHT OF ONTARIO AS REPRESENTED BY
THE MINISTER OF HEALTH AND LONG TERM CARE,
HER MAJESTY THE QUEEN IN RIGHT OF ONTARIO AS
REPRESENTED BY THE MINISTER OF COMMUNITY
SAFETY AND CORRECTIONAL SERVICES, AND HER
MAJESTY THE QUEEN IN RIGHT OF ONTARIO AS
REPRESENTED BY THE ATTORNEY GENERAL OF
ONTARIO

Defendants

---

### REASONS FOR DECISION

---

**FIRESTONE J.**

**Released:**  January  22, 2014

**11**

**CITATION:** Hosseini v. Gharagozloo, 2024 ONSC 1106
**COURT FILE NO.:** CV-22-00688949-0000
**DATE:** 20240222

2024 ONSC 1106 (CanLII)

## ONTARIO
## SUPERIOR COURT OF JUSTICE

| | | |
|---|---|---|
| **BETWEEN:** | ) | |
| | ) | |
| **SEYED MANSOUR HOSSEINI** | ) | *Mehrnaz Asad* for the Plaintiff |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| **- and -** | ) | |
| | ) | |
| **HAMID GHARAGOZLOO** | ) | |
| | ) | |
| Defendant | ) | **HEARD**: In writing |
| | ) | |

**PERELL, J.**

## REASONS FOR DECISION

Contents

A.   Introduction and Overview .................................................................... 2
B.   Procedural Background .......................................................................... 3
C.   Facts ...................................................................................................... 9
  1.   Historical Background ..................................................................... 9
  2.   *Dramatis Personae* ......................................................................... 9
    (a)   Dr. Noor Ali Tabandeh ............................................................ 9
    (b)   Reza Tabandeh ........................................................................ 9
    (c)   Seyed Mansour Hosseini ...................................................... 10
    (d)   Hamid Gharagozloo ............................................................. 10
  3.   The Narrative ................................................................................ 10
D.   Discussion and Analysis ...................................................................... 15
  1.   Motions for a Default Judgment ................................................... 15
  2.   Defamation .................................................................................... 16

3.  Analysis of Liability for Defamation ................................................. 17

4.  Remedies for Defamation ................................................................. 19

5.  Analysis of Remedies .................................................................... 21

E.  Costs ............................................................................................ 22

F.  Conclusion ................................................................................... 22

## A.  Introduction and Overview

[1]     This is a motion by the Plaintiff **Seyed Mansour Hosseini** for a default judgment pursuant to Rule 19 of the *Rules of Civil Procedure*.[1] The motion for judgment is in a defamation action, and it follows an unsuccessful anti-SLAPP motion by the Defendant **Hamid Gharagozloo**.[2]

[2]     By way of a summary and overview, the background to this default judgment motion is as follows.

[3]     Mr. Gharagozloo is an American human rights political advocate with a prominent position with **IOPHR** (the "**International Organization to Preserve Human Rights**"). In a news reporter or news commentator way, Mr. Gharagozloo presented several videos that were published on the Internet. The videos allegedly defamed Mr. Hosseini, who is a Canadian citizen that fled Iran for the freedom of Canada.

[4]     The main video presented by Mr. Gharagozloo temporarily came first, but it was labelled in the Statement of Claim as Video #2. It is a documentary. The documentary identifies **Dr. Reza Tabandeh**, who is a resident of Ontario, Canada, as one of seven main co-conspirators that plotted the house arrest and assassination of **Dr. Noor Ali Tabandeh**, the spiritual leader, which is known as a "Qutb," of a minority Islamic religious group, known as the Gonabadi Sufis. The documentary describes the assassination of Dr. Noor Ali Tabandeh to have him replaced by a leader acceptable to the Iranian Government. In a span of approximately 4.0 seconds, Video #2 twice displays a photographic image of Dr. Reza Tabandeh, one of the alleged plotters, standing beside Mr. Hosseini.

[5]     When he became aware of the video, Mr. Hosseini asked Mr. Gharagozloo for an apology and the removal of the videos or at least the obscuring of his photo. However, Mr. Gharagozloo double downed on the alleged defamation, and he double dared Mr. Hosseini to do something about it. Mr. Gharagozloo doubled down by participating in a series of more videos and online broadcasts on Dorr TV, an internet broadcaster. Mr. Gharagozloo double dared, by inviting Mr. Hosseini to sue him at risk of being exposed as a supporter or co-conspirator in the religious leader's death.

[6]     Mr. Hosseini picked up the gauntlet. He sued Mr. Gharagozloo. The double dare was a bluff. Mr. Gharagozloo has no evidence of anything other than Mr. Hosseini being acquainted with Dr. Reza Tabandeh, who is a Canadian resident. Mr. Gharagozloo did not defend the defamation action by delivering a Statement of Defence and he has no evidence to substantiate his allegations

---

[1] R.R.O. 1990, Reg. 194.

[2] *Hosseini* v. *Gharagozloo*, 2023 ONSC 2469.

2024 ONSC 1106 (CanLII)

against Mr. Hosseini. Instead of defending on the merits, Mr. Gharagozloo brought an anti-SLAPP motion. The anti-SLAPP motion was dismissed.

[7]     With the dismissal of his anti-SLAPP motion, Mr. Gharagozloo was called on to deliver a defence to the defamation action. He did not do so. He dismissed his lawyers. He was asked to deliver a defence. When he did not do so, he was noted in default.

[8]     Mr. Hosseini now moves for a default judgment of approximately $450,000 with costs of approximately $315,000. More specifically, he seeks: (a) $250,000 in general damages; (b) $100,000 in aggravated damages; (c) $100,000 in punitive damages; (d) $215,179.67 for the costs of the anti-SLAPP motion and this action; (e) $100,000 in costs on a substantial indemnity basis for the default judgment motion; and (f) prejudgment and postjudgment interest pursuant to the *Courts of Justice Act*.[3]

[9]     Mr. Hosseini also seeks injunctive relief; namely: (a) an Order that Mr. Gharagozloo shall permanently remove any and all social media posts regarding the Plaintiff, within 30 days; (b) an Order that Mr. Gharagozloo shall be permanently prohibited from publishing any defamatory, false, or disparaging statements about the Plaintiff, or encouraging any other person, whether a member of IOPHR or not, to publish such statements; and (c) an Order that Mr. Gharagozloo publish a retraction on Dorr TV's Telegram, YouTube, and Instagram accounts, acknowledging that his statements about Mr. Hosseini were false and defamatory and referring the audience, and where applicable providing them with a link, to the anti-SLAPP motion reasons for decision dated April 21, 2023 and the default judgment decision on CanLII.

[10]    For the reasons that follow, I grant Mr. Hosseini a default judgment of $400,000 with costs for the defamation action including all interlocutory motions of $180,000 all inclusive. The awards are to bear postjudgment interest. I make no order as to injunctive relief. I leave it to Mr. Gharagozloo to post as he may be advised links to CanLII of the decisions in this defamation action.

## B.  **Procedural Background**

[11]    On **August 10, 2022**, Mr. Hosseini learned about the alleged defamatory statements.

[12]    He retained counsel, and on **August 12, 2022**, Mr. Hosseini's counsel wrote a cease and desist letter and demanded an apology.

[13]    On **September 1, 2022**, Mr. Hosseini issued a libel notice under the *Libel and Slander Act*.[4]

[14]    On **October 20, 2022**, Mr. Hosseini commenced his defamation action against Mr. Gharagozloo.

[15]    On **December 23, 2022**, Mr. Gharagozloo brought his anti-SLAPP motion supported by his affidavits dated December 22, 2022 and January 31, 2023.

[16]    Mr Hosseini resisted the motion with an affidavit dated January 20, 2023.

[17]    On **February 7, 2023**, Mr. Hosseini and Mr. Gharagozloo were cross-examined.

---

[3] R.S.O. 1990, c. C.43.
[4] R.S.O. 1990, c. L.12.

2024 ONSC 1106 (CanLII)

[18]    The parties delivered factums, and the anti-SLAPP motion was argued on **March 28, 2023**. I reserved judgment.

[19]    On **April 21, 2023**, I dismissed Mr. Gharagozloo's anti-SLAPP motion.[5] I ordered that Mr. Gharagozloo pay costs for the anti-SLAPP motion in any event of the cause.

[20]    On **June 13, 2023**, Mr. Hosseini delivered an Amended Statement of Claim. For present purposes, the pertinent parts of his Statement of Claim are set out below.

CLAIM

1. The Plaintiff, Seyed Mansoor Hosseini (the "Plaintiff") claims against the Defendant, Hamid Gharagozloo (the "Defendant"):

(a) Damages in the amount of $700,000.00 CAD with respect to a series of false and defamatory statements that the Defendant has made against the Plaintiff;

(b) Special damages in the amount to be determined;

[…]

(d) A mandatory injunction requiring the Defendant to remove or cause to be removed from Instagram accounts, YouTube accounts, Pearl TV's (a.k.a Dorr TV) and its Telegram and YouTube Channel, Twitter Account(s) or other locations on the Internet that all the defamatory statements concerning the Plaintiff the Defendant has posted or caused to be posted on those websites/accounts or other locations;

(e) A public apology from the Defendant for the publication of the defamatory allegations on the above-mentioned platforms;

[…]

*False and Defamatory Statements*

6. As described below, the Defendant has engaged in a vicious, carefully orchestrated and unlawful campaign of defamation against the Plaintiff. His campaign of defamation, which has been carried out on various online platforms, has been planned with malice, for the express purposes of publicly embarrassing the Plaintiff, harming his reputation in his community, both religious and residential, and tarnishing his career with the ultimate goal of ejecting him out of Gonabadi Sufi.

(a) VIDEO #1

7. On or about August 10, 2022, the Plaintiff discovered a video ("Video #1"), four minutes and thirty-eight seconds long, in which the Defendant appeared and narrated. In Video #1, the Defendant claimed that he was attending the Convening of a Coalition for International Religious Freedom (the "Summit") and was reporting from the same. The background in Video#1 also suggested that the video was recorded while the Defendant was in the Summit.

8. The Summit was apparently held for three days – both in person and virtually – between June 28 to June 30, 2022, in Washington D.C. The purpose of the Summit was to gather different religious groups and promote the freedom of religion.

9. An important constituency, both in size and in prominence, of people, including, *inter alia*, the United States Speaker of the House of Representatives, Nancy Pelosi, the Former United States Secretary of State, Michael Pompeo, dozens of American senators, congressmen and

---

[5] *Hosseini v. Gharagozloo*, 2023 ONSC 2469.

2024 ONSC 1106 (CanLII)

5

congresswomen, such as Senator Marco Rubio and Congressman French Hill as well as members of Parliaments of the United Kingdom and Finland attended the Summit (the "Audience").

10. In Video #1, the Defendant admitted that he made a presentation at the Summit, during which he played a video ("Video #2"), for the Audience. The Defendant then claimed that during his presentation, he spoke about 43 years of the Islamic Regime of Iran's (the "Regime") brutal attack on the Gonabadi Sufis, the alleged assassination of three Gonabadi Sufi Masters, and the unlawful arrests of many Gonabadi Sufis in Iran.

11. In Video #1, the Defendant then proceeded to claim that during the Summit, he "unmasked" 7 agents of the Regime who allegedly played a key role in the above-mentioned brutal activities. During his narration, a picture of the Plaintiff, standing alongside two other individuals, was publicly displayed/shown (at 1:22), falsely implying that he was associated with the above-mentioned ruthless activities.

[…]

13. The Defendant then shared or allowed Video #1, which was made by him, to be shared online on the accounts that the Defendant owned, had control of, was associated with and/or was frequently represented or promoted by, including, *inter alia*, on Instagram (such as info.sufi, drdadrashfathi, afshin.sajedi, and etc), Twitter, YouTube, Pearl TV and Pearl TV's Instagram, Telegram and YouTube Channel.

[…]

(b) VIDEO #2

15. Upon the discovery of Video #1, the Plaintiff investigated the above-mentioned platforms and found Video #2, which, according to the Defendant's in Video #1, was shown to the Audience during his presentation at the Summit.

16. Video #2 was ten minutes and fifty-seven seconds long and narrated by an unknown female voice. While the narrator spoke, many pictures and clips that were supposedly related to the content of the video were displayed in the background.

17. In Video #2, the female narrator alleged that the Regime, and particularly, its head of state, the Supreme Leader of Iran, Ali Khamenei, has infiltrated and taken over the Gonabadi Sufis. The narrator further alleged that in or about February 2018, the Regime, through their infiltrated agents, including tens of thousands of besieges who pretended to be Gonabadi Sufis, put the then Master of the Gonabadi Sufi, Mr. Tabandeh, under house arrest, and eventually, after two years of repeatedly poisoning him, assassinated him.

18. During the period of time in which the female narrator advanced the above statements with respect to the besieges' cruel and violent activities, a picture of the Plaintiff (mentioned above) was intentionally shown (at 8:00) to imply that the Plaintiff was one of the alleged Iranian besieges who pretended to be a Gonabadi Sufis but committed terrorist activities against the members and the Master of the Gonabadi Sufi. The said picture reappeared during the conclusion of Video #2 (at 10:38). However, this time, there was a subtitle accompanying the image. The subtitle displayed on the top of the screen read, "*Main Co-conspirators to murder the spiritual leader of the Gonabadi Sufis,*" while the name of an individual, Reza Tabandeh, was mentioned at the bottom.

19. Similar to Video #1, Video #2 did not provide any support for the defamatory and harmful statements against the Plaintiff. Nonetheless, Video #2 was likewise shared on various online accounts that the Defendant owned or had control of, was associated with, and/or was frequently represented or promoted by including, *inter alia*, on Instagram (such as info.sufi, drdadrashfathi, afshin.sajedi, and etc.), Twitter, YouTube, Pearl TV and Pearl TV's Instagram, Telegram and YouTube Channel.

2024 ONSC 1106 (CanLII)

6

20. In addition to the audience at the Summit, Video #1 had 80.8K views on Dorr TV's Telegram channel alone. Similarly, Video #2 had 89.2K views on Dorr TV's Telegram channel.

~~20~~21. Those online accounts on which the video was shared pertained, *inter alia*, Instagram, Twitter, YouTube, and various online platforms that Dorr TV broadcasts its programs ~~from~~. In other words, in addition to the Audience, Video #2 has reached and continues to reach at least hundreds of thousands of people, if not millions to date.

(c) VIDEO #3

~~21~~22. Subsequent to broadcasting Video #1 and Video #2 on Pearl TV multiple times, the Defendant was invited to Pearl TV continually to further comments and discussions about the Summit and the alleged unmasking of the Regime's agents and their identity, which included the identity of the Plaintiff (Video #3). In Video #3, the Defendant discusses the suppression of the Gonabadi Sufis with a lawyer from the IOPHR, Dorr TV's hostess and a member of IOPHR, Ms. Hafezi, and two other individuals. The Plaintiff's picture (mentioned above) was shown while the Defendant was making the following remarks:

> "This year, we had the honour of speaking and presenting a film about the crimes committed against the Sufis and assassination of three Gonabadi Sufi Qutbs […] [and] the actors of the crimes [against Sufis and Qutb] and those who betrayed Sufis within the Gonabadi Sufi Order, and worked with the Regime's Supreme Leader […] and, of course, those crimes and conspiracies were exposed with our help […]"

23. Video #3 was an hour, fifteen minutes, and seven seconds (1:15:07) long, and has had about 109.5K views so far on Dorr Tv's Telegram channel alone. In addition to Dorr Tv's Telegram channel, Video #3 was posted on Dorr TV's YouTube Channel as well. During their discussions, however, the Defendant did not offer any supporting evidence beyond his bald and baseless accusations.

*Notice Of Defamation*

~~22~~24. Smearing the Plaintiff with false allegations was not only harmful to the Plaintiff's career and reputation within his community, but also imposed a real and serious risk of harm to him and his family.

~~23~~25. In an effort to mitigate the damages caused by the Defendant, on or about August 12, 2022, the Plaintiff, served the Defendant in person with a notice of cease and desist with respect to the unlawful, malicious and destructive false allegations made by him against the Plaintiff pursuant to section 5 of the *Libel and Slander Act*, R.S.O. 1990, c. L. 12. In the said notice, the Plaintiff expressly notified the Defendant that his allegations were false and defamatory, and sought the immediate publication of an apology and retraction.

(d) VIDEO #4

~~24~~26. In response to the notice, on or about August 28, 2022, the Defendant posted another clip ("Video #4") on various online platforms, where he stated that he stood by his allegations, called the plaintiff's demand to remove his pictures "nonsense" and welcomed any lawsuits against himself. In the caption of the clip, the Defendant further defamed the Plaintiff and alleged that the Plaintiff played a key role in the house arrest of the previous Gonabadi Sufi Master. No apology and/or retraction was published by the Defendant.

27. Video #4, with a duration of five minutes and fifty seconds (5:50), was distributed across multiple online platforms, including, but not limited to, Dorr TV's Instagram account, Telegram channel, and Info.Sufi's Instagram accounts. Notably, Video #4 garnered a total of 86.6K views solely on Dorr TV's Telegram channel. Lastly, in Video #4 a reference was made to the letter issued by the IOPHR lawyer to the Plaintiff.

2024 ONSC 1106 (CanLII)

2024 ONSC 1106 (CanLII)

e) VIDEO #5

28. On or about September 22, 2022, the Plaintiff discovered another video ("Video #5") in which the Defendant appeared on Dorr TV to address the Plaintiff's cease and desist letter further. Alongside the Defendant, two other individuals were present in the video: Mr. Sajedi, the counsel for IOPHR, and Ms. Hafezi, the show's hostess. Video #5 was forty-one minutes and seventeen seconds long (41:17) and was posted on Dorr TV's Telegram and YouTube channels as well as their Instagram account. On Telegram alone, Video #5 has been viewed 102.5K times.

29. Video #5 commenced with an introduction by Ms. Hafezi, during which she made a reference to the content of Video #2 and the Summit and alleged that Video #2 displayed images of a group of individuals (including the Plaintiff) who were involved in the project related to the Sufi's former master's house arrest.

30. Subsequently, the Defendant started his speech by showing and promoting Video #2 and its content. He then discussed the Plaintiff's cease of desist letter at length and dismissed it as nonsense and an empty threat. Additionally, the Defendant raised doubts about the credibility and existence of the Plaintiff's legal counsel, alleging that no reputable lawyer who obtained their law degree from a respected law school and successfully passed the bar exam would involve themselves in the Plaintiff's case due to the potential severe repercussions on their legal license.

31. In Video #5, the panel engaged in ridicule towards the Plaintiff, using derogatory terms like "termite Dervish" and making insinuations about the Plaintiff's lawyer being connected to the Regime. Additionally, there were threats made that the Plaintiff's IP address could be obtained to establish the Plaintiff's alleged affiliation with the Regime. The video concluded by welcoming the Plaintiff's lawsuit.

Defendant's Response to the Cease-and-Desist Letter Triggered a Defamation Campaign Targeting the Plaintiff

32. Following the release of Video #5, a deliberate campaign to defame and assassinate the character of the Plaintiff was initiated through a series of offensive and insulting videos. These videos, totalling eight in number to the best knowledge of the Plaintiff, were circulated across various social media platforms such as YouTube, Telegram, and Instagram. This campaign was orchestrated in direct response to the Plaintiff's cease and desist letter and his denial of any association with the Regime.

33. The primary creator of these videos was Ms. Hafezi, the hostess of Dorr TV and a colleague of the Defendant at IOPHR. Specifically, Ms. Hafezi produced a four-part series titled "*Who is Seyed Mansour Hosseini*?", which were primarily focused on undermining the Plaintiff and accusing him of affiliation with the Regime. In another video, prompted by the Iranian Embassy attack in London, UK, Ms. Hafezi called upon her "freedom-loving" supporters, fans, and audience to "conquer" the Vali-Asr Islamic Centre in Markham, Ontario, similar to the embassy incident in the UK. Ms. Hafezi's call for violence was based on the assumption that since the Plaintiff had visited the premises, the Islamic Centre must also be affiliated with the Regime.

34. As a result of the call for violence targeting the Vali-Asr Islamic Centre, the Plaintiff felt compelled to fulfill his civic duty by informing both the Islamic Centre itself and the police. A police report was generated to document the incident. The Plaintiff was particularly embarrassed having to clarify to the Islamic Centre steward that his past attendance at the said centre prompted the call for violence.

35. In addition to the aforementioned videos, IOPHR issued a letter publicly in support of the Defendant. Similar to Video #4 and #5, the IOPHR's counsel disregarded the legal significance of the Plaintiff's cease and desist letter, dismissing it as a mere publicity stunt and lacking any legal implications. Additionally, the IOPHR issued a threat to the Plaintiff, warning that if legal action is initiated, they would unveil evidence of the Plaintiff's alleged collaboration with the Regime in order

to expose him. Furthermore, the letter contained personal attacks directed towards the Plaintiff's legal counsel, Mr. Joel Etienne, who was named in the cease-and-desist letter.

*Libel, Defamation, And/Or Slander Causing Loss of Reputation*

25~~36~~. The Plaintiff states that the accusations against him with respect to his association with the Regime and involvement in brutal and terroristic activities are completely false. The Plaintiff pleads that the Defendant defamed and slandered him and continues to do the same through the discussed, disclosed, conveyed, and/or disseminated false allegations, which were made and broadcast to hundreds of thousands of people, if not millions in Iran and abroad.

26~~37~~. As a result of the Defendant's defamatory statements, videos, and posts on various online platforms, the Plaintiff has suffered and continues to suffer harm and damage. The malicious and false allegations made by the Defendant against the Plaintiff were calculated to impugn the Plaintiff's reputation and integrity and thereby isolate him from his community and Gonabadi Sufis. The Defendant's vexatious campaign against the Plaintiff will inflict a long-lasting effect on the Plaintiff's reputation, career, and religious status among Gonabadi Sufis.

*The Defamatory Statements Have Been Aggravated by the Sensitive Timing*

27~~38~~. On or about September 16, 2022, a twenty-two-year-old Iranian woman, named Mahsa Amini (a.k.a Zhina Amini), was arrested in Iran by the "morality" police in Iran for allegedly not wearing her hijab in accordance with the Regime's guidelines. Mahsa Amini eventually died under mysterious circumstances in police custody. Her death has sparked criticism among Iranians and non-Iranians against the Regime and has prompted a boycott of the same.

[…]

29~~40~~. Accordingly, the effect of the Defendant s defamatory statements has been exacerbated by the sensitive timing of the accusations due to the death of Mahsa Amini as well as the small size of the close-knit Iranian-Canadians community in Toronto, which allows the word to spread quickly. Indeed, Iranian-Canadians form a small but very tight community in Toronto where they shop, gather, hold ceremonies, and attend religious observances and services together.

30~~41~~. Due to the fear of being recognized from the above-mentioned videos and harassed, the Plaintiff and his family have refrained from attending Iranian stores, restaurants, or religious centres for prayers. In other words, the Plaintiff has been unfairly and unjustifiably isolated from his community due to false and baseless allegations by the Defendant.

31~~42~~. Throughout the relevant period, the Defendant has acted in a callous, supremely arrogant, contumacious, and egregious manner for the purpose of profiting and gaining more audience at the direct expense of the Plaintiff's reputation and safety. The Plaintiff pleads that the Defendant has engaged in a conscious effort to intensify and perpetuate his attacks on him without any regard for the truth of his allegations.

32~~43~~. Even after having been served with the Plaintiff's notice, the Defendant has continued to maintain, update, and advertise their defamatory posts, and to publicize and disseminate his false and defamatory statements concerning the Plaintiff. His conduct is shocking and oppressive and offensive to the sense of decency.

33~~44~~. The Plaintiff's reputation, including his reputation among Iranians as well as the Gonabadi Sufi community, has been harmed due to the publication and re-publication of the Defendant's false and defamatory statements on various online platforms.

34~~45~~. The Plaintiff pleads that the Defendant is strictly liable for his misconduct in publishing the false and defamatory comments. The Plaintiff further pleads that the Defendant's malice is plain and obvious in light of the contents of the defamatory comments, and the videos.

2024 ONSC 1106 (CanLII)

[…].

[21]    On **July 4, 2023**, Mr. Gharagozloo's counsel served a Notice that Mr. Gharagozloo intended to act in person.

[22]    Mr. Gharagozloo was repeatedly asked to defend the action and when he failed to do so on **July 20, 2023**, he was noted in default.

[23]    On **December 4, 2023**, Mr. Hosseini brought a motion for a default judgment. The motion was supported by Mr. Hosseini's affidavit dated December 4, 2023.

## C.  Facts

### 1.  Historical Background

[24]    In 1979, there was a revolution in the Imperial State of Iran. At that time, a monarchical government lead by the Shah of Iran, Mohammed Reza Pahlavi, was overthrown and replaced by the theocratic government of Ruhollah Khomeini, a religious cleric. The rebels established the present day Islamic Republic of Iran.

[25]    Within Iran, live the Nematollahi, a minority Islamic religious group, which has three main branches, the largest of which is the Gonabadi Sufis (also known as Gonabadi Dervishes). Since the revolution, the Iranian government has persecuted the Sufis. Their monasteries have been destroyed, and thousands of Sufis have been dismissed from employment, arrested, imprisoned, and tortured, and some have been executed.

### 2.  *Dramatis Personae*

#### (a)  Dr. Noor Ali Tabandeh

[26]    In 2018, the spiritual leader, "Qutb" of the Gonabadi Sufi order was **Dr. Noor Ali Tabandeh**, who was then in his nineties. Dr. Noor Ali Tabandeh had succeeded his brother **Mahboub Ali-Shah** as Qutb. In February 2018, the Iranian Government placed Dr. Noor Ali Tabandeh under house arrest in the custody of Seyed Alireza Jazbi Tabatabaei. Almost two years later on December 24, 2019, at the age of 92, Dr. Noor Ali Tabandeh died while under house arrest.

[27]    Mr. Gharagozloo believes that the death was caused by months of deprivation, poisoning, and medical malpractice, a practice employed by the Iranian Government to cover up the murders of religious activists. It is Mr. Gharagozloo's belief that during Dr. Noor Ali Tabandeh's house arrest, the Iranian Government interfered with Dr. Noor Ali Tabandeh's choice of successor and arranged that Seyed Alireza Jazbi Tabatabaei, who was loyal to the government, would be appointed as successor Qutb.

#### (b)  Reza Tabandeh

[28]    **Reza Tabandeh** is the son of the late Mahboub Ali-Shah, who was succeeded by his brother the late Dr. Noor Ali Tabandeh. Reza is thus the nephew of the late Dr. Noor Ali Tabandeh. Dr. Reza Tabandeh is a Canadian resident. He graduated from St. Xavier Catholic High School in Mississauga in 2002 and then obtained degrees in religious studies from York University, B.A.

2024 ONSC 1106 (CanLII)

2024 ONSC 1106 (CanLII)

(2005), University of Toronto, M.A. (2007), University of Exeter (Mississauga, Ontario, campus), Ph.D. (2008). He has been a teaching assistant at York University and the University of Toronto. He currently is a post-doctoral fellow at the University of Toronto (since 2014) and a researcher and sessional lecturer at Brock University (since 2018).

[29]    Mr. Gharagozloo believes that Dr. Reza Tabandeh was one of the seven main co-conspirators who plotted and carried out the assassination of his uncle Dr. Noor Ali Tabandeh in furtherance of a plot to have him replaced with a spiritual leader satisfactory to the Iranian Government.

### (c) Seyed Mansour Hosseini

[30]    Mr. Hosseini was born in Iran, and he received a degree in chemical engineering from Shiraz University. In 2006, he and his ex-wife moved to Canada. They have a now teenage son. Mr. Hosseini is now divorced. He is a devout Gonabadi Sufi, which he became after he moved from Iran to Canada.

[31]    After immigrating to Canada, he was hired as an engineer in the oil and gas industry, where he worked until 2016, when he was laid off. He then worked as an Uber driver, and he tried two business endeavours that were unsuccessful. In 2023, he was rehired as a piping lead engineer and resumed his career as an engineer. Mr. Hosseini does not support the Iranian Government's persecution of religious minorities and dissidents, and its violent attacks on the Gonabadi Sufis.

[32]    Mr. Hosseini and Dr. Reza Tabandeh are acquaintances in the Sufi community in Canada. The contacts between Mr. Hosseini and Dr. Reza Tabandeh all occurred in Canada. There is no evidence that Mr. Hosseini had anything at all to do with the death of Dr. Reza Tabandeh's uncle in Iran. There is no evidence that Dr. Reza Tabandeh had any role in his uncle's death.

### (d) Hamid Gharagozloo

[33]    After the revolution in Iran, Mr. Gharagozloo's family left the country to live in exile in the United States. He now lives in Richmond, Virginia, USA. Mr. Gharagozloo has a B.Sc. and two M.Sc. in chemical and industrial engineering and in operations research and statistics. He is the president and founder of Nest, LLC, a commercial real estate investment and development company that manages large-scale construction and oversees property development.

[34]    Mr. Gharagozloo became a human rights activist for the religious minorities and ethnic groups that have been persecuted by the Iranian government. Mr. Gharagozloo is a representative of the **International Organization to Preserve Human Rights** ("**IOPHR**"), which is a United Kingdom NGO that organizes conferences, lectures, and seminars about human rights issues. Mr. Gharagozloo is also the Chair of the Iran Working Group of the Office of International Religious Freedom ("IRF") Roundtable. The IRF is a policy lobby for U.S. foreign relations. At some time prior to the summer of 2022, Mr. Gharagozloo researched and the IOPHR produced an approximately eleven-minute documentary video, which Mr. Hosseini labels in his Statement of Claim "Video #2."

### 3.  The Narrative

[35]    At some time prior to the summer of 2022, Mr. Gharagozloo researched and the IOPHR

produced an approximately eleven-minute documentary video ("Video #2."). The video is an English language documentary about the forty-three years of oppression of Sufis in Iran by the Iranian Government.

[36]    Between **June 28 to June 30, 2022**, in Washington D.C., there was a meeting of the Coalition for International Religious Freedom (the "Summit").

[37]    On **June 29, 2022,** Mr. Gharagozloo made a speech at the Summit. During Mr. Gharagozloo's speech, he showed Video #2. In his speech, Mr. Gharagozloo's speech discussed the various covert and malicious activities carried out by the Iranian Government in the US, Canada, UK, EU, Iran, and elsewhere.

[38]    In Video #2, the narrator, an unidentified woman, discusses covert efforts taken by seven co-conspirator agents of the Iranian Government to assassinate Dr. Ali Noor Tabandeh and to appoint a regime loyalist as his successor. Mr. Gharagozloo researched and confirmed the accuracy of all the information in the video and in his speech about the activities of the Iranian Government and the seven conspirators.

[39]    In Video #2, the narrator describes the Iranian Government's suppression of human rights and its persecution of religious minorities, such as the Gonabadi Sufis. She reports that there are tens of thousands of *"basijis"* who pretend to be Sufis to infiltrate the Gonabadi Sufis. She describes a campaign to isolate and harm Dr. Noor Ali Tabandeh and to replace him with a Qutb who is loyal to the Iranian Government. She identifies the seven "<u>main</u>" conspirators as: Gholam Reza Harsini, Mir Yunes Jafari, Ali Reza Jazbi, Hussein Ali Kahani, Shahram Pazuki, Mohammed Tabandeh (another nephew of Dr. Noor Ali Tabandeh), and Dr. Reza Tabandeh.



[40]    During Video #2, there is a video clip of two seconds duration that is shown twice during the video. The video clip shows Dr. Reza Tabandeh standing by two individuals. In the photograph, standing to the left of Dr. Reza Tabandeh is Mr. Hosseini. The video does not name Mr. Hosseini nor the other individual in the photo, but all three men appear under the caption: "Main co-conspirators to murder, the spiritual leader of the Gonabadi Sufis – Reza TABANDEH."

[41]    The viewer of the video clip would not know that the video photograph was taken three years earlier at the memorial service for Dr. Noor Ali Tabandeh in 2019 at the Vali Asr Islamic Centre in Markham, Ontario, a service at which the Ontario Sufi community attended, including Dr. Reza Tabandeh and Mr. Hosseini. Mr. Hosseini says he and Dr. Reza Tabandeh were greeting attendees arriving at the memorial service for Dr. Reza Tabandeh's uncle.

[42]    On **June 29, 2022**, what is labelled Video #1 in Mr. Hosseini's Statement of Claim is posted on the Internet. Video #1 is four minutes and thirty-eight seconds in length (4:38 minutes). Video #1 video is narrated by Mr. Gharagozloo and appears to be produced and published by the IOPHR. In Video #1, Mr. Gharagozloo speaks in Farsi. He reports from Washington on his attendance at the Summit. As was the case with Video #2, nothing is said about Mr. Hosseini in Video #1. However, within Video #1, Video #2 with its depiction of Mr. Hosseini is displayed on a large screen beside Mr. Gharagozloo. In Video #1, the video clip from Video #2 is displayed

12

once. A translation of Mr. Gharagozloo's narration of Video #1 follows:

> With regards, I am Hamid Gharagozloo from the International Organisation to Preserve Human Rights on the second day of the international annual meeting of freedom of thought and religion in Washington.
>
> Yesterday, a film by the International Organisation to Preserve Human Rights was broadcasted about the 43 years of crimes committed against the Nematollahi Gonabadi order and the Gonabadi dervishes, as well as the martyrdom of three sole masters of this order and a large number of dervishes who are still in prison and about the crucial part of seven persons, termites, [that] play a key role, led by Mohammad Tabandeh and Hossein Ali Kashani, who each played their own role to the house-arrest and imprisonment of Dr. Tabandeh and in his martyrdom.
>
> Also, the role of people like […] And most importantly about Shahram Pazuki and his sinister plans during the past few decades, in order to fix the academic credibility and character for Reza Tabandeh, who [Pazouki planned to] become the future Sufi master of the order. And the role of Reza Tabandeh himself in those issues, I discussed with the head of the Commission for Freedom of Opinions and Religions and two employees of the Ministry of Foreign Affairs about the nefarious plans that the regime has through Shahram Pazuki and Reza Tabandeh to make the order a governmental order and also to make the order ISIS-like order, the relationship between Reza Tabandeh and the so-called Islamic centers in Toronto and Europe and how Shahram Pazuki through the communications with the Ministry of Guidance [in Iran] and Haddad Adel [influential person in Iranian regime] and European universities were able to create a certificate for Reza Tabandeh and give academic credit and personality to this person […] These people want to implement their racist, ISIS-like and terrorist thoughts all over the world through mysticism. […].

[43]    In late **June** and early **July 2022**, Video #2, along with what Mr. Hosseini labels Videos #1 and #3, are posted on Internet social media accounts. These videos are published online by the IOPHR, not Mr. Gharagozloo. Video #3 is broadcast on **August 8, 2022**. It is a video of an appearance by Mr. Gharagozloo on a Dorr TV broadcast hosted by Dorr TV's hostess, Ms. Hafezi.

[44]    Dorr TV is a broadcast channel popular with the Farsi speaking public. On the broadcast, Mr. Gharagozloo appears with IOPHR's counsel, Mr. Sajedi. During the broadcast, Mr. Gharagozloo, speaking in Farsi, reports about his presentation at the Summit. While he is speaking, clips from Video #2 are played, and the photo of Mr. Hosseini standing by Dr. Reza Tabandeh is displayed while Mr. Gharagozloo speaks. A translation of the discussion between Ms. Hafezi and Mr. Gharagozloo on Video #3 follows:

> Ms. Hafezi: Hello and Greetings, dear ones. The issue of violating the rights of Iranian citizens, especially the violation of the rights of religious and doctrinal diversities in Iran, has become one of the main problems of citizens in the country. What is solution to this crisis? In addition to we are witnessing unbridled general and continuous violation of human rights in all parts of the country. Truly, why are followers of different religions and beliefs the target of attacks and harassment organized by the government? To answer this question, we invited four human rights activists and had a conversation with them.
>
> […]
>
> Ms. Hafezi: Not long ago, Mr. Gharagozloo held a cyber conference on the sidelines of the annual meeting of the International Organization for Freedom of Religions and Beliefs in the United States of America, the World Association for International Organisation to Preserve Human Rights, regarding the violation of the rights of religious minorities in Iran. As a representative of the International Organisation to Preserve Human Rights, you were the organizer of this meeting, which was held in three days. If possible explain to our audience about the way of holding this meeting and the results of it.

2024 ONSC 1106 (CanLII)

Mr. Gharagozloo: […] And this year I had the honor of speaking and [presenting] a film about the crimes against the dervishes and martyrdom of the three sole masters of Nematullahi Gonabadi order and the reasons behind it, especially their enmity with Dr. Noor Ali Tabandeh and his creeds and ideals were discussed and who were those involved in those crimes inside the Gonabadi order and worked for Khameinei's regime, who are six people [who conspired from within the order] and after the imprisonment, house arrest and removal and consecutive poisonings of Dr. Noor Ali Tabandeh and his martyrdom, finally replacing selected person by Khamenei as the leader of the order. Of course, all these conspiracies and conspiracies were uncovered by continuous efforts of International Organisation to Preserve Human Rights.

[…]

[45]    On **August 10, 2022**, a friend of Mr. Hosseini tells him about the posting of Video #1 and Mr. Hosseini views the videos. He immediately seeks legal advice.

[46]    On **August 12, 2022**, Joel Etienne, Mr. Hosseini's legal counsel writes the following notice letter to Mr. Gharagozloo which was emailed to Mr. Gharagozloo and received by him on **August 17, 2022**:

We act for Mr. Seyed Mansour Hosseini […].

[…] you attended the "Convening of a Coalition for International Religious Freedom Summit", […] - between June 28 to June 30, 2022, in Washington D.C. (the "Summit"). […]

During the Summit, you presented a video - ten minutes and fifty-seven seconds of length - to the Audience, which was narrated by an unknown female voice […].

The female narrator alleged that the Islamic Regime of Iran (the "Regime"), particularly, Iran's Supreme Leader, Mr. Khamenei, has infiltrated and taken over the Gonabadi Sufis. The narrator further alleged that in or about February 2018, the Regime, through their infiltrated agents, including tens of thousands of besieges, who pretended to be Gonabadi Sufis, put the then Leader of the Gonabadi Sufi, Mr. Tabandeh, under house arrest, and eventually after a period of two years repeatedly poisoning him, assassinated him.

During the period of time where the female narrator advanced the above allegations, publicly, a picture of Mr. Hosseini was intentionally shown (at 8:00) to imply that our client is one of the alleged Iranian besieges who pretends to be a Gonabadi Sufis. The said video was further mass broadcasted and shared on social media, including […]. In addition to the above, on or about June 29, 2022, you shared another video - four minutes and thirty-eight seconds long - of yourself where you reported about the Summit and admitted that you spoke about 43 years of the Regime's brutal attack on the Gonabadi Sufi, the alleged assassination of three Gonabadi Sufi leaders, and the unlawful arrests of many Sufis in Iran. You proceeded to allege that at the Summit, you unmasked 7 agents of the Regime who allegedly played a part in the above-mentioned activities. A picture of our client again was publicly displayed/shown (at 1:22), implying that he was associated with these ruthless activities ("Video #2"). Similar to the first video, video #2 was also shared on social media, including […]

[…]

Further, our client demands forthwith, that you post a statement of retraction and apology on any and all communication platforms, specifically, on the Instagram accounts of […]. Mr. Hosseini shall take steps to pursue all legal and proper remedies available to him should you fail to comply.

[…]

[47]    On **August 17, 2022**, Mr. Hosseini posts on his Instagram account a copy of his lawyer's letter to Mr. Gharagozloo. The posting of this letter to Instagram is the first time that Mr. Hosseini's

2024 ONSC 1106 (CanLII)

name is publicly connected to Videos #1 and # 2 and to Mr. Gharagozloo.



[48] Mr. Gharagozloo does not respond to the cease and desist letter. Instead, he prepares Video #4, which is posted on social media and on Dorr TV on **August 28, 2022**. Video #4 shows Mr. Gharagozloo delivering a speech in Farsi. A translation of Mr. Gharagozloo's speech on Video #4 follows:

[…] Some time ago, a letter from a lawyer of a person named Mansour Hosseini addressed to me, Hamid Gharagozloo, was published in the cyberspace. In relation to the activities of the International Organisation to Preserve Human Rights, regarding my reports and speeches at the annual International Religious Freedom SUMMIT meeting, which was held in the city of Washington in the United States in June this year.

For you to be more familiar; this meeting is organized every year by Human right organizations from all over the world in relation to the violation of the rights of different religious and ideological groups under the management of the International Round Table on Freedom of Opinions and Religions, that I am also a member of its board of directors about Iran, that held this meeting. Every year the International Organisation to Preserve Human Rights publishes and present reports in the case of the crime[s] of the ruling regime in Iran for all ethnic groups, followers of different beliefs and religions, civil activists, political activists, environmental activists, Iranian women and all those who were oppressed in anyway by the ruling regime of Iran.

This year, the reports of the International Organisation to Preserve Human Rights included two parts: one part was about all the victims of the ruling regime in Iran, and the other part included reports and the presentation of documents, as well as an eleven minutes video briefly explaining the causes of Ali Khamenei's regime hostility with the Nehmetallah Gonabadi order and their crimes against this school led to the martyrdom of the three sole masters of this order, […] and at the end the martyrdom of Dr. Noor Ali Tabandeh, […] and also replacing Dr. Noor Ali Tabandeh with a person picked by Ali Khameini named Mohandes Jazbi as the sole master of the order was shown to the audience.

Now, Mr. Mansour Hosseini's lawyer is claiming that because his client is seen in a scene of this clip along with those involved in the conspiracy against Dr. Noor Ali Tabandeh, this clip has caused his client's disrepute and he can sue me. The lawyers of International Organisation to Preserve Human Rights, based on the laws and juridical standards and international laws, have given a very clear explanation of the absurdity of this claim and the destitution of these claimants and Mr. Mansour Hosseini. […]

Mr. Mansour Hosseini's lawyer and himself probably committed a crime by publishing the address of my residence and republishing it by his colleagues, but in response to this letter, I was told by Mansour Hosseini's lawyer that legal actions and a legal complaint will be filed against me. I must say, I am eagerly waiting for your action, because this meeting was held in America, the international organization to Preserve human rights is in Europe, Mr. Mansour Hosseini is in Canada, and this crime and these crimes were executed in Iran, so it should be through the federal court of the United States of America, they should file this complaint and you come and file your complaint and present your documents and evidence, I will do the same with thousands of pages of documents written and verbal testimonies about the imprisonment and martyrdom of His holiness […] Dr. Noor Ali Tabandeh.

Two years of investigation which validity of these documents was approved by the US Ministry of Foreign Affairs and the US government, and based on these documents, the US Ministry of State, the US Commission on International Religious Freedom, as well as the European Union, published reports on these crimes. […] Now you raise your complaint, finally, with this cartoon, [referring to the lawyer's letter], you will cause these documents to be registered and approved by the American Federal Court and the American Judicial Organization, and each of these paves the way for the next

2024 ONSC 1106 (CanLII)

15

steps of Dr. Noor Ali Tabandeh's litigation for us. If God wills the enemy to be the cause of good, he knows this.

[49]    When Video #4 appeared on Dorr TV, it identifies Mr. Hosseini as a resident of Canada and an attendee at the Islamic Center of the Islamic Republic of Iran in Toronto. The caption to the video, which is prepared by Dorr TV states that: "Mr. Hosseini was "an advisor to Reza Tabandeh, a family member of Dr. Noor-Ali Tabandeh, who played a significant role in the restrictions that led to the removal of Dr. Noor-Ali Tabandeh." The caption states: "the complainant is a person named Seyed Mansour Hosseini, who lives in Canada and visits the Islamic Center of the Islamic Republic of Iran in Toronto."

[50]    On **September 2, 2022** Video #5 is published on the Internet. Video #5 is another segment of a Dorr TV broadcast. In the video, Ms. Hafezi speaks to Mr. Gharagozloo and Mr. Sajedi, IOPHR's legal counsel. Mr. Sajedi states that Mr. Hosseini's lawyer's letter was a "laughable intimation" of a real letter and merely a show-off. Mr. Sajedi says that IOPHR has ample evidence to prove that Mr. Hosseini is a violator of human rights and participated in the house arrest and assassination of Dr. Noor-Ali Tabandeh. He repeats the invitation to Mr. Hosseini to commence a defamation lawsuit, otherwise, his letter would be considered a mere show of bravado. During Video #5, Mr. Gharagozloo states that:

> Mansour Hosseini is devotee of Reza Tabandeh…and if you want to know who Reza Tabandeh is, you have to know Shahram Pazouki and the rest of the group of seven who were unmasked/introduced to the world [at the Summit] as the architects of Dr. Noor-Ali Tabandeh's removal and house arrest and finally his martyrdom. […] if it was not for these "hypocrites and termites", Iranians and Sufis would have benefitted from Dr. Noor-Ali Tabandeh's teachings and millions would have followed.

[51]    Dorr TV has 713,500 subscribers on the Telegram channel, 21,600 followers on Instagram, and 15,100 subscribers on YouTube. Video #1 has been viewed 80,800 times on Dorr TV's Telegram channel. Video #2 has been viewed 89,200 times on Dorr TV's Telegram channel. Video #3 has been viewed 109,500 times. Video #4 has been viewed 86,600 times, and Video #5 has been viewed 102,500 times.

[52]    After Videos #1, #2, #3, #4, and #5, there are more videos, but none involve Mr. Gharagozloo. Ms. Hafezi and Dorr TV produce six more videos mentioning Mr. Hosseini including a four-part series called "Who is Seyed Mansour Hosseini?" The videos describe Mr. Hosseini's alleged ties to the Iranian Government. In the videos, Ms. Hafezi states that Mr. Hosseini was one of the core people who were either aware of, benefited from, or participated in the house arrest of Dr. Noor Ali Tabandeh and that Mr. Hosseini had close ties to Dr. Reza Tabandeh. With the numeration used by Mr. Hosseini, the videos are published on: **August 30, 2022** (Video #6); **September 4, 2022**; (Video #7); **September 6, 2022** (Video #8); **September 7, 2022** (Videos #9 and #10); **September 25, 2022** (Video #12); **September 26, 2022** (Video #13), and **September 28, 2022** (Video #11).

[53]    On **October 20, 2022**, Mr. Hosseini commenced his lawsuit against Mr. Gharagozloo.

## D.  Discussion and Analysis

### 1.  Motions for a Default Judgment

[54]    When a defendant has been noted in default, the plaintiff may make a motion for judgment.

[55]     On a motion for a default judgment, the court undertakes a three-step inquiry; namely: (a) what deemed admissions of fact flow from the Statement of Claim? (b) do the deemed admissions of fact entitle the plaintiff as a matter of law to judgment? and (c) if the deemed admissions are insufficient for judgment, has the plaintiff adduced admissible evidence that when combined with the deemed admissions entitles it to judgment on the pleaded claim?[6] Where the pleaded facts are not sufficient to establish liability, the court may consider the affidavit evidence to determine whether the plaintiff is entitled to judgment or whether the evidence disentitles the plaintiff to judgment.[7]

## 2.   **Defamation**

[56]     Defamation is a tort action to protect a person's reputation. Defamation occurs when the defendant makes a communication that tends to lower a person in the estimation of right-thinking members of society, or to expose a person to hatred, contempt, or ridicule."[8] The elements of a claim of defamation are: (1) the defendant makes a statement; (2) the words of the statement are defamatory, *i.e.*, the words would tend to lower the plaintiff's reputation in the eyes of a reasonable person; (3) the statement refers to the plaintiff; and (4) the statement is published.[9]

[57]     The defamatory communication may be made orally (slander), or in some written or printed form by way of a brochure, gesture, handbill, letter, photograph, placard, poster, sign, or cartoon *etc*. (libel).[10] To determine whether an expression is defamatory, the court undertakes a twofold analysis of whether a reasonable person to whom the words were published would understand them in a defamatory sense by asking (a) whether, as a matter of law, the published words are capable of bearing the defamatory meanings alleged by the plaintiff; and (b) if so, whether a reasonable person would have understood the words in their defamatory sense.[11]

[58]     Statements are defamatory when they lower the plaintiff's reputation in the eyes of a reasonable person.[12] A court must consider both the plain and ordinary meaning of the words, as well as the surrounding circumstances known to the recipient, and which give defamatory meaning by way of innuendo. In determining the meaning to be taken from the words used by the defendant, their plain and ordinary meaning must be considered, and the context in which the words are used and any reasonable implications the words may bear; the audience, and the manner of expression

---

[6] *Gillespie v. Fraser*, 2023 ONSC 537; *Kaur v Virk*, 2022 ONSC 6697; *Elekta Ltd. v Rodkin*, 2012 ONSC 2062.

[7] *Martin v. Hurst*, 2023 ONSC 2606 (Div. Ct.); *Salimijazi v. Pakjou*, [2009] O.J. No. 1538.

[8] *Thorpe v. Boakye*, 2022 ONSC 7176; *Kaur v. Virk*, 2022 ONSC 6697; *Foulidis v. Ford*, 2014 ONCA 530; *Botiuk v. Toronto Free Press Publications Ltd.*, [1995] 3 S.C.R. 3.

[9] *Konstan v. Berkovits*, 2023 ONSC 497; *Lavallee v. Isak*, 2022 ONCA 290; *Thorpe v. Boakye*, 2022 ONSC 7176; *Zoutman v. Graham*, 2020 ONCA 767; *Crookes v. Newton*, 2011 SCC 47; *Grant v. Torstar Corp.*, 2009 SCC 61 at para. 28; *Warman v. Grosvenor* (2008), 92 O.R. (3d) 663 at paras. 52-57 (S.C.J.); *Lysko v. Braley* (2006), 79 O.R. (3d) 721 (C.A.); *Mantini v. Smith Lyons LLP (No. 2)* (2003), 64 O.R. (3d) 516 (C.A.), leave to appeal to S.C.C. ref'd [2003] S.C.C.A. No. 344; *Hill v. Church of Scientology of Toronto*, [1995] 2 S.C.R. 1130; *Botiuk v. Toronto Free Press Publications Ltd.*, [1995] 3 S.C.R. 3.

[10]*Crookes v. Newton*, 2011 SCC 47 at para. 19.

[11] *Kam v. CBC*, 2021 ONSC 1304, aff'd 2022 ONCA 13; *Bernstein v. Poon*, 2015 ONSC 155.

[12] *Walsh Energy Inc. (c.o.b. The Energy Centre) v. Better Business Bureau of Ottawa-Hull Inc. (c.o.b. as Better Business Bureau Serving Eastern and Northern Ontario and Outaouais)*, 2018 ONCA 383 at para. 28; *Grant v. Torstar*, 2009 SCC 61 at para. 28.

2024 ONSC 1106 (CanLII)

are also relevant to determine meaning.[13]

[59]    Under the second branch of the analysis, the reasonable person is someone who is "reasonably thoughtful and informed, rather than someone with an overly fragile sensibility. A degree of common sense must be attributed to those receiving the defamatory content."[14] Similarly, when determining innuendo or inferential meaning from a potentially defamatory statement, the test is a reasonable person's assessment based on the entirety of the publication and in the context of all the circumstances.[15]

[60]    The gravity of some statements, such as an attribution of the plaintiff being dishonest, immoral, a pedophile, a terrorist, a terrorist supporter, a racist, a human smuggler, a corrupt politician, a swindler, a racketeer, a gangster, a mobster, are defamatory and so obviously likely to cause serious harm to a person's reputation that the likelihood of harm and general damages can be inferred.[16]

[61]    In the immediate case, the alleged defamation in Videos #1 and #2 is by images. Images, including photographs or video representations, may be defamatory depending on the circumstances of the particular case.[17]

### 3.    Analysis of Liability for Defamation

[62]    In the immediate case, the above account of the facts establishes that all of the elements of the tort of defamation have been satisfied.

[63]    The immediate case bears some similarity to the British Columbia case of *St. Pierre v. Pacific Newspaper Group Inc. and Skulsky*.[18] In that case, *The Vancouver Sun* published a photo accompanying a news article with the headline "Charges of supporting Hezbollah were dropped against Burnaby's Ali Adham Amhaz." The accompanying photo, however, was a photo of Mr. Amhaz's former legal counsel, David A. St. Pierre that had inadvertently been used by the newspaper. The newspaper apologized, but Mr. St. Pierre successfully brought a defamation suit. Justice Rice explained his reasoning for finding the publication of the photograph defamatory; in paragraphs 10 - 15 of his decision, he stated:

> 10. The fact that Mr. St Pierre's name was not mentioned anywhere in the Article does not exonerate the defendants. They admit that the photograph identified Mr. St. Pierre as Mr. Amhaz. Therefore,

---

[13] *Kam v. CBC*, 2021 ONSC 1304, aff'd 2022 ONCA 13; *Skafco Ltd. (c.o.b. Robbie's Italian Restaurant) v. Abdalla*, 2020 ONSC 136; *Walsh Energy Inc. (c.o.b. The Energy Centre) v. Better Business Bureau of Ottawa-Hull Inc. (c.o.b. as Better Business Bureau Serving Eastern and Northern Ontario and Outaouais)*, 2018 ONCA 383; *Bernstein v. Poon*, 2015 ONSC 155; *Cusson v. Quan*, 2007 ONCA 771; *Botiuk v. Toronto Free Press Publications Ltd.*, [1995] 3 S.C.R. 3 at para. 62.

[14] *Color Your World Corp. v. Canadian Broadcasting Corp.* (1998), 38 O.R. (3d) 97 (C.A.); *Weaver v. Corcoran*, 2017 BCCA 160; *DeKoter v. McLeod*, 2019 ABCA 163.

[15] *Taseko Mines Limited v. Western Canada Wilderness Committee*, 2017 BCCA 431.

[16] *Canadian Union of Postal Workers v. B'nai Brith Canada*, 2021 ONCA 529, aff'g 2020 ONSC 323; *Skafco Ltd. (c.o.b. Robbie's Italian Restaurant) v. Abdalla*, 2020 ONSC 136 at para. 15; *Montour v. Beacon Publishing Inc. (c.o.b. Frontline Safety & Security)*, 2019 ONCA 246 at paras. 27-42; *Lascaris v. B'nai Brith Canada*, 2019 ONCA 163 at para. 40-41; *Awan v. Levant*, 2016 ONCA 970, aff'g 2014 ONSC 6890, leave to appeal to S.C.C. ref'd [2017] S.C.C.A. 71; *Cooke v. MGN Ltd.*, [2015] 2 All ER 622 at para. 43 (C.A.); *Grant v. Torstar Corp.*, 2009 SCC 61

[17] *Tilbury v. Coulson*, 2023 BCSC 189; *St. Pierre v. Pacific Newspaper Group Inc. and Skulsky*, 2006 BCSC 241; *Chopra v. Hodson*, 2001 ABQB 380.

[18] 2006 BCSC 241.

2024 ONSC 1106 (CanLII)

words in the Article referring to Mr. Amhaz in effect refer to Mr. St. Pierre, and the defendants are liable if those words are defamatory. […]

11. The Article certainly does not expressly allege that Mr. Amhaz is or was a terrorist. It accurately describes him as an individual once indicted, but against whom the charges have been dropped. It also records his denial of the charges. The caption under Mr. St. Pierre's picture repeats the statement that charges were to be dropped against Mr. Amhaz. There is nothing else in the Article alleging explicitly that Mr. Amhaz is guilty of terrorist activity. Mr. Gibson, counsel for the defendants, argued that, therefore, the Article is not defamatory of Mr. Amhaz or of Mr. St. Pierre.

12. At law, a person must be presumed innocent until proven guilty. An indictment is not proof of guilt. However, it would be naïve to suppose that the fact of being indicted for a crime, especially a serious one, would not affect negatively a person's reputation. To report that a person has been indicted on charges of terrorism is enough, in my opinion, to injure his or her reputation. Terrorists are reviled by ordinary people. Little more than a bare accusation is needed to incite fear and loathing toward the person identified. The Article reported not only the indictment, but some of its inflammatory details too. The thrust of the Article as a whole was to alert the reader to a dangerous terrorist conspiracy with connections in Canada. It was likely to raise suspicions in people's minds against Mr. St. Pierre.

13. That Mr. St. Pierre is a person of colour identified by the name Ali Adham Amhaz, and shown in the picture with something of a frown on his face would lead some readers, I'm sure, to presume that he was of Middle Eastern origin and hostile. It would unfortunately tend to fortify those impressions that they gathered from what they read.

14. The fact that the Article also reported that the indictment was dropped and that Mr. Amhaz denied the charges might have reduced the negative impact, but not substantially in my opinion. People would naturally presume that the prosecutors had evidence to support their case, whether they chose to proceed with it or not.

15. The natural and ordinary meaning of the passages in the Article referring to Mr. Amhaz, in the context of the whole of the Article, is that the man in the picture was probably involved in terrorist activities. Thus, the Article was defamatory of Mr. St. Pierre.

[64]    In the immediate case, the publication of the photos of Dr. Reza Tabandeh was defamatory. The photos connect Mr. Hosseini to a conspiracy to assassinate and replace a spiritual leader. Any reasonable person, especially those within the tightly knit Gonabadi Sufi circle, would understand from the video that Dr. Reza Tabandeh and the person standing beside him were implicated in Dr. Noor Ali Tabandeh's assassination. They would understand that Mr. Hosseini was a co-conspirator or a supporter of an assassination scheme orchestrated by Iranian government agents.

[65]    If there were any lingering doubts in the minds of the audience about Mr. Hosseini's complicity in a successful conspiracy to murder a religious leader, Mr. Gharagozloo ended any doubts in Video #5. In that video, he reiterated his allegations and directly accused Mr. Hosseini of being involved in the house arrest and assassination of Dr. Noor Ali Tabandeh, and of depriving the Gonabadi Sufi community and all Iranians from the leadership and spiritual guidance of Dr. Noor Ali Tabandeh.

[66]    The videos individually or taken together expressly stated or implied that Mr. Hosseini was (a) a racist and a terrorist involved in serious criminal activities; (b) a sympathizer and collaborator with an oppressive theocratic regime that was persecuting religious minorities; (c) complicit in the house arrest and assassination of the former Qutb; and (d) a traitor to the Gonabadi Sufi community.

[67]    I arrive at my decision about the defamatory nature of Videos #1 and #2 independently of Videos #3, #4, and #5. Those videos have a defamatory expression which is expressed in words, not only in images like Videos #1 and #2 that implicate Mr. Hosseini in the death of Dr. Noor Ali Tabandeh and in the plot to have a pro-regime replacement installed as spiritual leader of the Gonabadi Sufis.

[68]    Mr. Hosseini is named in Videos #3, #4, and #5 and the defamatory message that he is amongst the plotters to assassinate and replace Dr. Noor Ali Tabandeh is manifest. Any reasonable person would conclude that the words in Videos #3, #4, and #5 spoken by Mr. Gharagozloo without any photos are such that they would lower Mr. Hosseini's reputation in the eyes of a reasonable person.

[69]    Standing alone Videos #1 and #2 are defamatory. The same is true about each of Videos #3, #4, and #5. Both as a matter of law and as a matter of the appreciation of a reasonable person, the expressions contained in these videos are defamatory.

[70]    Having been noted in default, Mr. Gharagozloo has no defence to Mr. Hosseini's claim of defamation.

### **4.    Remedies for Defamation**

[71]    In cases in which defamation is proven, the plaintiff's remedies may include: (a) general damages; (b) special or pecuniary damages that are causally connected to the defamatory statements; (c) aggravated damages; (d) punitive damages;[19] and (e) injunctive relief. Damages for defamation are assessed as the amount necessary under all of the circumstances to restore the plaintiff's reputation in the community and his or her injury to feelings and to provide consolation and public vindication.[20]

[72]    General damages and aggravated damages are compensatory and there may be some overlap in granting both general and aggravated damages.[21] Special damages for pecuniary loss are rarely claimed in defamation actions because they are exceedingly difficult to prove and the basis of recovery for loss of reputation usually lies in general damages, which are presumed from the publication of the libel.[22] The reputation of a lawyer and other professionals such as accountants, medical practitioners, engineers, is paramount to his or her livelihood and statements attributing dishonesty, untrustworthiness, villainy, or immorality will cause serious harm to the professional's reputation and livelihood.[23]

[73]    The factors to consider in determining the quantum of damages for defamation include: (a) the plaintiff's position and standing; (b) the nature and seriousness of the defamatory statements; (c) the mode and extent of publication; (d) the absence or refusal of any retraction or

---

[19] *Skafco Ltd. (c.o.b. Robbie's Italian Restaurant) v. Abdalla*, 2020 ONSC 136 at para. 21.

[20] *Skafco Ltd. (c.o.b. Robbie's Italian Restaurant) v. Abdalla*, 2020 ONSC 136 at para. 20; *Hill v. Church of Scientolog*y, [1995] 2 S.C.R. 1130 at paras. 168-173, 182-83.

[21] *Awan v. Levant*, 2016 ONCA 970 at paras. 97-108, aff'g 2014 ONSC 6890, leave to appeal to S.C.C. ref'd [2017] S.C.C.A. 7.

[22] *Rutman v. Rabinowitz*, 2018 ONCA 80 at paras. 62-63, aff'g 2016 ONSC 5864; *Hill v. Church of Scientolog*y, [1995] 2 S.C.R. 1130 at paras. 167-172.

[23] *Rutman v. Rabinowitz*, 2018 ONCA 80 at paras. 66-67, aff'g 2016 ONSC 5864; *Lascaris v. B'nai Brith Canada*, 2019 ONCA 163 at para. 42-44; *Botiuk v. Toronto Free Press Publications Ltd*., [1995] 3 S.C.R. 3 at paras. 91-92; *Hill v. Church of Scientology of Toronto*, [1995] 2 S.C.R. 1130 at para. 118.

apology; (e) the whole conduct and motive of the defendant from publication through judgment; and (f) any evidence of aggravating or mitigating circumstances.[24]

[74]    In contemporary times, where the mode of communication is the Internet this is a factor that intensifies the harm caused by the publication of the defamation because of the anonymous, interactive, and worldwide reach of an Internet communication and its insidious potential to persuade its audience of false information; defamation through the Internet is a particularly egregious type of defamation.[25]

[75]    In *Hill v. Church of Scientology of Toronto*,[26] the Supreme Court held that there is no cap placed on general damages in defamation cases as was done in the personal injury context.[27]

[76]    Aggravated damages compensate the plaintiff for the damages caused where the defendant's conduct has been particularly high-handed, insulting, spiteful, malicious or oppressive increasing the plaintiff's humiliation and anxiety caused by the defamation.[28] In *Hill v. Church of Scientology of Toronto*,[29] Justice Cory stated at paras. 190-91:

> 190. If aggravated damages are to be awarded, there must be a finding that the defendant was motivated by actual malice, which increased the injury to the plaintiff, either by spreading further afield the damage to the reputation of the plaintiff, or by increasing the mental distress and humiliation of the plaintiff. […] The malice may be established by intrinsic evidence derived from the libellous statement itself and the circumstances of its publication, or by extrinsic evidence pertaining to the surrounding circumstances which demonstrate that the defendant was motivated by an unjustifiable intention to injure the plaintiff. […]
>
> 191. There are a number of factors that a jury may properly take into account in assessing aggravated damages. For example, was there a withdrawal of the libellous statement made by the defendants and an apology tendered? If there was, this may go far to establishing that there was no malicious conduct on the part of the defendant warranting an award of aggravated damages. The jury may also consider whether there was a repetition of the libel, conduct that was calculated to deter the plaintiff from proceeding with the libel action, a prolonged and hostile cross-examination of the plaintiff or a plea of justification which the defendant knew was bound to fail. The general manner in which the defendant presented its case is also relevant. Further, it is appropriate for a jury to consider the conduct of the defendant at the time of the publication of the libel. For example, was it clearly aimed at obtaining the widest possible publicity in circumstances that were the most adverse possible to the plaintiff?

[77]    In defamation cases, punitive damages are only appropriate where the combined award of general and aggravated damages would be insufficient to achieve the goal of punishment and

---

[24] *Barrick Gold Corp. v. Lopehandia* (2004), 71 O.R. (3d) 416 (C.A.); *Hill v. Church of Scientology of Toronto*, [1995] 2 S.C.R. 1130.

[25] *Rutman v. Rabinowitz*, 2018 ONCA 80 at paras. 68-69, aff'g 2016 ONSC 5864; *Barrick Gold Corp. v. Lopehandia* (2004), 71 O.R. (3d) 416 at paras. 31-34 (C.A.).

[26] [1995] 2 S.C.R. 1130 at paras. 167-173.

[27] *Andrews v. Grand & Toy Alberta Ltd.*, [1978] 2 S.C.R. 229; *Arnold v. Teno*, [1978] 2 S.C.R. 287, and *Thornton v. Board of School Trustees of School District No. 57 (Prince George)*, [1978] 2 S.C.R. 267.

[28] *Skafco Ltd. (c.o.b. Robbie's Italian Restaurant) v. Abdalla* 2020 ONSC 136 at para. 21; *Paramount Fine Foods v. Johnston* 2019 ONSC 2910; *Awan v. Levant* 2016 ONCA 970 at para. 103, aff'g 2014 ONSC 6890, leave to appeal to S.C.C. ref'd [2017] S.C.C.A. 71; *Hill v. Church of Scientology of Toronto*, [1995] 2 S.C.R. 1130 at paras. 188-89; *Walker v. CFTO* Ltd., [1987] O.J. No. 236 (C.A.).

[29] [1995] 2 S.C.R. 1130 at paras. 167-173. (Cory, J for La Forest, Gonthier, McLachlin, Iacobucci and Major JJ; L'Heureux-Dubé J. concurring.)

deterrence.[30]

[78]    Where the court finds that the defendant has defamed the plaintiff, a permanent injunction restraining the defendant from making further defamatory statements of the plaintiff may be ordered where either: (a) there is a likelihood that the defendant will continue to publish defamatory statements despite the finding that he is liable to the plaintiff for defamation; or (b) there is a real possibility that the plaintiff will not receive any compensation, given that enforcement against the defendant of any damage award may not be possible.[31]

## 5.  **Analysis of Remedies**

[79]    I find as a fact that Mr. Gharagozloo acted with malice. He knew from the outset that it was a mistake to include an unobscured image of Mr. Hosseini in the documentary video. He had no idea who Mr. Hosseini was before he received or took notice of the letter from Mr. Hosseini's lawyer. At that juncture all Mr. Gharagozloo needed to do was apologize and obscure the image.

[80]    However, Mr. Gharagozloo did not apologize. Filled with hubris and bravado, he reacted with threats and smeared a private citizen who was no supporter of the Iranian regime and indeed, like Mr. Gharagozloo himself, was a refugee from the oppressive regime.

[81]    Video #5, with a duration of forty minutes and twenty seconds, was exclusively dedicated to defaming Mr. Hosseini and tarnishing his reputation.

[82]    Nothing warranted this aggressive attack against Mr. Hosseini. Mr. Hosseini was not a public figure. He was just living his life in Toronto as best as he could with his own share of the normal joys and miseries of everyday living in this great country.

[83]    Mr. Hosseini did know Dr. Reza Tabandeh as would everyone else in the small Gonabadi Sufi community. With no more than a photograph of Mr. Hosseini standing beside Dr. Reza Tabandeh, Mr. Gharagozloo audaciously, recklessly, and stupidly connected Mr. Hosseini to an alleged "avunculicide", the act of killing an uncle, in support of an oppressive regime that was persecuting the Sufi community in Iran. Instead of responding with an apology, Mr. Gharagozloo responded with malice.

[84]    The defamatory statements were at the highest degree of harming a person's reputation both in the world at large and in a religious community. The defamatory videos have been published and reposted many times on the internet and remain there to this day. Mr. Hosseini's family, friends, and colleagues in Iran and abroad have seen the videos. The small religious community in which he is a part has seen the videos. His son or schoolmates may come across the videos and falsely believe in Mr. Hosseini's involvement in the most serious criminal activities.

[85]    In the immediate case, I cannot differentiate Mr. Hosseini's general damages from his aggravated damages and this is one of those cases where they overlap. Having regard to the awards

---

[30] *Rutman v. Rabinowitz*, 2018 ONCA 80 at paras. 90-97, aff'g 2016 ONSC 5864; *Pate Estate v. Galway-Cavendish and Harvey (Township)*, 2013 ONCA 669; *Hill v. Church of Scientology of Toronto*, [1995] 2 S.C.R. 1130 at paras. 199-200.

[31] *Soliman v. Bordman*, 2021 ONSC 7023; *Paramount Fine Foods v. Johnston*, 2019 ONSC 2910; *St. Lewis v. Rancourt*, 2015 ONSC 513 at para. 13-16; *Astley v. Verdun*, 2011 ONSC 3651; *Ottawa-Carleton District School Board v. Scharf*, [2007] O.J. No. 3030 (S.C.J.) aff'd 2008 ONCA 154, leave to appeal refused, [2008] S.C.C.A. No. 285; *Barrick Gold Corp. v. Lopehandia* (2004), 71 O.R. (3d) 416 at para. 78 (C.A.)

in defamation cases including cases of internet defamation,[32] in my opinion, the appropriate award in the immediate case is **$400,000** plus costs of the defamation action including all interlocutory motions of **$180,000** all inclusive. This award is sufficient to serve the purposes of a punitive damages award.

[86]    I make no order as to injunctive relief. Dorr TV and IOPHR are not co-defendants and there was no evidence from the anti-SLAPP motion or on this default judgment motion as to the feasibility of ordering Mr. Gharagozloo to remove or to even attempt to have the internet postings removed or the photos in the documentary video blurred to obscure the identification of Mr. Hosseini.

[87]    Mr. Hosseini may post this court's judgments or links to this court's judgments as he may be advised. Ordering an apology from a non-resident is a futile order and would be a futile and meaningless gesture by Mr. Gharagozloo.

## E.  Costs

[88]    Given the egregious defamation and the taunting, and belligerent behaviour, I award Mr. Hosseini costs on a substantial indemnity scale, which I fix at $180,000, all inclusive for the action including the anti-SLAPP motion and the default judgment motion. Costs, even costs on a substantial indemnity scale, must be reasonable and I regard the claim of approximately $315,000 of costs for a $400,000 judgement excessive.

## F.  Conclusion

[89]    For the above reasons, I award Mr. Hosseini a judgment against Mr. Gharagozloo of $400,000 with postjudgment interest plus costs of $180,000 with postjudgment interest.

[90]    Judgment according.

Perell, J.

Released: February 22, 2024

---

[32] *Anson Advisors Inc. v. James Stafford,* 2023 ONSC 5537; *Sommer v. Goldi*, 2022 ONSC 3830; *Soliman v. Bordman*, 2021 ONSC 7023; *Emeny v. Tomaszewski*, 2019 ONSC 3298; *Paramount Fine Foods v. Johnston*, 2019 ONSC 2910; *Pathak v. Shapira,* 2019 MBQB 73;  *Rutman v. Rabinowitz*, 2018 ONCA 80; *Magno v. Balita*, 2018 ONSC 3230; *Nazerali v. Mitchell*, 2018 BCCA 104; *Awan v. Levant* 2016 ONCA 970, aff'g 2014 ONSC 6890, leave to appeal to S.C.C. ref'd [2017] S.C.C.A. 71; *St. Lewis v. Rancourt* 2015 ONCA 513; *Hill v. Church of Scientology of Toronto* [1995] 2 S.C.R. 1130.

**CITATION:** Hosseini v. Gharagozloo, 2024 ONSC 1106
**COURT FILE NO.:** CV-22-00688949-0000
**DATE:** 20240222

**ONTARIO
SUPERIOR COURT OF JUSTICE**

**BETWEEN:**

**SEYED MANSOUR HOSSEINI**

Plaintiff

**- and -**

**HAMID GHARAGOZLOO**

Defendant

---

**REASONS FOR DECISION**

---

PERELL, J.

**Released: February 22, 2024**

2024 ONSC 1106 (CanLII)

**12**

**Jones v. Tsige**

**108 O.R. (3d) 241**
**2012 ONCA 32**

**Court of Appeal for Ontario,**
**Winkler C.J.O., Sharpe J.A. and Cunningham**
**A.C.J. (ad hoc)**
**January 18, 2012**

2012 ONCA 32 (CanLII)

Torts -- Invasion of privacy -- Intrusion upon seclusion -- Right of action for intrusion upon seclusion existing in Ontario -- Range of damages for intrusion upon seclusion being up to $20,000 -- Defendant committing tort of intrusion upon seclusion when she used her position as bank employee to repeatedly examine private banking records of her spouse's ex- wife -- Damages in amount of $10,000 awarded.

The plaintiff and the defendant did not know each other, but they worked for different branches of the same bank and the defendant had formed a common law relationship with the plaintiff's ex-husband. For about four years, the defendant used her workplace computer to access the plaintiff's personal bank accounts at least 174 times. She did not publish, distribute or record the information in any way. When she discovered the conduct, the plaintiff brought an action for damages for invasion of privacy and moved for summary judgment. The defendant brought a cross-motion for summary judgment dismissing the action. The motion judge found that the tort of invasion of privacy does not exist at common law in Ontario. He dismissed the plaintiff's motion and granted the defendant's motion. The plaintiff appealed.

Held, the appeal should be allowed.

A right of action for intrusion upon seclusion should be recognized in Ontario. The case law supports the existence of such a cause of action. Privacy has long been recognized as an important underlying and animating value of various traditional causes of action to protect personal and territorial privacy. Charter jurisprudence recognizes privacy as a fundamental value in our law and specifically identifies, as worthy of protection, a right to informational privacy that is distinct from personal and territorial privacy. The right to informational privacy closely tracks the same interest that would be protected by a cause of action for intrusion upon seclusion. It is within the capacity of the common law to evolve to respond to the problem posed by the routine collection and aggregation of highly personal information that is readily accessible in electronic form. Technological change poses a novel threat to a right of privacy that has been protected for hundreds of years by the common law under various guises and that, since 1982 and the Charter, has been recognized as a right that is integral to our social and political order. Finally, the facts of this case cried out for a remedy.

The key features of the cause of action of intrusion upon seclusion are, first, that the defendant's conduct must be intentional (which includes recklessness); second, that the defendant must have

invaded, without lawful justification, the plaintiff's private affairs or concerns; and third, that a reasonable person would regard the invasion as highly offensive, causing distress, humiliation or anguish. Proof of harm to a recognized economic interest is not an element of the cause of action.

Given the intangible nature of the interest protected, damages for intrusion upon seclusion will ordinarily be measured by a modest conventional sum. The appropriate range is up to $20,000. Awards of aggravated and punitive damages may be appropriate in exceptional cases, but are not to be encouraged, as predictability and consistency are paramount values in an area where symbolic or moral damages are awarded. [page242]

The defendant committed the tort of intrusion upon seclusion when she repeatedly examined the plaintiff's private bank records. The intrusion was intentional, it amounted to an unlawful invasion of the plaintiff's private affairs, it would be viewed as highly offensive to the reasonable person and it caused distress, humiliation or anguish. The plaintiff was awarded damages in the amount of $10,000. The intrusion upon her seclusion did not exhibit any exceptional quality calling for an award of aggravated or punitive damages.

APPEAL by the plaintiff from the summary judgment of Whitaker J., [2011] O.J. No. 1273, 2011 ONSC 1475 (S.C.J.) dismissing an action for damages for breach of privacy.

The judgment of the court was delivered by

Cases referred toEuteneier v. Lee (2005), 77 O.R. (3d) 621, [2005] O.J. No. 3896, 260 D.L.R. (4th) 123, 202 O.A.C. 278, 133 C.R.R. (2d) 292, 142 A.C.W.S. (3d) 340 (C.A.), revg [2003] O.J. No. 4239, 113 C.R.R. (2d) 44 (Div. Ct.) [Leave to appeal to S.C.C. refused [2005] S.C.C.A. No. 516], consd Other cases referred to Athans v. Canadian Adventure Camps Ltd. (1977), 17 O.R. (2d) 425, [1977] O.J. No. 2417, 80 D.L.R. (3d) 583, 4 C.C.L.T. 20, 34 C.P.R. (2d) 126, [1977] 2 A.C.W.S. 1066 (H.C.J.); Aubry v. Editions Vice Versa, [1998] 1 S.C.R. 591, [1998] S.C.J. No. 30, 157 D.L.R. (4th) 577, 224 N.R. 321, J.E. 98-878, 39 C.C.L.T. (2d) 100, 45 C.C.L.T. (2d) 119, 78 C.P.R. (3d) 289, 50 C.R.R. (2d) 225, 78 A.C.W.S. (3d) 775, REJB 1998-05646; Campbell v. MGN Ltd., [2004] UKHL 22, [2004] 2 A.C. 457, [2004] 2 All E.R. 995 (H.L.); Capan v. Capan, [1980] O.J. No. 1361, 14 C.C.L.T. 191, 5 A.C.W.S. (2d) 245 (H.C.J.); Dulude v. Canada, [2000] F.C.J. No. 1454, [2001] 1 F.C. 545, 192 D.L.R. (4th) 714, 264 N.R. 1, 100 A.C.W.S. (3d) 1006 (C.A.); Dyne Holdings Ltd. v. Royal Insurance Co. of Canada, [1996] P.E.I.J. No. 28, 135 D.L.R. (4th) 142, 138 Nfld. & P.E.I.R. 318, 34 C.C.L.I. (2d) 180, [1996] I.L.R. I-3366, 62 A.C.W.S. (3d) 1206 (S.C. App. Div.) [Leave to appeal to S.C.C. refused [1996] S.C.C.A. No. 344]; Evans v. Detlefsen, 857 F.2d 330 (6th Cir. 1988); F. (J.M.) v. Chappell, [1998] B.C.J. No. 276, 158 D.L.R. (4th) 430, [1998] 7 W.W.R. 57, 103 B.C.A.C. 110, 45 B.C.L.R. (3d) 64, 41 C.C.L.T. (2d) 26, 15 C.R. (5th) 259, 77 A.C.W.S. (3d) 673 (C.A.) [Leave to appeal to S.C.C. refused [1998] S.C.C.A. No. 154, 231 N.R. 400]; Garrett v. Mikalachki, [2000] O.J. No. 1326, [2000] O.T.C. 248 (S.C.J.); Grant v. Torstar Corp., [2009] 3 S.C.R. 640, [2009] S.C.J. No. 61, 2009 SCC 61, 204 C.R.R. (2d) 1, 258 O.A.C. 285, EYB 2009-167615, J.E. 2010-8, 314 D.L.R. (4th) 1, 397 N.R. 1, 79 C.P.R. (4th) 407, 72 C.C.L.T. (3d) 1; Grosse v. Purvis, [2003] Q.D.C. 151, Aust. Torts Report 81-706; Haskett v. Trans Union of Canada Inc., [2001] O.J. No. 4949, [2001] O.T.C. 914, 10 C.C.L.T. (3d) 128, 110 A.C.W.S. (3d) 574 (S.C.J.);

Heckert v. 5470 Investments Ltd., [2008] B.C.J. No. 1854, 2008 BCSC 1298, 62 C.C.L.T. (3d) 249, 299 D.L.R. (4th) 689, 75 R.P.R. (4th) 278, 170 A.C.W.S. (3d) 648; Hill v. Church of Scientology of Toronto (1995), 24 O.R. (3d) 865, [1995] 2 S.C.R. 1130, [1995] S.C.J. No. 64, 126 D.L.R. (4th) 129, 184 N.R. 1, J.E. 95-1495, 84 O.A.C. 1, 25 C.C.L.T. (2d) 89, 30 C.R.R. (2d) 189, 56 A.C.W.S. (3d) 495; Hollinsworth v. BCTV, a division of Westcom TV Group Ltd., [1998] B.C.J. No. 2451, [1999] 6 W.W.R. 54, 113 B.C.A.C. 304, 59 B.C.L.R. (3d) 121, 44 C.C.L.T. (2d) 83, 83 A.C.W.S. (3d) 525 (C.A.), affg [1996] B.C.J. No. 2638, 34 C.C.L.T. (2d) 95 (S.C.); Hosking v. Runting, [2004] NZCA 34, [2005] 1 NZLR 1 (C.A.); Hunter v. Southam Inc., [1984] 2 S.C.R. 145, [1984] S.C.J. No. 36, 11 D.L.R. (4th) 641, 55 N.R. 241, [1984] 6 W.W.R. 577, J.E. 84-770, 33 Alta. L.R. (2d) 193, 55 A.R. 291, 27 B.L.R. 297, 14 C.C.C. (3d) 97, 2 C.P.R. (3d) 1, 41 C.R. (3d) 97, 9 C.R.R. 355, 84 D.T.C. 6467; Insurance Corp. of British Columbia v. Somosh, [1983] B.C.J. No. 2034, 51 B.C.L.R. 344, 24 A.C.W.S. (2d) 82 (S.C.); Katz v. United States, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); Krouse v. Chrysler Canada Ltd. (1973), 1 O.R. (2d) 225, [1973] O.J. No. 2157, 40 D.L.R. (3d) 15, 13 C.P.R. (2d) 28 (C.A.); Lee v. Jacobson; Weber v. Jacobson, [1994] B.C.J. No. 2459, 120 D.L.R. (4th) 155, 53 B.C.A.C. 75, 99 B.C.L.R. (2d) 144, 51 A.C.W.S. (3d) 376 (C.A.), revg [1992] B.C.J. No. 132, 87 D.L.R. (4th) 401, 31 A.C.W.S. (3d) 329 (S.C.); [page243] Lenah Game Meats Pty Ltd. v. Australian Broadcasting Corp., [2001] H.C.A. 63, 185 A.L.R. 1 (H.C. Aust.); Lipiec v. Borsa, [1996] O.J. No. 3819, 17 O.T.C. 64, 31 C.C.L.T. (2d) 294, 66 A.C.W.S. (3d) 794 (Gen. Div.); MacKay v. Buelow, [1995] O.J. No. 867, 24 C.C.L.T. (2d) 184, 11 R.F.L. (4th) 403, 54 A.C.W.S. (3d) 606 (Gen. Div.); Malcolm v. Fleming, [2000] B.C.J. No. 2400, 2000 CarswellBC 1316 (S.C.); Mosely v. News Group Newspapers Ltd., [2008] EWHC 1777, [2008] All E.R. (D) 322 (Q.B.); Motherwell v. Motherwell, [1976] A.J. No. 555, 73 D.L.R. (3d) 62, [1976] 6 W.W.R. 550, 1 A.R. 47 (S.C. App. Div.); Nesbitt v. Neufeld, [2010] B.C.J. No. 2232, 2010 BCSC 1605, [2011] B.C.W.L.D. 407 (S.C.); Nitsopoulos v. Wong, [2008] O.J. No. 3498, 298 D.L.R. (4th) 265, 60 C.C.L.T. (3d) 318, 169 A.C.W.S. (3d) 74 (S.C.J.); Ontario (Attorney General) v. Dieleman (1994), 20 O.R. (3d) 229, [1994] O.J. No. 1864, 117 D.L.R. (4th) 449, 49 A.C.W.S. (3d) 1059, 24 W.C.B. (2d) 302 (Gen. Div.); Palad v. Pantaleon, [1989] O.J. No. 985 (Dist. Ct.); Pateman v. Ross, [1988] M.J. No. 640, 68 Man. R. (2d) 181 (Q.B.); Provincial Partitions Inc. v. Ashcor Inplant Structures Ltd., [1993] O.J. No. 4685, 50 C.P.R. (3d) 497, 41 A.C.W.S. (3d) 823 (Gen. Div.); R. v. Dyment, [1988] 2 S.C.R. 417, [1988] S.C.J. No. 82, 55 D.L.R. (4th) 503, 89 N.R. 249, J.E. 89-77, 73 Nfld. & P.E.I.R. 13, 45 C.C.C. (3d) 244, 66 C.R. (3d) 348, 38 C.R.R. 301, 10 M.V.R. (2d) 1, 6 W.C.B. (2d) 78; R. v. O'Connor, [1995] 4 S.C.R. 411, [1995] S.C.J. No. 98, 130 D.L.R. (4th) 235, 191 N.R. 1, [1996] 2 W.W.R. 153, J.E. 96-64, 68 B.C.A.C. 1, 103 C.C.C. (3d) 1, 44 C.R. (4th) 1, 33 C.R.R. (2d) 1, 29 W.C.B. (2d) 152; R. v. Salituro, [1991] 3 S.C.R. 654, [1991] S.C.J. No. 97, 131 N.R. 161, J.E. 92-16, 50 O.A.C. 125, 68 C.C.C. (3d) 289, 9 C.R. (4th) 324, 8 C.R.R. (2d) 173, 14 W.C.B. (2d) 407; R. v. Tessling, [2004] 3 S.C.R. 432, [2004] S.C.J. No. 63, 2004 SCC 67, 244 D.L.R. (4th) 541, 326 N.R. 228, J.E. 2004-2035, 192 O.A.C. 168, 189 C.C.C. (3d) 129, 23 C.R. (6th) 207, 123 C.R.R. (2d) 257, 62 W.C.B. (2d) 525; R.W.D.S.U., Local 558 v. Pepsi-Cola Canada Beverages (West) Ltd., [2002] 1 S.C.R. 156, [2002] S.C.J. No. 7, 2002 SCC 8, 208 D.L.R. (4th) 385, 280 N.R. 333, [2002] 4 W.W.R. 205, J.E. 2002-268, 217 Sask. R. 22, [2002] CLLC Â220-008, 90 C.R.R. (2d) 189, 78 C.L.R.B.R. (2d) 161, 111 A.C.W.S. (3d) 272; R.W.D.S.U., Local 580 v. Dolphin Delivery Ltd., [1986] 2 S.C.R. 573, [1986] S.C.J. No. 75, 33 D.L.R. (4th) 174, 71 N.R. 83, [1987] 1 W.W.R. 577, J.E. 87-81, 9 B.C.L.R. (2d) 273, 38 C.C.L.T. 184, 87 CLLC Â14,002 at 12037, 25 C.R.R. 321, 2 A.C.W.S. (3d) 243; Robbins v. Canadian Broadcasting Corp. (1957), 12 D.L.R. (2d) 35

(Que. S.C.); Roe v. Cheyenne Mt. Conf. Resort, Inc., 124 F.3d 1221 (10th Cir. 1997); Roth v. Roth (1991), 4 O.R. (3d) 740, [1991] O.J. No. 1301, 9 C.C.L.T. (2d) 141, 34 M.V.R. (2d) 228, 28 A.C.W.S. (3d) 622 (Gen. Div.); S. & A. Nagy Farm v. Repsys, [1987] O.J. No. 1987 (Dist. Ct.); Saccone v. Orr (1981), 34 O.R. (2d) 317, [1981] O.J. No. 3132, 19 C.C.L.T. 37, 11 A.C.W.S. (2d) 402 (Co. Ct.); Shred-Tech Corp. v. Viveen, [2006] O.J. No. 4893, 153 A.C.W.S. (3d) 819, 2006 CarswellOnt 7762 (S.C.J.); Somwar v. McDonald's Restaurants of Canada Ltd. (2006), 79 O.R. (3d) 172, [2006] O.J. No. 64, 263 D.L.R. (4th) 752, [2006] O.T.C. 28, 144 A.C.W.S. (3d) 1128 (S.C.J.); Tran v. Financial Debt Recovery Ltd., [2000] O.J. No. 4293, 193 D.L.R. (4th) 168, [2000] O.T.C. 806, 2 C.C.L.T. (3d) 270, 101 A.C.W.S. (3d) 189 (S.C.J.); Wainwright v. Home Office, [2003] UKHL 53, [2004] 2 A.C. 406, [2003] 4 All E.R. 969 (H.L.); Wasserman v. Hall, [2009] B.C.J. No. 1932, 2009 BCSC 1318, 87 R.P.R. (4th) 184; Watts v. Klaemt, [2007] B.C.J. No. 980, 2007 BCSC 662, [2007] 11 W.W.R. 146, 71 B.C.L.R. (4th) 362, 61 C.C.E.L. (3d) 115, 157 A.C.W.S. (3d) 871 Statutes referred to Canadian Charter of Rights and Freedoms, ss. 7, 8, 9, 12, 15 Charter of Human Rights and Freedoms, R.S.Q. c. C-12, s. 5 Civil Code of Québec, S.Q. 1991, c. 64, arts. 3, 35 [as am.], 36, 37 Consumer Reporting Act, R.S.O. 1990, c. C.33 [as am.] [page244] Freedom of Information and Protection of Privacy Act, R.S.O. 1990, c. F.31 [as am.] Human Rights Act 1998 (U.K.), 1998 c. 42 Municipal Freedom of Information and Protection of Privacy Act, R.S.O. 1990, c. M.56 [as am.] Personal Health Information Protection Act, 2004, S.O. 2004, c. 3, Sch. A [as am.] Personal Information Protection and Electronic Documents Act, S.C. 2000, c. 5 [as am.] Privacy Act, R.S.B.C. 1996, c. 373 [as am.] Privacy Act, R.S.M. 1987, c. P125 [as am.], s. 4(2) Privacy Act, R.S.N.L. 1990, c. P-22 [as am.] Privacy Act, R.S.S. 1978, c. P-24 [as am.] Rules and regulations referred to Rules of Civil Procedure, R.R.O. 1990, Reg. 194, rules 21.01(1) (b), 76 Treaties and conventions referred to Convention for the Protection of Human Rights and Fundamental Freedoms, 4 November 1950, 213 U.N.T.S. 221 at 223, art. 8 International Covenant on Civil and Political Rights, 19 December 1966, 999 U.N.T.S. 171, art. 17 Universal Declaration of Human Rights, G.A. Res. 217(III) UNGAOR, 3d Sess., Supp. No. 13, UN Doc. A/810, (1948) 71, art. 12 Authorities referred to American Law Society, Restatement (Second) of Torts (2010) Bell, Robyn M. Ryan, "Tort of Invasion of Privacy -- Has its Time Finally Come?" in Archibald, Todd L., and Michael Cochrane, eds., Annual Review of Civil Litigation (Toronto: Carswell, 2005) Burns, Peter, "The Law and Privacy: The Canadian Experience" (1976), 54 Can. Bar Rev. 1 Craig, John D.R., "Invasion of Privacy and Charter Values: The Common-Law Tort Awakens" (1997), 52 McGill L.J. 355 Gibson, Dale, "Common Law Protection of Privacy: What to do Until the Legislators Arrive" in Klar, Lewis, ed., Studies in Canadian Tort Law (Toronto: Butterworths, 1977) Glenn, H. Patrick, "The Right to Privacy in Quebec Law" in Gibson, Dale, ed., Aspects of Privacy Law: Essays in Honour of John M. Sharp (Toronto: Butterworths, 1980) Lee, J.D., and Barry A. Lindahl, Modern Tort Law: Liability & Litigation, 2nd ed., looseleaf (West Group, 2002) Linden, Allen M., and Bruce Feldthusen, Canadian Tort Law, 9th ed. (Toronto: LexisNexis, 2011) McIsaac, Barbara, Rick Shields and Kris Klein, The Law of Privacy in Canada, looseleaf (Toronto: Carswell, 2004) McNairn, Colin H.H., and Alexander K. Scott, Privacy Law in Canada (Toronto: Butterworths, 2001) Osborne, Philip, The Law of Torts, 4th ed. (Toronto: Irwin Law, 2011) Prosser, William L., Law of Torts, 4th ed. (St. Paul: West Publishing Company, 1971) Prosser, William L., "Privacy" (1960), 48 Cal. L. Rev. 383 Waddams, Stephen M., The Law of Damages, looseleaf (Toronto: Canada Law Book, 2011) Warren, Samuel D., and Louis D. Brandeis, "The Right to Privacy" (1890), 4 Harv. L. Rev. 193

2012 ONCA 32 (CanLII)

[page245] Westin, Alan F., Privacy and Freedom (New York: Atheneum, 1967) Winfield, P.H., "Privacy" (1931), 47 Law Q. Rev. 23

Christopher Du Vernet and Carlin McGoogan, for appellant.

Alex Cameron and N. Melanson, for respondent.

[1] SHARPE J.A.: -- Does Ontario law recognize a right to bring a civil action for damages for the invasion of personal privacy?

[2] In July 2009, the appellant, Sandra Jones, discovered that the respondent, Winnie Tsige, had been surreptitiously looking at Jones' banking records. Tsige and Jones did not know each other despite the fact that they both worked for the same bank and Tsige had formed a common-law relationship with Jones' former husband. As a bank employee, Tsige had full access to Jones' banking information and, contrary to the bank's policy, looked into Jones' banking records at least 174 times over a period of four years.

[3] The central issue on this appeal is whether the motion judge erred by granting summary judgment and dismissing Jones' claim for damages on the ground that Ontario law does not recognize the tort of breach of privacy. Facts

[4] Jones and Tsige worked at different branches of the Bank of Montreal ("BMO"). Jones maintains her primary bank account there. Jones and Tsige did not know or work with each other. However, Tsige became involved in a relationship with Jones' former husband. For about four years, Tsige used her workplace computer to access Jones' personal BMO bank accounts at least 174 times. The information displayed included transactions details as well as personal information, such as date of birth, marital status and address. Tsige did not publish, distribute or record the information in any way.

[5] Jones became suspicious that Tsige was accessing her account and complained to BMO. When confronted by BMO, Tsige admitted that she had looked at Jones' banking information, that she had no legitimate reason for viewing the information and that she understood it was contrary to BMO's code of business conduct and ethics and her professional responsibility. Tsige explained then, and maintains in this action, that she was [page246] involved in a financial dispute with the appellant's former husband and accessed the accounts to confirm whether he was paying child support to the appellant. Jones does not accept that explanation as she says it is inconsistent with the timing and frequency of Tsige's snooping.

[6] Tsige has apologized for her actions and insists that she has ceased looking at Jones' banking information. Tsige is contrite and embarrassed by her actions. BMO disciplined Tsige by suspending her for one week without pay and denying her a bonus.

> [7] In her statement of claim, Jones asserts that her privacy interest in her confidential banking information has been "irreversibly destroyed" and claims damages of $70,000 for invasion of privacy and breach of fiduciary duty, and punitive and exemplary damages of $20,000. 1. Motions for summary judgment

2012 ONCA 32 (CanLII)

[8] Jones proceeded under the simplified procedure of Rule 76 of the Rules of Civil Procedure, R.R.O. 1990, Reg. 194 and moved for summary judgment. Tsige brought a cross-motion for summary judgment to dismiss the action.

[9] The motion judge found that Tsige did not owe Jones a fiduciary obligation and dismissed that claim. Jones has not appealed that finding.

[10] The motion judge then reviewed the jurisprudence concerning the existence of a tort of invasion of privacy. He observed that recent Superior Court decisions have refused to strike out such claims at the pleading stage and that some academic writing indicates that the tort may exist.

[11] The motion judge concluded, however, that the statement of Cronk J.A. in Euteneier v. Lee (2005), 77 O.R. (3d) 621, [2005] O.J. No. 3896 (C.A.), at para. 63, leave to appeal to S.C.C. refused [2005] S.C.C.A. No. 516 is, in his words, "binding and dispositive of the question" of whether the tort of invasion of privacy exists at common law in Ontario. Euteneier concerned a lawsuit brought by a woman whose clothes were forcibly removed by police following her suicide attempt while she was detained in a holding cell. In considering whether the trial judge had accurately described the plaintiff's privacy and dignity interests, Cronk J.A. observed, at para. 63, "[the plaintiff] properly conceded in oral argument before this court that there is no 'free-standing' right to dignity or privacy under the Charter or at common law". [page247]

[12] The motion judge added that given the existence of privacy legislation protecting certain rights, any expansion of those rights should be dealt with by statute rather than common law.

[13] The motion judge dismissed Jones' motion for summary judgment and granted the motion brought by Tsige. He rejected Jones' submission that costs should be denied on the ground that the issue was novel and that Tsige's conduct was objectionable. The motion judge felt that Jones had pursued the litigation aggressively and failed to accept reasonable settlement offers. He awarded costs fixed at $35,000. Issues

> [14] Jones appeals to this court, raising the following issues:
> (1) Did the motion judge err in holding that Ontario law does not recognize a cause of action for invasion of privacy? (2) Did the motion judge err with respect to costs?
> Analysis

Issue 1. Does Ontario law recognize a cause of action for invasion of privacy?
(a) Introduction

[15] The question of whether the common law should recognize a cause of action in tort for invasion of privacy has been debated for the past 120 years. Aspects of privacy have long been protected by causes of action such as breach of confidence, defamation, breach of copyright, nuisance and various property rights. Although the individual's privacy interest is a fundamental value underlying such claims, the recognition of a distinct right of action for breach of privacy remains uncertain. As Adams J. stated in Ontario (Attorney General) v. Dieleman (1994), 20 O.R. (3d) 229, [1994] O.J. No. 1864, 117 D.L.R. (4th) 449 (Gen. Div.), at p. 688 D.L.R., after a

comprehensive review of the case law, "invasion of privacy in Canadian common law continues to be an inceptive, if not ephemeral, legal concept, primarily operating to extend the margins of existing tort doctrine".

[16] Canadian, English and American courts and commentators almost invariably take the seminal articles of S.D. Warren and L.D. Brandeis, "The Right to Privacy" (1890), 4 Harv. L. Rev. 193 and William L. Prosser, "Privacy" (1960), 48 Cal. L. Rev. 383 as their starting point.

[17] Warren and Brandeis argued for the recognition of a right of privacy to meet the problems posed by technological and social [page248] change that saw "instantaneous photographs" and "newspaper enterprise" invade "the sacred precincts of private life" (at p. 195). They identified the "general right of the individual to be let alone", the right to "inviolate personality" (at p. 205), "the more general right to the immunity of the person" and "the right to one's personality" (at p. 207) as fundamental values underlying such well-known causes of action as breach of confidence, defamation and breach of copyright. They urged that open recognition of a right of privacy was well-supported by these underlying legal values and required to meet the changing demands of the society in which they lived.

[18] Professor Prosser's article picked up the threads of the American jurisprudence that had developed in the 70 years following the influential Warren and Brandeis article. Prosser argued that what had emerged from the hundreds of cases he canvassed was not one tort, but four, tied together by a common theme and name, but comprising different elements and protecting different interests. Prosser delineated a four-tort catalogue, summarized as follows, at p. 389:

> 1. Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs.
>
> 2. Public disclosure of embarrassing private facts about the plaintiff.
>
> 3. Publicity which places the plaintiff in a false light in the public eye.
>
> 4. Appropriation, for the defendant's advantage, of the plaintiff's name or likeness.

[19] Most American jurisdictions now accept Prosser's classification and it has also been adopted by the Restatement (Second) of Torts (2010). The tort that is most relevant to this case, the tort of "intrusion upon seclusion", is described by the Restatement, at 652B as:

> One who intentionally intrudes, physically or otherwise, upon the seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the invasion would be highly offensive to a reasonable person.

[20] The comment section of the Restatement elaborates this proposition and explains that the tort includes physical intrusions into private places as well as listening or looking, with or without mechanical aids, into the plaintiff's private affairs. Of particular relevance to this appeal is the observation that other non-physical forms of investigation or examination into private concerns may be actionable. These include opening private and personal mail or examining a

private bank account, [page249] "even though there is no publication or other use of any kind" of the information obtained.

[21] If Jones has a right of action, it falls into Prosser's first category of intrusion upon seclusion. While I will make some reference to the fourth category of appropriation of the plaintiff's name or likeness in my discussion below, I will focus primarily on intrusion upon seclusion. I do so for two reasons. First, I accept Prosser's insight that the general right to privacy embraces four distinct torts, each with its own considerations and rules, and that confusion may result from a failure to maintain appropriate analytic distinctions between the categories. Second, as a court of law, we should restrict ourselves to the particular issues posed by the facts of the case before us and not attempt to decide more than is strictly necessary to decide that case. A cause of action of any wider breadth would not only over-reach what is necessary to resolve this case, but could also amount to an unmanageable legal proposition that would, as Prosser warned, breed confusion and uncertainty.

[22] The following discussion will examine whether the common law recognizes a cause of action for invasion of privacy. I will canvass case law from Ontario and other provinces and examine federal and provincial legislation relating to privacy. For completeness, I will also discuss the state of the law in foreign jurisdictions.
(b) Case law

[23] Reflecting on Canadian jurisprudence, Allen M. Linden and Bruce Feldthusen, Canadian Tort Law, 9th ed. (Toronto:
LexisNexis, 2011) observed, at p. 59, that "[w]e seem to be drifting closer to the American model". See, also, Colin H.H. McNairn and Alexander K. Scott, Privacy Law in Canada (Toronto:
Butterworths, 2001), at ch. 3; Barbara McIsaac, Rick Shields and Kris Klein, The Law of Privacy in Canada, looseleaf (Toronto: Carswell, 2000), at 2.4; Philip Osborne, The Law of Torts, 4th ed. (Toronto: Irwin Law, 2011), at pp. 267-71.

[24] My analysis of the case law supports the same conclusion: Ontario has already accepted the existence of a tort claim for appropriation of personality and, at the very least, remains open to the proposition that a tort action will lie for an intrusion upon seclusion.
(i) Ontario case law

[25] In Canada, there has been no definitive statement from an appellate court on the issue of whether there is a common law right of action corresponding to the intrusion on seclusion [page250] category. Ontario trial judges have, however, often refused to dismiss such claims at the pleading stage as disclosing no cause of action and some have awarded damages for claims based on violations of the right to be free of intrusion upon seclusion. The clear trend in the case law is, at the very least, to leave open the possibility that such a cause of action does exist.

[26] Saccone v. Orr (1981), 34 O.R. (2d) 317, [1981] O.J. No. 3132 (Co. Ct.), for example, involved the recording of a private conversation without the knowledge or consent of the plaintiff. The recording was then played at a municipal council meeting and a transcript of the conversation published in a local newspaper. Jacob Co. Ct. J. dismissed the defendant's argument

against the existence of a tort of invasion of privacy, found in favour of the plaintiff and awarded damages of $500.

[27] Roth v. Roth (1991), 4 O.R. (3d) 740, [1991] O.J. No. 1301 (Gen. Div.) involved interference with the plaintiffs' ability to use and enjoy their cottage property. Mandel J. considered the application of several torts -- assault, battery, nuisance and trespass -- but found that the cumulative effect of the defendants' actions could best be described as an invasion of privacy. He rejected the contention that the common law did not allow for a claim for invasion of privacy and held, at p. 743 O.R., that the common law should not be confined to existing categories but must evolve. In recognizing the right of privacy, Mandel J. quoted a passage from a leading torts text indicating that liability for breach of privacy should only be imposed where the intrusion is substantial and would be regarded as offensive and intolerable to a person of reasonable sensitivity. He then stated, at p. 758 O.R., "whether the invasion of privacy of an individual will be actionable will depend on the circumstances of the particular case and the conflicting rights involved".

[28] A third trial judgment to award damages for breach of privacy falls under Prosser's fourth category of appropriation of the plaintiff's name or likeness. Athans v. Canadian Adventure Camps Ltd. (1977), 17 O.R. (2d) 425, [1977] O.J. No. 2417 (H.C.J.) involved a claim by an expert water-skier against a public relations firm that had copied a distinctive photograph of the plaintiff water skiing. Henry J. relied on Krouse v. Chrysler Canada Ltd. (1973), 1 O.R. (2d) 225, [1973] O.J. No. 2157 (C.A.), in which Estey J.A. had suggested that an action in tort for the appropriation of personality did exist under the common law of Ontario. Henry J. held that the plaintiff failed to make out the tort of passing off, but did have a claim for the tort of "appropriation of personality". The plaintiff recovered damages [page251] measured by the amount the plaintiff ought reasonably to have received in the market for permission to use his image.

[29] There are also several Ontario cases in which the trial judge refused to strike pleadings alleging the tort of invasion of privacy as disclosing no cause of action.

[30] Somwar v. McDonald's Restaurants of Canada Ltd. (2006), 79 O.R. (3d) 172, [2006] O.J. No. 64 (S.C.J.) contains perhaps the most coherent and definitive pronouncement in Ontario jurisprudence of the existence of a common law tort of invasion of privacy corresponding to the intrusion upon seclusion category. Somwar accused his employer, McDonald's Restaurants, of unlawfully invading his privacy by conducting a credit bureau check on him without his consent. The plaintiff claimed damages for invasion of privacy and for punitive damages. The defendant moved to strike the statement of claim and dismiss the plaintiff's action on the basis that it did not disclose a reasonable cause of action under rule 21.01(1)(b) of the Rules of Civil Procedure.

[31] Stinson J. reviewed the Ontario case law and observed that while the cases were not entirely consistent, even where the courts did not accept the existence of a privacy tort, they rarely went so far as to rule out the potential of such a tort. The body of case law, together with the recognition by the Supreme Court of Canada of the protection of privacy under s. 8 of the Canadian Charter of Rights and Freedoms, led him to conclude, at paras. 29 and 31:

2012 ONCA 32 (CanLII)

> With advancements in technology, personal data of an individual can now be collected, accessed (properly and improperly) and disseminated more easily than ever before. There is a resulting increased concern in our society about the risk of unauthorized access to an individual's personal information. The traditional torts such as nuisance, trespass and harassment may not provide adequate protection against infringement of an individual's privacy interests. Protection of those privacy interests by providing a common law remedy for their violation would be consistent with Charter values and an "incremental revision" and logical extension of the existing jurisprudence. . . . . .

Even if the plaintiff's claim for invasion of privacy were classified as "novel" (which, in any event, is not a proper basis for dismissing it), the foregoing analysis leads me to conclude that the time has come to recognize invasion of privacy as a tort in its own right. It therefore follows that it is neither plain nor obvious that the plaintiff's action cannot succeed on the basis that he has not pleaded a reasonable cause of action.

[32] Somwar was followed in Nitsopoulos v. Wong, [2008] O.J. No. 3498, 298 D.L.R. (4th) 265 (S.C.J.). See, also, Capan v. Capan, [1980] O.J. No. 1361, 14 C.C.L.T. 191 (H.C.J.); Lipiec v. Borsa, [1996] O.J. No. 3819, 31 C.C.L.T. (2d) 294 (Gen. Div.); [page252] Shred-Tech Corp. v. Viveen, [2006] O.J. No. 4893, 2006 CarswellOnt 7762 (S.C.J.), at para. 30. Compare Haskett v. Trans Union of Canada Inc., [2001] O.J. No. 4949, 10 C.C.L.T. (3d) 128 (S.C.J.).

(ii) Provincial case law

[33] While there appears to be no appellate decision from another province definitively establishing a common law right of action for intrusion upon seclusion, dicta in at least two cases support the idea. In Motherwell v. Motherwell, [1976] A.J. No. 555, 73 D.L.R. (3d) 62 (S.C. App. Div.), a case involving harassing telephone calls, the court held the plaintiff had a right of action in nuisance but added, at para. 25, that "the interests of our developing jurisprudence would be better served by approaching invasion of privacy by abuse of the telephone system as a

new category, rather than seeking by rationalization to enlarge" the existing categories of nuisance.

[34] The issue in Dyne Holdings Ltd. v. Royal Insurance Co. of Canada, [1996] P.E.I.J. No. 28, 135 D.L.R. (4th) 142 (S.C. App. Div.), leave to appeal to S.C.C. refused [1996] S.C.C.A. No. 344, was an insurer's duty to defend. One aspect of the claim arguably amounted to an invasion of privacy akin to the category of intrusion upon exclusion. After a review of the jurisprudence, Carruthers C.J. observed, at p. 160 D.L.R.: "the courts in Canada are not far from recognizing a common law right to privacy if they have not already done so. It is also clear that Canadian courts do not hesitate to protect privacy interests under some recognized tort."
(iii) Euteneier v. Lee

[35] This brings me to Euteneier v. Lee, and the statement from the case that the motion judge here found to be dispositive. In my respectful view, the motion judge's reliance on Euteneier for the proposition Ontario law excludes any and all claims for breach of privacy interests was misplaced. The plaintiff in Euteneier had been arrested and detained on criminal charges. She complained of her treatment while in police custody and sought damages for negligence, assault, civil conspiracy and breach of her ss. 7, 9, 12 and 15 rights under the Charter. The trial judge found that based on the appellant's own behaviour while in custody, which included an apparent suicide attempt, the defendant police officers had conducted themselves in a reasonable and prudent manner. They had breached no duty nor exhibited any bad faith or malice to ground any of the claims she had asserted and the claim was dismissed. [page253]

[36] The plaintiff's first appeal was to the Divisional Court on account of the quantum of damages assessed by the trial judge: see Euteneier v. Lee, [2003] O.J. No. 4239, 113 C.R.R. (2d) 44 (Div. Ct.). The Divisional Court allowed the appeal in part. A new trial was ordered on the issue of whether, after disrobing the plaintiff to prevent her from continuing to use articles of clothing to hang herself, the police were negligent, committed assault or breached the plaintiff's Charter rights [at para. 42] "by confining her in the [holding cell] and by handcuffing her to its bars without taking steps to maintain her dignity or to prevent her humiliation".

[37] The defendants appealed the order for a new trial to this court and the plaintiff cross-appealed seeking a new trial on all issues. This court allowed the appeal and dismissed the cross-appeal. Cronk J.A., writing for the court, held that the Divisional Court had failed to apply the proper standard of review with respect to the trial judge's factual findings. Of particular significance to the point at issue on this appeal is Cronk J.A.'s observation, at paras. 47 and 56. She noted that the plaintiff did not plead that the defendants owed her any duty to maintain her dignity and prevent her humiliation, and that any reference to her dignity or privacy interests were as particulars of other causes of action or as the consequences she alleged flowed from the actions of the defendants. Cronk J.A. held that the Divisional Court had erred in treating those allegations as stand-alone causes of action.

[38] Accordingly, it is clear from the context and from the words used that the passage, at para. 63, relied on by the motion judge -- "[the plaintiff] properly conceded in oral argument before this court that there is no 'free standing' right to dignity or privacy under the Charter or at common law" -- could not have been intended to express any dispositive or definitive opinion as

to the existence of a tort claim for breach of a privacy interest. No such claim had been advanced by the plaintiff, no argument on that point was addressed by counsel, and in my view, no opinion on that point was expressed by this court.

(c) Charter jurisprudence

[39] Charter jurisprudence identifies privacy as being worthy of constitutional protection and integral to an individual's relationship with the rest of society and the state. The Supreme Court of Canada has consistently interpreted the Charter's s. 8 protection against unreasonable search and seizure as protecting the underlying right to privacy. In Hunter v. Southam Inc., [1984] 2 S.C.R. 145, [1984] S.C.R. No. 36, at pp. 158-59 S.C.R., [page254] Dickson J. adopted the purposive method of Charter interpretation and observed that the interests engaged by s. 8 are not simply an extension of the concept of trespass, but rather are grounded in an independent right to privacy held by all citizens.

[40] In R. v. Dyment, [1988] 2 S.C.R. 417, [1988] S.C.J. No. 82, at p. 427 S.C.R., La Forest J. characterized the s. 8 protection of privacy as "[g]rounded in a man's physical and moral autonomy" and stated that "privacy is essential for the well-being of the individual. For this reason alone, it is worthy of constitutional protection, but it also has profound significance for the public order." La Forest J. added, at p. 429 S.C.R.:

> In modern society, especially, retention of information about oneself is extremely important. We may, for one reason or another, wish or be compelled to reveal such information, but situations abound where the reasonable expectations of the individual that the information shall remain confidential to the persons to whom, and restricted to the purposes for which it is divulged, must be protected.

[41] Charter jurisprudence has recognized three distinct privacy interests: Dyment, at pp. 428-29 S.C.R.; R. v. Tessling, [2004] 3 S.C.R. 432, [2004] S.C.J. No. 63, 2004 SCC 67, at paras. 19-23. The first two interests, personal privacy and territorial privacy, are deeply rooted in the common law. Personal privacy, grounded in the right to bodily integrity, protects "the right not to have our bodies touched or explored to disclose objects or matters we wish to conceal". Territorial privacy protects the home and other spaces where the individual enjoys a reasonable expectation of privacy. The third category, informational privacy, is the interest at stake in this appeal. In Tessling, Binnie J. described it, at para. 23:

> Beyond our bodies and the places where we live and work, however, lies the thorny question of how much information about ourselves and activities we are entitled to shield from the curious eyes of the state (R. v. S.A.B., [2003] 2 S.C.R. 678, 2003 SCC 60). This includes commercial information locked in a safe kept in a restaurant owned by the accused (R. v. Law, [2002] 1 S.C.R. 227, 2002 SCC 10, at para. 16). Informational privacy has been defined as "the claim of individuals, groups, or institutions to determine for themselves when, how, and to what extent information about them is communicated to others": A. F. Westin, Privacy and Freedom (1970), at p. 7. Its protection is predicated on the assumption that all information about a person is in a fundamental way his own, for him to communicate or retain . . . as he sees fit.

(Report of a Task Force established jointly by Department of Communications/Department of Justice, Privacy and Computers
(1972), at p. 13).

[42] This characterization would certainly include Jones' claim to privacy in her banking records. [page255]

[43] In Hill v. Church of Scientology of Toronto (1995), 24 O.R. (3d) 865, [1995] 2 S.C.R. 1130, [1995] S.C.J. No. 64, Cory J. observed, at para. 121, that the right to privacy has been accorded constitutional protection and should be considered as a Charter value in the development of the common law tort of defamation. In Hill, Cory J. stated, at para. 121: "reputation is intimately related to the right to privacy which has been accorded constitutional protection". See, also, R. v. O'Connor, [1995] 4 S.C.R. 411, [1995] S.C.J. No. 98, at para. 113, per L'Heureux-Dubé J.: identifying privacy as "an essential component of what it means to be 'free'".

[44] The Charter treatment of privacy accords with art. 12 of the Universal Declaration of Human Rights, G.A. Res. 271(III), UNGAOR, 3d Sess., Supp. No. 13, UN. Doc. A/810 (1948) 71, which provides that "[n]o one shall be subjected to arbitrary interference with his privacy, home or correspondence" and proclaims that "[e]veryone has the right to the protection of the law against such interference or attacks". Privacy is also recognized as a fundamental human right by art. 17 of the International Covenant on Civil and Political Rights, 19 December 1966, 999 U.N.T.S. 171.

[45] While the Charter does not apply to common law disputes between private individuals, the Supreme Court has acted on several occasions to develop the common law in a manner consistent with Charter values: see R.W.D.S.U., Local 580 v. Dolphin Delivery Ltd., [1986] 2 S.C.R. 573, [1986] S.C.J. No. 75, at p. 603 S.C.R.; R. v. Salituro, [1991] 3 S.C.R. 654, [1991] S.C.J. No. 97, at pp. 666 and 675 S.C.R.; Hill v. Scientology, at p. 1169 S.C.R.; R.W.D.S.U., Local 558 v. Pepsi- Cola Canada Beverages (West) Ltd., [2002] 1 S.C.R. 156, [2002] S.C.J. No. 7, 2002 SCC 8; Grant v. Torstar Corp., [2009] 3 S.C.R. 640, [2009] S.C.J. No. 61, 2009 SCC 61.

[46] The explicit recognition of a right to privacy as underlying specific Charter rights and freedoms, and the principle that the common law should be developed in a manner consistent with Charter values, supports the recognition of a civil action for damages for intrusion upon the plaintiff's seclusion: see John D.R. Craig, "Invasion of Privacy and Charter Values: The Common-Law Tort Awakens" (1997), 42 McGill L.J. 355.
(d) Legislation
(i) Acts relating to private information

[47] The federal and Ontario governments have enacted a complex legislative framework addressing the issue of privacy. [page256] These include Personal Information Protection and Electronic Documents Act, S.C. 2000, c. 5 ("PIPEDA"); Personal Health Information Protection Act, 2004, S.O. 2004, c. 3, Sch. A; Freedom of Information and Protection of Privacy Act, R.S.O. 1990, c. F.31; Municipal Freedom of Information and Protection of Privacy Act, R.S.O. 1990, c. M.56; Consumer Reporting Act, R.S.O. 1990, c. C.33.

[48] Tsige argues that it is not open to this court to adapt the common law to deal with the invasion of privacy on the ground that privacy is already the subject of legislation in Ontario and Canada that reflects carefully considered economic and policy choices. It is submitted that expanding the reach of the common law in this area would interfere with these carefully crafted regimes and that any expansion of the law relating to the protection of privacy should be left to Parliament and the legislature.

[49] I am not persuaded that the existing legislation provides a sound basis for this court to refuse to recognize the emerging tort of intrusion upon seclusion and deny Jones a remedy. In my view, it would take a strained interpretation to infer from these statutes a legislative intent to supplant or halt the development of the common law in this area: see Robyn Bell, "Tort of Invasion of Privacy -- Has its Time Finally Come?" in Archibald and Cochrane, eds., Annual Review of Civil Litigation (Toronto: Carswell, 2005), at p. 225.

[50] PIPEDA is federal legislation dealing with "organizations" subject to federal jurisdiction and does not speak to the existence of a civil cause of action in the province. While BMO is subject to PIPEDA, there are at least three reasons why, in my view, Jones should not be restricted to the remedy of a PIPEDA complaint against BMO. First, Jones would be forced to lodge a complaint against her own employer rather than against Tsige, the wrongdoer. Second, Tsige acted as a rogue employee contrary to BMO's policy and that may provide BMO with a complete answer to the complaint. Third, the remedies available under PIPEDA do not include damages, and it is difficult to see what Jones would gain from such a complaint.

[51] The Ontario legislation essentially deals with freedom of information and the protection of certain private information with respect to government and other public institutions. Like PIPEDA, it has nothing to do with private rights of action between individuals.
(ii) Provincial Privacy Acts

[52] Four common law provinces currently have a statutorily created tort of invasion of privacy: British Columbia, [page257] Privacy Act, R.S.B.C. 1996, c. 373; Manitoba, Privacy Act, R.S.M. 1987, c. P125; Saskatchewan, Privacy Act, R.S.S. 1978, c. P-24; and Newfoundland, Privacy Act, R.S.N.L., 1990, c. P-22. All four Privacy Acts are similar. They establish a limited right of action, whereby liability will only be found if the defendant acts wilfully (not a requirement in Manitoba) and without a claim of right. Moreover, the nature and degree of the plaintiff's privacy entitlement is circumscribed by what is "reasonable in the circumstances".

[53] Under Quebec law, the right to privacy is explicitly protected both by arts. 3 and 35-37 of the Civil Code of Québec, S.Q. 1991, c. 64 and by s. 5 of the Charter of Human Rights and Freedoms, R.S.Q. c. C-12. See Robbins v. Canadian Broadcasting Corp. (1957), 12 D.L.R. (2d) 35(Que. S.C.); Aubry v. Éditions Vice-Versa, [1998] 1 S.C.R. 591, [1998] S.C.J. No. 30; H. Patrick Glenn, "The Right to Privacy in Quebec Law" in Dale Gibson, ed., Aspects of Privacy Law: Essays in Honour of John M. Sharp (Toronto: Butterworths, 1980), at ch. 3.

[54] Significantly, however, no provincial legislation provides a precise definition of what constitutes an invasion of privacy. The courts in provinces with a statutory tort are left with more or less the same task as courts in provinces without such statutes. The nature of these acts does

not indicate that we are faced with a situation where sensitive policy choices and decisions are best left to the legislature. To the contrary, existing provincial legislation indicates that when the legislatures have acted, they have simply proclaimed a sweeping right to privacy and left it to the courts to define the contours of that right.

(e) Other jurisdictions

(i) United States

[55] As already indicated, most American states have recognized a right of action for invasion of privacy rights as defined by the four categories identified by Prosser and now adopted by the Restatement.

> [56] Generally speaking, to make out cause of action for intrusion upon seclusion, a plaintiff must show (1) an unauthorized intrusion; (2) that the intrusion was highly offensive to the reasonable person; (3) the matter intruded upon was private; and [page258] (4) the intrusion caused anguish and suffering. See William Prosser, Law of Torts, 4th ed. (West Publishing Company, 1971), at pp. 808-12.

[57] The first element indicates that the tort focuses on the act of intrusion, as opposed to dissemination or publication of information: Roe v. Cheyenne Mt. Conf. Resort, Inc., 124 F.3d 1221 (10th Cir. 1997), at p. 1236 F.3d. The focus of the court in determining whether this element is satisfied is on "the type of interest involved and not the place where the invasion occurs": Evans v. Detlefsen, 857 F.2d 330 (6th Cir. 1988), at p. 338 F.2d.

[58] With regard to the second element, factors to be considered in determining whether a particular action is highly offensive include the degree of intrusion, the context, conduct and circumstances of the intrusion, the tortfeasor's motives and objectives and the expectations of those whose privacy is invaded: see J.D. Lee and Barry A. Lindahl, Modern Tort Law: Liability & Litigation, 2nd ed., looseleaf (West Group, 2002), at 48:6.

[59] In determining the third element, the plaintiff must establish that the expectation of seclusion or solitude was objectively reasonable. The courts have adopted the two-prong test used in the application of the Fourth Amendment of the United States Constitution. The first step is demonstrating an actual subjective expectation of privacy, and the second step asks if that expectation is objectively reasonable: Katz v. United States, 389 U.S. 347, 88 S. Ct. 507 (1967), at p. 361 U.S.

[60] The fourth element has received considerably less attention as anguish and suffering are generally presumed once the first three elements have been established.

(ii) Commonwealth jurisdictions

[61] In England, privacy is expressly protected by art. 8 of the Convention for the Protection of Human Rights and Fundamental Freedoms, 4 November 1950, 213 U.N.T.S. 221 at 223, incorporated by the Human Rights Act 1998 (U.K.), 1998 c. 42:

"Everyone has the right to respect for his private and family life, his home and his correspondence." However, the House of Lords held in Wainwright v. Home Office, [2003] UKHL 53, [2003] 4 All E.R. 969 (H.L.), at para. 31, that while privacy may be "a value which

underlies the existence of a rule of law (and may point the direction in which the law should develop)", privacy is not "a principle of law in itself" capable of supporting a private law right if action for damages. Yet the next year, in Campbell v. MGN Ltd., [2004] UKHL 22, [2004] 2 A.C. 457 (H.L.), the House of Lords granted an injunction to restrain on grounds of breach [page259] of confidence publication of newspaper stories and photographs of a supermodel leaving a drug addiction treatment facility. Lord Hoffman held, in Campbell, at para. 51, that the tort of breach of confidence had evolved into a form of privacy protection, described by the court as a tort of misuse of private information:

> [T]he new approach takes a different view of the underlying value which the law protects. Instead of the cause of action being based upon the duty of good faith applicable to confidential personal information and trade secrets alike, it focuses upon the protection of human autonomy and dignity
> -- the right to control the dissemination of information about one's private life and the right to the esteem and respect of people.

[62] The reformulated action for breach of confidence has been held to embrace damages claims to protect privacy interests that would easily fall within the intrusion upon seclusion category: see Mosely v. News Group Newspapers Ltd., [2008] EWHC 1777, [2008] All E.R. (D) 322 (Q.B.), at para. 7: "[t]he law now affords protection to information in respect of which there is a reasonable expectation of privacy, even in circumstances where there is no pre-existing relationship giving rise of itself to an enforceable duty of confidence".

> [63] In Lenah Game Meats Pty Ltd v. Australian Broadcasting Corp., [2001] H.C.A. 63, 185 A.L.R. 1 (H.C. Aust.), the High Court of Australia expressly left the door open to the recognition of a common law right to privacy despite earlier authority to the contrary. This was applied in Grosse v. Purvis, [2003] Q.D.C. 151, Aust. Torts Reports 81-706, where the elements for the tort were found to be (1) a willed act by the defendant; (2) which intrudes upon the privacy or seclusion of the plaintiff; (3) in a manner which would be considered highly offensive to a reasonable person of ordinary sensibilities; and (4) which causes the plaintiff detriment in the form of mental, psychological or emotional harm or distress or which prevents or hinders the plaintiff from doing an act which she is lawfully entitled to do.

[64] In Hosking v. Runting, [2004] NZCA 34, [2005] 1 NZLR 1 (C.A.), the New Zealand Court of Appeal recognized a common law tort of breach of privacy that is separate and distinct from the tort of breach of confidence. Although the court dismissed the claim on the merits, the majority judgment confirmed the existence of a privacy tort in New Zealand dealing with wrongful [page260] publication of private facts to address publicity that is (at para. 126) "truly humiliating and distressful or otherwise harmful". The elements of the tort were described, at para. 117:

> 1. The existence of facts in respect of which there is a reasonable expectation of privacy; and

2. Publicity given to those private facts must be considered highly offensive to an objective reasonable person. 2. Defining the tort of intrusion upon seclusion
(a) Introduction

[65] In my view, it is appropriate for this court to confirm the existence of a right of action for intrusion upon seclusion. Recognition of such a cause of action would amount to an incremental step that is consistent with the role of this court to develop the common law in a manner consistent with the changing needs of society.
(b) Rationale

[66] The case law, while certainly far from conclusive, supports the existence of such a cause of action. Privacy has long been recognized as an important underlying and animating value of various traditional causes of action to protect personal and territorial privacy. Charter jurisprudence recognizes privacy as a fundamental value in our law and specifically identifies, as worthy of protection, a right to informational privacy that is distinct from personal and territorial privacy. The right to informational privacy closely tracks the same interest that would be protected by a cause of action for intrusion upon seclusion. Many legal scholars and writers who have considered the issue support recognition of a right of action for breach of privacy: see, e.g., P. Winfield, "Privacy" (1931), 47 Law Q. Rev. 23; D. Gibson, "Common Law Protection of Privacy: What to do Until the Legislators Arrive" in Lewis Klar, ed., Studies in Canadian Tort Law (Toronto:
Butterworths, 1977) 343; Robyn M. Ryan Bell, "Tort of Invasion of Privacy -- Has its Time Finally Come?" in Todd Archibald and Michael Cochrane, eds., Annual Review of Civil Litigation (Toronto: Carswell, 2005) 225; Peter Burns, "The Law and Privacy: The Canadian Experience" (1976), 54 Can. Bar Rev. 1; John D.R. Craig, "Invasion of Privacy and Charter Values: The Common-Law Tort Awakens" (1997), 52 McGill L.J. 355.

[67] For over 100 years, technological change has motivated the legal protection of the individual's right to privacy. In modern times, the pace of technological change has accelerated exponentially. Legal scholars such as Peter Burns have written [page261] of "the pressing need to preserve 'privacy' which is being threatened by science and technology to the point of surrender": "The Law and Privacy: the Canadian Experience", at p. 1. See, also, Alan Westin, Privacy and Freedom (New York:
Atheneum, 1967). The Internet and digital technology have brought an enormous change in the way we communicate and in our capacity to capture, store and retrieve information. As the facts of this case indicate, routinely kept electronic databases render our most personal financial information vulnerable. Sensitive information as to our health is similarly available, as are records of the books we have borrowed or bought, the movies we have rented or downloaded, where we have shopped, where we have travelled and the nature of our communications by cellphone, e-mail or text message.

[68] It is within the capacity of the common law to evolve to respond to the problem posed by the routine collection and aggregation of highly personal information that is readily accessible in electronic form. Technological change poses a novel threat to a right of privacy that has been protected for hundreds of years by the common law under various guises and that, since 1982 and the Charter, has been recognized as a right that is integral to our social and political order.

[69] Finally, and most importantly, we are presented in this case with facts that cry out for a remedy. While Tsige is apologetic and contrite, her actions were deliberate, prolonged and shocking. Any person in Jones' position would be profoundly disturbed by the significant intrusion into her highly personal information. The discipline administered by Tsige's employer was governed by the principles of employment law and the interests of the employer and did not respond directly to the wrong that had been done to Jones. In my view, the law of this province would be sadly deficient if we were required to send Jones away without a legal remedy.
(c) Elements

[70] I would essentially adopt as the elements of the action for intrusion upon seclusion the Restatement (Second) of Torts (2010) formulation which, for the sake of convenience, I repeat here:

> One who intentionally intrudes, physically or otherwise, upon the seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the invasion would be highly offensive to a reasonable person.

[71] The key features of this cause of action are, first, that the defendant's conduct must be intentional, within which I would [page262] include reckless; second, that the defendant must have invaded, without lawful justification, the plaintiff's private affairs or concerns; and third, that a reasonable person would regard the invasion as highly offensive causing distress, humiliation or anguish. However, proof of harm to a recognized economic interest is not an element of the cause of action. I return below to the question of damages, but state here that I believe it important to emphasize that given the intangible nature of the interest protected, damages for intrusion upon seclusion will ordinarily be measured by a modest conventional sum.
(d) Limitations

[72] These elements make it clear that recognizing this cause of action will not open the floodgates. A claim for intrusion upon seclusion will arise only for deliberate and significant invasions of personal privacy. Claims from individuals who are sensitive or unusually concerned about their privacy are excluded: it is only intrusions into matters such as one's financial or health records, sexual practises and orientation, employment, diary or private correspondence that, viewed objectively on the reasonable person standard, can be described as highly offensive.

> [73] Finally, claims for the protection of privacy may give rise to competing claims. Foremost are claims for the protection of freedom of expression and freedom of the press. As we are not confronted with such a competing claim here, I need not consider the issue in detail. Suffice it to say, no right to privacy can be absolute and many claims for the protection of privacy will have to be reconciled with, and even yield to, such competing claims. A useful analogy may be found in the Supreme Court of Canada's elaboration of the common law of defamation in Grant v. Torstar where the court held, at para. 65, that "[w]hen proper weight is given to the constitutional value of free expression on matters of public interest, the balance tips in favour of broadening the defences available to those who communicate facts it is in the public's interest to know." 3. Damages
> (a) Introduction

[74] As I have indicated, proof of actual loss is not an element of the cause of action for intrusion upon seclusion. However, the question necessarily arises: what is the appropriate approach to damages in cases, like the present, where the plaintiff has suffered no pecuniary loss? [page263]

[75] Where the plaintiff has suffered no provable pecuniary loss, the damages fall into the category of what Professor Stephen M. Waddams, The Law of Damages, looseleaf (Toronto: Canada Law Book, 2011), at para. 10.50, describes as "symbolic" and others have labelled as "moral" damages: see Dulude v. Canada, [2000] F.C.J. No. 1454, 192 D.L.R. (4th) 714 (C.A.), at para. 30. They are awarded "to vindicate rights or symbolize recognition of their infringement": Waddams, at para. 10.50. I agree with Prof. Waddams' observation that a conventional range of damages is necessary to maintain "consistency, predictability and fairness between one plaintiff and another".

[76] Guidance in determining an appropriate range of damages can be gleaned from existing case law from Ontario as well as from the provinces where there is a statutory cause of action.
(b) Damages under Ontario case law

[77] Although the tort of intrusion upon exclusion has not been fully recognized in Ontario law, several cases award damages for invasion of privacy in conjunction with, or under the head of, a traditional tort such as nuisance or trespass. These claims typically involve intangible harm such as hurt feelings, embarrassment or mental distress, rather than damages for pecuniary losses. I attach, as Appendix A, a summary of these cases and the damages awarded and will briefly discuss the facts of some of those cases here.

[78] In Saccone v. Orr, the court found that the proven damages were minimal; the plaintiff had not lost his job or suffered any material loss. However, acknowledging that the plaintiff's privacy was invaded and that he was embarrassed and felt that his confidence had been betrayed, the court awarded damages in the amount of $500. Similarly, in Provincial Partitions Inc. v. Ashcor Inplant Structures Ltd., [1993] O.J. No. 4685, 50 C.P.R. (3d) 497 (Gen. Div.), the judge found that the defendant committed the tort of nuisance by invasion of privacy through abuse of telephone communications when they called the plaintiff, a competitor company, dozens of times. The judge awarded only $500 against each defendant and because the defendants had already ceased placing the phone calls, the judge declined to provide injunctive relief.

[79] In Roth v. Roth, the plaintiff claimed $100,000 in damages for intimidation, harassment and invasion of privacy, in addition to approximately $400,000 in additional damages for other tortious acts. The judge found that because the various causes of action overlapped, damages were best addressed as a lump sum and that the plaintiff was entitled to aggravated [page264] damages. Despite the lack of evidence of actual physical or psychological harm, the plaintiff was awarded the sum of $20,000.

[80] MacKay v. Buelow, [1995] O.J. No. 867, 24 C.C.L.T. (2d) 184 (Gen. Div.) involved a family law dispute in which the defendant had harassed his ex-wife over a period of four months. He continuously called her, stalked her on several occasions, threatened to kill her and threatened to kidnap their child and take her to another country. The trial judge found that the plaintiff was entitled to a remedy for the [at para. 17] "calculated, devilishly creative and entirely

reprehensible conduct by the defendant" and awarded $25,000 general damages, $15,000 aggravated damages, $15,000 punitive damages, together with special damages and a significant award for the future medical care she would require.

(c) Damages under provincial legislation

[81] The four provincial privacy acts do not require proof of damage as an element of the cause of action. The Manitoba Privacy Act, however, is the only statute that provides specific guidance with regard to the determination of damages:

Considerations in awarding damages

> 4(2) In awarding damages in an action for a violation of privacy of a person, the court shall have regard to all the circumstances of the case including
>
>> (a) the nature, incidence and occasion of the act, conduct or publication constituting the violation of privacy of that person;
>>
>> (b) the effect of the violation of privacy on the health, welfare, social, business or financial position of that person or his family;
>>
>> (c) any relationship, whether domestic or otherwise, between the parties to the action;
>>
>> (d) any distress, annoyance or embarrassment suffered by that person or his family arising from the violation of privacy; and
>>
>> (e) the conduct of that person and the defendant, both before and after the commission of the violation of privacy, including any apology or offer of amends made by the defendant.

[82] The other provincial statutes leave this determination to judicial discretion. The case law, however, demonstrates that courts frequently consider the same factors enumerated in the Manitoba Act. Appendix B contains a summary of these cases, mostly from British Columbia.

[83] Absent proof of actual pecuniary loss, the awards are, for the most part, modest. For example, in Heckert v. 5470 Investments Ltd., [2008] B.C.J. No. 1854, 2008 BCSC 1298, 299 D.L.R. (4th) 689, [page265] the judge noted [at para. 148] that the only evidence regarding damages were "Ms. Heckert's general statements that she felt stressed and needed to see her chiropractor and acupuncturist for additional visits". The judge still found that Ms. Heckert's landlord had invaded her privacy by installing close imaging cameras in the hallway outside of her door, but that the lack of medical evidence meant that the award could be not more than nominal damages of $3,500.

[84] Egregious conduct, however, has attracted awards of aggravated damages. In Watts v. Klaemt, [2007] B.C.J. No. 980, 2007 BCSC 662, 71 B.C.L.R. (4th) 362, the plaintiff was terminated from her job when her next door neighbour, the defendant, recorded her phone calls

and after discovering she was perpetrating fraud against her company, reported this to her employer. The plaintiff claimed general damages for emotional pain and suffering, loss of enjoyment of life and diminution of her reputation as well as punitive or exemplary damages for the invasion of privacy. In assessing the quantum of damages, the judge considered the degree to which the plaintiff's life was destroyed following the invasion of privacy -- notably the termination of her employment, the need to seek psychological care for depression and post-traumatic stress disorder -- and weighed this against the plaintiff's own misconduct. The judge awarded [at para. 68] $30,000, including aggravated damages for the "substantial degree of suffering experienced by the plaintiff".

[85] The benchmark case for exemplary or punitive damages for an invasion of privacy under the British Columbia regime is Malcolm v. Fleming, [2000] B.C.J. No. 2400, 2000 CarswellBC 1316 (S.C.). The defendant, the plaintiff's landlord, installed a video camera in the plaintiff's apartment and recorded her in various stages of undress in her bathroom and bedroom. The judge awarded punitive damages of $35,000 in addition to $15,000 in general damages. In determining the figure for punitive damages the judge considered such factors as the intimate location of the invasion, the relationship between the parties as landlord and tenant as having a high expectation of privacy, the substantial premeditation and planning, the additional humiliation of discovery prior to trial, the fact that a permanent record of the violation existed creating the potential for future embarrassment and the fact that there was no other means of punishment as there was no criminal act perpetrated.

[86] Other cases have awarded punitive damages in consideration of society's abhorrence of the defendant's actions, a lack of remorse on the part of the defendant and the desire to promote specific deterrence: see [page266] Watts v. Klaemt; Lee v. Jacobson; Weber v. Jacobson, [1992] B.C.J. No. 132, 87 D.L.R. (4th) 401 (S.C.), revd [1994] B.C.J. No. 2459, 120 D.L.R. (4th) 155 (C.A.). In Hollinsworth v. BCTV, a division of Westcom TV Group Ltd., [1996] B.C.J. No. 2638, 34 C.C.L.T. (2d) 95 (S.C.), affd [1998] B.C.J. No. 241, 1998 B.C.C.A. 304 (C.A.), for example, the court assessed the plaintiff's damages for both breach of confidentiality and for the invasion of privacy at $15,000. The court there noted, at para. 27 (S.C.), that these damages were higher than usual for breaches of the Privacy Act in consideration of the "reprehensible conduct" of the defendant. In Hollinsworth, the defendant lied to a reporter, saying that he had consent to use a videotape of the plaintiff undergoing surgery to treat baldness. The video was then aired during a news broadcast.

(d) Determining the quantum of damages

[87] In my view, damages for intrusion upon seclusion in cases where the plaintiff has suffered no pecuniary loss should be modest but sufficient to mark the wrong that has been done. I would fix the range at up to $20,000. The factors identified in the Manitoba Privacy Act, which, for convenience, I summarize again here, have also emerged from the decided cases and provide a useful guide to assist in determining where in the range the case falls:

(1) the nature, incidence and occasion of the defendant's wrongful act; (2) the effect of the wrong on the plaintiff's health, welfare, social, business or financial position; (3) any relationship, whether domestic or otherwise, between the parties; (4) any distress, annoyance or embarrassment suffered by the plaintiff arising from the wrong; and (5) the

conduct of the parties, both before and after the wrong, including any apology or offer of amends made by the defendant.

[88] I would neither exclude nor encourage awards of aggravated and punitive damages. I would not exclude such awards as there are bound to be exceptional cases calling for exceptional remedies. However, I would not encourage such awards as, in my view, predictability and consistency are paramount values in an area where symbolic or moral damages are awarded and absent truly exceptional circumstances, plaintiffs should be held to the range I have identified. [page267] 3. Application to this case

[89] It is my view that, in this case, Tsige committed the tort of intrusion upon seclusion when she repeatedly examined the private bank records of Jones. These acts satisfy the elements laid out above: the intrusion was intentional, it amounted to an unlawful invasion of Jones' private affairs, it would be viewed as highly offensive to the reasonable person and caused distress, humiliation or anguish.

[90] In determining damages, there are a number of factors to consider. Favouring a higher award is the fact that Tsige's actions were deliberate and repeated and arose from a complex web of domestic arrangements likely to provoke strong feelings and animosity. Jones was understandably very upset by the intrusion into her private financial affairs. On the other hand, Jones suffered no public embarrassment or harm to her health, welfare, social, business or financial position and Tsige has apologized for her conduct and made genuine attempts to make amends. On balance, I would place this case at the mid- point of the range I have identified and award damages in the amount of $10,000. Tsige's intrusion upon Jones' seclusion, this case does not, in my view, exhibit any exceptional quality calling for an award of aggravated or punitive damages.

Issue 2. Did the motion judge err with respect to costs?

[91] As I would set aside the judgment in favour of Tsige and grant judgment in favour of Jones, it is not necessary for me to consider Jones' contention that the motion judge erred in his costs award. Disposition

[92] Accordingly, I would allow the appeal, set aside the summary judgment dismissing the action and in its place substitute an order granting summary judgment in Jones' favour for damages in the amount of $10,000.

[93] Both parties have filed bills of costs asking for significant awards. In my view, it is appropriate to take into account the novel issue raised by this case which has clearly broken new ground. There is discretion to depart from the usual order in cases of novelty. In my view, in the unusual circumstances of this case, the parties should bear their own costs throughout and I would make no order as to costs.

Appeal allowed. [page268] Appendix A: Ontario damage awards

[QL:GRAPHIC NAME="108OR3d241-1.jpg"/] [page269]

[QL:GRAPHIC NAME="108OR3d241-2.jpg"/] [page270] Appendix B: Damage awards under provincial privacy legislation

[QL:GRAPHIC NAME="108OR3d241-3.jpg"/] [page271]

[QL:GRAPHIC NAME="108OR3d241-4.jpg"/] [page272]

**13**

## Merrifield v. The Attorney General of Canada et al.
## [Indexed as: Merrifield v. Canada (Attorney General)]

Ontario Reports

Court of Appeal for Ontario

Juriansz, D.M. Brown and Huscroft JJ.A.

March 15, 2019

**145 O.R. (3d) 494**   |   2019 ONCA 205

## Case Summary

**Torts — Harassment — Trial judge erring in finding that common law tort of harassment exists in Ontario — No good reason existing for recognizing tort of harassment.**

**Torts — Intentional infliction of mental suffering — Trial judge's finding that plaintiff had established elements of intentional infliction of mental suffering flowing from palpable and overriding factual errors and reliance on entirely irrelevant matter — Defendants' appeal allowed.**

The plaintiff brought an action for damages arising from alleged harassment and bullying by Royal Canadian Mounted Police ("RCMP") managerial members while the plaintiff was serving with the RCMP. The action was allowed. The trial judge found that the common law tort of harassment exists in Ontario and that the elements of that tort were satisfied. She also found that the defendant P's decision to commence a formal investigation into whether the plaintiff's use of his credit card contravened the RCMP's Code of Conduct without first asking the plaintiff for an explanation for apparent irregularities in the use of the credit card was flagrant and outrageous conduct. P should have known it would cause the plaintiff harm, that the plaintiff suffered from depression and post-traumatic stress disorder as a result of the RCMP actions, and that the plaintiff had therefore established the tort of intentional infliction of mental suffering ("IIMS"). The defendants appealed.

**Held**, the appeal should be allowed.

The trial judge erred by recognizing a tort of harassment. The cases relied on by the trial judge were not authority for recognizing the existence of a tort of harassment in Ontario, still less for establishing either a new tort or its requisite elements. This was not a case whose facts cried out for the creation of a novel legal remedy. There were other legal remedies available to redress conduct that was alleged to constitute harassment, one of which was the tort of IIMS. There were good reasons for opposing the recognition of the tort of harassment at this time.

The trial judge's finding that P's decision to order a formal Code of Conduct investigation into the plaintiff's credit card usage was flagrant and outrageous was based on palpable and overriding factual errors and on a consideration -- the fact that P himself had been identified as attempting

to procure a prostitute in a john sting operation -- that was completely irrelevant. The trial judge's reliance on the irrelevant consideration vitiated her entire finding with respect to the Code of Conduct investigation, and also called into question her evaluation of the rest of P's evidence. The tort of IIMS was not made out as the plaintiff failed to establish that P's conduct was flagrant and outrageous. The trial judge also erred in finding that the second and third elements of the tort were established. There was no evidence that P's conduct was intended to cause harm or that he knew that harm was substantially certain to follow from his decision to order the investigation, and the evidence did not establish that P's conduct caused the plaintiff to suffer a visible and probable illness. [page495]

*Bhasin v. Hrynew*, [2014] 3 S.C.R. 494, [2014] S.C.J. No. 71, 2014 SCC 71, 379 D.L.R. (4th) 385, 464 N.R. 254, [2014] 11 W.W.R. 641, J.E. 2014-1992, 4 Alta. L.R. (6th) 219, 27 B.L.R. (5th) 1, 20 C.C.E.L. (4th) 1, EYB 2014-244256, 2015 CCLG para. 25-556, 2014EXP-3530, 245 A.C.W.S. (3d) 832; *John v. Cusack*, [2015] O.J. No. 4182, 2015 ONSC 5004 (S.C.J.); *Jones v. Tsige* (2012), 108 O.R. (3d) 241, [2012] O.J. No. 148, 2012 ONCA 32, 346 D.L.R. (4th) 34, 287 O.A.C. 56, 96 B.L.R. (4th) 1, 89 C.C.L.T. (3d) 221, [2012] CLLC para. 210-012, 251 C.R.R. (2d) 124, [2012] I.L.R. para. G-2451, 6 R.F.L. (7th) 247; *Lynch v. Westario Power Inc.*, [2009] O.J. No. 2927, 2009 CarswellOnt 4057 (S.C.J.); *M. (P.) v Evangelista Estate*, [2015] O.J. No. 1005, 2015 ONSC 1419 (S.C.J.); *Mainland Sawmills Ltd. v. IWA-Canada, Local 1-3567 Society*, [2006] B.C.J. No. 1814, 2006 BCSC 1195, 41 C.C.L.T. (3d) 52, 152 A.C.W.S. (3d) 543; *McHale v. Ontario*, [2014] O.J. No. 4434, 2014 ONSC 5179 (S.C.J.); *Savino v. Shelestowsky*, [2013] O.J. No. 3302, 2013 ONSC 4394, 4 C.C.L.T. (4th) 94, 231 A.C.W.S. (3d) 345 (S.C.J.), **consd**

**Other cases referred to**

*Boucher v. Wal-Mart Canada Corp.* (2014), 120 O.R. (3d) 481, [2014] O.J. No. 2452, 2014 ONCA 419, 318 O.A.C. 256, 374 D.L.R. (4th) 293, 16 C.C.E.L. (4th) 239, [2014] CLLC para. 210-037, 240 A.C.W.S. (3d) 389; *Launchbury v. Morgans*, [1972] UKHL 5, [1973] A.C. 127; *Piresferreira v. Ayotte*, [2010] O.J. No. 2224, 2010 ONCA 384, 263 O.A.C. 347, 319 D.L.R. (4th) 665, 74 C.C.L.T. (3d) 163, [2010] CLLC para. 210-037, 82 C.C.E.L. (3d) 14, 189 A.C.W.S. (3d) 881; *Prinzo v. Baycrest Centre for Geriatric Care* (2002), 60 O.R. (3d) 474, [2002] O.J. No. 2712, 215 D.L.R. (4th) 31, 161 O.A.C. 302, 17 C.C.E.L. (3d) 207, [2002] CLLC para. 210-027, 115 A.C.W.S. (3d) 801 (C.A.); *R. v. Mann*, [2004] 3 S.C.R. 59, [2004] S.C.J. No. 49, 2004 SCC 52, 241 D.L.R. (4th) 214, 324 N.R. 215, [2004] 11 W.W.R. 601, J.E. 2004-1495, 187 Man. R. (2d) 1, 185 C.C.C. (3d) 308, 21 C.R. (6th) 1, 122 C.R.R. (2d) 189, REJB 2004-68801, JCPQ 2004-106, 62 W.C.B. (2d) 516; *R. v. Salituro*, [1991] 3 S.C.R. 654, [1991] S.C.J. No. 97, 131 N.R. 161, 50 O.A.C. 125, 68 C.C.C. (3d) 289, 9 C.R. (4th) 324; *Saadati v. Moorhead*, [2017] 1 S.C.R. 543, [2017] S.C.J. No. 28, 2017 SCC 28, 409 D.L.R. (4th) 395, [2017] 6 W.W.R. 431, 96 B.C.L.R. (5th) 1, 37 C.C.L.T. (4th) 1, [2017] I.L.R. para. M-3000, EYB 2017-280397, 2017EXP-1678, 279 A.C.W.S. (3d) 84; *Watkins v. Olafson*, [1989] 2 S.C.R. 750, [1989] S.C.J. No. 94, 61 D.L.R. (4th) 577, 100 N.R. 161, [1989] 6 W.W.R. 481, J.E. 89-1369, 39 B.C.L.R. (2d) 294, 61 Man. R. (2d) 81, 50 C.C.L.T. 101, [1989] I.L.R. para. 89-699, 17 A.C.W.S. (3d) 404

**Statutes referred to**

Merrifield v. The Attorney General of Canada et al.[Indexed as: Merrifield v. Canada (Attorney General)]

*Canadian Charter of Rights and Freedoms*, ss. 2(*b*), (*d*), 3

*Royal Canadian Mounted Police Act*, R.S.C. 1985, c. R-10, Part IV [as am.], s. 40(1) [as am.]

**Rules and regulations referred to**

*Royal Canadian Mounted Police Regulations, 1988*, SOR/ 88-361 [rep.], s. 58.4(1)

APPEAL by the defendants from the judgment of Vallee J., [2017] O.J. No. 1009, 2017 ONSC 1333, 42 C.C.L.T. (4th) 4 (S.C.J.) for the plaintiff.

*Sean Gaudet* and *James Gorham*, for appellants.

*Laura Young*, *John Kingman Phillips* and *John-Otto Phillips*, for respondent.

---

[1] BY THE COURT: -- This appeal relates to claims of harassment and bullying by Royal Canadian Mounted Police ("RCMP") [page496] managerial members of the respondent Peter Merrifield from 2005 to 2012. Merrifield was a junior RCMP constable in 2005. He was promoted to corporal in 2009 and sergeant in 2014.

[2] The litigation has been protracted; Merrifield issued his notice of action in May 2007 and a 40-day trial was held over a period of 17 months, from November 2014--April 2016. A lengthy decision was released in February 2017.

[3] The trial judge's decision reviewed in considerable detail more than seven years of strained relations between Merrifield and several of his superiors in the RCMP. In allowing the action, the trial judge recognized a new freestanding tort of harassment and found that many of the managerial decisions made in relation to Merrifield constituted harassment. In addition, she found the appellants liable for intentional infliction of mental suffering in relation to one set of interactions. The trial judge awarded Merrifield $100,000 in general damages, $41,000 in special damages and $825,000 in costs of the action.

[4] We conclude that the trial judge erred by recognizing a tort of harassment, erred in applying the test for the intentional infliction of mental suffering, and made palpable and overriding errors in much of her fact-finding. The judgment must be set aside.

[5] The appeal is allowed for the reasons that follow. Merrifield's cross-appeal, seeking an increase in the damages awarded, is dismissed.

*Background*

[6] It is not necessary to review Merrifield's career in detail. A brief summary of the facts relevant to the litigation suffices.

[7] In February 2005, Merrifield was assigned to the RCMP's Threat Assessment Group ("TAG"), a unit responsible for providing protective services to federal politicians, including the

Merrifield v. The Attorney General of Canada et al.[Indexed as: Merrifield v. Canada (Attorney General)]

prime minister. TAG duties also included monitoring criminal, extremist and terrorist groups, and carrying out threat assessments.

[8] Merrifield's strained relations with RCMP management began in May 2005, when his superior officers learned that he had run for the nomination to be the Conservative Party's candidate in the upcoming federal election in the riding of Barrie without complying with the applicable RCMP regulations. It was decided that Merrifield was potentially in a conflict of interest position and should be removed from investigating a death threat made against Member of Parliament Belinda Stronach, who had recently left the Conservative Party caucus to join the Liberal Party caucus. Merrifield was transferred out of the TAG unit to another unit not responsible for protecting politicians. [page497]

[9] On July 9, 2005, Merrifield appeared on a radio show as a "terrorism consultant" and was interviewed about terrorist threats to Canada. After having learned that this was not the first time that Merrifield had spoken publicly about national security, Merrifield's line manager, Superintendent Marc Proulx, sent a memo to him on September 28, 2005, reminding him of his obligation to comply with applicable RCMP policies regarding media appearances.

[10] In October 2005, Merrifield was refused assignment to the Special Operations Centre ("SOC"), which had been constituted to respond to a terrorist threat against Toronto.

[11] In January 2006, Merrifield was transferred to Customs and Excise. He did not report for work but commenced sick leave. He did not report to his new post until July 2006. On January 5, 2006, Merrifield wrote to Proulx, accusing him of misconduct in his audit of Merrifield's corporate American Express card usage. The card had been cancelled by the RCMP in October 2005 due to non-payment.

[12] On January 6, 2006, Proulx commenced a formal investigation pursuant to Part IV of the *Royal Canadian Mounted Police Act*, R.S.C. 1985, c. R-10 ("*RCMP Act*") to establish whether Merrifield's use of his credit card had contravened the RCMP's Code of Conduct. The final report of the investigator concluded that Merrifield had contravened administrative policy by failing to pay the balance due on the card and had used the card for minor unauthorized purposes. A line officer issued a performance log directing Merrifield as to use of the credit card and expense policy.

[13] On June 27, 2007, Merrifield commenced this action against the Crown, on behalf of the RCMP, and individual RCMP members Inspector James Jagoe, Superintendent Marc Proulx, Assistant Commissioner Michel Seguin, Chief Superintendent Norman Mazzerolle and Superintendent Martin Van Doren, seeking damages for the mental distress he suffered as a result of managerial bullying and harassment. He twice amended his statement of claim, most recently in April 2012, seeking further declaratory relief related to claims under ss. 2(*b*), 2(*d*) and 3 of the *Canadian Charter of Rights and Freedoms*. The action was discontinued as against Seguin, Mazzerolle and Van Doren by order of the trial judge on November 17, 2014.

[14] On January 5, 2012, Merrifield sent an e-mail message to the RCMP commissioner and several other senior members of the RCMP, asking why his harassment claim was not being settled. Receipt of the e-mail message was acknowledged but his question went unanswered. [page498]

*The trial judge's decision*

[15] The trial judge found that the tort of harassment exists in Ontario. Her analysis concerning the existence of the tort is quite brief in the context of an otherwise lengthy decision - - a mere eight paragraphs of her 896-paragraph judgment. She set out four questions (as submitted by the plaintiff) that must be answered in order to establish entitlement to damages for harassment:

(1) Was the conduct of the defendants toward Merrifield outrageous?

(2) Did the defendants intend to cause emotional distress or did they have a reckless disregard for causing Merrifield to suffer from emotional distress?

(3) Did Merrifield suffer from severe or extreme emotional distress?

(4) Was the outrageous conduct of the defendants the actual and proximate cause of the emotional distress?

[16] The trial judge found that the elements of the tort were satisfied. She found, for example, that Merrifield's managers acted unreasonably in rejecting his explanation for failing to advise them he was running for the Conservative Party nomination in 2005. She found, further, that Merrifield's transfer out of the TAG unit was not *bona fide*, and the potential conflict of interest his managers apprehended was "remote at best" and a pretext for his transfer. She also found that Merrifield was "stood down" by the SOC because the manager at the SOC knew that he had been removed from TAG.

[17] The trial judge found that the appellants had a reckless disregard for whether their behaviour would cause Merrifield to suffer from emotional distress; that Merrifield suffered severe emotional distress; and that the appellants' outrageous conduct was the actual and proximate cause of his emotional distress.

[18] The trial judge found, further, that Proulx's decision to order a Part IV investigation without first asking Merrifield for an explanation of apparent irregularities in the use of his American Express card was flagrant and outrageous conduct that he should have known would cause Merrifield harm. She considered that Proulx acted hypocritically in ordering the Part IV investigation, because he had himself engaged in discreditable conduct contemporaneously in attempting to procure the services of a prostitute. The trial judge was satisfied that Merrifield suffered from depression and post-traumatic stress disorder as a result of the RCMP actions, and she concluded that [page499] Merrifield had established the tort of intentional infliction of mental suffering ("IIMS").

*Discussion*

I. *The tort of harassment*

[19] The decision under appeal is the first case in which a Canadian appellate court has been required to determine whether a common law tort of harassment exists. What is required in order for a new tort to be recognized or established? Neither party canvassed this issue, yet it is key to the resolution of this appeal. Accordingly, it is helpful to begin with a brief consideration of the nature of common law change, before considering whether a tort of harassment should be

Merrifield v. The Attorney General of Canada et al.[Indexed as: Merrifield v. Canada (Attorney General)]

recognized at this time.

*The nature of common law change*

[20] Common law change is evolutionary in nature: it proceeds slowly and incrementally rather than quickly and dramatically, as McLachlin J. explained in *Watkins v. Olafson*, [1989] 2 S.C.R. 750, [1989] S.C.J. No. 94, at p. 760 S.C.R.:

> Generally speaking, the judiciary is bound to apply the rules of law found in the legislation and in the precedents. Over time, the law in any given area may change; but the process of change is a slow and incremental one, based largely on the mechanism of extending an existing principle to new circumstances. While it may be that some judges are more activist than others, the courts have generally declined to introduce major and far-reaching changes in the rules hitherto accepted as governing the situation before them.

[21] As she went on to explain, at pp. 760-61 S.C.R., courts may not be in the best position to address problems in the law; significant change may best be left to the legislature:

> There are sound reasons supporting this judicial reluctance to dramatically recast established rules of law. The court may not be in the best position to assess the deficiencies of the existing law, much less problems which may be associated with the changes it might make. The court has before it a single case; major changes in the law should be predicated on a wider view of how the rule will operate in the broad generality of cases. Moreover, the court may not be in a position to appreciate fully the economic and policy issues underlying the choice it is asked to make. Major changes to the law often involve devising subsidiary rules and procedures relevant to their implementation, a task which is better accomplished through consultation between courts and practitioners than by judicial decree. Finally, and perhaps most importantly, there is the long-established principle that in a constitutional democracy it is the legislature, as the elected branch of government, which should assume the major responsibility for law reform.

[22] These wise words of caution have been reiterated by the Supreme Court in a variety of contexts including *R. v. Salituro*, [1991] 3 S.C.R. 654, [1991] S.C.J. No. 97 and *R. v. Mann*, [2004] 3 S.C.R. 59, [page500] [2004] S.C.J. No. 49, 2004 SCC 52. The same idea is seen in English law: see, *e.g.*, *Launchbury v. Morgans*, [1972] UKHL 5, [1973] A.C. 127.

[23] Thus, when the Supreme Court created a duty of honest contractual performance in *Bhasin v. Hrynew*, [2014] 3 S.C.R. 494, [2014] S.C.J. No. 71, 2014 SCC 71, it did so on the basis that good faith contractual performance *already existed* in Canadian common law as a general organizing principle that underpins and informs existing common law rules. Creation of the new common law duty was justified on the basis that it was an incremental step that followed from the implications of the general organizing principle, a step that responded to societal needs and vindicated the reasonable expectations of commercial parties without precipitating unintended effects.

*Common law change in Ontario*

Merrifield v. The Attorney General of Canada et al.[Indexed as: Merrifield v. Canada (Attorney General)]

[24] The importance of incremental development of the common law was discussed in *Jones v. Tsige* (2012), 108 O.R. (3d) 241, [2012] O.J. No. 148, 2012 ONCA 32, in which this court recognized the existence of a tort of intrusion upon seclusion.

[25] Far from being created from whole cloth, the intrusion upon seclusion tort was grounded in what Sharpe J.A. identified as an emerging acceptance of claims for breach of privacy. He carefully reviewed Ontario and Canadian case law, in which he discerned both supportive dicta and a refusal to reject the existence of the tort, and provincial legislation that established a right to privacy while not foreclosing common law development. He also considered academic scholarship, much of which supported the existence of a right to privacy. He drew upon American tort law, which recognizes a right to privacy, as well as the law of the United Kingdom, Australia and New Zealand. He also noted societal change -- in particular, technological developments that pose a threat to personal privacy -- and the impetus for reform that it created. "[M]ost importantly," he said, "we are presented in this case with facts that cry out for a remedy": at para. 69.

[26] Ultimately, Sharpe J.A.'s conclusion was couched in terms of confirming the existence of the tort rather than simply creating it. As he put it, at para. 65:

> In my view, it is appropriate for this court to confirm the existence of a right of action for intrusion upon seclusion. Recognition of such a cause of action would amount to an incremental step that is consistent with the role of this court to develop the common law in a manner consistent with the changing needs of society. [page501]

> *Authority does not support the recognition of a tort of harassment*

[27] The trial judge in this case relied on four trial-level decisions proffered by Merrifield as supporting the existence of the tort and establishing its elements: *Mainland Sawmills Ltd. v. IWA-Canada, Local 1-3567 Society*, [2006] B.C.J. No. 1814, 2006 BCSC 1195, 41 C.C.L.T. (3d) 52; *Savino v. Shelestowsky*, [2013] O.J. No. 3302, 2013 ONSC 4394, 4 C.C.L.T. (4th) 94 (S.C.J.); *McHale v. Ontario*, [2014] O.J. No. 4434, 2014 ONSC 5179 (S.C.J.); and *M. (P.) v. Evangelista*, [2015] O.J. No. 1005, 2015 ONSC 1419 (S.C.J.).

[28] She erred in doing so. Taken as a whole, these cases confirm neither the existence of the tort nor its elements.

[29] *Mainland Sawmills* is the key case in the analysis. It underlies all of the subsequent Ontario trial decisions -- this, despite the fact that it is a British Columbia trial level authority in which the court did no more than *assume*, for purposes of dealing with an application seeking to have particular claims dismissed, that the tort exists. Far from confirming the existence of the tort, the application judge in *Mainland Sawmills* specifically concluded that the law is unclear.

[30] As for the elements of the tort, these too were assumed by the application judge in *Mainland Sawmills* based on the plaintiffs' submission -- a submission that was based on American case law arising out of the tort of intentional infliction of emotional distress. In short, *Mainland Sawmills* is not authority for either the existence of the tort of harassment or the elements of such a tort.

[31] Nevertheless, *Mainland Sawmills* has been cited and relied on in several subsequent cases in Ontario in which the tort of harassment has been asserted.

Merrifield v. The Attorney General of Canada et al.[Indexed as: Merrifield v. Canada (Attorney General)]

[32] In *Savino*, the motion judge does no more than find that although a tort of harassment is "not largely accepted, the door does not appear to be entirely closed on the possibility of this tort's existence": at para. 15. The court cites *Mainland Sawmills* as one of the few cases in which the elements of the tort are set out.

[33] *McHale* appears to assume the existence of the tort and cites two cases, *Lynch v. Westario Power Inc.*, [2009] O.J. No. 2927, 2009 CarswellOnt 4057 (S.C.J.) and *Mainland Sawmills*, for the elements of the tort, only to conclude that the tort was not pleaded with sufficient particularity. *Lynch* specifically states that the existence of the tort of harassment is unclear and, like *McHale*, finds that the tort was not pleaded with sufficient particularity in accordance with *Mainland Sawmills* in any event. [page502]

[34] *M. (P.)* describes harassment as a "still-developing tort" and cites *Savino* and *Lynch* for the elements of the tort. *M. (P.)* is the only case cited by the respondent in which damages were awarded for harassment ($5,000), but the defendant in that case was the administrator of the estate of the tortfeasor and did not lead evidence.

[35] The trial judge concluded that the law of harassment has evolved since 2011, citing *McHale*, *M. (P.)* and *John v. Cusack*, [2015] O.J. No. 4182, 2015 ONSC 5004 (S.C.J.) in support. The motion judge in *John* acknowledges that the existence of the tort is a "live legal issue", but assumes its existence for purposes of a summary judgment motion, ultimately dismissing the claim as frivolous and vexatious.

[36] This is the extent of the authority cited in support of the existence of the tort. In sum, these cases assume rather than establish the existence of the tort. They are not authority for recognizing the existence of a tort of harassment in Ontario, still less for establishing either a new tort or its requisite elements.

### There is no other basis to recognize a new tort

[37] Given that authority does not support the existence of a tort of harassment, should this court nevertheless recognize such a new tort?

[38] To pose the question in this way is to suggest that the recognition of new torts is, in essence, a matter of judicial discretion -- that the court can create a new tort anytime it considers it appropriate to do so. But that is not how the common law works, nor is it the way the common law should work.

[39] At the outset, it is important to recognize that this is not a case like *Tsige*, which, as we have said, is best understood as a culmination of a number of related legal developments. As we have explained, current Canadian legal authority does not support the recognition of a tort of harassment.

[40] We were not provided with any foreign judicial authority that would support the recognition of a new tort. Nor were we provided with any academic authority or compelling policy rationale for recognizing a new tort and its requisite elements.

[41] This is not a case whose facts cry out for the creation of a novel legal remedy, as in *Tsige*. That case concerned a highly significant intrusion into the plaintiff's personal information. The defendant, who was in a relationship with the plaintiff's former husband, used her workplace computer to gain access to the plaintiff's banking records and personal information over a period

Merrifield v. The Attorney General of Canada et al.[Indexed as: Merrifield v. Canada (Attorney General)]

of several years -- actions the court found to be deliberate, prolonged and shocking. Discipline imposed on the defendant by her [page503] employer did not redress the wrong done to the plaintiff. In these circumstances, as Sharpe J.A. put it [at para. 69], "[T]he law of this province would be sadly deficient if we were required to send [the plaintiff] away without a legal remedy."

[42] That is not this case. In this case, there are legal remedies available to redress conduct that is alleged to constitute harassment. The tort of IIMS is one of these remedies, and it is discussed below.

[43] In summary, the case for recognizing the proposed tort of harassment has not been made. On the contrary, as we will explain, there are good reasons opposing the recognition of the proposed tort at this time.

II. *The Intentional Infliction of Mental Suffering (IIMS)*

[44] The tort of IIMS is well established in Ontario and may be asserted as a basis for claiming damages for mental suffering in the employment context.

[45] In the leading case, *Prinzo v. Baycrest Centre for Geriatric Care* (2002), 60 O.R. (3d) 474, [2002] O.J. No. 2712 (C.A.), at para. 48, this court held that the test for IIMS is met where the plaintiff establishes conduct that is (1) flagrant and outrageous, (2) calculated to produce harm, and which (3) results in visible and provable illness.

[46] A comparison of the elements of the proposed tort of harassment accepted by the trial judge and the elements of the existing tort of IIMS is instructive.

[47] Whereas IIMS requires flagrant and outrageous conduct, the proposed harassment tort would require only outrageous conduct. More significant, IIMS is an intentional tort, requiring an intention to cause the kind of harm that occurred or knowledge that it was almost certain to occur. This is a purely subjective test: *Boucher v. Wal-Mart Canada Corp.* (2014), 120 O.R. (3d) 481, [2014] O.J. No. 2452, 2014 ONCA 419, at para. 43, whereas the proposed tort of harassment would require either intention *or* objectively defined reckless disregard. Finally, IIMS requires conduct that is the proximate cause of a visible and provable illness, whereas causing severe or extreme emotional distress is sufficient for the proposed tort of harassment.

[48] Plainly, the elements of the tort of harassment recognized by the trial judge are similar to, but less onerous than, the elements of IIMS. Put another way, it is more difficult to establish the tort of IIMS than the proposed tort of harassment, not least because IIMS is an intentional tort, whereas harassment would operate as a negligence-based tort. [page504]

[49] Given the similarities between IIMS and the proposed tort of harassment, and the availability of IIMS in employment law contexts, what is the rationale for creating the new tort?

[50] Merrifield submits that the new tort must be created because there is an increased societal recognition that harassment is wrongful conduct. He notes that moral damages for mental distress can be awarded only at termination of employment, leaving a gap that the tort of harassment should fill. He asserts that the decision of the Supreme Court in *Saadati v. Moorhead*, [2017] 1 S.C.R. 543, [2017] S.C.J. No. 28, 2017 SCC 28, supports the creation of the tort of harassment, and that the test the trial judge recognized for the tort is sufficiently stringent to limit the reach of the tort.

Merrifield v. The Attorney General of Canada et al.[Indexed as: Merrifield v. Canada (Attorney General)]

[51] We disagree.

[52] Saadati is concerned with proof of mental injury in the context of a known cause of action. Although it may make damages for mental injury more readily available in negligence actions, it does not require the recognition of a new tort. Moreover, this court has not allowed negligence to ground a claim for mental suffering in the employment context: *Piresferreira v. Ayotte*, [2010] O.J. No. 2224, 2010 ONCA 384, 319 D.L.R. (4th) 665.

[53] In summary, while we do not foreclose the development of a properly conceived tort of harassment that might apply in appropriate contexts, we conclude that Merrifield has presented no compelling reason to recognize a new tort of harassment in this case.

### Was IIMS established?

[54] The trial judge set out the test for IIMS outlined by this court in *Wal-Mart*. This requires a plaintiff to establish that the defendant's conduct

(1) was flagrant and outrageous;

(2) was calculated to harm the plaintiff; and

(3) caused the plaintiff to suffer a visible and provable illness.

[55] The trial judge found that Proulx's decision to order a Part IV investigation into Merrifield's travel credit card usage was both flagrant and outrageous because (a) he did not ask Merrifield for an explanation for his cash withdrawals; (b) he did not reply to Merrifield's question about whether he had reason to believe the credit card was being used for non-RCMP purposes; (c) he provided no particulars of the transactions that concerned him or a date range for which the investigation was to be conducted; and (d) he alleged discreditable conduct contemporaneous [page505] to engaging in discreditable conduct himself, namely, attempting to procure a prostitute. She found that Proulx had a reckless disregard for causing Merrifield emotional distress, and that emotional distress was a consequence that was known to be substantially certain to follow from the decision to order the investigation. Finally, the trial judge found that Merrifield suffered from depression and post-traumatic stress disorder, based largely on his evidence and that of his family doctor that he was off work sick. Thus, she concluded that the tort of IIMS was established solely on the facts of the Part IV credit card investigation.

[56] This conclusion cannot stand. It flows from palpable and overriding errors in the trial judge's fact-finding and the incorrect application of the legal test.

[57] First, the trial judge suggests that Proulx was required to be satisfied that there was a breach of the RCMP Code of Conduct prior to ordering the investigation. This is incorrect. Proulx had the authority under s. 40(1) of the *RCMP Act* to order an investigation after having satisfied himself that Merrifield may have contravened RCMP policy on the use and payment of his RCMP credit card.

[58] Second, Proulx's January 2006 mandate letter stated that Merrifield was "suspected of having contravened administrative policy". At its highest, the letter stated that Merrifield "may have engaged in disgraceful conduct". This was serious, but it was not equivalent to alleging the commission of criminal offences, as the trial judge stated.

Merrifield v. The Attorney General of Canada et al.[Indexed as: Merrifield v. Canada (Attorney General)]

[59] Third, the trial judge found that Proulx's initiation of the Part IV investigation was flagrant and outrageous because Proulx himself had engaged in disgraceful conduct at a time "contemporaneous" to initiating the investigation, that is, that he had been identified as attempting to procure a prostitute in a "John Sting" operation. This was plainly a legal error. The inference that Proulx's concerns with Merrifield's credit card misuse could not be *bona fide* because he had breached a wholly unrelated provision of the Code of Conduct *after* initiating the Part IV investigation is palpably wrong. There is simply no logical connection between the two. We accept the Crown's submission that the trial judge's reliance on this evidence vitiates her entire finding with respect to the Part IV investigation, and also calls into question her evaluation of the rest of Proulx's evidence. In our view, this piece of evidence was irrelevant. It was never pleaded and should not have been admitted.

[60] In sum, the IIMS argument failed at the first requirement and the trial judge erred in concluding otherwise. But the trial judge also erred in finding that the second and third elements of [page506] the tort were established. There was no evidence that Proulx's conduct was intended to cause harm or that he knew that harm was substantially certain to follow from his decision to order the Part IV investigation, and "emotional distress" was insufficient in any event. Finally, despite multiple findings of flagrant and outrageous conduct, the evidence did not establish the requisite causal connection.

[61] Our conclusions that the trial judge erred in recognizing the tort of harassment and in finding that the tort of IIMS was established in regard to the Part IV investigation are sufficient to allow the appeal. It is not necessary to address all of the additional arguments made by the appellants; however, given that most of the trial was focused on contested issues of fact, we consider it appropriate to address additional palpable and overriding errors the trial judge made in her analysis, as we explain below.

III. *Factual errors*

[62] The trial judge made numerous palpable and overriding errors in her fact-finding. These errors include ignoring relevant evidence, considering irrelevant matters and making findings of fact that are clearly wrong. These errors preclude a conclusion that Merrifield was harassed -- even assuming that a tort of harassment exists, with the elements accepted by the trial judge -- as well as the trial judge's conclusion that the tort of IIMS was established in relation to the Part IV investigation or in any other context.

*Merrifield's conduct and explanation for running for the Conservative Party nomination*

[63] The event that initiated Merrifield's dispute with the RCMP was his standing for the Conservative Party nomination in the Barrie riding in 2005. The trial judge's findings concerning Merrifield's rationalization of his conduct and the RCMP's reaction are clearly unreasonable.

[64] In evaluating the factual record, the trial judge failed to keep in mind the requirements of the governing regulations: *Royal Canadian Mounted Police Regulations, 1988*, SOR/ 88-361. (These regulations were repealed in 2014, after all the events of this case.)

[65] Section 58.4(1) of the regulations provided that a member who was a peace officer "may, only while on leave without pay granted for that purpose, (a) run for nomination, or stand as a

candidate, in a federal, provincial or territorial election". Nothing in the RCMP Administrative Manual is inconsistent with the regulations. [page507]

[66] Merrifield was aware of the regulations in 2004. On February 3, 2004, he wrote an e-mail to Sergeant Verrecchia -- Advisor, Harassment, Human Rights, Conflicts of Issue, Central Region -- seeking clarification of the regulations. His e-mail indicates that he had considered the regulations closely, as he quoted and commented on several sections. He questioned whether the regulations applied if he were standing for nomination in an electoral district that did not exist as yet. Verrecchia replied stating unequivocally: "[T]he policy states you must be on LWOP [leave without pay] to run for nomination." She added that the leave would be without pay and that it applied, in the case of the nomination process, "beginning on the day on which the member enters the process and ending the day he withdraws or the process concludes". Verrecchia then provided Merrifield with a written memorandum dated February 11, 2004, indicating that the Professional Standards and Special Advisory (Legal) Unit of Internal Affairs had confirmed that "while running for nomination a member must be on LWOP". The memo reminded Merrifield that he had to submit his request for LWOP through proper channels and have it approved, and that it was his responsibility to identify and avoid situations of conflict.

[67] In 2004, Merrifield sought nominations in three ridings, but sought LWOP for only two of the three ridings. Subsequently, Merrifield ran as a candidate in the federal election while on LWOP and returned to his duties following his defeat.

[68] In 2005, Merrifield filed his papers seeking nomination in the Barrie riding some weeks before the nomination meeting was held on May 14, 2005. Merrifield revised his campaign literature from 2004 and had it reprinted. He had 300 pamphlets distributed. He had people working on his campaign, obtained a list of local party members, made audio recorded telephone calls and had a campaign website. However, he did not advise the RCMP that he was running and did not request LWOP to run for the nomination.

[69] Shortly before the nomination meeting on May 14, Merrifield was asked if he had any ambition to run in another election. According to Assistant Sergeant Crane, Merrifield stated: "None whatsoever. It was too expensive." Merrifield testified that he told Crane and Jagoe that he would not be running in an election "anytime soon". This, after informing those present at a dinner that he had received a call from the Richmond Hill riding of the Conservative Party offering him the candidacy in that riding.

[70] A few days following the nomination meeting, Crane and Jagoe learned that Merrifield had been running for the [page508] Conservative Party nomination in Barrie at the time of the conversation detailed above. They thought that Merrifield had not been forthright with them. When they confronted him with the fact he had run for nomination without disclosing it or obtaining proper leave, Merrifield explained the difference between running for nomination and running in a public election "at least twice", and stated that he was running as a protest. The trial judge thought it unreasonable of Crane, Jagoe, and Proulx not to accept Merrifield's explanation. At para. 749 of her decision, she states:

> A logical explanation of the difference between a nomination meeting [and] an election fell on deaf ears. Surely, these two higher ranking officers [Crane and Jagoe] who had

2019 ONCA 205 (CanLII)

management responsibilities were capable of understanding the difference. I find that they chose not to understand it.

[71] At para. 752 of her decision, the trial judge states that Proulx "did not know the difference between a nomination meeting and an election. To him it was all the same thing."

[72] Given the regulations, it made no difference whether Merrifield had been running for nomination or for election. He was required to be on leave during the entire period he was running for nomination. He should have sought and obtained LWOP before he stood for nomination, as Verrecchia had advised him in writing in 2004.

[73] The trial judge was clearly wrong in finding that Crane, Jagoe and Proulx were unreasonable in not accepting Merrifield's reliance on the irrelevant distinction between an election and a nomination. Merrifield's responses to direct questions led them to believe he had no current political ambitions at a time when he was actively involved in the political process. That, his failure to advise his line supervisor and request LWOP, and his subsequent self-serving rationalization for his conduct gave his superior officers good reason to conclude that he could not be trusted to be forthright with them. They could reasonably believe that a forthright colleague would have disclosed that he was running for nomination at the very time he was asked questions exploring his political ambitions. Crane and Jagoe could reasonably view Merrifield's response to the question about whether he had ambition to run for election -- "none whatsoever" -- as a half-truth at best. At trial, Crane still believed that Merrifield had lied to him -- that he had said one thing and done another.

[74] The trial judge supports Merrifield's rationalizations by pointing to several irrelevant considerations.

[75] The trial judge rejected the RCMP's argument at trial that Merrifield ran to win the nomination and accepted Merrifield's testimony that he stood for nomination only to have the status to [page509] speak at the nomination meeting and as a strategy to divert votes from the leading candidate. She accepted that Merrifield had not sold any (para. 688) (or many (para. 747)) memberships and did not have the required support to win the nomination.

[76] These irrelevant considerations do not excuse Merrifield for contravening the regulations. They do not change the facts that Merrifield stood for nomination; that he did not apply for leave; that he did not advise the RCMP before he ran; and that he did not disclose the fact he was running when asked directly about his political ambitions.

[77] The trial judge also excused Merrifield's conduct by observing that the nomination was a "private" event open only to party members, and that there was no "wide-spread public knowledge" of Merrifield's involvement. Again, this was irrelevant. The regulations requiring leave expressly applied to the nomination process without regard to the nature of that process. It was a legal error to consider that the "private" nature of a nomination process excused Merrifield's non-compliance with the regulations.

[78] The trial judge minimized the significance of Merrifield's candidacy for the nomination throughout her decision. The fact is that he ran as a candidate for the nomination. He completed the nomination papers and distributed campaign material and flyers to party members. It was irrelevant what his intentions were in doing so -- irrelevant whether he intended to win or could have done so.

[79] The trial judge accepted Merrifield's testimony that he did not believe he needed LWOP "based on his conversation with Sgt. Boos and his understanding of how the earlier LWOPs were re-categorized". Indeed, there had been confusion about how his previous leaves without pay to run for nominations and election should be coded. But Sgt. Boos said nothing that could reasonably be construed to lead Merrifield to believe that he did not need LWOP, however it was coded. Even accepting that Merrifield believed his LWOP could be coded "personal needs" LWOP or "special leave without pay", the fact remains that he still had to arrange leave and advise the RCMP that he was running for nomination.

[80] The trial judge did not disagree with Merrifield's position at trial that he needed leave only for the day of the nomination meeting. But that position is plainly a self-serving reading of the regulation. Verrecchia had clearly advised Merrifield otherwise in writing in February 2004. Merrifield should have arranged leave from the date he filed his candidacy papers with the riding until he was no longer a candidate for nomination. During this period [page510] he was sending out his campaign flyers, had an active website and was soliciting support for his nomination. Had Merrifield complied with the regulations, Crane, Jagoe and Proulx would not have been surprised to learn that he had run.

[81] In summary, the trial judge's analysis of Merrifield's rationalization of his conduct and the RCMP's reaction to it is clearly unreasonable. Merrifield's RCMP superiors had good reason to regard him as a colleague who could not be trusted to be completely forthright with them -- a matter of importance in any position, but especially so in the context of Merrifield's employment in the RCMP.

### *Merrifield's potential conflict of interest*

[82] A second significant error was the trial judge's finding that Merrifield's potential conflict of interest was "remote at best" and that the RCMP's concern about it was not "*bona fide*". In arriving at this conclusion, the trial judge failed to consider all of the evidence. In particular, she failed to consider the evidence that Merrifield himself had perceived the potential for a conflict, and she failed to consider the evidence of Verrecchia, despite having summarized it earlier in her reasons.

[83] At para. 149, the trial judge mentioned in passing that Merrifield declined to perform an order in council check on Belinda Stronach "because he was friends with her". This is neither a complete nor accurate account of Merrifield's testimony. Merrifield described his personal relationship with Stronach "as acquaintances". Significantly, he said that "I felt . . . that me conducting an order in council check for her *would be a conflict of interest, so I declined to do it*" (emphasis added). When asked to explain why he thought it would be a conflict of interest, he responded: "It would be a conflict of interest, because if there was something omitted or something erroneously reported, that personal relationship could be seen as a conflict of interest, whether through concealment or advantage. So it would be best not to conduct that order in council check." He further expressed his view that the conflict did not arise from his political affiliation but from his personal relationship with Stronach. What Merrifield described as a personal relationship was an artifact of his political activities. He said Stronach had been "very helpful and supportive throughout the 2004 campaign year for me". He added that he had sat with her on the Conservative caucus for the Greater Toronto Area.

[84] Further, the trial judge noted [at para. 152] that when Merrifield was assigned to investigate a death threat against Stronach, "he contacted Ms. Stronach directly on that day to ask [page511] her if she was comfortable with his doing the investigation". In his testimony, he described this contact with Ms. Stronach as having "taken steps to avoid [a] *conflict of interest* and ensure that the person who was [the] subject of the threats was comfortable with the investigation" (emphasis added).

[85] This testimony may not establish that Merrifield thought he was in a conflict of interest position, but it does show that he perceived the *possibility* of a conflict.

[86] The trial judge did not refer to Merrifield's decision not to perform the order in council check, or to his asking Stronach if he should recuse himself from investigating the death threat, when she concluded, at para. 754, that "the potential for a perceived conflict of interest was remote at best". The evidence that Merrifield shared the RCMP's perception of a possible conflict of interest undermines her finding that the perception was "remote at best".

[87] The trial judge's finding that the RCMP's perceived conflict was not *bona fide* lacks evidentiary support. The RCMP management was aware that Merrifield had asked Stronach if he should recuse himself from the investigation and was concerned about the appearance of their relationship as a potential conflict. As Jagoe explained in his testimony, if Merrifield were not removed from the death threat investigation, "it would appear that Ms. Stronach was deciding who was doing the investigation and this could be viewed as a conflict". This was a reasonable consideration.

[88] In summarizing the evidence, the trial judge recounted that Proulx checked with Verrecchia on May 24, 2005, asking "whether he was wrong to think that there was a conflict". The trial judge reviewed Verrecchia's testimony beginning at para. 168. Verrecchia said that Proulx sought her guidance about the conflict of interest policy and whether Merrifield had contravened it. Among other things, she told Proulx that Merrifield's investigation of Stronach's death threat was a conflict as he was partisan and his objectivity might be questioned. The RCMP had to be objective, especially with respect to political investigations. According to the trial judge, at para. 170, Verrecchia's view was that,

> objectively, it was an apparent conflict for Mr. Merrifield and the RCMP. If something had happened, Mr. Merrifield's integrity could be questioned and the Force's objectivity could be questioned as well. His involvement in the Stronach investigation created both perceived and apparent conflicts.

[89] Verrecchia also stated her concerns about the campaign literature Merrifield had distributed while he was not on LWOP and still working for the RCMP. He was speaking against some of the [page512] laws of the day, for example, the gun registry, which was a law of Canada that had to be enforced by the RCMP. Verrecchia said: "While working as an RCMP officer, he should not have taken a public stance against the government and its existing laws. He had an obligation to enforce the laws and remain objective." Significantly, the trial judge noted that Verrecchia had advised Proulx that "Mr. Merrifield was proceeding contrary to the advice that she had given him in 2004."

[90] Verrecchia also pointed out that s. 12.12 F of the RCMP Conflict of Interest Policy states that "once a member returns from LWOP, the officer is to determine a suitable assignment

taking into account political opinions expressed, political impact that may result from the posting and investigations with political overtones being conducted by the proposed unit". She stated that she had advised Proulx that Merrifield should not be doing any political investigations as it was a conflict.

[91] The fact that Proulx consulted and followed the advice of internal resources at the RCMP before forming a firm opinion that Merrifield posed a potential conflict of interest, and before transferring him out of TAG, demonstrates that the trial judge's finding that his action was not *bona fide* was clearly wrong. On no understanding could his conduct be said to be outrageous.

[92] A more minor matter is that Verrecchia's explanations show that the trial judge was also clearly wrong in stating, at para. 752, that "Mr. Merrifield's political views were irrelevant." His political views would have been less problematic if he had followed the regulations and been on LWOP, but as an active RCMP officer he had expressed political views in opposition to the laws of Canada that he was required to enforce, and in these circumstances it was not unreasonable to be concerned about a conflict of interest.

[93] The trial judge considered it significant that no conflict was apprehended when Merrifield, after running in the election in 2004, worked in the Integrated National Security Enforcement Team ("INSET") and was assigned to TAG, a sub-unit of INSET, in February 2005. Verrecchia explained in her testimony that this was not a concern as his LWOP status had separated him from the RCMP during the campaign and election period. As well, Proulx, who became Merrifield's line officer at TAG in February 2005, was unaware of Merrifield's previous political activities and unfamiliar with the policies that applied to RCMP members engaging in political activities. That is why he consulted Verrecchia.

[94] In her analysis section, the trial judge made only passing reference to Verrecchia. At para. 753, she said that Proulx "consulted Sgt. Verrecchia who believed that there could be a problem with perceived conflict". The trial judge then went on to state [page513] that Proulx also consulted the RCMP Policy Branch. The trial judge pointed out that the Policy Branch took a long time to respond and that, when it did, its reply was not responsive to the issue. She then found that "if there was a significant concern that Mr. Merrifield's attendance at the Barrie nomination meeting had compromised his ability to work in national security, the Policy Branch would have provided Supt. Proulx with direction in a timely manner".

[95] As the Crown points out, there are two problems with this.

[96] First, the issue was not whether Merrifield's political activities compromised his ability to work in national security; it was whether his political activities compromised his ability to protect politicians. Second, the trial judge was wrong to ascribe bad faith to Proulx, who was not responsible for the delay of the Policy Branch and was acting on the best information and advice he had been given. It is illogical for the trial judge to conclude that, because the Policy Branch took longer to answer Proulx's inquiries than she considered reasonable, Proulx's concerns were not *bona fide*.

[97] Setting aside the trial judge's finding that Proulx's concern over a potential conflict of interest was not *bona fide* sweeps away additional findings. For example, it sweeps away the finding that Merrifield's transfer out of TAG constituted an "other type" of discipline that was "unjustified and punitive".

Merrifield v. The Attorney General of Canada et al.[Indexed as: Merrifield v. Canada (Attorney General)]

*Merrifield's January 5, 2012 email correspondence*

[98] On January 5, 2012, Merrifield sent a lengthy e-mail to a number of senior members of the RCMP, including the commissioner, deputy commissioner and assistant commissioner, lamenting that the RCMP had taken no steps to settle his case and that the Department of Justice did not have "the best interest of the RCMP at heart". In the e-mail, he made a serious allegation of misconduct by Proulx.

[99] The trial judge evidently regarded the e-mail as significant and set it out in full, at para. 557 of her reasons. She said that in the e-mail Merrifield [at para. 793] "was taking extraordinary steps to contact upper management with the hope of resolving his concerns". She found that Merrifield received no response to the e-mail and that [at para. 794] "the RCMP's conduct in ignoring this email went beyond all standards of what is right or decent. I find that it was one of the actual and proximate causes of Mr. Merrifield's severe emotional distress."

[100] The trial judge's analysis is clearly erroneous. Merrifield and the RCMP were opposing parties in litigation. The proper avenue for communication between the parties was through counsel. In effect, Merrifield was complaining that the RCMP was [page514] defending the action rather than settling it. His request should have been communicated through his counsel. The RCMP response, if any, likewise should have been through counsel.

[101] In any event, the trial judge was mistaken in saying the RCMP did not respond to the e-mail. The assistant commissioner e-mailed Merrifield on January 6, 2012, the day after his e-mail was received, informing him that the RCMP was continuing its discussions with Department of Justice counsel "regarding the most appropriate manner to proceed with this civil action against us that is currently before the courts". He added that the RCMP had not abandoned efforts towards trying to reach a resolution and anticipated "additional discussions with you *and your counsel* in this regard" (emphasis added).

[102] In the circumstances, this was an entirely appropriate response.

*Proulx's failure to "set the record straight"*

[103] It was patently wrong for the trial judge to find it outrageous for Proulx not to have "set the record straight" with Van Doren by telling him after the SOC incident that his concerns with Merrifield had been addressed, and that Merrifield had been "cleared" of wrongdoing. As we have explained above, the perception that Merrifield could not be trusted to be completely forthright could reasonably be held. The fact that Proulx's September 28, 2005 letter to Merrifield warned rather than disciplined him did not give rise to an obligation on Proulx to inform anyone that Merrifield had been "cleared".

[104] In our view, this matter illustrates the readiness with which the trial judge identified wrongdoing on the part of the RCMP managers and found them to have acted outrageously. We note that the trial judge found that many of the other things the RCMP did or did not do were elements of conduct she considered outrageous. We are not to be taken to agree with those other findings, but for purposes of this decision it is not necessary or fruitful to go through all of them here.

*Conclusion*

[105] In summary, the trial judge erred in concluding that the tort of harassment exists in Ontario and we are not persuaded that the tort should be recognized. The trial judge also erred in concluding that the tort of IIMS was made out based on Proulx's initiation of a Code of Conduct investigation. No other facts found by the trial judge met the test for IIMS.

[106] For these reasons, the appeal is allowed. The cross-appeal is dismissed. [page515]

[107] The appellants are entitled to costs of the appeal, the cross-appeal, and the trial. The appellants may make brief submissions on costs, not exceeding ten pages, to the Registrar of this court within ten days of this decision. The respondent will have ten days from service of those written submissions to serve and file his submissions, which shall not exceed ten pages.

*Appeal allowed.*

2019 ONCA 205 (CanLII)

**14**

**Susan Nelles**  *Appellant*

v.

**Her Majesty The Queen in right of Ontario, the Attorney General for Ontario, John W. Ackroyd, James Crawford, Jack Press and Anthony Warr**  *Respondents*

INDEXED AS: NELLES v. ONTARIO

File No.: 19598.

1988: February 29; 1989: August 14.

Present: Dickson C.J. and Beetz*, Estey*, McIntyre, Lamer, Wilson, Le Dain*, La Forest and L'Heureux-Dubé JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

*Crown — Immunity — Civil action — Malicious prosecution — Whether Crown, Attorney General and Crown Attorneys are immune from suit for malicious prosecution — Whether a ruling on the issue of prosecutorial immunity should be made on an appeal of a preliminary motion — Proceedings against the Crown Act, R.S.O. 1980, c. 393, s. 5(6) — Rules of Practice and Procedure, R.R.O. 1980, Reg. 540, Rule 126.*

The appellant was charged with the murder of four infants and was discharged on all counts at the conclusion of the preliminary inquiry. She then brought an action against the Crown in right of Ontario, the Attorney General for Ontario, and several police officers, alleging that the Attorney General and his agents, the Crown Attorneys, counselled, aided and abetted the police in charging and prosecuting her and that the Attorney General and the Crown Attorneys were actuated by malice. Proceedings were later discontinued against the police officers and the Crown Attorneys were not named as defendants. Before trial, the respondents moved to have the action dismissed under Rule 126 of the Ontario Rules of Practice on the ground that the pleadings disclosed no reasonable cause of action and, in the alternative, for leave under Rule 124 to set down a point of law raised in the pleadings and to argue it on the return of the motion. The Supreme Court of Ontario allowed the motion and struck out the statement of claim. The Court of Appeal upheld the judgment. Both the Supreme Court of Ontario and the Court of Appeal

**Susan Nelles**  *Appelante*

c.

**Sa Majesté La Reine du chef de l'Ontario, le procureur général de l'Ontario, John W. Ackroyd, James Crawford, Jack Press et Anthony Warr**  *Intimés*

RÉPERTORIÉ: NELLES c. ONTARIO

Nᵒ du greffe: 19598.

1988: 29 février; 1989: 14 août.

Présents: Le juge en chef Dickson et les juges Beetz*, Estey*, McIntyre, Lamer, Wilson, Le Dain*, La Forest et L'Heureux-Dubé.

EN APPEL DE LA COUR D'APPEL DE L'ONTARIO

*Couronne — Immunité — Action civile — Poursuites abusives — La Couronne, le procureur général et les procureurs de la Couronne bénéficient-ils d'une immunité contre les actions pour poursuites abusives? — Convient-il de statuer sur la question de l'immunité du poursuivant dans le cadre d'un appel relatif à une requête préliminaire? — Loi sur les instances introduites contre la Couronne, L.R.O. 1980, chap. 393, art. 5(6) — Rules of Practice and Procedure, R.R.O 1980, Reg. 540, règle 126.*

L'appelante, accusée du meurtre de quatre enfants en bas âge, a été acquittée relativement à chacun des chefs d'accusation à l'issue de l'enquête préliminaire. Elle a alors intenté une action contre la Couronne du chef de l'Ontario, le procureur général de l'Ontario ainsi que plusieurs policiers, alléguant que le procureur général et ses représentants, les procureurs de la Couronne, avaient conseillé à la police de porter des accusations et d'engager des poursuites contre elle et l'avaient aidée et encouragée à le faire, et que le procureur général et les procureurs de la Couronne avaient agi avec malveillance. Il y a eu par la suite désistement de l'action contre les policiers et les procureurs de la Couronne n'ont pas été désignés défendeurs. Avant le procès, les intimés ont demandé par requête, en vertu de la règle 126 des Rules of Practice de l'Ontario, le rejet de l'action au motif que les actes de procédure ne révélaient aucune cause raisonnable d'action. Subsidiairement, ils demandaient, en vertu de la règle 124, la tenue d'une audience afin de faire valoir leur argumentation sur une question de droit soulevée dans les actes de procédure. La Cour suprême

---

\* Beetz, Estey and Le Dain JJ. took no part in the judgment.

\* Les juges Beetz, Estey et Le Dain n'ont pas pris part au jugement.

seemed to have acted under Rule 126. This appeal is to determine whether the Crown, the Attorney General and the Crown Attorneys enjoy an absolute immunity from a suit for malicious prosecution.

*Held* (L'Heureux-Dubé J. dissenting in part): The appeal should be dismissed as against the Crown. The appeal should be allowed as against the Attorney General and the matter returned to the Supreme Court of Ontario for trial of the claim against the Attorney General.

The Crown enjoys absolute immunity from a suit for malicious prosecution. Section 5(6) of the Ontario *Proceedings Against the Crown Act* exempts the Crown from any proceedings in respect of anything done or omitted to be done by a person while discharging or purporting to discharge responsibilities of a judicial nature or responsibilities that he has in connection with the execution of judicial process. The decision to prosecute is a judicial decision vested in the Attorney General and executed on his behalf by his agents, the Crown Attorneys. The Crown Attorneys and the Attorney General in deciding to prosecute the appellant came within s. 5(6) of the Act and the Crown is thus immune from liability to the appellant.

*Per* Dickson C.J. and Lamer and Wilson JJ.: There is no need for a trial to permit a conclusion on the question of prosecutorial immunity. This issue, disposed of in the courts below upon a pre-trial motion under Rule 124 or Rule 126 of the Ontario Rules of Practice, should be addressed by this Court. The issue has been given careful consideration in the Court of Appeal and in argument before this Court. To send the matter back for trial without resolving the issue would not be expeditious and would add both time and cost to an already lengthy case. The rules of civil procedure should not act as obstacles to a just and expeditious resolution of a case.

The Attorney General and Crown Attorneys are not immune from suits for malicious prosecution. A review of the authorities on the issue of prosecutorial immunity reveals that the matter ultimately boils down to a question of policy. In the interests of public policy, an absolute immunity for the Attorney General and his agents, the Crown Attorneys, is not justified. An absolute immunity has the effect of negating a private right of action and in some cases may bar a remedy under the *Canadian Charter of Rights and Freedoms*. As such, the existence of absolute immunity is a threat to the

de l'Ontario a accueilli la requête et radié la déclaration, décision qui a été confirmée par la Cour d'appel. La Cour suprême de l'Ontario et la Cour d'appel de l'Ontario semblent s'être fondées sur la règle 126. Le pourvoi vise à déterminer si la Couronne, le procureur général et les procureurs de la Couronne jouissent d'une immunité absolue contre une action pour poursuites abusives.

*Arrêt* (le juge L'Heureux-Dubé est dissidente en partie): Le pourvoi est rejeté en ce qui concerne la Couronne. Le pourvoi est accueilli en ce qui concerne le procureur général et l'affaire est renvoyée à la Cour suprême de l'Ontario pour instruction de la réclamation présentée contre le procureur général.

La Couronne jouit d'une immunité absolue contre les actions pour poursuites abusives. Le paragraphe 5(6) de la *Loi sur les instances introduites contre la Couronne* de l'Ontario met la Couronne à l'abri de procédures pour l'action ou l'omission d'une personne qui s'acquitte ou prétend s'acquitter d'une charge de nature judiciaire ou de responsabilités relatives à l'exécution d'actes de procédure judiciaire. La décision d'engager des poursuites est une décision de nature judiciaire qui incombe au procureur général et dont l'exécution relève des procureurs de la Couronne agissant en son nom. La décision des procureurs de la Couronne et du procureur général de poursuivre l'appelante relevait du par. 5(6) de la Loi et la Couronne bénéficie d'une immunité à l'égard de toute responsabilité envers l'appelante.

Le juge en chef Dickson et les juges Lamer et Wilson: Il n'est pas nécessaire d'avoir une instruction pour statuer sur la question de l'immunité du poursuivant. La Cour doit traiter de cette question que les juridictions inférieures ont tranchée sur requête préliminaire en se fondant sur la règle 124 ou la règle 126 des Rules of Practice de l'Ontario. La question a été examinée soigneusement en Cour d'appel et au cours des débats devant notre Cour. Renvoyer l'affaire à l'instruction sans résoudre la question serait peu expéditif, prolongerait des procédures déjà longues et ajouterait à leur coût. Les règles de procédure civile ne devraient pas faire obstacle au règlement juste et expéditif d'un litige.

Le procureur général et les procureurs de la Couronne ne jouissent pas d'une immunité absolue relativement aux actions pour poursuites abusives. Il ressort de l'examen de la jurisprudence sur la question de l'immunité du poursuivant qu'il s'agit en définitive d'une question d'intérêt public. Une immunité absolue pour le procureur général et les procureurs de la Couronne qui le représentent n'est pas justifiée par l'intérêt public. L'immunité absolue entraîne la négation d'un droit privé d'action et, dans certains cas, peut rendre impossible un recours fondé sur la *Charte canadienne des droits et*

1989 CanLII 77 (SCC)

individual rights of citizens who have been wrongly and maliciously prosecuted. While the policy considerations in favour of absolute immunity have some merit, these considerations must give way to the right of a private citizen to seek a remedy when the prosecutor acts maliciously in fraud of his duties with the result that he causes damage to the victim. The tort of malicious prosecution requires not only proof of an absence of reasonable and probable cause for commencing the proceedings but also proof of an improper purpose or motive, a motive that involves an abuse or perversion of the system of criminal justice for ends it was not designed to serve and as such incorporates an abuse of the office of the Attorney General and his agents the Crown Attorneys. The inherent difficulty in proving a case of malicious prosecution combined with the mechanisms available within the system of civil procedure to weed out meritless claims is sufficient to ensure that the Attorney General and Crown Attorneys will not be hindered in the proper execution of their important public duties. Finally, attempts to qualify prosecutorial immunity in the United States by the so-called functional approach and its many variations have proven to be unsuccessful.

*Per* La Forest J.: The common law position as set out by Lamer J. is accepted. The *Charter* implications need not be considered.

*Per* McIntyre J.: The state of the law relating to the immunity of the Attorney General is far from clear and a ruling on a point of this importance should not be made on an appeal of a preliminary motion. Before laying down any proposition to the effect that the Attorney General and his agents enjoy absolute immunity from civil suit, there should be a trial to permit a conclusion on the question of prosecutorial immunity and to provide—in the event that it is decided that the immunity is not absolute—a factual basis for a determination of whether or not in this case the conduct of the prosecution was such that the appellant is entitled to a remedy.

Furthermore, the Attorney General's immunity from judicial review, which is based on the exercise of a judicial function, does not equate with immunity from civil suit for damages for wrongful conduct in the performance of prosecutorial functions which do not involve the exercise of a judicial function. Indeed, most of the functions and acts performed by Crown Attorneys as agents of the Attorney General would fall into this category and, accordingly, the immunity may not extend

*libertés.* L'existence d'une immunité absolue menace donc les droits individuels de citoyens poursuivis à tort et abusivement. Quoique les considérations d'intérêt public invoquées en faveur de l'immunité absolue aient une certaine légitimité, ces considérations doivent céder le pas au droit d'un particulier de chercher à obtenir une réparation quand il subit un préjudice du fait que le poursuivant a agi avec malveillance dans l'exercice abusif de ses fonctions. Dans le cas du délit civil de poursuites abusives, on doit prouver non seulement l'absence de motif raisonnable et probable d'engager les poursuites, mais aussi l'existence d'un but ou motif illégitime, motif qui constitue un abus ou une perversion du système de justice criminelle à des fins auxquelles il n'est pas destiné et qui, en tant que tel, comporte un abus des pouvoirs du procureur général et de ses représentants, les procureurs de la Couronne. La difficulté à faire la preuve de poursuites abusives ainsi que les mécanismes existant dans le système de procédure civile qui permettent d'écarter les actions non fondées suffisent pour que le procureur général et les procureurs de la Couronne ne soient pas entravés dans l'exécution efficace de leurs importantes charges publiques. Finalement, les tentatives américaines de limiter l'immunité du poursuivant par le recours à ce qu'on appelle l'approche fonctionnelle et aux nombreuses variantes de cette approche ont échoué.

*Le juge La Forest:* Les motifs du juge Lamer en ce qui concerne la *common law* sont adoptés. Il n'est pas nécessaire d'examiner l'effet de la *Charte.*

*Le juge McIntyre:* L'état du droit à l'égard de l'immunité conférée au procureur général est loin d'être clair, et on ne devrait pas statuer sur une question aussi importante dans le cadre d'un appel d'une exception préliminaire. Avant d'énoncer en principe que le procureur général et ses représentants jouissent d'une immunité absolue contre les actions civiles, il doit y avoir un procès pour trancher la question de l'immunité du poursuivant et, s'il est décidé que l'immunité n'est pas absolue, pour fournir le fondement factuel permettant de déterminer si, en l'espèce, la poursuite a été menée de façon telle que l'appelante est en droit d'obtenir réparation.

De plus, l'immunité du procureur général à l'égard du contrôle judiciaire, fondée sur l'exercice d'une fonction judiciaire, n'équivaut pas à une immunité de responsabilité civile pour les dommages résultant d'un acte fautif commis dans l'accomplissement de fonctions de poursuivant ne comportant pas l'exercice d'une fonction judiciaire. En fait, la plupart des fonctions et des actes qu'exécutent les procureurs de la Couronne à titre de mandataires du procureur général relèveraient de cette

1989 CanLII 77 (SCC)

to claims for damages as a result of a prosecution, however instituted, that is carried out with malice. A ruling on a preliminary motion to the effect that Attorneys General and their agents are absolutely immune from all liability for suits for malicious prosecution may be too expansive and even ill-founded.

This case, therefore, should not have been disposed of upon a pre-trial motion under Rule 126 of the Ontario Rules of Practice. Under that rule, it is only in the clearest cases that an action should be struck out. This is not such a case.

*Per* L'Heureux-Dubé J. (dissenting in part): Appellant's action is completely dependent upon whether or not Attorneys General and Crown Attorneys are immune from civil suit and, as such, the matter can and should be decided by this Court in the present appeal. While, in general, important questions should not be disposed of in interlocutory fashion, this rule does not apply where the defence offered at the outset is one of law only—namely, that the right of action is barred independently of the facts alleged. There is every advantage, in terms of saving the time and cost of a trial, to decide a question of law at the outset. This, in fact, is the very reason for the existence of Rule 126 of the Ontario Rules of Practice.

Adopting the reasons of the Ontario Court of Appeal, the Attorneys General and Crown Attorneys enjoy an absolute immunity from civil suit when they are acting within the bounds of their authority. The role of absolute immunity is not to protect the interests of the individual holding the office but rather to advance the greater public good. The Attorneys General and Crown Attorneys are often faced with difficult decisions as to whether to proceed in matters which come before them and their freedom of action is vital to the effective functioning of our criminal justice system.

## Cases Cited

By Lamer J.

**Considered:** *Imbler v. Pachtman*, 424 U.S. 409 (1976); **referred to:** *Owsley v. The Queen in right of Ontario* (1983), 34 C.P.C. 96; *Richman v. McMurtry* (1983), 41 O.R. (2d) 559; *Levesque v. Picard* (1985), 66 N.B.R. (2d) 87; *Curry v. Dargie* (1984), 28 C.C.L.T.

catégorie et, en conséquence, il est possible que l'immunité ne s'étende pas aux demandes de dommages-intérêts résultant d'une poursuite menée avec malveillance, quelle que soit la façon dont elle a été engagée. Une décision rendue sur une exception préliminaire et portant que les procureurs généraux et leurs mandataires sont à l'abri de toute responsabilité en matière de poursuites abusives pourrait donc être trop large et peut-être même mal fondée.

Par conséquent, la présente affaire n'aurait pas dû être tranchée sur une requête préliminaire présentée en vertu de la règle 126 des Rules of Practice de l'Ontario. Ce n'est que dans les cas les plus évidents que des actions sont radiées en application de cette règle. Or, ce n'est pas le cas en l'espèce.

*Le juge* L'Heureux-Dubé (dissidente en partie): Le sort de l'action de l'appelante dépend entièrement de la réponse à la question de savoir si les procureurs généraux et les procureurs de la Couronne jouissent d'une immunité absolue contre les poursuites civiles. Une telle question peut et doit être résolue par notre Cour dans le présent pourvoi. Quoique, d'une manière générale, d'importantes questions ne devraient pas être décidées à l'occasion de requêtes interlocutoires, cette règle ne s'applique pas dans les cas où la défense est fondée uniquement sur un point de droit, savoir que le droit d'action n'existe pas, quels que soient les faits allégués. Il y a tout avantage, en termes de temps et de coût, de trancher une question de droit *in limine litis*. C'est précisément d'ailleurs la raison d'être de la règle 126 des Rules of Practice de l'Ontario.

Les motifs de la Cour d'appel de l'Ontario sont adoptés; les procureurs généraux et les procureurs de la Couronne bénéficient d'une immunité absolue contre les poursuites civiles quand ils agissent dans les limites de leurs pouvoirs. L'immunité absolue a pour but non pas de protéger l'individu qui détient la charge en question, mais plutôt d'assurer le plus grand bien du public. Les procureurs généraux et les procureurs de la Couronne sont souvent confrontés à des décisions difficiles quant à l'opportunité de poursuivre dans des affaires qui leur sont soumises, et leur liberté d'action est vitale pour assurer le fonctionnement efficace de notre système de justice criminelle.

## Jurisprudence

Citée par le juge Lamer

**Arrêt examiné:** *Imbler v. Pachtman*, 424 U.S. 409 (1976); **arrêts mentionnés:** *Owsley v. The Queen in right of Ontario* (1983), 34 C.P.C. 96; *Richman v. McMurtry* (1983), 41 O.R. (2d) 559; *Levesque v. Picard* (1985), 66 R.N.-B. (2e) 87; *Curry v. Dargie* (1984), 28 C.C.L.T.

1989 CanLII 77 (SCC)

93; *German v. Major* (1985), 39 Alta. L.R. (2d) 270; *Wilkinson v. Ellis*, 484 F. Supp. 1072 (1980); *Marrero v. City of Hialeah*, 625 F.2d 499 (1980), *cert.* denied, 450 U.S. 913 (1981); *Taylor v. Kavanagh*, 640 F.2d 450 (1981); *Riches v. Director of Public Prosecutions*, [1973] 2 All E.R. 935; *Hester v. MacDonald*, [1961] S.C. 370; *Boucher v. The Queen*, [1955] S.C.R. 16; *Hicks v. Faulkner* (1878), 8 Q.B.D. 167; *Mitchell v. John Heine and Son Ltd.* (1938), 38 S.R. (N.S.W.) 466; *Bosada v. Pinos* (1984), 44 O.R. (2d) 789; *R. v. Groves* (1977), 37 C.C.C. (2d) 429.

By McIntyre J.

**Referred to:** *Owsley v. The Queen in right of Ontario* (1983), 34 C.P.C. 96; *Richman v. McMurtry* (1983), 41 O.R. (2d) 559; *The Queen v. Comptroller-General of Patents, Designs, and Trade Marks*, [1899] 1 Q.B. 909; *Curry v. Dargie* (1984), 28 C.C.L.T. 93; *Roncarelli v. Duplessis*, [1959] S.C.R. 121; *Mostyn v. Fabrigas* (1774), 1 Cowp. 161, 98 E.R. 1021; *Henly v. Mayor of Lyme* (1828), 5 Bing. 91, 130 E.R. 995; *Asoka Kumar David v. Abdul Cader*, [1963] 3 All E.R. 579; *Imbler v. Pachtman*, 424 U.S. 409 (1976); *Unterreiner v. Wilson* (1982), 40 O.R. (2d) 197 (H.C.), aff'd (1983), 41 O.R. (2d) 472 (C.A.); *Bosada v. Pinos* (1984), 44 O.R. (2d) 789; *German v. Major* (1985), 39 Alta. L.R. (2d) 270; *Levesque v. Picard* (1985), 66 N.B.R. (2d) 87; *Gregoire v. Biddle*, 177 F.2d 579 (1949); *Riches v. Director of Public Prosecutions*, [1973] 2 All E.R. 935; *Warne v. Province of Nova Scotia* (1969), 1 N.S.R. (2d) 27; *Re Van Gelder's Patent* (1888), 6 R.P.C. 22; *Morier v. Rivard*, [1985] 2 S.C.R. 716; *Barrisove v. McDonald*, B.C.C.A., No. 490/74, November 1, 1974.

By L'Heureux-Dubé J. (dissenting in part)

*Roncarelli v. Duplessis*, [1959] S.C.R. 121; *Morier v. Rivard*, [1985] 2 S.C.R. 716; *Gregoire v. Biddle*, 177 F.2d 579 (1949); *Imbler v. Pachtman*, 424 U.S. 409 (1976); *Yaselli v. Goff*, 12 F.2d 396 (1926).

## Statutes and Regulations Cited

*Canadian Charter of Rights and Freedoms*, ss. 7, 11, 24(1).
*Code of Civil Procedure*, R.S.Q., c. C-25, art. 94.
*Criminal Code*, R.S.C., 1985, c. C-46, ss. 122, 139(2), (3), 465(1)(*b*), 504, 579(1) [rep. & subs. c. 27 (1st Supp.), s. 117], 737.
*Crown Attorneys Act*, R.S.O. 1980, c. 107.
*Ministry of the Attorney General Act*, R.S.O. 1980, c. 271.
*Proceedings Against the Crown Act*, R.S.O. 1980, c. 393, ss. 2(2)(*d*), 5(2) to (6).
Rules of Civil Procedure, O. Reg. 560/84, Rules 1.04(1), 20, 21.01.

---

93; *German v. Major* (1985), 39 Alta. L.R. (2d) 270; *Wilkinson v. Ellis*, 484 F. Supp. 1072 (1980); *Marrero v. City of Hialeah*, 625 F.2d 499 (1980), *cert.* refusé, 450 U.S. 913 (1981); *Taylor v. Kavanagh*, 640 F.2d 450 (1981); *Riches v. Director of Public Prosecutions*, [1973] 2 All E.R. 935; *Hester v. MacDonald*, [1961] S.C. 370; *Boucher v. The Queen*, [1955] R.C.S. 16; *Hicks v. Faulkner* (1878), 8 Q.B.D. 167; *Mitchell v. John Heine and Son Ltd.* (1938), 38 S.R. (N.S.W.) 466; *Bosada v. Pinos* (1984), 44 O.R. (2d) 789; *R. v. Groves* (1977), 37 C.C.C. (2d) 429.

Citée par le juge McIntyre

**Arrêts mentionnés**: *Owsley v. The Queen in right of Ontario* (1983), 34 C.P.C. 96; *Richman v. McMurtry* (1983), 41 O.R. (2d) 559; *The Queen v. Comptroller-General of Patents, Designs, and Trade Marks*, [1899] 1 Q.B. 909; *Curry v. Dargie* (1984), 28 C.C.L.T. 93; *Roncarelli v. Duplessis*, [1959] R.C.S. 121; *Mostyn v. Fabrigas* (1774), 1 Cowp. 161, 98 E.R. 1021; *Henly v. Mayor of Lyme* (1828), 5 Bing. 91, 130 E.R. 995; *Asoka Kumar David v. Abdul Cader*, [1963] 3 All E.R. 579; *Imbler v. Pachtman*, 424 U.S. 409 (1976); *Unterreiner v. Wilson* (1982), 40 O.R. (2d) 197 (H.C.), conf. (1983), 41 O.R. (2d) 472 (C.A.); *Bosada v. Pinos* (1984), 44 O.R. (2d) 789; *German v. Major* (1985), 39 Alta. L.R. (2d) 270; *Levesque v. Picard* (1985), 66 R.N.-B. (2ᵉ) 87; *Gregoire v. Biddle*, 177 F.2d 579 (1949); *Riches v. Director of Public Prosecutions*, [1973] 2 All E.R. 935; *Warne v. Province of Nova Scotia* (1969), 1 N.S.R. (2d) 27; *Re Van Gelder's Patent* (1888), 6 R.P.C. 22; *Morier c. Rivard*, [1985] 2 R.C.S. 716; *Barrisove v. McDonald*, C.A.C.-B., nº 490/74, 1ᵉʳ novembre 1974.

Citée par le juge L'Heureux-Dubé (dissidente en partie)

*Roncarelli v. Duplessis*, [1959] R.C.S. 121; *Morier c. Rivard*, [1985] 2 R.C.S. 716; *Gregoire v. Biddle*, 177 F.2d 579 (1949); *Imbler v. Pachtman*, 424 U.S. 409 (1976); *Yaselli v. Goff*, 12 F.2d 396 (1926).

## Lois et règlements cités

*Charte canadienne des droits et libertés*, art. 7, 11, 24(1).
*Code criminel*, L.R.C. (1985), chap. C-46, art. 122, 139(2), (3), 465(1)*b*), 504, 579(1) [abr. & rempl. chap. 27 (1ᵉʳ suppl.), art. 117], 737.
*Code de procédure civile*, L.R.Q., chap. C-25, art. 94.
*Loi sur le ministère du Procureur général*, L.R.O. 1980, chap. 271.
*Loi sur les instances introduites contre la Couronne*, L.R.O. 1980, chap. 393, art. 2(2)*d*), 5(2) à (6).
*Loi sur les procureurs de la Couronne*, L.R.O. 1980, chap. 107.
Règles de procédure civile, Règl. de l'Ont. 560/84, règles 1.04(1), 20, 21.01.

Rules of Practice and Procedure, R.R.O. 1980, Reg. 540, Rules 124, 126.

**Authors Cited**

Béliveau, Pierre and Jacques Bellemare and Jean-Pierre Lussier. *On Criminal Procedure.* Translated by Josef Muskatel. Cowansville: Éditions Yvon Blais Inc., 1982.

Edwards, John Ll. J. *The Attorney General, Politics and the Public Interest.* London: Sweet & Maxwell, 1984.

Filosa, John C. "Prosecutorial Immunity: No Place for Absolutes," [1983] *U. Ill. L. Rev.* 977.

Fleming, John G. *The Law of Torts,* 5th ed. Sydney: Law Book Co., 1977.

Luppino, Anthony J. "Supplementing the Functional Test of Prosecutorial Immunity" (1982), 34 *Stan. L. Rev.* 487.

Manning, Morris. "Abuse of Power by Crown Attorneys," [1979] *L.S.U.C. Lectures* 571.

Note, "Delimiting the Scope of Prosecutorial Immunity from Section 1983 Damage Suits" (1977), 52 *N.Y.U. L. Rev.* 173.

Pilkington, Marilyn L. "Damages as a Remedy for Infringement of the Canadian Charter of Rights and Freedoms" (1984), 62 *Can. Bar. Rev.* 517.

APPEAL from a judgment of the Ontario Court of Appeal (1985), 51 O.R. (2d) 513, 21 D.L.R. (4th) 103, 16 C.R.R. 320, 1 C.P.C. (2d) 113, affirming an order of Fitzpatrick J. granting respondents' application to strike out appellant's statement of claim and dismissing her action. Appeal dismissed as against the Crown and appeal allowed as against the Attorney General, L'Heureux-Dubé J. dissenting in part.

*John Sopinka, Q.C.,* and *David Brown,* for the appellant.

*T. C. Marshall, Q.C.,* and *L. A. Hunter,* for the respondents.

The judgment of Dickson C.J. and Lamer and Wilson JJ. was delivered by

LAMER J.—I have read the reasons for judgment of my colleague McIntyre J. and I agree with his disposition of the appeal but I do so for somewhat different reasons. McIntyre J. in his reasons for judgment concludes that there must be a trial to permit a conclusion on the question of

Rules of Practice and Procedure, R.R.O. 1980, Reg. 540, règles 124, 126.

**Doctrine citée**

Béliveau, Pierre et Jacques Bellemare et Jean-Pierre Lussier. *Traité de procédure pénale,* t. 1. Montréal: Éditions Yvon Blais Inc., 1981.

Edwards, John Ll. J. *The Attorney General, Politics and the Public Interest.* London: Sweet & Maxwell, 1984.

Filosa, John C. «Prosecutorial Immunity: No Place for Absolutes,» [1983] *U. Ill. L. Rev.* 977.

Fleming, John G. *The Law of Torts,* 5th ed. Sydney: Law Book Co., 1977.

Luppino, Anthony J. «Supplementing the Functional Test of Prosecutorial Immunity» (1982), 34 *Stan. L. Rev.* 487.

Manning, Morris. «Abuse of Power by Crown Attorneys,» [1979] *L.S.U.C. Lectures* 571.

Note, «Delimiting the Scope of Prosecutorial Immunity from Section 1983 Damage Suits» (1977), 52 *N.Y.U. L. Rev.* 173.

Pilkington, Marilyn L. «Damages as a Remedy for Infringement of the Canadian Charter of Rights and Freedoms» (1984), 62 *R. du B. can.* 517.

POURVOI contre un arrêt de la Cour d'appel de l'Ontario (1985), 51 O.R. (2d) 513, 21 D.L.R. (4th) 103, 16 C.R.R. 320, 1 C.P.C. (2d) 113, qui a confirmé une ordonnance du juge Fitzpatrick qui faisait droit à la requête des intimés en radiation de la déclaration de l'appelante et qui rejetait sa demande. Pourvoi rejeté en ce qui concerne la Couronne et accueilli en ce qui concerne le procureur général, le juge L'Heureux-Dubé est dissidente en partie.

*John Sopinka, c.r.,* et *David Brown,* pour l'appelante.

*T. C. Marshall, c.r.,* et *L. A. Hunter,* pour les intimés.

Version française du jugement du juge en chef Dickson et des juges Lamer et Wilson rendu par

LE JUGE LAMER—J'ai lu les motifs de mon collègue le juge McIntyre et je suis d'avis de trancher le pourvoi de la même façon que lui, mais pour des motifs un peu différents. Le juge McIntyre conclut qu'il doit y avoir un procès pour qu'il soit possible de statuer sur la question de l'immu-

1989 CanLII 77 (SCC)

prosecutorial immunity. I am in respectful disagreement with him in this regard. I am of the opinion that the question of immunity should be addressed by this Court in this case, and that nothing prevents the Court from so doing. I set out the relevant rules of the Ontario Rules of Practice as they were at the time of the case for ease of reference:

**124.** Either party is entitled to raise by his pleadings any point of law, and by consent of the parties or by leave of a judge, the point of law may be set down for hearing at any time before the trial, otherwise it shall be disposed of at the trial.

**126.** A judge may order any pleading to be struck out on the ground that it discloses no reasonable cause of action or answer, and in any such case, or in the case of the action or defence being shown to be frivolous or vexatious, may order the action to be stayed or dismissed, or judgment to be entered accordingly.

As McIntyre J. points out the respondents moved to have the action dismissed under Rule 126 on the ground that the pleadings disclosed no reasonable cause of action and, in the alternative, for leave under Rule 124 to set down a point of law raised in the pleadings and to argue the same on the return of the motion. Both Fitzpatrick J. of the Supreme Court of Ontario and the Court of Appeal for Ontario (1985), 51 O.R. (2d) 513, in allowing the motion to strike out the statement of claim, seemed to have acted under Rule 126.

A review of the cases dealing with the application of Rule 124 and Rule 126 reveals the following. The difference between the two rules lies in the summary nature of Rule 126 as opposed to the more detailed consideration of issues under Rule 124. A court should strike a pleading under Rule 126 only in plain and obvious cases where the pleading is bad beyond argument. Rule 124 is designed to provide a means of determining, without deciding the issues of fact raised by the pleadings, a question of law that goes to the root of the action. I would like to point out that what is at issue here is not whether malicious prosecution is a reasonable cause of action. A suit for malicious

nité du poursuivant. Avec égards, je ne suis pas d'accord avec lui sur ce point. J'estime en effet que cette Cour doit traiter de la question de l'immunité dans cette affaire et que rien ne l'en empêche. Par souci de commodité, je reproduis les dispositions pertinentes des Rules of Practice de l'Ontario, telles qu'elles étaient rédigées à l'époque en cause:

[TRADUCTION] **124.** Toute partie peut, dans un acte de procédure, soulever une question de droit et, avec le consentement des parties ou l'autorisation de la Cour, la question de droit ainsi soulevée peut faire l'objet d'une audition en tout temps avant l'instruction, sinon elle est décidée au cours de l'instruction.

**126.** Un juge peut ordonner la radiation de tout acte de procédure au motif qu'il ne révèle aucune cause raisonnable d'action ou réponse. En pareil cas ou dans le cas d'une action ou d'une défense jugée futile ou vexatoire, il peut ordonner que l'action soit suspendue ou rejetée ou qu'un jugement soit enregistré en conséquence.

Comme le signale le juge McIntyre, les intimés ont demandé par requête le rejet de l'action en vertu de la règle 126 pour le motif que les actes de procédure ne révélaient aucune cause raisonnable d'action. Subsidiairement, ils demandaient, en vertu de la règle 124, la tenue d'une audience afin de faire valoir leur argumentation sur une question de droit soulevée dans les actes de procédure. Le juge Fitzpatrick de la Cour suprême de l'Ontario, ainsi que la Cour d'appel de l'Ontario (1985), 51 O.R. (2d) 513, semblent s'être fondés sur la règle 126 pour accueillir la requête en radiation de la déclaration.

Voici ce qui se dégage de la jurisprudence portant sur l'application des règles 124 et 126. Celles-ci diffèrent l'une de l'autre car la règle 126 prévoit une procédure sommaire alors que la règle 124 permet un examen plus approfondi des questions soulevées. Un tribunal ne doit radier un acte de procédure en vertu de la règle 126 que dans des cas très clairs où l'acte de procédure est incontestablement vicié. La règle 124 est destinée à fournir un moyen de trancher une question de droit qui touche à la base même de l'action sans se prononcer sur les questions de fait soulevées par les actes de procédure. Je tiens à souligner que la question qui se pose ici n'est pas de savoir si des poursuites

1989 CanLII 77 (SCC)

prosecution has been recognized at common law for centuries dating back to the reign of Edward I. What is at issue is whether the Crown, Attorney General and Crown Attorneys are absolutely immune from suit for the well-established tort of malicious prosecution. This particular issue has been given careful consideration both by the Court of Appeal and in argument before this Court. The Court of Appeal for Ontario undertook a thorough review of authorities in the course of a lengthy discussion of arguments on both sides of the issue. As such it matters not in my view whether the matter was disposed of under Rule 124 or 126. To send this matter back for trial without resolving the issue of prosecutorial immunity would not be expeditious and would add both time and cost to an already lengthy case.

Furthermore I am of the view that the rules of civil procedure should not act as obstacles to a just and expeditious resolution of a case. Rule 1.04(1) of the Rules of Civil Procedure in Ontario confirms this principle in stating that "[t]hese rules shall be liberally construed to secure the just, most expeditious and least expensive determination of every civil proceeding on its merits."

In terms of whether the Crown enjoys absolute immunity from a suit for malicious prosecution, McIntyre J. concludes that s. 5(6) of the *Proceedings Against the Crown Act*, R.S.O. 1980, c. 393, exempts the Crown from any proceedings in respect of anything done or omitted to be done by a person while discharging or purporting to discharge responsibilities of a judicial nature or responsibilities that he has in connection with the execution of judicial process. I am of the opinion that McIntyre J. was correct in holding that the Crown is rendered immune from liability by the express terms of s. 5(6) of the Act, for the action by the Crown Attorney and the Attorney General in deciding to prosecute the appellant. I would like to point out, however, that for the reasons set out below, I am of the view that a functional approach to prosecutorial immunity at common law is inade-

abusives constituent une cause raisonnable d'action, car l'existence d'une action pour poursuites abusives est reconnue en *common law* depuis des siècles, depuis le règne d'Édouard I[er]. La question est plutôt de savoir si la Couronne, le procureur général et les procureurs de la Couronne bénéficient d'une immunité absolue contre toute action fondée sur le délit civil bien établi de poursuites abusives. Cette question a été examinée soigneusement en l'espèce tant par la Cour d'appel qu'au cours des débats devant notre Cour. La Cour d'appel de l'Ontario a fait une revue exhaustive de la jurisprudence dans le cadre d'une longue analyse des arguments opposés. Il importe peu, selon moi, qu'on ait eu recours à la règle 124 ou à la règle 126 pour trancher la question. Toutefois, renvoyer l'affaire à l'instruction sans résoudre la question de l'immunité du poursuivant serait peu expéditif, prolongerait des procédures déjà longues et ajouterait à leur coût.

J'estime en outre que les règles de procédure civile ne devraient pas faire obstacle au règlement juste et expéditif d'un litige. Ce principe est confirmé par le par. 1.04(1) des Règles de procédure civile de l'Ontario qui porte: «Les présentes règles doivent recevoir une interprétation large afin d'assurer la résolution équitable sur le fond de chaque instance civile, de la façon la plus expéditive et la moins onéreuse.»

Sur la question de savoir si la Couronne jouit d'une immunité absolue contre des actions pour poursuites abusives, le juge McIntyre conclut que le par. 5(6) de la *Loi sur les instances introduites contre la Couronne*, L.R.O. 1980, chap. 393, met la Couronne à l'abri de procédures pour l'action ou l'omission d'une personne qui s'acquitte ou prétend s'acquitter d'une charge de nature judiciaire ou de responsabilités relatives à l'exécution d'actes de procédure judiciaire. Je suis d'avis que le juge McIntyre a raison de conclure que la Couronne bénéficie de l'immunité du fait des termes exprès du par. 5(6) de la Loi, pour la décision prise par le procureur de la Couronne et le procureur général de poursuivre l'appelante. Je tiens à signaler cependant que, pour les motifs exposés ci-dessous, je suis d'avis qu'il n'est pas approprié d'adopter une approche fonctionnelle en ce qui concerne

1989 CanLII 77 (SCC)

quate. In this case the applicable legislation requires the Court to draw a distinction between prosecutorial functions in so far as Crown immunity under s. 5(6) is not available unless the function is "judicial" in nature. Therefore, although I agree with McIntyre J. that in this case the decision to prosecute is a "judicial" function for the purposes of s. 5(6), I hasten to add that in dealing with the policy considerations governing the availability of absolute immunity at common law for the Attorney General and Crown Attorneys the functional approach is not the proper test. In addition it should be noted that the constitutionality of the section was not an issue and was not addressed by counsel in this appeal. As such this issue is not before this Court, and therefore the constitutionality of s. 5(6) of the Act is still an open question.

Consequently, the remaining issue at hand is whether the Attorney General and his agents, the Crown Attorneys, are absolutely immune from civil liability in a suit for malicious prosecution. In resolving this question, a brief review of the situation prevailing in a few jurisdictions could be helpful and useful. While McIntyre J. in his reasons provides a detailed review of the authorities, I would like to add some further observations.

I. Different Approaches to Immunity

The situation in Canada is unclear and does not seem to be uniform throughout the country.

1. *Absolute Immunity—the Ontario Position*

The Ontario Court of Appeal in the case at bar found that an absolute immunity exists, and in reaching this conclusion relied extensively on the decision by the Supreme Court of the United States in *Imbler v. Pachtman*, 424 U.S. 409 (1976). The Court of Appeal found the idea of an absolute immunity "troubling" but determined that it was justified by the following policy concerns. First, the rule encourages public trust in the fairness and impartiality of those who act and exercise discretion in the bringing and conducting

l'immunité du poursuivant en *common law*. En l'espèce, la législation applicable oblige la Cour à faire une distinction entre les fonctions de poursuivant dans la mesure où l'immunité de la Couronne en vertu du par. 5(6) ne vaut que lorsque la fonction en cause est de nature «judiciaire». En conséquence, bien que je sois d'accord avec le juge McIntyre pour dire qu'en l'espèce, la décision de poursuivre est une fonction «judiciaire» aux fins du par. 5(6), je m'empresse d'ajouter que, pour ce qui est des considérations de principe qui régissent l'existence d'une immunité absolue en *common law* pour le procureur général et les procureurs de la Couronne, l'approche fonctionnelle ne fournit pas les critères appropriés. Notons de plus que la question de la constitutionnalité de ce paragraphe n'est pas en cause et n'a pas été abordée par les avocats dans le présent pourvoi. Comme la Cour n'est pas saisie de la question de la constitutionnalité du par. 5(6) de la Loi, cette question demeure entière.

Reste donc la question de savoir si le procureur général et les procureurs de la Couronne qui le représentent jouissent d'une immunité absolue contre la responsabilité civile dans le cas d'une action pour poursuites abusives. Pour trancher cette question, il pourrait être utile d'examiner brièvement la situation dans quelques autres ressorts. Quoique le juge McIntyre fasse dans ses motifs une étude approfondie de la jurisprudence, je souhaite y ajouter quelques observations.

I. Les différentes positions relatives à l'immunité

La situation au Canada est incertaine et il ne semble pas y avoir d'uniformité.

1. *L'immunité absolue—la position ontarienne*

La Cour d'appel de l'Ontario a conclu en l'espèce à l'existence d'une immunité absolue, conclusion fondée dans une grande mesure sur l'arrêt *Imbler v. Pachtman*, 424 U.S. 409 (1976), de la Cour suprême des États-Unis. Bien qu'elle ait trouvé «inquiétante» l'idée d'une immunité absolue, la Cour d'appel a jugé qu'elle se justifiait par les considérations d'intérêt public énumérées ci-après. En premier lieu, la règle favorise la confiance du public dans l'équité et l'impartialité de ceux qui agissent et qui exercent le pouvoir discrétionnaire

1989 CanLII 77 (SCC)

of criminal prosecution; the rule is designed for the benefit of the public not the benefit of the individual prosecutor. Second, the threat of personal liability for tortious conduct would have a chilling effect on the prosecutor's exercise of discretion and third, to permit civil suits against prosecutors would invite a flood of litigation which would deflect a prosecutor's energies from the discharge of his public duties. In short, the absence of an absolute immunity would open the door to unmeritorious claims and would be a threat to prosecutorial independence. The Court also relied on two decisions of the Ontario High Court, *Owsley v. The Queen in right of Ontario* (1983), 34 C.P.C. 96 and *Richman v. McMurtry* (1983), 41 O.R. (2d) 559. Both these decisions rely extensively on the American position as found in *Imbler, supra*. The case law in Ontario therefore, uniformly stands for the proposition that the Attorney General and Crown Attorneys enjoy absolute immunity from civil liability for malicious prosecution. Outside of Ontario, the issue is somewhat more ambiguous.

### 2. *Elsewhere in Canada—Absolute Immunity Questioned*

In *Levesque v. Picard* (1985), 66 N.B.R. (2d) 87, the New Brunswick Court of Appeal held on the authority of the Ontario cases, especially the case at bar, that an absolute immunity shielded a provincial Crown prosecutor from suit for malicious prosecution. By contrast the appellate courts of Nova Scotia and Alberta have cast some doubts on the existence of an absolute immunity. First, in *Curry v. Dargie* (1984), 28 C.C.L.T. 93 (N.S.C.A.), the Crown was sued as being vicariously liable for the action of a residential tenancy officer. Hart J.A. held that while the *Proceedings Against the Crown Act*, R.S.N.S. 1967, c. 239, might absolve the provincial Crown from civil liability, a Crown servant could still be personally liable for misconduct. In the course of his decision

d'intenter et de conduire des poursuites criminelles; la règle est conçue pour le bénéfice du public et non celui du poursuivant. En deuxième lieu, le risque de voir engager sa responsabilité personnelle pour une conduite délictuelle découragerait le poursuivant d'exercer son pouvoir discrétionnaire. En troisième lieu, permettre des actions civiles contre les poursuivants serait une invitation à une avalanche de litiges qui détourneraient les poursuivants de l'exécution de leurs fonctions publiques. En bref, l'absence d'une immunité absolue ouvrirait la voie à des demandes non fondées et menacerait l'indépendance des poursuivants. La Cour d'appel s'est fondée en outre sur deux décisions de la Haute Cour de l'Ontario: *Owsley v. The Queen in right of Ontario* (1983), 34 C.P.C. 96 et *Richman v. McMurtry* (1983), 41 O.R. (2d) 559. L'une et l'autre s'inspirent en grande partie de la position américaine énoncée dans l'arrêt *Imbler*, précité. La jurisprudence ontarienne établit donc sans exception que le procureur général et les procureurs de la Couronne jouissent d'une immunité absolue contre la responsabilité civile pour poursuites abusives. Hors de l'Ontario, la situation est moins claire.

### 2. *Ailleurs au Canada—l'immunité absolue mise en doute*

Dans l'affaire *Levesque v. Picard* (1985), 66 R.N.-B. (2e) 87, la Cour d'appel du Nouveau-Brunswick s'est appuyée sur la jurisprudence ontarienne, et notamment sur la présente cause, pour conclure qu'il y avait une immunité absolue mettant un avocat de la Couronne provincial à l'abri d'une action pour poursuites abusives. Les cours d'appel de la Nouvelle-Écosse et de l'Alberta, par contre, ont soulevé des doutes quant à l'existence d'une immunité absolue. Premièrement, dans l'affaire *Curry v. Dargie* (1984), 28 C.C.L.T. 93 (C.A.N.-É.), on a introduit contre la Couronne une instance alléguant sa responsabilité du fait d'un fonctionnaire de la commission de la location résidentielle. Le juge Hart a décidé que, si la *Proceedings Against the Crown Act*, R.S.N.S. 1967, chap. 239, pouvait dégager la Couronne provinciale de la responsabilité civile, il était encore possible qu'un préposé de la Couronne soit personnellement responsable de sa propre incon-

1989 CanLII 77 (SCC)

Hart J.A. considered the Ontario decisions especially that of Galligan J. in *Richman, supra* (at p. 110):

> I am not prepared to go as far as Galligan J. in holding that an officer of the Crown cannot be liable for a proceeding commenced maliciously, but it is not necessary to consider that issue at the moment. I do not believe that in the case at bar it can be said that the respondent in laying the information against the appellant was in fact carrying out a judicial function similar to those carried out by Attorneys General and prosecutors.

In *German v. Major* (1985), 39 Alta. L.R. (2d) 270, a Crown prosecutor was sued for alleged misconduct in the preferment of a charge of tax evasion, a charge on which the accused was acquitted. Kerans J.A. speaking for the Alberta Court of Appeal assumes throughout that a suit for malicious prosecution is possible and disposes of the case on the ground that there had been "reasonable and probable cause" to initiate the prosecution. The case was dismissed pursuant to Rule 129 of the Alberta Rules of Civil Procedure, a rule similar to the old Ontario Rule 126. In this context Kerans J.A. said the following (at p. 276):

> The rule upon which I rely has much to commend it. It falls short of the absolute immunity suggested by Major and accepted by the Supreme Court of the United States in *Imbler v. Pachtman* . . . but offers some protection from the harassment which he says would otherwise afflict prosecuting counsel because suit would not be permitted to proceed if utterly without merit. It would indeed be a curious thing if we chose a stern immunity rule in preference to an effective striking-out rule.

Further support for the view that Kerans J.A. is not inclined to accept the existence of an absolute immunity for prosecutors can be found in the following statements (at pp. 277 and 286):

I will assume, for the sake of argument, that, if counsel, with malice, continues a prosecution he once thought sound but now knows is unsound, he may be sued.

duite. Dans ses motifs, le juge Hart a examiné la jurisprudence ontarienne et surtout la décision du juge Galligan dans l'affaire *Richman*, précitée (à la p. 110):

> [TRADUCTION] Je ne suis pas prêt à aller aussi loin que le juge Galligan en statuant qu'un fonctionnaire de la Couronne ne peut être tenu responsable d'une poursuite engagée avec malveillance, encore qu'il n'y ait pas lieu d'examiner cette question pour le moment. En l'espèce, je ne crois pas qu'on puisse dire qu'en faisant une dénonciation contre l'appelant, l'intimée exerçait dans les faits une fonction judiciaire analogue à celle qu'exercent les procureurs généraux et les poursuivants.

Dans l'affaire *German v. Major* (1985), 39 Alta. L.R. (2d) 270, un procureur de la Couronne était poursuivi pour inconduite en raison d'une accusation de fraude fiscale portée contre un accusé, qui en avait été acquitté par la suite. Le juge Kerans, au nom de la Cour d'appel de l'Alberta, a tenu pour acquis qu'il était possible d'intenter une action pour poursuites abusives, mais a tranché le litige en disant qu'on avait eu [TRADUCTION] «des motifs raisonnables et probables» d'engager les poursuites. L'action a donc été rejetée en vertu de la règle 129 des Rules of Civil Procedure de l'Alberta, laquelle ressemble à l'ancienne règle 126 de l'Ontario. Le juge Kerans dit dans ce contexte (à la p. 276):

> [TRADUCTION] La règle sur laquelle je me fonde est recommandable. Sans accorder l'immunité absolue proposée par Major et retenue par la Cour suprême des États-Unis dans l'arrêt *Imbler v. Pachtman*, [. . .] elle offre une certaine protection contre le harcèlement auquel les avocats poursuivants seraient autrement exposés, parce qu'on ne pourrait pas aller de l'avant avec une action non fondée. Il paraîtrait étrange de choisir une stricte règle d'immunité de préférence à une règle efficace permettant la radiation.

Que le juge Kerans soit peu disposé à accepter l'existence d'une immunité absolue pour les poursuivants se dégage également des extraits suivants (aux pp. 277 et 286):

[TRADUCTION] Supposons pour les fins de la discussion que, si un avocat continue, avec une intention malveillante, des poursuites qu'auparavant il a cru justifiées et sait maintenant injustifiées, il peut lui-même être poursuivi.

1989 CanLII 77 (SCC)

Counsel for the Attorney General who acts as his agent in the prosecution of a criminal case is not accountable in civil proceedings to the accused except possibly to the extent that it is alleged against him that he has not acted in good faith, and to that extent the allegation falls within the nominative tort of malicious prosecution . . . [Emphasis added.]

Therefore the Canadian position ranges from a strong assertion of absolute immunity in Ontario to an acceptance of the possibility of suing the Attorney General and Crown Attorneys if bad faith or malice can be proven as evidenced by the cases from Nova Scotia and Alberta. The situation in Quebec differs in that since 1966 the *Code of Civil Procedure*, R.S.Q., c. C-25, specifically provides for claims against the Crown in the following terms:

**94.** Any person having a claim to exercise against the Crown, whether it be a revendication of moveable or immoveable property, or a claim for the payment of moneys on an alleged contract, or for damages, or otherwise, may exercise it in the same manner as if it were a claim against a person of full age and capacity, subject only to the provisions of this chapter.

No provisions in this chapter prevent a suit for malicious prosecution against the Crown. However, the substantive issue of immunity of Crown prosecutors has not been finally determined.

### 3. *Immunity in the United States*

A consideration of the position in respect of prosecutorial immunity in the United States is vital both because it is relied extensively upon by the Court of Appeal in the case at bar, and because it has been the source of a healthy debate in courts and among academics in that country. This position is furthermore interesting since a variety of approaches have been proposed and many critical comments have been made.

#### i) The Functional Approach—*Imbler v. Pachtman*: "The Powell Judgment"

In 1972 Paul Imbler filed a claim under 42 U.S.C. § 1983 alleging that the prosecutor and various members of the police force conspired to

Le substitut du procureur général, qui agit au nom de ce dernier dans des poursuites criminelles, n'est pas comptable à l'accusé dans un recours civil, sauf peut-être dans la mesure où il y a allégation de mauvaise foi dans l'exercice de ses fonctions, savoir l'équivalent du délit civil nommé de poursuites abusives ... [Je souligne.]

La position canadienne varie donc entre une reconnaissance non équivoque de l'immunité absolue, en Ontario, et l'acceptation de la possibilité de poursuivre le procureur général et les procureurs de la Couronne si on peut prouver qu'il y a eu mauvaise foi ou malveillance de leur part, selon les décisions de la Nouvelle-Écosse et de l'Alberta. Dans le cas du Québec, la situation est tout à fait différente en ce que, depuis 1966, le *Code de procédure civile*, L.R.Q., chap. C-25, prévoit spécifiquement les recours contre la Couronne de la manière suivante:

**94.** Toute personne ayant un recours à exercer contre la Couronne, que ce soit la revendication de biens meubles ou immeubles, ou une réclamation en paiement de deniers en raison d'un contrat allégué, ou pour dommages, ou autrement, peut l'exercer de la même manière que s'il s'agissait d'un recours contre une personne majeure et capable, sous réserve seulement des dispositions du présent chapitre.

Aucune disposition du chapitre en question n'interdit d'actionner la Couronne pour poursuites abusives. Cependant, la question de fond de l'immunité des procureurs de la Couronne n'a pas été définitivement tranchée.

### 3. *L'immunité aux États-Unis*

Il importe au premier chef d'examiner la position américaine relativement à l'immunité du poursuivant parce que c'est en grande partie sur elle que s'est appuyée la Cour d'appel en l'espèce et aussi parce qu'elle a suscité une saine discussion devant les tribunaux et dans la doctrine aux États-Unis. Cette position a d'ailleurs ceci d'intéressant que plusieurs approches ont été proposées et de nombreuses critiques formulées à son égard.

#### i) L'approche fonctionnelle—*Imbler v. Pachtman*: «Les motifs du juge Powell»

En 1972, Paul Imbler a présenté une demande en vertu de 42 U.S.C. § 1983 dans laquelle il reprochait au poursuivant et à plusieurs policiers

cause him loss of liberty by allowing a witness to give false testimony, suppressing evidence, prosecuting with knowledge of an exculpatory lie-detector test and introducing an altered police artist's sketch. Section 1983 of the *Civil Rights Act* creates a federal damage action against anyone who acts under colour of state law to deprive a person of his civil rights as protected by the U.S. Constitution. Powell J., speaking for five members of the Supreme Court, held that a prosecutor is absolutely immune from s. 1983 actions when the actions arise out of the prosecutor's initiation of prosecution and presentation of the State's case. In addition, the Court seemed to suggest that absolute immunity also attached to activities that "were intimately associated with the judicial phase of the criminal process" (p. 430). The Court then adopted what has become known as the "functional approach" of prosecutorial immunity.

The *Imbler* decision recognizes that prosecutors perform many functions in the course of fulfilling their duties, among them being the decision to initiate a prosecution, which witnesses to call, what other evidence to present, and obtaining, reviewing and evaluating evidence. The Court accepts that drawing a line between these functions is a difficult task but concludes that prosecutorial functions of a quasi-judicial or advocatory nature should be afforded absolute immunity. The Court refused to comment on whether a similar immunity attaches to what it called the "administrative" or "investigative" role of the prosecutor. In the course of justifying its position, the Court noted that the same policy considerations that afford absolute immunity to judges acting within the scope of their duties support a prosecutor's common law absolute immunity. The Court simply extended that line of reasoning to s. 1983 claims.

d'avoir comploté en vue de le priver de sa liberté en permettant à un témoin de donner un faux témoignage, en supprimant des éléments de preuve, en engageant des poursuites, tout en sachant que le résultat d'un test au détecteur de mensonges le disculpait, et en produisant en preuve un portrait-robot altéré. L'article 1983 de la *Civil Rights Act* prévoit une action fédérale en dommages-intérêts pouvant être exercée contre quiconque s'autorise d'une loi d'un État pour priver une personne des droits que lui garantit la Constitution des États-Unis. Le juge Powell, parlant au nom de cinq membres de la Cour suprême, a dit qu'un poursuivant bénéficie d'une immunité absolue contre des actions fondées sur l'art. 1983 lorsque celles-ci découlent de l'introduction des poursuites et de la présentation de la preuve de l'État par le poursuivant. De plus, la cour semble avoir reconnu également l'existence d'une immunité absolue à l'égard des activités [TRADUCTION] «intimement liées à la phase judiciaire du processus criminel» (p. 430). La cour a ensuite adopté relativement à l'immunité du poursuivant ce qu'on appelle «l'approche fonctionnelle».

L'arrêt *Imbler* reconnaît qu'en s'acquittant de leurs fonctions, les poursuivants accomplissent un grand nombre de tâches, dont décider d'engager des poursuites, quels témoins citer et quelles autres preuves produire, ainsi qu'obtenir, examiner et apprécier des éléments de preuve. La cour convient qu'il est difficile de tracer une ligne de démarcation entre ces fonctions, mais conclut qu'il devrait y avoir une immunité absolue dans le cas des fonctions du poursuivant qui revêtent un caractère quasi judiciaire ou qui tiennent du rôle d'un avocat. Elle a refusé de se prononcer sur la question de savoir si le poursuivant jouit d'une immunité semblable dans son rôle «administratif» ou «d'enquêteur». Pour justifier ce point de vue, la cour fait remarquer que les raisons de principe qui justifient l'immunité absolue accordée aux juges agissant dans les limites de leurs fonctions fondent également l'immunité absolue des poursuivants en *common law*. La cour a simplement appliqué ce raisonnement aux demandes fondées sur l'art. 1983.

The policy considerations canvassed by the Court are familiar ones and can be summarized as follows:

1. Public Confidence

"The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages."

2. Diversion from Duties

". . . if the prosecutor could be made to answer in court each time such a person charged him with wrongdoing, his energy and attention would be diverted from the pressing duty of enforcing the criminal law."

3. Balancing of Evils

". . . we find ourselves in agreement with Judge Learned Hand, who wrote of the prosecutor's immunity from actions for malicious prosecution:

". . . it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Gregoire* v. *Biddle*, 177 F. (2d) 579, 581 (CA2 1949) cert. denied, 339 U.S. 949 (1950)."

4. Other Available Remedies

"Even judges . . . could be punished criminally for willful deprivations of constitutional rights . . . The prosecutor would fare no better for his willful acts . . . Moreover, a prosecutor stands perhaps unique, among officials whose acts could deprive persons of constitutional rights, in his amenability to professional discipline by an association of his peers."

(*Imbler, supra*, at pp. 424-29)

Therefore, Powell J. affirmed the judgment of the Court of Appeal for the Ninth Circuit and held that a prosecutor is absolutely immune from suit in initiating a prosecution and in presenting the State's case.

Les raisons de principe analysées par la cour sont bien connues et peuvent se résumer ainsi:

1. La confiance du public

[TRADUCTION] «La confiance du public dans les poursuivants serait diminuée si ces derniers se voyaient soumis à des contraintes chaque fois qu'ils prennent une décision, en raison de la possibilité de poursuites en dommages-intérêts.»

2. Le détournement des fonctions

[TRADUCTION] «. . . si le poursuivant pouvait être actionné chaque fois qu'une telle personne l'accusait d'inconduite, ses efforts et son attention seraient détournés de la tâche importante qu'est l'application du droit criminel.»

3. Le choix entre deux maux

[TRADUCTION] «. . . nous partageons l'avis du juge Learned Hand, qui a écrit au sujet de l'immunité du poursuivant contre les actions pour poursuites abusives:

«on a finalement jugé préférable de laisser sans recours les fautes que peuvent commettre des fonctionnaires malhonnêtes plutôt que d'exposer ceux qui s'efforcent d'accomplir leur devoir à la menace constante de représailles». *Gregoire* v. *Biddle*, 177 F. (2d) 579, 581 (CA2 1949) *cert.* refusé; 339 U.S. 949 (1950).»

4. Les autres recours possibles

[TRADUCTION] «. . . Même les juges [. . .] pourraient s'attirer des sanctions pénales s'ils portaient volontairement atteinte à des droits constitutionnels [. . .] Il en serait de même du poursuivant pour des actes volontaires [. . .] De plus, un poursuivant est peut-être unique parmi les fonctionnaires dont les actes peuvent léser les droits constitutionnels d'individus parce qu'il peut faire l'objet de mesures disciplinaires prises par une association de ses pairs.»

(*Imbler*, précité, aux pp. 424 à 429)

Le juge Powell a donc confirmé l'arrêt de la Cour d'appel du Neuvième circuit et a statué qu'un poursuivant bénéficie d'une immunité absolue lorsqu'il engage des poursuites et présente la preuve de l'État.

NELLES v. ONTARIO  *Lamer J.*    [1989] 2 S.C.R.

ii) The Functional Approach—*Imbler v. Pacht-man*: "The White Judgment"

While concurring with the judgment of Powell J. and much of his reasoning, White J. (Brennan and Marshall JJ. joining) would carve out an exception to the rule of absolute immunity for the unconstitutional suppression of evidence. In doing so White J. examined the rationale for granting absolute immunity to prosecutors at common law (at p. 442):

The absolute immunity ... is designed to encourage [the prosecutors] to bring information to the court which will resolve the criminal case.... Lest they withhold valuable but questionable evidence or refrain from making valuable but questionable arguments, prosecutors are protected from liability for submitting before the court information later determined to have been false to their knowledge.

According to White J. immunity from suit based on the unconstitutional suppression of evidence would "stand this immunity rule on its head" (p. 442) by discouraging precisely the disclosure of evidence sought to be encouraged by the rule (at p. 443):

A prosecutor seeking to protect himself from liability for failure to disclose evidence may be induced to disclose more than is required. But this will hardly injure the judicial process. Indeed, it will help it. Accordingly, lower courts have held that unconstitutional suppression of exculpatory evidence is beyond the scope of "duties constituting an integral part of the judicial process" and have refused to extend absolute immunity to suits based on such claims. *Hilliard v. Williams*, 465 F. 2d 1212, 1218 (CA6), cert. denied, 409 U.S. 1029 (1972) ....

White J.'s position then would limit the scope of absolute immunity but would not eliminate the theoretical underpinning of the Powell majority judgment, namely the functional approach to absolute immunity.

The functional approach has been criticized on a number of grounds. First, there is the ever present problem of line-drawing between functions that are quasi-judicial and those that are administrative

ii) L'approche fonctionnelle—*Imbler v. Pacht-man*: «Les motifs du juge White»

Bien que souscrivant aux motifs du juge Powell et à une bonne partie de son raisonnement, le juge White (avec l'appui des juges Brennan et Marshall) était d'avis de créer une exception à la règle de l'immunité absolue pour les cas de suppression inconstitutionnelle d'éléments de preuve. À ce propos, le juge White a examiné la raison d'être de l'immunité absolue accordée aux poursuivants par la *common law* (à la p. 442):

[TRADUCTION] L'immunité absolue [...] est destinée à encourager [les poursuivants] à présenter à la cour des renseignements qui permettront de régler l'affaire criminelle [...] De crainte qu'ils ne communiquent pas des éléments de preuve utiles mais douteux ou qu'ils s'abstiennent d'avancer des arguments utiles mais douteux, les poursuivants sont protégés contre la responsabilité du fait d'avoir soumis à la cour des renseignements dont on découvre par la suite qu'ils les savaient faux.

Selon le juge White, l'immunité contre une action fondée sur la suppression inconstitutionnelle d'éléments de preuve aurait pour effet de [TRADUCTION] «pervertir la règle de l'immunité» (p. 442) en décourageant précisément la production des éléments de preuve dont la règle vise à favoriser la production (à la p. 443):

[TRADUCTION] Un poursuivant qui cherche à se protéger contre la responsabilité du fait de son omission de révéler des éléments de preuve pourrait être enclin à divulguer plus que ce qui est requis. Mais cela ne nuira guère au processus judiciaire. En fait, cela lui sera bénéfique. C'est pourquoi les juridictions inférieures ont dit que la suppression inconstitutionnelle de preuves disculpatoires ne relève pas des «fonctions faisant partie intégrante du processus judiciaire» et ont refusé d'accorder une immunité absolue contre les actions ayant une telle origine. *Hilliard v. Williams*, 465 F. 2d 1212, 1218 (CA6), *cert.* refusé, 409 U.S. 1029 (1972) ...

La position du juge White apporterait donc une restriction à l'immunité absolue sans pour autant écarter le fondement théorique des motifs de la majorité rédigés par le juge Powell, savoir l'approche fonctionnelle.

L'approche fonctionnelle a été critiquée à plusieurs titres. D'abord, il y a l'éternel problème du tracé de la ligne de démarcation entre les fonctions quasi judiciaires et les fonctions administratives ou

1989 CanLII 77 (SCC)

or investigative. Drawing the line is made more difficult by multi-faceted functions, functions that simultaneously serve quasi-judicial, administrative and investigative functions. (See Anthony Luppino, "Supplementing the Functional Test of Prosecutorial Immunity" (1982), 34 *Stan. L. Rev.* 487, at pp. 493-94.) Aside from the problem of distinguishing between prosecutorial functions, there is the conceptual difficulty in justifying differential treatment of malicious acts based on the criterion of function. If a prosecutor acts maliciously in the course of the prosecution of an accused, does it really matter whether the function being carried out is characterized as "quasi-judicial" or "administrative"?

An example of the difficulty with the functional approach is the disagreement in the lower courts in the United States over whether quasi-judicial absolute immunity extends to investigative functions of a prosecutor. In addition, and in light of the White concurring judgment in *Imbler*, there is disagreement over whether leaks of information and destruction or alteration of evidence are acts that are protected by absolute immunity: see cases cited by J. C. Filosa, "Prosecutorial Immunity: No Place for Absolutes," [1983] *U. Ill. L. Rev.* 977, at pp. 985-86. In my view, these disagreements demonstrate the futility of attempting to differentiate between functions of a prosecutor in a principled way. The result is often arbitrary line-drawing which leads to seemingly unresolvable conflict and the diversion of attention from the central issue, namely whether or not a prosecutor has acted maliciously.

Second, it has been argued that the policy rationales supporting absolute immunity for prosecutors, derived as they are from judicial immunity, rely on an inaccurate reading of history. Filosa in his article challenges the derivation of the prosecutor's quasi-judicial immunity from s. 1983

d'enquête. Tracer cette ligne devient encore plus difficile dans le cas de fonctions multidimensionnelles, c'est-à-dire celles qui sont à la fois fonctions quasi judiciaires, administratives et fonctions d'enquête. (Voir Anthony Luppino, «Supplementing the Functional Test of Prosecutorial Immunity» (1982), 34 *Stan. L. Rev.* 487, aux pp. 493 et 494.) Outre le problème que pose la différenciation des diverses fonctions du poursuivant, il y a la difficulté conceptuelle à justifier que des actes malveillants soient jugés différemment par suite de l'application du critère de la fonction. Si un poursuivant fait preuve de malveillance dans le cadre de poursuites engagées contre un accusé, importe-t-il vraiment que la fonction exercée soit qualifiée de «quasi judiciaire» ou d'«administrative»?

Un exemple de la difficulté inhérente à l'approche fonctionnelle est le désaccord entre les juridictions inférieures des États-Unis sur la question de savoir si l'immunité absolue quasi judiciaire s'étend aux fonctions d'enquête d'un poursuivant. De plus, compte tenu des motifs concordants du juge White dans l'affaire *Imbler*, il y a divergence sur le point de savoir si les fuites de renseignements et la destruction ou l'altération d'éléments de preuve sont des actes bénéficiant de la protection d'une immunité absolue: voir la jurisprudence citée par J. C. Filosa, «Prosecutorial Immunity: No Place for Absolutes», [1983] *U. Ill. L. Rev.* 977, aux pp. 985 et 986. À mon avis, ces désaccords démontrent la futilité de tenter de différencier les fonctions d'un poursuivant en ayant recours à quelque principe. Souvent cela n'aboutit qu'à l'établissement de lignes arbitraires qui amènent des conflits apparemment impossibles à régler et la question fondamentale, celle de savoir si un poursuivant a fait preuve de malveillance, est reléguée à l'arrière-plan.

Deuxièmement, on a prétendu que les raisons de principe invoquées comme fondement d'une immunité absolue pour les poursuivants, lesquelles dérivent du principe de l'immunité judiciaire, reposent sur une interprétation erronée de l'histoire. Dans son article, Filosa conteste l'idée que l'immunité quasi judiciaire du poursuivant contre les actions fondées sur l'art. 1983 découle de l'immunité abso-

1989 CanLII 77 (SCC)

claims from the absolute immunity of judges at common law (at pp. 980-81):

> In the sixteenth century, English judges were typically liable for their torts. Throughout the nineteenth century, judges remained liable for malicious conduct done without reasonable and probable cause. In America before *Bradley v. Fisher* [80 U.S. (13 Wall.) 335 (1872)], courts held many judicial officers liable for their wrongful acts .... Of the thirty-seven states in existence in 1871, thirteen had judicial immunity, six states held judges liable for malicious actions, nine had not taken a clear position, and nine had not faced the question.

Filosa goes on to argue that Congress could not have meant to incorporate a doctrine of absolute immunity into s. 1983 because *Bradley*, which firmly entrenched judicial immunity in the common law, was not decided until 1872, one year after the *Civil Rights Act of 1871* that contained s. 1983.

### 4. *Alternatives to Imbler*

#### i) The Functional Approach Reapproached

The difficulties in applying the functional test have led American courts and academic commentators to suggest alternatives or reassessments of the test. One such attempt has been described by its proponent as the "functional approach reapproached". (See Note, "Delimiting the Scope of Prosecutorial Immunity from Section 1983 Damage Suits" (1977), 52 *N.Y.U. L. Rev.* 173, at pp. 190-91.) This approach seeks to avoid a judicial hearing to determine whether a prosecutor's action is quasi-judicial. As such the test states that "the only duties clearly not entitled to quasi-judicial immunity are those so divorced from the judicial process that they could readily be assigned to another official who could be completely independent of the prosecutor" (see Note, loc. cit., at p. 191). This approach seeks to grant to the prosecutor absolute immunity in a wider sphere of activities in the hopes of clarifying the distinction between quasi-judicial and investigative activities. In my view, this modification still has the drawback of requiring a line to be drawn between

lue dont jouissaient les juges en *common law* (aux pp. 980 et 981):

> [TRADUCTION] Au seizième siècle, les juges anglais étaient en règle générale responsables des délits civils qu'ils commettaient. Tout au cours du dix-neuvième siècle, les juges continuaient à répondre de tout acte malveillant qu'ils accomplissaient sans motif raisonnable ou probable. Aux États-Unis, avant la décision *Bradley v. Fisher* [80 U.S. (13 Wall.) 335 (1872)], les tribunaux ont jugé beaucoup de fonctionnaires judiciaires responsables de leurs actes dommageables ... Sur les trente-sept États qui existaient en 1871, treize reconnaissaient l'immunité judiciaire, six tenaient les juges pour responsables de leurs actes malveillants, neuf n'avaient pas pris de position nette et neuf n'avaient pas abordé la question.

Filosa soutient ensuite que le Congrès n'a pas pu vouloir incorporer dans l'art. 1983 un principe d'immunité absolue parce que la décision *Bradley*, qui consacrait en *common law* la notion d'immunité judiciaire, n'a été rendue qu'en 1872, soit un an après l'adoption de la *Civil Rights Act of 1871*, dans laquelle figurait l'art. 1983.

### 4. *Positions de rechange face à l'arrêt Imbler*

#### i) Réexamen de l'approche fonctionnelle

Les difficultés d'application du critère fonctionnel ont amené les tribunaux et les commentateurs américains à proposer d'autres critères ou la réévaluation du critère existant. Une de ces propositions a été décrite par son auteur comme le [TRADUCTION] «réexamen de l'approche fonctionnelle». (Voir Note, «Delimiting the Scope of Prosecutorial Immunity from Section 1983 Damage Suits» (1977), 52 *N.Y.U. L. Rev.* 173, aux pp. 190 et 191.) On y cherche à éviter la tenue d'une audience judiciaire pour déterminer si l'acte du poursuivant revêt un caractère quasi judiciaire. Donc, suivant ce critère, [TRADUCTION] «les seules fonctions qui ne donnent manifestement pas lieu à une immunité quasi judiciaire sont celles qui sont à ce point étrangères au processus judiciaire qu'elles pourraient facilement être attribuées à un autre fonctionnaire totalement indépendant du poursuivant» (voir Note, *loc. cit.*, à la p. 191). Cette approche vise à accorder au poursuivant une immunité absolue dans des champs d'activité plus étendus, avec l'espoir de parvenir à préciser la

1989 CanLII 77 (SCC)

prosecutorial functions, a difficult task in itself. The modification, in seeking to make that task easier, errs on the side of including more activities within the realm of absolute prosecutorial immunity, a modification that, with respect, offers an immunity considerably wider than that given to judges from which prosecutorial immunity is allegedly derived.

#### ii) General Features Test: *Wilkinson v. Ellis*

In *Wilkinson v. Ellis*, 484 F. Supp. 1072 (E.D. Pa. 1980), the plaintiff alleged that a prosecutor destroyed a tape recorded interview with a man who admitted involvement in the alleged criminal activity, thereby exonerating the plaintiff. The prosecutor moved to dismiss the action, arguing that the destruction of evidence is a quasi-judicial act shielded by absolute immunity. The *Wilkinson* court refused to characterize the destruction as either investigative or quasi-judicial. Rather, it resolved the difficulty of classifying activities by asking whether the activity contained features "which generally characterize quasi-judicial activity" (p. 1083). In deciding that the destruction did not have the "general features" of quasi-judicial activity, the court identified three factors to be taken into account: (1) the activity's physical and temporal proximity to the judicial process; (2) the degree of dependence upon legal opinions and prosecutorial discretion involved in the conduct; and (3) whether the activity is primarily advocatory (p. 1080). This approach in my view, does little to get away from the inherent problems involved in categorizing prosecutorial actions.

#### iii) The *Imbler* "Umbrella"

This variation of the functional approach involves limiting the scope of the prosecutor's quasi-judicial function to conduct that falls within the

distinction entre les activités quasi judiciaires et les activités d'enquête. À mon avis, cette modification présente encore l'inconvénient d'obliger à tracer une ligne de démarcation entre les différentes fonctions du poursuivant, ce qui représente déjà une tâche difficile. En tentant de faciliter cette tâche, la modification pèche par l'extension de l'immunité absolue du poursuivant à un plus grand nombre d'activités et j'estime, avec égards, qu'elle offre au poursuivant une immunité nettement plus large que celle accordée aux juges, dont elle est censée dériver.

#### ii) Le critère des caractéristiques générales: *Wilkinson v. Ellis*

Dans l'affaire *Wilkinson v. Ellis*, 484 F. Supp. 1072 (E.D. Pa. 1980), le demandeur prétendait qu'un poursuivant avait détruit l'enregistrement d'une entrevue avec un homme qui avouait sa participation à l'acte criminel et qui en conséquence disculpait le demandeur. Le poursuivant a demandé le rejet de l'action, parce que la destruction d'éléments de preuve constitue un acte quasi judiciaire qui bénéficie d'une immunité absolue. La cour dans l'affaire *Wilkinson* a refusé de caractériser la destruction de la preuve comme un acte d'enquête ou un acte quasi judiciaire. Au lieu de cela, elle a résolu la difficulté de la classification des activités en se demandant si l'acte en cause comportait des traits [TRADUCTION] «qui caractérisent généralement les actes quasi judiciaires» (p. 1083). En décidant que la destruction de la preuve ne présentait pas les [TRADUCTION] «caractéristiques générales» d'un acte quasi judiciaire, la cour a énuméré trois facteurs à prendre en considération: (1) l'étroitesse du lien matériel et temporel de l'acte avec le processus judiciaire; (2) la part des opinions juridiques et du pouvoir discrétionnaire du poursuivant dans l'acte en cause; et (3) le fait que l'acte relève ou non principalement des fonctions d'un avocat (p. 1080). Cette approche, selon moi, ne contribue guère à résoudre les problèmes inhérents à la catégorisation des actes d'un poursuivant.

#### iii) Le «champ» de l'arrêt *Imbler*

Cette variante de l'approche fonctionnelle consiste à limiter l'étendue du rôle quasi judiciaire du poursuivant à la conduite qui s'inscrit dans les

1989 CanLII 77 (SCC)

narrowest confines of the *Imbler* test: in other words within the "umbrella" of coverage defined by the language of *Imbler*. Acts that are under the "umbrella" attract absolute immunity; all others receive at most qualified immunity. (See *Marrero v. City of Hialeah*, 625 F.2d 499 (5th Cir. 1980), *cert.* denied, 450 U.S. 913 (1981).) This approach merely re-states the categorization problem found in *Imbler*. The test requires a determination of what constitutes the coverage of the so-called "*Imbler* umbrella" and thereby takes us back to the original problem of line-drawing.

### iv) The Harm Test

This variation of *Imbler* construes that decision broadly by granting absolute immunity to prosecutorial conduct that causes a defendant to "face prosecution, or to suffer imprisonment or pretrial detention". (See *Taylor v. Kavanagh*, 640 F.2d 450 (2d Cir. 1981), at p. 453.) The test denies absolute immunity to prosecutorial conduct that inflicts harm independent of the prosecution itself. This approach looks to the effects of prosecutorial conduct and as such purports to reduce the issue to a factual determination of harms. If the harm is unrelated to the judicial phase of the criminal justice process then the prosecutorial act causing the harm is not quasi-judicial.

### v) The Supplemental Functional Approach

This approach involves a two-step process: first, determining what conduct normally merits absolute or qualified immunity and second, in the remaining cases, identifying the substantive values affected by conduct that is not susceptible to traditional categorization. (See Luppino, *loc. cit.*, at p. 505.) This variation recognizes that there will be occasions when conduct does not clearly fall into one of the two traditional categories: quasi-judicial and non-quasi-judicial. When conduct does not fall into either category explicit balancing of competing interests becomes necessary. In this respect,

limites les plus étroites du critère établi dans l'arrêt *Imbler* ou qui, en d'autres termes, relève du «champ» couvert par cet arrêt. Les actes compris dans ce «champ» bénéficient d'une immunité absolue; les autres donnent lieu tout au plus à une immunité restreinte. (Voir *Marrero v. City of Hialeah*, 625 F.2d 499 (5th Cir. 1980), *cert.* refusé, 450 U.S. 913 (1981).) Cette approche n'est autre qu'une reformulation du problème de classification qui se pose dans l'affaire *Imbler*. Il s'agit d'un critère qui exige la détermination de l'étendue de ce qu'on appelle le «champ de l'arrêt *Imbler*» et cela nous ramène au problème initial du tracé de lignes de démarcation.

### iv) Le critère du préjudice

Cette variante du principe posé dans l'arrêt *Imbler* donne à cet arrêt une interprétation large en accordant une immunité absolue à l'égard de toute conduite du poursuivant par suite de laquelle un défendeur doit [TRADUCTION] «faire face à des poursuites ou subir l'incarcération ou la détention préventive». (Voir *Taylor v. Kavanagh*, 640 F.2d 450 (2d Cir. 1981), à la p. 453.) Ce critère ne confère pas d'immunité absolue dans le cas d'une conduite de la part du poursuivant qui porte préjudice indépendamment des poursuites elles-mêmes. Cette approche tient compte des conséquences de la conduite du poursuivant et, de ce fait, vise à réduire la question à une détermination objective du préjudice. Si le préjudice n'a aucun rapport avec la phase judiciaire du processus de justice criminelle, l'acte dommageable du poursuivant ne revêt pas un caractère quasi judiciaire.

### v) L'approche fonctionnelle complémentaire

Cette approche comporte deux étapes. D'abord, on doit décider quelle conduite mérite normalement une immunité absolue ou restreinte. Ensuite, dans les autres cas, il faut déterminer quelles valeurs fondamentales sont touchées par une conduite qui ne se prête pas à la classification traditionnelle. (Voir Luppino, *loc. cit.*, à la p. 505.) Cette variante reconnaît qu'il y a des situations où une conduite ne relève pas clairement de l'une des deux catégories traditionnelles: le quasi judiciaire et ce qui ne l'est pas. Lorsqu'une conduite ne tombe ni dans l'une ni dans l'autre catégorie, il

courts should weigh the cost to the judicial system resulting from the unredressed civil wrong against the cost to the efficiency of the criminal justice system. This approach recognizes that the *Imbler* functional approach cannot account for all prosecutorial functions; there will be some conduct that is multi-faceted and uncategorizable. As a result the approach resorts to a consideration of first principles, namely a balancing of the policy considerations both in favour and opposed to prosecutorial immunity in the first place. In short, we have come full circle.

The American position, in any of its forms, demonstrates the impracticality of the functional approach to prosecutorial immunity. In my view, the functional approach leads to arbitrary line drawing between prosecutorial functions. This line drawing exercise is made nearly impossible by the reality that many prosecutorial functions are multi-faceted and cannot be neatly categorized. Further, it must be noted that however one categorizes a prosecutor's function it is still that of the prosecutor. If it can be demonstrated that a prosecutor has acted without reasonable cause and has acted with malice then does it really matter which functions he was carrying out? In my view to decide the scope of immunity on the basis of categorization of functions is an unprincipled approach that obscures the central issue, namely whether the prosecutor has acted maliciously. If immunity is to be qualified it should be done in a manner other than by the drawing of lines between quasi-judicial and other prosecutorial functions.

5. *The English Position*

The position in respect of prosecutorial immunity in England is somewhat unique in that jurisdiction owing in part to the tradition of private prosecution. Private prosecutors have always been liable to suit for malicious prosecution though few, if any, reported cases exist. The Director of Public Prosecutions, who performs the same or similar

faut alors soupeser les intérêts en conflit. Dans ce contexte, il incombe aux tribunaux de mettre en balance le coût pour le système judiciaire d'un délit civil non réparé et le coût pour l'efficacité du système de justice criminelle. Cette démarche reconnaît que l'approche fonctionnelle de l'arrêt *Imbler* ne peut tenir compte de la totalité des fonctions du poursuivant; certains actes seront multidimensionnels et non susceptibles de catégorisation. Il faut donc recourir à l'examen des principes de base, c'est-à-dire soupeser les considérations d'intérêt public militant à l'origine pour ou contre l'immunité du poursuivant. En bref, nous revenons au point de départ.

La position américaine, sous ses diverses formes, démontre l'impraticabilité de l'approche fonctionnelle dans le domaine de l'immunité du poursuivant. À mon avis, cette approche conduit à tracer des lignes de démarcation arbitraires entre les diverses fonctions du poursuivant. Or, le tracé de ces lignes est rendu presque impossible du fait qu'un bon nombre des fonctions en question sont multidimensionnelles et ne peuvent pas être classées dans des catégories déterminées. Il faut souligner en outre que, peu importe la façon dont on caractérise telle ou telle fonction du poursuivant, elle n'en demeure pas moins une fonction du poursuivant. Si l'on peut prouver qu'un poursuivant a agi sans motif raisonnable et avec malveillance, les fonctions précises dont il s'acquittait importent-elles vraiment? Je suis d'avis qu'avoir recours à la catégorisation de fonctions pour déterminer l'étendue de l'immunité est une méthode qui ne repose sur aucun principe et qui embrouille la question fondamentale: celle de savoir si le poursuivant a fait preuve de malveillance. Si l'immunité doit être restreinte, il faut le faire autrement qu'en traçant des lignes de démarcation entre les fonctions quasi judiciaires et les autres fonctions du poursuivant.

5. *La position anglaise*

La position anglaise à l'égard de l'immunité du poursuivant est assez unique, en raison partiellement de la tradition des poursuites privées. Les poursuivants privés ont toujours été exposés à des actions pour poursuites abusives, quoiqu'il existe peu, ou point, de décisions publiées dans ce domaine. La charge d'avocat général (*Director of*

1989 CanLII 77 (SCC)

1989 CanLII 77 (SCC)

function as a Canadian provincial Attorney General, was not created until 1879. In *Riches v. Director of Public Prosecutions*, [1973] 2 All E.R. 935 (C.A.), the Court said the following in respect of suits against the D.P.P. (at p. 941):

> I do not wish to be taken as saying that there may never be a case where a prosecution has been initiated and pursued by the Director of Public Prosecutions in which it would be impossible for an acquitted defendant to succeed in an action for malicious prosecution, or as saying, that the existence of the Attorney General's fiat where required conclusively negates the existence of malice and conclusively proves that there was reasonable and probable cause for the prosecution. There may be cases where there has been, by even a responsible authority, the suppression of evidence which has led to a false view being taken by those who carried on a prosecution and by those who ultimately convicted.

The English position then, at the very least, leaves the door open for suits against the equivalent of our Attorneys General and Crown Attorneys when what is at issue is the suppression of evidence. It is apposite to note that this position is reflective of White J.'s concurring opinion in *Imbler*, *supra*, wherein he carved out an exception to the rule of absolute immunity for the unconstitutional suppression of evidence.

## 6. *Scotland*

It would appear that in Scotland the equivalent of our Attorney General and Crown Attorneys are absolutely immune from civil liability. In *Hester v. MacDonald*, [1961] S.C. 370, the court said at p. 377:

> It is, therefore, an essential element in the very structure of our criminal administration in Scotland that the Lord Advocate is protected by an absolute privilege in respect of matters in connexion with proceedings brought before a Scottish Criminal Court by way of indictment . . . . Never in our history has a Lord Advocate been sued for damages in connexion with such proceedings. On the contrary, our Courts have consistently affirmed the existence of such immunity on his part.

*Public Prosecutions*), dont les fonctions sont identiques ou semblables à celles d'un procureur général provincial au Canada, n'a été créée qu'en 1879. Dans l'arrêt *Riches v. Director of Public Prosecutions*, [1973] 2 All E.R. 935 (C.A.), la cour disait ceci quant aux actions intentées contre le D.P.P. (à la p. 941):

> [TRADUCTION] Je ne voudrais pas qu'on interprète mes propos comme signifiant qu'il est impossible qu'un défendeur acquitté à l'issue de poursuites intentées par l'avocat général ait gain de cause dans une action pour poursuites abusives. Je ne dis pas non plus que l'autorisation du procureur général, lorsqu'elle est requise, efface péremptoirement toute trace de malveillance et constitue la preuve irréfutable que la poursuite était fondée sur un motif raisonnable et probable. On peut songer à des cas où il y a eu, même de la part d'une administration responsable, suppression d'éléments de preuve faussant la perception de ceux qui ont mené la poursuite et de ceux qui, finalement, ont prononcé la condamnation.

La position anglaise admet donc au moins la possibilité d'actions contre les homologues de nos procureurs généraux et procureurs de la Couronne lorsque la suppression d'éléments de preuve est en cause. Il convient de faire remarquer que cette position rejoint l'opinion concordante du juge White, dans l'affaire *Imbler*, précitée, qui a prévu une exception à la règle de l'immunité absolue dans le cas de la suppression inconstitutionnelle d'éléments de preuve.

## 6. *L'Écosse*

En Écosse, les homologues de nos procureurs généraux et procureurs de la Couronne paraissent jouir d'une immunité absolue contre la responsabilité civile. Dans l'affaire *Hester v. MacDonald*, [1961] S.C. 370, la cour dit, à la p. 377:

> [TRADUCTION] L'immunité absolue du Lord Advocate relativement à tout ce qui se rapporte aux procédures engagées par voie de mise en accusation devant une instance criminelle écossaise est un élément essentiel de la structure même de l'administration criminelle en Écosse [. . .] Jamais un Lord Advocate n'a fait l'objet d'une action en dommages-intérêts par suite de telles procédures. Au contraire, nos tribunaux ont toujours maintenu son immunité.

The rationale underlying this comment has been disputed by Professor Edwards in *The Attorney General, Politics and the Public Interest* (1984) in which he argues that the Scottish rationale is based upon the idea that the Lord Advocate and his agents enjoy a constitutional trust which assumes good faith in commencing a prosecution, a rationale far removed from that invoked by the Ontario courts.

### 7. *Australia and New Zealand*

The position in respect of prosecutorial immunity in Australia and New Zealand is not clear. As far as I can determine, there does not seem to be any reported case on the issue.

Although the situation prevailing in European civil law jurisdictions is interesting, its application to the case at bar is of limited usefulness because of the wide differences between the civil law system and our common law tradition.

### II. The Preferred Canadian Position

### 1. *The Role of the Attorney General and Crown Attorney*

Historically the Attorney General's role was that of legal adviser to the Crown and to the various departments of government. More specifically the principal function was and still is the prosecution of offenders. The appointment of Crown Attorneys as agents of the Attorney General, arose from the increasing difficulty of the Attorney General to attend effectively to all of his duties amid increases in population, and the expansion of settlement.

The office of the Crown Attorney has as its main function the prosecution of and supervision over indictable and summary conviction offences. The Crown Attorney is to administer justice at a local level and in so doing acts as agent for the Attorney General. Traditionally the Crown Attorney has been described as a "minister of justice" and "ought to regard himself as part of the Court rather than as an advocate". (Morris Manning, "Abuse of Power by Crown Attorneys," [1979] *L.S.U.C. Lectures* 571, at p. 580, quoting Henry Bull, Q.C.) As regards the proper role of the

Le fondement de cette opinion a été contesté par le professeur Edwards qui, dans *The Attorney General, Politics and the Public Interest* (1984), soutient que la position écossaise repose sur l'idée que le Lord Advocate et ses représentants se sont vu confier un devoir constitutionnel qui suppose qu'ils agissent de bonne foi en engageant des poursuites, ce qui est bien différent de la justification invoquée par les tribunaux ontariens.

### 7. *L'Australie et la Nouvelle-Zélande*

La position de l'Australie et de la Nouvelle-Zélande sur l'immunité du poursuivant n'est pas claire. À ma connaissance, aucun jugement publié ne traite de la question.

Malgré l'intérêt que peut présenter la situation dans les ressorts civilistes européens, elle n'a que peu d'utilité en l'espèce compte tenu des différences marquées entre le système de droit civil et la *common law*.

### II. La position canadienne

### 1. *Le rôle du procureur général et du procureur de la Couronne*

Traditionnellement, le procureur général jouait le rôle de conseiller juridique auprès de la Couronne et des différents ministères du gouvernement. Plus spécifiquement, sa tâche principale consistait, et consiste encore, à poursuivre les délinquants. La nomination de procureurs de la Couronne pour représenter le procureur général tient au fait que ce dernier avait de plus en plus de difficulté à s'acquitter efficacement de toutes ses fonctions, devant l'accroissement de la population et l'expansion des régions habitées.

Le rôle premier du procureur de la Couronne consiste à poursuivre les actes criminels et les infractions punissables sur déclaration sommaire de culpabilité et à exercer une surveillance à cet égard. Le procureur de la Couronne administre la justice au niveau local et, en cela, agit au nom du procureur général. Le procureur de la Couronne a traditionnellement été décrit comme un [TRADUCTION] «représentant de la justice» qui «devrait se considérer plus comme un fonctionnaire de la cour que comme un avocat». (Morris Manning, «Abuse of Power by Crown Attorneys», [1979] *L.S.U.C.*

1989 CanLII 77 (SCC)

Crown Attorney, perhaps no more often quoted statement is that of Rand J. in *Boucher v. The Queen*, [1955] S.C.R. 16, at p. 23-24:

It cannot be over-emphasized that the purpose of a criminal prosecution is not to obtain a conviction, it is to lay before a jury what the Crown considers to be credible evidence relevant to what is alleged to be a crime. Counsel have a duty to see that all available legal proof of the facts is presented: it should be done firmly and pressed to its legitimate strength but it must also be done fairly. The role of prosecutor excludes any notion of winning or losing; his function is a matter of public duty than which in civil life there can be none charged with greater personal responsibility. It is to be efficiently performed with an ingrained sense of the dignity, the seriousness and the justness of judicial proceedings.

Among the many powers of a prosecutor are the following: the power to detain in custody, the power to prosecute, the power to negotiate a plea, the power to charge multiple offences, the power of disclosure/non-disclosure of evidence before trial, the power to prefer an indictment, the power to proceed summarily or by indictment, the power to withdraw charges, and the power to appeal. (For a fuller description of the genesis and operation of these powers see Manning, *loc. cit.*, at pp. 586-608, and P. Béliveau, J. Bellemare and J.-P. Lussier, *On Criminal Procedure* (1982), at pp. 69-83.)

With this background in mind, it is now necessary to turn to a consideration of the tort at issue, malicious prosecution, and the policy rationales in favour of an absolute immunity for the Attorney General and Crown Attorneys in respect of that tort.

## 2. *The Tort of Malicious Prosecution*

There are four necessary elements which must be proved for a plaintiff to succeed in an action for malicious prosecution:

*Lectures* 571, à la p. 580, citant Henry Bull, c.r.) Sur le rôle qui est propre au procureur de la Couronne, il n'y a probablement aucun passage qui soit aussi souvent cité que cet extrait des motifs du juge Rand dans l'affaire *Boucher v. The Queen*, [1955] R.C.S. 16, aux pp. 23 et 24:

[TRADUCTION] On ne saurait trop répéter que les poursuites criminelles n'ont pas pour but d'obtenir une condamnation, mais de présenter au jury ce que la Couronne considère comme une preuve digne de foi relativement à ce que l'on allègue être un crime. Les avocats sont tenus de voir à ce que tous les éléments de preuve légaux disponibles soient présentés: ils doivent le faire avec fermeté et en insistant sur la valeur légitime de cette preuve, mais ils doivent également le faire d'une façon juste. Le rôle du poursuivant exclut toute notion de gain ou de perte de cause; il s'acquitte d'un devoir public, et dans la vie civile, aucun autre rôle ne comporte une plus grande responsabilité personnelle. Le poursuivant doit s'acquitter de sa tâche d'une façon efficace, avec un sens profond de la dignité, de la gravité et de la justice des procédures judiciaires.

Parmi les nombreux pouvoirs d'un poursuivant, on trouve notamment: le pouvoir de détenir préventivement, le pouvoir d'exercer des poursuites, le pouvoir de négocier sur le plaidoyer, le pouvoir de porter des accusations alléguant la perpétration de plusieurs infractions, le pouvoir de révéler ou de ne pas révéler la preuve avant le procès, le pouvoir de présenter un acte d'accusation, le pouvoir de procéder par voie sommaire ou par voie de mise en accusation, le pouvoir de retirer des accusations et le pouvoir d'interjeter appel. (Pour un exposé plus complet des origines et de l'exercice de ces pouvoirs, voir Manning, *loc. cit.*, aux pp. 586 à 608, et P. Béliveau, J. Bellemare et J.-P. Lussier, *Traité de procédure pénale* (1981), aux pp. 63 à 74).

Ayant ce contexte présent à l'esprit, il nous faut maintenant examiner le délit civil en cause, celui de poursuites abusives, ainsi que les considérations d'intérêt public militant en faveur d'une immunité absolue pour le procureur général et les procureurs de la Couronne relativement à ce délit civil.

## 2. *Le délit civil de poursuites abusives*

Le demandeur doit prouver quatre éléments pour obtenir gain de cause dans une action pour poursuites abusives:

1989 CanLII 77 (SCC)

a) the proceedings must have been initiated by the defendant;

b) the proceedings must have terminated in favour of the plaintiff;

c) the absence of reasonable and probable cause;

d) malice, or a primary purpose other than that of carrying the law into effect.

(See J. G. Fleming, *The Law of Torts* (5th ed. 1977), at p. 598.)

The first two elements are straightforward and largely speak for themselves. The latter two elements require explicit discussion. Reasonable and probable cause has been defined as "an honest belief in the guilt of the accused based upon a full conviction, founded on reasonable grounds, of the existence of a state of circumstances, which, assuming them to be true, would reasonably lead any ordinarily prudent and cautious man, placed in the position of the accuser, to the conclusion that the person charged was probably guilty of the crime imputed" (*Hicks v. Faulkner* (1878), 8 Q.B.D. 167, at p. 171, Hawkins J.)

This test contains both a subjective and objective element. There must be both actual belief on the part of the prosecutor and that belief must be reasonable in the circumstances. The existence of reasonable and probable cause is a matter for the judge to decide as opposed to the jury.

The required element of malice is for all intents, the equivalent of "improper purpose". It has according to Fleming, a "wider meaning than spite, ill-will or a spirit of vengeance, and includes any other improper purpose, such as to gain a private collateral advantage" (Fleming, op. cit., at p. 609). To succeed in an action for malicious prosecution against the Attorney General or Crown Attorney, the plaintiff would have to prove both the absence of reasonable and probable cause in commencing the prosecution, and malice in the form of a deliberate and improper use of the office of the Attorney General or Crown Attorney, a use inconsistent with the status of "minister of jus-

a) les procédures ont été engagées par le défendeur;

b) le tribunal a rendu une décision favorable au demandeur;

c) l'absence de motif raisonnable et probable;

d) l'intention malveillante ou un objectif principal autre que celui de l'application de la loi.

(Voir J. G. Fleming, *The Law of Torts* (5e éd. 1977), à la p. 598.)

Les deux premiers éléments sont clairs et, d'une manière générale, se passent d'explication. Les deux derniers en revanche exigent une analyse détaillée. Un motif raisonnable et probable a été décrit comme [TRADUCTION] «la croyance de bonne foi en la culpabilité de l'accusé, basée sur la certitude, elle-même fondée sur des motifs raisonnables, de l'existence d'un état de faits qui, en supposant qu'ils soient exacts, porterait raisonnablement tout homme normalement avisé et prudent, à la place de l'accusateur, à croire que la personne inculpée était probablement coupable du crime en question» (*Hicks v. Faulkner* (1878), 8 Q.B.D. 167, à la p. 171, le juge Hawkins).

Ce critère comporte à la fois un élément subjectif et un élément objectif. Il doit y avoir une croyance réelle de la part du poursuivant et cette croyance doit être raisonnable dans les circonstances. La question de l'existence d'un motif raisonnable et probable est à décider par le juge et non par le jury.

L'élément obligatoire de malveillance équivaut en réalité à un «but illégitime». D'après Fleming, la malveillance [TRADUCTION] «veut dire davantage que la rancune, le mauvais vouloir ou un esprit de vengeance, et comprend tout autre but illégitime, par exemple, celui de se ménager accessoirement un avantage personnel» (Fleming, *op. cit.*, à la p. 609). Pour avoir gain de cause dans une action pour poursuites abusives intentée contre le procureur général ou un procureur de la Couronne, le demandeur doit prouver à la fois l'absence de motif raisonnable et probable pour engager les poursuites et la malveillance prenant la forme d'un exercice délibéré et illégitime des pouvoirs de pro-

1989 CanLII 77 (SCC)

tice". In my view this burden on the plaintiff amounts to a requirement that the Attorney General or Crown Attorney perpetrated a fraud on the process of criminal justice and in doing so has perverted or abused his office and the process of criminal justice. In fact, in some cases this would seem to amount to criminal conduct. (See for example breach of trust, s. 122, conspiracy re: false prosecution s. 465(1)(*b*), obstructing justice s. 139(2) and (3) of the *Criminal Code*, R.S.C., 1985, c. C-46.)

Further, it should be noted that in many, if not all cases of malicious prosecution by an Attorney General or Crown Attorney, there will have been an infringement of an accused's rights as guaranteed by ss. 7 and 11 of the *Canadian Charter of Rights and Freedoms.*

By way of summary then, a plaintiff bringing a claim for malicious prosecution has no easy task. Not only does the plaintiff have the notoriously difficult task of establishing a negative, that is the absence of reasonable and probable cause, but he is held to a very high standard of proof to avoid a non-suit or directed verdict (see Fleming, op. cit., at p. 606, and *Mitchell v. John Heine and Son Ltd.* (1938), 38 S.R. (N.S.W.) 466, at pp. 469-71). Professor Fleming has gone so far as to conclude that there are built-in devices particular to the tort of malicious prosecution to dissuade civil suits (at p. 606):

The disfavour with which the law has traditionally viewed the action for malicious prosecution is most clearly revealed by the hedging devices with which it has been surrounded in order to deter this kind of litigation and protect private citizens who discharge their public duty of prosecuting those reasonably suspected of crime.

### 3. *Policy Considerations*

In light of what I have said regarding the role of the prosecutor in Canada, and the tort of malicious

cureur général ou de procureur de la Couronne, et donc incompatible avec sa qualité de «représentant de la justice». À mon avis, ce fardeau incombant au demandeur revient à exiger que le procureur général ou le procureur de la Couronne ait commis une fraude dans le processus de justice criminelle et que, dans la perpétration de cette fraude, il ait abusé de ses pouvoirs et perverti le processus de justice criminelle. En fait il semble que, dans certains cas, cela équivaille à une conduite criminelle. (Voir, par exemple, l'abus de confiance, art. 122, le complot en vue d'engager des poursuites injustifiées, al. 465(1)*b*), l'entrave à la justice, par. 139(2) et (3) du *Code criminel*, L.R.C. (1985), chap. C-46.)

Notons en outre que bien souvent, sinon toujours, les cas de poursuites abusives exercées par un procureur général ou un procureur de la Couronne, comporteront une atteinte aux droits garantis à l'accusé par les art. 7 et 11 de la *Charte canadienne des droits et libertés.*

Pour résumer donc, un demandeur qui intente une action pour poursuites abusives ne se lance pas dans une entreprise facile. Il doit non seulement s'acquitter de la tâche notoirement difficile de prouver un fait négatif, c'est-à-dire l'absence de motif raisonnable et probable, mais il doit également satisfaire à une norme très élevée en matière de preuve s'il veut éviter le non-lieu ou le verdict imposé (voir Fleming, *op. cit.*, à la p. 606, et *Mitchell v. John Heine and Son Ltd.* (1938), 38 S.R. (N.S.W.) 466, aux pp. 469 à 471). Le professeur Fleming va même jusqu'à conclure que le délit civil de poursuites abusives comporte certaines particularités destinées à décourager les actions civiles (à la p. 606):

[TRADUCTION] La désapprobation que le droit a traditionnellement manifestée à l'égard de l'action pour poursuites abusives ressort le plus nettement des restrictions qui lui ont été apportées afin de faire obstacle à ce type d'actions et de protéger les particuliers qui s'acquittent de leur devoir public de poursuivre les personnes raisonnablement soupçonnées d'avoir commis des crimes.

### 3. *Les considérations d'intérêt public*

Compte tenu de ce que j'ai dit concernant le rôle du poursuivant au Canada et le délit civil de

prosecution, it now is necessary to assess the policy rationales. I would begin by noting that even those decisions that have come out firmly in favour of absolute immunity have described the rule as "troubling", a "startling proposition", "strained and difficult to sustain" (see *Nelles v. The Queen in right of Ontario* (1985), 51 O.R. (2d) 513 (Ont. C.A.), at p. 531, and *Bosada v. Pinos* (1984), 44 O.R. (2d) 789 (H.C.), at p. 794).

It is said by those in favour of absolute immunity that the rule encourages public trust and confidence in the impartiality of prosecutors. However, it seems to me that public confidence in the office of a public prosecutor suffers greatly when the person who is in a position of knowledge in respect of the constitutional and legal impact of his conduct is shielded from civil liability when he abuses the process through a malicious prosecution. The existence of an absolute immunity strikes at the very principle of equality under the law and is especially alarming when the wrong has been committed by a person who should be held to the highest standards of conduct in exercising a public trust. (See Filosa, *loc. cit.*, at p. 982, and Marilyn L. Pilkington, "Damages as a Remedy for Infringement of the Canadian Charter of Rights and Freedoms" (1984), 62 *Can. Bar. Rev.* 517, at pp. 560-61.)

Regard must also be had for the victim of the malicious prosecution. The fundamental flaw with an absolute immunity for prosecutors is that the wrongdoer cannot be held accountable by the victim through the legal process. As I have stated earlier, the plaintiff in a malicious prosecution suit bears a formidable burden of proof and in those cases where a case can be made out, the plaintiff's *Charter* rights may have been infringed as well. Granting an absolute immunity to prosecutors is akin to granting a license to subvert individual rights. Not only does absolute immunity negate a private right of action, but in addition, it seems to me, it may be that it would effectively bar the seeking of a remedy pursuant to s. 24(1) of the *Charter*. It seems clear that in using his office to maliciously prosecute an accused, the prosecutor would be depriving an individual of the right to

poursuites abusives, nous devons examiner maintenant les considérations d'intérêt public. Je commence par souligner que même les décisions prenant fermement position en faveur de l'immunité absolue ont qualifié cette règle de [TRADUCTION] «inquiétante», «alarmante», et «forcée et difficilement justifiable» (voir *Nelles v. The Queen in right of Ontario* (1985), 51 O.R. (2d) 513 (C.A. Ont.), à la p. 531, et *Bosada v. Pinos* (1984), 44 O.R. (2d) 789 (H.C.), à la p. 794).

Les partisans de la règle de l'immunité absolue soutiennent qu'elle favorise la confiance du public dans l'impartialité des poursuivants. Il me semble toutefois que la confiance du public dans l'institution du poursuivant public diminue beaucoup lorsque la personne qui est en mesure de connaître l'impact constitutionnel et juridique de sa conduite est mise à l'abri de la responsabilité civile quand elle abuse du processus en engageant des poursuites abusives. L'immunité absolue va à l'encontre du principe même de l'égalité devant la loi et elle est particulièrement inquiétante lorsqu'il s'agit d'une faute commise par une personne qui devrait être tenue à une conduite exemplaire dans l'exercice de sa charge publique. (Voir Filosa, *loc. cit.*, à la p. 982, et Marilyn L. Pilkington, «Damages as a Remedy for Infringement of the Canadian Charter of Rights and Freedoms» (1984), 62 *R. du B. can.* 517, aux pp. 560 et 561.)

On doit penser également à la victime des poursuites abusives. La notion d'immunité absolue des poursuivants présente cette faille fondamentale que l'auteur du délit civil ne peut être obligé par la victime d'en répondre devant les tribunaux. Comme je l'ai déjà dit, la charge de la preuve incombant au demandeur dans une action pour poursuites abusives est extrêmement lourde et, dans les cas où il est en mesure d'établir sa cause, il est possible qu'il ait aussi été victime d'une atteinte aux droits que lui garantit la *Charte*. Accorder aux poursuivants une immunité absolue revient à leur donner toute latitude pour léser les droits individuels. Non seulement l'immunité absolue réduit à néant le droit des particuliers d'intenter des actions, mais en outre, me semble-t-il, il se peut qu'elle rende impossible l'exercice d'un recours en vertu du par. 24(1) de la *Charte*. Il

1989 CanLII 77 (SCC)

liberty and security of the person in a manner that does not accord with the principles of fundamental justice. Such an individual would normally have the right under s. 24(1) of the *Charter* to apply to a court of competent jurisdiction to obtain a remedy that the court considers appropriate and just if he can establish that one of his *Charter* rights has been infringed. The question arises then, whether s. 24(1) of the *Charter* confers a right to an individual to seek a remedy from a competent court. In my view it does. When a person can demonstrate that one of his *Charter* rights has been infringed, access to a court of competent jurisdiction to seek a remedy is essential for the vindication of a constitutional wrong. To create a right without a remedy is antithetical to one of the purposes of the *Charter* which surely is to allow courts to fashion remedies when constitutional infringements occur. Whether or not a common law or statutory rule can constitutionally have the effect of excluding the courts from granting the just and appropriate remedy, their most meaningful function under the *Charter*, does not have to be decided in this appeal. It is, in any case, clear that such a result is undesirable and provides a compelling underlying reason for finding that the common law itself does not mandate absolute immunity.

It is also said in favour of absolute immunity that anything less would act as a "chilling effect" on the Crown Attorney's exercise of discretion. It should be noted that what is at issue here is not the exercise of a prosecutor's discretion within the proper sphere of prosecutorial activity as defined by his role as a "minister of justice". Rather, in cases of malicious prosecution we are dealing with allegations of misuse and abuse of the criminal process and of the office of the Crown Attorney. We are not dealing with merely second-guessing a Crown Attorney's judgment in the prosecution of a case but rather with the deliberate and malicious

semble évident qu'en se prévalant de son poste pour engager des poursuites abusives contre un accusé, le poursuivant porte atteinte au droit d'un individu à la liberté et à la sécurité de sa personne, et ce, d'une manière non conforme aux principes de justice fondamentale. À condition de prouver la violation d'un de ses droits garantis par la *Charte*, cet individu jouirait normalement aux termes du par. 24(1) de la *Charte* du droit de s'adresser à un tribunal compétent pour obtenir la réparation que ce tribunal estime convenable et juste. La question qui se pose est donc de savoir si le par. 24(1) de la *Charte* confère aux particuliers le droit de demander une réparation au tribunal compétent. Personnellement, je crois que oui. Quand une personne peut démontrer qu'elle a été victime d'une atteinte à un droit garanti par la *Charte*, il est indispensable pour assurer la sanction de cette violation de la Constitution que la personne en question puisse s'adresser au tribunal compétent afin d'obtenir réparation. Créer un droit sans prévoir de redressement heurte de front l'un des objets de la *Charte* qui permet assurément aux tribunaux d'accorder une réparation en cas de violation de la Constitution. Nous n'avons pas à trancher dans ce pourvoi la question de savoir si une règle de droit découlant de la *common law* ou d'un texte législatif peut constitutionnellement empêcher les tribunaux d'accorder une réparation juste et convenable, ce qui est leur fonction la plus importante sous le régime de la *Charte*. De toute façon, il est évident qu'un tel résultat n'est pas souhaitable et constitue une raison puissante et fondamentale de conclure que la *common law* elle-même ne prévoit pas d'immunité absolue.

On soutient en outre que reconnaître moins que l'immunité absolue aurait un «effet paralysant» sur l'exercice du pouvoir discrétionnaire du procureur de la Couronne. Notons que ce dont il s'agit ici n'est pas l'exercice d'un pouvoir discrétionnaire par un poursuivant dans sa sphère légitime d'activité, telle que définie par son rôle de «représentant de la justice». En effet, dans des cas de poursuites abusives il s'agit plutôt d'allégations d'abus du processus criminel et des pouvoirs du procureur de la Couronne. Il ne s'agit pas d'une simple évaluation rétrospective de la sagesse de la décision du procureur de la Couronne d'engager des poursui-

use of the office for ends that are improper and inconsistent with the traditional prosecutorial function.

Therefore it seems to me that the "chilling effect" argument is largely speculative and assumes that many suits for malicious prosecution will arise from disgruntled persons who have been prosecuted but not convicted of an offence. I am of the view that this "flood-gates" argument ignores the fact that one element of the tort of malicious prosecution requires a demonstration of improper motive or purpose; errors in the exercise of discretion and judgment are not actionable. Furthermore, there exist built-in deterrents on bringing a claim for malicious prosecution. As I have noted, the burden on the plaintiff is onerous and strict. The fact that the absence of reasonable cause is a matter of law to be decided by a judge means that an action for malicious prosecution can be struck before trial as a matter of substantive inadequacy (see Rule 21.01 of the Ontario Rules of Civil Procedure for example). In fact this was the approach adopted by Kerans J.A. in *German v. Major*, *supra*. I agree with Kerans J.A. that "[i]t would indeed be a curious thing if we chose a stern immunity rule in preference to an effective striking-out rule" (p. 276). In addition most jurisdictions, including Ontario, have provisions that allow a defendant to move for summary judgment before a full-fledged trial takes place (see for example Rule 20 in Ontario). Finally, the potential that costs will be awarded to the defendant if an unmeritorious claim is brought acts as financial deterrent to meritless claims. Therefore, ample mechanisms exist within the system to ensure that frivolous claims are not brought. In fact, the difficulty in proving a claim for malicious prosecution itself acts as a deterrent. This high threshold of liability is evidenced by the small number of malicious prosecution suits brought against police officers each year. In addition, since 1966, the province of Quebec permits suits against the Attorney General and Crown prosecutors without any evi-

tes; mais plutôt l'exercice délibéré et malveillant de ses pouvoirs pour des fins illégitimes et incompatibles avec le rôle traditionnel du poursuivant.

Il me semble en conséquence que l'argument fondé sur «l'effet paralysant» est largement spéculatif et suppose que de nombreuses actions pour poursuites abusives seront intentées par des personnes dépitées qui, ayant été poursuivies, n'ont été reconnues coupables d'aucune infraction. Je suis d'avis que cet argument qui agite le spectre d'une «avalanche» d'actions ne tient pas compte du fait que le délit civil de poursuites abusives exige la preuve d'un motif ou d'un but illégitimes; les erreurs commises dans l'exercice du pouvoir discrétionnaire et les erreurs de jugement ne donnent pas lieu à des actions en justice. D'autre part, l'action pour poursuites abusives comporte ses propres moyens de dissuasion. Comme je l'ai déjà dit, la charge de la preuve incombant au demandeur est lourde et stricte. Puisque l'absence de motif raisonnable est une question de droit à décider par le juge, une action pour poursuites abusives peut être radiée pour absence de fondement suffisant (voir la règle 21.01 des Règles de procédure civile de l'Ontario, par exemple). C'est précisément cette démarche qu'a adoptée le juge Kerans de la Cour d'appel dans l'arrêt *German v. Major*, précité. Je suis d'accord avec le juge Kerans que [TRADUCTION] «[i]l paraîtrait étrange de choisir une stricte règle d'immunité de préférence à une règle efficace permettant la radiation» (p. 276). En outre, dans la plupart des ressorts, y compris l'Ontario, il existe des dispositions autorisant un défendeur à présenter une requête en jugement sommaire avant la tenue d'une instruction complète (voir, par exemple, la règle 20 en Ontario). Finalement, la possibilité de l'adjudication de dépens au défendeur aura un effet préventif contre les poursuites frivoles. Il existe donc à l'intérieur du système tous les mécanismes voulus pour prévenir les actions frivoles. En fait, la difficulté de prouver une allégation de poursuites abusives constitue elle-même un empêchement. Que le seuil de responsabilité en matière de poursuites abusives soit très élevé est confirmé par le peu d'actions de ce genre intentées chaque année contre des policiers. Par ailleurs, la province de Québec permet les actions contre le procureur général et les procureurs de la Couronne

1989 CanLII 77 (SCC)

dence of a flood of claims. Therefore, I find unpersuasive the claim that absolute immunity is necessary to prevent a flood of litigation.

As for alternative remedies available to persons who have been maliciously prosecuted, none seem to adequately redress the wrong done to the plaintiff. The use of the criminal process against a prosecutor who in the course of a malicious prosecution has committed an offence under the *Criminal Code*, addresses itself mainly to the vindication of a public wrong not the affirmation of a private right of action. Of special interest in this regard is s. 737 of the *Criminal Code* which deals with the making of a probation order. Section 737(2) stipulates that certain conditions may be prescribed in a probation order, one of them being that the convicted person "make restitution or reparation to any person aggrieved or injured by the commission of the offence for the actual loss or damage sustained by that person as a result thereof" (s. 737(2)(*e*)). This section would seem to be an indirect method of at least partially remedying a wrong done to an individual as a result of a malicious prosecution. However the section is only operative when an accused has been convicted of an offence and when a probation order is made. In addition, the Court's power to award compensation to a victim is limited to damages that are relatively concrete and ascertainable. (See *R.* v. *Groves* (1977), 37 C.C.C. (2d) 429 (Ont. H.C.)) As such it would seem a rather inadequate substitute for a private right of action. I do however pause to note that many cases of genuine malicious prosecution will also be offences under the *Criminal Code*, and it seems rather odd if not incongruous for reparation to be possible through a probation order but not through a private right of action.

Further, the use of professional disciplinary proceedings, while serving to some extent as punishment and deterrence, do not address the central issue of making the victim whole again. And as has already been noted, it is quite discomforting to realize that the existence of absolute immunity may bar a person whose *Charter* rights have been

depuis 1966 sans que cela ait provoqué une avalanche d'actions. En conséquence, je tiens pour peu convaincant l'argument selon lequel l'immunité absolue s'impose pour éviter une avalanche de litiges.

Des autres recours qui s'offrent aux personnes visées par des poursuites abusives, aucun ne semble adéquat pour réparer le préjudice subi. L'exercice de poursuites criminelles contre un poursuivant qui, dans le cadre de poursuites abusives, commet une infraction au *Code criminel*, vise surtout le redressement d'un tort public et n'a rien à voir avec un droit privé d'action. L'article 737 du *Code criminel*, portant sur le prononcé d'une ordonnance de probation, est particulièrement intéressant à cet égard. Aux termes du par. 737(2), une ordonnance de probation peut prescrire certaines conditions, dont l'obligation de la part du coupable de «faire restitution ou réparation, à toute personne lésée ou blessée du fait de l'infraction, de la perte ou du dommage véritables soufferts de ce fait par cette personne» (al. 737(2)*e*)). Cette disposition semble constituer un moyen indirect de réparer, du moins partiellement, le préjudice occasionné à un individu par des poursuites abusives. L'alinéa en question ne joue cependant que lorsqu'un accusé est déclaré coupable d'une infraction et qu'une ordonnance de probation est rendue. De plus, le pouvoir du tribunal d'accorder une indemnisation à une victime se limite aux dommages qui sont relativement concrets et déterminables (voir *R.* v. *Groves* (1977), 37 C.C.C. (2d) 429 (H.C. Ont.)) Ce pouvoir paraît donc se substituer assez mal à un droit privé d'action. Je fais remarquer toutefois que bien des cas de poursuites abusives véritables constitueront également des infractions au *Code criminel* et il semble plutôt curieux, voire absurde, qu'une réparation puisse être obtenue par le biais d'une ordonnance de probation, mais non par l'exercice d'un droit privé d'action.

En outre, les procédures disciplinaires professionnelles, quoique possédant un certain caractère punitif et dissuasif, n'atteignent pas le but principal qui est de remettre la victime dans son état antérieur et, ainsi que je l'ai déjà indiqué, il serait inquiétant que l'existence d'une immunité absolue puisse empêcher la victime d'une violation des

infringed from applying to a competent court for a just and appropriate remedy in the form of damages.

## III. Conclusion

A review of the authorities on the issue of prosecutorial immunity reveals that the matter ultimately boils down to a question of policy. For the reasons I have stated above I am of the view that absolute immunity for the Attorney General and his agents, the Crown Attorneys, is not justified in the interests of public policy. We must be mindful that an absolute immunity has the effect of negating a private right of action and in some cases may bar a remedy under the *Charter*. As such, the existence of absolute immunity is a threat to the individual rights of citizens who have been wrongly and maliciously prosecuted. Further, it is important to note that what we are dealing with here is an immunity from suit for malicious prosecution; we are not dealing with errors in judgment or discretion or even professional negligence. By contrast the tort of malicious prosecution requires proof of an improper purpose or motive, a motive that involves an abuse or perversion of the system of criminal justice for ends it was not designed to serve and as such incorporates an abuse of the office of the Attorney General and his agents the Crown Attorneys.

There is no doubt that the policy considerations in favour of absolute immunity have some merit. But in my view those considerations must give way to the right of a private citizen to seek a remedy when the prosecutor acts maliciously in fraud of his duties with the result that he causes damage to the victim. In my view the inherent difficulty in proving a case of malicious prosecution combined with the mechanisms available within the system of civil procedure to weed out meritless claims is sufficient to ensure that the Attorney General and Crown Attorneys will not be hindered in the proper execution of their important public duties. Attempts to qualify prosecutorial immunity in the United States by the so-called functional approach and its many variations have proven to be unsuccessful and unprincipled as I have previously

droits garantis par la *Charte* de s'adresser à un tribunal compétent pour obtenir une réparation juste et convenable sous la forme de dommages-intérêts.

## III. Conclusion

Il ressort de l'examen de la jurisprudence sur la question de l'immunité du poursuivant qu'il s'agit en définitive d'une question d'intérêt public. Pour les raisons déjà exposées, j'estime qu'une immunité absolue pour le procureur général et ses mandataires, les procureurs de la Couronne, n'est pas justifiée par l'intérêt public. Il ne faut pas oublier que l'immunité absolue entraîne la négation d'un droit privé d'action et, dans certains cas, pourrait rendre impossible un recours fondé sur la *Charte*. L'existence d'une immunité absolue menace donc les droits individuels de citoyens poursuivis à tort et abusivement. De plus, il importe de souligner qu'il s'agit ici d'une immunité contre des actions pour poursuites abusives; il n'est question ni d'erreurs de jugement, ni d'erreurs dans l'exercice d'un pouvoir discrétionnaire, ni même de négligence professionnelle. Dans le cas du délit civil de poursuites abusives, par contre, on doit prouver l'existence d'un but ou d'un motif illégitime, motif qui constitue un abus ou une perversion du système de justice criminelle à des fins auxquelles il n'est pas destiné et qui, en tant que tel, comporte un abus des pouvoirs du procureur général et des procureurs de la Couronne qui agissent en son nom.

Il ne fait pas de doute que les considérations d'intérêt public invoquées en faveur de l'immunité absolue ont une certaine légitimité. J'estime toutefois que ces considérations doivent céder le pas au droit d'un particulier de chercher à obtenir une réparation quand il subit un préjudice du fait que le poursuivant a agi avec malveillance dans l'exercice abusif de ses fonctions. À mon avis, la difficulté à faire la preuve de poursuites abusives ainsi que les mécanismes qui permettent, dans le système de procédure civile, d'écarter les actions non fondées suffisent pour que le procureur général et les procureurs de la Couronne ne soient pas entravés dans l'exécution efficace de leurs importantes charges publiques. Ainsi que je l'ai déjà fait remarquer, les tentatives américaines de limiter l'immunité du poursuivant par le recours à ce

1989 CanLII 77 (SCC)

noted. As a result I conclude that the Attorney General and Crown Attorneys do not enjoy an absolute immunity in respect of suits for malicious prosecution. I would therefore dismiss the appeal as against the Crown, there being no order as to costs. I would allow the appeal as against the Attorney General with costs and direct that the matter be returned to the Supreme Court of Ontario for trial of the claim against the Attorney General.

The following are the reasons delivered by

MCINTYRE J.—This appeal concerns the question of the liability of the Crown and the Attorney General of the province in a suit for malicious prosecution arising out of the institution of criminal proceedings, charges of murder, brought against the appellant.

In March, 1981, the appellant, then a nurse at the Toronto Hospital for Sick Children, was charged with the murder of four infant patients. At the conclusion of her preliminary hearing, the Provincial Court Judge who conducted the proceedings discharged the appellant upon a finding of an absence of evidence: (1982), 16 C.C.C. (3d) 97. The appellant later commenced an action against the Crown in right of Ontario, the Attorney General for Ontario, and several police officers, alleging that the Attorney General and his agents, the Crown Attorneys, counselled, aided and abetted the police in charging and prosecuting the plaintiff, and that in so doing the Attorney General, the Crown Attorneys, and police were acting as agents for the Crown in right of Ontario. It was also alleged that in the prosecution the Attorney General and the Crown Attorneys were actuated by malice while acting as agents for the Crown. Proceedings were later discontinued against the police officers and the Crown Attorneys were not named as defendants. The Crown and the Attorney General remained the only defendants and are the respondents in this Court.

qu'on appelle l'approche fonctionnelle et aux nombreuses variantes de cette approche ont échoué et n'ont aucun fondement dans les principes. Je conclus en conséquence que le procureur général et les procureurs de la Couronne ne jouissent pas d'une immunité absolue relativement aux actions pour poursuites abusives. Je suis donc d'avis de rejeter le pourvoi en ce qui concerne la Couronne, sans adjudication de dépens. Je suis par ailleurs d'avis d'accueillir le pourvoi en ce qui concerne le procureur général, avec dépens, et d'ordonner que l'affaire soit renvoyée à la Cour suprême de l'Ontario pour qu'elle instruise l'action intentée contre le procureur général.

Version française des motifs rendus par

LE JUGE MCINTYRE—Le présent pourvoi pose la question de la responsabilité de la Couronne et du procureur général de la province dans une action pour poursuites abusives résultant des procédures criminelles engagées contre l'appelante relativement à des accusations de meurtre.

L'appelante était infirmière au Hospital for Sick Children de Toronto lorsqu'au mois de mars 1981, elle a été accusée du meurtre de quatre patients en bas âge. À l'issue de son enquête préliminaire, le juge de la Cour provinciale qui présidait l'audience l'a acquittée faute de preuve: (1982), 16 C.C.C. (3d) 97. L'appelante a par la suite intenté une action contre la Couronne du chef de l'Ontario, le procureur général de l'Ontario ainsi que plusieurs policiers, alléguant que le procureur général et ses représentants, les procureurs de la Couronne, avaient conseillé à la police de porter des accusations contre la demanderesse et l'avaient aidée et encouragée à le faire et à s'engager contre elle des poursuites, et que, ce faisant, le procureur général, les procureurs de la Couronne et la police agissaient au nom de la Couronne du chef de l'Ontario. Elle a également allégué que, dans la conduite des poursuites, le procureur général et les procureurs de la Couronne avaient agi avec malveillance en leur qualité de représentants de la Couronne. Il y a eu par la suite désistement de l'action contre les policiers, et les procureurs de la Couronne n'ont pas été désignés défendeurs. La Couronne et le procureur général sont donc restés les seuls défendeurs à l'instance: ce sont les intimés devant cette Cour.

Before trial, the respondents moved to have the action dismissed under Rule 126 of the Ontario Rules of Practice, on the ground that the pleadings disclosed no reasonable cause of action and, in the alternative, for leave under Rule 124 to set down a point of law raised in the pleadings and to argue the same on the return of the motion. Rule 124 and Rule 126 are set out hereunder:

**124.** Either party is entitled to raise by his pleadings any point of law, and by consent of the parties or by leave of a judge, the point of law may be set down for hearing at any time before the trial, otherwise it shall be disposed of at the trial.

**126.** A judge may order any pleading to be struck out on the ground that it discloses no reasonable cause of action or answer, and in any such case, or in case of the action or defence being shown to be frivolous or vexatious, may order the action to be stayed or dismissed, or judgment to be entered accordingly.

The question of law for which leave was sought was in these terms:

A defendant in a preliminary inquiry held under the provisions of the Criminal Code of Canada and discharged thereof has no cause of action based in malicious prosecution or negligence against the Crown Attorneys conducting such proceedings or as against those in law responsible for their conduct.

Fitzpatrick J., of the Supreme Court of Ontario, allowed the motion and struck out the statement of claim. In doing so, he seems to have acted under Rule 126. He concluded on the basis of two decisions of the Supreme Court of Ontario (*Owsley v. The Queen in right of Ontario* (1983), 34 C.P.C. 96 (Ont. H.C.), and *Richman v. McMurtry* (1983), 41 O.R. (2d) 559 (Ont. H.C.)), that the Attorney General for Ontario has an absolute immunity from civil action while performing his duties as a public prosecutor, even if he acted maliciously. He concluded that the immunity had not been removed by the *Canadian Charter of Rights and Freedoms* and allowed the motion and struck out the statement of claim.

Avant le procès, les intimés ont demandé, par requête en vertu de la règle 126 des Rules of Practice de l'Ontario, le rejet de l'action au motif que les actes de procédure ne révélaient aucune cause raisonnable d'action. Subsidiairement, ils demandaient, en application de la règle 124, la tenue, d'une audition afin de faire valoir leur argumentation sur une question de droit soulevée dans les actes de procédure. Les règles 124 et 126 prévoient:

[TRADUCTION] **124.** Toute partie peut, dans un acte de procédure, soulever une question de droit et, avec le consentement des parties ou l'autorisation de la Cour, la question de droit ainsi soulevée peut faire l'objet d'une audition en tout temps avant l'instruction, sinon elle est décidée au cours de l'instruction.

**126.** Un juge peut ordonner la radiation de tout acte de procédure au motif qu'il ne révèle aucune cause raisonnable d'action ou réponse. En pareil cas ou dans le cas d'une action ou d'une défense jugée futile ou vexatoire, il peut ordonner que l'action soit suspendue ou rejetée ou qu'un jugement soit enregistré en conséquence.

La question de droit faisant l'objet de la demande d'audition sur autorisation de la Cour était ainsi formulée:

[TRADUCTION] Un défendeur, libéré au terme d'une enquête préliminaire tenue en application des dispositions du Code criminel du Canada, n'a aucune cause d'action, fondée sur les poursuites abusives ou la négligence, à faire valoir à l'encontre des procureurs de la Couronne qui ont mené les poursuites ou ceux qui sont légalement responsables de leur conduite.

Le juge Fitzpatrick de la Cour suprême de l'Ontario a accueilli la requête et radié la déclaration, apparemment en vertu de la règle 126. S'appuyant sur deux arrêts de cette même cour (*Owsley v. The Queen in right of Ontario* (1983), 34 C.P.C. 96 (H.C. Ont.), et *Richman v. McMurtry* (1983), 41 O.R. (2d) 559 (H.C. Ont.)), il a conclu que le procureur général de la province jouit d'une immunité absolue contre toute poursuite civile dans l'exercice de ses fonctions d'avocat du ministère public, et ce, même s'il a agi avec malveillance. Jugeant que cette immunité subsistait malgré la *Charte canadienne des droits et libertés*, il a accueilli la requête et radié la déclaration.

1989 CanLII 77 (SCC)

An appeal was dismissed in the Ontario Court of Appeal: (1985), 51 O.R. (2d) 513. At the outset, Thorson J.A., speaking for the Court (Houlden, Thorson and Robins JJ.A.) said, at pp. 514-15:

This Court reserved its judgment on the appeal following lengthy argument on whether, as a matter of law, any action can be asserted against the Crown or the Attorney-General, or both, in the circumstances which are found to be present in this case. My conclusion is that as a matter of law it cannot, and that the plaintiff's appeal must therefore be dismissed. The reasons for this conclusion follow.

From the foregoing, it may be somewhat doubtful whether the Court of Appeal acted under Rule 124 or 126. The record, however, does not disclose any consent by the parties or any grant of leave for the hearing of the point of law under Rule 124. Furthermore, in answer to arguments raised in the Court of Appeal in this form, at p. 518:

At the outset of his submissions counsel for the appellant, Mr. Sopinka, contended that on an application to a judge under Rule 126 of the Rules of Practice, the judge hearing the application ought not to strike out a plaintiff's statement of claim unless he was persuaded that the claim could have no hope of succeeding, even if the facts alleged in the statement of claim were proved. In considering such an application, the facts must be taken to be as they are alleged in the statement of claim. Moreover, where the statement of claim raises a "substantial issue of law" it ought not to be struck out under Rule 126, and where an allegation is made that an executive of ministerial act has been performed in bad faith or for an improper purpose, that issue should not be dealt with on a summary application under Rule 126 but should be left to be determined by the judge at trial. Similarly, where an issue arises as to whether any conduct is unconstitutional, it is important to have the kind of factual underpinning which is needed to determine that issue and which can only be brought out at a trial in the ordinary course.

Thorson J.A. said, at pp. 518-19:

With respect I cannot agree that Fitzpatrick J. erred in dealing with this application as one properly brought under Rule 126, albeit that the power conferred on a judge under that rule is one that ought to be used "sparingly", as noted by Dupont J. in *Owsley v. The Queen in right of Ontario* (1983), 34 C.P.C. 96 at p.

La Cour d'appel de l'Ontario a rejeté l'appel interjeté contre cette décision: (1985), 51 O.R. (2d) 513. Le juge Thorson, au nom de la cour (les juges Houlden, Thorson et Robins), déclare ceci, au début de ses motifs, aux pp. 514 et 515:

[TRADUCTION] Après avoir entendu la longue argumentation des parties, la présente cour a mis en délibéré la question de savoir si, en droit, on peut intenter une action contre la Couronne ou le procureur général, ou les deux, dans les circonstances de l'espèce. Je conclus qu'en droit on ne le peut pas et que l'appel de la demanderesse doit donc être rejeté. Voici quels sont les motifs de cette conclusion.

D'après ce qui précède, on peut se demander si la Cour d'appel s'est fondée sur la règle 124 ou sur la règle 126. Le dossier, cependant, ne révèle aucun consentement des parties ni aucune autorisation quant à l'audition de la question de droit, conformément à la règle 124. En outre, à la p. 518, la Cour d'appel fait ainsi état des arguments soulevés devant elle:

[TRADUCTION] Au début de sa plaidoirie, l'avocat de l'appelante, Mᵉ Sopinka, a soutenu que, sur requête faite à un juge en vertu de la règle 126 des Rules of Practice, le juge présidant l'audition ne devrait radier une déclaration que s'il est persuadé que la demande n'a aucune chance de succès, même si les faits allégués sont prouvés. Dans l'examen d'une requête de cette nature, les faits allégués doivent donc être tenus pour avérés. De plus, lorsque la déclaration soulève une «importante question de droit», elle ne devrait pas être radiée en vertu de la règle 126; et lorsqu'il est allégué qu'un acte ministériel ou de l'exécutif a été exécuté de mauvaise foi ou pour une fin illégitime, cette question ne devrait pas non plus être tranchée sur demande sommaire présentée en vertu de cette règle, mais être tranchée par le juge au procès. De même, lorsqu'il s'agit de statuer sur le caractère constitutionnel d'une conduite, il importe de régler la question à partir d'un fondement factuel qui ne peut se dégager que de l'audition normale de l'affaire.

Le juge Thorson fait la réponse suivante, aux pp. 518 et 519:

[TRADUCTION] Avec égards, je ne puis souscrire à l'argument selon lequel le juge Fitzpatrick a commis une erreur en statuant comme si la requête avait été faite à bon droit en vertu de la règle 126, encore que le pouvoir conféré aux termes de cette règle doive être utilisé «avec parcimonie», comme l'a souligné le juge Dupont dans

1989 CanLII 77 (SCC)

102. Nor can I agree with the assertion that merely because the statement of claim raises a "substantial issue of law" it ought not to be dealt with on an application under that rule. If the latter assertion were correct, it seems to me that the purpose of the rule would be largely defeated. That purpose, surely, is to make it possible for a person who has been named in an action to avoid having to go to the considerable trouble and expense of defending himself in court against a claim made in that action which has no reasonable expectation of succeeding against him, even if all the facts alleged are proved. If, in this case, the learned motions court judge had concluded that the Attorney-General, and thus by extension the Crown, did not enjoy an absolute immunity in law, it might well have been improper to decide the issue before him on an application under Rule 126 since in that event, and for the reasons explained by Linden J. in *King v. Liquor Control Board of Ontario* (1981), 33 O.R. (2d) 816 at p. 825, . . . a "factual underpinning" for the claim would then have been necessary for its disposition, but where, as here, he concluded that the immunity was absolute, the same kind of factual underpinning was not needed, for even if the facts as alleged were proved the claim could not succeed. Accordingly, I find no error on the part of Fitzpatrick J. in acting on the application as one which could be properly considered and dealt with by him under Rule 126 . . . .

Therefore, I will proceed on the basis that the Court of Appeal reached its determination by the application of Rule 126. In so doing, the court concluded that there existed an absolute immunity for the Crown and the Attorney General and the Crown Attorneys against suit for all acts done in relation to criminal proceedings, even though malice be shown. If this Court should hold that the immunity asserted for the Crown and the Attorney General is clearly absolute, the action would be at an end. If, however, it should conclude that the immunity is in any way limited or qualified or that its existence is doubtful, the matter would have to go to trial in the usual way, so that evidence could be heard on the matters of fact and the issues raised in order to provide a factual underpinning for the determination of any possible liability. In approaching the matter at this stage, it must be borne in mind that in proceedings under Rule 126 the facts alleged must be taken as true and this

l'arrêt *Owsley v. The Queen in right of Ontario* (1983), 34 C.P.C. 96, à la p. 102. Je ne puis davantage être en accord avec la prétention que pour la simple raison que la déclaration soulève une «importante question de droit», elle ne devrait pas être radiée à la suite d'une requête présentée en vertu de cette règle. Cette prétention serait-elle exacte qu'elle irait, à mon sens, largement à l'encontre de l'objet même de la règle. Cette dernière vise incontestablement à faire en sorte qu'une personne assignée en justice puisse éviter les ennuis et les frais considérables qu'entraîne l'obligation de se défendre contre une demande n'ayant aucune chance raisonnable de succès, à supposer même que tous les faits allégués soient prouvés. Si, en l'espèce, le juge des requêtes avait conclu que le procureur général, et par extension la Couronne, ne jouissaient pas d'une immunité absolue en droit, il aurait peut-être été inopportun de trancher la question dans le contexte d'une requête en vertu de la règle 126 puisque, dans ce cas, et pour les motifs qu'a énoncés le juge Linden dans l'arrêt *King v. Liquor Control Board of Ontario* (1981), 33 O.R. (2d) 816, à la p. 825, un «fondement factuel» aurait été nécessaire à l'examen de la demande; mais lorsque, comme en l'espèce, on conclut que l'immunité est absolue, un tel fondement factuel devient inutile puisque la demande n'a aucune chance de succès même en supposant prouvés tous les faits allégués. En conséquence, je ne puis conclure que le juge Fitzpatrick a commis une erreur en considérant que la requête pouvait être considérée et tranchée par lui en vertu de la règle 126 . . .

Je poursuivrai donc en présumant que la Cour d'appel a rendu son jugement en appliquant la règle 126. Elle a ainsi conclu que la Couronne, le procureur général et les procureurs de la Couronne jouissaient d'une immunité absolue pour tout acte, même malveillant, relatif à des poursuites criminelles. Si cette Cour devait statuer que l'immunité revendiquée au nom de la Couronne et du procureur général possède un caractère aussi manifestement absolu, l'action prendrait fin. Cependant, si elle devait conclure que cette immunité est, de quelque façon, limitée ou relative, ou que son existence même est douteuse, l'affaire devrait être renvoyée pour être instruite de la manière habituelle, afin que la preuve des faits et des points en litige puisse être présentée et que soit ainsi établi le fondement factuel nécessaire à l'examen de la responsabilité. À ce stade de l'analyse, il ne faut pas perdre de vue qu'aux fins d'une requête présentée en vertu de la règle 126, les faits allégués

1989 CanLII 77 (SCC)

motion must be disposed of on the basis that the Crown Attorneys and the Attorney General acted with malice in the initiation and conduct of these proceedings.

There are four necessary elements which must be proved for success in an action for malicious prosecution:

A. The proceedings must have been initiated by the defendant.

B. The proceedings must have terminated in favour of the plaintiff.

C. The plaintiff must show that the proceedings were instituted without reasonable cause, and

D. The defendant was actuated by malice.

This appeal must therefore be approached on the footing that all these elements are shown.

It was argued on behalf of the Crown that it enjoyed a complete immunity from liability for malicious prosecution, on the basis of a common law immunity of the Attorney General and the Crown Attorneys. Any liability on the part of the Crown arising from the conduct of its servants would be vicarious. Therefore, it was contended that because the common law accorded a full immunity to the Crown's servants, the Crown itself would not be liable. It was also contended that the Crown had an absolute immunity under the provisions of the *Proceedings Against the Crown Act*, R.S.O. 1980, c. 393 (the Act).

Any consideration of Crown liability must now be based upon the Act and I do not find it necessary for the purposes of this case to consider the common law position respecting Crown immunity. The purpose of the Act, clearly discernible from its form and structure, was to remove Crown immunities and place the Crown upon the same footing as any other person before the courts, save for the exceptions which are set out in the Act. The

doivent être tenus pour vrais et donc qu'il faut trancher la présente requête en partant de l'hypothèse que les procureurs de la Couronne et le procureur général ont agi avec malveillance en engageant et en menant les poursuites en cause.

Quatre éléments doivent être prouvés pour avoir gain de cause dans une action pour poursuites abusives:

A. Les poursuites ont été engagées par le défendeur.

B. Le tribunal a rendu une décision favorable au demandeur.

C. Le demandeur a établi que les poursuites ont été intentées sans motif raisonnable.

D. Le défendeur a agi par malveillance.

C'est donc en présumant établie la présence de tous ces éléments qu'il nous faut aborder le présent pourvoi.

On prétend, au nom de la Couronne, que cette dernière jouit d'une immunité complète en matière de responsabilité pour poursuites abusives en raison de l'immunité reconnue en *common law* au procureur général et aux procureurs de la Couronne. Or, toute responsabilité imputée à la Couronne en raison de la conduite de ses préposés relèverait de la responsabilité du fait d'autrui. Par conséquent, fait-on valoir, comme la *common law* accorde pleine immunité aux préposés de la Couronne, la responsabilité de la Couronne elle-même n'est pas engagée. On soutient également que la Couronne jouit d'une immunité absolue en vertu des dispositions de la *Loi sur les instances introduites contre la Couronne*, L.R.O. 1980, chap. 393 (ci-après la Loi).

Tout examen de la responsabilité de la Couronne doit maintenant être fondé sur la Loi et, je ne crois pas qu'il soit nécessaire, pour les fins de l'espèce, de prendre en compte la position de la *common law* sur la question de l'immunité. L'objet de la Loi, tel qu'il ressort clairement de sa forme et de sa structure était de lever les immunités dont jouissait la Couronne et la placer sur un pied d'égalité avec toute autre personne devant les tri-

effective sections for this purpose are ss. 2 and 5. Section 2(2)(*d*) was relied upon by the Crown. It provides:

2. ...

(2) Nothing in this Act

(*d*) subjects the Crown to proceedings under this Act in respect of anything done in the due enforcement of the criminal law or of the penal provisions of any Act of the Legislature;

It may be argued that commencing and conducting proceedings with malice against the object of the proceedings could not be considered as the "due" enforcement of the criminal law. But any opening in the wall of immunity found by the Court of Appeal would be, in my view, effectively closed by s. 5(6) of the Act, which provides:

5. ...

(6) No proceedings lie against the Crown under this section in respect of anything done or omitted to be done by a person while discharging or purporting to discharge responsibilities of a judicial nature vested in him or responsibilities that he has in connection with the execution of judicial process.

Section 5 expresses the general rule which subjects the Crown to all liabilities in tort to which, if it were a person of full age and capacity, it would be subject. Subsections (2) to (5) provide interpretative guides while subs. (6), excepts from the general rule Crown liability "in respect of anything done or omitted to be done by a person, while discharging or purporting to discharge responsibilities of a judicial nature vested in him or responsibilities that he has in connection with the execution of the judicial process."

The claim asserted here depends upon the actions of the Crown Attorneys and the Attorney General, specifically the decision to prosecute the appellant for murder. The decision to prosecute is a judicial decision and is obviously vested in the Attorney General and executed on his behalf by his agents, the Crown Attorneys: see *The Queen v. Comptroller-General of Patents, Designs, and*

bunaux, sous réserve des exceptions expressément prévues. Les dispositions pertinentes à cet égard sont les art. 2 et 5. La Couronne a invoqué l'al. 2(2)*d*):

[TRADUCTION] 2. ...

(2) La présente loi n'a pas pour effet:

*d*) d'exposer la Couronne à une instance en application de la présente loi en raison de tout acte accompli dans l'application légitime du droit criminel ou des dispositions pénales d'une loi de la Législature;

On pourrait soutenir que le fait d'introduire des poursuites et d'en assumer la conduite dans une intention malveillante à l'égard du sujet poursuivi ne saurait constituer une application «légitime» du droit criminel. Mais toute brèche dans le mur de l'immunité reconnue par la Cour d'appel serait, à mon avis, colmatée hermétiquement par le par. 5(6) de la Loi, que voici:

[TRADUCTION] 5. ...

(6) Aucune instance ne peut être intentée contre la Couronne en vertu du présent article pour l'action ou l'omission d'une personne dans l'accomplissement réel ou présumé d'une charge de nature judiciaire dont elle est investie ou dont elle doit s'acquitter relativement à l'exécution d'actes de procédure judiciaire.

L'article 5 énonce la règle générale selon laquelle la Couronne engage sa responsabilité délictuelle comme si elle était une personne majeure et capable. Les paragraphes (2) à (5) sont des règles d'interprétation tandis que le par. (6) précité prévoit une exception à la règle générale de la responsabilité «pour l'action ou l'omission d'une personne dans l'accomplissement réel ou présumé d'une charge de nature judiciaire dont elle est investie ou dont elle doit s'acquitter relativement à l'exécution d'actes de procédure judiciaire.»

L'immunité revendiquée en l'espèce vise les actes des procureurs de la Couronne et ceux du procureur général, en particulier la décision de poursuivre l'appelante pour meurtre. La décision d'intenter des poursuites est une décision de nature judiciaire qui incombe manifestement au procureur général et dont l'exécution relève des procureurs de la Couronne agissant en son nom: voir

1989 CanLII 77 (SCC)

*Trade Marks*, [1899] 1 Q.B. 909 (C.A.) A.L. Smith L.J. said, at pp. 913-14:

I wish to say a word or two about the position of the Attorney-General, because in my judgment it is of importance in this case, and his position appears likely to be lost sight of. Everybody knows that he is the head of the English Bar. We know that he has had from the earliest times to perform high judicial functions which are left to his discretion to decide. For example, where a man who is tried for his life and convicted alleges that there is error on the record, he cannot take advantage of that error unless he obtains the fiat of the Attorney-General, and no Court in the kingdom has any controlling jurisdiction over him. That perhaps is the strongest case that can be put as to the position of the Attorney-General in exercising judicial functions. Another case in which the Attorney-General is pre-eminent is the power to enter a nolle prosequi in a criminal case. I do not say that when a case is before a judge a prosecutor may not ask the judge to allow the case to be withdrawn, and the judge may do so if he is satisfied that there is no case; but the Attorney-General alone has power to enter a nolle prosequi, and that power is not subject to any control. Another case is that of a criminal information at the suit of the Attorney-General—a practice which has, I am sorry to say, fallen into disuse. The issue of such an information is entirely in the discretion of the Attorney-General, and no one can set such an information aside. There are other cases to which I could refer to be found in old and in recent statutes, but I have said enough to shew the high judicial functions which the Attorney-General performs . . . .

The Crown Attorneys and the Attorney General in deciding to prosecute the appellant would therefore come within s. 5(6) of the Act, and the Crown would have its statutory immunity despite any uncertainty which might arise because of an argument under s. 2(2)(*d*) of the Act, based on the concept of "due" enforcement of the <u>criminal law</u>. The Attorney General and his agents, whatever the motives underlying their conduct, were surely, in the words of s. 5(6), "discharging or purporting" to discharge responsibilities of a judicial nature. In my view, the Crown is rendered immune by the express terms of s. 5(6) of the Act from liability to the appellant.

*The Queen v. Comptroller-General of Patents, Designs, and Trade Marks*, [1899] 1 Q.B. 909 (C.A.) Voici ce qu'affirme lord juge A.L. Smith, aux pp. 913 et 914:

[TRADUCTION] Je voudrais dire quelques mots au sujet du statut du procureur général, question à mon avis importante en l'espèce et qui risque de passer inaperçue. Nul n'ignore que le procureur général est à la tête du barreau anglais. Chacun sait également que depuis les temps les plus reculés, il a été investi de hautes fonctions judiciaires dont l'exercice a été laissé à son pouvoir discrétionnaire. Ainsi, lorsqu'un accusé, condamné à la peine capitale, allègue qu'il y a erreur au dossier, il ne peut bénéficier de cette erreur à moins d'obtenir l'autorisation du procureur général dont la décision ne peut être révisée par aucun tribunal du royaume. Voilà peut-être le cas le plus manifeste où le procureur général exerce des fonctions judiciaires. Autre exemple du rôle prééminent qu'il occupe: son pouvoir d'ordonner l'arrêt des procédures par nolle prosequi dans une affaire criminelle. Certes, au procès, le poursuivant peut toujours demander le retrait de l'accusation et, le cas échéant, le juge rendra un non-lieu; mais c'est au procureur général seul qu'il appartient d'ordonner l'arrêt des procédures par nolle prosequi et ce pouvoir n'est assujetti à aucun contrôle. On peut également songer à la dénonciation criminelle à l'initiative du procureur général—pratique qui, je regrette de le dire, est tombée en désuétude. Encore ici, le dépôt d'une telle dénonciation relève entièrement du pouvoir discrétionnaire du procureur général et nul ne peut l'annuler. Je pourrais évoquer d'autres exemples tirés des lois anciennes et récentes, mais ce qui précède témoigne amplement des hautes fonctions judiciaires qu'exerce le procureur général . . .

Ainsi, la décision par les procureurs de la Couronne et le procureur général de poursuivre l'appelante, relèverait du par. 5(6) de la Loi et la Couronne bénéficierait de l'immunité légale, malgré toute incertitude que pourrait faire naître l'argument fondé sur la notion d'application «légitime» du <u>droit criminel</u>, selon la formule utilisée à l'al. 2(2)*d*). Quels que soient en effet les motifs à l'origine de leur conduite, le procureur général et ses représentants se trouvaient indéniablement, aux termes du par. 5(6) «dans l'accomplissement réel ou présumé» d'une charge de nature judiciaire. À mon avis, le par. 5(6) confère expressément à la Couronne, une immunité à l'égard de toute responsabilité envers l'appelante.

The fact of Crown immunity in this case does not necessarily mean that a similar immunity for the Attorney General and his agents follows. Any immunity that they might enjoy must find its own independent footing and the fact that the Act extends an immunity to the Crown in this case, therefore, cannot be understood as conferring or evidencing an immunity for the Attorney General and the Crown Attorneys. This point was made by Hart J.A. in the case of *Curry v. Dargie* (1984), 28 C.C.L.T. 93 (N.S.C.A.), where he held that, while the *Proceedings Against the Crown Act*, R.S.N.S. 1967, c. 239, at p. 107, might absolve the provincial Crown from liability, a Crown servant, in that case a residential tenancy officer, could still be personally liable for misconduct:

It seems to me that we are dealing here, once again, with the immunity of the Crown and not that of a tortfeasor.

It has been pointed out that the Proceedings Against the Crown Act was passed to give citizens the right to sue the Crown for the tortious acts of its officers and servants. The Act also prevents suits against the Crown for acts of its officers or servants carried out in the due enforcement of valid legislation. The Act was not designed, however, to protect the officers and servants of the Crown personally from actions arising out of torts committed by them against members of the public, whether during the course of their employment or not, which were not done solely for the due enforcement of the criminal law or the provisions of any act of the Legislature . . . .

What then is the nature of the immunity, if any, enjoyed by the Attorney General at common law?

There is clear authority in the jurisprudence of most common law, and some civil law, jurisdictions for the proposition that public officers and officials discharging or purporting to discharge the duties and powers of their offices may be personally liable in damages for wrongful conduct. The leading case in Canada on this point is *Roncarelli v. Duplessis*, [1959] S.C.R. 121. The facts are well known. Roncarelli was a restaurant owner in

Le fait qu'il y ait immunité en faveur de la Couronne en l'espèce ne signifie pas nécessairement que le procureur général et ses représentants jouissent d'une immunité semblable. La protection dont ils pourraient bénéficier doit reposer sur un fondement indépendant et on ne saurait par conséquent interpréter l'immunité que la Loi confère à la Couronne dans la présente affaire comme conférant une immunité au procureur général et aux procureurs de la Couronne. Le juge Hart de la Cour d'appel a apporté cette précision dans l'arrêt *Curry v. Dargie* (1984), 28 C.C.L.T. 93 (C.A.N.-É.) où il a conclu, à la p. 107, que même si la *Proceedings Against the Crown Act*, R.S.N.S. 1967, chap. 239, pouvait dégager la Couronne provinciale de toute responsabilité, un préposé de la Couronne, en l'occurrence un fonctionnaire de la commission à la location résidentielle, pouvait encore être tenu personnellement responsable de son inconduite:

[TRADUCTION] Il me semble qu'il s'agit, là encore, de l'immunité de la Couronne, et non de celle de l'auteur du délit.

On a souligné que la *Proceedings Against the Crown Act* avait été adoptée afin d'accorder aux citoyens le droit de poursuivre la Couronne pour les actes délictueux commis par ses préposés ou fonctionnaires. Cette loi empêche aussi toute poursuite contre la Couronne pour les actes accomplis par ces derniers dans l'application légitime de lois valides. Elle ne vise cependant pas à protéger personnellement les préposés et fonctionnaires de la Couronne contre les recours résultant des délits civils qu'ils ont commis contre des membres du public, dans l'exercice ou non de leur emploi, mais non uniquement dans l'application légitime du droit criminel ou des dispositions d'une loi de la Législature . . .

Quelle est donc la nature de l'immunité que pourrait avoir le procureur général en vertu de la *common law*?

Dans la plupart des juridictions de *common law* et dans certaines juridictions de droit civil, il est largement reconnu par la jurisprudence et la doctrine que les fonctionnaires peuvent, dans l'accomplissement réel ou présumé des fonctions qui leur sont conférées, avoir à répondre personnellement de leur inconduite. Au Canada, l'arrêt de principe sur ce point est *Roncarelli v. Duplessis*, [1959] R.C.S. 121. Les faits en sont bien connus. Proprié-

1989 CanLII 77 (SCC)

Quebec. He was a member of a religious group, the Jehovah's Witnesses, and he supported their cause financially and in assisting members of the group who from time to time ran afoul of the law. Duplessis was the Premier of Quebec and, as well, Attorney General of the province. The policy of the Government was opposed to the Jehovah's Witnesses and Duplessis sought to eliminate Roncarelli as an opponent in his efforts to curb the Jehovah's Witnesses. He ordered the General Director of the Quebec Liquor Commission, which had the legislative authority to "grant, refuse or cancel permits for the sale of alcoholic liquors", to revoke Roncarelli's liquor licence and to forever bar him from obtaining another. This ruined his business and he brought action for damages against Duplessis for the wrongful revocation of his licence and the prohibition against his obtaining a further licence. A majority in this Court held that Duplessis was liable. The judgment of Rand J. (with whom Judson J. concurred) has been regarded as the leading judgment in the case. He saw the issue in these terms, at p. 137:

In these circumstances, when the *de facto* power of the Executive over its appointees at will to such a statutory public function is exercised deliberately and intentionally to destroy the vital business interests of a citizen, is there legal redress by him against the person so acting?

He concluded that there was legal redress in the form of damages. He expressed the view that there existed a general presumption in legislation and regulation that powers given by the legislature will be exercised in good faith and without improper motives. At page 140, he said:

In public regulation of this sort there is no such thing as absolute and untrammelled "discretion", that is that action can be taken on any ground or for any reason that can be suggested to the mind of the administrator; no legislative Act can, without express language, be taken to contemplate an unlimited arbitrary power exercisable for any purpose, however capricious or irrelevant, regardless of the nature or purpose of the statute. Fraud and corruption in the Commission may not be mentioned in such statutes but they are always implied as exceptions. "Discretion" necessarily implies good faith

taire d'un restaurant au Québec, Roncarelli était membre de la secte religieuse des Témoins de Jéhovah; il appuyait financièrement cette cause et portait secours aux membres de la secte ayant à l'occasion maille à partir avec la justice. Premier ministre de la province de Québec, Duplessis en était également le procureur général. Son gouvernement était opposé aux Témoins de Jéhovah et Duplessis cherchait à empêcher Roncarelli de résister aux campagnes visant à limiter l'influence des Témoins de Jéhovah. C'est ainsi qu'il ordonna au directeur général de la Commission des liqueurs du Québec, investi de l'autorité législative d'«octroyer, refuser [et] annuler tout permis de vente de liqueurs alcooliques», de révoquer le permis de Roncarelli et de lui interdire à jamais d'en obtenir un autre. Ruiné, Roncarelli poursuivit Duplessis en dommages-intérêts pour la révocation injustifiée de son permis et la prohibition dont il était l'objet. Cette Cour a conclu à la majorité à la responsabilité de Duplessis. Le jugement du juge Rand, auquel a souscrit le juge Judson, est considéré comme faisant autorité dans cette affaire. Voici en quels termes il a posé la question en litige (à la p. 137):

[TRADUCTION] Lorsque le pouvoir exécutif, délibérément et intentionnellement, dans ces conditions, exerce le pouvoir de fait qu'il possède sur les personnes qu'il nomme selon son bon vouloir à une fonction publique pour détruire les intérêts commerciaux vitaux d'un citoyen, celui-ci peut-il prétendre, en droit, exiger réparation de la personne qui agit ainsi?

Le juge Rand a conclu qu'il y avait lieu à réparation en justice sous forme de dommages-intérêts. À son avis, toute loi ou réglementation comporte une présomption générale selon laquelle les pouvoirs conférés seront exercés de bonne foi et à des fins légitimes. Il affirme, à la p. 140:

[TRADUCTION] Dans une réglementation publique de cette nature, il n'y a rien de tel qu'une «discrétion» absolue et sans entraves, c'est-à-dire celle où l'administrateur pourrait agir pour n'importe quel motif ou pour toute raison qui se présenterait à son esprit; une loi ne peut, si elle ne l'exprime expressément, s'interpréter comme ayant voulu conférer un pouvoir arbitraire illimité pouvant être exercé dans n'importe quel but, si fantaisiste et étranger soit-il, sans avoir égard à la nature ou au but de cette loi. La fraude et la corruption au sein de la commission ne sont peut-être pas mention-

1989 CanLII 77 (SCC)

in discharging public duty; there is always a perspective within which a statute is intended to operate; and any clear departure from its lines or objects is just as objectionable as fraud or corruption.

In this context, it should be noted that in commencing and prosecuting criminal offences the Attorney General and his agents, the Crown Attorneys, are exercising statutory powers: see *Ministry of the Attorney General Act*, R.S.O. 1980, c. 271; *Crown Attorneys Act*, R.S.O. 1980, c. 107; and the *Criminal Code*, R.S.C., 1985, c. C-46, s. 504. Rand J. was also of the view that the acts shown to have been done by the respondent put him beyond the protection of any immunity which could attach to his office. He added, at pp. 141-42:

The act of the respondent [Duplessis] through the instrumentality of the Commission brought about a breach of an implied public statutory duty toward the appellant; it was a gross abuse of legal power expressly intended to punish him for an act wholly irrelevant to the statute, a punishment which inflicted on him, as it was intended to do, the destruction of his economic life as a restaurant keeper within the province. Whatever may be the immunity of the Commission or its member from an action for damages, there is none in the respondent. He was under no duty in relation to the appellant and his act was an intrusion upon the functions of a statutory body. The injury done by him was a fault engaging liability within the principles of the underlying public law of Quebec: *Mostyn v. Fabrigas*, and under art. 1053 of the *Civil Code*. That, in the presence of expanding administrative regulation of economic activities, such a step and its consequences are to be suffered by the victim without recourse or remedy, that an administration according to law is to be superseded by action dictated by and according to the arbitrary likes, dislikes and irrelevant purposes of public officers acting beyond their duty, would signalize the beginning of disintegration of the rule of law as a fundamental postulate of our constitutional structure.

nées dans des lois de ce genre, mais ce sont des exceptions que l'on doit toujours sous-entendre. La «discrétion» implique nécessairement la bonne foi dans l'exercice d'un devoir public. Une loi doit toujours s'entendre comme s'appliquant dans une certaine optique, et tout écart manifeste de sa ligne ou de son objet est tout aussi répréhensible que la fraude ou la corruption.

Dans ce contexte, soulignons qu'en engageant des poursuites criminelles, le procureur général et ses représentants, les procureurs de la Couronne, exercent des pouvoirs qui découlent de la loi: voir la *Loi sur le ministère du Procureur général*, L.R.O. 1980, chap. 271, la *Loi sur les procureurs de la Couronne*, L.R.O. 1980, chap. 107, ainsi que le *Code criminel*, L.R.C. (1985), chap. C-46, art. 504. Le juge Rand a également exprimé l'avis qu'en raison des actes dont la preuve avait été faite, l'intimé avait perdu le bénéfice de toute immunité susceptible de s'attacher à sa fonction. Il ajoute, aux pp. 141 et 142:

[TRADUCTION] La manière d'agir de l'intimé [Duplessis], par l'intermédiaire de la Commission, revenait à la violation d'un devoir public statutaire et tacite vis-à-vis de l'appelant: elle constituait un abus flagrant d'un pouvoir donné par la loi, dont le but exprès était de le punir à raison d'un acte tout à fait étranger à cette loi, de lui infliger une punition dont le résultat a été, comme on l'avait voulu, de détruire sa vie économique de restaurateur dans la province. Aussi à l'abri que soit la Commission ou celui qui en était membre d'une action en dommages-intérêts, il ne saurait en être de même de l'intimé. Il n'était soumis à aucun devoir en ce qui concerne l'appelant et son acte constituait une immixtion dans les fonctions d'un organisme statutaire. Le préjudice qu'il a causé était le résultat d'une faute engageant sa responsabilité, conformément aux principes de base du droit public du Québec (voir l'arrêt *Mostyn c. Fabrigas*, et conformément à l'article 1053 du *Code civil*. Le fait qu'en présence d'une réglementation administrative de plus en plus grande des activités économiques, la victime d'une telle mesure subisse celle-ci et ses conséquences sans aucun recours ni aucune réparation, et le fait que les sympathies et les antipathies arbitraires, de même que les visées non pertinentes d'officiers publics qui agissent en excédant leurs pouvoirs, puissent dicter leurs actions et remplacer une administration établie par la loi, voilà le signe avant-coureur de la désintégration du principe de légalité comme un des postulats fondamentaux de notre structure constitutionnelle.

1989 CanLII 77 (SCC)

It will be observed that Duplessis in the *Roncarelli* case purported to act not only as the Premier of Quebec but also as the Attorney General. It would appear to be clear from the majority judgments in *Roncarelli* that the principle that public officers of the highest rank in Canada who exercise the powers of their office in excess or in abuse of those powers will be liable in damages for injuries resulting. This principle has been well founded in English authority: see *Mostyn v. Fabrigas* (1774), 1 Cowp. 161, 98 E.R. 1021, where the Governor of Minorca was held to be liable in damages in a civil action for false imprisonment of a native Minorcan. Lord Mansfield rejected the Governor's claim for immunity at p. 175 Cowp., p. 1029 E.R.:

> Therefore to lay down in an English Court of Justice such a monstrous proposition, as that a governor acting by virtue of letters patent under the Great Seal, is accountable only to God, and his own conscience; that he is absolutely despotic, and can spoil, plunder, and affect His Majesty's subjects, both in their liberty and property, with impunity, is a doctrine that cannot be maintained.

See, as well, *Henly v. Mayor of Lyme* (1828), 5 Bing. 91, 130 E.R. 995.

Another case expressing the same or a similar proposition is *Asoka Kumar David v. Abdul Cader*, [1963] 3 All E.R. 579 (P.C.) In that case, a licensing authority had refused a licence for the operation of a cinema and the appellant brought action alleging a malicious refusal of licence. The action was struck out in a pre-trial motion and the Court of Appeal of Ceylon supported the respondent. In the judicial committee, Viscount Radcliffe expressed the view that the case was not one which should have been the subject of a pre-trial disposition, and said, at p. 582:

> Since then [1907] the English courts have had to give much consideration to the general question of the rights of the individual dependent on the exercise of statutory powers by a public authority . . . . In their lordships' opinion it would not be correct today to treat it as establishing any wide general principle in this field: certainly it would not be correct to treat it as sufficient to found the proposition, as asserted here, that an applicant for a statutory licence can in no circumstances have a right to damages if there has been a malicious misuse

On soulignera que dans l'affaire *Roncarelli*, Duplessis n'agissait pas seulement à titre de premier ministre du Québec, mais également en sa qualité de procureur général. Il semble ressortir clairement des opinions majoritaires dans *Roncarelli* qu'en principe, les fonctionnaires de très haut rang au Canada qui excèdent leurs pouvoirs ou en abusent seront tenus à des dommages-intérêts pour le préjudice causé. Ce principe est bien établi dans la jurisprudence anglaise: voir *Mostyn v. Fabrigas* (1774), 1 Cowp. 161, 98 E.R. 1021, où le gouverneur de Minorque, poursuivi au civil pour la séquestration d'un habitant de l'île, a été tenu à des dommages-intérêts. Lord Mansfield a rejeté en ces termes la prétention du gouverneur à l'immunité, à la p. 175 Cowp., à la p. 1029 E.R.:

> [TRADUCTION] En conséquence, on ne saurait soutenir devant une cour de justice anglaise la proposition monstrueuse selon laquelle un gouverneur, agissant en vertu de lettres patentes délivrées sous le grand sceau, n'est redevable qu'à Dieu et à sa conscience et qu'en véritable despote il peut, en toute impunité, piller et dépouiller les sujets de Sa Majesté, tant dans leurs biens que dans leur liberté.

Voir également l'arrêt *Henly v. Mayor of Lyme* (1828), 5 Bing. 91, 130 E.R. 995.

On retrouve un principe identique ou similaire dans l'arrêt *Asoka Kumar David v. Abdul Cader*, [1963] 3 All E.R. 579 (C.P.) Dans cette affaire, un organisme responsable de l'émission de permis avait refusé à l'appelant un permis pour l'exploitation d'un cinéma et ce dernier avait intenté une action où il alléguait l'intention malveillante. L'action avait été radiée sur exception préliminaire et la Cour d'appel de Ceylan avait statué en faveur de l'intimé. Au Comité judiciaire, le vicomte Radcliffe a exprimé l'avis que cette affaire n'aurait pas dû être tranchée sur requête préliminaire. Il affirme, à la p. 582:

> [TRADUCTION] Depuis lors [1907], les tribunaux anglais ont été fréquemment appelés à examiner la question générale des droits du particulier face à l'exercice, par une administration publique, des pouvoirs que la loi lui confère [. . .] De l'avis de leurs Seigneuries, il n'y a pas lieu de reconnaître aujourd'hui, en ce domaine, l'existence d'une règle générale; il ne convient pas davantage d'y voir la confirmation de la proposition, avancée en l'espèce, que celui qui demande un permis n'a, en aucune circonstance, le droit d'obtenir réparation

of the statutory power to grant the licence. Much must turn in such cases on what may prove to be the facts of the alleged misuse and in what the malice is found to consist. The presence of spite or ill-will may be insufficient in itself to render actionable a decision which has been based on unexceptionable grounds of consideration and has not been vitiated by the badness of the motive. But a "malicious" misuse of authority, such as is pleaded by the appellant in his plaint, may cover a set of circumstances which go beyond the mere presence of ill-will, and in their lordships' view it is only after the facts of malice relied on by a plaintiff have been properly ascertained that it is possible to say in a case of this sort whether or not there has been any actionable breach of duty.

It would appear on the basis of the authorities cited that in general terms public officers are entitled to no special immunities or privileges when they act beyond the powers which are accorded to them by law in their official capacities. It would follow, then, that where a public officer, a servant of the Crown, exceeds the powers of his office or acts improperly in fraud of his duties and powers, or acts with malice in the discharge of his duties, he does not have immunity from civil suit and where, by reason of such excess of power or improper motive, he causes damage he may be civilly liable in damages. This, indeed, seems clear as far at least as it may concern public servants who act in administrative capacities. However, the question before us involves a consideration of the position of the Attorney General, acting in his capacity as the chief law officer of the Crown concerned with the commencement and prosecution of criminal proceedings against accused persons.

The Court of Appeal, as has been said, found an absolute immunity from civil liability on the part of the Attorney General and the Crown Attorneys, and in reaching this conclusion they placed special emphasis on *Owsley v. The Queen in right of Ontario* and *Richman v. McMurtry, supra,* in the Ontario High Court and, as well, on *Imbler v. Pachtman,* 424 U.S. 409 (1976). They formed the view that the absolute immunity was a clearly established feature of the common law. This issue has been considered in many Canadian cases in recent years: see *Unterreiner v. Wilson* (1982), 40 O.R. (2d) 197 (H.C.), *per* Gray J., affirmed

s'il y a eu exercice malveillant et abusif du pouvoir légal d'émettre le permis. En pareils cas, tout dépendra de la preuve des faits allégués quant à l'exercice abusif et l'intention malveillante. Il se peut que la présence de rancune et de mauvais vouloir ne suffise pas, en soi, à donner ouverture à une poursuite contre une décision dont les motifs par ailleurs irréprochables n'auraient pas été viciés par la méchanceté de l'intention. Toutefois, l'abus «malveillant» qu'invoque l'appelant en l'espèce peut englober un éventail de circonstances allant au-delà du simple mauvais vouloir. De l'avis de leurs Seigneuries, ce n'est qu'une fois établis les faits allégués par le demandeur quant à la malveillance qu'il est possible de déterminer si, dans un cas semblable, il y a ouverture à une action pour violation d'une obligation.

Il semble se dégager de la jurisprudence précitée que, de façon générale, les fonctionnaires ne bénéficient d'aucune immunité ni d'aucun privilège particuliers lorsqu'ils excèdent les pouvoirs dont ils sont investis à titre officiel. Cela signifierait que lorsqu'un fonctionnaire, préposé de la Couronne, excède les pouvoirs de sa charge ou agit en violation de ses obligations et attributions ou encore fait preuve de malveillance dans l'exercice de ses fonctions, il n'est pas à l'abri d'une poursuite en matière civile et peut avoir à répondre de dommages causés par l'excès de pouvoir ou en raison du motif illégitime. Ce principe semble clair, du moins dans le cas de fonctionnaires agissant en leur qualité administrative. Cependant, la question dont nous sommes saisis en l'espèce nécessite l'examen du statut du procureur général agissant à titre de conseiller juridique principal de la Couronne, chargé d'engager et de mener des poursuites criminelles.

La Cour d'appel, rappelons-le, a jugé que le procureur général et les procureurs de la Couronne jouissent d'une immunité absolue en matière de responsabilité civile. S'appuyant en particulier sur les arrêts *Owsley v. The Queen in right of Ontario* et *Richman v. McMurtry,* précités, de la Haute Cour de l'Ontario, ainsi que sur l'arrêt *Imbler v. Pachtman,* 424 U.S. 409 (1976), la cour est arrivée à la conclusion que l'immunité absolue était indéniablement reconnue en *common law.* Cette question a été abordée dans plusieurs arrêts canadiens récents: voir *Unterreiner v. Wilson* (1982), 40 O.R. (2d) 197 (H.C.), le juge Gray, confirmé

1989 CanLII 77 (SCC)

(1983), 41 O.R. (2d) 472 (C.A.); *Owsley v. The Queen in right of Ontario, supra*; *Richman v. McMurtry, supra*; *Bosada v. Pinos* (1984), 44 O.R. (2d) 789 (H.C.), *per* Pennell J.; *Curry v. Dargie, supra*; *German v. Major* (1985), 39 Alta. L.R. (2d) 270 (C.A.); and *Levesque v. Picard* (1985), 66 N.B.R. (2d) 87 (C.A.), leave to appeal to the Supreme Court of Canada granted May 22, 1986, [1986] 1 S.C.R. x, notice of discontinuance filed January 7, 1987, [1987] 1 S.C.R. x.

These cases do not offer complete support for the position taken in the Court of Appeal. The cases decided in the Ontario courts, which are noted above, reach the conclusion that the prosecutorial immunity is absolute. In reaching a similar conclusion in the case at bar, Thorson J.A. relied extensively on American authority with particular emphasis on the judgments of Learned Hand J. in *Gregoire v. Biddle*, 177 F.2d 579 (2d Cir. 1949), and of Powell and White JJ., of the U.S. Supreme Court, in *Imbler v. Pachtman, supra*. These cases adopt the view that the social need to have prosecutors who are charged with the prosecution of criminal cases freed from the threat of civil action, so that they may fearlessly and objectively conduct the prosecutions justifies the adoption of the absolute rule. Powell J. in *Pachtman, supra*, at p. 428, expressed agreement with the words of Learned Hand J. in *Gregoire, supra*, at p. 581, where he said:

As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation . . . .

But the position respecting prosecutorial immunity is not unanimous. Other courts in other jurisdictions have indicated that they would not necessarily extend absolute immunity to those executing prosecutorial functions. In *Riches v. Director of Public Prosecutions*, [1973] 2 All E.R. 935 (C.A.), the plaintiff had been acquitted of a criminal charge and sought damages for malicious

par (1983), 41 O.R. (2d) 472 (C.A.); *Owsley v. The Queen in right of Ontario*, précité; *Richman v. McMurtry*, précité; *Bosada v. Pinos* (1984), 44 O.R. (2d) 789 (H.C.), le juge Pennell; *Curry v. Dargie*, précité; *German v. Major* (1985), 39 Alta. L.R. (2d) 270 (C.A.) et *Levesque v. Picard* (1985), 66 R.N.-B. (2ᵉ) 87 (C.A.), autorisation de pourvoi à la Cour suprême du Canada accordée le 22 mai 1986, [1986] 1 R.C.S. x, avis de désistement produit le 7 janvier 1987, [1987] 1 R.C.S. x.

Ces arrêts n'appuient pas entièrement la position adoptée par la Cour d'appel en l'espèce. Les arrêts précités rendus par les tribunaux ontariens, ont conclu au caractère absolu de l'immunité du poursuivant. En tirant une conclusion similaire en l'espèce, le juge Thorson de la Cour d'appel s'est largement fondé sur la jurisprudence américaine, mettant particulièrement en relief les jugements du juge Learned Hand dans *Gregoire v. Biddle*, 177 F.2d 579 (2d Cir. 1949), ainsi que des juges Powell et White de la Cour suprême des États-Unis, dans *Imbler v. Pachtman*, précité. On retrouve dans ces décisions l'idée que l'adoption d'une règle aussi absolue est justifiée par un impératif social: celui de mettre les personnes chargées d'intenter des poursuites criminelles à l'abri de la menace de recours civils, afin qu'elles puissent exercer leurs fonctions sans crainte et en toute objectivité. Dans l'arrêt *Pachtman*, précité, à la p. 428, le juge Powell s'est dit en accord avec les propos que tenait le juge Learned Hand dans l'arrêt *Gregoire*, précité, à la p. 581.

[TRADUCTION] Comme c'est souvent le cas, la réponse se trouve dans la recherche d'un juste équilibre entre deux maux également inévitables. En l'espèce, on a finalement jugé préférable de laisser sans recours les fautes que peuvent commettre des fonctionnaires malhonnêtes plutôt que d'exposer ceux qui s'efforcent d'accomplir leur devoir à la menace constante de représailles . . .

Il n'y a pas unanimité, cependant, en ce qui concerne l'immunité de la poursuite. Ainsi, dans d'autres juridictions, des tribunaux ont indiqué qu'ils ne seraient pas nécessairement disposés à accorder l'immunité absolue à ceux qui exercent des fonctions en matière de poursuites. Dans l'affaire *Riches v. Director of Public Prosecutions*, [1973] 2 All E.R. 935 (C.A.), le demandeur,

prosecution against the Director of Public Prosecutions. I observe, that in respect of the institution of prosecutions against individuals, the Director of Public Prosecutions is effectively performing the same function as a Canadian provincial Attorney General. In that case, although Stephenson L.J. held that the material before the Court disclosed that there had been a basis in evidence for the plaintiff's prosecution and that there was no cause of action disclosed by the statement of claim, he rejected the proposition that the Director of Public Prosecutions could never be found liable for malicious prosecution. He said, at p. 941:

I do not wish to be taken as saying that there may never be a case where a prosecution has been initiated and pursued by the Director of Public Prosecutions in which it would be impossible for an acquitted defendant to succeed in an action for malicious prosecution, or as saying that the existence of the Attorney-General's fiat where required conclusively negates the existence of malice and conclusively proves that there was reasonable and probable cause for the prosecution. There may be cases where there has been, by even a responsible authority, the suppression of evidence which has led to a false view being taken by those who carried on a prosecution and by those who ultimately convicted. But that case is, as it seems to me, many miles from this one. There is nothing in the judgment of the Court of Criminal Appeal in this particular case which lends any support to the view that there was no case for the plaintiff to answer; and I cannot find in anything that he has said to us or in any document that has been put before us anything to suggest that there was in existence material showing that there was no basis in evidence for a prosecution of him on the conspiracy charge or on any of the three substantive charges which he had to meet at the Suffolk Assizes. In those circumstances, as it seems to me, he has failed to show that the defendant put the facts unfairly before prosecuting counsel, that there was anything like a lack of reasonable or probable cause, or malice, on the defendant's part or that there is any possibility of such material being produced.

In Canada, decisions in the Alberta and Nova Scotia courts cast doubt on the existence of the complete immunity. In *German v. Major, supra,* the plaintiff had been prosecuted under the *Income Tax Act.* The trial judge acquitted on the basis of

acquitté de l'accusation criminelle portée contre lui, avait intenté contre l'avocat général un recours en responsabilité pour poursuites abusives. Soulignons qu'en ce qui concerne les poursuites contre les particuliers, l'avocat général remplit, en fait, la même fonction que le procureur général d'une province canadienne. Dans cette affaire, bien que le lord juge Stephenson ait conclu que les documents déposés devant la cour démontraient que la poursuite intentée contre le demandeur reposait effectivement sur des éléments de preuve et que la déclaration ne révélait aucune cause d'action, il n'en a pas moins écarté la proposition selon laquelle l'avocat général ne pourrait jamais être tenu responsable de poursuites abusives. Il déclare ainsi, à la p. 941:

[TRADUCTION] Je ne voudrais pas qu'on interprète mes propos comme signifiant qu'il est impossible qu'un défendeur acquitté à l'issue de poursuites intentées par l'avocat général ait gain de cause dans une action pour poursuites abusives. Je ne dis pas non plus que l'autorisation du procureur général, lorsqu'elle est requise, efface péremptoirement toute trace de malveillance et constitue la preuve irréfutable que la poursuite était fondée sur un motif raisonnable et probable. On peut songer à des cas où il y a eu, même de la part d'une administration responsable, suppression d'éléments de preuve faussant la perception de ceux qui ont mené la poursuite et de ceux qui, finalement, ont prononcé la condamnation. Mais, à mon avis, nous sommes à cent lieues en l'espèce d'une telle hypothèse. Rien dans le jugement de la section criminelle de la Cour d'appel ne permet d'affirmer qu'il n'y avait aucune preuve contre le demandeur. Je ne puis non plus trouver dans les déclarations de ce dernier ni dans les documents qui nous ont été présentés la preuve que les poursuites dont il a été l'objet, que ce soit sous l'accusation de complot ou sous les trois accusations de fond auxquelles il devait répondre aux assises du Suffolk, étaient sans fondement. Dans les circonstances, il me semble qu'il n'a pas été établi que le défendeur a déloyalement présenté les faits à l'avocat de la poursuite, ni qu'il n'existait pas de motif raisonnable ou probable, ni qu'il y a eu conduite malveillante, ni non plus qu'il y ait quelque possibilité de faire la preuve de telles allégations.

Au Canada, certaines décisions rendues par les tribunaux de l'Alberta et de la Nouvelle-Écosse jettent un doute sur l'existence de l'immunité absolue. Dans l'arrêt *German v. Major,* précité, le demandeur avait été poursuivi en vertu de la *Loi*

1989 CanLII 77 (SCC)

a doubt as to guilt and the defendant taxpayer then sued the prosecutor for malicious prosecution. Though Kerans, J.A. considered that the material before the court disclosed that the plaintiff's case was "doomed beyond doubt to fail", for absence of proof of malice, and because there were reasonable grounds for the prosecution he also considered that the prosecutor's immunity to prosecution was not absolute. In the closing paragraph of his judgment, at p. 286, he said:

Counsel for the Attorney General who acts as his agent in the prosecution of a criminal case is not accountable in civil proceedings to the accused except possibly to the extent that it is alleged against him that he has not acted in good faith, and to that extent the allegation falls within the nominative tort of malicious prosecution, and that cause of action has been dealt with [see p. 282]. I would therefore strike those portions of the statement of claim which deal with the remaining claims by German against Major. [Emphasis added.]

It would follow that had the prosecutor proceeded solely or principally on an improper motive: for example, malice, then coming within Kerans J.A.'s conception there would be no immunity against malicious prosecution. In *Curry v. Dargie, supra,* it was held that a residential tenancy officer who had instituted proceedings against a tenant could not claim an absolute prosecutorial immunity. Relying in part on the earlier case of *Warne v. Province of Nova Scotia* (1969), 1 N.S.R. (2d) 27 (S.C.T.D.), where Gillis J. refused to strike out a personal claim against the provincial Minister of Agriculture, Hart J.A. explained that he was not willing to go as far as the Ontario cases had gone in extending prosecutorial immunity. Although he distinguished the case before him from a case where the Attorney General or a Crown Attorney had instituted a prosecution, he made it clear that he was not deciding the issue as to the immunity of Attorneys General and Crown Attorneys. He said, at p. 110:

I am not prepared to go as far as Galligan J. [in *Richman, supra*] in holding that an officer of the Crown cannot be liable for a proceeding commenced malicious-

*de l'impôt sur le revenu.* Acquitté en raison d'un doute sur sa culpabilité, le défendeur contribuable a alors intenté contre le poursuivant un recours pour poursuites abusives. Bien que le juge Kerans de la Cour d'appel ait estimé que, d'après la preuve au dossier, l'action du demandeur devait certainement échouer puisque l'intention malveillante n'avait pas été établie et que les poursuites reposaient sur des motifs raisonnables, il n'en a pas moins considéré que l'immunité du poursuivant n'était pas absolue. Voici ce qu'il déclare dans le paragraphe final de son jugement, à la p. 286:

[TRADUCTION] Le substitut du procureur général, qui agit au nom de ce dernier dans des poursuites criminelles, n'est pas comptable à l'accusé dans un recours civil, sauf peut-être dans la mesure où il y a allégation de mauvaise foi dans l'exercice de ses fonctions, savoir l'équivalent du délit civil nommé de poursuites abusives, cause d'action dont nous avons traité [voir la p. 282, ci-dessus]. Je suis en conséquence d'avis de radier les parties de la déclaration ayant trait aux autres demandes que fait valoir German contre Major. [Je souligne.]

Ainsi, le poursuivant aurait-il agi uniquement ou principalement pour un motif illégitime, telle la malveillance, qu'il n'aurait pu bénéficier, suivant le raisonnement du juge Kerans, d'aucune immunité contre un recours pour poursuites abusives. Dans l'arrêt *Curry v. Dargie,* précité, on a conclu qu'un fonctionnaire de la commission de location résidentielle qui avait engagé une poursuite contre un locataire ne pouvait prétendre à une immunité absolue. Se fondant en partie sur l'arrêt antérieur *Warne v. Province of Nova Scotia* (1969), 1 N.S.R. (2d) 27 (C.S.D.P.I.), où le juge Gillis avait refusé de radier un recours dirigé personnellement contre le ministre provincial de l'Agriculture, le juge Hart de la Cour d'appel a expliqué qu'il n'était pas disposé à aller aussi loin que les arrêts ontariens dans l'extension de la portée de l'immunité rattachée à la poursuite. Quoiqu'il ait établi une distinction entre l'affaire dont il était saisi et le cas où la poursuite est engagée par le procureur général ou un procureur de la Couronne, il a précisé qu'il ne tranchait pas la question de l'immunité des procureurs généraux ni des procureurs de la Couronne. Il dit ceci à la p. 110:

[TRADUCTION] Je ne suis pas prêt à aller aussi loin que le juge Galligan [dans l'arrêt *Richman,* précité] en statuant qu'un fonctionnaire de la Couronne ne peut être

ly, <u>but it is not necessary to consider that issue at the
moment.</u> I do not believe that in the case at Bar it can
be said that the respondent in laying the information
against the appellant was in fact carrying out a <u>judicial
function</u> similar to those carried out by Attorneys Gen-
eral and prosecutors. An information can be laid by any
person and there is no obligation under the Residential
Tenancies Act requiring that it be laid by the respond-
ent. Surely a person who undertakes to swear that she
has reasonable and probable cause to believe that an
offence has been committed must take personal respon-
sibility for the results of that act and cannot simply say
that she was merely following instructions of her supe-
riors. Nor can it be said that she was by her act
enforcing the criminal law or the provisions of any
statute. She was simply setting in motion the forces of
the justice system which would enable the persons
charged with its administration to perform their duties.
She was in no different position from the police infor-
mant or other person who lays an information in a
criminal case without reasonable and probable cause for
believing that the offence had been committed and with
some malicious intent. Such a person is always liable to
an action for malicious prosecution. [Emphasis added.]

The basis upon which Hart J.A. draws the
distinction between the residential tenancy officer
and the Attorney General, and which erases any
doubt as to the non-existence of an immunity for
the residential tenancy officer, is the fact that the
Attorney General exercises a "judicial function" in
commencing a prosecution, whereas the residential
tenancy officer does not. I have already referred to
the "judicial" nature of the Attorney General's
decision to prosecute: see the discussion of *The
Queen v. Comptroller-General of Patents,
Designs, and Trade Marks, supra.* But can it be
said that the mere fact of the Attorney General's
decision being "judicial" confers an absolute
immunity? I do not think the law is decided on this
point.

The "judicial" nature of the Attorney General's
decision to prosecute does not in any way render
him a "court", that is, an <u>adjudicative</u> entity. See
on this point, *Re Van Gelder's Patent* (1888), 6
R.P.C. 22 (C.A.), where Lord Esher, M.R., said,
at p. 27:

tenu responsable d'une poursuite engagée avec malveil-
lance, <u>encore qu'il n'y ait pas lieu d'examiner cette
question pour le moment.</u> En l'espèce, je ne crois pas
qu'on puisse dire qu'en faisant une dénonciation contre
l'appelant, l'intimée exerçait dans les faits une <u>fonction
judiciaire</u> analogue à celle qu'exercent les procureurs
généraux et les poursuivants. Toute personne peut faire
une dénonciation et la Residential Tenancies Act n'avait
pas pour effet d'imposer cette obligation à l'intimée.
Certes, la personne qui affirme sous serment avoir des
motifs raisonnables et probables de croire qu'une infrac-
tion a été commise doit assumer personnellement les
conséquences de son acte: elle ne peut simplement se
retrancher derrière les instructions de ses supérieurs. On
ne peut affirmer non plus qu'elle appliquait le droit
criminel ou les dispositions d'une loi alors qu'elle ne
faisait en somme qu'actionner les rouages du système
judiciaire pour permettre ainsi à ceux qui sont chargés
de son administration d'exécuter leurs fonctions. Sa
position n'était en rien différente de celle de l'indicateur
ou de toute autre personne faisant une dénonciation
dans un affaire criminelle sans motifs raisonnables et
probables de croire que l'infraction a été commise et
avec quelque intention malveillante. Cette personne est
toujours exposée à un recours pour poursuites abusives.
[Je souligne.]

La distinction que fait le juge Hart entre le
fonctionnaire de la commission de location résiden-
tielle et le procureur général—distinction qui ne
laisse aucun doute sur l'inexistence d'une immu-
nité pour le premier—repose sur le fait qu'en
intentant des poursuites, le procureur général
exerce, à la différence du fonctionnaire, une «fonc-
tion judiciaire». J'ai évoqué précédemment la
nature «judiciaire» de la décision que prend le
procureur général en engageant des poursuites:
voir l'analyse de l'arrêt *The Queen v. Comptrol-
ler-General of Patents, Designs, and Trade
Marks*, précité. Mais doit-on conclure que le
simple fait que le procureur général prenne une
décision «judiciaire» lui confère une immunité
absolue? J'estime que le droit n'est pas fixé sur ce
point.

Le caractère «judiciaire» de la décision du procu-
reur général d'intenter des poursuites n'en fait
d'aucune façon un «tribunal», c'est-à-dire une
entité qui rend des décisions. Voir sur ce point *Re
Van Gelder's Patent* (1888), 6 R.P.C. 22 (C.A.),
où le maître des rôles, lord Esher, déclare, à la
p. 27:

1989 CanLII 77 (SCC)

If what I have said is true, after all the *Attorney-General* is not a Court. He may have a judicial function to perform, but he is not a Court, and prohibition does not lie to him . . . . [Emphasis added.]

What is meant by the words "prohibition does not lie to him" is that the Attorney General's decision to prosecute is not reviewable by any court. As A.L. Smith L.J. noted in *Comptroller-General of Patents, supra*, at p. 914:

The issue of such an [a criminal] information is entirely in the discretion of the Attorney-General, and no one can set such an information aside . . . . [Emphasis added.]

Hence, the law is settled that the Attorney General's exercise of his "judicial" functions, such as the commencement of criminal proceedings, the entering of a *nolle prosequi*, the entering of a stay under s. 579(1) of the *Criminal Code*, or the preferring of direct indictments in the absence of a committal for trial after a preliminary hearing, are all incapable of judicial review and to that extent, the Attorney General enjoys an absolute and total immunity on the basis that he is performing a judicial function.

Immunity from judicial review, however, does not equate to immunity from civil suit for damages incurred as a result of a maliciously instituted and executed prosecution. This Court has held that, in respect of adjudicative judicial decisions, there is a complete immunity from civil suit: *Morier v. Rivard*, [1985] 2 S.C.R. 716. In light of the reservations expressed by learned justices of the Alberta, Nova Scotia and English Courts of Appeal, however, I am loath to make a ruling on an appeal of a preliminary motion that a similar absolute immunity exists for the benefit of the Attorney General and his agents in respect of suits for malicious prosecution. If the Court were to make such a ruling on a point of this importance in a total absence of evidence, it would, in my view, be adopting a dangerous course. Let us not forget that, when Lord Mansfield was faced with the bleak reality of a colonial governor gone awry, imprisoning innocent people without proper trials and in contravention of the law, "absolutely des-

[TRADUCTION] Si ce qui précède est vrai, le procureur général n'est pas un tribunal. Il se peut qu'il soit investi d'une fonction judiciaire mais, n'étant pas un tribunal, il ne peut faire l'objet d'une prohibition. [Je souligne.]

Ce que le juge veut dire par «ne peut faire l'objet d'une prohibition», c'est que la décision du procureur général d'intenter des poursuites n'est pas assujettie au pouvoir de contrôle des tribunaux. Comme le souligne lord juge A.L. Smith dans l'arrêt *Comptroller-General of Patents*, précité, à la p. 914:

[TRADUCTION] Une telle dénonciation [criminelle] relève entièrement du pouvoir discrétionnaire du procureur général et nul ne peut l'annuler . . . [Je souligne.]

Ainsi, il est établi en droit que, dans l'exercice de ses fonctions «judiciaires», telles l'introduction de poursuites criminelles, l'arrêt des procédures, par *nolle prosequi* ou selon le par. 579(1) du *Code criminel* ou encore la présentation d'un acte d'accusation en l'absence de renvoi à procès, à l'issue d'une enquête préliminaire, le procureur général n'est pas assujetti au contrôle judiciaire et qu'il jouit dans cette mesure d'une immunité totale et absolue parce qu'il exerce une fonction judiciaire.

Cependant, échapper au contrôle judiciaire n'équivaut pas à bénéficier d'une immunité contre toute responsabilité civile pour les dommages résultant de poursuites engagées et menées avec malveillance. Cette Cour, dans l'arrêt *Morier c. Rivard*, [1985] 2 R.C.S. 716, a conclu à l'existence d'une immunité complète en ce qui concerne les décisions proprement judiciaires. Compte tenu cependant des réserves exprimées par les juges des cours d'appel de l'Alberta, de la Nouvelle-Écosse et de l'Angleterre, j'hésite à statuer, en appel d'une exception préliminaire, qu'une immunité aussi absolue existe au profit du procureur général et de ses mandataires en matière de responsabilité pour poursuites abusives. Si la Cour devait se prononcer sur un point de cette importance en l'absence totale de preuve, elle s'engagerait, à mon avis, sur une voie dangereuse. N'oublions pas que c'est confronté à la triste réalité du gouverneur d'une colonie qui, devenu insensé, emprisonnait des innocents illégalement et sans procès équitable, «véritable

potic" and "accountable only to God, and his own conscience", he felt compelled to reject any notion of immunity by virtue of the Governor's office: see *Mostyn v. Fabrigas, supra.* The state of the law relating to the immunity of the Attorney General is, as has been shown, far from clear. Before laying down any proposition to the effect that the Attorney General and his agents enjoy absolute immunity from civil suit, there must be a trial to permit a conclusion on the question of prosecutorial immunity and to furnish—in the event that it is decided that the immunity is not absolute—a factual basis for a determination of whether or not in this case the conduct of the prosecution was such that the appellant is entitled to a remedy.

Furthermore, the Attorney General's immunity from judicial review, based on the exercise of a judicial function, does not equate with immunity from civil suit for damages for wrongful conduct in the performance of prosecutorial functions which do not involve the exercise of a judicial function. Indeed, most of the functions and acts performed by Crown Attorneys, as agents of the Attorney General, would fall into this category and, accordingly, the immunity may not extend to claims for damages as a result of a prosecution, however instituted but carried out with malice. A ruling on a preliminary motion to the effect that Attorneys General and their agents are absolutely immune from all liability for suits for malicious prosecution may therefore be too expansive and even ill-founded.

Therefore, my view is that this case is not one which should have been disposed of upon a pre-trial motion under Rule 126. The law has long been settled that it is only in the clearest of cases that actions will be struck out, and this is not such a clear case. Of interest in this connection are the comments made in an unreported case in the British Columbia Court of Appeal (*Barrisove v. McDonald*, B.C.C.A., No. 490/74, November 1, 1974 (McFarlane, Robertson and Carrothers JJ.A.)) where an action was commenced against a county court judge for alleged misconduct in the

despote» n'ayant de compte à rendre «qu'à Dieu et à sa conscience», que lord Mansfield s'est vu contraint de rejeter toute notion d'immunité rattachée à la charge de gouverneur: voir *Mostyn v. Fabrigas*, précité. Comme on a pu le voir, l'état du droit à l'égard de l'immunité conférée au procureur général est loin d'être clair. Avant d'énoncer en principe que le procureur général et ses mandataires jouissent d'une immunité absolue contre toute poursuite en responsabilité civile, il doit y avoir un procès pour trancher la question de l'immunité du poursuivant et—s'il est décidé que l'immunité n'est pas absolue—pour fournir le fondement factuel permettant de déterminer si, en l'espèce, la poursuite a été menée de façon telle que l'appelante est en droit d'obtenir réparation.

De plus, l'immunité du procureur général à l'égard du contrôle judiciaire, fondée sur l'exercice d'une fonction judiciaire, n'équivaut pas à une immunité de responsabilité civile pour les dommages résultant d'un acte fautif commis dans l'accomplissement de fonctions ne comportant pas l'exercice d'une fonction judiciaire. En fait, la plupart des fonctions et des actes qu'exécutent les procureurs de la Couronne à titre de mandataires du procureur général relèveraient de cette catégorie et, en conséquence, il est possible que l'immunité ne s'étende pas aux recours en dommages résultant d'une poursuite menée avec malveillance, quelle que soit la façon dont elle a été introduite. Une décision rendue sur une exception préliminaire et portant que les procureurs généraux et leurs mandataires sont à l'abri de toute responsabilité en matière de poursuites abusives pourrait donc être trop large et peut-être même mal fondée.

Par conséquent, je suis d'avis que la présente affaire n'aurait pas dû être tranchée sur une requête préliminaire présentée en vertu de la règle 126. Il est établi depuis longtemps que ce n'est que dans les cas les plus évidents que des actions seront radiées. Or ce n'est pas le cas en l'espèce. Sont intéressants à cet égard les commentaires faits dans un arrêt inédit de la Cour d'appel de la Colombie-Britannique (*Barrisove v. McDonald*, C.A.C.-B., n° 490/74, le 1er novembre 1974 (les juges McFarlane, Robertson et Carrothers)), où une action avait été introduite contre un juge d'une

1989 CanLII 77 (SCC)

course of the plaintiff's trial. The pleadings were struck out in the Supreme Court of British Columbia as alleging no reasonable cause of action, but an appeal was allowed, holding, in effect, that the allegations against the judge were cognizable in a civil action for damages. This case cannot now be considered as authoritative in view of the judgment in this Court in *Morier v. Rivard*, *supra*, but the comments made by Robertson J.A. in agreeing with the disposition made of the appeal are significant. He said (at p. 10):

   I agree with the disposition proposed by my brother [McFarlane] and agree substantially with what he has said. I wish, however, to guard myself against being said to have made a pronouncement on the law which will be binding on the trial judge or upon this Court if following a trial, there should be an appeal to the Court. Rather than saying categorically that the endorsement on the writ and the Statement of Claim discloses a cause of action to which there can be no defence, I prefer to put my reasons on the ground that the question is not one which should have been decided in a proceeding of the sort that was taken here. It is so far from clear that no cause of action is disclosed that, as I have indicated, that stage of the proceedings was not one at which the question should have been decided.

In view of the uncertainty of the law upon this question, it is not possible, in my view, to conclude that the appellant has not alleged a reasonable cause of action in her pleadings and, therefore, the move to strike out the pleadings and dismiss the action as against the Attorney General must fail.

   I would therefore dismiss the appeal as against the Crown. There is no order as to costs. I would allow the appeal as against the Attorney General with costs, and direct that the matter be returned to the Supreme Court of Ontario for trial of the claim against the Attorney General.

The following are the reasons delivered by

LA FOREST J.—I agree with my colleague Lamer J. except that I prefer to rely solely on the common law position as set forth by him, leaving

cour de comté sur une allégation d'action fautive pendant le procès du demandeur. La Cour suprême de la Colombie-Britannique avait radié les actes de procédure au motif qu'ils ne révélaient aucune cause raisonnable d'action, mais l'appel de cette décision a été accueilli et il a été jugé que les allégations contre le juge pouvaient faire l'objet d'une action civile en dommages-intérêts. Compte tenu de l'arrêt précité de cette Cour, *Morier c. Rivard*, cette décision ne peut faire autorité, mais les propos qu'y tient le juge Robertson en souscrivant à la décision de la Cour d'appel sont significatifs (à la p. 10):

   [TRADUCTION] Je suis en accord avec la façon dont mon collègue [le juge McFarlane] propose de trancher le litige et je souscris à l'essentiel de ses motifs. Je ne voudrais pas toutefois qu'on puisse conclure que j'ai établi un principe de droit liant le juge de première instance ou cette Cour, si elle était appelée à statuer en appel. Plutôt que d'affirmer catégoriquement que la mention sur le bref et la déclaration révèlent une cause d'action incontestable, je préfère invoquer comme motifs qu'une question de ce genre n'aurait pas dû être tranchée à l'occasion d'une procédure comme celle qui a été prise en l'espèce. Il est si peu manifeste qu'aucune cause d'action n'est révélée que, je le répète, ce n'est pas à ce stade des procédures que cette question aurait dû être tranchée.

Vu l'incertitude du droit sur ce point, il est impossible à mon avis de conclure que l'appelante n'a pas allégué une cause raisonnable d'action dans ses actes de procédure. En conséquence, la demande de radiation des actes de procédure et la demande de rejet de l'action contre le procureur général doit échouer.

   Je suis donc d'avis de rejeter le pourvoi quant à la Couronne, sans adjudication de dépens. Je suis d'avis d'accueillir le pourvoi quant au procureur général, avec dépens, et d'ordonner que l'affaire soit renvoyée devant la Cour suprême de l'Ontario pour audition de la réclamation présentée contre le procureur général.

Version française des motifs rendus par

LE JUGE LA FOREST—Je souscris aux motifs de mon collègue le juge Lamer, quoique je préfère me fonder uniquement sur la position qu'il a adoptée

consideration of *Charter* implications to another day when it becomes necessary to deal with them.

The following are the reasons delivered by

L'HEUREUX-DUBÉ J. (dissenting in part)— While I agree with my colleague, Justice McIntyre, that the Crown enjoys absolute immunity from suit even for malicious prosecution, I respectfully disagree with his conclusion that the Attorney General and, by extension, Crown Attorneys, may not. Consequently, I would dismiss the appeal.

My colleague McIntyre J. is of the view that the lower courts erred in striking out the appellant's statement of claim under Rule 126 of the Ontario Rules of Practice under circumstances where there was sufficient doubt as to the actual state of the law on the question. He finds that the law in Canada is somewhat ambiguous as to the question of the degree of immunity of Attorneys General and Crown Attorneys. For that reason, he orders the matter to proceed to trial. My point of divergence from the reasons of McIntyre J. concerns the appropriate response of this Court under the circumstances. Since, in my view, strong policy reasons exist for granting Attorneys General and Crown Attorneys absolute immunity from prosecution for actions taken in the proper exercise of their powers, I see no reason to prolong this matter any further by remitting it to trial to decide this very same issue.

I would like to make it clear at the outset that I am proceeding from the premise that any decisions taken or acts performed by the respondents in this case were done within the scope of their authority. I perceive the claim of the appellant to be founded on the idea that her prosecution by the respondents, though carried out within the bounds of their authority, was malicious. In this respect, I would distinguish the situation from that which arose in *Roncarelli v. Duplessis*, [1959] S.C.R. 121. In that case, the claim was brought on the basis that the respondent had acted outside the scope of his legitimate authority. The civil action was brought

en vertu de la *common law* et remettre l'examen de l'effet de la *Charte* à un moment où il deviendra nécessaire de trancher cette question.

Les motifs suivants ont été rendus par

LE JUGE L'HEUREUX-DUBÉ (dissidente en partie)—Quoique je partage l'avis de mon collègue le juge McIntyre, que la Couronne jouit d'une immunité absolue même au cas de poursuite malicieuse, avec déférence, je ne partage pas sa conclusion à l'effet que le procureur général et, par extension, les procureurs de la Couronne n'en jouissent pas. En conséquence, je rejetterais l'appel.

Mon collègue le juge McIntyre estime que les cours d'instance inférieure ont commis une erreur en rejetant l'action de l'appelante en vertu de la règle 126 des Rules of Practice de l'Ontario là où il existait un doute suffisant en ce qui concerne l'état du droit sur cette question. Il conclut que le droit au Canada dénote une certaine ambiguïté quant au degré d'immunité dont jouissent le procureur général et les procureurs de la Couronne. Pour cette raison, il renvoie l'affaire au procès. Là où je diverge d'opinion avec le juge McIntyre c'est quant à la réponse appropriée que notre Cour doit donner à cette question dans les circonstances. Comme j'estime qu'il existe de sérieuses raisons de principe qui militent en faveur de l'immunité absolue pour le procureur général et les procureurs de la Couronne à l'encontre de poursuites civiles pour des actes commis dans l'exercice de leurs fonctions, je ne vois pas de raison de prolonger indûment le débat en remettant l'affaire au juge du procès pour qu'il en décide.

Je veux qu'il soit clair dès le départ que je pars de la prémisse que les décisions prises ou les actes entrepris par les intimés en l'instance l'ont été dans l'exercice de leurs fonctions. Telle que je la perçois, l'action de l'appelante est fondée sur la notion que la poursuite qui a été intentée contre elle par les intimés, quoiqu'intentée dans l'exercice de leurs fonctions, l'a été malicieusement. Dans cette perspective, il y a lieu de distinguer cette situation de celle qui a donné lieu à l'arrêt *Roncarelli v. Duplessis*, [1959] R.C.S. 121. Dans cette affaire, l'action avait été prise sur la base que l'intimé avait agi au-delà des limites de ses pouvoirs. La

1989 CanLII 77 (SCC)

against Maurice Duplessis in his capacity as an individual, and not against Duplessis in either of his official roles as Premier of the province or as Attorney General. As Rand J. stated, at pp. 142-43:

The office of Attorney-General traditionally and by statute carries duties that relate to advising the Executive, including here, administrative bodies, enforcing the public law and directing the administration of justice. In any decision of the statutory body in this case, he had no part to play beyond giving advice on legal questions arising. In that role his action should have been limited to advice on the validity of a revocation for such a reason or purpose and what that advice should have been does not seem to me to admit of any doubt. To pass from this limited scope of action to that of bringing about a step by the Commission beyond the bounds prescribed by the legislature for its exclusive action converted what was done into his personal act. [Emphasis added.]

And at p. 144:

Was the act here, then, done by the respondent in the course of that exercise [of his functions]? The basis of the claim, as I have found it, is that the act was quite beyond the scope of any function or duty committed to him, so far so that it was one done exclusively in a private capacity, however much in fact the influence of public office and power may have carried over into it.

It may well be that a governmental authority who acts with malice acts outside of the scope of his authority. However, this is not the issue which was put before us. It is to be noted that the appellant chose to proceed against the Attorney General in his official, rather than personal, capacity. In her factum, the appellant also maintains that all of the respondents were acting, "at all material times" as agents of the Attorney General for Ontario, who "acted as an agent" of Her Majesty the Queen in right of Ontario.

For the purposes of Rule 126, as McIntyre J. has indicated, we must assume that all the facts alleged by the appellant in her submissions are true. The question then, to be decided before the matter is allowed to go to trial, is simply: does the appellant's claim disclose a reasonable cause of

réclamation civile a été intentée contre Maurice Duplessis en sa capacité personnelle et non pas contre Duplessis en qualité premier ministre de la province ou procureur général de la province. Comme le juge Rand l'écrit, aux pp. 142 et 143:

[TRADUCTION] La charge de procureur général s'accompagne traditionnellement et en vertu de la loi de devoirs qui consistent à conseiller l'Exécutif et notamment, comme dans le cas présent, les corps administratifs, à mettre à exécution le droit public et à diriger l'administration de la justice. Dans toute décision de l'organisme statutaire qui nous occupe dans cette affaire, son rôle devrait se borner à celui de conseil sur les questions de droit qui pouvaient se poser. Dans ce rôle, son action aurait dû se limiter à donner un avis sur la validité d'une révocation pour une telle raison ou dans un tel but, et ce qu'aurait dû être cet avis ne me semble souffrir aucune discussion. Le fait de sortir de ce champ d'action limité pour provoquer de la part de la Commission une mesure qui dépassait les limites de l'action exclusive que la législature lui avait assignées, voilà ce qui a fait de son acte un acte personnel. [Je souligne.]

Et à la p. 144:

[TRADUCTION] L'acte en cause ici a-t-il, dès lors, été fait par l'intimé dans l'exercice de ses fonctions? Le fondement de la plainte, il me semble, était que cet acte était de loin hors de toute fonction ou de tout devoir qui lui avaient été confiés, à tel point qu'il n'a pu être fait qu'exclusivement à titre privé, malgré l'importance de l'influence qu'ont pu en fait exercer sur lui la charge et le pouvoir publics réels.

Il est sans doute possible de prétendre qu'une autorité gouvernementale qui agit avec malice, ce faisant, excède ses pouvoirs. Ce n'est toutefois pas ce qu'on plaide devant nous. Je trouve significatif que l'appelante ait choisi de procéder contre le procureur général en sa qualité officielle plutôt que personnellement. Dans son mémoire, l'appelante soutient de plus que tous les intimés agissaient «en tout temps opportun» à titre d'agents du procureur général de l'Ontario, qui, lui, «agissait à titre d'agent» de Sa Majesté la Reine du chef de l'Ontario.

Pour les fins de la règle 126, comme le juge McIntyre le mentionne, nous devons présumer que tous les faits allégués par l'appelante sont vrais. La question qui doit être décidée avant que l'affaire ne soit renvoyée à procès, est simplement celle-ci: l'appelante a-t-elle un droit d'action? Il s'agit là

action? This is a pure question of law, and no evidence is required for its determination. In fact, there is every advantage, in terms of saving the time and cost of a trial, to decide a question of law at the outset. This, in fact, is the very reason for the existence of Rule 126.

In the present case, a determination that the Attorney General and Crown Attorneys enjoy absolute immunity would settle the question definitively. Both the judge at first instance and the Court of Appeal of Ontario proceeded on this basis. I intend to do so as well. This is also the course followed in *Morier v. Rivard*, [1985] 2 S.C.R. 716, which came to this Court on an interlocutory question similar to the one in this case.

This, of course, does not mean that I disagree with McIntyre J. when he proposes that, in general, important questions should not be disposed of in interlocutory fashion. However, this, in my view, does not apply in cases such as the one before us, where the defense offered at the outset is one of law only, namely that the right of action is barred independently of the facts alleged.

The action brought by Nelles is completely dependent upon the answer to the question of whether Attorneys General and Crown Attorneys are immune from civil suit. As such, the matter can and should be decided by this Court in the present appeal. My answer to the question is that the immunity from civil suit enjoyed by Attorneys General and Crown Attorneys is absolute when they are acting within the bounds of their authority. I rest my reasons on the very carefully considered judgment of the unanimous Ontario Court of Appeal: *Nelles v. The Queen in right of Ontario* (1985), 51 O.R. (2d) 513. The Court of Appeal (Houlden, Thorson and Robins JJ.A.) undertook a thorough review of the authorities in the course of a lengthy and well reasoned discussion of the arguments on either side of the issue.

As Thorson J.A. put it, at p. 531:

d'une pure question de droit qui, pour sa détermination, ne requiert ni enquête ni preuve. En fait, il y a tout avantage, en termes de temps et de coût qu'implique un procès, de décider de cette question *in limine litis*. C'est précisément d'ailleurs la raison d'être de la règle 126.

En l'instance, une décision à l'effet que le procureur général et les procureurs de la Couronne jouissent d'une immunité absolue réglerait définitivement la question. Tant le juge de première instance que la Cour d'appel ont procédé sur cette base. J'entends aussi le faire. C'est d'ailleurs la voie empruntée par notre Cour dans l'arrêt *Morier c. Rivard*, [1985] 2 R.C.S. 716, qui est venu devant notre Cour sur une requête interlocutoire similaire à celle qui fait l'objet du présent appel.

Ceci, bien sûr, ne veut pas dire que je ne partage pas les vues de mon collègue le juge McIntyre lorsqu'il propose qu'en général d'importantes questions ne devraient pas être décidées à l'occasion de requêtes de nature interlocutoire. Cependant, j'estime que cette règle ne s'applique pas dans les cas où, comme ici, la défense à ce stade en est une de droit uniquement, soit que le droit d'action n'existe pas, quels que soient les faits allégués.

Le sort de l'action entreprise par l'appelante Nelles dépend entièrement de la réponse à la question de savoir si les procureurs généraux et les procureurs de la Couronne jouissent d'une immunité absolue à l'encontre d'une poursuite civile. Une telle question peut et doit être résolue par notre Cour dans le présent pourvoi. En réponse à cette question, je suis d'opinion que les procureurs généraux et les procureurs de la Couronne jouissent d'une immunité absolue à l'encontre de poursuites civiles lorsqu'ils agissent dans les limites de leurs pouvoirs. J'assois mon opinion sur le jugement unanime et les motifs de la Cour d'appel de l'Ontario: *Nelles v. The Queen in right of Ontario* (1985), 51 O.R. (2d) 513. La Cour d'appel (les juges Houlden, Thorson et Robins) s'est livrée à une revue exhaustive de la jurisprudence dans le cours d'une discussion, élaborée et bien étayée, des arguments militant en faveur de l'un et l'autre point de vue.

Tel que l'écrit le juge Thorson, à la p. 531:

1989 CanLII 77 (SCC)

... the concept that the Attorney-General and Crown Attorneys should enjoy an absolute immunity from civil suit for their conduct in initiating and conducting criminal prosecutions is a troubling one. That it confronts thoughtful and fair-minded persons with the need to make what cannot be other than a difficult choice, is obvious.

Ultimately, however, "[a]s is so often the case, the answer must be found in a balance between the evils inevitable in either alternative" (*Gregoire v. Biddle*, 177 F.2d 579 (2d Cir. 1949), at p. 581).

While there are significant differences between the role of prosecutors in the American legal system, and the role of Crown Attorneys in Canada, it is my view that the basic principles underlying the grant of immunity to these agents are the same. These principles have been clearly elucidated in American case law. For example, in *Gregoire*, *supra*, Learned Hand J. expanded on the underlying rationale for the immunity of officials, at p. 581:

The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors.

Similarly, Powell J. in *Imbler v. Pachtman*, 424 U.S. 409 (1976), observed, at pp. 422-23:

The common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties. These include concern that harassment by unfounded litigation would cause a de-

[TRADUCTION] ... le concept que le procureur général et les procureurs de la Couronne devraient jouir d'une immunité absolue à l'encontre de poursuites civiles en raison de leur conduite dans l'initiation et la conduite de poursuites criminelles est une question troublante. Qu'elle confronte des personnes ayant un souci d'équité et de justice avec la nécessité de faire un choix qui ne peut être que difficile, est évident.

En bout de ligne, toutefois, [TRADUCTION] «[c]omme c'est souvent le cas, la réponse se trouve dans la recherche d'un juste équilibre entre deux maux également inévitables» (*Gregoire v. Biddle*, 177 F.2d 579 (2d Cir. 1949), à la p. 581).

Quoiqu'il existe des divergences significatives entre le rôle des procureurs (*prosecutors*) dans le système juridique américain et celui des procureurs de la Couronne au Canada, j'estime que les principes fondamentaux qui sous-tendent l'immunité accordée à ces agents sont les mêmes. Ces principes ont été clairement énoncés dans la jurisprudence américaine. À titre d'exemple, dans *Gregoire*, précité, le juge Learned Hand a explicité la philosophie sous-jacente en ce qui concerne l'immunité des officiers publics, à la p. 581:

[TRADUCTION] La justification pour ce faire est qu'il est impossible de savoir si l'action est bien fondée jusqu'à ce que le procès ait lieu et de soumettre tous les officiers publics, les innocents comme les coupables, au fardeau d'un procès et à l'inévitable incertitude quant à son issue, serait de nature à éteindre l'ardeur de non moins que le plus résolu, ou le plus irresponsable, dans la décharge indéfectible de ses devoirs. L'intérêt public demande plus souvent qu'autrement que des décisions soient prises, décisions qui pourraient par la suite s'avérer mal fondées, ce pourquoi un officier public pourrait être obligé de défendre sa bonne foi devant un jury. Il doit sûrement y avoir des moyens de punir un officier public qui a négligé son devoir; ceci est toutefois tout autre chose que d'exposer ceux qui ont commis d'honnêtes erreurs de la part de quiconque a été victime de ces erreurs.

De même, le juge Powell dans *Imbler v. Pachtman*, 424 U.S. 409 (1976), a fait observer, aux pp. 422 et 423:

[TRADUCTION] L'immunité de *common law* d'un procureur (*prosecutor*) est fondée sur les mêmes considérations qui sous-tendent l'immunité des juges et des grands jurés qui agissent dans les limites de leurs pouvoirs. Ces considérations incluent la peur que le harcèlement d'être

flection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust.

The role of absolute immunity is not to protect the interests of the individual holding the office, rather it is to advance the greater public good. Absolute immunity is based upon principles of public policy. In *Yaselli v. Goff*, 12 F.2d 396 (2d Cir. 1926), Rogers J. wrote, at p. 406:

The public interest requires that persons occupying such important positions and so closely identified with the judicial departments of the government should speak and act freely and fearlessly in the discharge of their important official functions. They should be no more liable to private suits for what they say and do in the discharge of their duties than are the judges and jurors, to say nothing of the witnesses who testify in a case.

Attorneys General and Crown Attorneys are often faced with difficult decisions as to whether to proceed in matters which come before them. It is unfortunate that, like all human beings, they cannot be immune from error. However, the holders of such offices can and should be immune from prosecution for any such errors which occur in the course of the exercise of their functions. The freedom of action of Attorneys General and Crown Attorneys is vital to the effective functioning of our criminal justice system. In my view, the greater public interest is best served by giving absolute immunity to these agents.

I would dismiss the appeal.

*Appeal dismissed as against the Crown and appeal allowed with costs as against the Attorney General, L'HEUREUX-DUBÉ J. dissenting in part.*

*Solicitors for the appellant: Stikeman, Elliott, Toronto.*

*Solicitor for the respondents: R. F. Chaloner, Toronto.*

entraîné dans un litige non fondé serait de nature à réduire la vigueur que les procureurs doivent avoir dans la décharge de leurs devoirs publics et la possibilité qu'ils nuancent leurs décisions au lieu de les exercer avec l'indépendance de jugement que requiert la confiance que le public met en eux.

L'immunité absolue n'a pas pour but de protéger l'individu qui détient une charge publique mais plutôt d'assurer le plus grand bien du public. L'immunité absolue est fondée sur des principes d'ordre public. Dans l'arrêt *Yaselli v. Goff*, 12 F.2d 396 (2d Cir. 1926), le juge Rogers écrit, à la p. 406:

[TRADUCTION] L'intérêt public requiert que les personnes qui occupent des positions d'une telle importance et si intimement liées au secteur de la justice du gouvernement doivent parler et agir librement et sans peur dans la décharge de leurs importantes fonctions officielles. Elles ne devraient pas être plus susceptibles de poursuites civiles pour leurs paroles et leurs actes dans l'exercice de leurs fonctions que ne le sont les juges et les jurés, sans parler des témoins appelés à rendre témoignage dans une cause.

Les procureurs généraux et les procureurs de la Couronne sont souvent confrontés à des décisions difficiles quant au dépôt d'une poursuite dans des affaires qui leur sont soumises. Il est malheureux que, comme tout être humain, ils ne soient pas exempts d'erreurs. Toutefois, ceux qui détiennent de telles positions peuvent et doivent jouir d'une immunité de poursuite pour telles erreurs qui se produisent dans le cours de l'exercice de leurs fonctions. La liberté d'action des procureurs généraux et des procureurs de la Couronne est vitale pour assurer que notre système de justice criminelle fonctionne de façon efficace. J'estime que le bien public est mieux servi en conférant à ces agents une immunité absolue.

Je rejetterais l'appel.

*Pourvoi rejeté en ce qui concerne la Couronne et accueilli avec dépens en ce qui concerne le procureur général, le juge L'HEUREUX-DUBÉ est dissidente en partie.*

*Procureurs de l'appelante: Stikeman, Elliott, Toronto.*

*Procureur des intimés: R. F. Chaloner, Toronto.*

1989 CanLII 77 (SCC)

**15**

**CITATION:** Ontario Consumers Home Services v. Enercare Inc., 2014 ONSC 4154
**COURT FILE NO.:** CV-12-464349
**DATE:** 2014/07/10

### ONTARIO

### SUPERIOR COURT OF JUSTICE

| | |
|---|---|
| **BETWEEN:** | ) |
| | ) |
| Ontario Consumers Home Services Inc. | ) |
| | ) |
| Plaintiff | ) *Kevin D. Toyne* and *Pradeep Chand*, for the )  Plaintiff/Respondent |
| | ) |
| **– and –** | ) |
| | ) |
| | ) |
| EnerCare Inc., EcoSmart Home Services Inc., EcoSmart Energy Savings Corp., Direct Energy Marketing Limited, Stephen Wells, Patricia Carraretto, Tom Cooper, Shannon Miranda and Tanya Faulds | ) *Stuart Svonkin, Mark Klaiman, Paul Le Vay,*  ) *Barry Kuretzky* and *Jennifer Wu*, for the )  Defendants/Moving Parties |
| | ) |
| Defendants | ) |
| | ) |
| | ) |
| | ) **HEARD:** June 5, 2014 |

2014 ONSC 4154 (CanLII)

### A.J. O'MARRA J.:

[1]    The defendants move to strike out the statement of claim of the plaintiff as failing to disclose a reasonable cause of action under Rule 21.01(1) (b); the allegations are scandalous, frivolous and/or vexatious, and otherwise an abuse of the court process, Rules 21.01(3) (d) and 25.11; and for failing to conform to the rules of proper pleadings, pursuant to Rule 25.06 of the *Rules of Civil Procedure*.

[2]    In the statement of claim the plaintiff alleges five causes of action against the corporate and individual defendants: 1) civil conspiracy, 2) unlawful interference with economic interests, 3) trespass to property/chattels, 4) trespass to land, and 5) misappropriation of confidential information (breach of confidence).   The plaintiff seeks damages of $10,000,000, jointly and severally against all defendants, and an accounting and disgorgement of the revenues and profits of each defendant.

[3]    The principal allegation against the defendants is that they caused the attachment of GPS tracking devices, to a number of the plaintiff's service vehicles in order to track the location of

2014 ONSC 4154 (CanLII)

the plaintiff's customers and potential customers.  Further, it is alleged that the information obtained was then used by the defendants to contact the plaintiff's customers to dissuade them from contracting with the plaintiff and contract with them, thereby interfering with the plaintiff's economic interests.

[4]    The plaintiff, Ontario Consumers Home Services Inc. (OCHS), is a home service company that, among other things, rents hot water heaters to residential homes.  OCHS is a competitor to the defendants, Direct Energy Marketing Limited (Direct Energy) and EnerCare Inc. (EnerCare).  EcoSmart Home Services Inc. and EcoSmart Energy Saving Corp. (EcoSmart) are Direct Energy Service providers through EnerCare.  Individual defendants, Tom Cooper, vice president, sales and marketing, Shannon Miranda, marketing coordinator and Tanya Faulds, marketing manager are employees of EnerCare.  Stephen Wells and Patricia Carraretto are directors of EcoSmart.

## The Claim

[5]    The plaintiff claims that since March 2012 it has experienced an increase in the cancellation of its customer contracts, and "a dramatic increase in the number of prospective customers who refused to listen to the presentations made by its sales people".

[6]    About mid-June, 2012, OCHS received a call from a former EcoSmart employee to advise them that they were under surveillance.  OCHS examined several of its vehicles and discovered GPS tracking devices on two of them.

[7]    The plaintiff alleges that EnerCare, EcoSmart and Direct Energy arranged for OCHS's vehicles to be tracked by a motion activated GPS unit by a private investigation firm, which in turn reported the information as to the duration the vehicles were in motion as well as the location of each stop the vehicle made.  The information was then reported by EcoSmart to EnerCare.

[8]    The statement of claim states the following:

> 26.    At a lunch meeting attended by a representative of the (investigation) firm and Mr. Cooper, Mr. Cooper directed the firm to report only to EcoSmart and to bill EcoSmart.

> 27.    Mr. Wells and Ms. Carraretto arranged for the resulting information to be delivered, reported and/or accessible to EnerCare.  This information is confidential and proprietary to OCHS (the "confidential information").

> 28.    At the direction of Mr. Wells and/or Ms. Carraretto, EcoSmart and the firm shared the confidential information with Ms. Miranda, Ms. Faulds and Mr. Cooper at EnerCare.  In addition to providing access to the confidential information by the firm's servers, the firm's private investigators reported directly to Ms. Miranda.

2014 ONSC 4154 (CanLII)

29.     The confidential information was misappropriated and used by Direct Energy, EnerCare and EcoSmart to target areas where OCHS's sales people have been working in an effort to persuade customers to cancel their contracts with OCHS and remain with Direct Energy.

30.     Direct Energy, EnerCare and EcoSmart have used the confidential information to inappropriately target areas that OCHS's sales people were going to visit in an effort to dissuade potential customers from listening to OCHS sales people.   Direct Energy used the EcoSmart door-to-door sales people in these efforts in order to maintain an appearance of independence.

31.     In taking the above-noted actions, the defendants have acted together with the intent to harm OCHS's business.   They have used unlawful means that they knew, or ought to have known, would cause injury to OCHS.

32.     OCHS has suffered damages as a result of the defendant's conspiracy, the full particulars of which will be provided prior to trial.

[9]     The other causes of action, interference with economic interest, trespass to property and land, and misappropriation of confidential information are cited in paragraphs 33 to 35 of the statement of claim:

33.     By using the confidential information to persuade customers to cancel their contracts with OCHS, remain with Direct Energy and to dissuade potential customers from listening to OCHS sales people, the defendants have used illegal means to intentionally interfere with OCHS's economic interests.

34.     In order to install the GPS tracking devices used to obtain the confidential information, the defendants must have trespassed onto OCHS's property.

35     By improperly tracking OCHS's vehicles, the defendants have misappropriated OCHS's confidential information to OCHS's detriment.

## Applicable Rules

[10]     Under Rule 21.01(1) (b), a court may strike out all or part of a pleading on the basis it "discloses no reasonable cause of action".   An order striking out a claim and dismissing all or part of a claim at the pleading stage should only be granted if it is "plain and obvious" that the claim discloses no reasonable cause of action (see *Hunt v. Carey Canada Inc.*, [1990] 2 S.C.R. 959).   The Court is to presume the facts as set out in the statement of claim are true and taken as proven. The threshold for sustaining a pleading challenged under Rule 21.01(1) is low, as it is under Rule 21.01(3) (d) where the statement of claim is challenged as being frivolous, or vexatious or otherwise an abuse of the court process.   Such an order should be granted only in the clearest of cases.

2014 ONSC 4154 (CanLII)

[11]    Under Rule 25 a statement of claim must contain a concise statement of all the material facts on which the party relies for the claim or defence, but not the evidence by which those facts are to be proved.  Rule 25.06(8) provides that:

> Where fraud, misrepresentation, breach of trust, malice or intent is alleged, the pleading shall contain full particulars, but knowledge may be alleged as a fact without pleading the circumstances from which it is to be inferred.

[12]    In *Ballard v. Stavro*, [1997] O.J. No. 3577 Epstein J., as she then was, relying on Divisional Court in *Doe v. Metropolitan Toronto (Municipality) Commissioners of Police* (1990), 74 O.R. (2nd) 225 noted the following principles to be applied on a motion to strike a statement of claim:

a)  The pleadings must disclose a cause of action founded in law.  So long as this criterion is met, the novelty of the cause is of no concern;

b)  In determining whether a cause of action exists, the material facts pleaded are to be taken as proved.  However, this principle does not apply where the alleged facts are based on assumption or speculative conclusions which are incapable of proof;

c)  If the facts, taken as proved, disclose a reasonable cause of action, that is, one with some chance of success, then the action may proceed; and

d)  The statement of claim must be read as generously as possible, with a view to accommodating any inadequacies in the form of the allegations due to drafting deficiencies.

[13]    In *Balanyk v. University of Toronto*, [1999] O.J. No. 2162 (SCJ) Cameron J. observed that in assessing the adequacy of pleadings under Rules 21.01, 25.06 and 25.11 the purpose of the rules must be born in mind.  The pleadings must:

a)  Define clearly and precisely the questions in controversy between the litigants;

b)  Give fair notice of the precise case which is required to be met and the precise remedy sought; and

c)  Assist the court in its investigations of the truth of the allegations made. (See *National Trust Co. v. Furbacher*, [1994] O.J. No. 2385 at paras. 9 and 10).

[14]    The defendants argue that there are three reasons which the statement of claim must be struck in its entirety.

[15]    First, the statement of claim does not allege material facts that support each claim made by the plaintiff.

2014 ONSC 4154 (CanLII)

[16]    Second, the defendants that they do not know the case that they are to meet. The fundamental rules of pleading require that the pleadings are to frame the issues in a clear and concise manner for the parties and the court.  The pleadings are to put the parties on notice as to the case they have to meet.  Each corporate and individual defendant has made a demand for particulars.  However, most of the responses by the plaintiff have been that "the information is within the knowledge of the defendants" or "the particulars requested are not required by the Rules of Civil Procedure".   Such responses are  inadequate  and  do  nothing  to  allow  the defendants to prepared responsive statements of defence.

[17]    Third, insofar as the individual defendants are concerned, the plaintiff has not provided any material facts to support any personal liability alleging the individual defendant committed a separate tort or act outside the scope of his or her employment.

[18]    I shall deal with each cause of action cited in the statement of claim in turn.

## Civil Conspiracy

[19]    There are two types of civil conspiracy recognized in Canadian law, 1) "unlawful conspiracy" in which the defendant's conduct is unlawful, it is directed against the plaintiff, and the defendant knows in the circumstances that injury to the plaintiff is likely to result, and 2) "conspiracy to injure" in which the means used by the defendant may be lawful or unlawful and the predominant purpose of the defendant's conduct is to cause injury to the plaintiff.  (See *Agribrands Purina Canada Inc. v. Kasamekas,* [2011] O.J. No. 2786 at para. 24 citing *Canada Cement Lafarge v. B.C. Lightweight Aggregate*, [1983] 1 S.C.R. 452 at p.47).

[20]    It is unclear as to which type of civil conspiracy the plaintiff alleges in its statement of claim, however, for the purpose of the motion both are assumed to be pleaded.

[21]    To allege unlawful conspiracy material facts must be pleaded in support of the following elements:

   a) The defendants must act in combination, that is, in concert, by agreement or with a common design;

   b) Each defendant's conduct must be unlawful and in furtherance of the conspiracy;

   c) The defendants' acts must be directed towards the plaintiff;

   d) The defendants should have known that in the circumstances injury to the plaintiff would likely result; and

   e) Each defendant's conduct causes injury to the plaintiff.

[22]    To make out a claim for conspiracy to injure the plaintiff must plead material facts as outlined with respect to an unlawful conspiracy.  However, the overt act(s) of each defendant

need not be unlawful, but the predominant purpose of each defendant must be to inflict harm on the plaintiff as noted by Moldaver J.A. (as he then was) in *Harris v. Glaxosmithkline Inc.*, [2010] ONCA 827 at para. 39.

[23]    The defendant's predominant purpose must be to inflict harm on the plaintiff. It is not enough if the harm is the collateral result of acts pursued predominantly out of self-interest. The focus is on the actual intent of the defendant and not the consequences that the defendant either realized or should have realized would result.

[24]    To plead civil conspiracy a statement of claim must state with precision and clarity material facts as to:

    a)   the parties to the conspiracy and their relationship of one to the other;

    b)   the agreement between or amongst the defendants to conspire, including particulars as to the time, place and mode of agreement;

    c)   the precise purpose or object of the conspiracy;

    d)   the overt acts alleged to have been done by each of the alleged conspirators in pursuance and furtherance of the conspiracy, including the time, and place and nature of the acts; and

    e)   the injury and damage caused to the plaintiff as a result of conspiracy.

[25]    Conspiracy is an intentional tort and a serious allegation as such the material facts must be pleaded with heightened particularity. In *Ballard v. Stavro*, the court stated at para. 31:

> Under Rule 25, a statement of claim must contain a concise statement of all the material facts on which a party relies for the claim. The issues in dispute must be sufficiently identified as to enable the parties to plead a response without having to speculate. Where this minimum level of disclosure is not satisfied, the pleading is irregular. In certain circumstances, it may be appropriate to grant leave to amend or order that particulars be granted. In others the pleading is ordered to be struck. In an action such as this where there are serious allegations of conspiracy, the level of disclosure of material facts is required to be higher.

[26]    It is insufficient to simply "lump some or all of the defendants together into a general allegation that they conspired". (See *Penson Financial Services Canada Inc. v. Connacher*, [2010] O.J. No. 2114 at para. 15; *Normart Management Ltd.* (1998), 37 O.R. (3rd) 97 (OCA), and *J.G. Young and Son Ltd. v. Tec Park Ltd.*, [1999] O.J. No. 4066 at 451. )

[27]    Further, it was noted in *J.G. Young and Sons*, that the plaintiff is under a heavy burden as a consequence of seeking to plead such a serious cause of action as that of conspiracy. In *Balanyk v. University of Toronto*, at para. 29 Cameron J. stated:

> If the plaintiff does not, at the time of the pleading, have knowledge of the facts necessary to support the cause of action, then it is inappropriate to make the allegations in the statement of claim.

[28]    In reading the statement of claim generously and as a whole together with responses to the defendant's demand for particulars the necessary material facts in support of a claim of civil conspiracy are lacking in six respects:

1)  There are no material facts which support the allegation of an agreement.  There are no particulars as to the time, place or mode of agreement amongst the alleged co-conspirators.

2)  There is no particularization of the precise purpose of the conspiracy.  OCHS alleges that in taking the "above-noted actions, the defendants have acted together with the intent to harm OCHS's business.  They used unlawful means that they knew, or ought to have known, would cause injury to OCHS" (para. 31 Statement of Claim).  It is a conclusory statement as opposed to one of material fact.

3)  With respect to the conspiracy to injure claim there is no pleading that the predominant purpose of the conspiracy, or conspirators acting together were motivated predominantly to injure OCHS as opposed to advancing a commercial self-interest.

4)  The plaintiff in its statement of claim fails to identify with any specificity the overt act of each of the defendants in furtherance of the conspiracy, but rather simply lumps all defendants, corporate and individuals together.

5)  The plaintiff has cited a series of independently actionable acts and then added an allegation that the defendants conspired to commit the acts.  Any unlawful acts that are independently actionable cannot support a claim of civil conspiracy.  In this instance the allegations concerning the GPS surveillance also forms the basis for the claims of unlawful interference with economic interests, trespass and breach of confidence.

6)  The plaintiff has failed to plead material facts that would establish, if proven, that the alleged conspiracy caused it to suffer damages distinct from those caused by the other claims alleged.  There are no pleadings of material facts of separate harm or damage that flowed from the conspiracy alleged.

[29]    The pleadings of conspiracy which simply restate legal principles and bald, or speculative conclusions rather than alleging material facts must be struck as failing to disclose the cause of action.

[30]    Each of the defendants, as noted earlier, made demands for particulars as to:  a) the nature of the relationship between the various defendants, b) the overt acts allegedly committed by the

defendants, c) the loss of business as allegedly suffered by OCHS as a result of each cause of action and, d) the quantum of damages claimed as a result of each cause of action.

[31]    In response, with respect to the claim of conspiracy the plaintiff to each request in turn wrote:

    a)  As to the nature of the relationship between the various defendants, the plaintiff's response was that the facts "are within the knowledge of the defendants".

    b)  With respect to overt acts committed by each defendant, the plaintiff's response was that the facts "are within the knowledge of the defendants" and that some of the particulars requested "are not required by the Rules of Civil Procedure".

    c)  With respect to the loss of business suffered by the plaintiff it replied "the requested particulars are not required by the Rules of Civil Procedure".

    d)  As to the $10,000,000 in damages it replied that the claim is against the defendants jointly and severally in respect to the five causes of action.

[32]    I am satisfied that the pleading of civil conspiracy is defective and that it does not plead material facts as to the agreement, overt acts alleged to have been done by each of the alleged co-conspirators in pursuance and in furtherance of the conspiracy, or with respect to conspiracy to injure that the predominant purpose of each defendant was to inflict harm on the plaintiff. The pleading of conspiracy as such fails to meet the requirements for the cause of action and must be struck.

[33]    Counsel for the plaintiff argued strenuously that its response to particulars did not mean that particulars were not available. If such is the case it is unfortunate that the plaintiff was reticent to provide them. However, in *South Holly Holdings Ltd. v. Toronto Dominion Bank*, 2007 ONCA 456, [2007] O.J. No. 2445 at para. 6 the Court of Appeal emphasized that "a litigant's pleadings should not lightly be struck without leave to amend." It should only be denied in the "clearest of cases". Where deficiencies may be cured by appropriate amendments and without prejudice to the defendants leave should be granted. There is no evidence of prejudice to the defendants. Accordingly, leave is granted to amend the pleading to correct the deficiencies with particulars, if available, bearing in mind the higher requirement of disclosure for an intentional tort.

## Intentional Interference with Economic Interests

[34]    Intentional interference with economic interests, like civil conspiracy is an intentional tort and it must be pleaded with "full particulars". A plaintiff, to advance a claim of intentional interference with economic interest, must plead material facts that, if proven, would establish the following elements:

    1)  An intention to injure the plaintiff;

2014 ONSC 4154 (CanLII)

2) The interference with the plaintiff's economic interests must be by unlawful means;

3) The unlawful means are directed at a third party who has an actionable claim based on the defendant's conduct or would have a claim if it suffered a loss as a result of that conduct;

4) The defendant's conduct results in economic loss to the plaintiff (see *A.I. Enterprises Ltd.* v. *Bram Enterprises Ltd.*, [2014] SCJ No. 12 (SCC) at paras. 5, 23, 24, 26, 28, 37, 42-49, 74, 76).

[35]   Shaw J. in *AGFA Inc. v. Partners Prepress*, [2006] O.J. No. 3373 (SCJ) observed at para. 36:

> The pleading of intentional interference with economic relations is an intentional tort that requires full particulars. As noted in *Lysko v. Braley* (supra*)*, the strict pleading requirements relating to a plea of conspiracy apply equally to a plea of intentional interference with economic relations. The particulars must set out with clarity and precision each of the overt acts which are alleged to have been done in furtherance of the intentional interference with economic relations

[36]   Rule 25.06(8) requires that where intention is alleged the pleadings must contain full particulars. In the statement of claim it is alleged that the defendants by using confidential information to persuade customers to cancel contracts with OCHS, remained with Direct Energy and to dissuade potential customers from listening to OCHS sales people the defendants used illegal means to intentionally interfere with OCHS's economic interests.

[37]   In *A.I. Enterprises,* Cromwell J. observed that the tort of causing loss by unlawful means is available in three party situations in which the defendant commits an unlawful act against a third party and that act intentionally causes economic harm to the plaintiff. The conduct would be "unlawful" if it was actionable by the third party or would have been actionable if the third party had suffered loss as a result of the defendant's unlawful act. It is a tort that creates a type of "parasitic" liability in a three party situation. It permits a plaintiff to sue a defendant for economic loss resulting from the defendant's unlawful act against a third party. Cromwell J. cited, as he described it, an old case as an example at para. 24 of the decision:

> The defendant, the master of a trading ship, fired its cannons at a canoe that was attempting to trade with its competitor, the plaintiff's trading ship, in order to prevent it from doing so. The defendant was held liable, Lord Kenyon being of the opinion that these facts supported an action: *Tarleton v. M'Gawley* (1793), Peake 270, 170 E.R. 153. The plaintiffs were able to recover damages for the economic injury resulting from the defendant's wrongful conduct toward third parties (the occupants of the canoe) which had been committed with the intention of inflicting economic injury on the plaintiffs.

2014 ONSC 4154 (CanLII)

[38]    In this situation, the defendants argue that this is not a situation where the actions of the defendants, as alleged, would give rise to a civil cause of action by the third party (the customers) or would do so if the third party (customers) had suffered loss as a result of the conduct.

[39]    The plaintiff has not alleged facts that would establish wrongful acts were directed against a third party, that the third party as a result of wrongful acts had an actionable claim or would have if it had suffered a loss, or how any wrongful acts directed at the third party, the customers caused a specific or concrete economic loss to the plaintiff.

[40]    Even accepting that there were wrongful acts committed there is nothing alleged that the third party (the customers) had an actionable cause or would have if it suffered a loss.  The only wrongful acts referenced in the statement of claim are alleged to have been directed against OCHS and not third parties (customers). An essential element of the cause of action is lacking. There is no canoe in this claim as counsel for EnerCare aptly put it in submissions.

[41]    The acts alleged do not support a claim for unlawful interference with economic interest. There is no cause of action pleaded. The cause of action will be struck without leave to amend.

**Prejudicial and Irrelevant Allegations**

[42]    In this instance, the corporate defendants seek to have struck paragraphs 4, 16-19 as citing irrelevant allegations.   Portions of the claim should be struck for offending Rule 25.11(b) under which a pleading may be struck if it is "scandalous, frivolous or vexatious".

[43]    In *Rare Charitable Research Reserve v. Chaplin*, [2009] CanLII 49639 (SCJ) D.M. Brown J. stated at para. 22 the following, which is apposite here:

> Finally, the facts pleaded in a statement of claim or defence must relate to the elements of the claim or defence.   Portions of a pleading that are irrelevant, argumentative, speculative inserted merely for colour, or that constitute bare allegations or unfounded and inflammatory attacks on the integrity of a party are treated as scandalous and struck out under Rule 25.11(b) as offending the basic principles of pleading:  *George v. Harris*, [2000] O.J. No. 1762 (SCJ) para. 20. So, too, unnecessary historical recitation which is irrelevant to the cause of action or defence in issue should be struck: *Lac Des Mille Lacs First Nation v. Canada (Attorney General)*, [2002] O.J. No. 1977 (SCJ), para. 51.

> The whole point of these restraining rules is to keep pleadings focused on their major purpose – to identify the key issues in dispute and the material facts relating to those issues.   Put another way, counsel should strive to write a pleading as a short story, not as an effort to match the length of war and peace.

[44]    Paragraph 4 alleges a history of the corporate predecessors and various restructurings that led to the current corporate entities, Direct Energy and EnerCare. None of the predecessors are

parties to the action. The paragraph is irrelevant and has no connection to the causes of action advanced or relief sought in the statement of claim.

[45]    Paragraphs 16 and 17 allege that Direct Energy was the subject of anti-competitive proceedings before the Canadian Competition Tribunal which resulted in a consent order that expired in February 2012. The proceedings referenced have been fully resolved and the order therefrom has been spent. The allegations, both temporarily and substantively contained in these paragraphs of statement of claim are entirely irrelevant and disconnected to the claims advanced in the action. It would appear the paragraphs have been included for colour and possibly to undermine the integrity of Direct Energy. In any event, they are irrelevant to the claims asserted.

[46]    Paragraphs 18 and 19 allege that in February and March 2012 Direct Energy announced that it would unilaterally change the terms and conditions of its hot water rental contracts but then abandoned the plan and faced negative public and media reaction. These allegations, in the context of the claims advanced in the action are entirely irrelevant. They appear as well to have been inserted to cast Direct Energy in an unfavourable light and attack its integrity.

[47]    I do not accept submissions of plaintiff's counsel that paragraphs 4 and 16-19 are necessary background to the claims advanced. They amount to an unnecessary historical recitation irrelevant to the causes of action and will be struck.

## Trespass to Property (Chattels and Land)

[48]    The plaintiff's claim with respect to trespass to property and land is set out at paragraph 34: "In order to install the GPS tracking devices used to obtain the confidential information, the defendants must have trespassed onto OCHS's property."

[49]    Simply put the plaintiff's claim is that the defendants attached GPS tracking devices surreptitiously to a number of its vehicles and obtained information therefrom.

[50]    In *Hudson's Bay Company v. White*, [1997] O.J. No. 307(Ont.Gen.Div.) Lederman J. at para. 8 referenced the criteria necessary for trespass to chattels:

> In Clerk and Lindsell on Torts, 17th ed. (London: Sweet and Maxwell, 1995), at p. 705, the authors define trespass to chattels, or "trespass to goods", as being concerned with "the direct, immediate interference with the plaintiff's possession of a chattel". Halsbury's offers a similar definition at Vol. 45, para. 1491: "Trespass to goods is an unlawful disturbance of the possession of goods by seizure or removal, or by a direct act causing damage to the goods".

[51]    The defendants' position with respect to trespass to property (chattels) is that the statement of claim does not contain an allegation that the devices found on the plaintiff's motor vehicles interfered with the plaintiff's possession or use of those motor vehicles.

[52]    With respect to the claim of trespass to land Lederman J. in *Hudson's Bay* at para. 9 states as follows:

> Clerk and Lindsell define trespass to land, at p. 837, as consisting of "any unjustified intrusion by one person upon land in the possession of another". Halsbury's, Vol. 45, para. 1384 states that "every unlawful entry by one person on the land in possession of another is trespassed for which an action lies…

[53]    The elements for the claim of trespass to land are set out by Crane J in *Grace v. Fort Erie (Town),* [2003] O.J. No. 3475 (SCJ)  at para.86:

> The elements  of trespass have been described as follows:
>
> - Any direct and  physical intrusion onto land that is in the possession of the plaintiff,  (indirect  or  consequential  interference  does  not  constitute trespass).
>
> - The defendant's  act need not be intentional,  but it must be voluntary.
>
> - Trespass is actionable  without  proof of damage.
>
> - While some  form of physical entry onto or contact with the plaintiff's land is  essential  to  constitute  a  trespass,  the  act  may  involve  placing  or propelling  an object,  or  discharging  some  substance  onto  the  plaintiff's land can constitute  trespass.

[54]    The parties  referred  to  a  number  of  trespass  cases  involving  a  wide  variety  of circumstances, such as a motor vehicle towed and impounded, *McGrath Auto World Inc. v. Primus Automobile Financial Services*, [2010] O.J. No. 436; a vessel that sank after being attached (moored) to the plaintiff's property preventing its movement and use, *North King Lodge Ltd v. Gowlland Towing Ltd.,* [2005] B.C.J. 2485; a trespass that involved in part the depositing of a dead coyote on the hood of an owner's truck, *Fitzpatrick v. Orwin*, [2012] O.J. No. 2731 (S.C.J.).

[55]    However, neither party presented cases in which the interference alleged involved the placement or insertion of GPS tracking devices, which is not in and of itself indicative that it is plain and obvious that the claim must fail.  Rather, in my view, it tends to lend itself to an acceptance that there is a novel aspect to the claim, even if the attachment or insertion of the device did not prevent use or movement of the vehicles, and *de minimus* damage.  If proved it amounts to an intrusion  and direct interference  with the plaintiff's  property nonetheless.

[56]    In *Bank of Nova Scotia v. Dunphy Leasing Enterprises Ltd.*, [1991] 120 AR 241 at p.259 the Alberta Court of Appeal stated actual damage is not required:

Moreover, to recover damages for trespass to goods, a plaintiff is not required to prove actual damage: *Leitch and Co. v. Leydon*, [1931] AC 90, at 106 (HL). Liability flows from the act of trespass. G.H.L. Fridman, Q.C., in the Law of Torts in Canada, Vol. 1, at 7 (Toronto: Carswell, 1989), explains this principle in this way:

> Trespass in all its forms is actionable per se, i.e. without the need for the plaintiff to prove he has sustained actual damage… [t]he absence of any requirement that damage must be shown before an action will lie is an important hallmark of trespass as contrasted with other torts. Torts which are actionable per se such as trespass attract damages at large.

[57] There are material facts alleged that the corporate defendants had knowledge of and involvement with the tracking devices, thereby meeting at a minimum the requirements of pleading trespass to chattels.

[58] The trespass to land pleading is speculative, as evidenced by use of the phrase "the defendants must have trespassed onto OCHS's property" and is thereby deficient. The trespass to land pleading is struck. However, leave is granted to amend. The plaintiff should be given the opportunity to amend that aspect of the pleading by providing particulars.

## **Misappropriation of Confidential Information (Breach of Confidence)**

[59] In paragraph 34 of the statement of claim it is alleged that the defendants by improperly tracking OCHS's vehicles misappropriated OCHS's confidential information to OCHS's detriment.

[60] In *Lysko v. Braley et al*, [2006] 79 O.R. (3rd) 721 at para. 17 the Court of Appeal stated that a claim for breach of confidence requires proof of three elements:

1. The information conveyed was confidential,

2. The information was conveyed in confidence, and

3. The confidential information was misused by the party to whom it was communicated to the detriment of the confider. (See also *Lac Minerals v. International Corona,* [1989] 2 S.C.R. 574 (SCC)).

[61] The position of the defendants is that the information as to where the plaintiff's motor vehicles attended and how long the vehicles were at specific locations was not confidential information. Rather, counsel submits it was public information, in the sense that the vehicles operated on public streets and attended openly to various locations. Anyone following the vehicles would have been able to obtain the information. Counsel contends that the threshold requirement that the information is confidential has not been met.

[62]    The plaintiff contends that it is not public information.    The information that was surreptitiously acquired was the information that identified its customers, potential customers and their residential locations, all of which was information conveyed to their drivers in confidence. It is alleged that the defendants misused the information to the plaintiff's detriment.

[63]    In *B.W. International Inc. v. Thomson Canada Ltd.*, [1996] O.J. No. 2697 at para. 16 Kiteley J. referenced the description of the cause of action of a claim for breach of confidence as stated in *Saltman Engineering Co. Ltd. et al v. Campbell Engineering Co. Ltd.*, [1963] 3 All E.R. 413 (CA) as follows:

> If a defendant is proved to have used confidential information, directly or indirectly obtained from a plaintiff, without the consent, express or implied of the plaintiff, he will be guilty of an infringement of the plaintiff's rights.

[64]    In this instance, the facts presumed to be true are that the defendants obtained confidential information surreptitiously after which the plaintiff's contract sales declined to its detriment. If proved, intrusive and unseemly means of espial were employed to obtain information at the expense of the plaintiff.

[65]    In my view, reading the statement of claim generously and as a whole it is not plain and obvious that the claims of trespass to chattel and breach of confidence are doomed to fail.    As such those causes of action shall not be struck.

**Individual Defendants**

[66]    The individual defendants, Tom Cooper, Patricia Carraretto, Stephen Wells, Shannon Miranda, and Tanya Faulds submit that a $10,000,000 against them personally is frivolous and vexatious. In order for an employee or officer of a corporation to be found personally liable, there must be specific allegations of material fact that would support a finding of individual liability. The leading case is *Scotia McLeod Inc. v. People's Jewellers Ltd.* (1995), 26 O.R. (3rd) 481 (CA) in which the Court of Appeal explained:

> The decided cases in which employees and officers and companies have been found personally liable for actions ostensibly carried out under a corporate name are fact specific.    In the absence of findings of fraud, deceit, dishonesty or wanton authority on the part of the employees or officers, they are also rare.    Those cases in which the corporate veil has been pierced usually involve transactions where the use of the corporate structure was a sham from the outset or was an afterthought to a deal which had gone sour.    There is also a considerable body of case law wherein injured parties to actions for breach of contract have attempted to extend liability to the principals of the company by pleading that the principals were privy to the tort of inducing breach of contract between the company and the plaintiff...additionally there have been attempts by injured parties to attach liability to the principals of failed businesses through insolvency litigation.    In

every case, however, the facts giving rise to personal liability were specifically pleaded. <u>Absent allegations which fit within the categories described above, officers or employees of limited companies are protected from personal liability unless it can be shown that their actions are themselves tortious or exhibit a separate identity or interest from that of the company so as to make the act or conduct complained of their own.</u> (Emphasis added)

[67]    Also, where a plaintiff asserts personal liability of an individual defendant there is a heightened onus at the pleading stage. In *Tran v. University of Western Ontario*, [2014] O.J. No. 407 (S.C.J.) E.M. Morgan J. noted at para. 16 the following:

> [D]espite the fact that the onus in a Rule 21 motion is on the moving party to demonstrate that it is "plain and obvious" the claim must fail, *Hunt v. T&NPLC*, [1990] CanLII 90 (SCC), [1990] 2 SCR 959, at para. 36, a party who pleads personal liability against the employees of a corporate defendant with which he has had dealings must satisfy a rather stringent test. As the Prince Edward Island Court of Appeal put it in *Kay Aviation v. Rofe* (2001), 2002 DLR (4th) 683 at para. 25, "[t]he minimum level of material facts in a statement of claim founded on causes of action against an officer, director or employee of a corporation with whom the plaintiff has contracted is very high.

[68]    In order to give rise to personal liability the factual underpinnings to the claim must be specifically and sufficiently pleaded.

[69]    In this matter, none of the individual defendants are alleged to have exhibited a separate identity or interest beyond their role as employee or director of the corporate defendants. There are no allegations in the statement of claim that any of the individual defendants engaged in any acts or conduct other than that said to have been done in their roles as employees or directors of the corporate defendants. There is no allegation that any of them acted outside the scope of his or her authority.

[70]    It would appear, as noted in the circumstances of *National Trust Co. v. Furbacher*, [1994] O.J. No. 2384 that asserting a claim in the amount of $10,000,000 in which the individual defendants would be jointly and severally liable amounts to either tactical harassment or an inappropriate attempt to get discovery of senior personnel possibly for an impermissible fishing expedition. The claims of personal liability against the individual defendants are an abuse of process.

[71]    The claims against all of the individually named defendants shall be struck.

## Conclusion

[72]    In summary:

2014 ONSC 4154 (CanLII)

1) The claim of civil conspiracy is struck due to the deficiencies in pleading the requisite elements, with leave to amend by providing particulars.

2) The claim of intentional interference with economic interests is struck as disclosing no cause of action, with leave to amend denied.

3) All claims against the individual defendants are struck for failing to plead any material facts that the individual defendants committed acts or that their conduct was "tortious or exhibited a separate identity or interest from that of the company so as to make the act or conduct complained of their own".

4) Paragraphs 4 and 16-19 in the statement of claim are hereby struck as unnecessary to the narrative or providing context for the claims asserted and as irrelevant.

5) The claim of trespass to land is struck, with leave to amend to provide particulars.

6) It is neither plain nor obvious that the claims of trespass to property (chattels) and breach of confidence are doomed to fail, requiring the plaintiff to be driven from the judgment seat.

[73]    In that the results are divided on the motion I make no order as to costs as between the plaintiff and corporate defendants.   However, costs are awarded to the individual defendants against whom all claims are struck.

[74]    If the parties are unable to agree as to costs then submissions may be made no more than four pages in length together with the bill of costs within 15 days of the release of the judgment and the response no later than 15 days thereafter.

_____

A.J. O'Marra J.

**Released:** July 10, 2014

**CITATION:** Ontario Consumers Home Services v. Enercare Inc., 2014 ONSC 4154
**COURT FILE NO.:** CV-12-464349
**DATE:** 2014/07/10

2014 ONSC 4154 (CanLII)

# ONTARIO

## SUPERIOR COURT OF JUSTICE

**BETWEEN:**

Ontario Consumers Home Services Inc.

Plaintiff

– **and** –

Enercare Inc., Ecosmart Home Services Inc., Ecosmart Energy Savings Corp., Direct Energy Marketing Limited, Stephen Wells, Patricia Carraretto, Tom Cooper, Shannon Miranda and Tanya Faulds

Defendants

---

### REASONS FOR JUDGMENT

---

A.J. O'Marra J.

**Released:** July 10, 2014

**16**

# COURT OF APPEAL FOR ONTARIO

CITATION: Owsianik v. Equifax Canada Co., 2022 ONCA 813
DATE: 20221125
DOCKET: C69995

Doherty, Tulloch and Miller JJ.A.

BETWEEN

Alina Owsianik

Plaintiff/Respondent (Appellant)

and

Equifax Canada Co. and Equifax Inc.

Defendants/Appellants (Respondents)

Jean-Marc Leclerc, Tassia Poynter and Adil Abdulla, for the appellant

Laura F. Cooper, Alex D. Cameron, Sarah J. Armstrong, Vera Toppings and Pavel Sergeyev, for the respondents

Heard: June 7, 2022

On appeal from the order of the Divisional Court (Associate Chief Justice Faye E. McWatt, Justice James A. Ramsay, and Justice Harriet E. Sachs, dissenting), dated June 9, 2021, with reasons reported at 2021 ONSC 4112, 18 B.L.R. (6th) 78 (Div. Ct.), allowing an appeal from the order of Justice Benjamin T. Glustein of the Superior Court of Justice, dated December 13, 2019, with reasons reported at 2019 ONSC 7110.

**Doherty J.A.:**

2022 ONCA 813 (CanLII)

Page:  2

I

**OVERVIEW**

[1]     In *Jones v. Tsige*, 2012 ONCA 32, 108 O.R. (3d) 241, this court recognized the tort of intrusion upon seclusion. In that case, the defendant repeatedly accessed the private banking records of the plaintiff, the former wife of the defendant's common-law partner, without lawful justification. Sharpe J.A., for the court, held that an intentional or reckless invasion of the private affairs of another, without lawful justification, in circumstances in which a reasonable person would regard the invasion as highly offensive and causing distress, humiliation or anguish, was actionable without proof of any pecuniary loss: *Jones*, at paras. 70-71.

[2]     In June 2022, this court heard three grouped appeals, including this one, arising out of three separate class actions. In each of those proceedings, the plaintiffs sought to apply the tort of intrusion upon seclusion, first recognized in *Jones*, to defendants who, for commercial purposes, collected and stored the personal information of others ("Database Defendants"), and whose failure to take adequate steps to protect that information allowed third-party "hackers" to access and/or use the personal information.

[3]     All three proceedings are at the certification stage. In each case, the Database Defendants argued that the intrusion upon seclusion claim should not

2022 ONCA 813 (CanLII)

Page:  3

be certified because, as pleaded, it did not disclose a cause of action as required by s. 5(1)(a) of the *Class Proceedings Act, 1992*, S.O. 1992, c. 6. The Database Defendants submitted that the tort as defined in *Jones* targeted those who, like the defendant in *Jones*, had actually invaded or intruded upon the privacy of a plaintiff, by accessing that plaintiff's private information. The tort could not reach Database Defendants whose inadequate security measures may have allowed others, with no connection to the Database Defendants, to access the private information stored in the databases. The Database Defendants submitted that, just as the negligent operator of a storage facility does not become a thief when a third party takes advantage of the operator's negligence, enters a storage unit and steals property kept in that unit, the Database Defendants do not invade the privacy of the persons whose information is stored in the databases if a third party takes advantage of the Database Defendants' failure to adequately protect the information and accesses that information.

[4]     In this proceeding, Ms. Owsianik, on behalf of the identified class, was initially successful in certifying an intrusion upon seclusion claim as part of a class proceeding. However, the majority of the Divisional Court reversed the motion judge and held the tort had no application to a Database Defendant when the private information was accessed by a third-party hacker acting independently of the Database Defendant. Sachs J., in dissent, would have upheld the motion

2022 ONCA 813 (CanLII)

2022 ONCA 813 (CanLII)

judge's decision to certify the intrusion upon seclusion claim. Ms. Owsianik appeals with leave of this court.

[5]     In *Obodo v. Trans Union of Canada, Inc.*, 2021 ONSC 7297, heard with this appeal, Mr. Obodo, on behalf of the identified class, unsuccessfully brought a motion for an order certifying an intrusion upon seclusion claim against the Database Defendant, Trans Union of Canada, Inc. ("Trans Union"). The motion judge did, however, certify other common issues. Mr. Obodo appeals from the refusal to certify the intrusion upon seclusion claim.

[6]     In *Winder v. Marriott International, Inc.*, 2022 ONSC 390, the other case heard with this appeal, Mr. Winder, on behalf of the identified class, brought a pretrial motion under r. 21.01(1)(a) of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, for a determination of a question of law. Mr. Winder asked the court to determine whether he had pleaded a legally viable cause of action for intrusion upon seclusion against Marriott and the related defendants ("Marriott"). Mr. Winder's claim alleged, among other things, that Marriott had failed to take adequate steps to protect the private information provided to it by Mr. Winder and others from being accessed and/or used by third-party hackers. The motion judge held that the claim as pleaded did not disclose a viable cause of action against Marriott for intrusion upon seclusion. The other claims made against Marriott were not in issue on the motion. Mr. Winder appeals from the motion judge's determination.

Page: 5

[7]     I would dismiss all three appeals. On the facts as pleaded, the defendants did not do anything that could constitute an act of intrusion or invasion into the privacy of the plaintiffs. The intrusions alleged were committed by unknown third-party hackers, acting independently from, and to the detriment of, the interests of the Database Defendants. There are no facts pleaded which could in law provide a basis upon which the actions of the hackers could be attributed to the Database Defendants. There are no material facts pled which indicate that the Database Defendants acted in consort with, or were vicariously liable for, the hackers' conduct. The identity of the hackers is unknown.

[8]     On the claims as pleaded, the Database Defendants' fault lies in their failure to take adequate steps to protect the plaintiffs from the intrusion upon their privacy by hackers acting independently of the Database Defendants. As recognized in the courts below, the Database Defendants may be liable for their failure to protect the plaintiffs' privacy interests in the stored material in negligence, contract and under various statutes. The Database Defendants' failure to meet their common law duty of care, or their contractual and statutory responsibilities to the plaintiffs to properly store the data, cannot, however, be transformed by the actions of independent third-party hackers into an invasion by the Database Defendants of the plaintiffs' privacy.

Page:  6

II

## THE APPROACH TO THE APPEALS

[9]    The three appeals all turn on the application of the tort of intrusion upon seclusion to Database Defendants who have gathered and stored large amounts of personal information, and who allegedly, through their failure to properly secure the information, allowed intruders to access that information. The relevant facts are very similar in all three appeals. Many of the same arguments have been advanced and fully developed by counsel in all three appeals.

[10]    I will address the issues and arguments common to all three appeals in the context of the *Owsianik* appeal. I do so because the reasons of the motion judge, and the reasons of the majority and dissenting judge in the Divisional Court, taken together, provide a comprehensive consideration of the issues. The reasons of the majority in the Divisional Court were also relied on by the motion judges in *Obodo*[1] and *Winder* to reject the intrusion upon seclusion claims advanced by the plaintiffs in those proceedings. To the extent that there are issues or arguments raised in *Obodo* or *Winder* that are not addressed in these reasons, I will consider them in the reasons directly applicable to those cases.

---

[1] The motion judge in *Obodo* was the same judge who had heard the certification motion in this case. In this case, he certified the intrusion upon seclusion claim. In *Obodo*, he declined to certify the claim, correctly holding that he was bound by the decision of the majority in the Divisional Court in this case.

2022 ONCA 813 (CanLII)

Page: 7

### III

## THE RELEVANT ALLEGATIONS

[11]   The proceedings are still at the certification stage. There are no findings of fact, only allegations. The factual allegations are, however, taken as true for the purposes of determining whether Ms. Owsianik has pleaded a proper cause of action for intrusion upon seclusion: *R. v. Imperial Tobacco Canada Ltd.*, 2011 SCC 42, [2011] 3 S.C.R. 45, at para. 22; *Bowman v. Ontario*, 2022 ONCA 477, 83 C.C.L.T. (4th) 235, at paras. 25, 38-41.

[12]   There are many allegations advanced by Ms. Owsianik in the Amended Amended Statement of Claim ("Statement of Claim"). In addition to the intrusion upon seclusion claim, Ms. Owsianik successfully sought certification on other common issues relating to allegations of negligence, breach of contract, breach of consumer protection law, and breaches of privacy legislation enacted in several provinces. Apart from the intrusion upon seclusion claim, the other claims are not in issue on this appeal and I need not detail the allegations or the arguments for and against their viability. These reasons focus on the allegations relating to the intrusion upon seclusion claim.[2]

---

[2] For the purposes of the certification motion, the parties divided the proposed class into three groups. The intrusion upon seclusion claim applied to two of the three subclasses. Members of those two subclasses alleged their personal information held in Equifax's database had been accessed by third parties without legal justification.

2022 ONCA 813 (CanLII)

Page:  8

[13]    Equifax and related companies (referred to collectively as "Equifax") operate around the world providing credit reporting services and credit protection services to customers. For the purposes of providing credit ratings to its customers, Equifax collects and aggregates financial and other information relating to millions of individuals and various corporate entities ("consumers"). The information gathered by Equifax is organized and analyzed by Equifax to assist its customers in assessing the credit worthiness of the consumers to whom the information relates. Those consumers do not give Equifax permission to accumulate or analyze the data, and have no control over Equifax's collection of the data.

[14]    In addition to providing credit ratings, Equifax also provided clients with services intended to protect those clients from fraud, identity theft, and other financial crimes. Equifax accumulated and stored information pertaining to those clients for the purposes of providing those services.

[15]    Between mid-May and late July 2017, hackers gained unauthorized access to the personal information stored by Equifax. The information accessed included individuals' social insurance numbers, names, dates of birth, addresses, driver's licence numbers, credit card numbers, email addresses, and passwords.

[16]    The data breach affected persons around the world. Equifax estimated that about 20,000 Canadians were affected by the breach.

2022 ONCA 813 (CanLII)

Page:  9

[17]   Equifax discovered that its data had been improperly accessed in July 2017. It made the breach public in September 2017.

[18]   The Statement of Claim alleged that Equifax knew, because of the vast amounts of personal information held in its database, and the nature of that information, that it was a prime target for cybercriminals. Equifax acknowledged that the proper safeguarding of the information it held in its database was crucial to the services provided to its customers. Equifax represented, publicly and in its contract with clients, that it maintained strict security safeguards to prevent unauthorized access to, and use of, the private information Equifax had accumulated and aggregated.

[19]   The Statement of Claim further alleged a litany of deficiencies in the security systems put in place by Equifax to protect access to the database. The allegations included:

- the defendants' cybersecurity was grossly inadequate and dangerously deficient;

- the defendants' data protection measures failed to meet the most basic industry standards;

- the defendants used outdated and obsolete software;

- the defendants used inadequate network monitoring practices;

2022 ONCA 813 (CanLII)

- the defendants failed to restrict access to sensitive data to only those employees whose job responsibilities required such access; and

- the defendants failed to heed advice from external security experts warning of inadequacies in their cybersecurity, including calls to perform comprehensive system reviews.

[20]   The Statement of Claim also alleged that Equifax was fully aware of the inadequacies in its system. Specific shortcomings were brought to Equifax's attention after security audits in 2014 and 2016.

[21]   Ms. Owsianik further alleged that when Equifax became aware that its database had been improperly accessed, it failed to respond to the intrusion in a timely or effective manner.

[22]   The Statement of Claim went on to describe the information accessed by the hackers as sensitive and comprehensive. The information could be used by fraudsters for a variety of criminal purposes, including identity theft.

[23]   Ms. Owsianik pled that Equifax's failure to take appropriate steps to guard against unauthorized access to sensitive financial information in the database constituted an intentional or reckless intrusion upon her privacy. Paragraph 37 of the Statement of Claim sets out the intrusion upon seclusion claim:

> The actions of the defendants constitute intentional or reckless intrusions upon seclusion that would be highly offensive to a reasonable person, for which the defendants are liable. The defendants failed to take

Page:  11

2022 ONCA 813 (CanLII)

> appropriate steps to guard against unauthorized access
> to sensitive financial information involving the Class
> Members' private affairs or concerns. Their actions were
> highly offensive, causing distress and anguish to Class
> Members, for which the defendants are liable and should
> pay damages. [Emphasis added.]

[24]   The Statement of Claim sought pecuniary damages on several bases,

general damages assessed in the aggregate, damages for the unlawful conduct of

third-party hackers, including identity theft, and punitive damages.

**IV**

**THE DECISIONS BELOW**

[25]   Equifax advanced several arguments on the certification motion against

certifying the intrusion upon seclusion claim. The motion judge carefully dealt with

each argument and rejected all of them: *Agnew-Americano v. Equifax Canada Co.*,

2019 ONSC 7110.[3]

[26]   The Divisional Court granted Equifax leave to appeal on a single question

of law:

> Did the motion judge err in finding that the tort of intrusion
> upon seclusion is available against collectors and
> custodians of private information, such as the defendants
> in this case, where the private information is improperly
> [accessed] by a third party, including in circumstances

---

[3] Ms. Owsianik is the "Jane Doe" referred to in the style of cause before it was amended. Subsequently,
Ms. Agnew-Americano was removed as the proposed representative plaintiff and replaced by Ms.
Owsianik.

Page: 12

> where the defendants are alleged to have acted
> recklessly?

[27]   The order of the Divisional Court reflects the narrow basis on which it granted leave. The order struck only claims alleging an intrusion upon seclusion (i.e., paras. 3(iii), (iv) and (v) of the motion judge's order). The Divisional Court refused to consider claims not captured by the specific question on which leave had been granted: *Owsianik v. Equifax Canada Co.*, 2021 ONSC 4112, 18 B.L.R. (6th) 78 (Div. Ct.), at paras. 14-15. I take the same approach in these reasons.[4]

[28]   The motion judge concluded, assuming the truth of the alleged facts, that it was not "plain and obvious" the intrusion upon seclusion claim could not succeed against Equifax. He stressed that a certification motion, and in particular a determination of whether the plaintiff had pleaded a cause of action, was not the forum in which to determine "what the law should be in novel circumstances or how unsettled existing law should be reconciled." If the law was not "fully settled", the case "must be permitted to proceed": *Agnew-Americano*, at paras. 79, 87-88.

[29]   The motion judge carefully examined the reasons in *Jones* and considered the caselaw, some of which offered support for the availability of the claim against a Database Defendant. In reference to *Jones*, the motion judge said, at para. 133:

---

[4] As I would affirm the decision of the majority in the Divisional Court, that the intrusion upon seclusion claim does not disclose a cause of action, it is unnecessary for me to address the other arguments relevant to the intrusion upon seclusion claim considered by the motion judge. I also make no comment on the application of this analysis to the breach of privacy claims based on various provincial privacy statutes.

2022 ONCA 813 (CanLII)

Page:  13

> The principles in *Jones* could apply to (or be expanded to include) a claim for intrusion upon seclusion against a Database Defendant arising from a hacker attack.

[30]    The motion judge considered the meaning of the word "reckless" as used in *Jones* in describing the scope of a defendant's potential liability for acts of intrusion into the privacy of others. He noted that various meanings had been ascribed to the word in different legal contexts. In his view, it was not clear that the concept of recklessness could not capture the conduct alleged against Equifax in the claim: *Agnew-Americano*, at para. 160.

[31]    In the Divisional Court, the majority, relying on *Atlantic Lottery Corp. Inc. v. Babstock*, 2020 SCC 19, 447 D.L.R. (4th) 543, held that novel legal claims which are doomed to fail even if the alleged facts are true, should be disposed of at the certification stage: *Owsianik*, at para. 53. The majority concluded the intrusion upon seclusion claim advanced by Ms. Owsianik fell within the "doomed to fail" category. Ms. Owsianik had not alleged that Equifax perpetrated any act capable of amounting to an intrusion or invasion of her privacy, but had instead alleged that Equifax failed to take appropriate steps to protect Ms. Owsianik from intrusions perpetrated by independent third-party hackers. In the majority's view, the pleadings mischaracterized Equifax's failure to protect Ms. Owsianik from the invasion of her privacy by third-party hackers, as an intrusion into Ms. Owsianik's privacy by Equifax. Ramsay J., writing for the majority, said, at para. 55:

Page:  14

> I agree with my colleague (paragraph 43) that Equifax's actions, if proven, amount to conduct that a reasonable person could find to be highly offensive. <u>But no one says that Equifax intruded, and that is the central element of the tort. The intrusion need not be intentional; it can be reckless. But it still has to be an intrusion</u>. It is the intrusion that has to be intentional or reckless and the intrusion that has to be highly offensive. Otherwise the tort assigns liability for a completely different category of conduct, a category that is adequately controlled by the tort of negligence. [Emphasis added.]

[32]    In her dissent, Sachs J. concluded, at para. 36, that the analysis in *Babstock* had "little application to the case at bar." In her view, the "plain and obvious" test applied. The uncertainty in the caselaw and the relative novelty of the claim both spoke against disposing of the claim on a pretrial motion.

[33]    Sachs J. was satisfied that the motion judge correctly interpreted *Jones*. The potential liability of a Database Defendant was not before the court in *Jones*, however, nothing in the judgment foreclosed an application of the intrusion upon seclusion tort to Database Defendants. In Sachs J.'s view, the references in *Jones*, both to the policies underlying the tort, and the need to provide an effective remedy to those whose privacy had been violated by persons gaining access to large databases could support the extension of the tort to negligent Database Defendants who recklessly allowed hackers to gain access to the information in their databases. She concluded, at para. 51:

> The tort is a new tort, whose limits have not been fully developed at common law in Canada. The rights at issue are fundamental rights that are facing unprecedented

Page:  15

threats. The common law should be allowed to develop
in an incremental way to see how far the tort should be
extended to meet those threats.

**V**

**ANALYSIS**

**(i)      The test under s. 5(1)(a) of the *Class Proceedings Act, 1992***

[34]    A court cannot certify a class proceeding unless the prerequisites to

certification set down in s. 5(1) of the Act are met. Section 5(1)(a) requires:

> The pleadings or the notice of application discloses a
> cause of action.

[35]    A determination that a plaintiff has or has not pled a cause of action for the

purposes of s. 5(1)(a) raises a question of law alone, reviewable on a correctness

standard: *Bowman*, at para. 26.

[36]    Counsel for Ms. Owsianik submits that the requirement in s. 5(1)(a) that the

claim "disclose a cause of action" sets a low bar and is not intended to pre-empt

novel, or tenuous claims. On the motion, the court must read the pleadings

generously, accept as true the facts as pleaded and determine whether, on those

facts, it is "plain and obvious" that the plaintiff has no cause of action against the

defendant: *Imperial Tobacco*, at para. 17; *Hunt v. Carey Canada Inc.*, [1990] 2

S.C.R. 959, at p. 980.

[37]    The test to be applied in deciding whether a claim discloses a cause of action

for the purposes of s. 5(1)(a) is the same as the test to be applied on a motion to

2022 ONCA 813 (CanLII)

Page:  16

strike a pleading as disclosing no reasonable cause of action under r. 21.01(1)(b): *Babstock*, at para. 14. I accept that a claim should only be struck if it is "plain and obvious" that the claim cannot succeed. I also agree that *Babstock* has not altered that test.

[38]    *Babstock* is, however, helpful in that it demonstrates the application of the "plain and obvious" criterion in circumstances in which novel legal claims are advanced by plaintiffs. In *Babstock*, the plaintiffs relied on the doctrine of waiver of tort in support of one of the claims advanced by them. The defendant moved to strike, claiming that the doctrine did not exist in Canadian law and therefore the cause of action based on the doctrine could not succeed.

[39]    At the time of the motion to strike, no court had recognized the doctrine of waiver of tort. Several courts had, however, certified claims, relying on the doctrine after concluding it was not "plain and obvious" that those claims could not succeed: *Babstock*, at para. 15. There was some academic support for the doctrine, although it seems from the comments in *Babstock*, at para. 21, that the weight of that support is waning. It was also clear that the availability of the doctrine on the facts as pleaded raised a pure question of law in the sense that the answer to the question could not be affected by any evidence that might be adduced at the trial. As observed by Brown J., at para. 21:

Page:  17

> Nothing is gained, and much court time and considerable litigant resources are lost, by leaving this issue unresolved.

[40]   Some of the factors in *Babstock* outlined above exist in this case. No decision has held that the tort of intrusion upon seclusion applies to Database Defendants based on negligent or reckless storage of private information. Such claims have been certified in class actions, but on the basis that it is not "plain and obvious" the claim cannot succeed: e.g., *Bennett v. Lenovo (Canada) Inc.*, 2017 ONSC 1082, at paras. 8, 17, 23 and 36; see also *Kaplan v. Casino Rama*, 2019 ONSC 2025, 145 O.R. (3d) 736, at paras. 28-29[5]; *Tucci v. Peoples Trust Company*, 2020 BCCA 246, 41 B.C.L.R. (6th) 250, at paras. 53-88, rev'g in part 2017 BCSC 1525. The legal viability of the intrusion upon seclusion claim is also amenable to determination based exclusively on the facts as pleaded. There is no reason to think evidence adduced at the trial would have any effect on the determination of whether, as a matter of law, the tort could apply to Database Defendants whose failure to properly protect the data permits independent hackers to access the data.

[41]   In *Babstock*, at para. 19, Brown J. addressed the application of the "plain and obvious" criterion to a case in which a novel claim is advanced, the viability of which turned exclusively on the application of the law as determined on the motion to the facts as pled by the plaintiff:

---

[5] An appeal to this court in *Kaplan* was dismissed as abandoned.

Page:  18

> Of course, it is not determinative on a motion to strike that the law has not yet recognized the particular claim. The law is not static, and novel claims that might represent an incremental development in the law should be allowed to proceed to trial [citation omitted]. That said, a claim will not survive an application to strike simply because it is novel. It is beneficial, and indeed critical to the viability of civil justice and public access thereto that claims, *including novel claims*, which are doomed to fail be disposed of at an early stage in the proceedings. This is because such claims present "no legal justification for a protracted and expensive trial" [citation omitted]. <u>If a court would not recognize a novel claim when the facts as pleaded are taken to be true, the claim is plainly doomed to fail and should be struck. In making this determination, it is not uncommon for courts to resolve complex questions of law and policy</u> [citations omitted]. [Emphasis added.]

[42]    I take the majority in *Babstock* to recognize that when the validity of a claim turns exclusively on the resolution of a legal question, the court may on a pleadings motion, even if the answer to the legal question is complex, policy-laden and open to some debate, determine the law and apply the law as determined to the facts as pleaded to decide whether "the claim is plainly doomed to fail and should be struck."

[43]    *Babstock* is consistent with prior authority from the Supreme Court of Canada. In *Nelles v. Ontario*, [1989] 2 S.C.R. 170, the plaintiff sued the Crown and the Attorney General of Ontario for malicious prosecution. The defendants brought a pretrial motion to strike the claim on the basis that the Crown and the Attorney General enjoyed absolute immunity from a malicious prosecution lawsuit. The

Page:  19

motion judge and a unanimous Court of Appeal accepted that argument. The majority of the Supreme Court reversed, holding that, while the Crown was immune from prosecution, the Attorney General and his agents were not.

[44]    Lamer J., for five of six judges, held, at pp. 176-77, that the immunity of the Crown and the Attorney General was properly determined on a pretrial motion, whether that motion was styled as a motion on a question of law or a motion to strike the claim as not revealing a cause of action. Lamer J. described the immunity issue as raising "a question of law that goes to the root of the action". In his view, a timely pretrial determination of the legal viability of the malicious prosecution claim against the Attorney General would expedite the proceedings and potentially save unnecessary costs.

[45]    The question of the Attorney General's immunity from a malicious prosecution lawsuit could hardly be described as "fully settled" law at the time of the *Nelles* litigation. Five judges, including the motion judge, three judges of this court, and one judge of the Supreme Court of Canada, held the Attorney General had immunity. The five-person majority in the Supreme Court, however, held that the Attorney General did not enjoy immunity from a malicious prosecution lawsuit. As set out in the judgment of Lamer J., the law in other jurisdictions was also unclear and unsettled. Despite the contentious nature of the legal issue, the majority held that it could properly decide that issue on a pretrial pleadings motion. This same approach is reflected in the recent judgment of the Supreme Court of

2022 ONCA 813 (CanLII)

Page:  20

Canada in *Ontario (Attorney General) v. Clark*, 2021 SCC 18, 456 D.L.R. (4th) 361. There, the court struck a misfeasance in public office claim on the basis that the tort could not be extended to a claim brought by police officers against Crown attorneys in respect of their conduct of a prosecution.

[46]    As catalogued by Brown J. in *Babstock*, there are several advantages to determining the viability in law of a claim on a pleadings motion when that viability turns exclusively on a question of law and the only material facts relevant to the question are those pled by the plaintiff. Deciding those questions early in the litigation serves judicial efficiency, enhances access to justice, and promotes certainty in the law: *Babstock*, at paras. 18-21; see also *Arora v. Whirlpool Canada LP*, 2013 ONCA 657, 118 O.R. (3d) 113, at paras. 90-93, leave to appeal refused, [2013] S.C.C.A. No. 498; Stephen G.A. Pitel & Matthew B. Lerner, "Resolving Questions of Law: A Modern Approach to Rule 21" (2014) 43:3 Adv. Q. 344.

[47]    The effect of leaving legal questions bearing on the viability of a claim unresolved while the claim proceeds through trial is evident from a review of the class action proceedings involving intrusion upon seclusion claims against Database Defendants. Several of those claims have been allowed to move forward, not on the basis that the intrusion upon seclusion claim could actually be made out against the Database Defendant, but rather on the basis that it was not "plain and obvious" the claim could not succeed. Those decisions leave the law unclear and the ultimate viability of the claim uncertain.

2022 ONCA 813 (CanLII)

Page: 21

[48]    Class proceeding actions in which an intrusion upon seclusion claim is made against Database Defendants have continued to enter the system and continued to be certified on the same basis up to the Divisional Court's decision in this case. As these cases have slowly wended their way through the system, consuming valuable litigation resources, no one could say with any certainty whether the cause of action asserted in these claims existed as a matter of law. That question would only be answered in the litigation if and when one of the claims actually made it through trial. If a claim actually got that far, the trial judge would be obligated to decide exactly the same legal question that was before the motion judge on the certification motion months, if not years, earlier. And yet the trial judge would be in no better position to resolve that question than the motion judge.

[49]    Not only did allowing these cases to proceed to trial result in uncertainty, that uncertainty arguably resulted in unfairness to Database Defendants. The certification of intrusion upon seclusion claims without a determination that the claim was viable in law gave a plaintiff an advantage in certification proceedings. Because damages for intrusion upon seclusion do not require proof of any actual pecuniary loss, but are instead awarded on a "symbolic" or "moral" basis, damages are well suited to an award on a class-wide basis. The nature of the damages to be awarded offered support for the plaintiff's argument that a class proceeding was the preferable proceeding for the resolution of common issues: *Class Proceedings Act, 1992*, s. 5(1)(d). Consequently, the presence of an intrusion upon seclusion

2022 ONCA 813 (CanLII)

Page:  22

claim, despite the uncertainty as to its legal viability, gave plaintiffs a leg up in the certification process and, as a result, in any settlement negotiations: see *Winder*, at para. 16; *Babstock*, at para. 21.

[50]    I accept that there are legitimate arguments on both sides of the debate over the legal viability of the intrusion upon seclusion claim against Database Defendants. The parties did not refer to any appellate authority in Canada or elsewhere in the Commonwealth directly on point. However, uncertainty in the law did not require the motion judge to decline to resolve the legal question at the certification stage. Four factors offered strong justification for deciding the legal viability of this claim on the certification motion:

- the question fell to be answered on the facts as pleaded. There was no dispute as to the facts that were relevant and material to the legal viability of the cause of action pleaded. There was no chance any evidence could be led at trial that would impact on the answer to the legal question posed;

- there was no unfairness to either party in deciding the merits of the legal question on the pleadings motion;

- the issue was fully briefed and argued on the pleadings motion; and

- the institutional considerations articulated in *Babstock* favoured deciding the legal question on the merits.

2022 ONCA 813 (CanLII)

Page:  23

[51]   The majority in the Divisional Court properly determined whether the claim as pled could in law amount to an intrusion by Equifax into the privacy of the plaintiffs. The majority's finding that the facts could not amount in law to the required intrusion meant that it was "plain and obvious" the claim could not succeed and should be struck.

### (ii)    Can Equifax be liable for the tort of intrusion upon seclusion?

[52]   Having concluded the majority in the Divisional Court properly addressed the legal viability of the intrusion upon seclusion claim, it remains for me to explain why I agree with the conclusion reached by the majority.

[53]   The tort of intrusion upon seclusion is one of several intentional torts which, when taken together, provide "broad protection of the plaintiff's personal integrity and autonomy": Philip H. Osborne, *The Law of Torts*, 6th ed. (Toronto: Irwin Law, 2020), at p. 268. Generally speaking, intentional torts require that the defendant engage in the proscribed conduct with a specified state of mind.

[54]   The elements of the tort of intrusion upon seclusion are laid down in *Jones*, at para. 71. I would describe them as follows:

- the defendant must have invaded or intruded upon the plaintiff's private affairs or concerns, without lawful excuse [the conduct requirement];

- the conduct which constitutes the intrusion or invasion must have been done intentionally or recklessly [the state of mind requirement]; and

Page:  24

- a reasonable person would regard the invasion of privacy as highly offensive, causing distress, humiliation or anguish [the consequence requirement].

[55]    In *Jones*, the conduct component of the tort was never in dispute. The defendant admitted that she had, without lawful excuse, taken advantage of her employment to look at the plaintiff's banking records and related information on 174 occasions. On any definition, the defendant's conduct amounted to a deliberate invasion by her of the plaintiff's personal privacy: *Jones*, at paras. 57, 72.

[56]    The conduct component is very much in issue in this case. Equifax stored the data and accessed and used the data for commercial purposes. That is not, however, the conduct which is alleged to have constituted the interference with the plaintiffs' privacy. As set out above (at para. 23), the alleged intrusion occurred when:

> The defendants failed to take appropriate steps to guard against unauthorized access to sensitive financial information involving the Class Members' private affairs or concerns.

[57]    On the allegation made, Equifax failed to take steps to prevent independent hackers from conduct that clearly invaded the plaintiffs' privacy interests in the documents stored by Equifax. Equifax did not, however, itself interfere with those privacy interests. The wrong done by Equifax arose out of Equifax's failure to meet

2022 ONCA 813 (CanLII)

Page: 25

its obligations to the plaintiffs to protect their privacy interests. Like the majority in the Divisional Court, I conclude the claim fails at this fundamental level. There is simply no conduct capable of amounting to an intrusion into, or an invasion of, the plaintiff's privacy alleged against Equifax in the claim: *Owsianik*, at para. 55; see also *Del Giudice v. Thompson*, 2021 ONSC 5379, 71 E.T.R. (4th) 23, at paras. 137-38.

[58]    Ms. Owsianik submits that her claim does allege an intrusion upon seclusion because she pleads that the defendant acted recklessly. *Jones* recognizes that recklessness will suffice to establish liability.

[59]    Ms. Owsianik's submission misunderstands the relationship between the two elements of the tort. The first element, the conduct requirement, requires an act by the defendant which amounts to a deliberate intrusion upon, or invasion into, the plaintiffs' privacy. The prohibited state of mind, whether intention or recklessness, must exist when the defendant engages in the prohibited conduct. The state of mind must relate to the doing of the prohibited conduct. The defendant must either intend that the conduct which constitutes the intrusion will intrude upon the plaintiffs' privacy, or the defendant must be reckless that the conduct will have that effect. If the defendant does not engage in conduct that amounts to an invasion of privacy, the defendant's recklessness with respect to the consequences of some other conduct, for example the storage of the information, cannot fix the defendant with liability for invading the plaintiffs' privacy.

Page: 26

[60]    Intention is established if the defendant meant to intrude upon the privacy of the plaintiff or knew that it was a substantially certain consequence of the act which constitutes the intrusion: see *Piresferreira v. Ayotte*, 2010 ONCA 384, 319 D.L.R. (4th) 665, at paras. 72-75, leave to appeal refused, [2010] S.C.C.A. No. 283. Recklessness, also a subjective state of mind, refers to the realization at the time the prohibited conduct is being done that there is a risk that the conduct will intrude upon the privacy of the plaintiffs, coupled with a determination to nonetheless proceed with that conduct: see *Demme v. Healthcare Insurance Reciprocal of Canada*, 2022 ONCA 503, 83 C.C.L.T. (4th) 1, at paras. 62-64. The degree of recklessness required to fix liability can vary and need not be addressed in these reasons.

[61]    In summary, the claim brought against Equifax fails at the conduct component of the tort of intrusion upon seclusion. Equifax's negligent storage of the information cannot in law amount to an invasion of, or an intrusion upon, the plaintiffs' privacy interests in the information. Equifax's recklessness as to the consequences of its negligent storage cannot make Equifax liable for the intentional invasion of the plaintiffs' privacy committed by the independent third-party hacker. Equifax's liability, if any, lies in its breach of a duty owed to the plaintiffs, or its breach of contractual or statutory obligations.

[62]    Counsel on behalf of Ms. Owsianik submits that the extension of the tort from the actual intruder to entities who fail to adequately protect information in their

Page:  27

possession is, like the recognition of the tort in *Jones*, an incremental development in the common law: *Jones*, at para. 65. Counsel contends that the development is fully justified, given the state of the law in other jurisdictions, the realities of modern technology, the threats to individual privacy posed by the accumulation of large amounts of private information, and the absence of any effective remedy for persons whose information held in databases is accessed and used improperly.

[63]   I do not agree that extending liability for the commission of the intentional tort of invasion of privacy by a stranger to Equifax would amount to an incremental change in the law. The extension of the common law proposed in this submission would not be a small step along a well-established path, but would be a giant step in a very different direction: see *Merrifield v. Canada (Attorney General)*, 2019 ONCA 205, 145 O.R. (3d) 494, at paras. 20-26, leave to appeal refused, [2019] S.C.C.A. No. 174.

[64]   On the alleged facts, Equifax did not unlawfully access any information. No one acting on Equifax's behalf, or in consort with Equifax, did so. No one for whom Equifax could be held vicariously liable accessed any private information. A third-party stranger to Equifax accessed the information.

[65]   To impose liability on Equifax for the tortious conduct of the unknown hackers, as opposed to imposing liability on Equifax for its failure to prevent the hackers from accessing the information, would, in my view, create a new and

Page:  28

potentially very broad basis for a finding of liability for intentional torts. A defendant could be liable for any intentional tort committed by anyone, if the defendant owed a duty, under contract, tort, or perhaps under statute, to the plaintiff to protect the plaintiff from the conduct amounting to the intentional tort. The security guard who fell asleep on the job, recklessly allowing an assailant to assault the person who the security guard was obliged to protect, would become liable for battery. The garage operator who negligently, and with reckless disregard to the risk of theft, left the keys in a vehicle entrusted to his care, would become a thief if an opportunistic stranger stole the car from the garage parking lot.

[66]   Not only would the scope of intentional torts expand, that expansion would radically reconfigure the border between the defendant's liability for the tortious conduct of third parties, and the defendant's direct liability for its own failure to properly secure the information of the plaintiffs. The distinction between the two forms of liability is made clear in *Fullowka v. Pinkerton's of Canada Ltd.*, 2010 SCC 5, [2010] 1 S.C.R. 132. In that case, the plaintiffs sued Pinkerton's (and others) who were responsible for mine safety during a violent strike. The plaintiffs alleged Pinkerton's had failed to protect the victims who were killed in a bombing caused by a striker. Cromwell J., for a unanimous court, explained the nature of Pinkerton's' potential liability, at paras. 16-17:

> The appellants do not allege that either Pinkerton's or the Government actually inflicted the fatal injuries on the murdered miners; rather, they allege that Pinkerton's and

2022 ONCA 813 (CanLII)

Page:  29

the government breached a duty to take reasonable care to prevent the harm inflicted by Mr. Warren [the bomber]. The Court of Appeal characterized this as a claim that Pinkerton's and the government were liable for Mr. Warren's tort (para. 98). This however is not the right way to frame the issue because it does not accurately reflect the appellants' claims.

<u>We are here concerned with allegations of direct liability. Simply put, the appellants do not claim that Pinkerton's and the government are responsible for Mr. Warren's tort; the claim is that they were negligent in trying to prevent it. The appellants' position is that primary liability should be imposed based on the fault of these two defendants [citation omitted]. The question is not, therefore, whether these defendants are responsible for the tort of another, but whether they, in relation to another's tort, failed to meet the standard of care imposed on them and thereby caused the ultimate harm.</u> [Emphasis added.]

[67]    The words of Cromwell J. ring true here. On a reading of the actual allegations in the Statement of Claim, the real complaint against Equifax is that it failed to guard the information it was duty-bound to protect.

[68]    The law relating to a defendant's potential liability for the tortious conduct of "strangers" is well-developed in Canada and in England. That law will impose liability on Equifax if the plaintiff can show that Equifax had an obligation at tort, under contract, or perhaps under statute, to protect the private information stored in its database from access by third-party hackers, and failed to do so, thereby causing economic harm to the plaintiffs: see e.g., *Rankin (Rankin's Garage & Sales) v. J.J.*, 2018 SCC 19, [2018] 1 S.C.R. 587; *P. Perl (Exporters) Ltd. v. Camden London Borough Council*, [1983] EWCA Civ 9, [1984] Q.B. 342; and

Page:  30

Lewis N. Klar & Cameron Jefferies, *Tort Law*, 6th ed. (Toronto: Carswell, 2017), at pp. 598-604. The law as it exists properly fixes liability on the defendant for the defendant's misconduct and provides remedies consistent with the remedies available in contract and negligence for that kind of misconduct. I am not persuaded there are deficiencies in the present law calling out for the drastic change endorsed by the appellant.

[69]   The appellant further argues that expanding the tort of intrusion upon seclusion the way she suggests is consistent with American caselaw. The parties in all three proceedings have referred to various American authorities said to support their respective positions on the expansion of the tort to include negligent Database Defendants.

[70]   There can be no doubt that the American jurisprudence has long recognized the right to privacy as important and worthy of the protection of tort law. It is equally clear that the analysis in *Jones* was heavily influenced by American commentary. However, as is often the case, the sheer quantity of American caselaw and the different statutory provisions at play in many of the cases, make it difficult to arrive at any generalized conclusion about the state of the law.

[71]   The cases relied on by the Database Defendants offer direct support for their position. Negligence cannot morph or be transformed into an intentional tort: see e.g., *Allgood v. Paperlesspay Corp.*, 2022 WL 846070 (M.D. Fla.); *Burton v.*

Page:  31

*MAPCO Exp., Inc.*, 47 F. Supp. (3d) 1279 (N.D. Ala. 2014); *Stephens v. Availity*, 2019 WL 13041330 (M.D. Fla.); *Purvis v. Aveanna Healthcare, LLC*, 563 F. Supp. (3d) 1360 (N.D. Ga. 2021); and *Damner v. Facebook Inc.*, 2020 WL 7862706 (N.D. Cal.).

[72]    In contrast, the cases relied on by the appellants do not directly support their position. This, to a large extent, is because the outcomes of those cases turn on other legal principles. Some cases are explained by vicarious liability: see e.g., *Savidge v. Pharm-Save, Inc.*, 2021 WL 3076786 (W.D. Ky.); *McKenzie v. Allconnect, Inc.*, 369 F. Supp. (3d) 810 (E.D. Ky. 2019); and *Carter v. Innisfree Hotel, Inc.*, 661 So. (2d) 1174 (Ala. 1995). Some cases are explained by statutory liability: see e.g., *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F. (3d) 625 (3rd Cir. 2017). Some cases are explained by liability for other torts, like nuisance, trespass and negligence: see e.g., *Moore v. New York Elevated Railroad Co.*, 130 N.Y. 523 (1892); *Remijas v. Neiman Marcus Group, LLC*, 794 F. (3d) 688 (7th Cir. 2015).

[73]    The American cases relied on by the appellants do affirm the importance of privacy rights and several of them affirm that a real injury can be suffered when there is a loss of privacy. The cases also make clear that a negligent actor can be held liable for reasonably foreseeable harms to which their actions give rise, including reasonably foreseeable intentional harms committed by independent third parties: see e.g., *Carter*; *Thetford v. City of Clanton*, 605 So. (2d) 835 (Ala.

Page: 32

1992). This, however, does nothing to support the view that negligent parties in this position should also be held liable for the intentional torts.

[74]    In my view, the state of the American jurisprudence does not provide a justification for extending the tort to negligent database defendants.

[75]    Ms. Owsianik submits that the remedies available against Equifax in a claim based on breach of contract, negligence, or breach of a statute, are inadequate. She contends that just as in *Jones*, she and her fellow victims are left in circumstances that "cry out for a remedy": *Jones*, at para. 69.

[76]    In *Jones*, the plaintiff had no remedy of any kind against the defendant who had intentionally invaded her privacy. Ms. Owsianik and the other class members have a remedy against the hackers who intentionally invaded their privacy. They can sue for invasion of privacy. No doubt, they face a very real problem. In most cases it will be impossible to identify, much less sue, the hackers. The inability to sue the actual hackers is not, however, justification for creating a remedy against a different defendant who has committed a different tort for which the plaintiffs have all the usual remedies available to them. The inability to successfully sue the hacker is no reason to make a Database Defendant liable, not only for its own wrongdoing, but also for the invasion of privacy perpetrated by the hacker.

[77]    To award "moral damages" against Equifax for what is essentially its negligence or breach of contract runs contrary to the very purposes underlying the

2022 ONCA 813 (CanLII)

Page: 33

award of such damages. Moral damages are awarded to vindicate the rights infringed, and in recognition of the intentional harm caused by the defendant. These purposes are served only if the damages are awarded against the actual wrongdoer, that is the entity that invaded the privacy of the plaintiff.

[78]  Ms. Owsianik and the other plaintiffs have remedies against Equifax. Those remedies are the same remedies available to anyone who can prove the claims advanced in tort, contract, and statute by the plaintiffs against Equifax.

[79]  The plaintiffs' "no remedy" argument really comes down to the assertion that because the remedies available in contract and negligence require proof of pecuniary loss, the plaintiffs who cannot prove pecuniary loss are left with no remedy. With respect, this is not what the court meant in *Jones* when it described the plaintiff as being without remedy. The plaintiffs here are in the same position as anyone else who advances the kind of claim the plaintiffs have advanced here. Because the claim sounds in negligence and contract, the plaintiffs must prove pecuniary loss. The plaintiffs' position is miles away from the predicament faced by the plaintiff in *Jones.*

[80]  While it cannot be said the plaintiffs are left without a remedy, it is true that the inability to claim moral damages may have a negative impact on the plaintiffs' ability to certify the claim as a class proceeding. In my view, that procedural

2022 ONCA 813 (CanLII)

Page: 34

consequence does not constitute the absence of a remedy. Procedural advantages are not remedies.

[81]    The plaintiffs have not made out the case for extending the tort of intrusion upon seclusion to Database Defendants whose negligent storage of information permits independent hackers to access that information. That is not to say that the risk to privacy presented by the accumulation of private information by Database Defendants is not real. It may be that existing common law remedies do not adequately encourage Database Defendants to take all reasonable steps to protect the private information under their control. Parliament and provincial legislatures have enacted legislation intended to protect informational privacy. It is certainly open to Parliament and the legislatures to expand these protections to provide for what Parliament and the legislatures might regard as more effective remedies against Database Defendants who do not take proper steps to secure the information under their control.

**VI**

**CONCLUSION**

[82]    I would dismiss the appeal.

Page:  35

[83]   I would award costs to Equifax in the amount of $25,000. That amount includes the costs of the leave application, disbursements and relevant taxes.

Released: "November 25, 2022 DD"

"Doherty J.A."
"I agree. M. Tulloch J.A."
"I agree. B.W. Miller J.A."

**17**

# Paulus et al. v. Fleury
## [Indexed as: Paulus v. Fleury]

Ontario Reports

Court of Appeal for Ontario

K.N. Feldman, Pardu and L.B. Roberts JJ.A.

December 21, 2018

**144 O.R. (3d) 791**   |   2018 ONCA 1072

## Case Summary

**Civil procedure — Settlement — Setting aside — Defendant agreeing to settle action for damages arising from motor vehicle accident after plaintiffs' counsel stated at pre-trial conference that he had independent witnesses to collision — Defence counsel subsequently discovering that witnesses' son lived across street from plaintiffs — Motion judge erring in refusing to enforce settlement on basis that statement of plaintiff's counsel amounted to civil fraud — Plaintiff's counsel's statement not amounting to civil fraud as there was reasonable basis for it and it was made in good faith — Plaintiffs' counsel not intending opposing counsel to rely on his submission in deciding whether to settle action — Defence counsel not acting with due diligence in investigating link between plaintiffs and witnesses.**

**Torts — Fraud — Defendant agreeing to settle action for damages arising from motor vehicle accident after plaintiffs' counsel stated at pre-trial conference that he had independent witnesses to collision — Defence counsel subsequently discovering that witnesses' son lived across street from plaintiffs — Motion judge erring in refusing to enforce settlement on basis that statement of plaintiff's counsel amounted to civil fraud — Plaintiff's counsel's statement not amounting to civil fraud as there was reasonable basis for it and it was made in good faith — Plaintiffs' counsel not intending opposing counsel to rely on his submission in deciding whether to settle action — Defence counsel not acting with due diligence in investigating link between plaintiffs and witnesses.**

During a pre-trial conference in an action for damages arising from a motor vehicle accident, counsel for the plaintiffs stated that he had "independent" witnesses to the collision who were "good people" and "solid . . . good witnesses". The defendant's counsel agreed to settle the claim. Defence counsel then discovered that the witnesses' son lived across the street from the plaintiffs. He repudiated the settlement. The plaintiffs brought a motion to enforce the settlement. They argued that when their counsel described the witnesses as independent, he meant that they could give evidence extrinsic to that of the plaintiffs, as they were in a separate car in a separate lane, and not that they did not know the plaintiffs. The motion judge rejected that interpretation. He found that the plaintiffs' counsel's statement that the witnesses were "independent" was a statement of fact, not opinion, and that it was untrue. He concluded that the

statement amounted to civil fraud and that the defendant was induced to settle the case because of the false representation. The motion was dismissed. The plaintiffs appealed.

**Held**, the appeal should be allowed.

The statement in question was an opinion, not a statement of fact. Counsel did not have the mental state or intention required for civil fraud in the context of submissions made by counsel before a judge. A finding of civil fraud could have devastating consequences for a lawyer's reputation. The potential for this type of finding could have a chilling effect on counsel's willingness to advocate resolutely for his or her client. Statements or submissions made by counsel do not amount to civil [page792] fraud if either there is a reasonable basis for them, *or* if counsel is not knowingly misleading the court, that is, is acting in good faith. In this case, there was a reasonable basis for the statement that the witnesses were independent, given counsel's knowledge at the time of the pre-trial conference. There was no familial relationship between the plaintiffs and the witnesses. Although the plaintiffs' counsel knew that the witnesses were acquainted with the plaintiffs, he was unaware of the nature of their acquaintance. The witnesses had nothing to gain from the trial of the accident claim. Counsel's description of the witnesses as independent was a legitimate exercise of advocacy. The point at which the degree of acquaintance renders a witness not independent is open to debate and may differ in different contexts. There was also no basis to conclude that plaintiffs' counsel did not sincerely and in good faith describe the witnesses in the manner he did. Further, it would be unreasonable to conclude that plaintiffs' counsel intended opposing counsel to rely on his submission in settling the action, given the adversarial context and the nature of the impugned statement. Finally, defence counsel did not act with due diligence in investigating any link between the plaintiffs and the witnesses.

*Groia v. Law Society of Upper Canada*, [2018] 1 S.C.R. 772, [2018] S.C.J. No. 27, 2018 SCC 27, 424 D.L.R. (4th) 443, 46 C.R. (7th) 227, EYB 2018-294877, 2018EXP-1541, 34 Admin. L.R. (6th) 183, 292 A.C.W.S. (3d) 13, **consd**

**Other cases referred to**

*Amertek Inc. v. Canadian Commercial Corp.* (2005), 76 O.R. (3d) 241, [2005] O.J. No. 2789, 256 D.L.R. (4th) 287, 200 O.A.C. 38, 5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 141 A.C.W.S. (3d) 226 (C.A.) [Leave to appeal to S.C.C. refused [2005] S.C.C.A. No. 439]; *Biron v. Aviva Insurance Co.*, [2014] O.J. No 3436, 2014 ONCA 558; *Deposit Insurance Corp. of Ontario v. Malette*, [2014] O.J. No. 2194, 2014 ONSC 2845, [2014] I.L.R. ÂG-2575 (S.C.J.); *International Corona Resources Ltd. v. LAC Minerals Ltd.* (1988), 66 O.R. (2d) 610, [1988] O.J. No. 3118, 54 D.L.R. (4th) 647, 12 A.C.W.S. (3d) 436 (H.C.J.); *Midland Resources Holding Ltd. v. Shtaif* (2017), 135 O.R. (3d) 481, [2017] O.J. No. 1978, 2017 ONCA 320, 69 B.L.R. (5th) 1, 278 A.C.W.S. (3d) 736 [Leave to appeal to S.C.C. refused [2017] S.C.C.A. No. 246]; *Pepe v. State Farm Mutual Automobile Insurance Co.* (2011), 105 O.R. (3d) 794, [2011] O.J. No. 2011, 2011 ONCA 341, 282 O.A.C. 157, 98 C.C.L.I. (4th) 1, 201 A.C.W.S. (3d) 380

**Authorities referred to**

Paulus et al. v. Fleury[Indexed as: Paulus v. Fleury]

Advocates' Society, *Principles of Civility for Advocates* (2001)

Advocates' Society, *Principles of Professionalism for Advocates* (2009)

Law Society of Ontario, *Rules of Professional Conduct*, s. 5.1-2(e)

Osborne, Philip H., *The Law of Torts*, 5th ed. (Toronto: Irwin Law, 2015)

APPEAL from the order of Heeney J., [2018] O.J. No. 906, 2018 ONSC 1188 (S.C.J.) dismissing the motion to enforce a settlement.

*Raymond Colautti*, for appellants.

*Vanda Santini* and *Alicia Tymec*, for respondent.

The judgment of the court was delivered by
**PARDU J.A.**: — —

A. *Background*

   [1] The plaintiffs appeal from the refusal of the motion judge to enforce a settlement reached at a pre-trial conference in their [page793] action for damages resulting from a car accident. In the course of that conference, their counsel made submissions indicating that he had "independent" witnesses to the collision that had resulted in injury to his clients. He described the witnesses as "good people . . . independent . . . solid . . . good witnesses". The defendant's counsel agreed to settle the claim for $850,000. Immediately after the pre-trial, the defendant's counsel got a call from his own investigator indicating that tax, mortgage and insurance records revealed that it was likely that the witnesses' son lived across the street from the plaintiffs. Defendant's counsel wrote to the plaintiffs' counsel the next day to repudiate the settlement.

B. *Motion Judge's Findings*

   [2] The plaintiffs argued before the motion judge that when their counsel described the witnesses as independent, he meant to indicate that they could give evidence extrinsic to that of the plaintiffs. The witnesses were in a separate car in a separate lane. Counsel said he did not mean to suggest that the witnesses did not know the plaintiffs. This interpretation of "independent" was arguably supported by appellate authority: *Pepe v. State Farm Mutual Automobile Insurance Co.* (2011), 105 O.R. (3d) 794, [2011] O.J. No. 2011, 2011 ONCA 341. The motion judge rejected this interpretation, concluding that counsel had given the impression that the witnesses were [at para. 43] "neutral witnesses, who had no connection to anyone involved in the case, and therefore had no reason to favour either side with their evidence, and would be credible and reliable witnesses at trial".

Paulus et al. v. Fleury[Indexed as: Paulus v. Fleury]

[3] He found that counsel for the plaintiffs' statement that the witnesses were "independent . . . solid . . . good" was untrue. He found that this was untrue because the witnesses contacted one of the plaintiffs, Mr. Paulus, at his office to tell him they had witnessed the accident, because Mr. Paulus provided his own counsel with the witnesses' contact information and because plaintiffs' counsel knew his client was acquainted with the witnesses in some undefined way. The motion judge also relied on information not known to the plaintiffs' counsel at the time of the pretrial to corroborate his finding that the statement was false.[1] [page794]

[4] The motion judge found that plaintiffs' counsel knew the statement was untrue or was reckless as to its truth. He drew this conclusion because, at the time of the pre-trial, plaintiffs' counsel knew that it was Mr. Paulus who had provided him with the names, address and contact information for the witnesses, knew that his clients and the witnesses were somehow acquainted with one another, and knew the witnesses had difficulty communicating in English.

[5] He also held that counsel had a duty to opposing counsel not to knowingly make misleading statements. He characterized counsel's statement about the characteristics of the witnesses as a statement of fact, not opinion.

[6] The motion judge concluded that the plaintiffs' counsel's statement amounted to civil fraud and that the defendant was induced to settle the case as a result of the false representation. He accordingly refused to enforce the settlement.

[7] The plaintiffs appeal from this decision and ask that the settlement be enforced. For the reasons that follow, I would allow the appeal and enforce the settlement.

C. *Analysis*

(1) *The test for civil fraud*

[8] As the defendant's allegation of civil fraud was central to the motion judge's decision, I begin by noting that courts have used the same test for civil fraud as they have for the torts of deceit and fraudulent misrepresentation: see, *e.g.*, *Deposit Insurance Corp. of Ontario v. Malette*, [2014] O.J. No. 2194, 2014 ONSC 2845 (S.C.J.), at para. 19; *Amertek Inc. v. Canadian Commercial Corp.* (2005), 76 O.R. (3d) 241, [2005] O.J. No. 2789 (C.A.), at para. 63, leave to appeal to S.C.C. refused [2005] S.C.C.A. No. 439; and *Midland Resources Holding Ltd. v. Shtaif* (2017), 135 O.R. (3d) 481, [2017] O.J. No. 1978, 2017 ONCA 320, at para. 162, leave to appeal to S.C.C. refused [2017] S.C.C.A. No. 246.

[9] For the purposes of this appeal, I adopt Brown J.A.'s articulation of this test in *Midland Resources Holding Ltd.*, at para. 162. The five elements of the test are as follows:

(i) a false representation of fact by the defendant to the plaintiff; (ii) knowledge the representation was false, absence of belief in its truth, or recklessness as to its truth; (iii) an intention the plaintiff act in reliance on the representation; (iv) the plaintiff acts on the representation; and (v) the plaintiff suffers a loss in doing so.

(Citations omitted)

Paulus et al. v. Fleury[Indexed as: Paulus v. Fleury]

[10] Here the statement by counsel was an opinion, not a statement of fact, counsel did not have the mental state or [page795] intention required for civil fraud in the context of submissions made by counsel before a judge and the defendant's lack of due diligence barred it from setting aside the settlement on the ground of fraud. I turn then to consider each of these issues.

(2)  *The proper approach to civil fraud in the context of submissions by counsel*

[11] The motion judge did not have the benefit of *Groia v. Law Society of Upper Canada*, [2018] 1 S.C.R. 772, [2018] S.C.J. No. 27, 2018 SCC 27, 34 Admin. L.R. (6th) 183, released after his decision. *Groia* is relevant here because of its discussion of a lawyer's duty of resolute advocacy on behalf of a client. That duty is relevant to an assessment of whether submissions by counsel amount to civil fraud.

[12] *Groia* dealt with the balancing that must occur in deciding whether a lawyer's mistaken allegations of misconduct on the part of opposing counsel amount to professional misconduct and whether it is a matter for discipline by a law society. The fact that a lawyer is mistaken is not a basis in itself for a finding of misconduct. Where counsel challenges opposing counsel's integrity, that challenge does not amount to professional misconduct if the allegations are reasonably based and made in good faith, even if counsel is mistaken [at para. 7]:

> That said, the Appeal Panel's finding of professional misconduct against Mr. Groia on the basis of incivility was, in my respectful view, unreasonable. Even though the Appeal Panel accepted that Mr. Groia's allegations of prosecutorial misconduct were made in good faith, it used his honest but erroneous views as to the disclosure and admissibility of documents to conclude that his allegations lacked a reasonable basis. However, as I will explain, Mr. Groia's allegations were made in good faith and they were reasonably based. As such, the allegations themselves could not reasonably support a finding of professional misconduct.

[13] The assessment of whether uncivil behaviour amounts to professional misconduct is "fundamentally contextual and fact specific": *Groia*, atpara. 79.

[14] In *Groia*, Moldaver J. for the majority held that challenges to opposing counsel's integrity must "both be made in good faith *and* have a reasonable basis" [emphasis in original]: at para. 84.

[15] He shared the intervenors' concerns that this could result in sanctions for a lawyer expressing sincerely held but mistaken legal positions or adopting questionable legal strategies, but held that the impact of an accusation of professional misconduct could so severely affect the reputation of the recipient of the criticism that it was appropriate to require both good faith and a reasonable basis for the allegation. He stated the following, at para. 86:

> Maintaining a reputation for practicing with integrity is a lifelong challenge. Once sullied, a lawyer's reputation may never be fully restored. As such, [page796] allegations of prosecutorial misconduct must have a reasonable foundation. I agree with the Appeal Panel that anything less "gives too much licence to irresponsible counsel with sincere but nevertheless unsupportable suspicions": para. 235. The consequences for the opposing lawyer's reputation are simply too severe to require anything less than a reasonable basis for allegations impugning his or her integrity.

Paulus et al. v. Fleury[Indexed as: Paulus v. Fleury]

[16] Here the context is different. This is not a case of professional discipline, however, a finding of civil fraud is a matter that could have devastating consequences for a lawyer's reputation. The potential for such a finding could have a chilling effect on counsel's willingness to advocate resolutely for his or her client. Statements or submissions made by counsel do not amount to civil fraud if either there is a reasonable basis for them, *or* if counsel is not knowingly misleading the court, *i.e.*, is acting in good faith. This conclusion plays a necessary role in ensuring that counsel is able to fulfill the duty of "resolute advocacy" that he or she owes to his or her clients.

[17] There can be no doubt that the plaintiffs' trial counsel owed his clients this duty of resolute advocacy in advancing their best interests, whether at a trial or a pretrial conference. The importance of this duty was highlighted in *Groia*, at paras. 72 and 73:

> The importance of resolute advocacy cannot be understated. It is a vital ingredient in our adversarial justice system -- a system premised on the idea that forceful partisan advocacy facilitates truth-seeking: see e.g. *Phillips v. Ford Motor Co.* (1971), 18 D.L.R. (3d) 641, at p. 661. Moreover, resolute advocacy is a key component of the lawyer's commitment to the client's cause, a principle of fundamental justice under s. 7 of the *Canadian Charter of Rights and Freedoms*: *Canada (Attorney General) v. Federation of Law Societies of Canada*, 2015 SCC 7, [2015] 1 S.C.R. 401, at paras. 83-84.
> Resolute advocacy requires lawyers to "raise fearlessly every issue, advance every argument and ask every question, however distasteful, that the lawyer thinks will help the client's case": Federation of Law Societies of Canada, *Model Code of Professional Conduct* (online), r. 5.1-1 commentary 1. This is no small order. Lawyers are regularly called on to make submissions on behalf of their clients that are unpopular and at times uncomfortable. These submissions can be met with harsh criticism -- from the public, the bar, and even the court. Lawyers must stand resolute in the face of this adversity by continuing to advocate on their clients' behalf, despite popular opinion to the contrary.

[18] The corollary of this duty is that counsel owes no such duty to the opposing party: *Biron v. Aviva Insurance Co.*, [2014] O.J. No. 3436, 2014 ONCA 558, at para. 6.

[19] The duty of resolute advocacy has limits. As rule 5.1-2(e) of the Law Society of Ontario's *Rules of Professional Conduct* indicates, when a lawyer is acting as an advocate, he or she shall not "*knowingly* attempt to deceive a tribunal or influence the course of justice by offering false evidence, misstating facts or law, [page797] presenting or relying upon a false or deceptive affidavit, suppressing what ought to be disclosed, or otherwise assisting in any fraud, crime, or illegal conduct" (emphasis added). Advocates should not use tactics that are dishonest, including in their interactions with opposing counsel, or "engage in any . . . conduct calculated to induce the court to act under a misapprehension of the facts": Advocates' Society, *Principles of Professionalism for Advocates* (2009), at p. 6; and Advocates' Society, *Principles of Civility for Advocates* (2001), atp. 11.

[20] That being said, it is worth bearing in mind that in almost every trial, at least one counsel's submissions will be rejected as unsustainable. By definition, a losing party's counsel will have made factual or legal arguments that are rejected by the judge. The notion that judicial disagreement with an opinion expressed by counsel in the course of judicial proceedings makes

Paulus et al. v. Fleury[Indexed as: Paulus v. Fleury]

that counsel guilty of civil fraud is incompatible with the duty of counsel to advocate on behalf of his or her client.

[21] In a personal injury trial one counsel may submit that the evidence shows the plaintiff has made a full recovery. The opposing counsel may submit that the evidence shows that the plaintiff will suffer lifetime impairments. Neither counsel is required to have a personal belief in the submission made.

[22] Here plaintiffs' counsel's statement did not amount to civil fraud. There was a reasonable basis for his statement, and the statement was made in good faith.

(a) *Reasonable basis*

[23] The statements by counsel were expressions of opinion for which there was a reasonable basis, given counsel's knowledge at the time of the pre-trial. There was no familial relationship between the plaintiffs and the witnesses. Although the plaintiffs' counsel knew that the witnesses were acquainted with the plaintiffs, the nature of their acquaintance was unknown. Neither was an employee of the other. The witnesses were in their own car adjacent to the accident scene. They had nothing to gain from the trial of the accident claim. That they had difficulty expressing themselves in English did not mean they were not good people nor that they would make poor witnesses if translation was provided. There is no indication of any criminal record that might undermine their credibility or any other history of dishonesty. That they refused to speak to the defendant's counsel, as was their right, did not undermine their credibility. The fact that the plaintiffs gave the witnesses' contact information to their counsel does not mean the witnesses were biased. [page798]

[24] The plaintiffs' counsel's description of the witnesses was a legitimate exercise of advocacy. No complaint could have been made if counsel had provided a jury with the same observations concerning the quality of the witnesses in issue. Opinions as to whether someone is a good or independent witness are as open to debate and disagreement as opinions as to whether someone is a good lawyer. The degree of acquaintance may range from intimate to non-existent, with innumerable variations between those extremes. The point at which the degree of acquaintance renders a witness "not independent" or biased may be open to debate and may differ in different settings. In some communities where jurors are tested for impartiality, for example, the fact that a juror may have gone to the same high school as an accused may be a matter of indifference; in others it may result in disqualification of the juror.

[25] Even if mistaken, the expression of this opinion did not amount to civil fraud. As noted, at para. 91, of *Groia*,

> [I]nquiring into the legal merit of a lawyer's position to conclude that his or her allegations lack a reasonable basis would discourage lawyers from raising well-founded allegations, impairing the lawyer's duty of resolute advocacy.

[26] The motion judge ultimately had a different view as to whether the witnesses could be described as independent. However, a contrary opinion expressed in submissions by counsel does not make that counsel guilty of civil fraud where there is a reasonable basis for that opinion.

Paulus et al. v. Fleury[Indexed as: Paulus v. Fleury]

[27] Furthermore, the motion judge erred in relying on information that came to light after the pretrial conference and that was unknown to plaintiffs' counsel at the time his statements were made to assess whether those statements were false, *i.e.*, lacked any reasonable basis. The motion judge was also wrong to infer that the plaintiffs' counsel knowingly made a false statement because he knew of the matters highlighted in para. 4 above. The fact that he knew about those matters does not mean that he was knowingly making a false statement and not acting in good faith.

(b) *Good faith*

[28] There is also no basis to conclude that plaintiffs' counsel did not sincerely and in good faith describe the witnesses in the manner he did. For example, counsel's portrayal of the witnesses as independent was consistent with a statement that he made in a letter months before the November 22, 2016 pretrial. In that letter, dated July 25, 2016, counsel described the witnesses as independent to his own clients:

> Mr and Mrs Eftimov's evidence will be very important because they are independent witnesses with no stake in the outcome of your trial. That kind of [page799] testimony is important and helpful in a jury trial. I want to "look them over" and listen to their story so I can be sure of their reliability.

[29] Mistakes by lawyers are not an infrequent occurrence. Counsel may lose credibility with the court and their colleagues if they are not scrupulously careful about factual assertions, or if they advance arguments with no reasonable foundation, but these should not amount to civil fraud in this context unless there is neither a reasonable basis for the statements nor a good faith belief in their accuracy. Arguments that might amount to an enormous stretch may later seem quite reasonable.

[30] This is not to say that there may not be some circumstances where a factual misrepresentation by counsel in judicial proceedings amounts to deceit or civil fraud. For example, counsel who tendered as evidence a forged cheque evidencing payment of a debt in an action on that debt, and who knew the cheque was a false document, could be liable for deceit. In those circumstances there would be no reasonable basis for the factual assertion; nor could it be said that the statement was made in good faith.

(3) *Reliance*

[31] Further, it would be unreasonable to conclude that plaintiffs' counsel intended opposing counsel to rely on his submission.

[32] The intention that the opposing party rely on the representation is an essential element of civil fraud which is absent here. In *The Law of Torts*, 5th ed. (Toronto: Irwin Law, 2015), at p. 333, Philip Osborne explains the policy rationale behind the intent requirement when discussing the tort of deceit:

> The defendant must intend that the plaintiff will rely on the fraudulent misrepresentation and the plaintiff must in fact rely on it. The requirement that the defendant intends that the plaintiff

Paulus et al. v. Fleury[Indexed as: Paulus v. Fleury]

will rely on the misrepresentation addresses the problem of potentially indeterminate liability in deceit.

(Footnotes omitted)

[33] Given the adversarial context and the nature of the impugned statements, it would be unreasonable to conclude in this case that plaintiffs' counsel intended that opposing counsel rely on his submissions as to the qualities of the witnesses in deciding whether to settle the action. This is not to foreclose the possibility that there may be other circumstances where reliance by counsel upon a factual assertion by opposing counsel would be reasonable.

####     (4)  *The defendant's conduct*

[34] The accident occurred in 2008. The plaintiffs' counsel had disclosed the witness statement in an affidavit of documents and [page800] had provided a copy of the statement to defendant's counsel. Defendant's counsel asked no questions about the witnesses at discovery. Defendant's counsel knew the witnesses refused to speak to him. Four days before the pre-trial in 2016, defendant's counsel had concerns about the witnesses' credibility and sent an investigator out to explore what connections the witnesses might have had with the plaintiffs. Despite these concerns, and without waiting for the report from the investigator just retained, the defendant's counsel and the adjuster elected to settle the case.

[35] This case is analogous to *International Corona Resources Ltd. v. LAC Minerals Ltd.* (1988), 66 O.R. (2d) 610, [1988] O.J. No. 3118 (H.C.J.). In that case, a losing party attempted to set aside a judgment on account of fraud. It alleged that a witness had intentionally perjured himself and intentionally misled the court. Osborne J. noted that the issues raised on the motion were left "twisting in the wind" as a result of decisions, perhaps strategic and tactical, by counsel as to how counsel would conduct cross-examination at trial. Osborne J. observed, at pp. 622-23 O.R., that a losing party who seeks to set aside a judgment on account of fraud must establish due diligence on his or her own part, and that the questions to be asked are "what did the moving party know, and what ought the moving party to have known".

[36] This pre-trial occurred some eight years after the accident. It cannot be said that the defendant's counsel acted with due diligence in investigating or asking any questions about any link between the plaintiffs and the witnesses. In the absence of such due diligence, the need for finality in legal proceedings favours enforcing the settlement. The motion judge erred in concluding that any need for due diligence on the part of the defendants came to an end as a result of the submission made on behalf of the plaintiffs about the qualities of the witnesses.

### D. *Conclusion*

[37] I would set aside the order of the motion judge dated February 20, 2018 and substitute judgment in favour of the plaintiffs in the sum of $850,000 plus post-judgment interest from November 22, 2016.

[38] I would set aside the costs award in the sum of $100,000 granted in favour of the defendants on the motion below and award that amount to the plaintiffs for the motion below.

2018 ONCA 1072 (CanLII)

Paulus et al. v. Fleury[Indexed as: Paulus v. Fleury]

[39] I would award costs of the appeal to the plaintiffs in the agreed upon amount of $30,000, inclusive of disbursements and HST.

*Appeal allowed.*

## Notes

1    For example, plaintiffs' counsel only learned after the pre-trial that one of the plaintiffs, who was in the business of preparing tax returns, had prepared tax returns for the witnesses at some time in the past (motion judge's reasons, para. 48). There was no finding that at the time of the pre-trial, plaintiffs' counsel knew that the witnesses' son lived across the street from the plaintiffs.

**End of Document**

2018 ONCA 1072 (CanLII)

**18**

**WIC Premium Ltd. v. General Instrument Corporation, 1999 ABQB 804**

Date:19991027
Action No. 9703-16746

IN THE COURT OF QUEEN'S BENCH OF ALBERTA
JUDICIAL DISTRICT OF EDMONTON

BETWEEN:

WIC Premium Ltd.

Plaintiff

- AND -

General Instrument Corporation, Next Level Systems of Delaware, Inc., Showtime Networks, Inc., Home Box Office, Inc., Warner Communications, Inc., John Doe, Echostar Communications Corporation, Dish Ltd., Echosphere Corporation, United States Satellite Broadcasting Company, Inc., Corman Park Satellite Ltd., Warren Supply Company, Programmers Clearing House, Inc., Ralph Warren, Ronald Warren, Ralph Warren and Ronald Warren carrying on business as 'Programmers Clearing House', and as "Warren Activations', and as 'Warren Radio & Television', and as 'Entertainment Direct', Warren Supply Company carrying on business as 'Builders Express', 4-12 Electronics Corporation, Freedom Satellite Corporation, Christopher Nelson personally and carrying on business as 'Skylight Home Satellite Theater', Christian Nelson, Sheldon Nelson and Centre One Hundred Holdings (Amalgamated) Ltd.

Defendants

_____

Memorandum of Judgment
of the
Honourable Mr. Justice C. Philip Clarke

_____

**Application of Time Warner Entertainment Company, L.P. to
Strike Certain Portions of the Statement of Claim**

[1]     An application was brought by the Defendant, Time Warner Entertainment Company L.P. ("Time Warner") to strike out certain allegations found in the Plaintiff's Amended Fresh As

1999 ABQB 804 (CanLII)

1999 ABQB 804 (CanLII)

Page: 2

Amended Statement of Claim ("Statement of Claim") or in the alternative for further and better particulars of those allegations. The Defendant asked for the following:

1.     The allegations of fraudulent misrepresentation relating to the "settlement agreement" contained in par. 44 to 46 should be struck out or, in the alternative, the Plaintiff should be ordered to provide full particulars of these allegations.

2.     The conspiracy alleged by the Plaintiff or in the alternative the allegations in par. 35 and  36 should be struck out due to the doctrine of merger.  The conspiracy allegations merge with the cause of action in unjust enrichment and the tort of intentional interference with economic relations and are thus duplicate;

3.     The Plaintiff should be ordered to particularize its allegations against HBO of conspiracy to defraud, on the issue of the alleged agreement amongst the co-conspirators;

4.     The allegations relating to "aiding and abetting" are irrelevant and fail to disclose a cause of action.   Accordingly they should be struck out.

For the purposes of this decision Time Warner and HBO should be treated as the same entity.

1.     **Allegations of fraudulent misrepresentation should be struck out or particularized**

Rule 115 requires a party pleading misrepresentation to provide particulars (with dates and items, if necessary) in the pleading.  The courts in Alberta have recognized the more onerous requirement to give particulars where misrepresentation is alleged.  The Court of Appeal in *Balaz v. Petro-Infor (1983), Edmonton, Alberta 43* A.R. 229 at 223 said in part:

> ".... Allegations of such conduct must not be made lightly or on mere suspicion.
> Those against whom the allegations are made are in my view entitled to
> particulars.  It is not enough to say that examinations for discovery will give
> them the opportunity to obtain those particulars."

In this case the allegations of misrepresentation are made in relation to a settlement agreement between these parties and are found in par. 43 through 46.  Those paragraphs state as follows:

Page: 3

43.  On or about the 13th day of June, 1993 the Plaintiff and the Defendant HBO entered into an agreement that was intended by WIC to resolve the differences between them to that date as pleaded in this action ("the settlement agreement").  The settlement agreement was executed by WIC in good faith on the basis that HBO would eradicate the black and grey market in Canada and included an agreement to terminate the California Court action.

44.  The Plaintiff entered into the settlement agreement based upon HBO's representations and assurances that it had no previous or present direct knowledge that its programming was being viewed in the territories.  In addition WIC entered into this agreement on the representation and agreement by HBO that it would take all necessary actions to terminate the private and grey market decoding of its encrypted subscription programming signals in the territory.  At the time of the negotiations that led up to the settlement, representatives of WIC were advised by HBO that HBO did not have the contractual right to monitor or audit the DTH distributors of HBO's programming and also that HBO did not provide access to Canadians via an '800' telephone number.  The Plaintiff relied upon the truth of these assertions which were, at the time and to the knowledge of HBO, false and misleading.

45.  Without limiting the generality of the foregoing, in the settlement agreement HBO undertook to take such action as necessary to prevent the decoding of its encrypted subscription signals.

46.  The Plaintiff asks that the settlement agreement be rescinded or declared void and of no effect.


When asked for particulars the Plaintiff responded essentially by saying the information would be the subject matter of discovery.  I have been unable to find any Alberta authority that decides what must be provided to satisfy the requirement of Rule 115.  There is, however, authority from British Columbia and Ontario dealing with a similarly worded rule that gives some guidance.  The rule is quoted in the decision of Mr. Justice Greer in *Lana International Ltd. et al. v. Menasco Aerospace Ltd. et al.* (1996) 28 O.R. (3d) 343 at 350 where the Court quoting from a decision in British Columbia says the following must be contained in the pleading to satisfy the rule:

> "The pleading, even of innocent misrepresentation, must set out with careful particularity the elements of the misrepresentation relied upon, that is:
>
> 1.   The alleged misrepresentation itself,
>
> 2.   When, where, how, by whom and to whom it was made,

Page: 4

3.   Its falsity,

4.   The inducement,

5.   The intention that the Plaintiff should rely on it,

6.   The alteration by the Plaintiff of his or her position relying on the misrepresentation,

7.   The resulting loss or damage to the Plaintiff."

During the course of argument Time Warner stated that the key information that they require is who made the representation, when it was made and where.  It was their position that they needed that information to be able to respond to the pleading.  In that regard, I note that the pleading says that there was an agreement made on the 13th day of June, 1993, in writing, that constituted the settlement agreement.  The Plaintiff says that the agreement was signed by the Plaintiff based on representations and assurances of Time Warner which the Plaintiff asserts were false and misleading.  It is clear on its face that the Plaintiffs must know the Time Warner person who made the representations and the Plaintiff person who received the representations since the representatives of the Plaintiff had to be present to receive the representations and therefore to act on them.  In all other respects I am satisfied that the pleadings in question satisfy the requirements set out by Justice Greer in the *Lana International Ltd.* case *supra*.  During the discovery process the Plaintiff may learn of other people from Time Warner who were involved. At that time it can provide further particulars.

[2]     It is trite law in this jurisdiction that a pleading may only be struck where it is "plain and obvious" that the claim will fail.  Time Warner does not meet the requirements of that test with respect to this particular part of the application.  However, the alternative request for particulars is granted to the extent that the Plaintiff should provide particulars of whom and to whom the representations were made.

2.     **Doctrine of merger and the striking of duplicate pleadings**

[3]     Time Warner says that the conspiracy that is alleged is in nearly identical language to the claim based on unjust enrichment (par. 35).  Since they are substantially the same allegation the conspiracy adds nothing to the unjust enrichment cause of action and should be struck out.  In addition, where there is an allegation of a tort (par. 36) and an allegation that the Defendant conspired to commit that tort the doctrine of merger should also operate to merge the conspiracy and the underlying tort.  In such instances, the conspiracy adds nothing and should be struck out. In support of these propositions, Time Warner cited as authority *Ward v. Lewis and Others* (1955) 1 All E.R. 55 (C.A.) where Lord Denning stated at p. 56:

Page: 5

> "It is important to remember that when a tort has been committed by two or more persons an allegation of a prior conspiracy to commit the tort adds nothing.  The prior agreement merges in the tort.  A party is not allowed to gain an added advantage by charging conspiracy, to get an added advantage, for instance in proceedings for discovery or by getting in evidence which would not be admissible in a straight action in tort, or to overcome substantive rules of law, such as here, the rules concerning republication of slanders.  When the court sees attempts of that kind being made, it will discourage them by striking out the allegation of conspiracy on the simple ground that the conspiracy adds nothing when the tort has been committed.

The Supreme Court of Canada has dealt with a similar issue in the case of *Hunt v. Carey Inc.* [1990] 2 S.C.R. 959.  The Court was dealing with an application to strike a cause of action in conspiracy.  The Defendants in that case contended that it was not open to the Plaintiff to proceed with his claim in the conspiracy because the Plaintiff had pled that the Defendants had engaged in other various tortious acts.  Although it was not argued on the basis of merger that was essentially the principle being invoked.  The Supreme Court of Canada in upholding the British Columbia Court of Appeal held in part as follows:

> "In my view there are least two problems with this submission.  First, while it may be arguable that if one succeeds under a distinct nominate tort against an individual Defendant, then an action in conspiracy should not be available against that Defendant, it is far from clear that the mere fact that a Plaintiff alleges that a Defendant committed other torts, is a bar to pleading the tort of conspiracy.  It seems to me that one can only determine whether the Plaintiff should be barred from recovering under the tort of conspiracy once one ascertains whether he has established that the Defendant did in fact commit the other alleged torts.  And while on a motion to strike we are required to assume that the facts as pleaded are true I do not think it is open to us to assume that the Plaintiff will necessarily succeed in persuading the court that these facts establish the commission of the other alleged nominate torts.  Thus if one were to accept the Defendant's submission that 'upon proof of the commission of the tortious acts alleged' in paragraph 20 of the Plaintiff's Statement of Claim, **'the conspiracy merges with the tort'** one simply could not decide whether this 'merger' had taken place without first deciding whether the Plaintiff had proved that the other tortious acts had been committed.

Page: 6

This brings me to the second difficulty I have with the Defendant's submission. It seems to me to be **totally inappropriate** on a motion to strike out a statement of claim to get into the question whether the Plaintiff's allegations concerning other nominate torts will be successful. This is a matter that should be considered at trial where evidence with respect to the other torts can be led and where a fully informed decision about the applicability of the tort of conspiracy can be made in the light of that evidence and the submissions of counsel. If the Plaintiff is successful with respect to the other nominate torts then the trial judge can consider the Defendant's arguments about the unavailability of the tort of conspiracy. If the Plaintiff is unsuccessful with respect to the other nominate torts then the trial judge can consider whether he might still succeed in conspiracy. Regardless of the outcome it seems to me to be inappropriate at this stage in the proceedings to reach a conclusion about the validity of the Defendant's claims about merger. I believe that this matter is also properly left for the consideration of the trial judge."

(Emphasis added)

However, Time Warner submits that the application can succeed in this particular case because of the authority found in *Elliott et al. v. Canadian Broadcasting Corporation et al.* (1993) 16 O.R. (3d) 677 (Ont. Gen. Div.) where Mr. Justice Montgomery struck a statement of claim. This was an action in liable and slander brought by the Plaintiff on behalf of 25,000 surviving members of Bomber Command for damages for defamation arising out the publication of film and book about the Bomber Command. Justice Montgomery said at pp. 691-692 in part as follows:

"Further, because there was publication of the words complained of the conspiracy and the tort merge, they planned to do something and they did it. ..."

He then goes on to quote from the extract of Lord Denning set out above and concludes at page 692 as follows:

"*Hunt v. Carrey, supra,* is distinguishable on the facts. There, the unlawful means to carry out the conspiracy differed from the tort and therefore the doctrine of merger did not apply. ...."

He then went on to strike that claim. With respect I have concluded that Justice Montgomery was wrong in the basis on which he distinguished the *Hunt* case, *supra*. In the *Hunt* case the argument was made that the doctrine of merger applied and I note again that the court said

Page: 7

> "... Regardless of the outcome, it seems to me inappropriate at this stage of the proceedings to reach a conclusion about the validity of the Defendant's claims about merger. I believe that this matter is also properly left for the consideration of the trial judge."

I understand the *Hunt* case, *supra*, to be saying that before trial the Court should not be striking out pleadings where merger is claimed by the Defendants. I consider myself bound by that expression of authority and I have concluded with respect to this part of the application that this is not the appropriate time to deal with this issue and accordingly this part of the application is dismissed.

### 3.    Request for particulars regarding the conspiracy to defraud

In *Petersen v. Highwood Distillers* (1998), 158 D.L.R.(4th) 569 the Alberta Court of Appeal decided that Rule 115 did not apply to conspiracy pleadings. This statement of claim and the Response For Further Particulars plead a conspiracy which is described as a "predominant purpose conspiracy" as that term is defined in *Canada Cement Lafarge Ltd. v. British Columbia Lightweight Aggregate Ltd* (1983), 145 D.L.R. (3d) 385 (S.C.C.). In an earlier decision made by me in this matter *Allarcom Pay Television Ltd. v. General Instrument Corp.* (1998) 58 A.L.R. (3d) 13, in reviewing this same conspiracy pleading I had found that Rule 115 did apply. Unfortunately I did not have the benefit of the Court of Appeal's decision in *Petersen, supra,* which was released the same day. I am satisfied that I am bound by the *Petersen* decision. This application at this time is dismissed. The particulars that have been provided at this stage of the action are sufficient.

### 4.    Motion to Strike the Aiding and Abetting Allegation

Time Warner asks that par. 22 of the Statement of Claim be struck out pursuant to Rule 129 because it discloses no cause of action. That paragraph reads as follows:

> 22. In the alternative the Defendants, or one or more of them, assisted, aided and abetted the decoding of their signals or the signals of other Defendants or third parties in the territory with the knowledge and intent that this would cause financial loss to and damage the goodwill and reputation of WIC. The losses and damage are continuing.

The pleading begins with the phrase "in the alternative" and it appears that the Plaintiffs are alleging that an independent tort of aiding and abetting the tort of intentional interference of economic relations took place. That is not an independent cause of action. In <u>The Law of Torts</u>

1999 ABQB 804 (CanLII)

Page: 8

(9th ed) (Carswell, Toronto: 1998) Fleming stated that the degree of participation that is required of an individual to become a joint tortfeasor is somewhat akin to aiding and abetting.  He said at p. 289:

> "While the requisite degree of participation has not been precisely defined in modern decisions, there is cogent support both in principle and ancient authority for the suggestion that it may well correspond with the description attached by the criminal law to principals in the first and second degree.  This would include, besides the actual perpetrator, anyone who 'aids and abets', whether or not he actively intervenes.  Knowingly assisting, encouraging or merely being present as a conspirator at the commission of the wrong would suffice.

The acts complained of in par. 22 are the subject of the same complaints in other paragraphs where the Defendants are alleged to be joint tortfeasors.  Counsel for the Plaintiff submitted that the aiding and abetting could be a separate tort because the Radio Communications Act RSC 1985 ch.R-2 in s. 18 allows a civil action to be brought for breach of the statute.  The Plaintiff is alleging breaches of sections of that Act.  Because breaches of the section of the Act could be considered quasi-criminal the aiding and abetting principle of the *Criminal Code* could apply.  I know of no such authority for that proposition and none was presented to me by counsel.  I am satisfied that in this particular case the test of "plain and obvious" has been satisfied and that this allegation does not disclose a cause of action known at law.  IN reading this decision I have considered the caution contained in *Fullowka v. Whitford* (#1) (1997) 147 D.L.R. (4th) 531 leave denied (1997) 147 D.L.R. (4th) 531n as applied in *Plas-Tex Canada Ltd. v. Dow Chemical of Canada Ltd.*(1998) A.J. 1107.  Accordingly it will be struck.

## 5.   Costs

The issue of costs was not addressed during argument.  If any party wishes to have the matter of costs dealt with they should advise the Court within 30 days of this decision.

**DATED** at Edmonton, Alberta this 27th day of October, 1999.

_____
**J.C.Q.B.A.**

**APPEARANCES:**

K. William McKenzie
G. Cheung

Page: 9

for WIC Premium Television Ltd.

T. J. Mallett
A.D. Little
        for Time Warner Entertainment Company, L.P.

J.K. McFadyen
D.C. Rolf
        for General Instrument Corporation,
        NextLevel Systems Delaware, Inc. and
        Showtime Networks, Inc.

A. Veylan
        for Corman Park Satellite

1999 ABQB 804 (CanLII)